UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA

UNITED STATES OF AMERICA,          .
                                   .
            Plaintiff,             .   CR No. 23-0257 (TSC)
                                   .
       v.                          .
                                   .
DONALD J. TRUMP                    .   Washington, D.C.
                                   .   Friday, August 11, 2023
            Defendant.             .   10:00 a.m.
. . . . . . . . . . . . . . . .

HEARING ON PROTECTIVE ORDER
BEFORE THE HONORABLE TANYA S. CHUTKAN
UNITED STATES DISTRICT JUDGE

<u>APPEARANCES</u>:

For the Government:            THOMAS WINDOM, ESQ.
                               MOLLY G. GASTON, ESQ.
                               U.S. Attorney's Office
                               601 D Street NW
                               Washington, DC 20530


For Defendant:                 JOHN F. LAURO, ESQ.
                               GREGORY M. SINGER, ESQ.
                               Lauro & Singer
                               400 North Tampa Street
                               15th Floor
                               Tampa, FL 33602

                               TODD BLANCHE, ESQ.
                               Blanche Law
                               99 Wall Street
                               New York, NY 10005

Court Reporter:                BRYAN A. WAYNE, RPR, CRR
                               U.S. Courthouse, Room 4704-A
                               333 Constitution Avenue NW
                               Washington, DC 20001


Proceedings reported by stenotype shorthand.
Transcript produced by computer-aided transcription.

<pre>
 1                      P R O C E E D I N G S

 2           THE DEPUTY CLERK:  Good morning, Your Honor.  This is

 3      Criminal Case No. 23-257, United States of America versus

 4      Donald J. Trump.

 5         Counsel, please approach the lectern and state your

 6      appearances for the record.

 7           MR. WINDOM:  Good morning, Your Honor.

 8           THE COURT:  Good morning.

 9           MR. WINDOM:  Thomas Windom and Molly Gaston for the

10      United States.  With us at counsel table is FBI Special Agent

11      Jamie Garman.

12           THE COURT:  Good morning.

13         Who will be speaking for the government this morning?

14           MR. WINDOM:  I will, Your Honor.

15           THE COURT:  All right.  Thank you.

16           MR. LAURO:  Good morning, Your Honor.  Nice to meet

17      you.

18           THE COURT:  Good morning.

19           MR. LAURO:  John Lauro on behalf of President Trump.

20      With me is Todd Blanche, my co-counsel, and also my partner,

21      Greg Singer.

22           THE COURT:  Good morning.

23         And who will be speaking for counsel this morning?

24           MR. LAURO:  I will.

25           THE COURT:  All right.  Just so you know, because we're
</pre>

1    going to be working through this, you all are free to remain

2    at counsel table and seated if you want, just as long as you

3    speak into the microphone so my court reporter can hear you.

4    Even if I can hear you, if you're not on the microphone, he

5    cannot, and he's got to keep the record.  So you're welcome

6    to stay at counsel table rather than hop up and down.  It's

7    totally up to you.

8         All right.  We are here for a hearing regarding the

9    parties' proposed protective orders in this case.  The

10   government has moved for imposition of a protective order in

11   ECF No. 10, which is frequently used in criminal cases to

12   ensure that certain information that the government shares

13   with the defense is not disclosed to the public.

14        The defense has objected to the government's initial

15   proposed order, and the government then proposed a second

16   order to which the defense also has objections.  The parties

17   have been unable to so far resolve those objections and reach

18   agreement on their own, and so I decided to schedule this

19   hearing to work through those objections one by one.

20        And I want to thank the parties for making themselves

21   available on such short notice.  I know initially I said

22   I wasn't available on Friday, and then I became available.

23   So I really appreciate that because, as you all know, the

24   government can't turn over discovery until there's a protective

25   order in place, and so it's imperative that this be resolved

1   promptly so that discovery can be disclosed and the case can

2   move forward in the regular order.

3       So a brief word about briefing schedules.  Under Local

4   Criminal Rule 47(b), a party may oppose a motion within 14 days

5   of the date of service or at such other time as the Court may

6   direct.

7       Likewise, under rule 47(d), the default deadline for replies

8   in support of a motion is seven days after service of the

9   memorandum in opposition; however, I routinely depart from the

10  default 14- and 7-day time limits, as do many of my colleagues,

11  when it serves the interest of justice and efficiency.

12      With respect to the government's pending motion, for

13  instance, I determined that a shorter briefing schedule deadline

14  was appropriate given the relative brevity of the proposed

15  protective order and the need to proceed with discovery in this

16  case.  There may well be other instances and times in this case

17  where my briefing schedule is shorter or longer than the one

18  prescribed in our local rule.

19      And so now I intend to resolve the parties' objections by

20  going through defendant's redline to the government's proposed

21  order one by one as they're set forth in ECF No. 14, which is

22  Exhibit A.  There's a few minor differences between A and B, but

23  I thought A best...

24      So I am prepared to rule immediately on some of the

25  revisions.  For others, I will have some questions.  I will have

some questions of counsel before I make my decision, and after this hearing it's my intention to issue a protective order consistent with today's rulings as quickly as possible.

So Federal Rule of Criminal Procedure 16(d) provides that at any time the court may, for good cause, deny, restrict, or defer discovery or inspection or grant other appropriate relief.

Under binding D.C. Circuit precedent in *United States v. Cordova*, 806 F.3d 1085, 1090, the burden of showing good cause is on the party seeking the order, and among the considerations to be taken into account by the court will be the safety of witnesses and others, a particular danger of perjury or witness intimidation, and the protection of information vital to national security.

Relatedly, I must also comply with what the Supreme Court has said is my affirmative constitutional duty to minimize the effects of prejudicial pretrial publicity, and that's from *Gannett Co. v. DePasquale*, 443 U.S. 368. The Supreme Court noted that after the commencement of the trial itself, inadmissible prejudicial information about a defendant can be kept from a jury by a variety of means. When such information is publicized before the trial, however, it may never be altogether kept from potential jurors.

As a result, the Supreme Court stated in *Alderman v. United States*, 394 U.S. 165, 185, that the trial court can and should, where appropriate, place a defendant and his counsel under

1    enforceable orders against unwarranted disclosure of materials

2    which they may be entitled to inspect.

3        Mr. Trump, like every American, has the First Amendment right

4    to free speech, but that right is not absolute.  In a criminal

5    case such as this one, a defendant's free speech is subject to

6    the release conditions imposed at arraignment and must also

7    yield to the orderly administration of justice, especially with

8    respect to disclosure of materials obtained in discovery.

9        Without a protective order, a party could reveal information

10   that would taint the potential jury pool, result in the

11   harassment or intimidation of witnesses or parties in the case,

12   or otherwise prevent a fair trial.

13       Accordingly, I'm going to review each disputed portion of the

14   proposed orders today to ensure that they are consistent with

15   the defendant's rights and the integrity of the judicial process

16   — in other words, that there is good cause for the order that

17   I'll issue.

18       So I want to begin with what is perhaps the parties' biggest

19   disagreement:  the scope of the protective order.  The

20   government proposes that the order govern all discovery material

21   that it turns over to the defense.  The defense proposes that

22   the order govern only the materials that the government

23   designates as sensitive.  This disagreement is reflected

24   throughout Defendant's Exhibit A, but the most relevant

25   paragraphs are paragraphs 1 and 2.

1      So here I have some questions for you, Mr. Windom.  In your

2   motion, you stated that there was good cause shown -- excuse

3   me -- that there was good cause for your proposal, and I quote,

4   "because issuance of the government's proposed order would

5   expedite the flow of discovery in this case, give the defendant

6   prompt access to a large portion of the discovery he ultimately

7   will receive, and protect the highly sensitive categories of

8   material."

9      But I don't see why those same goals wouldn't be served by

10   the defense proposal.  So can you explain why you think there

11   is good cause to cover all discovery materials rather than just

12   sensitive materials?  And I have a couple of follow-up.

13          MR. WINDOM:  Yes, Your Honor.  Thank you.

14      So that is the kind of larger philosophical difference

15   between the government's proposed order and the defendant's

16   proposed order.  The government wants the protective order

17   to cover all discovery.  The defense only wants it to cover

18   sensitive discovery.

19          THE COURT:  Right.

20          MR. WINDOM:  On this issue, in addition to the line

21   from our motion that you read, in the paragraph underneath

22   that it also talks about preventing the improper dissemination

23   or use of discovery materials including to the public.

24      So the larger basis here is that, under the government's

25   proposed order, it really follows three overlapping bases for

good cause.  The first one is to ensure that the purpose of
discovery is for the fair and efficient adjudication of the
court in the courtroom as opposed to in the public.

The second is that, consistent with the Advisory Committee
explanation for the purpose of the rule, it is to safeguard
witness security, to prevent intimidation of the witnesses, to
prevent harm to reputation or dignity of the witnesses, and to
prevent personal information from being released, in addition
to the third overlapping piece, which, as Your Honor noted, is
the Court's affirmative duty to prevent prejudicial pretrial
publicity.

Those are the overlapping three core objectives at which
our protective order is aimed and which is, in some respects,
different than what the defense has proposed.

The defendant's proposal specifically is tailored to permit
them to try this case in the media.  This is something that
Your Honor, in the Rule 57.7 hearing in the *Butina* case, noted
was an improper purpose, to try the case in the media.

Here, the defendant is asking for the Court's blessing to
be able to use criminal discovery for political purposes.
That is not a proper use of discovery.  And what is, I think,
telling is that the defendant's proposed order and the
defendant's arguments do not actually indicate any way in
which the government's proposed order hinders the defense's
use of discovery material in defense of this case in the

1    courtroom.

2         THE COURT:  I hate to interrupt you, Mr. Windom, but

3    all that may be so, but how is that explaining why all of this

4    material is both sensitive and nonsensitive?  So my question

5    really goes to what is the good cause shown for subjecting the

6    nonsensitive material to the order.

7         MR. WINDOM:  There is some sensitive material, a great

8    amount of sensitive material that we would designate, and

9    there's some nonsensitive as well.

10        THE COURT:  Right.  It's the nonsensitive I'm

11   interested in.

12        MR. WINDOM:  Yes, ma'am.

13     The nonsensitive falls within the exact same rubric that

14   I just laid out.  Even if it's nonsensitive, it still may be

15   inadmissible, it may still be irrelevant, but it may be

16   sensational.  It may be something that is used by the defense

17   or the defendant to pollute the jury pool, whether purposely

18   or not.

19     The information the defense has set forth, both in the

20   defendant's own posts and the defense counsel's statements on

21   the Sunday shows last weekend, the defendant has set forth an

22   intention to publicly disseminate any information that they

23   deem, quote, "informative" is what the defense counsel said.

24        THE COURT:  Well, defense has a First Amendment right

25   to -- within limits, to speak about the case.  What I'm

1    interested in is the Circuit says I have to enunciate good

2    cause for protecting information, and certainly there's no --

3    I don't see any problem with the sensitive information.

4        Well, let me ask you this:  What percentage of the

5    discovery, if you can just give me a rough estimate, is

6    nonsensitive?

7            MR. WINDOM:  Giving you an estimate, Your Honor?

8            THE COURT:  Yes.  You said a "small amount."

9            MR. WINDOM:  Yes, ma'am.  I would say that the vast

10   majority would be designated as sensitive within the

11   government's definition of "sensitivity."  Obviously, that's

12   an issue of dispute between the parties, but I would say the

13   vast majority.  It's hard to give a percentage, because some

14   of the discovery material may already be in the defendant's --

15   he may have the right to access that material otherwise.

16           THE COURT:  But that's the sensitive material.

17   Nonsensitive is what I'm focused on.

18           MR. WINDOM:  Yes, ma'am.

19       For the nonsensitive material that the government intends

20   to produce, there is some, obviously, nonsensitive material,

21   which is a fairly small amount.  Then there is another bucket

22   of material which may be up to a quarter of the government's

23   first production which we need to consult with defense counsel

24   on because the defendant may have the ability to actually

25   access that information other than us giving it to him.

1        THE COURT:  And would that be sensitive or nonsensitive

2    information under the definition as set forth in the protective

3    order?

4        MR. WINDOM:  Sure.  Under the definition, assuming that

5    the defense can affirm in writing that they otherwise are able

6    to access that information, we would not consider it

7    sensitive.  We're talking about information specifically from

8    the defendant's campaign entities or PAC entities.

9        THE COURT:  All right.  So if I understand what you're

10   saying, your position is it's even the nonsensitive information

11   could be used for witness intimidation or reputational damage

12   or -- I mean, if so, why wouldn't it be sensitive, I guess?

13        MR. WINDOM:  It would not be sensitive within the

14   definitions we have laid out, but it still could be produced

15   in discovery.  And then Your Honor mentioned the First

16   Amendment right.

17     As you know, and as you quoted from *Seattle Times*, there is

18   simply a different calculus when it is discovery that is used

19   in a judicial proceeding.  There is much less of a First

20   Amendment issue, and the only thing the court needs to look

21   for, as you've said, is the good cause standard.

22     So I would just go back to the three animating principles

23   they provide for protection for all of the discovery material

24   for the government, both sensitive and nonsensitive.  The main

25   thing is -- well, it's all important, but as Your Honor said,

1    there is the potential of damaging reputations of witnesses,

2    depending on what the nonsensitive information is.  It doesn't

3    simply need to include PII in or a witness's statement in

4    order to potentially damage the witness's reputation.

5        But secondly, the larger issue here is the defense has

6    broadcast their strategy; and that is not to try this case in

7    this courtroom, and the Court should address that with this

8    protective order.

9            THE COURT:  I intend to, but my task here is somewhat

10   narrower.

11           MR. WINDOM:  Sure.

12           THE COURT:  And it really focuses on how much -- you

13   know, I don't want this order to be overinclusive.

14           MR. WINDOM:  Yes, ma'am.

15           THE COURT:  In other words, I don't want to just

16   issue a blanket protective order over information that is

17   not sensitive.  But if you're talking about a small amount

18   relative to what's being turned over, or if you can enunciate

19   good cause, because that is what I have to find.

20       And, certainly, if I decide to have two categories and not

21   have the nonsensitive information subject to the protective

22   order, you can always go over the nonsensitive and consider if

23   you need to designate it as sensitive.  Isn't that right?

24           MR. WINDOM:  That is right.  I will put out an

25   additional implication for the fair and efficient

1    administration of this case and getting this case to trial,

2    which I think is an important consideration.

3            THE COURT:  Oh, I agree.

4            MR. WINDOM:  Should the Court -- the government has a

5    blanket approach.  The defense has the sensitivity designation

6    or not, or simply outside the protective order.  Should the

7    Court go with the defense's approach, I anticipate that there

8    will be never-ending battles over sensitivity designations,

9    and perhaps every week we might be before the Court in order

10   for the defense to raise an objection as to the government's

11   sensitivity designation.

12           THE COURT:  But if the amount of material you're

13   describing as nonsensitive is relatively small -- I mean,

14   I suspect we're going to be having disagreements about a lot

15   of things in this protective order, but if the nonsensitive

16   material you're describing is relatively small, that is a

17   limited amount of disagreement we could have, isn't it?

18           MR. WINDOM:  I think it's the flip, Your Honor.

19   Since the sensitive amount is so large, under the government's

20   order, if the government produces it in discovery, the defense

21   simply cannot use it on the weekend shows.  If the government --

22   if the Court goes to the defense's proposed order, then there

23   will be the squabbles over what is sensitive --

24           THE COURT:  Isn't that going to happen in any event?

25   If I go with your request and designate it all as sensitive,

1   can't the defense come to me through motion and say, we

2   believe this document is not sensitive?  Isn't that going to

3   be the case anyway?

4          MR. WINDOM:  The defense could do that, Your Honor, but

5   it would still be covered under the protective order and would

6   not be permitted to be publicly disseminated.

7          THE COURT:  Until I ruled otherwise.

8          MR. WINDOM:  Unless you ruled otherwise under paragraph

9   16 of our proposed protective order.

10         THE COURT:  Okay.

11         MR. WINDOM:  The other thing to consider here that the

12  government will attempt to lay out, this is a decision today

13  to address what the Court sees as good cause and the best

14  interest of this case and the fair administration of justice.

15  Should it prove unworkable for some reason, paragraph 13

16  permits a modification; paragraph 16 permits document-specific

17  adjudication by the Court.

18     So, for those reasons, the ones that we've set forth as our

19  animating principles for all discovery, sensitive or not, and

20  the potential for what the government believes to be endless

21  litigation over sensitivity designation — so it's whether it's

22  in or outside of a protective order — the government believes

23  that the Court should enter our proposed protective order.

24         THE COURT:  Thank you, Mr. Windom.

25     Mr. Lauro?

1           MR. LAURO:  Yes, Your Honor.

2        I think you hit the nail on the head.

3           THE COURT:  That may be the last time you say this

4     for a while.

5        (Laughter)

6           MR. LAURO:  I doubt it, Your Honor.

7        But truly, this kind of blanket order is extraordinary.

8     The government has the ability to separate out sensitive and

9     nonsensitive information.  We have to face the fact that we

10    are in uncharted waters here, where we have a presidential

11    candidate running for office, and his opponent has the Justice

12    Department bringing criminal charges against him.  And in this

13    situation, certainly President Trump has the right to respond

14    and speak about these issues.

15        What we're asking for is for the government to show good

16    cause as Your Honor has designated those items under Rule 16

17    as well as the case law.  Extrajudicial speech, or public

18    speech, is not one of the good-cause factors Your Honor

19    described.

20           THE COURT:  It is a good-cause factor if that

21    extrajudicial speech causes witness intimidation or harassment

22    or interferes with -- I mean, it must always yield.  And so

23    what the defendant is currently doing -- you know, the fact

24    that he's running a political campaign currently has to yield

25    to the orderly administration of justice.  And if that means

1    that he can't say exactly what he wants to say about people

2    who may be witnesses in this case, that's how it's going to

3    have to be.

4         MR. LAURO:  And that's a different issue, though, than

5    a Rule 16 protective order, I believe, because --

6         THE COURT:  But isn't a protective order under Rule 16

7    designed to protect the harassment or intimidation of witnesses

8    or the dissemination of information that is sensitive?

9         MR. LAURO:  Sure.  It's directed if there is some

10   cognizable harm or identifiable harm to a particular witness

11   or an issue of perjury.  Here we don't have that.

12        THE COURT:  Well, Mr. Lauro, what about talking about

13   a potential witness to a nationwide, or potential worldwide,

14   audience and denigrating that witness?  Isn't that the kind

15   of -- isn't that the kind of situation that the protective

16   order is designed and Rule 16 is designed to prevent?

17        MR. LAURO:  Your Honor, you may have Mr. Pence in mind?

18   Is that your concern?

19        THE COURT:  Any witness.

20        MR. LAURO:  All right.  Well, obviously, on the

21   campaign trail, since the prosecutors decided to bring this

22   case in the middle of the campaign, President Trump has the

23   ability to respond fairly to political opponents, and that's

24   the problem with the way this order is structured.

25        THE COURT:  The defendant's desire to conduct a

1       campaign, to respond to political opponents has to yield.  Do

2       you disagree with that, that there are limits regardless of

3       what is going on in -- you know, I hate to say -- his day job?

4          I mean, this is a criminal case.  The need for this

5       criminal case to proceed in the normal order and protect

6       witnesses and the integrity of the process means that there

7       are going to be limits on the defendant's speech.

8          MR. LAURO:  I can assure you that my client will abide

9       by the integrity of the process, but he also can't be subject

10      to some kind of a contempt trap, which this really is.

11         THE COURT:  I think you're going -- I mean, nobody's

12      talked about contempt.  What we're talking about now are the

13      parameters of this order, and the parameters of the order that

14      we're all considering means that there are certain things, if

15      they have an impact on the administration of justice or on

16      witnesses, can't be said regardless of what endeavors the

17      defendant is currently engaged in.

18         MR. LAURO:  No one disagrees that any speech that

19      intimidates a witness would be covered by this order and

20      prohibited.  What we're talking about, though, is the fair use

21      of information.  For example, if my client has a memory of a

22      certain event that occurred and wants to speak publicly about

23      it in the course of a campaign, he's certainly entitled to do

24      that.

25         THE COURT:  Not if that memory ends up containing

1    information that would intimidate a witness.  It always has to

2    yield to the fact that there are pretrial release conditions

3    and a protective order will be in place.

4    MR. LAURO:  And he'll abide by that, obviously, and

5    has abided by it.  But my concern here is that the first

6    obligation is on the government, under Rule 16, to establish

7    what's sensitive and what's not sensitive.

8    THE COURT:  So let's go back to that, because we're

9    kind of painting with a very broad brush here.  Let's go back

10   to the designation.

11   Is it your position that with regard to the nonsensitive

12   information, that your client can say whatever he wants to say

13   about the nonsensitive information?

14   MR. LAURO:  No.  Subject to the limitations that

15   you've described, he has to abide by the rules of this court.

16   Certainly, he has First Amendment rights, but in no way am I

17   suggesting that any client could ever intimidate a witness or

18   use that information.  But we are in the middle of a campaign,

19   and the way this order is structured, it would provide an

20   enormous advantage to President Biden in the middle of a

21   campaign, and that's my concern.  It really --

22   THE COURT:  What the effects of my order are on a

23   political campaign are not before me and are not going to

24   influence my decision here.  This is a criminal trial.  This

25   is going to be a criminal trial brought at the time that the

1   government decided to bring the charges and they decided they

2   were ready to bring charges.  I don't have any control over

3   that.  But I cannot, and I will not, factor into my decisions

4   the effect it's going to have on a political campaign for

5   either side.

6           MR. LAURO:  Although, Your Honor, one of the good-cause

7   factors requires you to do the balancing that you described.

8           THE COURT:  Of course.

9           MR. LAURO:  And one of those is the impact on the

10  defendant when you enter this order, and I think, as a result

11  of that, the Court has to balance the factor and the impact on

12  a defendant --

13          THE COURT:  Mr. Lauro, your client has not seemed to

14  have had any trouble talking about the prosecution of this

15  case for some time and the investigation that he's been under

16  for some time, and the protective order, in many ways, would

17  not infringe on his right to talk about that.

18          MR. LAURO:  And then we have no problem, if he can

19  speak the way he's been speaking.

20          THE COURT:  So let's go back to the sensitive versus

21  nonsensitive designation.  What would be the burden on the

22  defense if I designated all materials, sensitive and

23  nonsensitive, as subject to the protective order, to the

24  defense simply moving to exempt certain documents?  I mean,

25  I suspect we're going to be dealing with discovery disputes

1    occasionally.

2         MR. LAURO:  It would be a massive burden, Your Honor.

3         THE COURT:  Tell me how.

4         MR. LAURO:  Especially when they can designate

5    sensitive versus nonsensitive information.  We looked at all

6    the Rule 16 orders that have been added on J6 cases.  We

7    haven't seen a single one that resembles this type of order

8    in terms of breadth.  I'll give you a practical example.

9      They designate all examples of testimony or interviews or

10   videos as being sensitive, and they require us, as counsel, to

11   sit with our client in the same room while our client reviews

12   that material.

13        THE COURT:  I'm going to get to that.

14        MR. LAURO:  Okay.

15        THE COURT:  I'm going to get to that.

16        MR. LAURO:  But that's just one example of how

17   over-burdensome that is.  And the other issue is --

18        THE COURT:  But that material is already designated

19   as sensitive.  I'm not inclined -- I'm not hearing a request

20   to say that that material is not included in the sensitive

21   designation.  What I'm talking about is the nonsensitive.

22   In other words, are you saying that those witness interviews

23   should not be designated as sensitive?

24        MR. LAURO:  Absolutely they should not be designated --

25        THE COURT:  Okay.  I'm going to get to that.

1        MR. LAURO:  -- unless the government can come up with

2    good cause as to why.  But I think, as you've seen under Rule

3    16 in your experience and the orders that you've entered, the

4    burden should be on the government --

5        THE COURT:  It is.

6        MR. LAURO:  -- first to designate what's sensitive and

7    what's not sensitive.  The nonsensitive material is subject to

8    the regular rules of the Court that we all have to abide by in

9    terms of what we can say and what we can't say about it.

10   But that nonsensitive information should not restrict,

11   under the Sixth Amendment, our ability to represent our client

12   and our ability to have an opportunity to discuss these issues

13   with our client, but also not be required to sit in the same

14   room as we go over a massive amount of documents in this case.

15       THE COURT:  Well, again, I'll get to that.

16       MR. LAURO:  I know we'll get to that.  But, really,

17   the burden is on the government under Rule 16, and here

18   they're trying to switch it.  They're trying to say the burden

19   is on President Trump's team when it's not.  It really has to

20   be something that the government has to go through and provide

21   good cause.  These kinds of blanket orders really present an

22   enormous problem here as well because of the ambiguity in this

23   order.

24   The risk is that someone can say something in the course of

25   a heated debate or heated campaign, and they're going to throw

1     a flag and say, No, wait a minute, somewhere in the bowels

2     of discovery there was something that mentioned what you

3     just said, and therefore you're in violation of this order.

4     And then we're off to the political spectacle of President

5     Trump in violation of the order.  All of this, Your Honor,

6     unfortunately, has to be understood in context under the

7     microscope of how the government decided to proceed.

8         And I will say one other thing.  Everything that we do

9     here now is under a microscope -- a political microscope,

10    unfortunately -- because of the result of what the government

11    has done.  And I understand our requirement, and we will obey

12    Your Honor's direction 100 percent --

13            THE COURT:  I'm glad to hear that.

14            MR. LAURO:  -- and not ever deviate from what Your

15    Honor directs us to do.  But there has to be fair play here.

16    All we're asking for is fairness in terms of how we handle

17    this discovery.  We don't even know the magnitude of the

18    discovery yet.  They haven't even described it for us.  Is it

19    one terabyte?  Is it three terabytes?

20        But the bottom line is we need something that's workable,

21    that isn't ambiguous, that doesn't intrude on the attorney-

22    client privilege, that affords my client the due process

23    rights that he's entitled to in the context of a campaign.

24    We can't ignore the fact that it's a campaign.

25            THE COURT:  I intend to ensure your client is afforded

1   all the rights he's entitled to.  I reiterate that the

2   existence of a political campaign is not going to have any

3   bearing on my decision other than, you know, any other lawyer

4   coming before me saying that my client needs to be able to do

5   his job.  I will always, obviously, factor it in, but I intend

6   to keep politics out of this.

7       And, Mr. Windom, since you have the burden, I'm going to

8   let you to respond to Mr. Lauro.

9       Did I cut you off?

10          MR. LAURO:  No.  Absolutely not.

11      Your Honor, just in sum, the factors that are at issue

12   here is whether or not the government can show good cause

13   with respect to witness intimidation or perjury.  We'll put

14   national security aside because there's no question, no issue

15   there.  But they haven't done that yet.  They haven't done

16   that in terms of any cognizable or nonspeculative harm that

17   exists.

18          THE COURT:  As to the nonsensitive.

19          MR. LAURO:  Exactly.

20          THE COURT:  I keep trying to come back to the paragraph.

21          MR. LAURO:  I understand your difference.  And, Your

22   Honor, that's our difference.  That's why we wanted the order

23   to separate out sensitive from nonsensitive and put the burden

24   on the prosecutor to come up with what's sensitive at an

25   initial blush.

1    Now, if they put something in the sensitive bucket, we can

2    argue that it shouldn't be.  But in fairness, they should have

3    the first obligation to do that and not have this blanket

4    assertion.

5    And one other point that I need to make on paragraph 1

6    before I forget, if I may, Your Honor, it says, "The order

7    does not apply to records," and we should add "or information."

8    "Records or information."  Because that covers the *Seattle*

9    *Times* issue where a client who is subject to a protective

10   order may have some information from prior that's not

11   connected to the discovery process.

12        THE COURT:  Well, isn't that covered by another

13   paragraph?

14        MR. LAURO:  It's not, really, and we just wanted to

15   make that clear in paragraph 1.

16        THE COURT:  Okay.

17        MR. LAURO:  But I think Your Honor knows our concerns

18   in terms of a blanket order.  We think it's much more

19   practical and much more in accordance with the way that this

20   Court has handled these orders, is to have the burden on the

21   government at first issue.

22        THE COURT:  Well, they always bear the burden when they

23   move for the order.  So I'll hear from Mr. Windom in response,

24   and then I'll rule.

25        MR. LAURO:  Yes.

1          MR. WINDOM:  Thank you, Your Honor.

2      The government is happy to accept its mandates to bear

3      the burden for good cause here.  The defense counsel's made a

4      bunch of comments that are obviously political in nature here

5      in this courtroom.  I'm not going to address those.

6      What I will say is that it is emblematic of what the

7      defendant has done even more recently, since we filed a week

8      ago, in posting things about potential witnesses in the case.

9      Counsel also has made no secret about what his intention is.

10     The good cause here is in order to, among what I already have

11     said, to prevent pollution of the jury.

12         THE COURT:  I really want you to focus -- I mean, we're

13     just -- this is the first thing.  We have a number of things

14     to discuss, and I really want you to focus on the sensitive

15     versus nonsensitive difference and whether it should all be

16     subject to the order.

17         MR. WINDOM:  Yes, ma'am.  And the government's aim here

18     is to prevent the use of any material produced in discovery

19     for purposes of harming the jury pool, whether it's sensitive,

20     whether it's nonsensitive.  The aims control, the objectives

21     control, regardless of the designation.

22         THE COURT:  I agree.  But you still have to show good

23     cause for the nonsensitive.  That's really what I'm trying to

24     home in on.

25         MR. WINDOM:  Yes, ma'am.  And I cannot be more specific

1   than they have identified what they intend to do with it.

2   Even if it is nonsensitive material, it still has the

3   potential to pollute the jury pool.  It still has the

4   potential to intimidate witnesses, to damage witness

5   reputation.

6        And I would say that this is not -- the defense has said

7   this is some sort of extreme thing that the government's

8   reaching for here.  The defense agreed to these same

9   protections in the Southern District of Florida not two months

10  ago.  The Court has entered an order with the same broad brush

11  of covering all discovery in the *Butina* case in addition to

12  the handful of cases that the government mentioned here in its

13  brief.

14       THE COURT:  I think the differences with the *Butina*

15  case, which now seems so small and quiet, is that there was

16  no argument from the defense there that the defendant in that

17  case needed to speak, and we have a different situation.  As I

18  said to Mr. Lauro, the fact that there's a political campaign

19  going on is not going to influence my decision one way or the

20  other.  But I do have to weigh the defendant's -- all

21  limitations on a defendant's First Amendment rights.

22       And I would point out that even without the protective

23  order, the defendant is -- Mr. Trump is subject to pretrial

24  release conditions, which also prevent him from interfering

25  with the orderly administration of justice and engaging in

1    behavior that could harass or intimidate a witness, because

2    the release conditions are also there.

3         MR. WINDOM:  That's also correct.  What the protective

4    order does is to prevent -- is to limit the amount of

5    information and data that the defendant would be able to use

6    in the event he wants to go after a potential witness.

7         THE COURT:  And so the statement that you used where

8    the defendant posted something about the former vice

9    president, for example, that's not really -- that really

10   wouldn't be covered, right, because that's not really

11   information.  That's covered under his conditions of release.

12     Isn't that right?  I mean that's not from information that

13   would be turned over in discovery.  That's behavior that may

14   be affecting his conditions of release but not really

15   implicated on the protective order.

16        MR. WINDOM:  That's correct.  However, once the

17   defendant receives discovery, if he says something that

18   clearly he got from a transcript or from another document --

19        THE COURT:  Well, we'll get to it, but a transcript

20   may be designated as sensitive, so it's subject to the order.

21   I'm really trying to determine if I need to subject the

22   nonsensitive information to the order, and that's where I keep

23   getting a lot of broad arguments.  But I'm not --

24        MR. WINDOM:  Sure.  And it's a little hard to speak in

25   the abstract, which is why --

1          THE COURT:  I know.

2          MR. WINDOM:  In addition to the overriding principles

3     that the government has laid out, I guess I would say two

4     other things.

5          First, in paragraph 1 of the proposed protective order, the

6     government's order is appropriately limited.  It does exempt

7     information that is public.  It does exempt information that

8     the defendant or defense counsel come into possession of by

9     independent means unrelated to the discovery process.

10         So we are talking about -- in terms of the nonsensitive

11    versus sensitive, we're talking about a relatively small

12    percentage of discovery.  But nonetheless, the concern is that

13    the defendant will still use that in order to affect the fair

14    administration of justice to the extent that there is -- once

15    we get the ability to be more granular, once discovery is

16    produced, to the extent that there is an issue where there is

17    a strong defense reason to rebut the government's good cause

18    that we have set forth, the defense can come back to the Court.

19         THE COURT:  All right.  Thank you.

20         MR. WINDOM:  Thank you, Your Honor.

21         THE COURT:  It is close.  But as I said, there are

22    release conditions, and the government has an opportunity to,

23    before turning over discovery once the protective order is

24    issued, to go over its materials and add sensitive

25    designations.

1      So, at this point, I am not persuaded that the government

2      has shown good cause to subject to the protective order all

3      the information in this case, and therefore I will adopt the

4      defense'S revised scope.  The protective order will govern

5      only materials that the government designates as sensitive.

6      At this stage, as I said, I haven't -- I'm not persuaded.

7      I will tell you, Mr. Lauro, that as I just said to

8      Mr. Windom, the defendant is also covered by conditions of

9      release, and all his behavior and statements are governed by

10     those conditions of release.

11     So, regardless of whether statements are made that are

12     derived from the discovery or not, if they are made and they

13     have an effect on the administration of justice or have the

14     effect of intimidating or causing harassment to a witness, I

15     will be scrutinizing them very carefully.

16     All right.  The remainder of the disputes about the

17     protective order are largely confined to the defense's

18     discrete edits in the particular paragraphs.  So, as I said,

19     I'm going to go through them in sequence as they appear in

20     Exhibit A to defendant's opposition brief in ECF No. 14,

21     beginning with paragraph 1.

22     I cannot accept the defense's edit that would exempt from

23     the protective order any records that -- and I guess you

24     would -- that would exempt from the protective order any

25     records that, in quotes, "become publicly available."

1    Discovery materials could become publicly available through

2    any number of ways, some improper.  I am not willing to

3    automatically allow the parties to disclose or confirm any

4    materials just because, for instance, someone else manages to

5    access and disseminate that information.  So I'm not going to

6    go for that edit, and the government language will stay.

7    Instead, I will retain the government's proposed language

8    which exempts only records that are publicly available

9    independent of the government's production.  If certain

10   records that are not publicly available now become so during

11   the course of these proceedings, the defense may move to

12   modify the protective order to exempt them.

13   Next we move to paragraph -- we're still in paragraph 1.

14   I also cannot agree to the defense's other proposed edit to

15   paragraph 1 which would exempt records which the defense came

16   into possession by means other than government production.

17   As the government points out in its reply, that would allow

18   the defense to subpoena sensitive information learned through

19   discovery and then disseminate those materials, and I don't

20   want that to happen.  So I will therefore retain the

21   government's proposed language which exempts only records that

22   the defense obtains by independent means unrelated to the

23   discovery process.  I move now to paragraph 3.

24         MR. LAURO:  Your Honor, if I may?

25         THE COURT:  Yes.

1        MR. LAURO:  I don't mean to interrupt.

2    Will the Court adopt our request that it should be "records

3    or information" to cover the *Seattle Times* issue?

4        THE COURT:  In paragraph 1?

5        MR. LAURO:  In paragraph 1, yes.

6        THE COURT:  Mr. Windom?

7        MR. WINDOM:  The government has no objection to that,

8    Your Honor.

9        THE COURT:  I will.

10       MR. LAURO:  Thank you, Your Honor.

11       THE COURT:  Okay.  Paragraph 3.  The defense proposes

12   broadening the definition of authorized persons who can view

13   the protected materials to include not only persons employed

14   to assist the defense, but also to any persons assisting the

15   defense in any capacity, and I quote, "including any attorneys,

16   investigators, paralegals, support staff, consultants, or expert

17   witnesses who are advising or assisting defense counsel."

18   I am not comfortable with that broad a definition which

19   could include just about anyone and would significantly

20   heighten the risk of unauthorized disclosure.  So I'm not

21   going to alter that definition.  I do note, however, that the

22   parties' briefing suggested that the defense might be amenable

23   to drafting a narrower definition to which the parties could

24   agree.

25       Did you have a proposed alternative, Mr. Lauro?

1          MR. LAURO:  We could submit one, Your Honor.  Yes.

2          THE COURT:  And, obviously, submit it to the government

3     first because, to the extent that there's anything that is

4     unopposed, I'm going to treat it much more quickly than I

5     would if it's opposed.  So I would appreciate it if you would

6     do that.

7          MR. LAURO:  Your Honor, may I speak to that issue,

8     though?

9          THE COURT:  Yes.

10         MR. LAURO:  I'm assuming and want to represent to the

11    Court that anyone on our team who has access to any discovery

12    will be given a copy of this order, and we will require them

13    to abide.

14         THE COURT:  Actually, I'm going to get to it, but I'm

15    going to add a provision that neither party had mentioned,

16    that they sign a document.

17         MR. LAURO:  Yes.  And we understand that.

18      But one thing we want to be able to do, obviously, is as we

19    build our team with this incredibly large case, to be able to

20    have, you know, consultants and others who are working under

21    our direction or with us, including in some instances people

22    who volunteered to be volunteer lawyers and volunteer

23    paralegals to assist us.  They'll all be subject to this rule

24    and subject to Your Honor's order.

25      This is a massive case, and it's impossible to get ready

1     under the terms that the government is seeking, which is

2     in early January, without the kind of staff -- the special

3     counsel, as I understand it, has over 60 lawyers and

4     investigators working on this.  We have a relatively small

5     group here.

6          THE COURT:  I understand.

7          MR. LAURO:  And it's an impossible task unless we're

8     able to enlist the help of people who are willing to abide by

9     Your Honor's ruling, abide by this order, abide by the rules

10    of the court, but who want to provide assistance.  In order

11    for us to defend this case, we have to have more help and more

12    manpower beyond just the lawyers working on it.

13         THE COURT:  I understand that.  And no one is more

14    aware than I that you and your team are defending Mr. Trump

15    in more than one jurisdiction at the same time.  I'm aware

16    of that.  Notwithstanding that fact, and the need for you

17    to obtain assistance, there's a process.  I cannot accept a

18    definition that would basically let anyone, including, I might

19    note, individuals who may be unindicted co-conspirators, to

20    assist and to have access to this material without leave of

21    court.

22       If there is a lawyer or legal personnel, you know, a

23    paralegal or lawyer or consultant that you want to have assist

24    you, then that person needs to fit the definition and be

25    subject to the protective order, and the definition you have

1   currently is simply too broad.  It allows just about anybody --

2   you know.  I live in Washington.  Everyone is a consultant.

3       (Laughter)

4       MR. LAURO:  That may be, Your Honor, but not anyone

5   would be operating under the direction of counsel and subject

6   to the order.  And if the government would like, they can give

7   us a list of co-conspirators.  Obviously, we would --

8       THE COURT:  I'm sure you would like that, but I don't

9   think they're ready for that yet.

10      MR. LAURO:  Yeah, we can exclude those.  But to

11  basically disable us from having consultants or volunteer

12  lawyers working on the case would hamstring us in an

13  incredible way.  In every large case I've had, and I'm sure

14  Your Honor has had, there have been consultants, trial

15  consultants, third parties that assist in the accumulation

16  and processing of documents --

17      THE COURT:  But those people are usually employed by

18  the defense.  They are people who are subject to, you know,

19  all -- they're officers of the court.  They are people who are

20  subject not only to your supervision, but they must abide by

21  the rules of this case.

22    But volunteers?  I mean, you're asking for such a broad

23  definition that it makes me very concerned, and I just cannot

24  have it this open-ended and this broad a definition.

25      MR. LAURO:  These outside consultants are often

1   employed by the client, or paid by the client.  They're under

2   my supervision, but I don't pay all the consultants.

3       THE COURT:  The payment is less troubling to me than

4   the broadness of the definition.  I mean, I hear you and I

5   understand your need to have assistance, but that -- I think

6   allowing your definition would basically allow almost anyone

7   to just sort of come in, and it would increase the chance and

8   the possibility that information subject to the protective

9   order would be improperly disseminated.  But I'll hear

10  Mr. Windom on this.

11      MR. LAURO:  And, Your Honor, if we could submit,

12  perhaps, alternative language.  But I just want to make clear

13  that anybody who sees any discovery in this case, it will be

14  at my direction and co-counsel's direction.  It will not be

15  done in a haphazard --

16      THE COURT:  Anybody who sees any discovery in this case

17  has to sign a document indicating that they understand and are

18  bound by the protective order.

19      MR. LAURO:  We're fine with that, Your Honor.

20      THE COURT:  Okay.  Well, I'm not going to accept the

21  language as you proposed.  As with this order, it is subject

22  to modification.  If there's alternative language that you

23  want to meet and confer with the government about, I'll hear

24  you further down.  But as it stands right now, I am not going

25  to -- I'm going to leave the government language in.  I'm not

1   going to change it to the language that you propose, at least

2   in your motion.  Mr. Windom?

3               MR. WINDOM:  I don't need to be heard, Your Honor.

4               THE COURT:  Sometimes it's good to just -- yeah, move

5   on.  All right.

6         Paragraph 4, which is the exception for generalized mental

7   impressions.  The government does not object to the defense's

8   proposed exception to paragraph 4 for generalized mental

9   impression, so I will accept it.

10         With regard to paragraph 5, agreement in writing, I will

11   make one minor edit, as I said, that has not been requested by

12   either side, which paragraph 5 provides, that all authorized

13   persons must be provided with a copy of the protective order

14   and agree to abide by it.  And I am going to add that such

15   agreement must be in writing.

16         Paragraph 6, exception for work products, etc.  The

17   government does not object to the defense-proposed exception

18   to paragraph 6 for work product, notes, or other documents

19   reflecting the content of protected materials.  And I agree

20   that that edit is appropriate, so I will accept it.

21         In paragraph 7, the defense proposes a similar exemption

22   from the protective order for any records that become publicly

23   available.  For the reasons I discussed earlier, I will not

24   add that language here.  So that I will not add that edit, and

25   that is for the reasons that I discussed in the information

1    that may become publicly available.

2       So next paragraph, 8(e).  The defense proposes two changes

3    to the definition of sensitive materials in paragraph 8.

4    In paragraph 8(e), they replace "recordings, transcripts,

5    interview reports, and related exhibits of witness interviews"

6    with "information regarding the government's confidential

7    sources or which may jeopardize witness security."

8       The government states that the defense definition would allow

9    disclosure of discovery transcripts and audio recordings of

10   witness interviews conducted outside of the grand jury process.

11      Let me ask you, Mr. Windom, the transcripts and audio

12   recordings that you're concerned about that are not from

13   confidential sources -- well, are the transcripts and audio

14   recordings that you're concerned about not from confidential

15   sources?  Because if they are, wouldn't they be covered by

16   the defense's proposed language?

17            MR. WINDOM:  They would be covered by the defendant's

18   proposed language, but let me give you a sense as to what

19   we're talking about.

20            THE COURT:  Okay.

21            MR. WINDOM:  During the course of this investigation,

22   it was the government's general practice to audio record

23   witness interviews conducted outside of the grand jury.  Those

24   fall into interviews that occurred in preparation for grand

25   jury.  They fall into separate interviews conducted outside of

1    the local area.  They fall into interviews that occurred at

2    our office.  There are hundreds of recordings of witness

3    interviews.

4        What is or is not a confidential source, it's hard to say

5    when you're simply talking about a percipient fact witness,

6    for example, to the defendant's criminal conduct.  Our

7    approach is much cleaner.

8        It will prevent -- it is the functional equivalent of a

9    grand jury transcript taken outside of a grand jury setting,

10   and what it will prevent is what defense has forecast it's

11   going to do.  It will prevent the defendant from putting a

12   post out and attaching a three-second snippet of an audio

13   recording.  It will prevent the defendant from putting out a

14   Metro billboard with a quote or sending out a mass mailer

15   targeted to the D.C. jury pool.  It will prevent the defense

16   from systematically and scientifically generating the grounds

17   for a Rule 26 motion for change of venue.  It will prevent the

18   pollution of the jury pool.

19       That is the import of the government's proposed order with

20   respect to that subparagraph.

21           THE COURT:  Are there other materials you're concerned

22   that the defense's proposed language would exclude?

23           MR. WINDOM:  So the government's proposed language

24   covers all of the transcripts and recordings.  The defendant's

25   proposed language, we would construe it broadly.  We would

1    have to designate all of those transcripts should the Court

2    decide to go with the defense here.  But I anticipate that

3    it would result in protracted weekly litigation over which

4    sentence of which transcript that the defendant finds

5    favorable that it wants to put out, you know, on the Sunday

6    shows or put through a surrogate.  Ours is much cleaner and

7    straightforward and more efficient for this court.

8              THE COURT:  Okay.  Mr. Lauro?

9              MR. LAURO:  Yes, Your Honor.  Once again, it's too

10   broad of a brush.  For example, let's assume the government

11   has obtained information, a transcript that came about during

12   the J6 committee -- assuming that they haven't destroyed it --

13   and in the course of that, the government has that discovery.

14   It's a transcript.  It was never intended to be confidential.

15   For whatever reason, the J6 committee did not decide to

16   release it, but there never was any degree of confidentiality

17   attached to it.

18       That clearly should not be designated as sensitive

19   information, particularly if it contains *Brady* or *Giglio*

20   material that would be very important to President Trump in

21   terms of his defense and in terms of the -- you know, the

22   wider scope of what he has to do to defend himself publicly.

23             THE COURT:  But, again, you're sort of conflating what

24   your client needs to do to defend himself and what your client

25   wants to do politically, and your client's defense is supposed

 1    to happen in this courtroom, not, you know, on the internet.

 2            MR. LAURO:  Well, and here's --

 3            THE COURT:  And to the extent your client wants to,

 4    you know, make statements on the internet, they have to always

 5    yield to witness security, witness safety.  And that's what

 6    I'm concerned about.  The subcommittee may not have designated

 7    those transcripts as confidential, but you start releasing

 8    snippets of witness interview transcripts, what do you think

 9    is going to happen to those witnesses?

10            MR. LAURO:  The problem is, Your Honor, the way that

11    this is drafted, if President Trump talks about something

12    relating to that witness and it happens to be in a transcript,

13    then they throw the red flag and they say there's been a

14    violation.

15            THE COURT:  Well, I'm finding it very difficult to

16    envision the former president of the United States engaged in

17    a political campaign talking about potential witnesses who may

18    not have, you know, the kinds of protection that he has.  I

19    mean, I could see the possibility for a lot of problems here.

20      I'm not sure what right -- I mean, your client retains, as

21    I said in the beginning, a First Amendment right.  But I can

22    see how, in advance of trial, making public statements about

23    potential witnesses is going to, in and of itself, affect the

24    orderly administration of justice and, Mr. Lauro, could run

25    afoul of his release conditions.  So the example you're giving

1    me is not helping.  It's actually causing me some concern.

2          MR. LAURO:  And I understand your concern, Your Honor.

3    And President Trump will scrupulously abide by his conditions

4    of release, and we will do everything to ensure that that

5    happens, and it will happen.  But let's take one example.

6        Vice President Pence is a political opponent now in a

7    campaign, and there's going to be an exchange between the

8    two of them.  There's going to be arguments back and forth.

9    And if, in one of President Trump's statements, it happens to

10   overlap with something that's in discovery that's included in

11   this definition, we suddenly have a problem.

12       And the other thing, Your Honor, respectfully, is President

13   Trump, in the middle of a campaign, should not have that chill

14   over him in terms of the way that he campaigns and advocates

15   for his position.

16         THE COURT:  He is a criminal defendant.  He's going to

17   have restrictions like every single other defendant.  This

18   case is proceeding in the normal order.  I know there are

19   obviously security concerns, and there are many, many concerns

20   that we all have because of the unusual nature of this case,

21   but the fact that the defendant is engaged in a political

22   campaign is not going to allow him any greater or lesser

23   latitude than any defendant in a criminal case.

24         MR. LAURO:  We understand that, absolutely.  But the

25   problem is, the way that this order is written by the

1    government, it paints too broadly.  All we're asking for

2    is more specificity, particularly with respect to sensitive

3    information that the government can designate with some

4    particularity and have a reason for.

5        Simply saying a transcript is sensitive, that's not enough

6    under Your Honor's original determination, because there's no

7    good cause to identify that particular transcript as

8    sensitive.  Once again, we have to go back to the government

9    showing good cause why it's sensitive and why it should be

10   protected.  That's all we're asking for.

11       THE COURT:  Well, what I did in the beginning was

12   agree with you that the government has to show good cause here

13   for why certain materials should be covered by the protective

14   order and shouldn't, and I agreed with you that, as to the

15   nonsensitive information, it would not be covered.

16       But now we're talking about what can be designated as

17   sensitive, and I have to tell you, so far I'm not being

18   persuaded by your argument that witness transcripts or

19   recordings of witness interviews shouldn't be sensitive for

20   the reasons I have concern, and the examples you're giving me

21   are not comforting.  But I'll hear from Mr. Windom on this.

22       MR. LAURO:  If I may say one last thing, Your Honor,

23   respectfully.

24       THE COURT:  Yes.

25       MR. LAURO:  I think the government can easily identify

1    what they believe are sensitive transcripts, videos and so

2    forth, and have some basis for making that argument based on

3    Your Honor's order here.  That's something that they're

4    capable of doing.  Rather than having this broad category, all

5    we're asking is that the government have to be put to its

6    burden to identify what's sensitive.

7             THE COURT:  All right.  Mr. Windom?

8             MR. WINDOM:  Thank you, Your Honor.

9        The government's proposed order is much more specific

10   than the defendant's proposed order.  The defendant's proposed

11   order is subjective and nebulous as to what is a confidential

12   source or what could jeopardize safety.  Ours is demarcated by

13   the type of document it is.

14       The defense just said that the government should have to

15   identify which transcripts or audio recordings are sensitive

16   and which are not.  Every single one of those people we

17   interviewed is a potential trial witness.  All of them are

18   sensitive.

19       I guess the next argument from the defense would be,

20   well, the government has to go through each one and designate

21   specific paragraphs, designate specific pages.  That is

22   antithetical to the smooth and orderly discovery process

23   that this court should impose here for the fair and efficient

24   administration of justice.

25            THE COURT:  All right.  I am going to retain the

government's proposed language.  The definition of "sensitive

materials" will include all recordings, transcripts, interview

reports, and related exhibits of witness interviews.  Disclosure

of any of those materials creates too great a risk that witnesses

may be intimidated or that prejudicial information reaches the

jury pool.

Mr. Trump is already bound by his conditions of release to,

and I quote, "not communicate about the facts of the case with

any individual known to him to be a witness, except through

counsel or in the presence of counsel."  That's ECF No. 13 at 3.

But I am concerned that members of the public -- I mean, in

addition to the concerns I've already talked about with regard

to witness security, I'm concerned that members of the public

who are not bound by the release conditions and by these terms

might use sensitive witness information in ways that intimidate

witnesses or otherwise threaten the integrity of the proceedings,

so I am going to go with the government's definition of

sensitive materials.

Again, the order provides that either side may seek

modification.

Moving on to paragraph 8(f), which concerns materials

obtained from other governmental entities, the defense also

proposes to change the definition of sensitive materials in

paragraph 8(f).  Specifically, they seek to exclude the

category of materials obtained from other governmental

1        entities.  Mr. Windom, I'm not sure I understand exactly what

2        would fall into this category.  Can you give me an example?

3            MR. WINDOM:  Yes, ma'am.  So paragraph 8(e) really

4        was targeted at the SCO, the Special Counsel's interviews.

5        Paragraph 8(f) is mainly dealing with a few things.  The first

6        bucket is the material that we've obtained -- or that we did

7        obtain from the House Select Committee.  There are nonpublic

8        items that the House Select Committee provided to the

9        government including transcripts of witness interviews that we

10       do not believe are public.

11           THE COURT:  But those will be covered by the previous

12       paragraph, right?

13           MR. WINDOM:  And perhaps this is poor wording on our

14       part.  The intention was for 8(e) really to be focused on what

15       the -- the government's own interviews and for 8(f) to

16       encompass the Select Committee's interviews.  I see that it

17       could be covered by both.  So that is one category.

18         The second category is there's a large volume of material

19       obtained from the Secret Service including internal emails

20       which have, you know, the names of individuals, various things

21       that the defendant may or may not have known in his time as

22       president that deal with any number of issues that should be

23       nonpublic.

24         Again, the blanket designation, the government believes,

25       is appropriate for the reasons of not polluting the jury pool,

1    not intimidating witnesses, not naming people who are within

2    the Service or within other governmental agencies.  Should

3    there be a specific document, we're happy to discuss that with

4    the defendant under the paragraph 16 of the proposed order

5    after discovery is released.

6         THE COURT:  All right.

7         MR. LAURO:  And, Your Honor, that clearly can be

8    something they designate as sensitive.

9         THE COURT:  I'm sorry?

10        MR. LAURO:  I'm sorry.  It clearly could be something

11   they designate as sensitive if it's a Secret Service or other

12   matter.  But to just have it as this broad category,

13   automatically sensitive, kind of --

14        THE COURT:  Well, it fits the definition -- and

15   wouldn't you agree, or do you agree, that some of this

16   material under 8(f) would already be covered under 8(e),

17   such as the transcripts of witness interviews?

18        MR. LAURO:  Yeah, it could.

19        THE COURT:  What about the material that Mr. Windom

20   just referenced, for example, Secret Service emails?  That

21   would fit the definition of 8(f), materials from other

22   governmental entities, and that is very sensitive.

23        MR. LAURO:  Right.  And it should be designated as

24   sensitive, and they can do that.  But what I'm concerned about

25   is nonsensitive information that is swallowed in this broad

1    language of "anything that's obtained."  You know, it just --

2    it makes it impossible to comply.  That's our problem.

3         THE COURT:  Well, I may one day regret saying this, but

4    the parties are always free to seek modifications under the

5    terms of the agreement.  But I think, given the examples and

6    given the good-cause argument that I've heard from the

7    government, I am going to retain the government's proposed

8    language.  The definition of "sensitive materials" will

9    include "materials obtained from other governmental entities."

10       I am persuaded that disclosure could compromise --

11   especially given the example that Mr. Windom has given me, and

12   I can think of others, could compromise the confidentiality of

13   those entities' own proceedings.  And so I'm going to leave

14   the language in as the government has stated.  I'm not going

15   to adopt the defense edit.

16       Now, if you want to propose language that narrows this,

17   you're free to meet and confer with Mr. Windom about it.

18       MR. LAURO:  I may have to, Your Honor, because it

19   literally would include -- all of the J6 materials that the

20   government obtained would be subsumed in this provision,

21   again, assuming that J6 didn't destroy any documents.

22       THE COURT:  Wouldn't some of that material already be

23   publicly available?

24       MR. LAURO:  Not necessarily, because --

25       THE COURT:  But some of it would.  So you said "all,"

1    and that's not actually correct.  Right?  So some of that

2    material has been broadcast.

3          MR. LAURO:  You know, talk about pretrial publicity,

4    they had big TV screens going on.  But the problem is that we

5    don't know what's there and what's not there.  For example, if

6    there's something that was not publicly disclosed that came

7    within J6, then it's all going to be considered sensitive even

8    though there's not a good-cause showing.  That's my concern.

9          THE COURT:  I think the government has established good

10   cause for materials that are defined in that paragraph, and,

11   as I said, this order has to be read as a whole.  And so there

12   may be some of those materials that are just not sensitive

13   because they are publicly available.  And with regard to the

14   subcommittee materials, there may be quite a bit of that that

15   is publicly available given the public proceedings.  So, at

16   this point, I'm not going to adopt the defense language.

17        Now, paragraph 8, the final edit the defense proposes --

18   not the final.  The final edit to paragraph 8 would require

19   the government to conspicuously mark all sensitive materials.

20        Now, Mr. Windom, my understanding is -- well, tell me if

21   I'm wrong.  Do you intend to, when you produce the materials,

22   segregate all sensitive materials from nonsensitive materials?

23   Correct?  And your reply brief suggests that it would be --

24   you said "logistically unworkable to mark all sensitive

25   materials."

1          Can you explain why?  Obviously, if you have to go through

2     and stamp every single page "sensitive," that's really quite

3     burdensome.  But what about an interim measure, like stamp on

4     the first page or -- I don't know.  Aren't there some ways

5     that could make sure that the defense doesn't inadvertently

6     produce something that's sensitive that they could argue to

7     me, well, we just didn't know; it wasn't clear that that was

8     sensitive?

9          MR. WINDOM:  So this is actually a -- it may not seem

10    on its face, it's a very important point for the speed of

11    getting discovery out.

12         THE COURT:  And I'm -- you know, I'm all for that.

13         MR. WINDOM:  Yes, ma'am.  So what the government wants

14    to do is in the -- whether it's in the cover letter or in the

15    source logs -- and I have an example where the source logs

16    have the exact production, by very organized title and

17    description, the Bates number, and whether it is sensitive or

18    nonsensitive.

19         THE COURT:  Okay.

20         MR. WINDOM:  That is the fastest and most efficient way

21    to accomplish this.  The defense has asked for a page-by-page

22    stamping of them.  If the Court went with that --

23         THE COURT:  I'm not going with that.

24         MR. WINDOM:  Thank you, Your Honor.

25         I will say that this approach also was adopted in a

1    protective order in a case in which Mr. Lauro was counsel

2    in Florida about two years ago, with this language being

3    permissible to include it not just on the face of the

4    document, but also in cover letter or in transmittal

5    information.

6         THE COURT:  And the organization and designation that

7    you describe in cover letter and transmittal would include a

8    Bates range.  Is that correct?

9         MR. WINDOM:  Yes, ma'am.  It is the source, the

10   beginning Bates, the end Bates, the designation.

11        THE COURT:  All right.

12      Mr. Lauro, I'll hear you if you want.

13        MR. LAURO:  They're going to do what they're going to do.

14        THE COURT:  Well, no.  I mean, you enunciate a

15   reasonable concern, which is you don't want to be in front of

16   me saying, we released sensitive information, but we didn't

17   know.  And I want to make sure that you're not in a position

18   where you may do that and that the production is designed so

19   to ensure that there's no confusion.

20     The procedure that Mr. Windom has described sounds like it

21   would make clear by Bates range and source and in every other

22   way that, you know, what is sensitive and what is not.  I do

23   think that stamping every page would be not only unworkable

24   but would delay this considerably for a reason that's not

25   really a problem.  I don't mind taking the time to ensure that

1    things are done right, but it seems like a solution in search

2    of a problem.

3        MR. LAURO:  Your Honor, based on the explanation

4    that counsel gave, we're fine with it as long as we have

5    identifiable sensitive information that we know exists.

6        THE COURT:  Okay.

7        MR. LAURO:  I just resent the fact that counsel has

8    been searching for prior orders in cases that I had no idea

9    about.  So I just need to put that on the record.

10       THE COURT:  Well -- you know.  I hear you.  I feel

11   your pain.  All right.  Based on the parties' submissions and

12   the arguments, I will retain the government's proposed

13   language.  I will not require the government to mark every

14   record it designates as sensitive, and I'm willing to accept

15   their representation that individually marking the documents

16   would be too burdensome and unnecessary, frankly, in light of

17   the government's representations as to how they will produce

18   and segregate and designate the documents.

19       Now paragraph 9, which goes to assisting the defense, and

20   that goes back to our discussion that I had, Mr. Lauro, with

21   persons who are subject to the order.

22       In paragraph 9, the defense edits reiterate the expanded

23   definition of "authorized persons" that I discussed earlier in

24   relation to paragraph 3, and for the same reasons as my ruling

25   on paragraph 3, I will not accept those edits and am going to

leave in place the government's definition of "authorized persons."

Also in paragraph 9, the defense's other edit extends permission to share sensitive materials to the counsel of persons to whom the materials solely and directly pertain. That edit and revision is unopposed, and I will enter it.

Paragraph 10, counsel review of defendant's notes.  The defense edit to paragraph 10 would remove defense counsel's obligation to review Mr. Trump's notes regarding sensitive materials and ensure that they do not include any personal identifying information under Federal Rule of Criminal Procedure 49.1.

I am inclined to reject that edit.  That obligation is imperative, as I mentioned earlier, to prevent witness intimidation and other potentially prejudicial consequences. With regard to paragraph 11 --

MR. LAURO:  Your Honor, I have one question about paragraph 10, and this really does raise an important issue. If there are transcripts or documents of prior witness testimony, for example, I want to be able to allow my client to read those in private and have the ability to examine them without counsel present or without counsel being in the same room.  And I think we have to have some degree of assurance that we don't have to literally sit next to our client while he reviews transcripts and otherwise sensitive information.

1          THE COURT:  Well -- and I'll hear from Mr. Windom in a

2     minute, but -- hold on.

3          (Court reviewing document.)

4        Wouldn't your client be able to review -- and Mr. Windom

5     can correct me if my reading is incorrect.  But he would be

6     able to review those materials in private, but afterwards

7     you would have to check his notes to make sure that personal

8     identifying information wasn't included in those notes.  It's

9     not how he reviews the notes.

10       Am I wrong, Mr. Windom?  I mean, Mr. Lauro's concern is

11    that his client be allowed to review the notes in private.

12         MR. WINDOM:  Just to make sure we're talking about the

13    same thing, the notes or the sensitive discovery materials?

14         THE COURT:  Mr. Lauro, as I understand it, wants his

15    client to be able to review the sensitive material without him

16    having to be there.  Is that -- let's break it down.  Is that

17    agreeable to the government?

18         MR. WINDOM:  So the -- I guess I would first note that

19    Mr. Lauro did not object to that language in paragraph 10 in

20    this proposal here.  What it sounds like he's asking for is

21    that he need not sit next to his client the entire time.

22         THE COURT:  Right.

23         MR. WINDOM:  I think as long as it is a person employed

24    to assist with the defense to be with him when the sensitive

25    materials are present and then to collect the material after

1    the defendant is done reviewing the sensitive material.

2         THE COURT:  Hold on a second.

3        (Court reviewing document.)

4        So your objection, Mr. Lauro, is to the language that says

5    "but defense counsel may not provide a copy of sensitive

6    material to the defendant"?

7         MR. LAURO:  Exactly, Your Honor.  And we're not --

8    in terms of personal identifying information or that nature,

9    we're fine with it.  I mean, we can sit with the client.

10   But in terms of -- and other orders, by the way, have done

11   sensitive and highly sensitive differentiations.

12       What I'm saying is, if there's a transcript of a witness or

13   if there's a video, I want to be able to share it with my client

14   without having to sit in the room or having somebody from the

15   defense team sitting in the room with him.  That becomes

16   impractical under the circumstances, and it really does impinge

17   on Sixth Amendment rights.

18       We have a lot to do in this case, with a relatively small

19   staff, and for us to have our folks sitting with a client as

20   he reads through a transcript, maybe hours, really is an

21   intolerable burden on us.  At least allow us to have the client

22   read transcripts, read information that could be relevant to

23   the case, and then coordinate with us and communicate with us.

24       We can put in procedures to get that information back

25   immediately, but we have to have a situation where the client

1    is allowed to review materials on his own, outside the presence

2    of counsel.

3         THE COURT:  You didn't object to that part.  In your

4    motion, you addressed the notes issue.  You didn't address the

5    reviewing on your own issue.

6         MR. LAURO:  Well, that's correct, Your Honor.  But in

7    light of the fact of how sensitive information is now defined

8    under this order, which will include these transcripts and

9    interviews and so forth, the issue does come to the forefront,

10    unfortunately, in terms of dealing with that issue.

11         THE COURT:  Okay.  Mr. Windom, Mr. Lauro has a point,

12    which is -- tell me what it is you're worried about.  So I'm

13    already inclined to have the order require that the defense

14    inspect any notes.  So that would apply whether or not

15    Mr. Trump is accompanied by counsel or other legal staff while

16    he's reviewing the material or not.  They're still going to

17    have to check all notes that he makes.

18         So tell me the harm or the prejudice that you see arising

19    from him being able to read the materials, which he's allowed

20    to see, by himself, in another room, as opposed to having one

21    of his lawyers or paralegals or legal staff be there with him.

22         MR. WINDOM:  Yes, Your Honor.  Three things on that.

23         First, defense counsel has a certain level of trust in the

24    defendant that the government does not.

25         Second, the defense counsel agreed to an extraordinarily

1      similar position in Florida.  It is defendant shall only have

2      access to discovery materials under the direct supervision of

3      defense counsel or member of defense counsel's team.

4          THE COURT:  But that involves some very -- some

5      classified and national security-implicated information,

6      doesn't it?

7          MR. WINDOM:  No, ma'am.  This particular order that

8      I'm reading from is the nonclassified protective order.

9      There's a separate CIPA Section 3 classified protective order.

10     Third, publicly, the defense counsel and the defendant have

11     had a divergence of views on the protective order, whether

12     there should be one at all or not.  The defendant says there

13     should not be.

14     Second, the defendant has made claims in the press that his

15     counsel has not adopted with respect to motions that should

16     have already been filed or will soon will be filed.  There's a

17     delta that I'm concerned about.

18         THE COURT:  But how would -- and I hate to interrupt

19     you, but I'm going to.  Because how -- and I share your -- but

20     sometimes -- you know.  I was a defense attorney.  Sometimes

21     there is a divergence.

22     But how would the procedure that you're talking about

23     address that?  In other words, whether Mr. Lauro or one of

24     his legal staff is in the room or out of the room isn't

25     necessarily going to solve that problem.  Can you tell me how

1    it would?

2          MR. WINDOM:  It would ensure that the defendant doesn't

3    have unfettered access to sensitive materials to do with it as

4    he wants.

5          THE COURT:  But even if Mr. Lauro -- okay.  Say I

6    go with your provision and I require Mr. Lauro, one of his

7    co-counsel or legal staff to be present.  If the defendant is

8    going to do something, he can still do it whether they were

9    there or not there.  I mean, the safety is the notes, right?

10   Making sure that any notes that he takes are reviewed by

11   defense counsel to make sure they don't include identifying

12   information.

13         MR. WINDOM:  Two things, Your Honor.  First of all, the

14   point of the protective order is to limit risk.  It will limit

15   risk in order to have a defense counsel or an employee --

16         THE COURT:  How, though?

17         MR. WINDOM:  Because of this:  The defendant, when he

18   only has the materials to himself, could elect to photocopy

19   or otherwise reproduce, take a picture of, the sensitive

20   materials.  That risk is much lower when in the presence of a

21   member --

22         THE COURT:  You mean like live tweeting something?

23         MR. WINDOM:  I mean literally just photocopying or

24   taking a picture of something, having it in order to do

25   whatever he wants with it.  He has shown a tendency to desire

1     to hold onto material to which he should not have.

2            THE COURT:  Well, you know --

3        I'll hear you, Mr. Lauro.

4        I'm still having a hard time figuring out how having

5     somebody right there with him is going to -- and I hear you

6     about the photocopy or photograph.  I guess that's a

7     possibility.  But I'll hear your response on that, Mr. Lauro.

8            MR. LAURO:  Yes, Your Honor.  I'm quite surprised that

9     counsel would say that, because it suggests that really what

10    they want to do is just bog us down and bog President Trump

11    down in the middle of a campaign, and maybe that's what they

12    want to do.  But the reality is, to have a lawyer physically

13    with a client all the time --

14           THE COURT:  Let me stop you.

15       Actually, Mr. Windom, would the government be willing to

16    allow the defendant to review the material, provided that the

17    defendant didn't review the material with a phone or -- I

18    mean, just without access to those -- to the extent that

19    that's a possibility, without access to those?  Because

20    Mr. Lauro does have a point.  It's a lot of material, and they

21    are stretched.  And absent some real danger of what you're

22    saying happens, I think it would be burdensome for the defense

23    to require legal staff there all the time.

24           MR. WINDOM:  The issue really is a custody or control

25    one.  I think Your Honor has identified some mitigating

1     measures.  Should the defendant not be permitted to have

2     electronic devices, not be permitted to have a replicating

3     machine --

4          THE COURT:  While he is reviewing the material.

5          MR. WINDOM:  Yes, ma'am.  And then also the other

6     catch to that is, even though a defense counsel or member of

7     the team wouldn't be sitting there, they would have to be

8     immediately available to collect the material if the defendant

9     goes to lunch, if the defendant --

10         THE COURT:  Absolutely.  That's sensitive material.

11    That can't be left lying around.

12         MR. WINDOM:  So if somebody is going to be there

13    anyway outside the room, I'm not sure why they couldn't be in

14    the room.  That said, I understand Your Honor's mitigation

15    measures.

16       I have yet to hear -- there has not yet been a motion to

17    amend the specific language already employed in Florida, so

18    I'm not sure what the actual aspect of the hypothetical harm

19    here is.

20         THE COURT:  That I forgot to ask you about, Mr. Lauro.

21    You did agree to it in Florida.  What's the problem now?  And

22    that case involves, as far as I know -- I don't know any

23    details -- a lot of materials as well.

24         MR. LAURO:  It does, Your Honor.  And I'm not involved

25    in the case in Florida.  I'm not counsel.

1          THE COURT:  Oh.

2          MR. LAURO:  But the bottom line here is that we have to

3     have a workable system that allows President Trump to review

4     these materials without counsel either sitting in the room or

5     outside the room.  We are stretched incredibly thin in this

6     case.

7          THE COURT:  Well, what about Mr. Windom's point, which

8     is -- I intend to retain the provision that says the notes

9     have to be reviewed, so --

10         MR. LAURO:  We can direct the client not to make any

11    notes, obviously.  I mean, this kind of intrusion --

12         THE COURT:  But Mr. Windom's point, which is even

13    if the defendant is reviewing notes alone, in a room where he

14    doesn't have access to electronic devices that could reproduce

15    those materials, somebody still has to be present to collect

16    it, safeguard it.  I mean, it's still going to require time.

17    What about that?

18         MR. LAURO:  The problem is, Your Honor -- respectfully,

19    is the government has not shown good cause for that kind of

20    intrusion into the attorney-client relationship.

21         THE COURT:  But I'm saying, even if he's allowed to

22    review it by himself, it's still going to require staffing to

23    make sure that the conditions of the order are complied with.

24    The materials can't be -- you know, they have to be

25    safeguarded, and they have to be collected.  Right?

1          MR. LAURO:  That's the problem with the order as

2     it stands now.

3          THE COURT:  Oh, that's not going to change.

4          MR. LAURO:  No, no.  But I'm just saying the

5     practicality of a case like this, of this magnitude, with the

6     number of documents involved, based on what the folks here are

7     requesting, would put President Trump and his defense team at

8     an incredible disadvantage at a time when not only is he

9     facing other prosecutions brought by this administration, but

10    also other litigation.

11        He's in the middle of a campaign against this

12    administration, and to have this kind of burden on us is

13    enormous.  And in 40 years of practice, I've never seen a

14    situation in a white-collar case where counsel has to sit next

15    to a client and literally sort of babysit what goes on in

16    terms of what they review and what notes they take.

17        What Your Honor has in this order already are protections

18    that if President Trump made any statements in violation of

19    the order, then that's a problem.  But having all of these

20    oppressive kinds of conditions which they know will interfere

21    with the campaign, that's the goal.  They know that --

22         THE COURT:  I'm not going to accept that premise, and

23    again, I -- I'm not going into that.

24         MR. LAURO:  But the practicality of it --

25         THE COURT:  And I will tell you, I think the more

1    reasonable and what I see is -- I see a desire to move this

2    case along.  I haven't seen any evidence that this is

3    politically motivated.  I understand you have a different

4    view, but it might be -- it might be more persuasive to me if

5    the former president had not entered into this agreement in

6    the Florida case.  It certainly undercuts some of the strength

7    of your arguments, that they're already agreeing to do it in

8    Florida.

9        And I'm willing to consider a modification to that, but I

10   am not willing to consider anything that's going to result in

11   information that's sensitive being disseminated to the public.

12   And I have concerns about that.

13       MR. LAURO:  And, obviously, we will abide by your

14   order, and we understand Your Honor's position.  But there

15   has to be some practical way of carrying this out so that it

16   doesn't burden the defense.  And as a defense lawyer, it's not

17   easy to sit with a client for hours and hours while they read

18   a document.  It just doesn't work, Your Honor.

19       THE COURT:  Okay.  I agree with you, and therefore I

20   am going to compromise here.  I will allow the defendant to

21   review the sensitive material without being accompanied,

22   without having a member of the legal team sit next to him,

23   but I am going to retain the provision that requires counsel,

24   members of the legal team, to review any notes.  And if you're

25   saying you're going to instruct him not to take notes, so much

1    the better, but to ensure that there's no notes taken and no

2    personal identifying information that is kept.  And if the

3    defendant's going to review those materials alone, the

4    defendant cannot have access, during that review, to an

5    electronic device, photocopier machine, or anything that could

6    reproduce or copy those materials.

7        Mr. Windom?

8        MR. WINDOM:  Your Honor, the issue remains about

9    keeping custody or control on breaks or lunches and things

10   like that.

11       THE COURT:  Oh, yes.  Those materials must be

12   safeguarded.  They cannot be left alone.  Should the defendant

13   need to leave the room for any reason, someone has to

14   safeguard those materials, and certainly he can't carry them

15   around with him.

16       Okay.  Paragraph 11.  The defense-proposed edits would

17   permit the parties to include sensitive materials in any

18   public filing without leave of court if all sensitive

19   information is redacted.  This doesn't materially alter the

20   government's proposed approach, which likewise contemplates

21   filing without leave redacted sensitive materials.

22       I will allow the parties to include in their public filings

23   redacted sensitive materials without leave of court only if

24   they have conferred and both sides agree to the redactions.

25   I realize that exception may swallow up my ruling, but if the

1   parties disagree about the redactions, leave of court must be

2   sought before the filing.

3      Again, with paragraph 11, filing sensitive materials under

4   seal without leave, the defense similarly proposes an edit

5   that would permit the parties to file unredacted copies of

6   sensitive materials under seal without leave of court, I'm not

7   going to accept.  This edit is in violation of our local

8   rules.  Local Criminal Rule 49(f)(6)(I)(1) provides that no

9   document may be sealed without an order from the Court.

10     In accordance with that rule, I will require the parties to

11  follow the regular procedure for seeking leave to file a

12  document under seal each time they wish to do so for sensitive

13  materials.

14     I will also require that any motion for leave to file

15  sensitive materials under seal shall attach a redacted copy of

16  those sensitive materials so that the Clerk of the Court can

17  file the redacted copy on the public record if I grant the

18  motion.  And I've consulted, and the Clerk of the Court is

19  prepared and able to do that.

20     Paragraph 12, introducing sensitive materials under seal

21  without leave.  So the defense's edits propose, essentially,

22  the same approach for handling sensitive materials at

23  hearings as they do for filings; that is, the parties may

24  (1) introduce redacted sensitive materials without leave, and

25  (2) go under seal to introduce or discuss unredacted sensitive

materials.

My approach to those procedures and hearings will be the same as it is for filings.  The parties may introduce redacted sensitive materials during hearings without leave of court so long as both sides agree to the redactions.  However, they may not go under seal or introduce unredacted sensitive materials during hearings without first seeking leave of court.  And that's unredacted.

Paragraph 12, handling sensitive materials at trial.  The defense proposes an edit stating that the Court will determine the appropriate handling of sensitive materials at trial in a future order.  And I'm not going to add this language at this juncture, but as we get closer to trial, the parties can move for modifications to the protective order that will change or specify different provisions for trial.

So are there any proposed or disputed edits from the defense, Mr. Lauro, that I haven't covered?

MR. LAURO:  I don't believe so, Your Honor.

THE COURT:  All right.

Mr. Windom, is there anything else?

MR. WINDOM:  No, ma'am.  Thank you.

THE COURT:  All right.  I will issue a protective order consistent with my decisions in short order, but for now I just have a couple more items of business.

First, as reflected on the docket, last night I denied a

1     motion from the government for leave to file a document under

2     seal and ex parte.  I intend for this case to proceed in the

3     public record as much as possible, and the motion did not

4     persuade me that there was a need to file the document ex

5     parte.  Accordingly, neither that motion nor its attached

6     document had any bearing on my decision today, and that's why

7     I denied it without prejudice.

8        Going forward, I want to underscore that any motions to

9     file under seal, especially ex parte motions, must articulate

10    the need for those designations, and I will carefully weigh

11    the relevant factors to ensure that there's sufficient reason

12    for keeping any material off the public record.

13       Second, yesterday the government moved to schedule a

14    conference under the Classified Information Procedures Act,

15    CIPA, to discuss what they said was a small amount of

16    classified information that may be subject to discovery in

17    this case.  That's ECF No. 25.  The government proposes that

18    we hold that conference on August 28, which is the same day we

19    have our next status conference in the case.

20       Mr. Lauro, are you available to do that?  It makes sense to

21    me.  We could do it in the afternoon or, you know, right after

22    the status.

23       MR. LAURO:  I think, since we'll see you on the 28th,

24    it might be a good time to discuss that as well, Your Honor.

25       THE COURT:  Excellent.  Then we'll do it then.

1    Okay.  So I will schedule that conference.  Actually, it'll

2    just be part of our status conference on the 28th.  I don't

3    think I need to schedule another conference.

4    This is a good time to mention that, in the interest of

5    efficiency and in keeping with my standard practice, I expect

6    the parties to confer before filing any nondispositive motions

7    and indicate in the caption whether it is opposed or not, and

8    that way I can move speedily with regard to unopposed motions.

9    So just say, you know, defense opposed, defense unopposed

10   motion, or say in a paragraph that the government opposes it,

11   and then I'll know to give time and have a briefing schedule.

12   All right.  Any other matters related to discovery or

13   pretrial motions that we need to address, Mr. Lauro?

14           MR. LAURO:  Yes, Your Honor.  If I may approach?

15           THE COURT:  Yes.

16           MR. LAURO:  Your Honor, we've asked the government

17   not to hide the ball and tell us how much discovery there is.

18   They won't do that.  We don't know if it's terabytes, you

19   know, multiple terabytes, how many boxes, how they're

20   organized.  It's a humongous task, and Your Honor has been

21   there, as defense counsel, and knows what it's like dealing

22   with something like this.

23   We would like a Rule 16 conference with the government as

24   soon as possible, no later than Monday at five o'clock, where

25   we can discuss these issues because we have to respond to Your

1  Honor in terms of trial schedules, and we need to know how
2  much discovery there is.
3            THE COURT:  Well, so here's the thing.  It seems to
4  me -- and Mr. Windom can correct me if I'm wrong -- that the
5  government is prepared to give you that information as soon as
6  I enter a protective order.  Is that correct?
7            MR. WINDOM:  With respect to the --
8            THE COURT:  The amount and -- well, tell me.
9  You tell me.
10           MR. WINDOM:  Thank you.  If I may?
11           MR. LAURO:  And if I may ask, how much is it?
12           THE COURT:  Well, you may find out, as I said,
13  immediately after I issue the order.
14           MR. WINDOM:  The government has actively been trying
15  to get the defendant discovery for some time now.  We are
16  producing, presumably today, if the Court enters the protective
17  order soon, the first production.  There's an extraordinarily
18  detailed, extensive source log in the same manner the defense
19  is familiar with from the Southern District of Florida case,
20  lays out exact Bates numbers, the exact organization of the
21  discovery.  So that information will be provided in that
22  source log.
23      There is, in addition to that, a hard drive that we'll go
24  over when the defense lets us know which address to send it
25  to.  That is the first discovery production.

1          THE COURT:  And let me stop you.

2      Is there any reason why you can't tell Mr. Lauro how many

3      documents?  What are we talking about?

4          MR. WINDOM:  Sure.  And he'll have it in a letter, you

5      know, by the end of the day --

6          THE COURT:  Okay.

7          MR. WINDOM:  -- in the first production.  If Your Honor

8      would like to hear it on record, I'm happy to provide the

9      information.  He's going to have it in a letter within 24 hours.

10          THE COURT:  I'm just saying, is there any reason why we

11      can't go on the record now?

12          MR. WINDOM:  No, ma'am.

13          THE COURT:  Well, go ahead.

14          MR. WINDOM:  So, for the first discovery production,

15      the volume of it is roughly 11.6 million pages, or files,

16      which are load ready, available at length.  There's also a

17      hard drive with 2703(d) returns and extractions from other

18      certain electronic facilities.  Those are impossible to

19      paginate or to identify by that.

20      I cannot go into the details because of various Rule 6

21      or sealing concerns.  In general, I will say the material is

22      extraordinarily well organized.  Roughly a quarter of it comes

23      from entities associated with the defendant already, and it

24      may be that the defendant has access to that material already.

25          Some of the material is open-source.  Some of it is also

1    necessarily duplicative just from an organizational

2    standpoint, just to make sure that the defense knows precisely

3    which documents came from where.  As I, said this is the same

4    format and the same process that is used in the Southern

5    District of Florida.  We anticipate additional productions

6    in the coming weeks, and our goal is to have discovery

7    substantially complete by August 28.

8         THE COURT:  You heard Mr. Windom, Mr. Lauro.  I can

9    just imagine your motion for a trial date now.

10        MR. LAURO:  I'm waiting for the deluge, Your Honor.

11   It's going to come.

12     One small point, though.  I think Your Honor mentioned

13   that, with respect to filing under seal, we would have to

14   justify under the normal rules.  I assume that the government

15   will also have to establish a reason for filing anything under

16   seal in terms of...

17        THE COURT:  Rules apply to both sides.

18        MR. LAURO:  Thank you.

19        THE COURT:  I mean, I assume, if it's sensitive

20   material, they have to file it under seal.  They don't have to

21   give additional reasons if it's sensitive material as defined

22   under the order.

23        MR. LAURO:  All right.

24        THE COURT:  Okay.

25     All right.  Thank you, all of you, for your preparation and

attention today.  Before we conclude, I just want to make two
points about this case going forward.

First, as I have said before, I am committed to ensuring
that this case proceeds in the normal course that our criminal
justice system prescribes.  The protective order that I will
issue is just one example of that.  Courts across the country
and in this district routinely issue similar orders in criminal
cases for many of the same reasons that I've discussed today.

The defense has reiterated at length Mr. Trump's First
Amendment right to speak about this case and the evidence in
it.  While I intend to ensure that Mr. Trump is afforded all
the rights that any citizen would have, I also take seriously
my obligation to prevent what the Supreme Court called in
*Sheppard v. Maxwell* a "carnival atmosphere" of unchecked
publicity and trial by media rather than our constitutionally
established system of trial by impartial jury.

It is a bedrock principle of judicial process in this
country, as the Supreme Court said in *Bridges v. California,*
that "legal trials are not like elections, to be won through
the use of the meeting-hall, the radio, and the newspaper."
Obviously, in *Bridges*, the internet hadn't been invented yet.
This case is no exception.

Second, and relatedly, both parties' briefing on the
protective order referred to certain public statements that
Mr. Trump has made in recent days.  There are no motions based

1    on these statements, nor does the government claim they

2    violated the defendant's conditions of release.  So I will not

3    address them specifically, but I do want to issue a general

4    word of caution.

5        As I have stressed at several points during this hearing,

6    I intend to ensure the orderly administration of justice in

7    this case as I would with any other case; and even arguably

8    ambiguous statements from parties or their counsel, if they

9    could reasonably be interpreted to intimidate witnesses or to

10   prejudice potential jurors, can threaten the process.

11       In addition, the more a party makes inflammatory statements

12   about this case which could taint the jury pool or intimidate

13   potential witnesses, the greater the urgency will be that we

14   proceed to trial quickly to ensure a jury pool from which we

15   can select an impartial jury.

16       I caution all of you and your client, therefore, to

17   take special care in your public statements about this case.

18   I will take whatever measures are necessary to safeguard the

19   integrity of these proceedings.

20       I'll see you all on August 28.  We are adjourned.

21        (Proceedings adjourned at 11:39 a.m.)

22

23

24

25

\* \* \* \* \* \*

CERTIFICATE

I, BRYAN A. WAYNE, Official Court Reporter, certify that the foregoing pages are a correct transcript from the record of proceedings in the above-entitled matter.

*/s/ Bryan A. Wayne*
Bryan A. Wayne