```
                    UNITED STATES DISTRICT COURT
                    FOR THE DISTRICT OF COLUMBIA


   UNITED STATES OF AMERICA,      .
                                  .
             Plaintiff,           .   CR No. 23-0257 (TSC)
                                  .
       v.                         .
                                  .
   DONALD J. TRUMP                .   Washington, D.C.
                                  .   Monday, August 28, 2023
             Defendant.           .   10:00 a.m.
   . . . . . . . . . . . . . .    .


                    TRANSCRIPT OF STATUS HEARING
              BEFORE THE HONORABLE TANYA S. CHUTKAN
                  UNITED STATES DISTRICT JUDGE


     APPEARANCES:

   For the Government:            THOMAS WINDOM, ESQ.
                                  MOLLY G. GASTON, ESQ.
                                  U.S. Attorney's Office
                                  601 D Street NW
                                  Washington, DC 20530


   For Defendant:                 JOHN F. LAURO, ESQ.
                                  GREGORY M. SINGER, ESQ.
                                  Lauro & Singer
                                  400 North Tampa Street
                                  15th Floor
                                  Tampa, FL 33602

                                  TODD BLANCHE, ESQ.
                                  Blanche Law
                                  99 Wall Street
                                  New York, NY 10005

   Court Reporter:                BRYAN A. WAYNE, RPR, CRR
                                  U.S. Courthouse, Room 4704-A
                                  333 Constitution Avenue NW
                                  Washington, DC 20001



   Proceedings reported by stenotype shorthand.
   Transcript produced by computer-aided transcription.
```

<pre>
 1                    P R O C E E D I N G S
 2          THE DEPUTY CLERK:  Good morning, Your Honor.  This is
 3    Criminal Case No. 23-257, United States of America versus
 4    Donald J. Trump.  Counsel, please approach the lectern and
 5    state your appearances for the record.
 6          MS. GASTON:  Good morning, Your Honor.  Molly Gaston
 7    for the United States along with Thomas Windom, and with us
 8    at counsel table is Special Agent Jamie Garman.
 9          THE COURT:  Good morning.
10          MR. LAURO:  Good morning, Your Honor.  John Lauro on
11    behalf of President Trump.  With me is my partner, Greg Singer,
12    and Todd Blanche, who has noticed an appearance as well, as
13    co-counsel for President Trump.
14          THE COURT:  And is Filzah Pavalon here?  Is that person
15    appearing or they're not appearing in this case?
16          MR. LAURO:  She's with my firm but not here presently.
17          THE COURT:  All right.  So pro hac entered.  Good
18    morning, everyone.
19       We are here for a hearing regarding the parties' proposed
20    trial dates.  But before we discuss the proposed schedules, I
21    want to address the defense's motion to exclude time under the
22    Speedy Trial Act, which is ECF No. 18.
23       The defense has moved to exclude the 25 days between
24    Mr. Trump's initial appearance on August 3, 2023, and today's
25    status conference from the Speedy Trial Act calculation.  The
</pre>

government has opposed that motion but acknowledged in their filing that the exclusion of time between the August 3rd initial appearance and August 28th scheduled hearing already will occur under the operation of other provisions of the act such as those provisions that automatically exclude time delays resulting from the filing of motions.

As the Supreme Court noted in *Bloate v. United States*, 559 U.S. 196 at 203, the Speedy Trial Act requires that a criminal defendant's trial commence within 70 days of a defendant's initial appearance or indictment, but excludes from the 70-day period days lost to certain types of delay.  Section 3161(h)(7) of the Speedy Trial Act permits the Court to exclude time from the calculation based on findings that the ends of justice served by taking such action outweigh the best interests of the public and the defendant in a speedy trial.

Taking into account the reasonable time necessary for effective preparation, the numerous motions filed between defendant's arraignment and this hearing, as well as the fact that the motion has been filed by the defense, I do find that the ends of justice outweigh the defendant and the public's interest in a speedy trial, and therefore I will grant the motion.  Accordingly, the 25 days between Mr. Trump's initial appearance on August 3, 2023, and today's status conference will be excluded.

Now let's move on to the proposed schedule.  In my August

3, 2023, minute order I asked the government to submit a proposed trial date with an estimate of the time that would be needed to set forth the prosecution's case-in-chief during trial.  I also asked the defense to respond with their proposed trial date and estimate to the extent possible of the time that they believe they would need to put on a defense case.

So the government in its proposed pretrial schedule, which is ECF No. 23, proposes that trial begin on January 2, 2024, and estimates that its case-in-chief will take no longer than four to six weeks, and actually the government also proposed that voir dire jury selection begin before that date.

The defense in their proposed trial schedule, which is ECF No. 30, proposes that trial begin in April 2026, and states that it cannot yet estimate how long the defense will take but for now adopts, and I quote, the same calculation as the government, four to six weeks.

These proposals are obviously very far apart.  And for reasons I will discuss shortly, neither of them is acceptable. So with regard to the Speedy Trial Act, the right to a speedy trial is guaranteed by the Sixth Amendment and the Speedy Trial Act comprehensively regulates the time within which a criminal trial must begin.  And that's from *Zedner v. United States*, 547 U.S. 489 at 500.

The act, which is codified at 18 U.S.C. § 3161(a), provides

1    that the appropriate judicial officer at the earliest

2    practicable time shall, after consultation with the counsel

3    for the defendant and the attorney for the government, set the

4    case for trial on a day certain so as to assure a speedy

5    trial.

6        The earliest practicable time depends in part on factors

7    which can exclude time from the act's calculation; that is, to

8    stop the speedy trial clock.  These factors include whether

9    the case is so unusual or so complex due to the number of

10   defendants, the nature of the prosecution, or the existence of

11   novel questions of fact or law, that it is unreasonable to

12   expect adequate preparation for pretrial proceedings or for

13   the trial itself before the trial date.  That's from section

14   (h)(7)(B)(ii).

15       Another factor is whether the trial date would deny the

16   defendant reasonable time to obtain counsel, would

17   unreasonably deny the defendant or the government continuity

18   of counsel, or would deny counsel for the defendant or the

19   attorney for the government the reasonable time necessary for

20   effective preparation, taking into account the exercise of due

21   diligence.  And that's from (h)(7)(B)(iv).

22       Now, I want to note here that setting a trial date does

23   not depend and should not depend on a defendant's personal and

24   professional obligations.  Mr. Trump, like any defendant, will

25   have to make the trial date work regardless of his schedule.

1    If this case, for example, involved a professional athlete, it

2    would be inappropriate for me to schedule a trial date to

3    accommodate her schedule.  The same is true here.

4        Moreover, although the Speedy Trial Act primarily

5    safeguards the defendant's rights, as the Supreme Court noted

6    in *Barker v. Wingo*, 407 U.S. 514 at 519, there is a societal

7    interest in providing a speedy trial which exists separate

8    from and at times in opposition to the interests of the

9    accused.  The Supreme Court in *Zedner* observed that if the act

10   were designed solely to protect a defendant's right to a

11   speedy trial, it would make sense to allow a defendant to

12   waive the application of the act.  But the act was designed

13   with the public interest firmly in mind.

14       Among other things, the public has an interest in the fair

15   and timely administration of justice, as well as reducing

16   defendant's opportunity -- reducing a defendant's opportunity

17   to commit crimes while on pretrial release, and preventing

18   extended pretrial delay from impairing the deterrent effort --

19   deterrent effect of punishment.  And I'm quoting from *Zedner*

20   at 501.

21       The Supreme Court's decision in *Barker* further highlights

22   that delay may prejudice the prosecution and public interest.

23   It noted:  Delay is not an uncommon defense tactic.  As the

24   time between the commission of the crime and the trial

25   lengthens, witnesses may become unavailable or their memories

may fade.  If the witnesses support the prosecution, its case

will be weakened, sometimes seriously so, and it is the

prosecution which carries the burden of proof in this case, as

in every case.  And that's from *Barker* at 521.

Relatedly, the Sixth Amendment also guarantees a defendant's

right to effective assistance of counsel, which in turn depends

on counsel having adequate time to prepare for trial.  But as

the D.C. Circuit noted in *United States v. Burton*, 584 F.2d

485 at 489, note 10, counsel is not entitled to unlimited

preparation time.  Instead, counsel is entitled to reasonable

preparation time.

And in *United States v. Cronic*, 466 U.S. 648 at 663, the

Supreme Court held that neither the period of time that the

government spent investigating the case nor the number of

documents that its agents reviewed during that investigation

is necessarily relevant to the question of whether a competent

lawyer could prepare to defend the case.

I am aware that Mr. Trump faces charges in other state and

federal criminal cases.  Given that Federal Rule of Criminal

Procedure 43 requires his presence at trial unless waived, the

Court has considered the currently set trial schedules in

those cases, as well as the competing demands of his counsel

in this and other cases.  Although I believe Mr. Lauro, who is

lead counsel in this case, does not represent the defendant in

any of the other matters -- is that right, Mr. Lauro?

1          MR. LAURO:  That's correct, Your Honor, although my

2     co-counsel, Mr. Blanche, does represent President Trump in the

3     New York proceeding as well as in the Florida proceeding, and

4     we will be trying this case together.  Given the magnitude of

5     the documents, over 250 witnesses, the complexity of the

6     issues, it really is a team effort.  So both of us are co-lead

7     counsel in this matter.

8          THE COURT:  All right.  Thank you.

9       All right.  I'm going to have some questions for each side,

10    but I'm going to start by addressing the defense argument

11    regarding the timing of other cases.  So the defense contends

12    that the median time from commencement to termination for a

13    jury demandable case involving 18 U.S.C. § 371, which is

14    conspiracy to defraud the United States, is 29.4 months, and

15    that the court regularly allows far more time than the

16    government proposes in other January 6 cases.

17       As an initial matter, and as the government correctly

18    points out, that 29.4 months cited by the defense was the

19    time from commencement to sentencing, not to trial.  And

20    sentencing, in this court at any rate, in the last few years

21    usually takes place about 90 days or more from verdict.  So

22    that statistic is a bit misleading.  And one of the cases that

23    the defense cites, *United States v. Foy*, 21-CR-108, is my

24    case.

25       In that case, there have been multiple continuances due to

1    the COVID-19 pandemic, litigation over -- considerable

2    litigation over pretrial detention, a superseding indictment,

3    and plea negotiations.  So, given that all the other cases the

4    defense cites were brought in 2021, I expect and suspect that

5    the pandemic had an impact on the time it took to resolve

6    those as well.

7         In addition, as the government notes, the other January 6

8    cases cited by the defense all involve between six and 17

9    codefendants.  There are no codefendants in this case.  And

10   from my review, the defense has not identified any case in

11   this district where the defendant was given over two years

12   between indictment and trial in which there were no

13   codefendants and no ongoing pandemic.

14        And the government hasn't identified any cases in this

15   district where the length of time between indictment and trial

16   was roughly five months, although they did point to the

17   *Manafort* case in the Eastern District of Virginia, which went

18   to trial roughly five months after the superseding indictment.

19        The other factor I wanted to focus on is the preparation

20   that's needed for trial.  And I think I will have some

21   questions in that area.  The defense advocates for a trial

22   schedule equal to the government's time spent investigating.

23   But as I've already noted, the Supreme Court found in *Cronic*

24   that there is no necessary correlation between the period of

25   time that the government spent investigating the case and the

1  defendant's task in preparing to deny or rebut a criminal

2  charge.

3      *Cronic* was a mail fraud case in which the government took

4  over four and a half years to investigate and included

5  extensive document review.  The Court found that the time

6  devoted by the government to the assembly, organization, and

7  summarization of the thousands of written records

8  unquestionably simplified the work of the defense counsel in

9  identifying and understanding the basic character of the

10  defendant's scheme.  That's at 664 of *Cronic*.

11      The defense here argues that they need years to review

12  the over 11.5 million pages of discovery, declaring they would

13  need to review nearly a hundred thousand pages per day to

14  finish the government's initial production by its proposed

15  date for jury selection.  The government responds that

16  characterization of the discovery review burden is misleading.

17  It contends that 65 percent of its initial production consists

18  of materials to which the defendant has functionally had

19  access, are duplicative, or do not constitute Rule 16

20  discovery.  25 percent come from entities associated with

21  Mr. Trump.  And hundreds of thousands of pages come from the

22  National Archives and House Select Committee to investigate

23  the January 6 attack.

24      The government further states that it has made a small

25  second discovery production consisting of 615,000 pages or

1    files, 20 percent of which were generated by records from an

2    entity associated with Mr. Trump.  The government also

3    represents that in the first production it provided defense

4    counsel with a set of key documents that it views as some of

5    the most pertinent to its case-in-chief.  Now, I realize the

6    defense may have a different view of that, but nonetheless

7    it's been provided.

8        So who will be arguing at this point?  Will it be you,

9    Ms. Gaston?

10        MS. GASTON:  Yes, Your Honor.

11        THE COURT:  So regarding the discovery that's been

12    turned over to the defense so far, you said in your motion

13    that about 65 percent of the first production is either

14    duplicative, is material that Mr. Trump has already had access

15    to, or is not Rule 16 discovery.

16        How much of the discovery did Mr. Trump already have access

17    to such as documents from the archives that his counsel would

18    have reviewed for privilege?

19        MS. GASTON:  Yes, Your Honor.  And let me begin by

20    saying that at this point discovery is now substantially

21    complete.

22        THE COURT:  Okay.

23        MS. GASTON:  We made a fifth production last night.

24        THE COURT:  Oh, a fifth.

25        MS. GASTON:  A fifth.

1          THE COURT:  Okay.  So I had two in the last -- so

2     there's been three more.  Okay.

3          MS. GASTON:  Correct, Your Honor.  So at this point

4     the discovery is at approximately 12.8 million pages.  That

5     is generally the number of pages that we are at.  But as we

6     described in our reply, number of pages is not the best metric

7     for measuring such things.

8        So of those 12.8 million pages, approximately 25 percent,

9     or more than 3 million, are pages associated with the

10    defendant's campaign or political action committees.  More

11    than 3 million, as we stated in our reply, came from the

12    United States Secret Service.  That's approximately 24

13    percent.  There are hundreds of thousands of pages from

14    publicly available litigation, 172,000 pages from the National

15    Archives.  And so --

16         THE COURT:  And those are documents that were -- would

17    have been reviewed for privilege by Mr. Trump's counsel before

18    they were turned over.

19         MS. GASTON:  Yes, Your Honor.  So approximately 61

20    percent of what we have provided so far, or 7.8 million pages,

21    are pages that came from entities associated with the

22    defendant, either in political action committees or the

23    campaign, from the National Archives, from publicly available

24    litigation documents, open-source materials like tweets,

25    materials from the House Select Committee, the vast majority

1    of which were already publicly available, and then some data

2    associated with a consultant to the defendant in some of the

3    election litigation.

4       So what is in the other 5 million pages, which is what

5    we're really talking about, is things like every grand jury

6    transcript in this case up to indictment and the accompanying

7    exhibits.  The defendant has all of those already.

8            THE COURT:  And those exhibits -- excuse me.  If an

9    exhibit was produced but shown to a witness during the grand

10   jury testimony, then it's been duplicated.  Is that correct?

11           MS. GASTON:  Yes, Your Honor.

12           THE COURT:  It's listed twice.

13           MS. GASTON:  Exactly.  So for instance, if a witness

14   in this case received a grand jury subpoena and produced

15   documents to the government, and the government went though

16   the documents, and then that person testified in the grand

17   jury and the government used documents from the document

18   production, those documents would be reproduced to the

19   defendant both in terms of the grand jury production and as --

20   the subpoena production, and the testimony and the documents

21   shown to the witness in the grand jury.

22      The same thing is true of all of our witness interviews in

23   the course of the investigation.

24           THE COURT:  That's what I was going to ask you next.

25   How much of the discovery could be categorized as witness

1       statements and notes?

2              MS. GASTON:  One moment, Your Honor.

3         Your Honor, approximately 58,000 pages are from witness

4       interview folders.  That includes the transcripts of those

5       interviews.  Most of them were audio recorded.  So the defense

6       has been provided audio recordings as well as transcripts

7       created for convenience of review.  And then all of the

8       exhibits that were used in the course of those interviews, and

9       those were provided in an organized fashion.

10        So, basically, there's a folder or a Bates range associated

11      with each witness.  It includes the transcript of either the

12      grand jury testimony or of the interview, the agent notes if

13      it was an interview, and then the exhibits associated or any

14      interview report of the interview.

15             THE COURT:  Do you have an idea of how much of the

16      discovery is material that Mr. Trump actually created, such as

17      tweets or other...

18             MS. GASTON:  The open-source material, Your Honor,

19      would include things like the publicly available litigation.

20      So I'm not sure I have a breakdown exactly of his tweets, but

21      I could get that for you.

22             THE COURT:  All right.  That's fine.

23        Now, you also said, at least in your response, that more

24      than 3 million pages, or 25 percent of the first production,

25      and 20 percent of the second production, came from, in quotes,

1    entities associated with Mr. Trump.  And you mentioned a PAC,

2    a political action committee.  Are there other -- what do you

3    mean by that?

4         MS. GASTON:  There's the defendant's campaign,

5    Your Honor, and then a few different political action

6    committees.

7         THE COURT:  Okay.

8         MS. GASTON:  And let me correct myself, Your Honor.  In

9    terms of the open-source material that includes campaign

10   statements, tweets, Truth Social posts, that's about 27,000

11   pages.

12        THE COURT:  Okay.  Now, in your key documents list, do

13   you have an approximation of how many documents are included

14   in that list?

15        MS. GASTON:  Yes, Your Honor.  One moment, please.

16     The key documents are approximately 47,000 pages.  And let

17   me take a moment just to describe what the key documents are.

18        THE COURT:  Yes.

19        MS. GASTON:  So it includes all of our case agent's

20   summary testimony as well as any exhibits introduced through

21   her to the grand jury.  And so that includes things like

22   transcripts of witness testimony or testimony before the House

23   Select Committee.  It also includes a file that is essentially

24   an annotation of the indictment.  It is almost 3 00 different

25   documents that are labeled and named according to the

1    paragraph of the indictment that they support.  So it is

2    essentially a road map to our case, Your Honor.  And it

3    includes other key documents that the government believes that

4    it may use at trial as well.

5        The other thing that we did through case agent testimony,

6    and have pointed the defense to in our cover letter and

7    through that case agent testimony, is we identified material

8    that we believe is arguably favorable to the defendant.  Of

9    course, that is simply the government's guess at what the

10   defense might find favorable, and it is of course a duty for

11   the defense to also identify potentially exculpatory material

12   in materials --

13       THE COURT:  But your *Brady* obligations are

14   constitutional and ongoing and that's what -- that's the

15   material you're talking about.

16       MS. GASTON:  Yes, Your Honor.

17       THE COURT:  And as you know, I think we take a --

18   if there's a doubt, the government's encouraged to take an

19   overinclusive position on that.

20       MS. GASTON:  Yes, Your Honor.  And, in addition,

21   the defense has spoken in interviews and such about various

22   defenses that they may raise in this case.  And all of the

23   materials that we have provided, the grand jury subpoena

24   returns, the search warrant returns, it is all searchable in

25   their electronic database for purposes of identifying that

1    material as well.

2           THE COURT:  Okay.  Thank you for answering a couple

3    of my questions, including how the information is organized.

4    And so -- and it's substantially complete.

5       All right.  And that key documents list, was that just for

6    the first production or has that been supplemented for the

7    entire production?

8           MS. GASTON:  The key documents list was an entirely

9    duplicative collection of material in the very first

10   production so that we could say to the defense in our very

11   first production, here's what we view as the most important

12   evidence in this case.  Here it is, it's all in one place for

13   you in a very organized fashion.

14          THE COURT:  Okay.  Thank you.

15      Well -- thanks.

16          MS. GASTON:  Thank you, Your Honor.

17          THE COURT:  I'll note that many years ago when I was

18   trying murder and conspiracy cases across the street in

19   Superior Court, we got witness names on the day of trial and

20   witness statements and grand jury testimony before the witness

21   testified and sometimes after the witness testified.  And

22   while the discovery rules here in federal court provide for

23   far more disclosure in advance, the manner in which the

24   discovery in this case has been organized indicates that the

25   government has made a considerable effort to expedite review,

1    certainly beyond their normal discovery obligations.

2        In cases involving large amounts of document discovery,

3    initial review is usually done by electronic searches.  The

4    government represents that it has produced the discovery in

5    load ready files so that the defense can review them quickly,

6    in the same manner as the government did, through targeted

7    keyword searches and electronic sorting.

8        So, Mr. Lauro, why won't that significantly speed up the

9    review process?

10           MR. LAURO:  Because Mr. Trump, President Trump, is

11    entitled to a fair trial.

12           THE COURT:  Absolutely.

13           MR. LAURO:  He is entitled to an opportunity to have a

14    defense lawyer who is reasonably prepared.  This is a request

15    for a show trial, not a speedy trial.

16        Your Honor, I respectfully and strongly disagree with the

17    prosecution's presentation here.  The concept that we would

18    have access to materials in the archives, in Secret Service,

19    in other government agencies, that that would somehow enable

20    us to prepare for trial because we should have already been

21    reading that material for the last two and a half years, is

22    absurd and ridiculous.

23        We have to do our job as defense lawyers to represent a

24    client.  This is a solemn obligation of every defense lawyer,

25    no matter if you're representing someone who's in a street buy

1    on a corner or a former president of the United States.

2    I have a special obligation to make sure that my client is

3    adequately represented.  And I'm sorry, Your Honor, to

4    suggest -- for a federal prosecutor to suggest that we could

5    go to trial in four months is not only absurd but it's a

6    violation of the oath to do justice.  And let me just go

7    through this organized material --

8         THE COURT:  Okay.  Let's take the temperature down for

9    a moment here.

10        MR. LAURO:  I take my obligation seriously as a defense

11   lawyer.  I've been doing this for 40 years.  I know Your Honor

12   has done it as well.  It's a sacred obligation to represent a

13   defendant.  And it's not easy when you have the entire

14   government amassed against you.  But we need adequate time to

15   prepare.  President Trump stands before Your Honor as an

16   innocent man right now.  He's entitled to his Sixth Amendment

17   protection.  He's entitled not only to counsel, but under

18   *Gideon*, the promise of *Gideon*, he's entitled to counsel that

19   can prepare adequately.

20       What this case means, we're talking about 9 terabytes of

21   information.  I have to go through that information.  I have

22   to sort it by witnesses, over 250 witnesses.  I have to

23   organize it in a way that's reasonable.  I have to look at all

24   the information in terms of these key witnesses.  I have to

25   cross-reference against other witnesses that may have said

1    something about a particular witness.  I need to think about

2    impeachment material.  I need to think about corroborative

3    material.  I need to think about my own Rule 17 subpoenas as

4    well.

5        For the government to suggest that I can do that in four

6    months is an outrage to justice, that not once have they

7    talked about justice in this case, not once.  So this is what

8    I have to do.

9        Now, they can give me key documents.  That's very nice of

10   them.  That's very kind of them.  I'd like to know one defense

11   lawyer in the United States that's going to rely on a

12   government's proposal of key documents.

13       THE COURT:  Mr. Lauro, as I said, let's take the

14   temperature down.  I understand you have a sacred obligation.

15   I understand Mr. Trump is presumed innocent, as is every

16   defendant.  But let's not overlook the fact that Mr. Trump has

17   considerable resources that every defendant -- criminal

18   defendant does not usually have.

19       And what I want -- my question to you is, given how the

20   discovery in this case has been produced, in an electronic

21   searchable form, and given the fact that a substantial portion

22   of the discovery has already been reviewed by Mr. Trump's

23   counsel as part of documents produced by archives -- hold

24   on -- why won't that speed it up?

25       I mean, we're not talking -- discovery in 2023 is not

1    sitting in a warehouse with boxes of paper looking at every

2    page at the first cut.  You and I both know that that is not

3    how the first cut of discovery in a complex case is reviewed;

4    it's reviewed by electronic searches.  So why won't the manner

5    in which this discovery has been turned over speed up your

6    review process?

7         MR. LAURO:  For a number of reasons.  First of all,

8    we've not had access as criminal defense counsel to what's in

9    the archives, what's in the Secret Service, what's in DOJ,

10   what's in political action committees.  We have not had that

11   access.  We as criminal defense lawyers now, for the first

12   time looking at these charges, have to assess these charges in

13   terms of what the actual relevance is.

14     They have given us what they represent is Rule 16 material

15   that's relevant to the defense.  We are now the defense and

16   we're looking at all the material they've given us.

17        THE COURT:  All right.  But some of that material is

18   not new to you --

19        MR. LAURO:  It is new to me, Your Honor.

20        THE COURT:  Whether or not you're looking at it through

21   the eyes of a criminal defense lawyer, certainly it was

22   reviewed by Mr. Trump's counsel before, before this case came

23   in.

24        MR. LAURO:  Who were not criminal defense lawyers.  How

25   is that new to me, Your Honor?  I just have to work through --

1          THE COURT:  In other words, this is not brand-new

2     information.  Some of it are statements, some of it are

3     materials of your client's own creation.  In other words, none

4     of this -- you're not seeing this for the -- you personally

5     may be, this may be new to you, but this is material that has

6     been reviewed, at least for privilege -- some of this material

7     are statements of your client and materials created by your

8     client or entities associated with him.  Why -- that's not

9     brand-new information, is it?

10         MR. LAURO:  Of course it is.  Of course.  To a criminal

11    defense lawyer, it's brand-new information.  That's like

12    saying if a CEO of a public company was before Your Honor and

13    had responsibility for running a company, oh, they've seen all

14    the information that the company has, why do they need time to

15    prepare?  They've already had it for years.

16         THE COURT:  No, that's a different point.  Because it's

17    information from the company doesn't mean that the defendant

18    had seen it.  But a lot of this material is material your

19    client created or material that your client's lawyers, maybe

20    not you specifically, saw and reviewed and had possession of

21    before this case.

22         MR. LAURO:  Your Honor, the statements of my client are

23    minuscule compared to the avalanche of information here.

24    Minuscule.  And by the way, I need to look at all the

25    statements, Mr. Blanche needs to look at all the statements

1    as a criminal defense lawyer, not from a client's perspective.

2    That's the teaching of *Gideon*.  It would be a miscarriage of

3    justice if a lawyer were expected to absorb all the

4    information that a client already knew and not look at it anew

5    and not look at it from the perspective of a criminal defense?

6        THE COURT:  Absolutely.  And certainly you have to look

7    at your client's statements, you have to look at -- there's a

8    lot that you may personally have to eyeball.  But you don't

9    need to look at -- you personally, at least at the first cut,

10   are not going to review all 12 million pages, right?  Some of

11   those documents are going to be reviewed electronically.  Am I

12   correct?

13       MR. LAURO:  No documents get reviewed electronically.

14   They get assembled electronically, and we can do searches for

15   documents, but, Your Honor, all I can tell you is I've worked

16   these large cases.  Maybe -- I don't know what the prosecution

17   has done in a former life, but these cases are enormously

18   complex and they go something like this.  As you know,

19   Your Honor, I'm not telling you anything; you've been through

20   it.  You have to do searches, maybe with key terms.

21       THE COURT:  Right.

22       MR. LAURO:  You have to organize those documents

23   typically by witnesses and issues.  You have to cross-

24   reference them with respect to what other people say and

25   what other people have mentioned.  Then you have to organize

1    a narrative.  I like to do witness outlines.  Some lawyers are

2    different.  I like to be prepared for trial.  I have an

3    obligation to a client.

4         Then, in addition, you have to look for evidence that

5    corroborates witnesses that are favorable to you.  You have

6    to look for impeachment evidence with respect to witnesses

7    that say something bad about you.

8         In this case we have not only documents we're searching

9    for, we have videos and recordings that can't be searched

10   electronically.

11            THE COURT:  But you have --

12            MR. LAURO:  This is a massive undertaking.

13            THE COURT:  But you have the transcripts of those

14   recordings.

15            MR. LAURO:  I don't think in all respects we do, and

16   not certainly with respect to every single video I don't think

17   we do.  This is over 12 million pages, 9 terabytes of

18   information.  This is an overwhelming task.  Never in the

19   history of the United States have we seen a case of this

20   magnitude go to trial in four months, let alone a year, let

21   alone less than two years.

22        If we were big corporations in America, where the only

23   thing was money at stake, no one would blink an eye at a

24   two-and-a-half or three-year trial schedule.  But this man's

25   liberty and life is at stake and he deserves an adequate

1    representation, as every American does.  He's no different

2    than any American.

3          THE COURT:  Mr. Lauro.

4          MR. LAURO:  I'm sorry, Your Honor.  For a defense

5    lawyer to hear these arguments from a prosecutor who took an

6    oath to do justice, I'm sorry, it has to be spoken.  Every

7    single person in this courtroom, every single person in the

8    United States deserves a fair and adequate defense.

9       And I'm telling you, as an experienced trial lawyer, an

10   experienced defense lawyer, we cannot do this in the time

11   frame that the government has outlined, and we cannot do this

12   in the time frame that would be suggested by anything less

13   than what we have.  We need this time to prepare.

14         THE COURT:  I understand, Mr. Lauro, but I can tell

15   you, you are not going to get two more years.  This case is

16   not going to trial in 2026.  It's not going to trial in --

17         MR. LAURO:  Your Honor, I can only give you my best

18   estimate based on the fact that, you know, we're looking at

19   this discovery right now.  We just got a discovery at three

20   o'clock in the morning today.

21         THE COURT:  I understand.  But Mr. Lauro, for one

22   thing -- okay.  You suggest that the defense needs a

23   substantial amount of time to investigate, for example.

24   The existence of the grand jury investigating in this case has

25   been known for -- since September 2022, almost a year, has been

1    public knowledge.  The identity of many of the witnesses who

2    have testified in the grand jury, and potential trial witnesses,

3    have been a matter of public record.  And given that Mr. Trump

4    likely knows most of the witnesses the government -- or many of

5    the witnesses the government would call, several of whom,

6    according to at least page 7 of the indictment, may be staff and

7    associates.  So why would the defense need two years to

8    investigate?

9         MR. LAURO:  Because there's no obligation for any

10   American citizen to start conducting their own defense during

11   a grand jury investigation and prepare for a trial when we

12   don't even know what the issues are, what the charges are.

13        THE COURT:  There may not be an obligation, but

14   certainly a defense attorney, a good defense attorney, knowing

15   that their client was under investigation by a grand jury,

16   knowing who the witnesses -- some of the witnesses were in the

17   grand jury, would already start.  Right?  Isn't that what a

18   good defense attorney would do?

19        MR. LAURO:  Your Honor, I was not hired during that

20   period of time.  The government never communicated, as far as

21   I know, to President Trump's counsel regarding the theories of

22   investigation, the matters under investigation, the statutes

23   at issue, the witnesses.  None of that was ever provided.

24   They could have done that.  They could have said, yes, here's

25   what we're doing --

1          THE COURT:  I'm not sure if they could commensurate

2     with --

3          MR. LAURO:  -- the fact that they didn't puts us at a

4     disadvantage because how can we go into a dark room and figure

5     out what they are investigating?  That would be absurd.  We

6     can't be charged and hindered because we didn't do an

7     investigation during the grand jury period when they wouldn't

8     tell us what that investigation was about.

9        I mean, this case, Your Honor, looking at it from a defense

10    lawyer's perspective, is an enormous, an enormous factual

11    issue.  We haven't even talked about the novel issues of law

12    we're going --

13         THE COURT:  I'm coming to those.

14         MR. LAURO:  -- to have to address.  And I know you're

15    going to get to that.  But this is an enormous, overwhelming

16    task.  We have two law firms, two small law firms here working

17    around the clock, and you see how diligent we are in

18    responding to Your Honor.  Whenever anything is asked, we

19    respond right away.  Even if the rules are shortened for

20    President Trump, we're making sure we're responding

21    immediately, we're doing everything that a diligent defense

22    lawyer can do.

23       But Mr. Trump is entitled, entitled to a defense that's

24    reasonably prepared.  It would be a miscarriage of justice if

25    that truth is not sustained in this court, and every single

1    court.  Whether it's Mr. Trump or anyone else deserves that

2    kind of defense.

3          THE COURT:  And they're going to get it.  The point I'm

4    asking you is about the review necessary for this case.  And

5    Mr. Lauro, I'm well acquainted with *Gideon*.  I'm well

6    acquainted with the defendant's Sixth Amendment rights, his

7    right to a fair trial, and I intend to ensure he gets it.  But

8    I'm not going to give -- as I said, this trial is not -- this

9    case isn't going to trial in 2026.

10         And I want to know, despite the rhetoric in your response

11   to the government's proposed trial date, realistically, why

12   you think that you need this time when, although there are 12

13   million pages of discovery, you and I both know and the

14   government knows that that's not -- again, nobody's sitting

15   there going through page by page.  A significant amount of

16   this discovery is duplicative.  A significant amount of it you

17   already have in your possession or know about.  And whether or

18   not you, the defense lawyer, are seeing it for the first time,

19   Mr. Trump has been ably represented by experienced counsel

20   during the whole pendency of this investigation.

21         This is not -- you know, it's not an unveiling -- a

22   surprise he's been indicted.  You've known this was coming.

23   Mr. Trump's counsel has known this was coming for some time.

24   And I'm sure any able, diligent, zealous defense counsel would

25   not have been sitting on their hands waiting for an

1    indictment.  Certainly -- yes, an indictment signifies the

2    beginning of a case, and you're looking at the indictment and

3    you're looking at what you need to prepare.  But a lot of this

4    material was in the hands of Mr. Trump and his counsel for a

5    significant period of time before the grand jury was convened.

6    And that's what I'm asking you about.

7         You can keep talking about 12 million pages and his right

8    to a fair trial.  He has a right to a fair trial, but what is

9    a fair amount of time to prepare?  And the 12 million pages we

10   talk about here are not truly indicative of how much time he

11   needs to prepare because a lot of that is simply a belt and

12   suspenders approach by the government, for example, in

13   releasing duplicative documents, exhibits that were referred

14   to in witness testimony and grand jury testimony that are also

15   disclosed to you in production.

16        So a lot of this is duplicative, a lot of this may not even

17   be relevant, and I realize there has to be some searches to

18   categorize that, but that does not, in this court's estimation,

19   need to take two years.

20        All right.  Let me ask you this --

21             MR. LAURO:  Your Honor, may I respond to that?

22             THE COURT:  Yes.

23             MR. LAURO:  And respectfully, what I'm saying is not

24   rhetoric, it's in defense of the Constitution and my client

25   and with respect to trying to explain to Your Honor what's

1    necessary to defend somebody under these circumstances.

2        I doubt, I doubt that -- you can't push a button these days

3    and get documents sorted.  You have to go through those

4    documents.  No person who is charged with a crime should be in

5    some way disadvantaged because they didn't do or anticipated

6    what that crime would be in connection with a grand jury

7    proceeding, and they didn't do or whether or not they did do

8    any kind of research or examination or defense prior to the

9    charge.

10       We start at the time of the charge.  It would be highly

11   prejudicial if Your Honor took into account any time before

12   the charge was entered and suggest that the defense had some

13   obligation to conduct investigation prior to the time the

14   charges were brought.

15       THE COURT:  I'm not suggesting you had an obligation.

16   I'm simply suggesting you had an opportunity.

17       MR. LAURO:  I didn't.  I was hired, you know, a month

18   and a half ago, Your Honor, and I'm going to be trial counsel

19   along with Mr. Blanche.  Not only do we have to review this

20   material, we have to absorb it.  You know what it's like as a

21   trial lawyer.  Sure, you know, a firm can help, paralegals can

22   help, they can read documents, they can look at documents.

23   But at the end of the day, Your Honor, we stand before the

24   jury and we have to make our case before a jury.  We have to

25   know the facts.  Mr. Blanche and I have to absorb a gargantuan

1   amount of facts in this case in order to adequately represent

2   a client.

3       Cross-examining a witness is not an easy task.  You have to

4   make sure that you understand all the documents that might be

5   related.  This is a question of whether or not -- and I'm

6   pleading with Your Honor as an experienced defense lawyer,

7   having done this over 40 years -- this is a question of

8   whether or not one man, one United States citizen, gets a fair

9   trial or not.  And I am telling you, Your Honor, based on what

10  I've seen so far, it is a gargantuan task.

11      I understand we have modern search tools.  Years ago maybe

12  there would be 50 boxes, right, in a room, and we'd look

13  through the boxes one by one.  Now there's 12 million pages.

14  Sure, we sort them in some way by computerized searches, but

15  at the end of the day I have to read the grand jury

16  transcripts, I have to read the FBI 302s, I have to go through

17  all of the text messages.

18      THE COURT:  That's a much smaller universe of

19  documents, Mr. Lauro.

20      MR. LAURO:  I don't think so, Your Honor.

21      THE COURT:  You and I both know that.

22      MR. LAURO:  250 witnesses in this case, and counting,

23  that might be witnesses in this case so far is the estimate we

24  have.  And that's to say nothing of our opportunity to file

25  and seek Rule 17 subpoenas, to do our own witness interviews,

1    to conduct our own investigation.  All of that will be

2    eviscerated.  All of that will be eviscerated.

3        And if the goal here is to truly do justice, truly do

4    justice, then every American citizen is entitled to counsel

5    with a reasonable time to prepare.  No one, no one, is

6    suggesting that we're not being diligent.  No one is

7    suggesting that we're not taking these obligations seriously,

8    because we are, Your Honor.  We have an enormous

9    responsibility here, not just to one client but to the system,

10   and to ensure that the system works for every American.

11       Mr. Trump is not above the law but he's not below the law.

12   He should not be treated any differently than any other person

13   who appears before Your Honor and asks and pleads for justice.

14   And I am saying, without question, that we cannot be ready

15   under the circumstances of this case until we have a

16   reasonable amount of time, consistent with justice, so we can

17   prepare and we can also present.

18       Your Honor, candidly, the jury is entitled to an organized

19   defense.  The jury is entitled to a presentation that makes

20   sense, a defense narrative that shows that counsel is

21   prepared.  The worst thing for a jury to see is a lawyer that

22   gets up there are starts asking questions, they don't even

23   know what they're talking about because they haven't been

24   prepared.  And we've been there, we've seen that, and none of

25   us here in this courtroom would do that, and I'm certainly

1    not.

2           THE COURT:  Thank you, Mr. Lauro.  And I will say that

3    I don't doubt for a minute that you're working diligently, but

4    I will say that you and I have a very, very different estimate

5    of the time that's needed to prepare for this case.  But as

6    you have mentioned several times, Mr. Trump will be treated

7    exactly, with no more or less deference, than any other

8    defendant would be treated.

9      All right.  With regard to the complexity of the case, the

10   defense says this is a complicated, unusual case that might

11   require the Court to address novel questions of fact or law,

12   but you don't explicitly state what those novel questions are.

13   I mean, some of the January 6 cases, all of which have been

14   brought in this court, have involved conspiracies related to

15   the Electoral Count Act.

16     Now, a former president being charged for crimes while in

17   office, or the prosecution of a presidential candidate may be

18   points of historic note about this case, but they aren't legal

19   issues.  This case involves one defendant and four counts.

20   The charges are not multijurisdictional.  The alleged conduct

21   occurred over the period of a few months.  Why is this case

22   complex, other than the historic aspect of it?

23          MR. LAURO:  We've outlined the factual complexity to

24   some extent.  The legal complexity, number one, is we have a

25   very initial issue of executive immunity which we're going to

1    raise with the Court likely this week or early next week,

2    which is a very complex and sophisticated motion regarding

3    whether or not this court would even have jurisdiction over

4    this case in light of the fact that, as the indictment

5    essentially indicts President Trump for being President Trump

6    and faithfully executing the laws and executing on his take

7    care obligations, so we're going to have a very, very unique

8    and extensive motion that deals with executive immunity.

9        We also anticipate a selective prosecution motion, given

10   the fact that this prosecution provides an advantage to these

11   prosecutors' boss, who is running a political campaign against

12   President Trump, which everybody knows about, and this

13   selective prosecution motion will go directly to the core of

14   criticisms that Mr. Trump made historically against President

15   Biden and his son and whether or not this is a retaliatory

16   action as a result of that.  So we expect that there's going

17   to be a selective prosecution motion as well.

18       We also have core First Amendment issues that are going to

19   be litigated in this case.  We also have a number of Rule 17

20   subpoenas that we anticipate serving.  There might be some

21   litigation about that.

22       So there's going to be an enormity of unique legal issues.

23   None of these have been decided yet.  To say nothing of the

24   core question of whether or not 18 U.S.C. 371 should be used

25   in a political context.  That's going to be a novel issue

1   because historically it's not been used against a political

2   opponent.  This is the first time where the Biden

3   administration has used that statute against a political

4   opponent.  We're going to be dealing with whether or not the

5   obstruction statute should be applied under the circumstances

6   of this case.

7        So all of those are novel issues, Your Honor, and I will

8   say that this court -- I know Your Honor is going to look at

9   all those issues seriously, but they're going to be briefed

10  completely and fully by the defense.  And not only are we

11  going to be dealing with a host of very significant factual

12  issues, but I'm afraid, Your Honor, we're going to be back

13  many, many times arguing some of these complex motions.  And

14  I --

15            THE COURT:  Can't wait.

16            MR. LAURO:  I see you smiling, Your Honor, that you're

17  looking to enjoy these novel issues, but they've never been

18  decided.  And certainly the question of executive immunity is

19  a very important one.  It's not been decided in the criminal

20  context by the Supreme Court.  It has with respect to civil

21  litigation, but everything in the indictment, it's a speaking

22  indictment, 45 pages of essentially a prosecutorial theory.

23       All of that really embraces executive action or items

24  within the penumbra of executive action, within the outer

25  perimeter, as the legal definition is, of what President Trump

1    was required to do as president.  That's going to present an

2    incredibly important *ab initio* legal issue for Your Honor to

3    decide.

4        So we're going to be busy with very, very complex, novel

5    issues without question in this case.  This is one of the most

6    unique cases from a legal perspective ever brought in the

7    history of the United States.  Ever.  And we're going to have

8    to deal with those issues.  And we will.

9        But we're already starting that at the same time that we

10   have this massive factual investigation under way.  So it's a

11   dual issue.  And that's why I'm so adamant about the time to

12   prepare.  It's not just looking through 18 million pages of

13   documents, it's also looking through legal theories and legal

14   issues that will be presented, and some of these have never

15   touched a court before, and Your Honor's time and effort are

16   going to have to be devoted to that as well.

17       So all of this presents a clear reason to handle this as if

18   President Trump were any other person coming before Your Honor

19   and needing the time necessary to prepare adequately both on

20   the legal side and on the factual side.

21            THE COURT:  All right.

22       Ms. Gaston.  Could you respond to Mr. Lauro's discussion

23   of the time needed to review the documents in this case.

24            MS. GASTON:  Yes, Your Honor.  I think there is a

25   reason why Mr. Lauro resisted answering your specific question

about what the exact time would be needed to review the materials in this case, and it's because he doesn't want to admit that through electronic searches and through the reasonable due diligence used in modern criminal trials, it is possible to be ready much sooner than April of 2026.

Let me first address a few of Mr. Lauro's points that suggest that the defense is starting fresh at indictment. So, first, in advance of indictment in this case, the Select Committee made public a large amount of the evidence in this case, and the defendant himself published video and written defenses in response, which demonstrate that the defendant was observing the Select Committee's investigation and work, and defending himself against it.

In fact, in an interview the night the indictment was unsealed in this case, Mr. Lauro called the indictment "a regurgitation of the J6 committee report."

In terms of pre-indictment litigation, the government and the defendant engaged in extensive pre-indictment litigation regarding executive privilege. It took place in five sealed proceedings starting in August 2022 and lasting through March of 2023. And it concerned the scope of grand jury testimony for 14 witnesses. And I'll just note that we asked for and received permission from the chief judge to provide that information to you today.

In terms of witnesses, a number of people on our potential

1    witness list are not a surprise to the defense either.  The
2    defendant's political action committee paid attorneys' fees for
3    more than a dozen witnesses during the course of our
4    investigation.  And since indictment, Mr. Lauro has a team of
5    experienced attorneys working for him.  There are four counsel
6    of record, two additional attorneys who attended the
7    arraignment, one of whom was intimately involved in the
8    pre-indictment litigation that I just mentioned, another at the
9    last hearing.

10       And when Mr. Lauro appeared on multiple news programs and
11   podcasts following the indictment, he described a number of the
12   defenses he plans to raise, motions he plans to file, and he
13   stated that he had read Vice President Pence's book twice and
14   was already planning his cross-examination.

15       Just a week or so ago, the defendant claimed publicly to have
16   created a robust report on the stolen presidential election of
17   2020 that contained irrefutable and overwhelming evidence of
18   election fraud that his attorneys would use in service of a
19   motion to dismiss.  We are not starting fresh at indictment in
20   this case.

21       Other things that Mr. Lauro mentioned are not a reason not to
22   proceed promptly to trial.  With respect to Rule 17 subpoenas,
23   as the Court knows, those are not intended as a discovery tool,
24   and the defense has to meet exacting standards of relevancy,
25   admissibility, and specificity.  And the best way to find out if

1    the defense can meet those standards is to set a schedule based

2    off of a trial date and move forward with them.

3        The same goes, Your Honor, with respect to the complexity

4    that Mr. Lauro just mentioned.  So, first of all, Mr. Lauro

5    mentioned that they are prepared to file a motion regarding

6    executive immunity this week.  Let's have that motion.  The

7    government will respond to that motion and the Court can

8    consider it.  But let's set a trial date and set a schedule.

9        Other things that Mr. Lauro mentioned are not novel

10   questions.  Selective prosecution motions are common in this

11   district.  I'm sure that Your Honor receives them all the time.

12   Similarly, Rule 17 subpoenas, there's a lot of case law on

13   those.  And First Amendment issues in the context of fraud is

14   not a new legal issue and that won't be complex either.  And

15   §371 has been challenged in a number of ways in the course of

16   more than a decade, and that is not a complex legal issue

17   either.

18       But I think the thing that all of this shows is the

19   importance of setting a trial date and working backwards with a

20   schedule.  I think all of us, Your Honor, Mr. Lauro, we know

21   that a trial date really sort of focuses the mind and enables

22   everybody to work towards a common date.

23       And so the question before the Court today is, under the

24   Speedy Trial Act, what is the balance of the defendant's right

25   and need to prepare for a fair trial and, on the other hand,

1    the public's exceedingly and unprecedentedly strong interest in

2    a speedy trial here.  The defendant, formerly the senior-most

3    official in our federal government, is accused of historic

4    crimes: attempting to overturn the presidential election,

5    disenfranchise millions of Americans, and obstruct the peaceful

6    transfer of power.

7        There is an incredibly strong public interest in a jury's

8    prompt and full consideration of those claims in open court.

9    And there's also a strong public interest in a fair trial, which

10   means that we need to proceed to trial as soon as the defense

11   can be ready, reasonably, because on a near daily basis the

12   defendant posts on social media about this case.  He has

13   publicly disparaged witnesses, he has attacked the integrity of

14   the courts and of the citizens of the District of Columbia who

15   make up our jury pool, and this potentially prejudices the jury

16   pool.

17       So under the Speedy Trial Act, Your Honor, we need to find a

18   time for trial when -- as soon as the defense can reasonably be

19   ready.  The government's trial date estimate was an estimate of

20   when, based on our knowledge of the discovery, the public nature

21   of the evidence in this case, the pre-indictment litigation,

22   Mr. Lauro's experience and ability to prepare, and the

23   organization of the discovery, that was our estimate.  But the

24   government urges the Court to set the soonest possible trial

25   date when the Court believes that the defense can reasonably

1    be ready.

2          THE COURT:  Okay.  Thank you.

3       So I'm going to digress for a moment and talk about CIPA.

4    The parties agreed to hold a conference today on the

5    Classified Information Procedures Act, CIPA, to discuss the

6    small amount of classified information that may be subject to

7    discovery in this case.  Because such procedures might affect

8    the trial date and the parties' readiness, I think it might

9    make sense to discuss CIPA now, or we can wait till the end of

10   the hearing.  What's your preference?  Mr. Windom?

11         MR. WINDOM:  I think now makes sense, Your Honor.

12         THE COURT:  Mr. Lauro?

13         MR. LAURO:  Yes, Your Honor.  Mr. Blanche will take

14   care of that.

15         THE COURT:  All right.

16      So, as I understand it, CIPA does not create any additional

17   rights to discovery or disclosure but rather establishes

18   procedures for how and when certain procedures relating to

19   classified information will be handled during the discovery

20   process and the lead-up to trial.

21      The government filed a consent motion in what may be our

22   last joint unopposed filing -- such a nice beginning to the

23   case.  The government filed a consent motion to appoint a

24   classified information security officer pursuant to CIPA

25   Section 2, which was ECF No. 33, and an unopposed motion for a

protective order regarding classified materials pursuant to CIPA Section 3, which was ECF No. 35.  I granted both motions on August 22 and entered a sealed order designating the classified information security officer, and that was ECF Nos. 36 and 37.

Now, CIPA Section 4 provides that the Court upon a sufficient showing may authorize the United States to delete specified items of classified information from documents to be made available to the defendant through discovery under the Federal Rules of Criminal Procedure, to substitute a summary of the information for such classified documents, or to substitute a statement admitting the relevant facts that classified information would tend to prove.

Pursuant to the discovery process under Section 4, there are three steps governing the handling of classified information under Sections 5 and 6 of CIPA.

First, under Section 5, the defense must file a pretrial notice precisely identifying the classified information they want to use at trial; second, upon motion of the government, the Court shall hold a hearing pursuant to Section 6(a) to determine the use, relevance, and admissibility of the proposed evidence; and third, following the Section 6(a) hearing and formal findings of admissibility by the Court, the government may move to substitute redacted versions of classified documents for the originals or to prepare an

1    admission of certain relevant facts or summaries for

2    classified information that the Court has ruled admissible.

3         So, Mr. Windom, are you handling this?

4              MR. WINDOM:  Yes, Your Honor.

5              THE COURT:  The government has noted that it does not

6    anticipate introducing classified documents in its

7    case-in-chief.  Is this still the case?

8              MR. WINDOM:  Yes, ma'am.

9              THE COURT:  I realize this is dependent on the trial

10   date, but does the government have an estimated schedule for

11   producing classified information to the defense and/or moving

12   for deletion or substitution under Section 4?

13             MR. WINDOM:  Yes, ma'am.

14             THE COURT:  How much material are we talking about

15   here?

16             MR. WINDOM:  Sure.  So top line, whatever happens with

17   CIPA we don't anticipate will affect any trial date Your Honor

18   sets, whatever the date may be.

19        There are two things to talk about here.  First, there

20   is the limited amount of classified information that the

21   government is going to make available to the defense.  And

22   second is the CIPA Section 4 process.

23        With respect to the information that is going to be made

24   available to the defense, the universe of what we're talking

25   about is five to ten nonduplicative classified documents

1    totaling less than a hundred pages of material.  Those are the

2    documents.

3        There's also a transcript.  The transcript will be about

4    125 pages long.  It's a transcript of a witness interview.  We

5    have already provided the relevant part of the transcript in a

6    nonclassified form.  In fairness, we are going to provide the

7    rest of the transcript as well.  That is in classification

8    review.  That will be provided to the defense as well.

9        So in total, between the documents and the transcript,

10   we're talking about 225, 250 pages total.

11          THE COURT:  Okay.

12          MR. WINDOM:  This is information that the defense can

13   review as soon as it gets its final security clearance.

14   Mr. Blanche currently has an interim top secret clearance.  He

15   is allowed to review only a small part of the material at this

16   point.  We anticipate Mr. Blanche may have a better

17   understanding of when he'll get his final security clearance,

18   but we anticipate that will be fairly soon.  Within the next

19   few weeks is our best estimate.  That's not something we

20   control.

21       As I said at the beginning, we do not anticipate introducing

22   classified information in our case-in-chief.  To the extent

23   that the defense reviews the material and wants to give notice

24   under CIPA Section 5 that they intend to use the material,

25   first of all, based on my knowledge and information, I don't

1     think they will do that.  If they do do that, we would

2     recommend a date for that CIPA 5 notice, a deadline for the

3     CIPA 5 notice of 30 days after Mr. Blanche gets his final

4     security clearance.  That would give him time to review the

5     material.

6          Mr. Lauro, my understanding, he does not have a security

7     clearance at this point, but there are ways -- to the extent

8     that Mr. Blanche needs to discuss the material with Mr. Lauro,

9     the government believes that there are ways to do that either

10    in a unclassified form or in a classified form available to

11    Mr. Lauro should he get an interim security clearance, which

12    is a much faster process than a final security clearance.

13         If the defense does move under Section 5 of CIPA, which

14    again we recommend 30 days after Mr. Blanche gets his final

15    clearance, the government would then be in a position to move

16    very quickly for a CIPA 6 hearing.

17              THE COURT:  I was going to ask you, how long do you

18    estimate you'd need for the Section 6(a) hearing?

19              MR. WINDOM:  I'll say top line two weeks to make the

20    motion.  It's somewhat dependent on which documents, if any,

21    which would then implicate which equity holders would be

22    involved that the defense wants notice.  That said, there's a

23    universe in which the government doesn't move for a CIPA 6

24    hearing.

25              THE COURT:  You said does not?

1          MR. WINDOM:  Correct.  There's a universe in which that

2     happens, in which the government does not move for a CIPA 6

3     hearing.

4          THE COURT:  Okay.

5          MR. WINDOM:  But I think, in fairness, you can set a

6     date two weeks after the CIPA 5 notice deadline for the

7     government to move under CIPA 6.

8          THE COURT:  And I assume that after the 6(a) hearing,

9     if there is one, the government will not need much time -- or

10    how much time will the government need to prepare redacted

11    versions?  Substitute redacted versions.

12         MR. WINDOM:  Sure.  Again, with the variable that it's

13    highly dependent on what the document is, we believe that that

14    can be accomplished very quickly, in a matter of weeks, and I

15    think it's fine if you want to put a two-week deadline on that

16    given the nature of the documents.

17         THE COURT:  All right.

18         MR. WINDOM:  That's with respect -- so that's the first

19    bucket of the information that the defense will be getting in

20    classified discovery.  CIPA 4 is separate.  The government

21    anticipates filing a motion under CIPA Section 4 which we will

22    request that the Court hear on an ex parte basis.  It involves

23    a limited amount of information for the Court to review on a

24    discrete issue.  And we anticipate, if Your Honor would like

25    to set a deadline for that, September 25, which is four weeks

1   away, is more than enough time.  If you want it to be sooner,

2   that will be --

3         THE COURT:  September 25 is fine.

4         MR. WINDOM:  Thank you, Your Honor.  And thereafter,

5   once we file that, then Your Honor can consider that in

6   whatever due course Your Honor believes appropriate.

7         THE COURT:  All right.  Mr. Blanche.  Good morning.

8         MR. BLANCHE:  Good morning, Your Honor.

9         THE COURT:  All right.  I realize, again, this is

10  dependent on the trial date.  But does the defense have an

11  estimated time -- obviously, you don't have your final

12  clearance yet, so it would depend on that -- by which it plans

13  to file its notice identifying the classified information it

14  plans to use?

15        MR. BLANCHE:  So, Your Honor, just as far as my

16  security clearance is concerned and also my counsel who is

17  here today, the process is ongoing, and I do not believe that

18  there's a lot of time left in the process, but it's completely

19  out of my control.

20     In the case in the Southern District of Florida, there's

21  a tremendous amount of key events in September and October

22  around the CIPA discovery in that case.  So I anticipate

23  spending a fair amount of time between whenever I get a

24  security clearance and into October with the CIPA discovery in

25  that case.  My understanding from the government is that the

1    number of documents in this case is small.

2              THE COURT:  It's relatively small.

3              MR. BLANCHE:  The issue I have is -- about when we will

4    make Section 5 motions, if we make Section 5 motions at all,

5    is I would certainly have to speak about that with my counsel

6    who I don't believe has even interim clearance yet.

7              THE COURT:  Well, remember, at least according to

8    Mr. Windom, the government isn't even planning on using any

9    classified documents in its case-in-chief.  So this would sort

10   of be dependent on whether you wanted to introduce that

11   information.

12             MR. BLANCHE:  And even beyond that, there's other

13   potential litigation -- beyond just whether the government

14   chooses to use anything in their case-in-chief, there's

15   litigation that the defense can initiate under CIPA depending

16   on what the documents show, whether it's requests for

17   additional documents or for the government to do additional

18   searches for additional documents.  I don't know.  There may

19   not be any of that litigation, but I won't know that until I

20   review the documents.

21       So the only contention or issue I have with the schedule

22   proposed by the government is I think the triggering date for

23   a Section 5 filing should be 30 days after co-counsel gets

24   security clearance, not me.

25             THE COURT:  But why does that have anything to do with

1    you?  It's an ex parte filing they're proposing giving to me

2    by September 25.  Are we talking about the same thing?

3            MR. BLANCHE:  No, that's Section 4.

4            THE COURT:  Okay.

5            MR. BLANCHE:  That's the government, and that's fine.

6    The proposed date by the government for our motions was 30

7    days after --

8            THE COURT:  That's based on their proposed trial date,

9    though.  Right?

10           MR. BLANCHE:  I don't know what it's based on.  It's

11   just what they suggested.  My request would be that any

12   motions we need to file under CIPA, to the extent it's

13   triggered, it's triggered off of the date that Mr. Lauro and

14   his team receive security clearances.  It's not supposed to

15   take that long.  For example, I believe I started the process

16   in the Southern District of Florida about 45 days ago, and so

17   it's nearly complete.  My understanding, not from anybody

18   sitting at this table --

19           THE COURT:  Excuse me.  When did you get your interim

20   clearance?

21           MR. BLANCHE:  Oh, that's within a day or two.  It's

22   very quick.  However, Your Honor, my understanding is there's

23   not -- well, I don't want to speak to the documents.  But my

24   understanding is that the special counsel's office was able to

25   accelerate the process in the Florida case, and I'm assuming

1    they can do the same here.

2         THE COURT:  Oh, I'm sure they will try.

3         MR. BLANCHE:  They apparently have the ability.  So I

4    would just respectfully request, Your Honor -- I can certainly

5    look at the documents as soon as I have clearance, and I

6    appreciate the government making them available as soon as I

7    do have clearance, but that doesn't help my strategy and

8    whether we need to file Section 5 motions without counsel

9    being able to look at them.

10     So that would be my only adjustment.  The other proposed

11   dates for the Section 4 filing, I don't have an objection to

12   that.

13        THE COURT:  Okay.  Thank you.

14     All right.  Mr. Lauro, you've already touched on -- do

15   you want to respond, Mr. Windom?

16        MR. WINDOM:  Just briefly, Your Honor.

17        THE COURT:  Yes.

18        MR. WINDOM:  What I would propose is that the Court

19   keep that deadline for the CIPA 5 notice of 30 days after

20   Mr. Blanche gets his final clearance.  Based on what I believe

21   to be able to happen, if Mr. Blanche is able to review that

22   material, he may be able to make determinations on his own

23   with respect to notice, or he may be able to actually speak to

24   Mr. Lauro with an interim clearance regarding the nature of

25   the documents such that they can make a determination soon.

1      What I don't want to happen is for us to key things off of

2  a date which we cannot know as to when Mr. Lauro will get a

3  final clearance.  Maybe we're lucky, maybe that's only two

4  months, but then we're talking about three months from now is

5  when a CIPA 5 notice would be filed.

6      THE COURT:  I'm inclined to keep the schedule, and if

7  there's a delay in the clearance process, I'll adjust it on

8  motion of the parties.

9      MR. WINDOM:  Thank you, Your Honor.

10      THE COURT:  Now, motions schedule.  Mr. Lauro, you've

11  already talked about some of the motions you might file.  And

12  again, I won't hold you to this, but can you give me a sense

13  of what if any dispositive motions or motions requiring

14  significant briefing you intend to file?  You've mentioned the

15  executive immunity, you've mentioned selective prosecution.

16  What else are we talking about here?

17      MR. LAURO:  Thank you, Your Honor.  We'll have motions

18  addressed to each conspiracy that's alleged in the indictment

19  as well.

20      THE COURT:  What kind of motions are you talking about?

21      MR. LAURO:  Motions to dismiss based on the flawed

22  legal theory, and the fact that in our view this is a

23  political prosecution.  And as a result we're going to have to

24  raise that issue squarely with Your Honor and do it justice.

25  So we anticipate those motions to be filed.

1      My understanding is that the selective prosecution motion

2   may involve a request for an evidentiary hearing as well, and

3   I anticipate that the executive immunity argument will also

4   come with a motion to stay as well which we may be entitled to

5   under existing law.

6      So all of those are motions that we anticipate filing as

7   quickly as possible.  Needless to say, it's a significant

8   task.  We want to make sure we get all the issues before Your

9   Honor in a way that does justice to these important motions.

10      THE COURT:  All right.  Thank you.

11      Ms. Gaston, I'm assuming there may be in limine motions

12   from both sides, but does the government plan on filing any

13   other motions that will require a significant briefing

14   schedule?

15      MS. GASTON:  No, Your Honor.  We're thinking in limine

16   motions and then depending on Rule 17 subpoenas and such,

17   responding.

18      THE COURT:  All right.  I am going to take a very brief

19   recess, a few minutes, five or 10 minutes, and we'll reconvene

20   for the trial date.

21      (Recess from 11:14 a.m. to 11:20 a.m.)

22      THE COURT:  All right.  I understand all too well

23   the need for counsel to have enough time to investigate and

24   prepare for trial.  That need is even more compelling in a

25   case such as this where the defendant faces serious charges

1    carrying significant penalties, and where the government has

2    had ample time and resources to investigate and bring these

3    charges.

4        I take seriously the defense's request that Mr. Trump be

5    treated like any other defendant appearing before this court,

6    and I intend to do so.  But I also want to point out that most

7    defendants do not receive this level of assembled, organized

8    and summarized discovery, as well as other concessions made

9    because of the historic nature of the case.

10       Nonetheless, the government's requested date of January 2,

11   2024, does not in my opinion give the defense enough time to

12   get ready for trial.  Even with the considerable resources at

13   his disposal, Mr. Trump, who faces trial in several other

14   matters, needs more than five months to prepare.

15       On the other hand, the defense's proposed date of April

16   2026 is far beyond what is necessary.  The offense giving rise

17   to this case occurred at the end of 2020 and the beginning of

18   2021.  To propose trying this case over five years later risks

19   the real danger that witnesses may become unavailable or their

20   memories may fade.  And while Mr. Trump has a right to time to

21   prepare, the public has a right to a prompt and efficient

22   resolution of this matter.

23       The defense cites to *Powell v. State of Alabama*, 287 U.S.

24   45 at 49, for the proposition that while prompt disposition of

25   criminal cases is to be commended and encouraged, a defendant

1    charged with a serious crime must not be stripped of his right

2    to have sufficient time to advise with counsel and prepare his

3    defense.

4        Quoting the case, the defense argues that scheduling a too

5    speedy trial is not to proceed promptly in the calm spirit of

6    regulated justice but to go forward with the haste of the mob.

7    In that landmark decision in *Powell*, which is also known as

8    the Scottsboro Boys case, the Supreme Court reversed the

9    convictions of several young black men for allegedly raping

10   two white women.

11       The court noted that after their arrest the defendants

12   were met at Scottsboro by a large crowd and that the attitude

13   of the community was one of great hostility.  That's at 51.

14   The defendants' trials began six days after indictment.  The

15   Supreme Court found that there was a clear denial of due

16   process because the trial court failed to give the defendants

17   reasonable time and opportunity to secure counsel and the

18   defendants were incapable of adequately making their own

19   defense.  That's at 71.

20       This case, for any number of reasons, is profoundly

21   different from *Powell*.  Mr. Trump is represented by a team of

22   zealous, experienced attorneys and has the resources necessary

23   to efficiently review the discovery and investigate, and, as

24   the government points out, a great deal of the discovery

25   provided has already been available to the defense or is

1   duplicative.

2       The grand jury investigating the events in this case was

3   convened in September of 2022, meaning that Mr. Trump has

4   known about the government's investigation for nearly a year.

5       I have seen many cases unduly delayed because a defendant

6   lacks adequate representation or cannot properly review

7   discovery because they are detained.  That is not the case

8   here.

9       Consequently, after considering the parties' briefs and

10  arguments, I find that a trial beginning on March 4, 2024,

11  would give the defense adequate time to prepare for trial

12  and ensure the public's interest in seeing this case resolved

13  in a timely manner.

14      I realize that Mr. Trump's criminal case in New York is

15  scheduled for trial on March 25.  I did speak briefly with

16  Judge Merchan to let him know that I was considering a date

17  that might overlap with his trial.

18      A trial start date of March 4, 2024, gives Mr. Trump

19  seven months between indictment and trial, which I believe

20  is sufficient time to advise with counsel and prepare his

21  defense.  Indeed, I have considered all of the relevant

22  factors under the Speedy Trial Act, many of which I've already

23  discussed.  This timeline does not move the case forward with

24  the haste of the mob.  The trial will start three years, one

25  month, and 27 days after the events of January 6, 2021.

1    The trial involving the Boston Marathon bombing began less

2    than two years after the events.  The trial involving Zacarias

3    Moussaoui for his role in the September 11 attacks was set to

4    begin one year after the attacks; but due to continuances,

5    appeals, and voluminous discovery, it began roughly four years

6    later.

7    My primary concern here, as it is in every case, is the

8    interest of justice, and that I balance the defendant's

9    right to adequately prepare with my responsibility to move

10   this case along in the normal order.  Accordingly, trial will

11   commence on March 4, 2024, meaning jury selection will begin

12   then.  I will issue an order with a schedule for pretrial

13   matters, including motions deadlines, status hearing, a

14   pretrial conference, and other interim deadlines.

15   If the parties have conflicts or other issues with the

16   schedule other than the trial date, you may file a motion to

17   alter those dates after consulting with opposing counsel

18   regarding alternative dates.

19   Do the parties have a proposed date for our next status

20   hearing?  Ms. Gaston, Mr. Lauro?

21           MR. LAURO:  I don't, Your Honor.

22           THE COURT:  Ms. Gaston?

23           MS. GASTON:  No, Your Honor.

24           MR. LAURO:  Your Honor, I do need to put on the record.

25           THE COURT:  Yes.  Go ahead.

1          MR. LAURO:  On behalf of President Trump, we will

2     certainly abide by Your Honor's ruling as we must, but we will

3     not be able to provide adequate representation to a client who

4     has been charged with serious offenses as a result of that

5     trial date.  The trial date will deny President Trump the

6     opportunity to have effective assistance of counsel in light

7     of the enormity of this case.

8        I feel I need to put that on the record so there's no doubt

9     that in our judgment that trial date is inconsistent with

10    President Trump's right to due process and his right to

11    effective assistance of counsel under the Sixth Amendment.

12         THE COURT:  I understand, and your objection is noted

13    for the record.

14       Does it make sense for us to have a status hearing -- to

15    set a date for a status hearing now, or why don't I issue a

16    minute order with a proposed pretrial schedule and then maybe

17    the parties can meet and confer and propose a status date.  Is

18    that agreeable to you, Mr. Lauro?

19         MR. LAURO:  I don't see any need for a status hearing.

20         THE COURT:  All right.  I'm sure we'll be back.  Okay.

21    I'll issue a minute order with the pretrial schedule.

22    Ms. Gaston?

23         MS. GASTON:  Your Honor, very briefly, one last matter.

24    In -- the government knows that in some cases in this district

25    attorneys have sent out polls to the general public in advance

1    of trial to gather material for change of venue motions.  I

2    believe Mr. Lauro has suggested in interviews both that the

3    defense might file such a motion and that they might conduct

4    some polling.

5              THE COURT:  By file such a motion, you mean a change of

6    venue motion?

7              MS. GASTON:  Yes, Your Honor.  Based on the wording of

8    the questions, the government has some concern about whether a

9    polling could affect the jury pool in the District, and so we

10   would just request that before either party does any such

11   polling, that the parties be allowed to brief the issue.

12             THE COURT:  Mr. Lauro?

13             MR. LAURO:  I'm not quite sure why that's necessary,

14   Your Honor, in light of fact that that is a core defense

15   function.

16             THE COURT:  Well, here's the problem I see.  The

17   District of Columbia is the site of the events at issue.

18   The citizens of the District of Columbia have a right -- an

19   interest in seeing that this matter is -- moves forward in a

20   fair manner.

21     I don't know whether you intend to file a motion to transfer

22   or what the grounds for such a motion to transfer would be, but

23   certainly based on statements that have been made outside of

24   this courtroom regarding the defense's view of the ability of

25   the citizens of the District of Columbia to provide a fair jury

1    pool, I'm watching carefully for any -- anything that might

2    affect that jury pool or poison that jury pool or in any way

3    affect the ability of the parties to select a fair jury in this

4    case.

5        So I guess I am concerned about what -- you know, if you file

6    a motion to transfer -- and you haven't, on one hand -- but are

7    doing polling on the other, that might affect the same jury pool

8    you're claiming is not fair, there's a problem.  And so I can't

9    tell you what pretrial -- you know -- what investigation you can

10   do or what information you can gather, but I am concerned that,

11   in terms of gauging the views of the venire, of the jury pool,

12   you may actually affect their ability to render a fair verdict

13   by virtue of the kinds of questions you're asking, because

14   questions can be phrased in all kinds of ways.

15       That's what I'm concerned about.  So I would ask -- well, are

16   you intending to conduct that kind of polling, first of all?

17           MR. LAURO:  We intended to address this issue as we get

18   closer to trial, and now in terms of the expedited trial

19   schedule, we'll likely need to do it sooner rather than later.

20   Those motions are typically done with the assistance of some

21   sort of public assessment of views and positions among a jury

22   pool generally.  I've never seen a court deny the opportunity

23   for defense counsel to do that in order to obtain a fair

24   trial.

25           THE COURT:  I'm not planning to restrict your ability

1   to do that.  But I do think it's fair to find out, for you to

2   let the Court know whether you're going to do that.

3        MR. LAURO:  Well, perhaps we could submit something *in*

4   *camera* to Your Honor if that issue does come up.  But I'm

5   certainly not going to share it with the United States

6   government in terms of what we're doing or the questions we're

7   asking.  I don't think that would be appropriate.

8        THE COURT:  I'm going to ask that if you intend to do

9   that kind of polling, that you notify the Court ex parte,

10  should you decide to do that, and then I'll consider it.

11  Ms. Gaston?

12       MS. GASTON:  Yes, Your Honor.  Our request was simply

13  that that polling not begin before we have an opportunity to

14  brief the issue.

15       THE COURT:  Well, there may not be an issue to brief.

16  It's going to be -- if there's a motion to change venue and

17  polling, those two things may be interconnected.  So let's not

18  get ahead of ourselves and find more motions and more briefing

19  that we need to do.  But I'll ask Mr. Lauro to notify the

20  Court, and it can be done ex parte, if and when the defense

21  decides to undertake such activities.

22       MS. GASTON:  Thank you, Your Honor.

23       THE COURT:  All right.  Thank you all.

24       (Proceedings adjourned at 11:32 a.m.)

25

* * * * * *

CERTIFICATE

I, BRYAN A. WAYNE, Official Court Reporter, certify that the foregoing pages are a correct transcript from the record of proceedings in the above-entitled matter.

*/s/ Bryan A. Wayne*
Bryan A. Wayne