**IN THE UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF COLUMBIA**

| | | |
|---|---|---|
| **UNITED STATES OF AMERICA** | * | |
| | * | |
| **v.** | * | **CRIMINAL NO. 23-cr-257 (TSC)** |
| | * | |
| **DONALD J. TRUMP,** | * | |
| | * | |
| **Defendant.** | * | |
| | * | |

**GOVERNMENT'S RESPONSE IN OPPOSITION TO DEFENDANT'S**
**MOTION FOR RECUSAL OF DISTRICT JUDGE PURSUANT TO 28 U.S.C. § 455(a)**

There is no valid basis, under the relevant law and facts, for the Honorable Tanya S. Chutkan, United States District Judge for the District of Columbia, to disqualify herself in this proceeding. In service of his motion (ECF No. 50) seeking the Court's recusal, the defendant both takes out of context the Court's words from prior judicial proceedings and misstates the proper legal standards governing judicial recusals.

To support his claim, the defendant cherry-picks from portions of the Court's sentencings of two individuals for their crimes related to the January 6, 2021, attack on the United States Capitol. In both instances, the Court was appropriately responding to—and ultimately rejecting—a common argument raised by scores of January 6 offenders: that they deserved leniency because their actions were inspired by, or were not as serious as, those of others who contributed to the riot but had not been held responsible—including former president Donald J. Trump, the defendant in this case. The Court's statements addressing this sentencing mitigation argument were factually accurate, responsive to arguments presented to the Court, and evidenced no improper bias or prejudgment of the current case.

In addition, the defendant attempts to apply the wrong recusal standard to the Court's statements. Where, as here, a recusal motion is based on statements made by a judge during

judicial proceedings in response to facts and arguments placed before her, recusal is warranted "only in the rarest circumstances" where the statements "display a deep-seated favoritism or antagonism that would make fair judgment impossible." *Liteky v. United States*, 510 U.S. 540, 555 (1994). The challenged statements fall well short of that mark. And while the defendant seeks to avoid the applicable legal standard by asserting that the Court's opinions derive from some source outside of the courtroom (ECF No. 50 at 7-8), he provides no basis for this claim. Because the defendant's motion fails to establish any bias by the Court, much less the deep-seated antagonism required for recusal, the Court has a duty to continue to oversee this proceeding. The defendant's motion should be denied.

## I.      Applicable Law

In his motion, the defendant fails to mention that there is a presumption against recusal, set forth the proper legal standard for judicial recusal, or acknowledge the heightened standard that applies here because the defendant's claims are based solely on the Court's comments arising from and in the performance of its judicial duties. The reason for the defendant's omissions is clear: he cannot meet these standards, so he seeks to elide them. Below, the Government sets forth the controlling legal principles that establish that the Court has a duty not to recuse from this matter.

Judges take a solemn oath to discharge their duties "faithfully and impartially" by "administer[ing] justice without respect to persons," 28 U.S.C. § 453, and absent evidence to the contrary, judges "are presumed to be impartial," *SEC v. Bilzerian*, 729 F. Supp. 2d 19, 22 (D.D.C. 2010). Parties seeking to overcome the "presumption against disqualification" must meet a high bar. *Id.* (quoting *Cobell v. Norton*, 237 F. Supp. 2d 71, 78 (D.D.C 2003)). Thus, when a defendant, as here, moves to disqualify a federal judge on the ground that her "impartiality might reasonably be questioned" under 28 U.S.C. § 455(a), he may not rely on "conclusory, unsupported or tenuous

allegations," but must provide "clear and convincing evidence," which a court should "scrutinize[]" with care." *United States v. Nixon*, 267 F. Supp. 3d 140, 147 (D.D.C. 2017). "[A] judge once having drawn a case should not recuse himself on an unsupported, irrational, or highly tenuous speculation; were he or she to do so, the price of maintaining the purity of appearance would be the power of litigants or third parties to exercise a negative veto over the assignment of judges." *In re United States*, 666 F.2d 690, 694 (1st Cir. 1981); *see also Bryce v. Episcopal Church in the Diocese of Col.*, 289 F.3d 648, 659 (10th Cir. 2002) ("[A] judge also has as strong a duty to sit when there is no legitimate reason to recuse as he does to recuse when the law and facts require." (quotations omitted)); *Alberti v. Gen. Motors Corp.*, 600 F. Supp. 1024, 1025 (D.D.C. 1984). Indeed, "[i]n the wrong hands, a disqualification motion is a procedural weapon to harass opponents and delay proceedings.  If supported only by rumor, speculation, or innuendo, it is also a means to tarnish the reputation of a federal judge." *United States v. Microsoft Corp.*, 253 F.3d 34, 108 (D.C. Cir. 2001) (en banc) (per curiam).

The question under Section 455(a) is whether a judge's impartiality might "reasonably" be questioned, which is assessed from "the perspective of a fully informed third-party observer who understands all the relevant facts and has examined the record and the law," *United States v. Cordova*, 806 F.3d 1085, 1092 (D.C. Cir. 2015) (per curiam) (cleaned up), and not from the perspective of a "'hypersensitive, cynical, and suspicious person.'" *Nixon*, 267 F. Supp. 3d at 148 (quoting *Sensley v. Albritton*, 385 F.3d 591, 599 (5th Cir. 2004)).  *See Sao Paulo State of Federative Republic of Braz. v. Am. Tobacco Co., Inc.*, 535 U.S. 229, 232-33 (2002) (per curiam); *Cheney v. U.S. Dist. Ct. for D.C.*, 541 U.S. 913, 924 (2004) (Scalia, J., in chambers).

The defendant's sole ground for recusal in this case is the Court's statements made during formal proceedings, in her courtroom, in the course of her judicial duties.  There is a higher

standard for recusal based on such "intrajudicial" statements—that is, statements made by a judge while she is doing her job—because a judge's core duties include reviewing facts, responding to parties' arguments, and forming opinions, all while maintaining neutrality and fairness. *See Liteky*, 510 U.S. at 544-54 (describing that a judge may become "exceedingly ill disposed" toward a defendant after hearing evidence about him, but not be "recusable for bias or prejudice, since his knowledge and the opinion it produced were properly and necessarily acquired in the course of the proceedings"). Accordingly, the Supreme Court has held that where a recusal motion rests on statements made in a judicial setting and reflect "opinions formed by the judge on the basis of facts introduced or events occurring in the course of the current proceedings, or of prior proceedings," recusal will be warranted "only in the rarest circumstances" where the comments "display a deep-seated favoritism or antagonism that would make fair judgment impossible." *Id.* at 555. After all, "opinions held by judges as a result of what they learned in earlier proceedings" are "normal and proper," and "not subject to deprecatory characterization as 'bias' or 'prejudice.'" *Id.* at 551; *see Belue v. Leventhal*, 640 F.3d 567, 573 (4th Cir. 2011) ("The high bar set by *Liteky* for predispositional recusals makes good sense. If it were otherwise—if strong views on a matter were disqualifying—then a judge would hardly have the freedom to be a judge.").

This higher standard applies equally when a court's intrajudicial statements were made in separate proceedings, including proceedings in which the defendant was not a party. The D.C. Circuit made this clear in its decision in *United States v. Haldeman*, 559 F.2d 31 (D.C. Cir. 1976) (en banc). There, defendants sought recusal of the judge presiding over numerous, separate Watergate-related matters, in part based on statements the judge had made during an earlier, separate trial in which, among other things, he "expressed a belief that criminal liability extended beyond the seven persons there charged." *Id.* at 131-32 & n.293. The Circuit found that recusal

was not warranted because the grounds for the claim were "judicial acts" including "prior judicial rulings . . . or the exercise of related judicial functions." *Id.* at 133-34.  The Circuit further stated that the "disabling prejudice" necessary for recusal "cannot be extracted from dignified though persistent judicial efforts to bring everyone responsible for Watergate to book." *Id.*  A fundamental component of "[t]he rule of law . . . is that what a judge learns in his judicial capacity whether by way of guilty pleas of codefendants or alleged coconspirators, or by way of pretrial proceedings, or both is a proper basis for judicial observations, and the use of such information is not the kind of matter that results in disqualification."  *United States v. Bernstein*, 533 F.2d 775, 784-85 (2d Cir. 1976) (recusal unwarranted where judge, in handling multiple indictments of various coconspirators, made intrajudicial statements during previous plea colloquies and sentencings, including that the scheme at issue was "terrible" and that he was "sure this conspiracy has cost society millions of dollars . . . You cannot close your eyes to these things."); *see also Obert v. Republic W. Ins. Co.*, 398 F.3d 138, 145 (1st Cir. 2005) (rejecting recusal motion where the judge's "comments were based on what he had learned in presiding over related litigation," and explaining that "[t]he law is well settled that, absent quite unusual circumstances, a judge cannot be recused for views formed on the basis of what he learned in court"); *United States v. Thirion*, 813 F.2d 146, 154-55 (8th Cir. 1987) (rejecting recusal motion, where, at the sentencings of co-defendants, the judge described Thirion—who was at the time a fugitive and had not made an initial appearance—as "the most culpable," and his conduct "considerably greater than the criminal conduct of any of the defendants here on trial" because he "got most of the money and got a disproportionate amount of the money that was obtained from the victims."); *United States v. Wedd*, 993 F.3d 104, 116-117 (2d Cir. 2021) (district court's intrajudicial comments in the context of co-defendant's impending sentencing were no basis for recusal because a judge "cannot be said

to have manifested partiality simply by expressing a view of a particular defendant's culpability based on information that has been presented to the court").

Given the demanding standard for recusal based on intrajudicial comments, a judge's in-court statements based on courtroom proceedings almost never give rise to recusal. Rather, cases where courts have granted recusal motions based on such statements "tend to involve singular and startling facts." *Belue*, 640 F.3d at 573. In one such example, *Berger v. United States*, the judge presiding over an espionage trial against German-American defendants stated in court, "If anybody has said anything worse about the Germans than I have I would like to know it so I can use it. . . . One must have a very judicial mind, indeed, not to be prejudiced against the German-Americans in this country. Their hearts are reeking with disloyalty." 255 U.S. 22, 28 (1921). In *United States v. Antar*, when the district judge stated at sentencing, "My object in this case from day one has always been to get back to the public that which was taken from it as a result of the fraudulent activities of this defendant and others," he made clear "in stark, plain and unambiguous language . . . that his goal in the criminal case, from the very beginning, was something other than what it should have been and, indeed, was improper." 53 F.3d 568, 573, 576 (3d Cir. 1995), *overruled on other grounds by Smith v. Berg*, 247 F.3d 532 (3d Cir. 2001). Finally, in *Sentis Grp., Inc. v. Shell Oil Co.*, the Eighth Circuit found recusal appropriate where the judge "directed profanities at Plaintiffs or Plaintiffs' counsel over fifteen times" and refused to allow the plaintiffs to present argument at a sanctions hearing. 559 F.3d 888, 904-05 (8th Cir. 2009). *See Belue*, 640 F.3d at 573 (citing *Berger*, *Antar*, and *Sentis Group* and noting that "[s]imilar examples are, thankfully, not easy to find").

On the other side of the ledger are countless cases in which recusal based on judicial comments was deemed unwarranted—even based on comments that, unlike this Court's comments

on which the defendant bases his motion, directly criticize a defendant.  For instance, recently in this District, a judge told a defendant at a hearing, "Arguably, you sold your country out. . . . I'm not hiding my disgust, my disdain for this criminal offense."  *In re Flynn*, 973 F.3d 74, 83 (D.C. Cir. 2020) (en banc) (per curiam).  The D.C. Circuit found that these statements did not meet the *Liteky* test, stating, "the District Judge was not simply holding forth on his opinions; rather, each of the statements to which Petitioner objects was plainly made in the course of formal judicial proceedings over which he presided—not in some other context."  *Id.*  Similarly, in *United States v. Young*, the Tenth Circuit rejected a defendant's request for disqualification where the judge opined on the defendant's "obvious" guilt, predicted that she would "get convicted" at trial, and speculated that she would sooner subject herself to contempt of court and jail time than cooperate against her co-defendants.  45 F.3d 1405, 1414-16 (10th Cir. 1995).  The Tenth Circuit held that the judge's comments did not indicate "an opinion based upon knowledge gathered outside of the course of judicial proceedings," and that, "considered in context," they did not "'display a deep-seated . . . antagonism that would make fair judgment impossible.'"  *Id.* at 1415 (quoting *Liteky*); *see also id.* at 1415-16 (elaborating that the judge's comments did "not show that the judge could not possibly render fair judgment" or "indicate[ ] that the judge was unable or unwilling to carry out his responsibilities impartially").  *See also United States v. Allen*, 587 F.3d 246, 250-53 (5th Cir. 2009) (per curiam) (judge did not need to recuse from civil tax matter even though he directed the government to initiate criminal contempt charges against the defendant and said defendants were "in criminal contempt as far as [he was] concerned"); 13D Charles A. Wright & Arthur R. Miller, *Federal Practice and Procedure* § 3549 nn.23 & 32 (3d ed. 2023) (collecting cases where recusal was denied).

## II.    Argument

In two of the dozens of January 6 related sentencings over which this Court presided, the offenders being sentenced deployed a common strategy: they invoked the defendant, and the mob on January 6, in their bids for sentencing reductions—arguing that the culpability of others, including the defendant, should reduce their own.  The Court responded to these arguments, as required by law, and rejected them.  Now, the defendant's motion seeks the Court's recusal for its statements made while discharging this core judicial responsibility, claiming that the "disqualifying" statements undermine public confidence in the Court's impartiality and demonstrate that the Court has made prejudgments about the defendant.  ECF No. 50 at 2-4.  The Court's prior judicial statements do no such thing.  Instead, an objective look at them reveals that the defendant's motion takes the Court's words out of context in order to manufacture allegations of bias.  Because the defendant falls far short of his burden to demonstrate that the Court has "display[ed] a deep-seated favoritism or antagonism that would make fair judgment impossible," *Liteky*, 510 U.S. at 555, his motion should be denied.

### A. The Defendant's Motion Takes the Court's Intrajudicial Statements Out of Context

Although the defendant tries to claim otherwise, the Court's statements about which he complains are core intrajudicial statements—statements that the Court made while performing its official duties, in direct response to the arguments before it, and which were derived from knowledge and experience the Court gained on the bench.  As such, to mount a successful recusal claim based on the cited statements, the defendant must show that they display a deep-seated animosity toward him.  The defendant cannot meet this heavy burden.

As described below, the defendant's motion omits important context about both of the sentencing hearings in which the Court made the cited statements.  First, it is important to

understand the context of the Court's work in the aftermath of the January 6, 2021, attack on the United States Capitol.  This Court, like all courts in this District, has presided over dozens of criminal cases related to January 6.  And this Court, like all courts in this District, gained knowledge about the events of January 6 and insight about the persons charged based on its daily administration of those cases.  For instance, the Court learned that numerous individuals charged with January 6 crimes attempted to minimize their actions and spread blame to others, including to defendant Trump and to the mob that each rioter joined at the Capitol.  Indeed, the Court regularly heard variations of such arguments from other defendants, in the form of sentencing memoranda and allocutions, before similar claims were made by the defendants in the two sentencing hearings on which the defendant bases his claim of bias.[1]

---

[1] *See United States v. Bauer*, 21-cr-49, ECF No. 38 at 3 (D.D.C. Oct. 6, 2021) (Def. Sentencing Mem.) (arguing that Bauer "only decided to turn from the Ellipse and head towards the Capitol when then-President Trump directed the crowd to proceed in that direction" and then followed the group); *United States v. Hemenway*, 21-cr-49, ECF No. 39 at 2 (D.D.C. Oct. 6, 2021) (Def. Sentencing Mem.) (arguing that Hemenway decided "to take part in the political rally on the Ellipse" and got "caught up in the group mentality of the crowd that entered the Capitol"); *United States v. Bissey*, 21-cr-165, ECF No. 29 at 17 (D.D.C. Oct. 12, 2021) (Sentencing Tr.) (defense attorney arguing that Bissey had minimal role on January 6 and "did not come to D.C. with any intention other than supporting her president"); *United States v. Miller*, 21-cr-226, ECF No. 52 at 4 (D.D.C. Dec. 8, 2021) (Def. Sentencing Mem.) (arguing that "[Miller] had absolutely no expectation or desire to overthrow the government.  Rather, she was supporting the President in what he claimed were legitimate efforts to claim victory in the Presidential election."); *United States v. Perretta*, 21-cr-539, ECF No. 55 at 2 (D.D.C. Jan. 4, 2022) (Def. Sentencing Mem.) (arguing that Perretta "attended the 'Save America' political rally, where then-President Trump encouraged listeners to march to the Capitol to make their voices heard" and then went to the Capitol with thousands of other individuals from the Ellipse); *United States v. Ehmke*, 21-cr-29, ECF No. 30 at 2-5, 8-9 (D.D.C. May 6, 2022) (Def. Sentencing Mem.) (arguing that Ehmke had a minor role and that others, "including the former president, the rally's organizers and speakers, and other nefarious, organized groups . . . arguably bear much greater responsibility"); *United States v. Ponder*, 21-cr-259, ECF No. 58 at 21-22 (D.D.C. Jul. 26, 2022) (Sentencing Tr.) (Ponder asserting that he marched from Ellipse to Capitol "with the intentions on a peaceful protest.  However, things had spiraled out of control" and he "got caught up in it."); *United States v. Cortez*, 21-cr-317, ECF No. 80 at 38 (D.D.C. Aug. 31, 2022) (Sentencing Tr.) (defense attorney arguing

It was with this background that the Court conducted the two sentencing hearings from which the defendant isolates the statements in his motion.  In both instances, the comments of which the defendant complains were not focused on defendant Trump, but instead addressed mitigation arguments by defendants before the Court at the time, an argument that the Court had heard in some variation several times before.   As such, when the Court's comments are taken properly in context, rather than in the "hypersensitive, cynical, and suspicious" way that the defendant has cast them, *Nixon*, 267 F. Supp. 3d at 148, they evince no bias against the defendant. In fact, the Court's judicial statements reveal that when individuals being sentenced attempted to mitigate their culpability, including by assigning blame to defendant Trump, the Court rejected the argument and responded that it had no bearing on those cases.

Furthermore, as set forth below, the Court made the statements at issue in the course of the Court's performance of its responsibilities to conduct sentencing proceedings consistent with the law—including by considering each of the factors in 18 U.S.C. § 3553(a) and making "an individualized assessment based on the facts presented." *Gall v. United States*, 552 U.S. 38, 50 (2007).  This individualized assessment must include consideration of the arguments made by the parties, including any arguments in support of a downward variance from the advisory Sentencing Guidelines. *See, e.g.*, *United States v. Pyles*, 862 F.3d 82, 88 (D.C. Cir. 2017) ("[W]hen presented with non-frivolous arguments for mitigation, the District Court must consider those arguments before imposing the sentence" and "must provide a reasoned basis when announcing its sentencing decision." (quotations omitted)).

---

that Cortez was "being told these things by the president, you need to save your country, and he's trying to do something right").

i.   The Court's Statements at Sentencing in *United States v. Palmer*, 21-cr-328

On December 17, 2021, the Court sentenced Robert Scott Palmer, an individual who, on

January 6, 2021, after attending the former president's remarks at the Ellipse and while wearing a

"Florida for Trump" hat, "threw a wooden plank at" police officers; "sprayed the contents of a fire

extinguisher at the officers until it was empty, and then threw the fire extinguisher" at them; and

"assaulted another group of law enforcement officers with a 4-5 foot pole," which he threw "like

a spear at the officers."  *United States v. Palmer*, 21-cr-328, ECF 30, at 10, 2 (Govt. Sentencing

Mem.); *id.*, ECF No. 23, at 3 (D.D.C. Oct. 4, 2021) (Statement of Offense).  Palmer was charged

with, and pled guilty to, assaulting, resisting, or impeding certain officers using a dangerous

weapon, in violation of 18 U.S.C. §§ 111(a) and (b).  *Id.*, ECF No. 24 at 1 (D.D.C. Oct. 4, 2021)

(Plea Agreement).

In a sentencing memorandum filed before his hearing, Palmer's attorney asserted that he

had gone to the Capitol "at the behest of" the defendant and had been convinced by individuals,

including the defendant, that the election was fraudulent and that Palmer needed to take action to

stop the presidential transition.  *Id.*, ECF No. 31 at 8 (D.D.C. Dec. 13, 2021) (Def. Sentencing

Mem.).  Two paragraphs later in the memorandum, Palmer's attorney argued that the Court should,

as a mitigating factor, "consider that the riot almost surely would not have occurred but for the

financing and organization that was conducted by persons unconnected to Mr. Palmer who will

likely never be held responsible for their relevant conduct." *See id*. at 8-9.

The Court acknowledged this argument on the record at sentencing, as it was required to

do.  *See Pyles*, 862 F.3d at 88.  The Court first summarized Palmer's argument:

> In support of the downward variance, Mr. Palmer further refers to the sentencing
> factors outlined in 18 USC § 3553(a). Specifically, Mr. Palmer asserts that he was
> motivated to go to the Capitol at the behest of the former president, who had

convinced him that the 2020 presidential election was stolen and that his presence was needed at the Capitol to stop the presidential transition.

Mr. Palmer argues that his presence at the Capitol on January 6 was the result of his desire to act patriotically and for the good of the nation; this mindset and the, quote, "crowd mob effect" caused him to assault the Capitol Police that day. He also offers that while he accepts and regrets his actions, it is relevant to consider that any purported architects of the January 6 riots have not been charged with any criminal offense and that it would be an imbalance to sentence him to an extended prison term while those actors remain free.

*Id.*, ECF No. 33 at 18-19 (D.D.C. Dec. 17, 2021) (Sentencing Tr.).  After providing that summary,

the Court explained why the argument did not warrant a downward variance, given that Palmer's

violent conduct was ultimately an exercise "of [his] own free will":

And it is true, Mr. Palmer -- you have made a very good point, one that has been made before -- that the people who exhorted you and encouraged you and rallied you to go and take action and to fight have not been charged.

That is not this court's position.  I don't charge anybody.  I don't negotiate plea offers.  I don't make charging decisions.  I sentence people who have pleaded guilty or have been convicted.  The issue of who has or has not been charged is not before me.  I don't have any influence on that.  I have my opinions, but they are not relevant.  And you're correct in that no one who was encouraging everybody to take the Capitol has been charged as of yet, but I don't think that fact means that you should get a lower sentence.

The fact is that there are lots of people who agreed with you, who didn't like the results of the election, who perhaps thought the election was stolen in some way. They stayed home.  You decided, of your own free will, to leave Florida and come to Washington and go to the rally.

That's your right.  You're not being sentenced for your political views.  When you left that rally and went to the Capitol and saw what was going on and engaged in combat with those law enforcement officers, that's what you're being punished for. So you have a point, that the people who may be the people who planned this and funded it and encouraged it haven't been charged, but that's not a reason for you to get a lower sentence.

*Id.* at 21-22.  The Court then sentenced Palmer to 63 months' imprisonment, which represented

the bottom of the advisory Guidelines range.  *Id.* at 46.

In his recusal motion, the defendant seizes upon statements in the Court's ordinary colloquy above and attempts to cast them in a sinister light.  In particular, the defendant asserts that the Court's required recognition of and response to Palmer's mitigation argument ("you have made a very good point . . . that the people who exhorted you and encouraged you and rallied you to go and take action and to fight have not been charged") and the Court's uncontroversial factual and legal statement that "I have my opinions, but they are not relevant," reflect bias against defendant Trump.  ECF No. 50 at 3, 7.

There is no basis for the defendant's conclusory assertions of bias.  Taken in proper context, the Court made the factually and legally accurate statement that the actions of other individuals who had not been charged and whom Palmer claimed were responsible for January 6 had no bearing on Palmer's personal culpability.  The Court's comments simply demonstrate the Court doing its job, by stating back to Palmer the argument for mitigation that he had made (including that the defendant had influenced him), and explaining that it lacked merit, since Palmer was ultimately responsible for his own violent conduct.  In fact, the Court took pains to emphasize that it had no role in "mak[ing] charging decisions," no "influence" on those decisions, and that, as a neutral arbiter, any opinions the Court may have are "not relevant."  *Id.*[2]

ii.  The Court's Statements at Sentencing in *United States v. Priola*, 22-cr-242

On October 28, 2022, the Court sentenced Christine Priola, who on January 6, 2021, surged with other rioters into the Capitol and onto the Senate floor, "carrying a large sign reading, 'WE

---

[2] In *United States v. Ciavarella*, the district judge made an extrajudicial statement in which he expressly acknowledged that his "personal opinions [were] in complete sympathy" with those of a member of the public who had opined on the severity of the offense and said that the sentence contemplated by the plea agreement was insufficient.  716 F.3d 705, 723 (3d Cir. 2013).  Recusal was nevertheless unwarranted, because the judge added that his "personal beliefs cannot guide my responsibility and judgments," which, to a reasonable observer, would sufficiently dispel any appearance of bias.  *Id*.

THE PEOPLE TAKE BACK OUR COUNTRY' on one side and 'THE CHILDREN CRY OUT FOR JUSTICE' on the other," *United States v. Priola*, 22-cr-242, ECF No. 65 at 3 (D.D.C. July 26, 2022) (Statement of Offense), and wearing pants with the phrase, "MAKE AMERICA GREAT AGAIN," *id.*, ECF No. 56 at 13, 16 (D.D.C. Oct. 21, 2022) (Govt. Sentencing Mem.).  Priola was charged with, and pled guilty to, obstructing an official proceeding, in violation of 18 U.S.C. § 1512(c)(2).  *Id.*, ECF No. 66 at 2 (D.D.C. Feb. 21, 2023) (Sentencing Tr.).

In her sentencing memorandum, Priola, too, laid the groundwork for spreading the blame to others, noting that "[a]fter the presidential election, Donald Trump . . . and his inner circle began spreading the word that the election was 'stolen' from him by Democrats and others," with claims "made on media sources, as well as by the President himself, that the election system had been corrupted and that the integrity of the election should be questioned." *Id.*, ECF No. 57 at 3 (D.D.C. Oct. 21, 2022) (Def. Sentencing Mem.).  Priola's sentencing memorandum then sought leniency for Priola in part because she "played no role of importance" at the Capitol, and had she not been there, "there wouldn't be one change in what transpired."  *Id*. at 14.

At her sentencing hearing, Priola likewise explained that, at the time of her criminal conduct, she believed that the election had been stolen and that "certain politicians or groups have, like, taken over things that maybe weren't supposed to be."  *Id.*, ECF No. 66 at 26 (D.D.C. Feb. 21, 2023) (Sentencing Tr.).  She further represented to the Court that the sign she held at the Capitol on January 6 was a reflection of the fact that she believed generally in allegations of corruption, that the election had been stolen, and that if the defendant were not president, less attention would be paid to human trafficking.  *Id.* at 25-27.  Priola and her attorney continued, at the hearing, to minimize Priola's role in the events of January 6 and spread blame to others.  *Id*. at 21-22, 25-27 (Priola's attorney requesting downward variance for "her minimal role in the entire event" and

Priola stating that she had gotten "wrapped up in the emotions and the people around [her]" before ultimately entering the Capitol).

In response, the Court—again as required by binding precedent—addressed Priola's and her attorney's requests for leniency, based in part on their minimization of Priola's role and the request for a downward variance:

> And so while [Priola's attorney] is correct in that your background didn't involve any criminal activity, the events of that day and the seriousness of those events cannot be understated. This was nothing less than an attempt to violently overthrow the government, the legally, lawfully, peacefully elected government by individuals who were mad that their guy lost.
>
> I see the videotapes. I see the footage of the flags and the signs that people were carrying and the hats they were wearing and the garb. And the people who mobbed that Capitol were there in fealty, in loyalty, to one man -- not to the Constitution, of which most of the people who come before me seem woefully ignorant; not to the ideals of this country; and not to the principles of democracy. It's a blind loyalty to one person who, by the way, remains free to this day.
>
> There is no mob without the members of the mob, as I've said before. So [Priola's attorney] made a point in his sentencing memorandum, that if we were to take your participation out of that group, that everything would have still happened; your actions did not materially contribute. But they did, because you were there. And people act in ways that they would never act alone when they're with a group, or when they're with a mob, and when emotions are involved.

*Id.*, ECF No. 66 at 29-30 (D.D.C. Feb. 21, 2023) (Sentencing Tr.).

With respect to Priola's sentencing, the defendant's motion focuses on the Court's comment to Priola that "it's a blind loyalty to one person who, by the way, remains free to this day." From this simple statement of uncontroverted fact, the defendant purports to draw the "inescapable" message that the Court believes that defendant Trump should be imprisoned. ECF No. 50 at 2.

But the only inescapable thing about the Court's comment is that it stated an uncontested and accurate fact in response to a mitigation argument that the Court had heard many times before.

The Court—unlike the judges in *Flynn*, *Therion*, and *Young*, none of whom were recused—did not state that the defendant was legally or morally culpable for the events of January 6 or that he deserved punishment.  Instead, as the full transcript of Priola's sentencing hearing reveals, the Court was engaged in its judicial responsibility to hear, acknowledge, and respond to Priola's sentencing allocution.  An objective observer, fully informed of the record at Priola's sentencing and cognizant of the Court's substantial experience presiding over January 6 cases, would understand the Court's comments for what they were: the rejection of Priola's arguments and the response to Priola that she—and she alone—was responsible for her actions and was standing before the Court to answer for them, while others that Priola may seek to blame were not.  Accordingly, the Court gave Priola a sentence within her advisory Guidelines range.  *United States v. Priola*, No. 22-cr-242, ECF No. 66 at 37 (D.D.C. Feb. 21, 2023) (Sentencing Tr.).

### B. The Defendant Falls Far Short of His Burden to Show that the Court's Impartiality Might Reasonably Be Questioned

The defendant relies solely on intrajudicial statements in these two sentencing proceedings, and thus he must meet the high burden of proving that the Court's cited statements "display a deep-seated favoritism or antagonism that would make fair judgment impossible."  *Liteky*, 510 U.S. at 555.  The defendant cannot meet this burden.

The defendant attempts to evade application of this proper standard by cursorily asserting in his motion (ECF No. 50 at 7-8) that the Court's "views on President Trump derive from extrajudicial sources."  He provides no basis for this claim.  As described above, in making both of the statements upon which the defendant relies, the Court was performing its judicial duties in sentencing other individuals.  The Supreme Court has made clear that such intrajudicial statements to which the higher standard applies includes "opinions formed by the judge on the basis of facts introduced or events occurring in the course of the current proceedings, or of prior proceedings."

*Liteky*, 510 U.S. at 555; *see Haldeman,* 559 F.2d at 131-132; *Obert*, 398 F.3d at 145; *Bernstein*, 533 F.2d at 784-85; *Wedd*, 993 F.3d at 116-117; *Thirion*, 813 F.2d at 154-55.  Nor can the defendant establish that the Court's statements came from some source other than the courtroom— because the record proves the opposite.  *See Palmer*, No. 21-cr-328, ECF No. 33, at 21 (D.D.C. Dec. 17, 2021) (Sentencing Tr.) (Court telling Palmer that his mitigation argument is "one that has been made before"); *Priola*, No. 22-cr-242, ECF No. 66, at 29-30 (D.D.C. Feb. 21, 2023) (Sentencing Tr.) (Court describing to Priola the "videotapes" and "footage" the Court has viewed and that inform its understanding of the events of January 6).

Because the defendant cannot point to any statements expressing actual bias, all he can say—and he says it repeatedly—is that the Court's comments "suggest" some sort of bias or prejudice toward the defendant.  *See* ECF No. 50 at 1 ("Judge Chutkan has, in connection with other cases, suggested that President Trump should be prosecuted and imprisoned."); *id.* at 2 ("Judge Chutkan similarly suggested that, in her view, President Trump was responsible for the events of January 6, 2021."); *id.* at 3 ("Similarly, Judge Chutkan's statement that 'I have my opinions' suggests that in her view—formed almost two years before the initiation of this matter— President Trump should be charged."); *id.* at 6 ("Judge Chutkan's statement . . . suggests that President Trump has culpability for the events of that day and should not be free."); *id.* at 6-7 ("[H]er comments suggest that she reached a conclusion, before this case, that President Trump is more deserving of a term of imprisonment than the defendant she was sentencing."); *id.* at 7 ("[M]ost reasonable observers would understand Judge Chutkan's statements . . . [as] a suggestion that President Trump may and should be prosecuted based on those facts.").  But the defendant's reliance on inference and innuendo fatally undercuts his claim.  That is because "when intrajudicial behavior is at issue, manifestations of animosity must be much more than subtle to establish bias."

*Liteky*, 510 U.S. at 556 n.3.  Instead, it must typically involve the sorts of "singular and startling facts" displayed in *Berger*, *Antar*, and *Sentis Group*.  *See Belue*, 640 F.3d at 573.  With his "conclusory, unsupported [and] tenuous speculation," *Nixon*, 267 F. Supp. 3d at 147, the defendant fails entirely to establish that the Court's statements demonstrate any animosity toward him.

Tellingly, the defendant does not cite a single case in which recusal has been warranted on remotely similar facts.  Instead, he quotes general legal propositions from cases that either have no bearing on the facts of this case or that undercut his request for recusal.  One involves the denial of a recusal motion despite gratuitous and inflammatory judicial comments made in front of a jury and targeted at a defendant on trial.  *See United States v. Nickl*, 427 F.3d 1286, 1297-99 (10th Cir. 2005) (denying recusal where the district court "analogized homosexuality to illegal drug use during *voir dire*" in a case involving a gay defendant; "interrupted the prosecution's closing argument to rebuke [the defendant's partner] and eject him from the courtroom" and refused to instruct the jury about the ejection because, the judge stated, the ejected partner was "'in effect [the defendant's] wife'").  Others involve recusal claims stemming from straightforward conflicts of interest.  *See In re Al-Nashiri*, 921 F.3d 224, 226, 235 (D.C. Cir. 2019) (finding recusal necessary where military judge, while presiding over the defendant's case to which the Justice Department was a party, secretly applied for employment with the Justice Department); *Hall v. Small Bus. Admin.*, 695 F.2d 175, 176-77 (5th Cir. 1983) (finding recusal necessary because magistrate judge's law clerk had been a member of the plaintiff class); *In re Kensington Int'l Ltd.*, 353 F.3d 211, 223 (3d Cir. 2003) (remanding for recusal-related discovery where the court had hired court-appointed consultants, some of whom allegedly had an interest in related litigation).  Still other cases relied upon by the defendant involve personal or familial relationships.  *See Cheney*, 541 U.S. at 922-24, 929 (declining recusal request based on a recent vacation the Justice

took with a named party); *Microsoft Corp. v. United States*, 530 U.S. 1301, 1301 (2000) (Rehnquist, C.J., in chambers) (declining recusal while acknowledging that "[m]y son . . . is one of the attorneys working on" related litigation); *Potashnick v. Port City Constr. Co.*, 609 F.2d 1101, 1104 (5th Cir. 1980) (finding recusal necessary where the presiding judge was involved in business dealings with and was being represented by lead trial counsel); *Parker v. Connors Steel Co.*, 855 F.2d 1510, 1514 (11th Cir. 1988) (finding recusal necessary in light of close familial relationship between law clerk and senior partner in the firm representing one of the parties). None of these cases provide support for the defendant's demand for recusal under the circumstances presented here.

The defendant cites only one case in which a court found that recusal was warranted on the basis of a judge's statements. But that case—*United States v. Microsoft Corp.*, 253 F.3d 34 (D.C. Cir. 2001)—undermines the defendant's position rather than supports it, because the judge's extrajudicial statements in that case are so easily contrasted with this Court's, in both content and setting. In *Microsoft*, the district judge presiding over an antitrust case in which Microsoft was a party engaged in a series of extrajudicial statements—in the form of public speeches and secretive media interviews—while the case was still pending. *Id.* at 108. In these interviews and speeches, the judge not only engaged in "crude characterizations" and "frequent denigrations" of one of the parties—emphasizing, for example, "the company's prevarication, hubris, and impenitence"—the judge "also secretly divulged to reporters his views on the remedy for Microsoft's antitrust violations." *Id.* at 110-15. By contrast, the Court's two statements here were factually accurate intrajudicial statements made in the course of sentencing proceedings of other defendants, and neither of them evince bias—much less the deep-seated antagonism necessary to justify recusal.

## III.    Conclusion

The defendant has failed to identify anything approaching the clear and convincing evidence necessary to overcome the presumption of impartiality.  *Nixon*, 267 F. Supp. 3d at 147. Instead, he has relied on suggestion and innuendo to insinuate something sinister in the Court simply doing its job by addressing sentencing arguments.  The Court's comments, when viewed in context by "a fully informed third-party observer," *Cordova*, 806 F.3d at 1092, do not remotely "display a deep-seated favoritism or antagonism that would make fair judgment impossible," *Liteky*, 510 U.S. at 555.  The Court thus has a duty not to recuse itself from this case and should deny the defendant's motion.

Respectfully submitted,

JACK SMITH
Special Counsel

By:    /s/Molly Gaston
        Molly Gaston
        Thomas P. Windom
        Senior Assistant Special Counsels
        950 Pennsylvania Avenue NW
        Room B-206
        Washington, D.C. 20530