**UNITED STATES DISTRICT COURT**
**DISTRICT OF COLUMBIA**

UNITED STATES OF AMERICA

v.                                                  Case No. 1:23-cr-257-TSC

DONALD J. TRUMP,

      Defendant.

_____/

**PRESIDENT TRUMP'S RESPONSE IN OPPOSITION**
**TO PROSECUTION'S MOTION FOR PRIOR RESTRAINTS**

President Trump respectfully submits this response in opposition to the prosecution's motion to impose unconstitutional prior restraints on President Trump's political speech. (the "Motion," Doc. 57, seeking the "Proposed Gag Order," Doc. 57-2).

On August 1, 2023, the prosecution publicly released a forty-five-page speaking Indictment that read very much like a campaign press release. As if the Indictment's media talking points were not enough, prosecutor Jack Smith then held a press conference to deliver an incendiary attack upon President Trump, falsely claiming that he "fueled . . . an unprecedented assault on the seat of American democracy." This inflammatory rhetoric, which violated long-standing rules of prosecutorial ethics, was then repeated daily by media publications across the country. Following these efforts to poison President Trump's defense, the prosecution now asks the Court to take the extraordinary step of stripping President Trump of his First Amendment freedoms during the most important months of his campaign against President Biden. The Court should reject this transparent gamesmanship and deny the motion entirely.

**INTRODUCTION**

For hundreds of years, our country has embraced the core value that the "government has no power to restrict expression because of its message, its ideas, its subject matter, or its content,"

*In re Murphy-Brown, LLC*, 907 F.3d 788, 796–97 (4th Cir. 2018) (quoting *Ashcroft v. ACLU*, 535 U.S. 564, 573 (2002) (internal quotation marks omitted)). This freedom from government censorship is fundamental to our national ethos and "it can hardly be doubted that the constitutional guarantee has its fullest and most urgent application precisely to the conduct of campaigns for political office." *Monitor Patriot Co. v. Roy*, 401 U.S. 265, 272 (1971).

Tossing these foundational principles aside, the Biden Administration charged President Trump—the leading contender in the 2024 Presidential Election—for statements he made as president. Now, keenly aware that it is losing that race for 2024, the prosecution seeks to unconstitutionally silence President Trump's (but not President Biden's) political speech on pain of contempt. *See Citizens United v. Fed. Election Comm'n*, 558 U.S. 310, 349 (2010) ("If the First Amendment has any force, it prohibits Congress from fining or jailing citizens, or associations of citizens, for simply engaging in political speech.").

In support, the prosecution presents nothing but pretexts, claiming that the Court must muzzle President Trump to ensure that: (1) the prosecution, the Court, and witnesses are not "intimidated" by political criticism; and (2) the District of Columbia citizenry (who voted by a margin of around 95% for Biden in the 2020 election) do not magically transform and become biased *in President Trump's favor*.

The prosecution does not present one shred of evidence to demonstrate either of these claims—let alone enough to establish, as it must, a "clear and present danger to the administration of justice." *See Landmark Commc'ns, Inc. v. Virginia*, 435 U.S. 829, 844-845 (1978). Neither the prosecution nor the Court are reluctant to proceed with this case, and none of the public figures the prosecution references in its Motion have refused to participate, either. Just the opposite, these individuals appear to relish the notoriety they have gained through their proximity to President

Trump, variously writing books about their experiences, appearing for interviews with national media, and even running for president in their own right. Similarly, despite repeatedly claiming President Trump's statements threaten "the impartiality of the venire," Motion at 13, the prosecution does not identify a single potential juror who has allegedly become partial against the government due to President Trump's statements.

Worse, the Proposed Gag Order lacks any semblance of narrow tailoring, sweeping in, for instance, all "disparaging" statements about any "potential witness," regardless of subject, and including individuals who are actively waging political campaigns against President Trump. And it does so in a unilateral way, preventing President Trump from defending himself in the political arena, while giving President Biden and his surrogates (including those in the corporate media) free reign to say whatever they want. All for no legitimate reason—the purported goals of the Proposed Gag Order would not be served by the order itself; the media would still feature this case, and the prosecutors, the Court, and "potential witnesses" (yet unidentified by the prosecutors) would still be criticized in the public arena. The prosecution, therefore, cannot come close to "eliminat[ing] . . . the exact source of the evil" it purportedly seeks to remedy. *See City Council of L.A. v. Taxpayers for Vincent,* 466 U.S. 789, 808–10 (1984) ("A statute is narrowly tailored if it targets and eliminates no more than the exact source of the 'evil' it seeks to remedy.").

At bottom, the Proposed Gag Order is nothing more than an obvious attempt by the Biden Administration to unlawfully silence its most prominent political opponent, who has now taken a commanding lead in the polls. Indeed, this very Motion came on the heels of adverse polling for President Biden. His administration's plan is quite simple: unleash a 45-page speaking indictment, discuss and leak its talking points in the press, and then cynically attempt to invoke the Court's authority to prevent President Trump and those acting on his behalf from presenting his side of the

story to the American people during a political campaign. This desperate effort at censorship is unconstitutional on its face. *NAACP v. Button,* 371 U.S. 415, 445 (1963) (the First Amendment is a value-free provision whose protection is not dependent on "the truth, popularity, or social utility of the ideas and beliefs which are offered").

## APPLICABLE LAW

"Even among first amendment claims, gag orders warrant a most rigorous form of review because they rest at the intersection of two disfavored," and presumptively unconstitutional, "forms of expressive limitations: prior restraints and content-based restrictions." *In re Murphy-Brown, LLC*, 907 F.3d at 796–97.

"In light of these twin presumptions, gag orders must survive strict scrutiny." *Id.* at 797; *see also* Erwin Chemerinsky, *Lawyers Have Free Speech Rights Too: Why Gag Orders On Trial Participants Are Almost Always Unconstitutional*, 17 Loy. L.A. Ent. L. Rev. 311 (1997).[1]

Strict scrutiny, in turn, requires the prosecutors to prove the restriction is "(1) narrowly tailored, to serve (2) a compelling state interest." *Republican Party of Minnesota v. White*, 536 U.S. 765, 774–75 (2002); *United States v. Playboy Ent. Grp., Inc.*, 529 U.S. 803, 804 (2000) ("When the Government restricts speech, the Government bears the burden of proving the constitutionality of its actions."). The prosecutors must meet both exacting standards "to ensure that communication has not been prohibited merely because public officials disapprove the speaker's view." *U.S. Postal Serv. v. Council of Greenburgh Civic Assocs.,* 453 U.S. 114, 132 (1981) (citation and quotation marks omitted).

---

[1] "[C]ourt orders that actually forbid speech activities—are classic examples of prior restraints." *Alexander v. United States*, 509 U.S. 544, 550 (1993).

In the context of pending litigation, the prosecutors can only establish "a compelling state interest" by proving the speech at issue "constitute[s] a clear and present danger to the administration of justice." *Landmark Commc'ns, Inc.*, 435 U.S. at 844. This requires far more than just speculation regarding potential harm. Rather, the prosecution must proffer a "solidity of evidence" proving "[t]he danger [is not just] remote or even probable," but "immediately imperil[s]" the administration of justice. *Id.* at 845; *see also id.* ("What emerges from these cases is the 'working principle that the substantive evil must be extremely serious and the degree of imminence extremely high before utterances can be punished.'"); *Turner Broad. Sys., Inc. v. F.C.C.,* 512 U.S. 622, 664 (1994) ("When the Government defends a regulation on speech as a means to redress past harms or prevent anticipated harms, it must do more than simply posit the existence of the disease sought to be cured. It must demonstrate that the recited harms are real, not merely conjectural, and that the regulation will in fact alleviate these harms in a direct and material way." (citations and internal quotation marks omitted)).[2]

Accordingly, the Supreme Court has "consistently rejected the argument that" "out-of-court comments concerning pending cases or grand jury investigations" may be censored. *Landmark Commc'ns, Inc.*, 435 U.S. at 844; *see also United States v. Ford*, 830 F.2d 596, 598 (6th Cir. 1987) (rejecting lower "likelihood" of prejudice standard and holding the "exacting 'clear and

---

[2] As the Supreme Court instructed:

> To courageous, self-reliant men, with confidence in the power of free and fearless reasoning applied through the processes of popular government, no danger flowing from speech can be deemed clear and present, unless the incidence of the evil apprehended is so imminent that it may befall before there is opportunity for full discussion. If there be time to expose through discussion the falsehood and fallacies, to avert the evil by the processes of education, the remedy to be applied is more speech, not enforced silence.

*Texas v. Johnson*, 491 U.S. 397, 419 (1989) (quotation omitted).

present danger' test" applies); *id*. ("We see no legitimate reasons for a lower threshold standard for individuals, including defendants, seeking to express themselves outside of court than for the press."); *Chi. Council of Lawyers v. Bauer,* 522 F.2d 242, 251 (7th Cir.1975) ("We do not believe that there can be a blanket prohibition on certain areas of comment[,] a per se proscription- without any consideration of whether the particular statement posed a serious and imminent threat of interference with a fair trial."); *Karhani v. Meijer,* 270 F. Supp. 2d 926, 933 (E.D. Mich. 2003) (a court must find "clear and present danger" in order to impose a prior restraint on a civil litigant); *Hammes Co. Healthcare, LLC v. Tri-City Healthcare Dist.*, 2011 WL 6182423, at *18 (S.D. Cal. Dec. 13, 2011) (citing *CBS Inc. v. Young,* 522 F.2d 234, 239 (6th Cir.1975) (quoting *Craig v. Harney,* 331 U.S. 367, 373 (1947)) ("Before a trial court can limit parties' and their attorneys' right to freedom of speech, the court must make sufficient specific findings establishing that the party's conduct is "a serious and imminent threat to the administration of justice."); *Coomer v. Noel*, 2023 WL 1862617, at *2 (S.D. Ind. Feb. 9, 2023) ("[A] Court should restrict the speech of lawyers and litigants only when the comments in question 'pose a serious and imminent threat of interference with the fair administration of justice.'"); *Bianchi v. Tonigan*, 2012 WL 5966543, at *6 (N.D. Ill.

Nov. 28, 2012) (Courts require a showing of a "clear and present danger" or a "serious and imminent threat" to a fair trial before restraining litigant speech.).[3]

"The thread running through all these cases is that prior restraints on speech and publication are the most serious and the least tolerable infringement on First Amendment rights." *Nebraska Press Ass'n v. Stuart*, 427 U.S. 539, 559 (1976). Thus, even where a "prior restraint [is] imposed to protect [another] vital constitutional guarantee," such as the right to a fair trial, "the explicit command . . . that the freedom to speak and publish shall not be abridged" remains of paramount importance, "and the presumption against its [abridgment] continues intact." *Id.* (reversing prohibition on case commentary and holding the government had not met the "heavy burden imposed as a condition to securing a prior restraint").[4]

---

[3] The prosecution inappositely cites *Gentile v. State Bar of Nevada*, to suggest it must meet a lower (but still quite high) standard of "a substantial likelihood of materially prejudicing an adjudicative proceeding." 501 U.S. 1030, 1056 (1991). *Gentile*, however, addressed the First Amendment rights of attorneys, not parties. Thus, "[m]uch of the reasoning in *Gentile* justifying a lower standard for regulating attorney speech in pending cases does not apply to non-attorneys," and the case provides "no cause to limit the speech of the parties." *Nelle as Next Friend of B.N. v. Huntsville Sch. Dist.*, No. 5:21-CV-05158, 2021 WL 6135690, at *3 n.2 (W.D. Ark. Dec. 29, 2021) (citing *Gentile* discussion of the unique role and responsibilities of attorneys as officers of the court)). Additionally, *Gentile* did not concern a prior restraint, which is subject to higher scrutiny. *See Nelle,* 2021 WL 6135690, at *3 ("[T]he higher standard used in *Nebraska Press Association* for a prior restraint on the press would apply to a prior restraint on a party."). Regardless, the Proposed Gag Order fails under either standard.

[4] The prosecution relies on *Sheppard v. Maxwell*, 384 U.S. 333 (1966) to justify depriving President Trump of his free speech rights. But *Sheppard* did not concern the First Amendment. Rather, it addressed the need to protect a *defendant's* due process rights from a "carnival atmosphere at trial." *Id.* at 358. The prosecution has no parallel due process right, *see United States v. Cardinal Mine Supply,* 916 F.2d 1087, 1089 n.3 (6th Cir.1990) (citing *South Carolina v. Katzenbach,* 383 U.S. 301, 323–24 (1966)), meaning the Motion does not pit two constitutional guarantees against each other, but rather attempts to subordinate President Trump's free speech rights in favor of the prosecution's preference for silence.

## ARGUMENT

**1.      President Trump's Posts Do Not Endanger the Administration of Justice**

Throughout its Motion, the prosecution complains that President Trump's political statements "undermine confidence in the criminal justice system," which it asserts somehow justifies the Proposed Gag Order. Motion at 2, 6, 8, 15. The prosecution cites no authority in support of this bizarre claim. Nor can it. As the Supreme Court has repeatedly emphasized, "speech critical of the exercise of the State's power lies at the very center of the First Amendment." *Gentile*, 501 U.S. at 1034; *New York Times Co. v. Sullivan*, 376 U.S. 254, 273 (1964) ("Criticism of their official conduct does not lose its constitutional protection merely because it is effective criticism and hence diminishes their official reputations."). This includes criticism of the Court and the Special Counsel.

> The judicial system, and in particular our criminal justice courts, play a vital part in a democratic state, and the public has a legitimate interest in their operations. . . . It would be difficult to single out any aspect of government of higher concern and importance to the people than the manner in which criminal trials are conducted. . . . Public awareness and criticism have even greater importance where, as here,… the criticism questions the judgment of an elected public prosecutor. Our system grants prosecutors vast discretion at all stages of the criminal process . . . The public has an interest in its responsible exercise.

*Gentile*, 501 U.S. at 1035–36 (citations and quotation marks omitted).

The prosecution would silence President Trump, amid a political campaign where his right to criticize the government is at its zenith, all to avoid a public rebuke of this prosecution. However, "above all else, the First Amendment means that government has no power to restrict expression

because of its message, its ideas, its subject matter, or its content." *Police Dep't of City of Chicago v. Mosley*, 408 U.S. 92, 95 (1972).[5]

The prosecution may not like President's Trump's entirely valid criticisms, but neither it nor this Court are the filter for what the public may hear. Rather, "[t]he very purpose of the First Amendment is to foreclose public authority from assuming a guardianship of the public mind . . . In this field every person must be his own watchman for truth, because the forefathers did not trust any government to separate the true from the false for us." *Meyer v. Grant*, 486 U.S. 414, 419–20 (1988) (citations and internal quotations omitted); *Consol. Edison Co. of New York v. Pub. Serv. Comm'n of New York*, 447 U.S. 530, 537–38 (1980) ("If the marketplace of ideas is to remain free and open, governments must not be allowed to choose which issues are worth discussing or debating. . . . To allow a government the choice of permissible subjects for public debate would be to allow that government control over the search for political truth." (citations and internal quotations omitted)).

If the prosecution wishes to avoid criticism for abusing its power, the solution is simple: stop abusing its power. The Constitution allows no alternative.[6]

---

[5] No one can doubt that substantial segments of the U.S. public harbor deep suspicions regarding the prosecution's motives in this case. President Trump has a constitutional right to speak on this subject, both as a political candidate and as a citizen of this country.

[6] Enforcing "confidence in the judicial system" through censorship is repugnant to the First Amendment in every respect; however, even if it were a "compelling government interest," the prosecution utterly fails to establish that any confidence has been lost due to President Trump's comments, or that censoring him would do anything to restore or preserve such confidence. It cites no statistics, provides no affidavits, and does not even explain how many people have seen President Trump's comments. To satisfy strict scrutiny, harm must not be speculative or assumed, but rather demonstrated through compelling evidence. *Landmark Commc'ns, Inc.*, 435 U.S. at 844. Likewise, the prosecution does not, and cannot, explain how the Proposed Gag Order is the least restrictive method of achieving its purported goal of preserving public confidence.

A.   _President Trump Has Not Intimidated Anyone_

Next, the prosecution argues (without evidence) that it needs the Proposed Gag Order to prevent the purported "intimidation" of the prosecution, the Court, and "potential witnesses." Motion at 15. This claim is meritless.

First, it is absurd to suggest the prosecution and the Court are "intimidated" by critical social media posts, let alone to such an extent that it "constitute[s] a clear and present danger to the administration of justice." _Landmark Commc'ns, Inc._, 435 U.S. at 844. The prosecution does not point to a single prosecutorial or judicial function that has been impaired due to the cited social media posts, or otherwise suggest that it would be unable to fulfill its duties absent the Proposed Gag Order. Every hearing in this case has gone forward on schedule, without incident, and there is zero reason to believe that will change due to President Trump's political expressions.

Similarly, no witness has suggested that he or she will not testify because of anything President Trump has said. To the contrary, witnesses appear eager to share their expected testimony with the media and will undoubtedly testify at a potential trial, if called to do so.[7] Nor has any witness suggested that President Trump's protected statements have "influenc[ed] [his or her] testimony," as the prosecution baselessly suggests. Motion at 15.

This is entirely unsurprising, as President Trump has never called for any improper or unlawful action. Quite the opposite, the prosecution's cited posts show that President Trump

---

[7] Two "potential witnesses" the prosecution does not want President Trump speaking about, for example, are former Attorney General Bill Barr and former Vice President Mike Pence. Both have written books about their tenure with President Trump and the latter is currently running for president. _See, e.g._, Geoff Bennett, _Bill Barr: Trump Committed a "Grave Wrongdoing" in Jan. 6 Case_, PBS NEWSHOUR, Aug. 3, 2023. Neither shies away from a hearty public debate with President Trump. Both were at the very top of government and it is absurd to think that they would be intimidated by social media posts. Others the prosecution identifies as "harassed," are likewise current and former government officials who have made politics, for all its discord and discourse, a large part of their lives.

intends to redress the unfairness of this proceeding through legitimate means. This includes, for example, filing motions with the Court—a form of relief that President Trump has every right to pursue and talk about. This is a far cry from the type of "true threat" the prosecution would need to show to justify a prior restraint. *Virginia v. Black*, 538 U.S. 343, 360 (2003) ("Intimidation in the constitutionally proscribable sense of the word is a type of true threat, where a speaker directs a threat to a person or group of persons with the intent of placing the victim in fear of bodily harm or death.").[8]

Unable to identify any instance where President Trump uttered any threat, the prosecution points to others, claiming President Trump "knows that when he publicly attacks individuals and institutions, he inspires others to perpetrate threats and harassment against his targets." Motion at 3. Again, the prosecution offers no evidence of any causal connection between his speech and the alleged unlawful acts of others to support this meritless claim. Regardless, it goes without saying that the Constitution does not permit the censorship of President Trump for the unprovoked acts of third parties, and no such alleged acts can justify a prior restraint of President Trump. Indeed,

---

[8] The prosecution once again cites President Trump's August 4, 2023, Truth Social post; however, as previously explained, Doc. 14 at 7–8 n.8, that post did not concern this case. *See* Nick Robertson, *Trump campaign defends threatening social media posts as free speech*, The Hill (August 5, 2023) (quoting a Trump campaign statement that "[t]he Truth post cited is the definition of political speech, and was in response to the RINO, China-loving, dishonest special interest groups and Super PACs, like the ones funded by the Koch brothers and the Club for No Growth.").

In today's environment, this Court could easily take judicial notice that "[t]he language of the political arena . . . is often vituperative, abusive, and inexact," *Watts*, 394 U.S. at 708 (citations omitted), and even "very crude [or] offensive method[s] of stating a political opposition" are not true threats. *Id*.

Finally, the prosecution raised (and President Trump addressed), this same post in connection with its motion for a protective order. Doc. 14 at 7–8 n.8. Despite having ample opportunity to dispute President Trump's explanation, including in a reply brief, Doc. 15, and at oral argument, Doc. 29, the prosecution chose not to do so. Now, the prosecution once again tries to revive this debunked position in support of its Motion. The Court should accord such unpersuasive arguments no weight.

the Supreme Court consistently holds that speech cannot be prohibited based on an incitement theory unless it "is directed to inciting or producing imminent lawless action and is likely to incite or produce such action." *Brandenburg v. Ohio*, 395 U.S. 444, 447–448 (1969).

The prosecution does not and cannot explain how President Trump's statements would provoke any reasonable listener to lawlessness, or otherwise "fall within that small class of 'fighting words' that are likely to provoke the average person to retaliation, and thereby cause a breach of the peace." *Texas v. Johnson*, 491 U.S. 397, 409 (1989) (citation and quotation marks omitted). Rather, President Trump's statements are pure "expression[s] of dissatisfaction with the policies of this country" that are "situated at the core of our First Amendment values," *Id*. at 411.[9] Criticism of prosecution witnesses, likewise, is core protected speech absent a true threat.

Again, the First Amendment requires far more than bare speculation that third parties *might* interact with the individuals President Trump comments on. Instead, the prosecution must proffer a "solidity of evidence" proving President Trump's statements "immediately imperil" the administration of justice. *Landmark Commc'ns, Inc.*, 435 U.S. at 845 (citations omitted). That means proving genuine, material harm to this proceeding and drawing a direct causal link between that alleged harm and President Trump's protected speech. The prosecution has done neither.

But even if the prosecution could meet this test by identifying some utterance of a true threat or incitement sufficient to satisfy the *Brandenburg* standard—and it emphatically cannot—

---

[9] Nor has the prosecution established that President Trump's statements actually incited anyone. Fallacious *post hoc ergo prompter hoc* assertions aside, no evidence links President Trump's social media posts to any alleged lawlessness and there is no reason to think the Proposed Gag Order would resolve the harms the prosecution alleges. *See Playboy Ent. Grp., Inc.*, 529 U.S. at 822 ("[A]side from conclusory statements during the debates by proponents of the bill, . . . the congressional record presented to us contains no evidence as to how effective or ineffective the . . . regulations were or might prove to be." (citation omitted)). Unknown third parties who, in a raucous political atmosphere, allegedly crossed, or may hypothetically cross, a line is not a reason to prevent President Trump from speaking.

that would only justify a very narrow restriction on the specific language at issue. It would not allow, as the prosecution demands, categorical restrictions on all "disparaging" statements regarding the prosecution, the Court, and an unknown set of all "potential witnesses," and certainly not all "comment" on this case.

Finally, the prosecution bemoans the disparaging messages directed to it, Motion at 12, but ignores the equal amount of vitriol directed to the defense. Counsel for President Trump receives harassing messages by phone or email nearly every day. Others associated with President Trump have received the same treatment. Yet the prosecution seeks only to bar President Trump from speaking. Such inequitable restrictions offend the First Amendment on their face and have no place in our jurisprudence.

B.    *President Trump's Posts Will Not Prejudice the Jury*

The prosecution next speculates that President Trump's public statements "could affect potential jurors," and impact the "impartiality of the jury pool," Motion at 13, 15, but fails to explain how. *Playboy Ent. Grp., Inc.*, 529 U.S. at 822 ("The Government must present more than anecdote and supposition."). That argument is laughable given the jury pool.

In the prosecution's view, President Trump simply talking about a witness (who might be a public critic, author, or political opponent) would prejudice the jury through improper "bolster[ing] or impeach[ment]." Motion at 16. That is not the law, and no authority permits a blanket gag order that would prevent a defendant from exercising his First Amendment rights. For good reason: "[a]n impartial jury . . . need not be wholly unaware of information—including potentially prejudicial information—outside the record. Prominence does not necessarily produce prejudice, and juror impartiality . . . does not require ignorance." *In re Murphy-Brown, LLC*, 907 F.3d at 798; *Gentile*, 501 U.S. at 1054-1055 ("Empirical research suggests that in the few instances

when jurors have been exposed to extensive and prejudicial publicity, they are able to disregard it and base their verdict upon the evidence presented in court.").[10]

Further, to promote impartiality, "[t]he law empowers trial courts to ensure fair jury trials using a number of tools short of gag orders…include[ing] enlarged jury pools, *voir dire*, changes to a trial's location or schedule, cautionary jury instructions, and, in more unusual circumstances, sequestration." *In re Murphy-Brown, LLC*, 907 F.3d at 799. The Supreme Court discussed many other alternatives to prior restraints in *Nebraska Press Ass'n v. Stuart*, including: (a) change of trial venue to a place less exposed to the intense publicity; (b) postponement of the trial to allow public attention to subside; (c) searching questioning of prospective jurors to screen out those with fixed opinions as to guilt or innocence; (d) the use of emphatic and clear instructions on the sworn duty of each juror to decide the issues only on evidence presented in open court; and (e) sequestration of jurors. 427 U.S. 539, 563–64 (1976). "When a plausible, less restrictive alternative is offered to a content-based speech restriction, it is the Government's obligation to prove that the alternative will be ineffective to achieve its goals." *Playboy Ent. Grp., Inc.*, 529 U.S. at 816.

The prosecution has not demonstrated why any of the plausible alternatives above would be inadequate, or offered a single less restrictive alternative to a near complete gag order that would preclude any "comment" on these proceedings or "potential witnesses." This is insufficient. The prosecution cannot just claim that the Proposed Gag Order is narrowly tailored. It must prove that

---

[10] In *Gentile*, the Supreme Court was unable to identify "a single example where a defense attorney has managed by public statements to prejudice the prosecution" and found "no convincing case for restrictions upon the speech of defense attorneys." 501 U.S. at 1055. Rather, it is "[t]he police, the prosecution, other government officials, and the community at large hold innumerable avenues for the dissemination of information adverse to a criminal defendant," and in part because of this imbalance, "blanket rules restricting speech of defense attorneys should not be accepted without careful First Amendment scrutiny." *Id*. at 1056.

it is the least restrictive method of protecting a compelling interest and that *no* other alternative would suffice. The prosecution falls hopelessly short of meeting this high burden.

"The question, therefore, is neither whether a case has garnered public attention nor whether public discussion of it risks revealing potentially prejudicial information. Guidance is the critical concept. The question is whether the judge finds it likely that he or she will be unable to guide a jury to an impartial verdict. If judges can guide the jury to an impartial verdict, then no gag order may issue." *In re Murphy-Brown, LLC*, 907 F.3d at 798.

Here, the prosecution has not pointed to any statements by President Trump, as distinct from the countless statements by others about these proceedings, that present "a danger of the necessary gravity, imminence, or likelihood" necessary to warrant a violation of his First Amendment rights. *Gentile*, 501 U.S. at 1058.[11]

The speaking Indictment, as part of an obvious strategy, launched false and derogatory public accusations against President Trump, which the prosecution then expanded with gratuitous, out-of-court statements wrongly insinuating that President Trump was responsible for the events of January 6—an allegation not made in the Indictment. In this respect, the prosecution and its media allies represent a far greater threat of prejudice to the venire than anything President Trump has or will say—particularly, in the District of Columbia. *See Gentile*, 501 U.S. at 1042. President Trump, his counsel, and agents, have the right to counter this harmful publicity with public

---

[11] The size of the potential venire and the timing of President Trump's statements both also weigh against any suggestion of prejudice. In *Gentile*, for example, the Supreme Court held that prejudice was unlikely in a community of 600,000 potential jurors,[11] particularly where, as here, trial remains several months away. *See Gentile*, 501 U.S. at 1044 (citing ABA Annotated Model Rules of Professional Conduct 243 (1984) ("timing of statement a significant factor in determining seriousness and imminence of threat"); *see also Gentile*, 501 U.S. at 1039 ("[T]he Nevada court's conclusion that petitioner's abbreviated, general comments six months before trial created a 'substantial likelihood of materially prejudicing' the proceeding is, to say the least, most unconvincing.").

statements of their own. *See Id.* at 1043 ("[Defendant's attorney] sought only to stop a wave of publicity he perceived as prejudicing potential jurors against his client and injuring his client's reputation in the community."). Such efforts, far from prejudicing these proceedings, protect President Trump's rights and are core free speech. *Id.*

In sum, for alleged "jury influence" to justify a prior restraint, the prosecution must establish that President Trump's political commentary irrevocably biases District citizens (against the Biden Administration prosecution) such that *voir dire* and other alternative remedies cannot remedy. Because the prosecution fails to meet this heavy burden, the Proposed Gag Order is unconstitutional.

**2.      The Proposed Gag Order is Not Narrowly Tailored**

"[T]he seriousness with which the regulation of core political speech is viewed under the First Amendment requires such regulation to be as *precisely* tailored as possible." *Republican Party of Minnesota v. White*, 416 F.3d 738, 751 (8th Cir. 2005) (emphasis in original).

"A narrowly tailored regulation is one that actually advances the state's interest (is necessary), does not sweep too broadly (is not overinclusive), does not leave significant influences bearing on the interest unregulated (is not underinclusive), and could be replaced by no other regulation that could advance the interest as well with less infringement of speech (is the least-restrictive alternative)." *Republican Party of Minnesota*, 416 F.3d at 751 (collecting cases); *see also City Council of L.A.,* 466 U.S. at 808–10 ("A statute is narrowly tailored if it targets and eliminates no more than the exact source of the 'evil' it seeks to remedy.").

Any restraint must "provide fair notice to those to whom it is directed" and not leave the speaker to "guess at its contours." *Gentile*, 501 U.S. at 1030, 1048. A "grammatical structure" that relies on "classic terms of degree" that "have no settled usage or tradition of interpretation in law"

violates the Constitution because the speaker has "no principle for determining when his remarks pass from the safe harbor of the general to the forbidden sea of the elaborated." *Id*. at 1048–49.

The Proposed Gag Order does not meet either of these tests. It is sweepingly broad and many of its terms are undefined. For example, the prosecution proposes that President Trump and his attorneys be restricted from making or "authorizing"[12] any statements that pose "a substantial likelihood of material prejudice." Doc. 57-2 at 1. This is not only the wrong standard, *see Landmark Commc'ns, Inc.*, 435 U.S. at 844, but it is vague on its face, providing no settled boundaries and utilizing prohibited "classic terms of degree" that leave President Trump to guess at what the prosecution or the Court might consider "substantial" or "material" despite obvious disagreement on those issues. *Gentile*, 501 U.S. at 1030, 1048. Determining whether a single, specific statement poses "a substantial likelihood of material prejudice" is a difficult, fact-intensive question that Courts struggle to resolve. *See Gentile*, 501 U.S. at 1048–49. To expect President Trump and his counsel to make that judgment in real-time, every time he speaks, is utterly intolerable. *Id*. Let's be clear: the prosecution hopes to create a contempt trap for President Trump and his attorneys.

Although the prosecution offers some examples of conduct it would consider prohibited, it simultaneously cautions the examples are non-exhaustive. Doc. 57-2 at 1 ("Such statements include, but are not limited to . . .). Further, the prosecution's examples are intentionally vague in order to chill the First Amendment rights of President Trump and his counsel.

---

[12] "Authorize" could mean to allow or permit. Under this entirely too broad proposed order, President Trump could arguably be sanctioned if he simply failed to prevent others from making statements. The Proposed Gag Order also attempts to ensnare President Trump's "surrogates" within its reach. Of course, "surrogates" is not defined. But it would presumably include members of the media, which is forbidden by *Nebraska Press*, or other citizens, including politicians, which is a straightforward infringement of the First Amendment.

For instance, the prosecution would prohibit *any* statement regarding the identity, testimony, or credibility of prospective witnesses. Doc. 57-2 at 1 (emphasis added). The prosecution provides no list of "prospective witnesses," nor does it define "prospective." That group could include anyone who worked in the federal government around January 6 or anyone who was involved in a state election. Further, that broad characterization likely still does not include everyone who the prosecution could claim is a "prospective witness." The group of "prospective witnesses" could also arguably include many of President Trump's political rivals in the upcoming election. Thus, the Proposed Gag Order places President Trump at risk of contempt any time he speaks about anyone relevant to his political campaign. That is plainly unconstitutional and would inevitably lead to repeated and needless collateral litigation. *Gentile*, 501 U.S. at 1051 ("The prohibition against vague regulations of speech is based in part on the need to eliminate the impermissible risk of discriminatory enforcement, for history shows that speech is suppressed when either the speaker or the message is critical of those who enforce the law." (citations omitted)).

The prosecution's second example seeks to preclude President Trump from making or authorizing "disparaging and inflammatory or intimidating statements" regarding another wide and undefined set of individuals. Doc. 57-2 at 1. The government does not define those adjectives, but by the content of its motion, it appears this example would include speech far below the constitutional requirement of a "clear and present danger" to the administration of justice.

The only speech the government appears willing to permit is basic case information, communicated "without comment." Doc. 57-2 at 2. However, none of the cases the prosecution cites allow such a significant restriction on speech. "Comment" is at the very core of the First Amendment. The United States Constitution may be inconvenient for the Biden Administration,

but public speech in response to unfair and widely disseminated attacks is President Trump's right.[13]

Finally, as stated above, the Proposed Gag Order is entirely disconnected from the specific harms the prosecution alleges in its Motion, and the prosecution makes no attempt to minimize the burden these sweeping restraints would have on President Trump's rights. In short, the Proposed Gag Order is unconstitutionally overbroad and vague in nearly every respect, and therefore fails to satisfy strict scrutiny's narrow tailoring requirement.

### 3. President Trump's Attorneys' Statements Are Entirely Appropriate

Little of the Motion is devoted to President Trump's attorneys' speech. Nonetheless, the prosecution seeks to place the same unconstitutional restrictions on counsel. In support, the prosecution cites comments made by Present Trump's co-lead counsel in the immediate aftermath of the speaking Indictment and the Special Counsel's false and derogatory public statements regarding President Trump. Doc. 57 at 16. Although the prosecution acknowledges defense counsel has not spoken recently on this subject, it nonetheless seeks to unlawfully restrain counsel's ethical duty to defend President Trump moving forward. Not surprisingly, the prosecution makes no mention of Smith's comments, while seeking to censor defense counsel.

Without question, the misleading allegations in the 45-page speaking Indictment sought to skew public opinion against President Trump in this historic case. *See, e.g.,* Mark Berman, Assailed by Trump, *Special Counsel Jack Smith Lets Indictments Speak for Him*, THE WASHINGTON POST, Aug. 3, 2023.

---

[13] Silencing President Trump would only make publicity regarding this case unfairly one-sided. *See Gentile*, 501 U.S. at 1042 ("[H]is primary motivation was the concern that, unless some of the weaknesses in the State's case were made public, a potential jury venire would be poisoned by repetition in the press of information being released by the police and prosecutors.").

The Special Counsel's improper, out-of-court statements have had the same effect. Despite D.C. Bar Rule 3.8(f)'s specific prohibition on prosecutors' "extrajudicial comments which serve to heighten condemnation of the accused,"[14] the Special Counsel falsely told the press that President Trump "fueled . . . an unprecedented assault on the seat of American democracy,"[15] matching rampant leaks to the same press. *See, e.g.,* Zoe Tillman, *The Trump Indictments Won't End Special Counsel's Investi*gations, PORTLAND PRESS HERALD, Aug. 2, 2023; Katelyn Polantz, Kristen Holmes, Paula Reid and Jeremy Herb, *Special Counsel Smith speeds ahead on criminal probes surrounding Trump*, CNN.com, Dec. 11, 2022.

The prosecution has engineered negative press towards President Trump and now seeks to censor his counsel. Under settled law, counsel had, and has, the right to counter this false narrative with statements of their own. *Gentile*, 501 U.S. at 1043 ("An attorney's duties do not begin inside the courtroom door. He or she cannot ignore the practical implications of a legal proceeding for the client . . . [S]o too an attorney may take reasonable steps to defend a client's reputation and reduce the adverse consequences of indictment, especially in the face of a prosecution deemed unjust or commenced with improper motives.").

---

[14] *See also* ABA Model Rule of Professional Conduct 3.8(f) "except for statements that are necessary to inform the public of the nature and extent of the prosecutor's action and that serve a legitimate law enforcement purpose, refrain from making extrajudicial comments that have a substantial likelihood of heightening public condemnation of the accused and exercise reasonable care to prevent investigators, law enforcement personnel, employees or other persons assisting or associated with the prosecutor in a criminal case from making an extrajudicial statement that the prosecutor would be prohibited from making under Rule 3.6 or this Rule."

[15] The statement read in part: "The attack on our nation's capital on January 6, 2021, was an unprecedented assault on the seat of American democracy. As described in the indictment, it was fueled by lies. Lies by the defendant targeted at obstructing a bedrock function of the U.S. government, the nation's process of collecting, counting, and certifying the results of the presidential election." The statement ended by "bolstering" the prosecution and law enforcement team, some of whom will certainly be witnesses in the case, one of the types of speech the prosecution wants restricted by its motion.

As recognized by the Supreme Court, public debate about a criminal case almost always skews in favor of the prosecution: "[i]n the context of general public awareness, these police and prosecution statements were no more likely to result in prejudice than were petitioner's statements, but given the repetitive publicity from the police investigation, it is difficult to come to any conclusion but that the balance remained in favor of the prosecution." *Gentile*, 501 U.S. at 1046. "By prohibiting only certain kinds of information from selected sources, a gag order can actually warp and distort discussion, thereby enhancing prejudice rather than mitigating it." *In re Murphy-Brown, LLC*, 907 F.3d at 798.

Thus, both this Court and the "disciplinary rules governing the legal profession cannot punish activity protected by the First Amendment," *Gentile*, 501 U.S. at 1054, and attorney speech about ongoing proceedings is afforded "traditional First Amendment Protections." *Id*. at 1055. Indeed, "there are circumstances in which [the Supreme Court] will accord speech by attorneys on public issues and matters of legal representation the strongest protection our Constitution has to offer." *Fla. Bar v. Went For It, Inc.*, 515 U.S. 618, 634 (1995) (citing *Gentile,* 501 U.S. at 1030; *In re Primus,* 436 U.S. 412 (1978)).

For that reason, ABA Model Rule of Professional Conduct 3.6 regarding pretrial publicity, does not restrict attorney speech made to "protect a client from the substantial undue prejudicial effect of recent publicity…" *See* ABA Model Rule 3.6(c).[16] D.C. Bar Rule 3.6, Cmt. 1, likewise recognizes the need to protect counsel's ability to publicly defend their clients:

> It is difficult to strike a proper balance between protecting the right to a fair trial and safeguarding the right of free expression, which are both guaranteed by the

---

[16] ABA Model Rule 3.6(c) provides: "Notwithstanding paragraph (a), a lawyer may make a statement that a reasonable lawyer would believe is required to protect a client from the substantial undue prejudicial effect of recent publicity not initiated by the lawyer or the lawyer's client. A statement made pursuant to this paragraph shall be limited to such information as is necessary to mitigate the recent adverse publicity."

Constitution. On one hand, publicity should not be allowed to influence the fair administration of justice. On the other hand, litigants have a right to present their side of a dispute to the public, and the public has an interest in receiving information about matters that are in litigation. Often a lawyer involved in the litigation is in the best position to assist in furthering these legitimate objectives. No body of rules can simultaneously satisfy all interests of fair trial and all those of free expression.

Every statement counsel has made in this matter has been appropriate under applicable law and in response to the prejudicial environment created by the media and the prosecution. In a case with this much widely disseminated scrutinization, President Trump's attorneys cannot adequately and ethically defend him and assure a fair trial without responding to these sources of pretrial prejudice. Otherwise, the prejudice will remain one-sided. *See, e.g.,* Zack Beauchamp, *What the New Trump Indictment Has Already Proven*, VOX, Aug. 2, 2023; Carlos Lozada, *The Trump Indictments are an Indictment of America*, THE NEW YORK TIMES, Aug. 21, 2023.

Counsel has met every ethical obligation imposed by D.C. Bar Rule 3.6 and otherwise, consistent with the First Amendment and *Gentile*. The prosecution's baseless efforts to tarnish the reputation of counsel who has practiced before this Court for forty years should be condemned rather than entertained. Regardless, the Court should decline to enter any order further restricting counsel's speech.

### 4. President Trump's Attorneys Should Not Be Required to Seek Permission Before Conducting Public Polling or Studies

In a related request, the prosecution asks that the Court prohibit President Trump from conducting any public polling or jury study in the District of Columbia unless he: (1) discloses to the Court "(a) a brief description of the intended methodology; (b) all questions that will be asked in the pretrial survey, poll, or study; and (c) the expected number of participants," (2) obtains Court permission, and (3) completes all polling at least 30 days before the start of jury selection. Doc.

57-3. In support, the prosecution argues in conclusory fashion that this protocol is necessary to avoid prejudicing the venire. Motion at 17–19.

President Trump has no objection to informing the Court of the dates and sample sizes of his polling in the District of Columbia; however, he opposes the remainder of the prosecution's request. As an initial matter, jury studies and polling have almost no chance of influencing the jury. Washington D.C. has almost 700,000 residents. A statistically significant sample size would ordinarily include only a few hundred people, meaning it is highly unlikely that any polled individuals would be in the jury venire. Moreover, it would be simple enough to ask potential jurors during *voir dire* if they participated in any pretrial polling, which would adequately screen for any minimal influence a poll might have. (Keeping in mind, the purpose of polling and jury studies is not to influence respondents, but to get a true read on the community's opinions or feelings on certain issues).[17]

In addition, polls and jury studies commissioned by defense counsel are work product and some parts, if not all, are attorney-client privileged. *See Blankenship v. Fox News Network, LLC*, 2020 WL 7225765, at *1 n.3 (S.D.W. Va. Dec. 8, 2020) (material such as questions and methodologies, "venue reports, venue comparative survey findings, juror profiling surveys, jury research, voir dire research, juror investigation and consulting research as well as in-court jury assistance, which appears to collectively fall under opinion and fact work product."). The government has not articulated a basis to overcome these privileges.

---

[17] The prosecution also ignores that the media, academics, and others are conducting polling of their own, without prompting from the parties. *See, e.g.,* "D.C. POLL: 64% of Residents Would Find Trump Guilty Ahead of Trial," EMERSON COLLEGE, September 5th, 2023, https://emersoncollegepolling.com/d-c-poll-64-of-residents-would-find-trump-guilty-ahead-of-trial/. Given this, the proposed restrictions, even if imposed, would not resolve the government's inexplicable concern that polling will influence the venire.

The lone Circuit Court opinion cited by the prosecution, *United States v. Collins*, 972 F.2d 1385 (5th Cir. 1992), also does not support the notion that a District Court should always review pretrial polling. The issue there was whether pretrial polling by the *government* deprived the *defendant* of a fair trial. *Id*. at 1398–99. That is not the issue here as both parties have an equal opportunity to poll. Ultimately, the *Collins* court was satisfied because, as here, "[n]one of the jurors who served on the jury was contacted, and the court specifically inquired as to this matter in voir dire." *Id*. at 1398. The Court emphasized: "[a]lthough a survey of community attitudes may aid a party in deciding what to *emphasize* at trial, our adversarial system with its liberal discovery mechanisms does not permit a party to 'contrive' a conviction that is not based on the evidence. There is no evidence that the Government manufactured or 'tailored' evidence based on the survey." *Id.* at 1400 (internal quotation marks omitted).

Preventing any polling 30 days before trial is also detrimental to the defense. With the immense pretrial publicity in this case, public opinion could sway dramatically as the trial approaches. Thus, polling is most valuable if conducted close to trial. Thirty days before jury selection is an arbitrary and unnecessary restriction, and it does not matter when a person is polled if they will be queried during *voir dire*.

The prosecution in this case already knows the population of Washington D.C. and knows that it does not favor President Trump. Any restrictions on pretrial polling would only work as a further disadvantage to the defense, which has the right to prepare for trial without prosecutorial interference. Accordingly, the Court should reject the government's proposed polling order.

**CONCLUSION**

The Court should deny the Motion in its entirety. Given the significant First Amendment issues presented by the Motion, President Trump respectfully requests the Court schedule a hearing at the first opportunity.

Respectfully submitted,

Dated: September 25, 2023

Todd Blanche, Esq. (PHV)
toddblanche@blanchelaw.com
BLANCHE LAW
99 Wall St., Suite 4460
New York, NY 10005
(212) 716-1250

*/s/*Gregory M. Singer
John F. Lauro, Esq.
D.C. Bar No. 392830
jlauro@laurosinger.com
Gregory M. Singer, Esq. (PHV)
gsinger@laurosinger.com
Filzah I. Pavalon, Esq. (PHV)
fpavalon@laurosinger.com
LAURO & SINGER
400 N. Tampa St., 15th Floor
Tampa, FL 33602
(813) 222-8990
*Counsel for President Trump*