**IN THE UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF COLUMBIA**

| | | |
|---|---|---|
| **UNITED STATES OF AMERICA** | * | |
| | * | |
| **v.** | * | **CRIMINAL NO. 23-cr-257 (TSC)** |
| | * | |
| **DONALD J. TRUMP,** | * | |
| | * | |
| **Defendant.** | * | |
| | * | |

**GOVERNMENT'S REPLY IN SUPPORT OF OPPOSED MOTION TO ENSURE THAT**
**EXTRAJUDICIAL STATEMENTS DO NOT PREJUDICE THESE PROCEEDINGS**

After the defendant and his counsel engaged in weeks of widespread public statements threatening the orderly administration of justice in this case, the Government filed a motion seeking: (1) a narrowly tailored order placing restrictions on all parties' extrajudicial statements, which carefully balances the defendant's free speech right with the Court's responsibility to ensure a fair trial free from outside influence, and (2) a common-sense order through which the Court can ensure that no jury study conducted by any party prejudices the venire. In the defendant's opposition—premised on inapplicable caselaw and false claims—he demands special treatment, asserting that because he is a political candidate, he should have free rein to publicly intimidate witnesses and malign the Court, citizens of this District, and prosecutors. But in this case, Donald J. Trump is a criminal defendant like any other. And as this Court has correctly stated, it has an obligation to protect the integrity of these proceedings from prejudicial interference: "In a criminal case such as this one, a defendant's free speech is subject to the release conditions imposed at arraignment and must also yield to the orderly administration of justice." Tr. of Protective Order Hr'g, at 6:4-7 (Aug. 11, 2023). The defendant should not be permitted to continue to try this case in the court of public opinion rather than in the court of law, and thereby undermine the fairness and integrity of this proceeding. The Government's motion should be granted.

I.       **The Government's Proposed 57.7(c) Order Is Necessary and Appropriate**

The Government's proposed order restricting the parties' statements under Local Criminal Rule 57.7(c) is necessary and appropriate to protect the due administration of justice in this case. The defendant's opposition to it is based on several faulty premises: that the defendant need not face even the most limited imposition in order to protect the public interest in the due administration of justice; that the legal standard for imposing reasonable restrictions on extrajudicial statements in a criminal case is higher than it actually is; that the defendant's statements to date have not been intimidating or prejudicial; and that the proposed order would impose sweeping restrictions that it plainly would not.  In fact, the proposed order readily meets the relevant legal standard set forth below.

A.   Legal Background

Courts have an obligation to "take such steps by rule and regulation that will protect their processes from prejudicial outside interferences." *Sheppard v. Maxwell*, 384 U.S. 333, 363 (1966). At times, this obligation may require a court to impose limited and reasonable restrictions on parties to a criminal case—including defendants—if their conduct risks prejudicial interference with the due administration of justice.  "Neither prosecutors, counsel for defense, the accused, witnesses, court staff nor enforcement officers coming under the jurisdiction of the court should be permitted to frustrate [the Court's] function." *Id*.  The proposed order would do precisely what Rule 57.7(c) authorizes the Court to do in this particular type of case: establish a reasonable and narrowly tailored restriction that prevents all parties—including the defendant—from making materially prejudicial statements that threaten the integrity of this proceeding and a fair trial.

The defendant's opposition proffers several standards—including strict scrutiny, clear and present danger, incitement, and true threats—by which to assess the constitutionality of a limitation

on extrajudicial statements.  None of these is correct.  In fact, as the Supreme Court concluded in *Gentile v. State Bar of Nevada*, a restriction on extrajudicial statements that pose "a substantial likelihood of material prejudice" survives First Amendment scrutiny.  501 U.S. 1030, 1038-39, 1075-76 (1991).  In *Gentile*, a defense attorney was held in contempt of court for violating a court rule that prohibited an attorney from making an "extrajudicial statement that a reasonable person would expect to be disseminated by means of public communication if the lawyer knows or reasonably should know that it will have a substantial likelihood of materially prejudicing an adjudicative proceeding."  501 U.S. at 1033 (quoting court rule).  The Supreme Court explained that although under *Nebraska Press Ass'n v. Stuart*, 427 U.S. 539 (1976), the First Amendment requires "a showing of a 'clear and present danger' that a malfunction in the criminal justice system will be caused before a State may prohibit media speech or publication about a particular pending trial," *Gentile*, 501 U.S. at 1070-71, "the speech of lawyers representing clients in pending cases may be regulated under a less demanding standard than that established for regulation of the press," *id.* at 1074.

Specifically, in *Gentile*, the Court arrived at the "substantial likelihood of material prejudice" standard by assessing that the restriction on extrajudicial statements by defense counsel was "designed to protect the integrity and fairness" of judicial proceedings because it was aimed at "(1) comments that are likely to influence the actual outcome of the trial, and (2) comments that are likely to prejudice the jury venire, even if an untainted panel can ultimately be found."  *Id.* at 1075.  The Court further determined that "[t]he restraint on speech is narrowly tailored to achieve those objectives," *id.* at 1076, because "[w]hile supported by the substantial state interest in preventing prejudice to an adjudicative proceeding by those who have a duty to protect its integrity,

the Rule is limited on its face to preventing only speech having a substantial likelihood of materially prejudicing that proceeding." *Id.*

Although *Gentile* based its conclusion in part on the role of attorneys as "officer[s] of the court" who "in pending cases [are] subject to ethical restrictions on speech to which an ordinary citizen would not be," 501 U.S. at 1071-72 (quotation omitted), the "substantial likelihood of material prejudice" standard applies to restrictions on extrajudicial statements by defendants as well. *See United States v. Brown*, 218 F.3d 415, 428 (5th Cir. 2000) (concluding that *Gentile*'s substantial-likelihood-of-material-prejudice standard applies to restrictions on extrajudicial statements by a defendant); *United States v. Hill*, 420 F. App'x 407, 411-12 (5th Cir. 2011) (same); *United States v. Batiste*, No. 06-20373-CR, 2008 WL 11333659, at *5 (S.D. Fla. Jan. 31, 2008) (same); *United States v. Calabrese*, No. 02 CR 1050, 2007 WL 2075630, at *1 (N.D. Ill. July 13, 2007) (same); *United States v. Fieger*, No. 07-20414, 2008 WL 474084, at *3-4 (E.D. Mich. Feb. 19, 2008) (report & recommendation) (same); *United States v. Rodriguez*, No. 2:04-cr-55, 2006 WL 8438023, at *3 (D.N.D. June 29, 2006) (same); *United States v. Koubriti*, 307 F. Supp. 2d 891, 899 (E.D. Mich. 2004) (same); *United States v. Scrushy*, No. 2:03-cr-530, 2004 WL 848221, at *4-6 (N.D. Ala. April 13, 2004) (same); *United States v. Hernandez*, No. 1:98-cr-721, 2001 WL 37126807, at *7-9 (S.D. Fla. Feb. 20, 2001) (same); *United States v. Davis*, 902 F. Supp. 98, 102 (E.D. La. 1995) (same). *But see United States v. Carmichael*, 326 F. Supp. 2d 1267, 1293 (M.D. Ala. 2004) (concluding that the clear-and-present-danger standard should apply to defendants); *United States v. McGregor*, 838 F. Supp. 2d 1256, 1260-62 (M.D. Ala. 2012) (same); *United States v. Schock*, No. 16-cr-30061, 2016 WL 7176578, at *1-2 (C.D. Ill. Dec. 9, 2016) (applying test of "serious and imminent threat to the administration of justice"); *Nelle ex rel. B.N. v. Huntsville Sch. Dist.*, No. 5:21-cv-5158, 2021 WL 6135690 (E.D. Ark. Dec. 29, 2021) (concluding

that the clear-and-present-danger standard should apply to parties in a civil case). In *Gentile*, the Supreme Court distinguished "between participants in the litigation and strangers to it," and the court explained that its prior cases "expressly contemplated that the speech of those participating before the courts could be limited." 501 U.S. at 1072-73. The Court noted its admonition in *Sheppard*, cited above, that included "the accused" among the parties that should not be "permitted to frustrate" the court's function. 501 U.S. at 1072 (quoting *Sheppard*, 384 U.S. at 363); *see also Seattle Times Co. v. Rhinehart*, 467 U.S. 20, 32 n.18 (1984) (noting that the First Amendment rights of litigants "may be subordinated to other interests" and that "on several occasions this Court has approved restriction[s] on the communications of trial participants where necessary to ensure a fair trial for a criminal defendant").

Courts in this District are in accord, and have adopted the *Gentile* standard in Rule 57.7(c) orders, including those that apply to defendants as well as attorneys. *See, e.g.*, *United States v. Stone*, No. 19-cr-18, ECF No. 36 at 3 (D.D.C. Feb. 15, 2019) (Rule 57.7(c) order to attorneys to "refrain from making statements to the media or in public settings that pose a substantial likelihood of material prejudice to this case"); *United States v. Butina*, No. 18-cr-218, ECF No. 31 at 2 (D.D.C. Sept. 12, 2018) (Rule 57.7(c) order to "all interested participants, in the matter, including the parties, any potential witnesses, and counsel for the parties and the witnesses . . . to refrain from making statements to the media or in public settings that pose a substantial likelihood of material prejudice"); *United States v. Manafort*, No. 17-cr-201, ECF No. 38 at 2 (D.D.C. Nov. 8, 2017) (Rule 57.7(c) order citing *Gentile* and ordering "all interested participants in the matter, including the parties, any potential witness, and counsel for the parties and the witnesses . . . to refrain from making statements to the media or in public settings that pose a substantial likelihood of material prejudice to this case"); *United States v. Clemens*, No. 10-223, 2011 WL 1256628, *1

(D.D.C. Apr. 4, 2011) (cautioning defendant, among others, that his public statements regarding the case had been "precariously close to violating, if not violating," the court's order under *Gentile* directing "all interested participants in this matter" to "refrain from making any further statements about this case to the media or in public settings outside the courtroom that are 'substantially likely to have a materially prejudicial effect' on this case") (internal citations omitted).

For various reasons, the cases the defendant cites (ECF No. 60 at 4-6) to support a different standard are inapposite. Many of them merely discuss general First Amendment principles that do not apply in this context. The cases cited that more squarely address extrajudicial statements by litigants are either civil cases, cases decided before *Gentile*, or both. The only criminal case that the defendant cites is *United States v. Ford*, 830 F.2d 596, 598 (6th Cir. 1987); that case, in which the Sixth Circuit applied the clear-and-present-danger standard, was decided before *Gentile*, which "foreclose[s] the applicability of" the clear-and-present-danger standard "to the regulation of speech by trial participants." *Brown*, 218 F.3d at 427 (discussing *Ford*). Since *Gentile*, district courts in the Sixth Circuit have recognized that *Gentile*, rather than *Ford*, supplies the applicable standard. *See, e.g.*, *Koubriti*, 307 F. Supp. 2d at 899; *Fieger*, 2008 WL 474084, at *3-4. The civil cases cited by defendant, such as the Fourth Circuit's opinion in *In re Murphy-Brown*, LLC, 907 F.3d 788 (4th Cir. 2018), do not govern here. *See, e.g.*, *Marceaux v. Lafayette City-Par. Consol. Gov't*, 731 F.3d 488, 493 (5th Cir. 2013) (after *Brown*, separately addressing the standard that applies in civil litigation). The defendant fails to inform the Court, for example, that the Fourth Circuit distinguishes between restraints on extrajudicial statements in civil and criminal cases. *See Hirschkop v. Snead*, 594 F.2d 356, 373 (4th Cir. 1979) (en banc) (per curiam). In fact, the Fourth Circuit permits restraints on extrajudicial statements by participants in criminal cases if there is a ''reasonable likelihood'' that extrajudicial commentary will prejudice a fair trial. *In re Russell*,

726 F.2d 1007, 1010 (4th Cir. 1984); *see also In re Morrissey*, 168 F.3d 134, 140 (4th Cir. 1999) (concluding that *Gentile* did not overrule *Hirschkop*).

In sum, the Court may enter an order in this case restricting the parties' extrajudicial statements if the statements present a "substantial likelihood of material prejudice" as long as the Court's order is narrowly tailored to the objectives of preventing comments that are likely to influence the actual outcome of trial or are likely to prejudice the venire.[1] *Gentile*, 501 U.S. at 1075-1076. As described in the Government's initial motion, ECF No. 57, and below, the proposed order targets only extrajudicial statements that present a substantial likelihood of material prejudice and is narrowly tailored to precisely those objectives.

B. The Proposed Order Is Necessary and Constitutional, and the Defendant's Claims to the Contrary Misstate the Facts

The proposed order under Rule 57.7(c) is consistent with *Gentile* and necessary under the circumstances—circumstances that the defendant himself has created by waging a sustained campaign of prejudicial public statements regarding witnesses, the Court, the District, and prosecutors. To argue otherwise, the defendant's opposition ignores the substantial record of the defendant's prejudicial statements, misstates the facts, and claims that the proposed order imposes restrictions that it clearly does not.

---

[1] Even if the highest of the many standards the defendant proffers—the clear-and-present danger standard—were applicable, the Government would meet that standard as well. *See Levine v. U.S. Dist. Ct. for Cent. Dist. of California*, 764 F.2d 590, 598 (9th Cir. 1985) (district court's findings—that defense attorneys' detailed statements to media about case presented "serious and imminent threat to a fair trial" that outweighed any First Amendment rights at stake—were sufficient).

*i.  The  Proposed Order*

The proposed order is consistent with *Gentile* and is more narrowly tailored than similar orders entered by other courts in this District.  First, the proposed order applies the *Gentile* standard and prohibits only statements "that pose a substantial likelihood of material prejudice to this case." *See* ECF No. 57-2 at 1.  To further tailor the restriction and focus on statements most likely to prejudice the jury venire or the outcome of the trial, *see Gentile* at 1075-76, the proposed order specifies that such statements include those regarding the identity, testimony, or credibility of prospective witnesses, and statements that are disparaging and inflammatory, or intimidating.  ECF No. 57-2 at 1.  Far from being the "contempt trap"[2] that the defendant claims, ECF No. 60 at 17, the proposed order is more targeted than others previously entered in this District, as described above.  Finally, while the order that the government has proposed is narrowly tailored, the Court may consider modifications, suspensions, or reinstatements of the order as changing circumstances may warrant.  *See, e.g., Brown*, 218 F.3d at 418-420, and Brief of Appellee at \*21, *United States v. Brown*, No. 00-30134, 2000 WL 33981267 (5th Cir. Mar. 9, 2000) (where, in the final two months leading up to an election, the district court suspended an order restricting a defendant's speech, but reinstituted an order almost immediately because various defendants released prejudicial audio recordings in its absence).

---

[2] Defense counsel previously used this same "contempt trap" language when opposing the imposition of a protective order in this case.  The Court rejected the suggestion that balancing the defendant's interests with the need to protect the due administration of justice was tantamount to a contempt trap.  *See* Tr. of Protective Order Hr'g, at 17:12-17 (Aug. 11, 2023) ("Protective Order Hr'g") (COURT: "[N]obody's talked about contempt.  What we're talking about now are the parameters of the order, and the parameters of this order that we're all considering means that there are certain things, if they have an impact on the administration of justice or on witnesses, can't be said regardless of what endeavors the defendant is currently engaged in.").

The need for the proposed order is further evidenced by a review of the defendant's prejudicial statements in the weeks since the Government initially filed its motion on September 5. *See* ECF No. 47-3. Since that date, the defendant has continued to make statements that pose a substantial likelihood of material prejudice to this case and that fall within the narrowly tailored order proposed by the Government. These include:

- On September 5, shortly before the Government filed its motion, the defendant posted an article on the social media platform Truth Social, on which the defendant has more than 6 million followers, making claims about the Court with the sarcastic caption, "Oh, I'm sure she will be very fair" and an article circulating a false accusation against a Special Counsel's Office prosecutor with the caption, "Really corrupt!" [3]

- On September 6, on Truth Social, the defendant issued two posts attacking the former Vice President, a witness identified in the indictment, in relation to this case, saying that he had seen the Vice President "make up stories about me, which are absolutely false," and that the witness had gone to the "Dark Side"; [4]

- In an interview aired on NBC's Meet the Press on September 17, [5] the defendant answered questions for more than an hour, and said, among other things:

  - That the Georgia Secretary of State, a witness identified in the indictment, recently said things that he had not, including that the defendant "didn't do anything wrong" during a phone call constituting an overt act in the indictment;

  - That another witness identified in the indictment, the former Attorney General, "didn't do his job" during the charged conspiracy because he was afraid of being impeached;

---

[3] https://truthsocial.com/@realDonaldTrump/posts/111013216116097929; https://truthsocial.com/@realDonaldTrump/posts/111013180388667397.

[4] https://truthsocial.com/@realDonaldTrump/posts/11101976209455346; https://truthsocial.com/@realDonaldTrump/posts/111019761485786681.

[5] https://www.nbcnews.com/meet-the-press/transcripts/full-transcript-read-meet-the-press-kristen-welker-interview-trump-rcna104778.

- On September 22, on Truth Social, the defendant falsely claimed that the retiring Chairman of the Joint Chiefs of Staff, a witness cited in the indictment, had committed treason and suggested that he should be executed:[6]



> **Donald J. Trump** ✓
> @realDonaldTrump
>
> Mark Milley, who led perhaps the most embarrassing moment in American history with his grossly incompetent implementation of the withdrawal from Afghanistan, costing many lives, leaving behind hundreds of American citizens, and handing over BILLIONS of dollars of the finest military equipment ever made, will be leaving the military next week. This will be a time for all citizens of the USA to celebrate! This guy turned out to be a Woke train wreck who, if the Fake News reporting is correct, was actually dealing with China to give them a heads up on the thinking of the President of the United States. This is an act so egregious that, in times gone by, the punishment would have been DEATH! A war between China and the United States could have been the result of this treasonous act. To be continued!!!
>
> **6.95k** ReTruths  **20.6k** Likes                    Sep 22, 2023, 7:59 PM

- On September 23, on Truth Social, the defendant re-posted with the caption "What a mess!" the false claim that the Georgia Secretary of State "knew [of tens of thousands of fraudulent votes in Georgia in 2020] and covered it up";[7] and

- On September 26, on Truth Social, the defendant posted a link to an article singling out a specific prosecutor in the Special Counsel's Office and claiming that the SCO is a "team of Lunatics that are working so hard on creating Election Interference . . . "[8]

The defendant's baseless attacks on the Court and two individual prosecutors not only could subject them to threats—it also could cause potential jurors to develop views about the

---

[6] https://truthsocial.com/@realDonaldTrump/posts/111111513207332826.

[7] https://truthsocial.com/@realDonaldTrump/posts/111112757748267246.

[8] https://truthsocial.com/@realDonaldTrump/posts/111133017255697239.

propriety of the prosecution, an improper consideration for a juror prior to trial.  *See Fieger*, 2008 WL 474084 at \*3-6 (E.D. Mich. Feb. 19, 2008) (magistrate judge imposing an order, adopted in relevant part by district court, preventing defendant from publicizing, including through commercials, his claims of improper, selective, or vindictive prosecution because they "create the danger that potential jurors will associate the content of these commercials to this criminal prosecution of Defendant Fieger.  The commercials therefore are substantially likely to materially prejudice a fair trial even though this pending criminal action is not explicitly mentioned."); *Scrushy,* 2004 WL 848221, at \*4-\*6 & n.5 (N.D. Ala. April 13, 2004) (ordering all trial participants, including the defendant, to "remove from their existing webpages . . . allegations of prosecutorial misconduct," and ordering the defendant not to use "his morning television show . . . to make statements about the case that his lawyers would be precluded from making by the Rules of Professional Conduct").

Likewise, the defendant's continuing public statements about witnesses are substantially likely to materially prejudice a fair trial.  In his opposition, the defendant makes light of some of his previous attacks on witnesses—some of whom are federal and state government figures in their own right—by stating that such witnesses do not "sh[y] away from a hearty public debate with [the defendant]" and were not intimidated by the defendant, or by implying that government officials somehow have asked for his attacks because they "have made politics, for all its discord and discourse, a large part of their lives."  ECF No. 60 at n.7.  Even assuming that certain witnesses are not intimidated by the defendant's statements, other witnesses see and may be affected by what the defendant does to those who are called to testify in this case.  And regardless of whether certain witnesses are intimidated by the defendant's extrajudicial statements, the defendant should not be

permitted to attack or bolster the credibility of any witness in a manner that could influence prospective jurors.

In addition, the defendant's argument essentially concedes that he is trying this case in the public sphere, not in the courtroom, which is precisely the harm that Rule 57.7(c) is designed to prevent. The defendant is publicly maligning witnesses and very intentionally commenting on the specific topics of their potential testimony at trial. In the context of a pending criminal case and trial, it is not the solution to the defendant's improper and prejudicial statements to encourage a "hearty public debate" in the media regarding witnesses and the merits of the case—it is the problem. *See Sheppard*, 384 U.S. at 351 ("legal trials are not like elections, to be won through the use of the meeting-hall, the radio, and the newspaper" and "freedom of discussion . . . must not be allowed to divert the trial from the very purpose of a court system to adjudicate controversies . . . in the calmness and solemnity of the courtroom according to legal procedures") (internal citations omitted). From the defendant's statements, potential jurors may form improper views about various witnesses' reputations, veracity, or what they will say at trial. The Court can and should prevent such improper dissemination of information about the substance of this case. *Id*. at 363; *see also Marshall v. United States*, 360 U.S. 310, 312-13 (1959) (prejudice arising from jurors' exposure to evidence from extrajudicial sources can be particularly acute because "it is then not tempered by protective procedures."); *United States v. Lindh*, 198 F. Supp. 2d 739, 743 (E.D. Va. 2002) ("Defendant has no constitutional right to use the media to influence public opinion concerning his case so as to gain an advantage at trial. No such right inheres in either the Sixth Amendment right to a public trial, or the public's First Amendment right to a free press.").

Contrary to the defendant's claim, the Government is not trying to "unconstitutionally silence" the defendant, ECF No. 60 at 2, and the proposed order would have no such effect. Since

the Government's initial filing, beyond the prejudicial examples cited above, the defendant has made a large volume and wide variety of public statements—through social media posts, interviews, and speeches—that would be unaffected by the proposed order.  If the Court entered the proposed order, it would in no way hinder the defendant's ability to campaign and publicly maintain his innocence.  All it would limit is the defendant's use of his candidacy as a cover for making prejudicial public statements about this case—and there is no legitimate need for the defendant, in the course of his campaign, to attack known witnesses regarding the substance of their anticipated testimony or otherwise engage in materially prejudicial commentary in violation of the proposed order.

ii.   *The Defendant's Opposition Misstates the Facts*

The defendant's opposition makes no attempt to address most of the factual record that the Government submitted to the Court regarding the defendant's history and current practice of using public statements to target individuals, *see* ECF No. 57 at 2-13, and instead advances conclusory statements that the Government's claims are baseless.  That is because he cannot explain away the obvious intent and well-known effect of his words.  The single statement that the defendant does address—in a footnote—is the threatening Truth Social post that he issued on August 4, the day after his arraignment in this case: "IF YOU GO AFTER ME, I'M COMING AFTER YOU!"  The defendant complains that the Government's motion did not note that after public outcry—given the objectively reasonable understanding of the defendant's post as a threat related to this case— a spokesperson issued a statement claiming that the defendant had issued the threat "in response to . . . special interest groups and Super PACs."  ECF No. 60 at n.8.  But the spokesperson's after-the-fact explanation is implausible on its face.  The truth is clear: the defendant was caught making a public threat and then had a spokesperson issue an excuse.  As the Court has stated, "even

arguably ambiguous statements from parties or their counsel, if they could reasonably be interpreted to intimidate witnesses or to prejudice potential jurors, can threaten the process." Protective Order Hr'g 72:7-10.  The defendant should not be permitted to obtain the benefits of his incendiary public statements and then avoid accountability by having others—whose messages he knows will receive markedly less attention than his own—feign retraction.[9]  Likewise, no other criminal defendant would be permitted to issue public statements insinuating that a known witness in his case should be executed; this defendant should not be, either.

The defendant's opposition also makes the self-serving claim that rather than address the source of the material prejudice—the defendant's inflammatory statements—the Court should employ alternatives to a Rule 57.7(c) order, such as change of venue, postponement of trial, voir

---

[9] The defendant recently was caught potentially violating his conditions of release, and tried to walk that back in similar fashion. In particular, on September 25, the defendant's campaign spokesman posted a video of the defendant in the Palmetto State Armory, a Federal Firearms Licensee in Summerville, South Carolina.  The video posted by the spokesman showed the defendant holding a Glock pistol with the defendant's likeness etched into it. The defendant stated, "I've got to buy one," and posed for pictures with the FFL owners.  The defendant's spokesman captioned the video Tweet with the representation that the defendant had purchased the pistol, exclaiming, "President Trump purchases a @GLOCKInc in South Carolina!"  The spokesman subsequently deleted the post and retracted his statement, saying that the defendant "did not purchase or take possession of the firearm" (a claim directly contradicted by the video showing the defendant possessing the pistol).  *See* Fox News, Trump campaign walks back claim former president purchased Glock amid questions about legality (Sept. 25, 2023), https://www.foxnews.com/politics/trump-campaign-walks-back-claim-former-president-purchased-glock-amid-questions-about-legality (accessed Sept. 26, 2023).  Despite his spokesperson's retraction, the Defendant then re-posted a video of the incident posted by one of his followers with the caption, "MY PRESIDENT Trump just bought a Golden Glock before his rally in South Carolina after being arrested 4 TIMES in a year."

The defendant either purchased a gun in violation of the law and his conditions of release, or seeks to benefit from his supporters' mistaken belief that he did so.  It would be a separate federal crime, and thus a violation of the defendant's conditions of release, for him to purchase a gun while this felony indictment is pending.  *See* 18 U.S.C. § 922(n).

dire, or jury instructions.  ECF No. 60 at 14.  But such alternatives are not adequate because they would not address the source of the prejudice: the defendant's repeated efforts to try this case in the media.  The Court's duty here is to implement "measures that will prevent the prejudice at its inception," *Sheppard*, 384 U.S. at 363, and so long as the defendant persists in making materially prejudicial statements on social media, in interviews, and in speeches, the defendant will continue to affect the potential venire for this trial.  In addition, the defendant's statements have such broad reach that as long as he makes them, he will taint potential jurors anywhere in the country.  *See Gentile*, 501 U.S. at 1075 (even "[e]xtensive *voir dire* may not be able to filter out all of the effects of pretrial publicity, and with increasingly widespread media coverage of criminal trials, a change of venue may not suffice to undo the effect of [trial participants'] statements"); *Brown*, 218 F.3d at 431 (jury instruction may fail to address threat of "carnival atmosphere" around trial).  Finally, the alternatives that the defendant suggests the Court consider would have the perverse incentive of encouraging, rather than curbing, the defendant's prejudicial statements.  The defendant has, for instance, already stated publicly that he intends to seek a change of venue in this case.  *See* ECF No. 57 at 7-8.  He should not be permitted to pollute the jury pool in this District with his prejudicial statements and then seek a change of venue based on the complaint that the venire is tainted.

The defendant seeks to deflect responsibility for his own prejudicial statements by claiming that the indictment in this case was "false and derogatory" and that the Special Counsel's brief statement upon its unsealing was prejudicial because it ascribed to the defendant responsibility for the events of January 6, 2021—which, according to the defendant's opposition, the indictment does not allege.  ECF No. 60 at 19-20.  The defendant is wrong.  First, the indictment, filed in court, does what indictments are supposed to do: set forth the criminal charges against the

defendant and give notice of the factual allegations that underpin them.  The defendant provides

no support for his claim that the indictment can be a source of unfair prejudice here—because there

is no such support.  And second, the indictment does in fact clearly link the defendant and his

actions to the events of January 6.  It alleges—and at trial, the Government will prove—the

following:

- The defendant's criminal conspiracies targeted, in part, the January 6 certification and capitalized "on the widespread mistrust the [d]efendant was creating through pervasive and destabilizing lies about election fraud," ECF No. 1 at ¶4.

- In advance of January 6, the defendant "urged his supporters to travel to Washington on the day of the certification proceeding, tweeting, 'Big protest in D.C. on January 6th.  Be there, will be wild!,'" *id.* at ¶87.  He then "set the false expectation that the Vice President had the authority to and might use his ceremonial role at the certification proceeding to reverse the election outcome in [his] favor, *id.* at ¶96.

- Then, despite his awareness "that the crowd [ ] on January 6 was going to be 'angry,'" *id.* at ¶98, on the morning of January 6, the defendant "decided to single out the Vice President in public remarks," *id.* at ¶102, and "repeated knowingly false claims of election fraud to gathered supporters, falsely told them that the Vice President had the authority to and might alter the election results, and directed them to the Capitol to obstruct the certification proceeding and exert pressure on the Vice President to take the fraudulent actions he had previously refused," *id*. at ¶10d.

- Finally, on the afternoon of January 6, after "a large and angry crowd—including many individuals whom the [d]efendant had deceived into believing the Vice President could and might change the election results—violently attacked the Capitol and halted the proceeding," the defendant exploited the disruption in furtherance of his efforts to obstruct the certification, *id*. at ¶10e.

In short, the indictment alleges that the defendant's actions, including his campaign of knowingly

false claims of election fraud, led to the events of January 6.

The defendant's motion also attempts to downplay defense counsel's clear violations of

Rule 57.7(b), and appears to suggest that the defendant's attorneys reserve the right to violate that

Rule in the future.  *See* ECF No. 60 at 19-22.  But it is uncontroverted that, on multiple occasions

in the week following the unsealing of the indictment, defense counsel appeared on media

programs and talked extensively about this case, including on topics that Rule 57.7(b) prohibits attorneys from discussing. *See* ECF No. 57 at 16 (citing Rule 57.7(b) and linking to lead counsel's appearances). The defendant's opposition then complains that the Court would render his attorneys inadequate if it were to restrict them from further public statements through the Government's proposed 57.7(c) order, but fails to recognize that most of its terms mirror existing restrictions on all attorneys practicing in this District under Local Criminal Rule 57.7(b). *Compare* Local Criminal Rule 57.7(b) (prohibiting attorneys from making extrajudicial statements regarding, among other things, the "identity, testimony, or credibility of prospective witnesses") *with* ECF No. 57-2 (same, with prohibition on "disparaging and inflammatory or intimidating statements" about parties, witnesses, attorneys, court personnel, or potential jurors).

Finally, the defendant's opposition makes faulty claims about the scope and applicability of the proposed order. In addition to making inaccurate claims about the proposed order's breadth, *see* ECF No. 60 at 17, the defendant suggests that the Government seeks to prevent the defendant from "redress[ing] the unfairness of this proceeding through legitimate means" including "for example, filing motions with the Court." ECF No. 60 at 10-11. But nothing in the proposed order prevents the defendant from doing so—rather, it explicitly states that he can. *See* ECF No. 57-2 at 1-2 (order "does not preclude the defendant or his attorneys, agents, or others acting on his behalf from (a) quoting or referring without comment to public records of the court in the case"). Similarly, the defendant's opposition states that "the prosecution seeks only to bar [the defendant] from speaking." ECF No. 60 at 13. Not so. The proposed order applies to all parties—including the Government. But the defendant's allegation here is telling, in that it highlights that the defendant—and no other party—is making materially prejudicial public statements in this case.

In sum, the Government has provided the Court with a robust factual record to establish that the defendant's pervasive public comments about this case, the witnesses, the Court, and prosecutors present a substantial likelihood of material prejudice to these proceedings.  To prevent that prejudice, the Government has proposed a narrowly tailored order pursuant to Rule 57.7(c) placing limited restrictions on the public statements of all parties to this case.  In response, the defendant's opposition demands special treatment, asserting that the defendant's desire to publicly malign witnesses without restriction prevails over all other interests—including that of the public in the fair administration of justice.  *See Koubriti*, 307 F. Supp. 2d at 897 ("the vigilance of trial courts against the prejudicial effects of pretrial publicity also protects the interest of the public and the Government in the fair administration of criminal justice").  The Court should treat this defendant like all others, and enter the Government's proposed 57.7(c) order.

## II.  The Government's Proposed Order on Jury Studies Seeks Only to Protect the Venire, and the Defendant's Arguments Against it Are Unavailing

Although he does not challenge the Court's discretionary power to enter it, the defendant also opposes the Government's request for an order that would provide the Court with an opportunity to ensure that jury studies by the parties do not prejudice the jury pool.  ECF No. 60 at 23-25.  At the outset, it is important to reiterate the limited scope of what the Government actually proposes in contrast to the defendant's inaccurate characterization of it.  The Government does not seek to prohibit the defendant from using a jury study, nor does it seek to intrude into the defense strategy.  Instead, the Government has proposed that the Court enter an order with five reasonable conditions: (1) any party—whether the Government or the defendant—must notify the Court *ex parte* before the party or "any individual or entity acting at the party's direction or under the party's control undertakes any jury study in the District of Columbia;" (2) the notice must include a brief description of the intended methodology, all questions to be asked, and the expected

number of participants; (3) the party cannot begin the jury study, or use any results from it, absent the Court's approval, which may be conditioned on editing or removing portions of the intended jury study that threaten to materially prejudice the jury pool; (4) the jury study must be completed 30 days before the start of jury selection; and (5) the party must maintain the names and addresses of the study participants and provide that information to the Court at least two weeks prior to jury selection. *See* ECF No. 57-3. The defendant objects to every one of these provisions.[10]

First, the defendant posits that "jury studies and polling have almost no chance of influencing the jury," noting that "Washington D.C. has almost 700,000 residents" and "[a] statistically significant sample size would ordinarily include only a few hundred people." ECF No. 60 at 23. But the size of the jury pool is immaterial; indeed, the Government's motion cites to a standing order on jury studies in a Division of the Eastern District of Texas with a population exceeding that of this District. *See* ECF No. 57 at 19 (citing Judge Clark's standing order in the Beaumont and Lufkin Divisions); https://www.census.gov/library/stories/state-by-state/texas-population-change-between-census-decade.html (estimating the 2020 population of the counties comprising the Division to be approximately 832,000). In addition, nothing would prevent the defendant from creating and implementing a biased jury study and then publicizing its results—or answers to specific, slanted questions—on a widespread basis to the entire potential jury pool. The Court should exercise its discretion to protect against such prejudice by taking the simple step of reviewing the proposal *ex parte*.

---

[10] The defendant objects to the Government's proposal, but "has no objection to informing the Court of the dates and sample sizes of his polling in the District of Columbia." ECF No. 60 at 23. The defendant's alternative, however, would not address the potential tangible harm—materially prejudicing the jury pool—posed by inappropriate studies.

Second, the defendant suggests that no Court regulation is needed because "the purpose of polling and jury studies is not to influence respondents, but to get a true read on the community's opinions or feelings on certain issues." ECF No. 60 at 23.  But in practice, jury studies, like other polls, may be skewed to influence the participants or shape the results.  *See* Ellen Kreitzberg & Mary Procaccio-Flowers, *Jury Selection: The Law, Art & Science of Selecting a Jury* § 3:4 (2002) ("Providing respondents with a misleading description of the facts may produce responses that are pleasing to the client, but will be useless in providing insight into the reactions of the jurors who will hear the whole truth during trial.").[11]  Because skewed studies could influence potential jurors, the questions should be subject to review by the Court.  *See Brewer v. Lennox Hearth Prods., LLC*, 601 S.W.3d 704, 726 (Tex. 2020) ("A campaign of disinformation, in whatever form, undermines the sanctity of the judicial process and is inimical to the constitutional promise of a fair and impartial jury trial.").

Third, the defendant objects to a requirement that any jury study be concluded 30 days before trial because "polling is most valuable if conducted close to trial."  ECF No. 60 at 24.  Yet at the status hearing one month ago, defense counsel suggested the defendant would "likely need to do it sooner rather than later," Transcript of Status Hearing, at 59 (Aug. 28, 2023), in reference to polling for a Rule 26 motion, the filing deadline for which is October 9, 2023.  *See* ECF No. 39 at ¶2 (setting deadline for "[a]ll other pre-trial motions, excluding motions *in limine*").  In any

---

[11] While in office, the defendant provided an example of one type of distorted polling the proposed order seeks to prevent: "A poll should be done on which is the more dishonest and deceitful newspaper, the Failing New York Times or the Amazon (lobbyist) Washington Post! They are both a disgrace to our County, the Enemy of the People, but I just can't seem to figure out which is worse?"  *See* Trump Tweet, June 16, 2019, 9:39:22 EST, *available at* https://www.thetrumparchive.com/ (last visited Sept. 27, 2023).

event, the proposed 30-day limit creates a reasonable buffer that would reduce the potential impact

of any jury study on the venire.  *See Brewer*, 601 S.W.3d at 726.

Fourth, relying on *Blankenship v. Fox News Network, LLC*, No. 2:19-cv-00236, 2020 WL

7225765, at *1 n.3 (S.D.W. Va. Dec. 8, 2020), the defendant contends that "polls and jury studies

commissioned by defense counsel are work product and some parts, if not all, are attorney-client

privileged."  ECF No. 60 at 23.  That inapposite case, though, dealt with a civil subpoena seeking

"all documents and communications that underlie these investigations as well as analyses carried

out on Plaintiff's behalf and documents and communications between Plaintiff and his attorneys

and [the jury consulting company] pertaining to the criminal trial."  *Id.* at *2.  Here, the proposed

order addresses a far more limited set of information—"a brief description of the intended

methodology. . . all questions that will be asked. . . [and] the expected number of participants," as

well as the participants' names and addresses.  ECF No. 57-3 at 1-2.  Assuming any privileges

applied to such information, they would dissipate when the "questions to be asked" were actually

asked of the participants.  In other words, the parties cannot shield from the Court, on privilege

grounds, the questions they intend to broadcast to hundreds, if not thousands, of District residents.

Setting that aside, the defendant's argument ignores that the proposed order calls for information

about proposed jury studies to be provided *ex parte* to the Court—not to the Government—and

does not require that the results or analysis of any jury study be disclosed at all.  Moreover, the

Court could enter an order under Federal Rule of Evidence 502(d) to further mitigate any concern.

*See id.* ("A federal court may order that the privilege or protection is not waived by disclosure

connected with the litigation pending before the court—in which event the disclosure is also not a

waiver in any other federal or state proceeding.").

The rationale for the proposed order is to protect the integrity of the trial and the jury pool, and the regulations it would impose are modest.  The defendant's complaints are unfounded, and the Court should exercise its  discretion to enter the order.

### III.    Conclusion

Through both of its proposed orders, the Government seeks appropriate processes for protecting the jury pool in this case and the integrity of this proceeding.  The Court should grant the Government's motion and enter them.

Respectfully submitted,

JACK SMITH
Special Counsel

By:      /s/Molly Gaston
         Molly Gaston
         Thomas P. Windom
         Senior Assistant Special Counsels
         950 Pennsylvania Avenue NW
         Room B-206
         Washington, D.C. 20530