IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA

| | |
|---|---|
| UNITED STATES OF AMERICA, | * |
| | * |
| v. | * |
| | *    CRIMINAL NO. 23-cr-257 (TSC) |
| DONALD J. TRUMP, | * |
| | * |
| Defendant. | * |
| | * |

**PRESIDENT DONALD J. TRUMP'S REPLY IN SUPPORT OF MOTION FOR ACCESS TO CIPA § 4 FILING AND AN ADJOURNMENT OF THE CIPA § 5 DEADLINE**

President Donald J. Trump respectfully submits this reply in further support of his motion for (1) a redacted, publicly filed version of the CIPA § 4 motion by the Special Counsel's Office that discloses non-sensitive aspects of the submission, (2) an opportunity to submit briefing regarding President Trump's objections to *ex parte* proceedings under CIPA § 4 and other procedural issues after the redacted CIPA § 4 motion is filed, and (3) an extension of the deadline for CIPA § 5 notice until three weeks after the Office complies with its discovery obligations.

President Trump's motion seeks specific relief to ensure that he has access to all discoverable information before being required to conclusively describe defense theories to the Court in connection with the pending CIPA § 4 motion and provide CIPA § 5 notice. To the extent we have not proposed dates for the requested filings, that is only because it is abundantly clear that the Office has not met its discovery obligations and we cannot predict when that will be remedied.[1]

---

[1] Regarding the CIPA § 4 submission, although we initially proposed an October 11, 2023 deadline for President Trump's challenge to *ex parte* proceedings, we now request a deadline of seven days after the sealing issue is addressed in light of the opposition to redactions by the Special Counsel's Office. Regarding CIPA § 5, after we reminded the Special Counsel's Office that we were not provided with read-ins necessary to access the classified discovery until September 26, 2023, the Office indicated that it does not object to a deadline of October 26, 2023.

1

The opposition of the Special Counsel's Office's is based largely on conclusory assertions of compliance and glib contentions about the scope of classified discovery obligations. While classified discovery may be "limited and tangential" to the Office's case-in-chief, that plan does not in any way limit the Office's obligations under *Brady*, *Giglio*, the Jencks Act, and Rule 16(a)(1)(E)(i) with respect to classified information. (Opp'n at 1). Based on the materials that have been produced to date, issues regarding classified discovery are anything but "narrow and incidental." (*Id.*). For example, because the Indictment contains allegations regarding conclusions by the USIC and other federal agencies, classified information that undercuts those conclusions must be collected and disclosed to President Trump under *Brady*. Those materials have not yet been produced.

Against this backdrop, the Office refrains from confirming that it has taken even the most basic, required steps to prepare discovery in a case like this, such as (1) collecting and reviewing substantive case-related communications by all members of the prosecution team under Justice Manual § 9-5.002, and (2) performing Prudential Search Requests designed to identify discoverable classified information under Justice Manual § 9-90.210. If those steps have not been completed—and it does not appear that they have—then the Office's argument that forging ahead is necessary "to conserve judicial resources" is frivolous. (Opp'n at 7). To the contrary, proceeding "apace" as the Office demands, without necessary disclosures, will in all likelihood require multiple inefficient rounds of filings under CIPA §§ 4, 5 and 6. (*Id.* at 1).

For the reasons set forth below, the Court should require the Office to provide additional details regarding its alleged discovery compliance at the October 16, 2023 conference, and grant President Trump's motions relating to CIPA §§ 4 and 5.

# DISCUSSION

## I. The Special Counsel's Office Is Not In Compliance With Its Discovery Obligations

President Trump cannot reasonably be expected to conclusively articulate defense theories to the Court in connection with a CIPA § 4 motion until he has all of the discovery to which he is entitled and a reasonable opportunity to review those materials. The Special Counsel's Office responded to that argument with a narrow and inaccurate construction of its classified discovery obligations, which only highlights that (1) the Office is not in compliance, and (2) motion-to-compel litigation is likely to lead to additional discovery that bears on President Trump's defense theories and could require additional CIPA § 4 practice by the Office.[2]

### A. The Justice Manual Requires That Prudential Search Requests Be Completed

President Trump's discussion of Prudential Search Requests, or PSRs, was not "elusive." (Opp'n 13). We made clear in our opening submission that PSRs "will be necessary." (Dkt. No. 62 at 6). The Special Counsel's Office declined to specify whether it has conducted PSRs. And the argument that such Requests are not "legally required" is in significant tension with the Office's assertion that it "understands and continues to comply with its discovery obligations." (Opp'n at 13 & n.8). Because the Office is wrong.

The Special Counsel's Office is obligated to complete PSRs based on the circumstances of this case. Prosecutors routinely do so pursuant to the policy set forth in the Justice Manual where, as here, at least some classified information is discoverable. *See, e.g.*, *United States v. Saab Moran*, 2022 WL 4291417, at *3 (S.D. Fla. 2022); *United States v. Kuciapinski*, 2022 WL 3081928, at *6 (D. Colo. Aug. 3, 2022); *United States v. Doe No. 2*, 2009 WL 10720338, at *3 (S.D. Fla. 2009).

---

[2] In the Southern District of Florida, the same Special Counsel's Office indicated to the Court—accurately—that defense discovery requests could lead to "follow on Section 4 litigation." (7/18/23 Tr. 13-14, *United States v. Trump, et al.*, No. 23-80101-cr (S.D. Fla.)).

The Justice Manual describes the "*legally-mandated* scope of that review," and makes clear that classification status "shall have no effect" on "the prosecutor's *obligation*." Justice Manual § 9-90.210(B) (emphases added). The policy also provides that, "except as modified by CIPA, the prosecutor's *obligation* to produce to the defendant information found during that review is unaffected by the classified nature of that information." *Id.* (emphasis added).

Perhaps it is true that President Trump cannot by himself "dictate" how the Special Counsel's Office purports to "comply" with its discovery obligations. (Opp'n at 13). But he can certainly pursue relief when the Office proceeds based on an inaccurate definition of those obligations, or fails to do what the law—including the prosecutors' ethical obligations—requires. *See United States v. Sutton*, 2022 WL 2383974, at *8 (D.D.C. 2022) ("[G]overnment counsel's ethical obligations impose disclosure requirements broader than what is constitutionally mandated."). Thus, to the extent the Office has declined to follow DOJ policy designed to address a "legally-mandated . . . obligation," the prosecutors should be required to make that clear on the record. In light of the frequency with which PSRs are conducted, the failure to conduct them here would itself be a discoverable fact because, *inter alia*, it would implicate President Trump's due process rights and serve as evidence of the type of prosecutorial intent that is relevant to President Trump's anticipated selective prosecution motion.

### B. *Brady* Requires That Prudential Search Requests Be Completed

The PSR "obligation" set forth in the Justice Manual is a DOJ policy intended to provide uniform handling of *Brady* obligations across federal prosecutors' offices in cases involving classified information. Under *Brady*, even if the Office does not plan to offer classified evidence in its case-in-chief, President Trump is entitled to classified evidence that is "favorable" to him

4

because it undercuts the Office's theory of the case. *United States v. Safavian*, 233 F.R.D. 12, 16-17 (D.D.C. 2005).

> The meaning of the term "favorable" under *Brady* is not difficult to discern. It is any information in the possession of the government—broadly defined to include all Executive Branch agencies—that relates to guilt or punishment and that tends to help the defense by either bolstering the defense case or impeaching potential prosecution witnesses. It covers both exculpatory and impeachment evidence.

*Id.* at 16-17; *see also United States v. Chansley*, 2023 WL 4637312, at *8 (D.D.C. 2023) ("Favorable evidence tends to help the defense by either bolstering the defense case or impeaching potential prosecution witnesses." (cleaned up)).

The Office's *Brady* obligation includes an "affirmative duty" to "search possible sources of exculpatory information," which includes an obligation "to cause files to be searched that are not only maintained by the prosecutor's or investigative agency's office, but also by other branches of government closely aligned with the prosecution"—*i.e.*, a PSR by another name. *Safavian*, 233 F.R.D. at 17 (cleaned up). "The government is obligated to disclose such favorable evidence even in the absence of a defense request." *Sutton*, 2022 WL 2383974, at *4 (cleaned up); *see also United States v. Agurs*, 427 U.S. 97, 108 (1976) ("[B]ecause the significance of an item of evidence can seldom be predicted accurately until the entire record is complete, the prudent prosecutor will resolve doubtful questions in favor of disclosure.").

### C. The USIC And Other Agencies Possess Information That Is Favorable To President Trump

Several allegations in the Indictment implicate classified information. The Special Counsel's Office must collect and produce information that is inconsistent with those allegations and therefore favorable to President Trump. Because *Brady* disclosures are relevant to the adjudication of the CIPA § 4 motion, President Trump is entitled to those materials before the Court rules. *See United States v. Celis*, 608 F.3d 818, 835 (D.C. Cir. 2010) ("Disclosure by the

5

government must be made at such a time as to allow the defense to use the favorable material effectively in the preparation and presentation of its case, even if satisfaction of this criterion requires pre-trial disclosure."). We will be prepared to discuss these issues in greater detail in the scheduled classified hearing on the afternoon of October 16, and we provide the following discussion based on unclassified information for purposes of illustration, only.

### 1. The Alleged March 2021 USIC Conclusions

The Special Counsel's Office alleges that the Director of National Intelligence "disabused" President Trump "of the notion that the [USIC's] findings regarding foreign interference would change the outcome of the election." (Indictment ¶ 11(c)). The Office points out that these "findings" are set forth in a "publicly-available version of the same document that contains the same ultimate conclusions." (Opp'n at 12). This is a reference to the unclassified version of the National Intelligence Council's March 2021 Report titled "Foreign Threats to the 2020 US Federal Elections" (the "Report").[3]

President Trump was not obligated to accept the Report's conclusions at face value while acting as Commander In Chief, and he is not required to treat them as accurate when defending this case. The Report's conclusions include: "We have no indications that any foreign actor attempted to interfere in the 2020 US elections by altering any technical aspect of the voting process." (Report at i). Even the unclassified version of the Report, however, is adequate to illustrate the need for PSRs and the fact that the Special Counsel's Office is not currently in compliance with *Brady*. For example, the Report states: "We identified some successful compromises of state and local government networks prior to Election Day." (*Id.*). The Report

---

[3] The unclassified Report is available at:
https://www.dni.gov/files/ODNI/documents/assessments/ICA-declass-16MAR21.pdf.

6

also describes a "Minority View" that "influence efforts" by the Chinese government "were intended to at least indirectly affect US candidates, political processes, and voter preferences," and "Beijing preferred former President Trump's defeat." (*Id.* at 8).

Under *Brady*—regardless of what the Special Counsel's Office or other parts of the current Administration believe to be true—President Trump is entitled to details regarding these incidents and assessments, and any other information that tends to contradict the Report's conclusions and anticipated trial testimony. *See United States v. Stevens*, 2008 WL 8743218, at *5 n.1 (D.D.C. 2008) ("Obviously, a statement may be exculpatory and subject to disclosure to the defense, even if the government believes the statement is untrue . . . ."); *United States v. Edwards*, 887 F. Supp. 2d 63, 68 (D.D.C. 2012) ("It is not for the prosecutor to decide not to disclose information that is on its face exculpatory based on an assessment of how that evidence might be explained away or discredited at trial, or ultimately rejected by the fact finder." (cleaned up)).

In *Stevens*, Judge Sullivan elaborated: "For example, if a witness is interviewed by the police and provides an alibi for a suspect, that statement must be produced, even if the government suspects the statement is untrue and, indeed, even if it later proves to be untrue." 2008 WL 8743218, at *5 n.1. The same logic applies to classified holdings relating to intelligence assessments, witness statements, intercepts, and any other evidence that is inconsistent with the Report's conclusions.

### 2. Evidence Of Foreign Influence

The Special Counsel's Office alleges that President Trump "create[d] an intense national atmosphere of mistrust and anger" and "erode[]d public faith in the administration of the election." (Indictment ¶ 2). Any evidence that foreign adversaries contributed to the alleged "intense national

atmosphere" in connection with covert foreign influence operations is favorable to President Trump and therefore must be produced.

The Report makes clear that such evidence exists.[4]  For example:

- "We assess that Russian President Putin authorized, and a range of Russian government organizations conducted, influence operations aimed at . . . undermining public confidence in the electoral process, and exacerbating sociopolitical divisions in the US." (Report at i).

- "Throughout the election, Russia's online influence actors sought to amplify mistrust in the electoral process by denigrating mail-in ballots, highlighting alleged irregularities, and accusing the Democratic Party of voter fraud." (*Id.* at 3-4).

- "We assess that Iran carried out a multi-pronged covert influence campaign intended to . . . undermine public confidence in the electoral process and US institutions, and sow division and exacerbate societal tensions in the US." (*Id.* at i).

- The Report "assess[ed]" that Lebanese Hizballah, Cuba, and Venezuela sought to undermine President Trump's 2020 campaign efforts.  (*Id.* at i).

Evidence of specific instances of foreign influence is favorable to President Trump under *Brady* for at least two reasons.  First, such evidence tends to suggest that President Trump was not the "cause" of the "atmosphere" alleged by the Special Counsel's Office.  Second, foreign influence efforts—particularly efforts to "undermin[e] public confidence in the electoral process" and "highlight[] alleged irregularities"—serve as a good-faith, exculpatory basis for President Trump to have taken that he steps that he did while acting as the Nation's Chief Executive.

---

[4] The United States House Select Committee on the January 6 Attack (the "House Select Committee") discussed evidence of foreign meddling in the 2020 election in Appendix 4 of its report.  The House Select Committee noted, for example, that "[t]he 2020 U.S. elections saw an increase in the number of foreign state and non-state entities that attempted to influence the U.S. electorate." (House Select Committee Report, Appendix 4 at 807).  In addition to the references to classified materials by General Milley, there are many other indications that the House Select Committee collected and relied upon classified information.

### 3. Evidence Of Cyber Attacks

The Special Counsel's Office alleges that the Department of Homeland Security's Cybersecurity and Infrastructure Security Agency ("CISA") concluded that "there was no evidence any voting system had been comprised" and "declared the 2020 election 'the most secure in American history'" (the "CISA Statement"). (Indictment 1 ¶ 11(d)).[5]

The CISA Statement asserted that there was "no evidence that any voting system . . . was in any way compromised." The Report, however, was not as sanguine. It expressed "low confidence" in the assessment that "foreign cybercriminals probably did not work to interfere or influence the US elections on behalf of or at the direction of a nation state." (Report at 9). The "low confidence" likely arose from the following types of evidence:

- "The IC tracked a handful of unsuccessful hacktivist attempts to influence or interfere in the 2020 US elections." (Report at 9).

- "Cybercriminals disrupted some election preparations. . . . ." (*Id.* at i).

- "In early 2020, Iranian cyber actors exploited a known vulnerability to compromise US entities associated with election infrastructure as a part of a broad targeting effort across multiple sectors worldwide." (*Id.* at 6).

- "Over the course of the election cycle, the IC, other US agencies, and state and local officials also identified thousands of reconnaissance or low-level, unsuccessful attempts to gain access to county or state government networks." (*Id.* at 2).

President Trump is entitled to the details of any incidents that are inconsistent with CISA's claim, relied upon by the Special Counsel's Office, that there was "no evidence any voting system had been comprised."

---

[5] The CISA Statement is available at: https://www.cisa.gov/news-events/news/joint-statement-elections-infrastructure-government-coordinating-council-election.

### 4. Defense Department Holdings

The Special Counsel's Office has sufficient access to the files of the Department of Defense ("DOD") to produce to President Trump two documents, totally approximately 773 pages, that the Office "obtained" from DOD. (Opp'n at 5). It appears, however, that there is a larger set of relevant DOD holdings, which the Office must review and make any necessary productions required by Rule 16, *Brady*, *Giglio*, and the Jencks Act.

In November 2021, General Mark Milley told the House's January 6 Select Committee that "we have a boatload of documentary stuff . . . both classified and unclassified stuff. And I will make sure that you get whatever we have. And it's a lot." (Tr. 10).[6] In response to a question about a particular document, General Milley volunteered that he had overclassified a large volume of relevant material:

> I classified the document at the beginning of this process by telling my staff to gather up all the documents, freeze-frame everything, notes, everything and, you know, classify it. And we actually classified it at a pretty high level, and we put it on JWICS, the top secret stuff. It's not that the substance is classified. It was I wanted to make sure that this stuff was only going to go people who appropriately needed to see it, like yourselves. We'll take care of that. We can get this stuff properly processed and unclassified.

(Tr. 169). In addition to the above-referenced classified documents "obtained" from DOD, the Special Counsel's Office has produced nearly a million pages of documents from the House Select Committee. But it is not clear that those materials include any of the classified documents referenced by General Milley during his testimony, or whether the Office has even reviewed those materials.

\*   \*   \*

---

[6] The transcript is available at: https://www.govinfo.gov/content/pkg/GPO-J6-TRANSCRIPT-CTRL0000034620/pdf/GPO-J6-TRANSCRIPT-CTRL0000034620.pdf.

In sum, the failure by the Special Counsel's Office to collect and produce exculpatory evidence referenced in the unclassified version of the Report and other public documents illustrates that the Office is not, in fact, in compliance with its discovery obligations. Under *Brady*, and as explained in the Justice Manual, the Office must search for and produce exculpatory materials. The Office has not done so, and the Court should not permit it to benefit from these deficiencies by pressing President Trump to articulate developed defense theories to the Court before discovery is complete. *See Safavian*, 233 F.R.D. at 16 (noting that prosecutors' judgments regarding, *inter alia*, "what the nature of the defense will be" are "necessarily . . . speculative"). Similarly, the Court should not maintain a CIPA § 5 deadline, which would require President Trump to provide notice of classified information that he intends to disclose at trial, before he has access to all discoverable classified information that he may rely upon to craft that notice.

## II.    The Special Counsel's Office Has Not Justified Sealing Its Entire CIPA § 4 Filing

The Court previously chastised the Special Counsel's Office for using only "conclusory terms" to address sealing of a different motion. (Dkt. No. 55 at 2 n.1). Despite that warning, the Office claims that it may file the entire CIPA § 4 under seal "if the Government so elects." (Opp'n at 7-8). That bold claim is contrary to law, and the current record lacks details required to permit sufficient judicial findings for purposes of appellate review.

To the extent the Special Counsel's Office acknowledges the legal framework that governs this issue, it does so selectively and based on flawed circular logic. Specifically, the Office contends that "there is no history of public access to sealed, classified filings" under the First Amendment. (Opp'n at 10). Of course that is true, but that is not the point. The First Amendment's "experience and logic" test does not require such a narrow frame of refence. *See Press-Enterprise Co. v. Superior Court*, 478 U.S. 1, 9 (1986); *see also In re Public Defender Serv.*, 607 F. Supp. 3d

11

11, 20 (D.D.C. 2022) ("Public access plays a significant positive role in the functioning of evidentiary decision making because it enhances both the basic fairness of the criminal trial and the appearance of fairness so essential to public confidence in the system." (cleaned up)).[7] There is a history of public access to pretrial motion submissions. *See, e.g.*, *In re New York Times*, 828 F.2d 110, 114 (2d Cir. 1987) (agreeing with other courts of appeals that "a qualified First Amendment right of access" extends to "written documents filed in connection with pretrial motions"). Thus, although President Trump is not seeking unsealing of classified information, the First Amendment requires the Office to explain why it should be permitted to hide from the defense and the public non-sensitive aspects of the CIPA § 4 submission. The Office has not done so.

Once again, the Special Counsel's Office has failed to address the *Hubbard* factors under the separate and "independent" common law public-access framework. *In re L.A. Times Commc'ns. LLC*, 628 F. Supp. 3d 55, 62 (D.D.C. 2022). At common law, the "strong" presumption of access applies because the CIPA § 4 motion is a "judicial record" that was "filed in court" and "intended to influence the court." *Id.* "[E]very part of every brief filed to influence a judicial decision qualifies as a judicial record." *CNN v. FBI*, 984 F.3d 114, 118 (D.C. Cir. 2021) (cleaned up). "Accessing judicial records is fundamental to the rule of law and important to maintaining the integrity and legitimacy of an independent Judicial Branch." *Id.* (cleaned up). It is therefore incumbent on the Office to demonstrate why sealing the entire CIPA § 4 motion is necessary, in a manner that permits the Court to provide a "full explanation" that can be scrutinized, if necessary, by the Court of Appeals. *In re L.A. Times Commc'ns. LLC*, 28 F.4th 292, 298 (D.C. Cir. 2022).

---

[7] "[T]he explicit Sixth Amendment right of the accused is no less protective of a public trial than the implicit First Amendment right of the press and public." *Press-Enterprise Co.*, 478 U.S. at 7 (cleaned up).

12

The Special Counsel's Office cannot shoulder that burden with respect to non-sensitive portions of the submission such as unclassified arguments and citations to legal authority. There is no magic to the CIPA § 4 process that overrides these frameworks or permits sealing of materials and information that would be required to be filed publicly if included in a different type of motion. *See Dhiab v. Trump*, 825 F.3d 1087, 1092 (D.C. Cir. 2017) ("Access and disclosure rights in criminal cases do not endanger the government's paramount interest in national security. The government's interest can be protected by dismissal of the prosecution or less drastic concessions by the government in a criminal case."). The non-CIPA examples cited by President Trump illustrate that courts routinely strike a balance between national security issues and other considerations that results in such public disclosures. Judge Walton did so in *Libby*, including with CIPA-related submissions, and the Special Counsel's Office ignores the court's orders requiring redactions so that non-sensitive portions of classified filings could be filed publicly. (*See* Dkt. Nos. 38, 55, 189, 356, *United States v. Libby*, No. 05 Cr. 394 (D.D.C.)). President Trump respectfully submits that the Court should proceed in a similar fashion so that the public has appropriate access to the motion, and we have an adequate opportunity to respond to the unclassified arguments and legal citations upon which the Office has relied.

### III. The Court Should Not Accept *Ex Parte* Filings Without Permitting President Trump To Articulate Objections

The invocation of CIPA's "purpose" by the Special Counsel's Office is insufficient to justify the extraordinary position that President Trump should not even be permitted to submit briefing in support of his objection to *ex parte* proceedings under CIPA § 4. (*See* Opp'n at 7). Indeed, because it is readily apparent that the Office has yet to collect and produce necessary classified discovery, the assertion that "[o]nly a limited amount of [classified] material is

13

discoverable by the defendant" underscores the importance of adversarial proceedings rather than taking the Office's claims at face value. (*Id.* at 5).

When Congress intended to require *ex parte* procedures in the national security setting, it did so explicitly by using the term "shall." 50 U.S.C. § 1806(f). CIPA § 4, on the other hand, uses a permissive term, "may," which does not obligate the Court to accept a submission that the defense is unable to scrutinize. General Milley's above-quoted admission to the House Select Committee regarding intentional and improper overclassification of a large volume of relevant documents illustrates why classification status alone cannot sustain a conclusory invocation of *ex parte* procedures. So too does the decision of the Special Counsel's Office to include a 761-page document in classified discovery, "in an abundance of caution," "even though . . . the majority of it is not classified." (Opp'n at 5 n.1). Put simply, the Office's claim that something is sensitive does not make it so.

Along similar lines, the Special Counsel's Office misapprehends the import of *United States v. Stillwell*. (Opp'n at 6 n.3). In *Stillwell*, a DOJ component convinced a district court that materials relating to its CIPA § 4 motion were too sensitive to be disclosed to the defense (or the prosecutors). The Second Circuit rejected that contention and ordered the prosecutors to produce "any material" that was discoverable notwithstanding its classification. 986 F.3d 196, 199 (2d Cir. 2021); *see also United States v. Hunter*, 32 F.4th 22, 25 (2d Cir. 2022) ("We vacated the District Court's protective order and ordered those documents disclosed to both parties."). The salient point is that prosecutors often contend that materials subject to a CIPA § 4 motion are too sensitive to be disclosed to the defense, and *Stillwell* is an example of an appellate court rejecting that position without the resulting parade of horribles that the Office is suggesting would follow from disclosure of its CIPA § 4 motion to President Trump's defense team.

14

*Stillwell* and *Libby* are not the only cases where judges have expressed concern about *ex parte* proceedings in national security cases. *See United States v. Libby*, 429 F. Supp. 2d 46, 48 (D.D.C. 2006). In *United States v. Rezaq*, Judge Lamberth authorized prosecutors to seek "leave to file submissions *ex parte*, with the understanding that such motions must be served on the defendant and then litigated in an adversarial hearing before this court." *United States v. Rezaq*, 899 F. Supp. 697, 707 (D.D.C. 1995); *see also United States v. Rezaq*, 156 F.R.D. 514, 526 (D.D.C. 1994) ("Defense counsel is entitled to inspect the government's submissions. Defendant himself may not review the submissions unless defense counsel demonstrates that particular evidence must be disclosed to him as well.").

Based on these authorities, the Court should permit President Trump to file a brief challenging the *ex parte* CIPA § 4 submission by the Special Counsel's Office. We should not be required to file that submission until after the Office establishes whether and to what extent sealing is appropriate. Only after the need for sealing is addressed will President Trump have the ability to respond to unclassified case citations and arguments as well as other non-sensitive portions of the filing.

President Trump's brief may also include additional procedural objections relating to the CIPA § 4 submission. The Special Counsel's Office scoffs at that suggestion, but at this point we have not been provided with any information regarding the procedures the Office has employed. (*See* Opp'n at 6). For example, the state-secret privilege must be properly invoked in connection with a CIPA § 4 motion. Some authority requires prosecutors to "invoke the privilege through the 'head of the department which has control over the matter, after actual personal consideration by that officer.'" *United States v. Aref*, 533 F.3d 72, 81 (2d Cir. 2008) (quoting *United States v. Reynolds*, 345 U.S. 1, 8 (1953)). While the Attorney General sometimes plays that role in

15

connection with a CIPA § 4 motion filed by a local U.S. Attorney's Office, it is not clear that the Attorney General is the appropriate department head in this case. CIPA also places restrictions on who may use its procedures that could present additional issues, including under the Appointments Clause, depending on how the Special Counsel's Office proceeded. *See* CIPA § 14 ("The functions and duties of the Attorney General under this Act may be exercised by the Deputy Attorney General, the Associate Attorney General, or by an Assistant Attorney General designated by the Attorney General for such purpose and may not be delegated to any other official."). This is the type of procedural issue that President Trump seeks to evaluate and challenge, if appropriate, upon being granted access to non-sensitive details regarding the filing.

**CONCLUSION**

For the foregoing reasons, the Court should require the Office to provide additional details regarding its alleged discovery compliance at the October 16, 2023 conference, and grant President Trum's motion for (1) a redacted, publicly filed version of the CIPA § 4 motion by the Special Counsel's Office that discloses non-sensitive aspects of the submission, (2) an opportunity to submit briefing regarding President Trump's objections to *ex parte* proceedings under CIPA § 4 and other procedural issues after the redacted CIPA § 4 motion is filed, and (3) an extension of the deadline for CIPA § 5 notice until three weeks after the Office complies with its discovery obligations.

Dated: October 5, 2023                          Respectfully submitted,

                                                */s/ Todd Blanche*
Gregory M. Singer                               Todd Blanche, Esq. (PHV)
John F. Lauro, Esq.                             toddblanche@blanchelaw.com
D.C. Bar No. 392830                             BLANCHE LAW PLLC
jlauro@laurosinger.com                          99 Wall St., Suite 4460
Gregory M. Singer, Esq. (PHV)                   New York, NY 10005
gsinger@laurosinger.com                         (212) 716-1250
Filzah I. Pavalon, Esq. (PHV)
fpavalon@laurosinger.com
LAURO & SINGER
400 N. Tampa St., 15th Floor
Tampa, FL 33602
(813) 222-8990

*Counsel for President Donald J. Trump*

## CERTIFICATE OF SERVICE

I HEREBY CERTIFY that on October 5, 2023, I electronically filed the foregoing document with the Clerk of the Court using CM/ECF, which in turn serves counsel of record via transmission of Notices of Electronic Filing.

<i><u>/s/ Todd Blanche</u></i><br>
Todd Blanche