**IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA**

| | | |
|---|---|---|
| **UNITED STATES OF AMERICA** | * | |
| | * | |
| **v.** | * | **CRIMINAL NO. 23-cr-257 (TSC)** |
| | * | |
| **DONALD J. TRUMP,** | * | |
| | * | |
| **Defendant.** | * | |
| | * | |

**GOVERNMENT'S OPPOSED MOTION FOR
FAIR AND PROTECTIVE JURY PROCEDURES**

Trial in this matter—in which the defendant, a former president, is charged with attempting to overturn the presidential election, disenfranchise millions of Americans, and obstruct the peaceful transfer of power—is a matter of national importance and will likely generate significant public attention.  To ensure that voir dire in this case proceeds in an orderly, efficient, and fair manner, the Government proposes that the Court use a written juror questionnaire shortly in advance of in-person jury selection.  A questionnaire would save time by allowing the Court to excuse some potential jurors without requiring them to appear in court, and by permitting the Court and the parties to organize and streamline their questions for in-person voir dire.  Because the questionnaire process will give the parties early access to prospective jurors' identifying information and the ability to conduct open-source research regarding them, the Court should impose reasonable boundaries for such research and reiterate its practice—standard among courts in this District—of prohibiting public identification of potential or selected jurors.  Through counsel, the defendant opposes this motion.

I.     **Proposed Jury Measures**

The Court has broad discretion to manage jury selection, *Rosales-Lopez v. United States*, 451 U.S. 182, 189 (1981), and a duty to "maintain control of the process" to "preserve fairness and

at the same time protect legitimate privacy," *Press-Enterprise Co. v. Superior Ct. of Cal., Riverside Cnty.*, 464 U.S. 501, 512 (1984).  The Court's discretion includes determining whether to employ a written juror questionnaire, deciding which questions to pose to prospective jurors, and deploying measures including anonymity and sequestration necessary to protect the integrity of the proceeding.  *See Skilling v. United States*, 561 U.S. 358, 386 (2010) (citing *Ristaino v. Ross*, 424 U.S. 589, 594–595 (1976)) ("Jury selection . . . is 'particularly within the province of the trial judge'"); *United States v. Tsarnaev*, 595 U.S. 302, 313 (2022) ("A trial court's broad discretion in this area includes deciding what questions to ask prospective jurors."); *United States v. Childress*, 58 F.3d 693, 702 (D.C. Cir. 1995) (Court's duty "to make a sensitive appraisal of the climate surrounding a trial and a prediction as to the potential security or publicity problems that may arise during the proceedings" includes determining whether to anonymize jury); *United States v. Haldeman*, 559 F.2d 31, 85 n.135 (D.C. Cir. 1976) (en banc) (per curiam) (it is "axiomatic that the decision to sequester (or unsequester) a jury rests within the trial judge's discretion").  In this case, the Court should exercise its discretion to streamline jury selection through the use of a jury questionnaire.  At the same time, in light of the public attention that is expected, and the defendant's record of using public social media platforms in an intimidating manner—further evinced by events in a separate trial in New York last week—the Court should implement several of the standard measures frequently used in this District to protect the jury, and impose additional clear guidelines for use of information regarding potential jurors.[1]

---

[1] The record in this case amply supports the proposed restrictions on the disclosure of juror information.  Indeed, the Court has before it evidence sufficient to implement far more restrictive measures, including full juror anonymity and full sequestration.  *See United States v. Edmond*, 52 F.3d 1080, 1091 (D.C. Cir. 1995) (per curiam) (explaining that juror anonymity may be warranted upon a showing of, among other things, "'extensive publicity that could enhance the possibility that jurors' names would become public and expose them to intimidation or harassment'" (quoting

A.      The Government Requests a Questionnaire To Make Voir Dire More Efficient

Use of a written questionnaire in this case, shortly before in-person voir dire, will expedite the process of selecting a fair jury.  "Written questionnaires are now a common complement to oral examination when selecting an effective and impartial jury," *United States v. Isaacson*, 752 F.3d 1291, 1301 (11th Cir. 2014), and are "routinely employ[ed] . . . to facilitate jury voir dire in a number of circumstances," *id*., including "where a large number of prospective jurors must be screened; where an anonymous jury is to be empaneled; [or] where there has been extensive pre-trial publicity," *United States v. Quinones*, 511 F.3d 289, 299 (2d Cir. 2007) (citations omitted). When confronted with trials estimated to last longer than two weeks or that are otherwise expected to require a larger jury pool from which to draw, courts in this District have used questionnaires to make in-person voir dire more expedient.  *See, e.g.*, *United States v. Rhodes*, No. 22-cr-15 (APM) (D.D.C.) (advance written questionnaire used for eight week January 6-related seditious conspiracy trial of multiple defendants associated with the Oath Keepers); *United States v. Nordean*, No. 21-cr-175 (TJK) (D.D.C.) (advance written questionnaire used in January 6-related months-long seditious conspiracy trial of multiple defendants associated with the Proud Boys); *United States v. Stone*, No. 19-cr-18 (ABJ) (D.D.C.) (advance written questionnaire used in highly publicized trial for false statements to Congress); *United States v. Slatten*, No. 14-cr-107 (RCL) (D.D.C.) (advance written questionnaire used in months-long trial of Blackwater contractor for 2007 massacre at Nisour Square in Baghdad).  Here, a questionnaire will make in-person voir dire

---

*United States v. Ross*, 33 F.3d 1507, 1520 (11th Cir. 1994))); *Childress*, 58 F.3d at 703 ("The court reasonably found the serious potential for juror intimidation during and after the trial that would justify the extreme precautions of anonymity and sequestration.")  Nonetheless, the Government is not proposing such measures at this time.

more efficient because it will allow the Court and the parties, in advance, to confer and excuse jurors who should be struck for cause.  It also will assist the parties in preparing organized and succinct lists of questions, tailored to each juror.  *See Slatten*, ECF No. 1052 at 6 (June 18, 2018) (court informing jurors that questionnaire "will save a lot of time ultimately and will speed the process of jury selection and minimize the amount of time that you must spend in the courtroom while a jury is selected").

In particular, the Government proposes the following schedule consistent with the written questionnaire process directed by this Court in *United States v. Alford*, No. 21-cr-263 (D.D.C.), and other cases in this District.  First, the Court should order the Government to draft a questionnaire, confer with the defense, and file a proposed questionnaire with indications as to which questions the parties agree upon and which they do not, after which the Court will issue a final questionnaire.  *See id.*, ECF No. 46 at 15 (Apr. 18, 2022) (ordering defendant, who moved for written advance questionnaire, to "prepare a written questionnaire for distribution to prospective jurors" and "meet and confer with the government . . . before submitting it for court approval," indicating in his filing disputes between the parties regarding language).  Next, the Clerk will issue summonses to potential jurors to appear at the courthouse and complete written questionnaires in advance of in-person voir dire.  Courts have scheduled this for varying amounts of time in advance of trial, ranging from days, to weeks, to months.  *See id.*, ECF No. 50 (one day in advance); *Rhodes*, ECF Nos. 133 & 319 (Apr. 29, 2022 & Sept. 15, 2022) (two weeks in advance); *Nordean*, ECF No. 562  (Nov. 30, 2022) (roughly two weeks in advance); *Stone*, ECF No. 362 at 10, 21 (April 16, 2020) (almost two months in advance).  Here, subject as always to the Court's schedule, the Government proposes that jurors complete written questionnaires on or about Friday, February 9, 2024, approximately three weeks before in-person jury selection begins on

Monday, March 4.  Then, on a date of the Court's choosing the week of February 26, the parties would jointly submit a list of jurors whom they agree should be struck for cause, and separate lists of jurors whom each party moves to strike for cause, based solely on information in the questionnaire (*e.g*, individuals who establish that they genuinely cannot serve because of some actual and immovable personal or professional conflict, or individuals who unequivocally establish that they cannot follow the Court's instructions).

        B.    <u>The Court Should Impose Reasonable and Standard Restrictions to Protect Jurors</u>

If the Court approves the use of a questionnaire, the parties will learn the identities of potential jurors in advance of in-person jury selection.  It is commonplace in this District for parties, once they are provided with jurors' identifying information, to conduct open-source social media research on the venire.  Given the particular sensitivities of this case, stemming both from heightened public interest and the defendant's record of using social media to attack others, the Court should impose certain limited restrictions on the ability of the parties to conduct research on potential jurors during jury selection and trial and to use juror research.  In addition, the Court should strictly enforce the standard practices in this District designed to shield juror identities from the public.

It is standard and accepted practice in this and other districts for parties to conduct open-source internet research, including by viewing the public-facing social media accounts of potential jurors.  *See* D.C. Bar Ethics Op. 371, *Social Media II: Use of Social Media in Providing Legal Services* (Nov. 2016) ("Competent and zealous representation . . . may require investigation of relevant information from social media sites of jurors or potential jurors to discover bias or other relevant information for jury selection.  Accessing public social media cites of jurors or potential jurors is not prohibited . . . as long as there is no communication by the lawyer with the juror.").

This is appropriate and consistent with the jury selection process's purpose of weeding out partial or unfair jurors and helping the parties exercise challenges.  *See Mu'Min v. Virginia*, 500 U.S. 415, 431 (1991) ("*Voir dire* examination serves the dual purposes of enabling the court to select an impartial jury and assisting counsel in exercising peremptory challenges.").  Moreover, the review of open-source information will mitigate the risk that a post-trial review will give rise to litigation. *See United States v. Stone*, 613 F. Supp. 3d 1, 41-44 (D.D.C. 2020) (defendant's motion for new trial based on unfounded claim that juror had misrepresented social media activity denied in part because defense had necessary information from juror's questionnaire with which to confront juror during in-person voir dire and chose not to).

The Court should make clear to the parties, however, that research beyond what is publicly available—especially if it results in any kind of contact with a potential juror—would infringe upon potential jurors' privacy interests and could constitute improper *ex parte* communication. *See Oracle Am., Inc. v. Google, Inc.*, 172 F. Supp. 3d 1100, 1103 (N.D. Cal. 2016) (jurors are not "celebrities or public figures" but "good citizens commuting from all over our district, willing to serve our country, and willing to bear the burden of deciding a commercial dispute the parties themselves cannot resolve.  Their privacy matters.  Their privacy should yield only as necessary to reveal bias or a reluctance to follow the Court's instructions.").  The parties should thus be precluded, during jury selection and trial, from asking to "follow" or "friend" anyone, or make any analogous affirmative request, to gain access to posts or profiles that are not otherwise publicly available.  D.C. Bar Ethics Op. 371; *see also* Local Criminal Rule 24.2(a) ("No party, attorney for a party, or person acting on behalf of a party or attorney, shall communicate directly or indirectly with a juror or an excused juror or a member of a juror's, or excused juror's, family during the trial.").  This prohibition should not apply, however, to mere passive viewing of publicly available

information on sites like LinkedIn that may alert a potential juror to the fact that a particular person has reviewed his or her account.  *See, e.g.*, *Standing Order Regarding Research as to Potential Jurors in All Cases Assigned to U.S. District Judge Rodney Gilstrap* (E.D. Tex.).[2]  Finally, the parties should also be precluded from any form of investigation—whether online or otherwise—that could reasonably be perceived as vexatious or harassing.

The Court also should prohibit the use of information gained from juror research for any purpose other than voir dire, and even there, the Court should require that if a party intends to use any information gained through open-source research, the party does so in a way that does not reveal any juror's identity.  This limitation is consistent with this District's practice and Local Criminal Rule 24.1(b), which dictate that jurors' identifying information not be made public outside of the courtroom, and that in the courtroom, the Court and parties refer to jurors by number rather than name.  *See* Local Criminal Rule 24.1(b) ("Officers of the Court and other parties who have access to juror names through the Court . . . shall not disclose names of prospective and sitting petit jurors to the public outside of open court, except upon order of the Court.");[3] *Nordean*, Trial Tr. at 571-574 (Dec. 20, 2022) (court admonishing an attorney, "It's not appropriate to mention potential jurors' names in court."); *Rhodes*, Trial Tr. at 73 (Sept. 27, 2022) (court correcting

---

[2]    https://www.txed.uscourts.gov/sites/default/files/judgeFiles/Standing%20Order%20--%20Juror%20Research%20%28signed%29.pdf.  This standing order in the Eastern District of Texas provides that parties are not "prohibited from conducting or causing another to conduct any type of online investigation merely because a juror or potential juror may become aware that his or her [electronic social media] is being reviewed," and therefore the parties are not "prohibited from reviewing the LinkedIn accounts of jurors or potential jurors even if network settings would alert that juror or potential juror to the fact that a lawyer from the case has reviewed his or her LinkedIn account."

[3] Though it has long been standard practice in this District not to publicly disseminate juror names, recently, after a large number of high-profile trials, the Local Criminal Rules were amended in April 2023 to add this provision and make the practice the rule.

attorney who used a juror's name); *United States v. Bannon*, No. 21-cr-670 (CJN), ECF No. 172 at 3 (D.D.C. July 18, 2022) at 3 (court directing the parties before voir dire, "I very much expect that while we, of course, have the names of the jurors, that we will not and no one will mention the juror names on the public record during voir dire today. We will use only juror numbers"); *Stone*, ECF No. 242 at 4 (Oct. 25, 2019) (order adopting multiple protections for jurors, including a prohibition on sketch artists "drawing detailed sketches of any member of the jury").

Finally, the Court should admonish the parties to handle juror questionnaires and jury sheets containing jurors' identifying information with care, including by requiring each party to ensure that any individual the party permits to access these sensitive materials understands that he cannot publicly disclose the information. With respect to questionnaires, this is analogous to the restrictions that courts in this District place on handling of the jury sheets that reveal to the parties the potential jurors' names and personal information during in-person voir dire. *See United States v. Handy*, No. 22-cr-96 (CKK), ECF No. 320 at 2-3 (D.D.C. Aug. 1, 2023) (in case involving civil rights conspiracy to obstruct access to reproductive health services, court tightly controlled jury sheets listing jurors' names and identifying information, including that they must remain in the courtroom and be returned to the court at night to "be placed under seal and maintained in the Court's vault"); *id.*, Trial Tr. at 7 (Aug. 10, 2023) (explaining that reason for control over jury sheets is "to make sure that there are no issues, that the jurors are not interfered with, not influenced, not intimidated."). Such a precaution is not only necessary to ensure that all parties handle sensitive juror information responsibly, but also so that the Court can assure prospective and seated jurors in this case that no party will improperly use their names or other identifying information.

There are other good reasons in this case for the Court to impose these restrictions and enforce this District's standard prohibition against publicizing jurors' identities.  Chief among them is the defendant's continued use of social media as a weapon of intimidation in court proceedings.  In addition to the record before the Court from the Government's previous filings, *see* ECF Nos. 57 & 64, just last week the defendant escalated his conduct and publicly attacked the trial judge's law clerk in his pending civil fraud trial in New York State Supreme Court.  The defendant did so by reposting on his Truth Social account—which has 6.4 million followers—a photograph of the law clerk and a United States Senator with the baseless caption, "[Senator's] girlfriend, [Clerk], is running this case against me.  How disgraceful!  This case should be dismissed immediately!"[4]  As a result, the judge in that case was forced to issue an oral order that no party speak publicly about members of the court staff.[5]  Given that the defendant—after apparently reviewing opposition research on court staff—chose to use social media to publicly attack a court staffer, there is cause for concern about what he may do with social media research on potential jurors in this case.  It is therefore necessary for the Court to employ the limited restrictions described above.

Even before the defendant's most recent concerning conduct, as the Court is aware, the defendant's supporters already had directed threats to the Court, *see United States v. Shry*, No. 4:23-mj-1602, ECF No. 1 at 3 (Criminal Complaint) (S.D. Tex. Aug. 11, 2023), and to grand jurors

---

[4] *See Wall Street Journal*, "Judge Admonishes Trump for Social Media Post Attacking Law Clerk" (Oct. 3, 2023), *available at* https://www.wsj.com/us-news/law/judge-dampens-trumps-enthusiasm-on-limiting-scope-of-fraud-case-30dfe11c.

[5] See CNN, "Judge issues gag order and rebukes Trump after social media post attacking his clerk" (Oct. 4, 2023), *available at* https://www.cnn.com/2023/10/03/politics/trump-gag-order-social-media-threat/index.html.

who returned an indictment in Fulton County, Georgia.[6]  For these and related reasons, another federal court presiding over a civil case involving the defendant recently found it appropriate to adopt measures to protect juror privacy that are far more restrictive than those proposed by the Government here. *See Carroll v. Trump*, No. 22-cv-10016, 2023 WL 2612260, at *2, *4 (S.D.N.Y. Mar. 23, 2023) (keeping jurors' identities secret even from the parties upon findings that—in the context of the defendant's repeated attacks on "courts, judges, various law enforcement officials and other public officials, and even individual jurors in other matters"—"[i]f jurors' identities were disclosed, there would be a strong likelihood of unwanted media attention to the jurors, influence attempts, and/or of harassment or worse of jurors by supporters of Mr. Trump").  The Court should likewise protect prospective and selected jurors in this case from intimidation and fear through the limited measures proposed above.

Finally, jurors in this case are likely to receive substantial media and other public attention. In consultation with the United States Marshals Service, the Court may wish to consider measures to protect the jury in this case from scrutiny and harassment, such as arranging for jurors to gain discreet entry into and out of the courthouse. *See, e.g.*, *Stone*, ECF No. 294 at 13 (Nov. 5, 2019) (court explaining to prospective jurors, "We will make arrangements . . . for the jurors who are selected to serve to come and go from the courthouse in a private manner so that you do not have to interact with other people or make your way through any crowds that gather at any of the public entrances.").  Courts in some of the other high-profile matters cited above took similar steps.

---

[6] *See Washington Post,* FBI Joins Investigation of Threats to Grand Jurors in Trump Georgia Case, (Aug. 18, 2023), https://www.washingtonpost.com/national-security/2023/08/18/fbi-joins-investigation-threats-grand-jurors-trump-georgia-case/ (citing an online post stating, "These jurors have signed their death warrant by falsely indicting President Trump").

Closer in time to trial, the Government may request specific additional protective measures for the jury.

## II.      Conclusion

To ensure an efficient process for selecting a fair and impartial jury in this case, the Court should use a written questionnaire shortly in advance of in-person voir dire.  At the same time, the Court should adopt several of this District's standard measures to protect the identities, privacy, and security of prospective and selected jurors.

Respectfully submitted,

JACK SMITH
Special Counsel

By:      /s/Molly Gaston
Molly Gaston
Thomas P. Windom
Senior Assistant Special Counsels
950 Pennsylvania Avenue NW
Room B-206
Washington, D.C. 20530