UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA


UNITED STATES OF AMERICA,          .
                                   .
          Plaintiff,               .   CR No. 23-0257 (TSC)
                                   .
     v.                            .
                                   .
DONALD J. TRUMP                    .   Washington, D.C.
                                   .   Monday, October 16, 2023
          Defendant.               .   10:02 a.m.
. . . . . . . . . . . . . . .


TRANSCRIPT OF MOTION HEARING
BEFORE THE HONORABLE TANYA S. CHUTKAN
UNITED STATES DISTRICT JUDGE


<u>APPEARANCES</u>:

For the Government:          MOLLY G. GASTON, ESQ.
                             THOMAS WINDOM, ESQ.
                             U.S. Attorney's Office
                             601 D Street NW
                             Washington, DC 20530


For Defendant:               JOHN F. LAURO, ESQ.
                             GREGORY M. SINGER, ESQ.
                             Lauro & Singer
                             400 North Tampa Street
                             15th Floor
                             Tampa, FL 33602

                             TODD BLANCHE, ESQ.
                             Blanche Law
                             99 Wall Street
                             New York, NY 10005

Court Reporter:              BRYAN A. WAYNE, RPR, CRR
                             U.S. Courthouse, Room 4704-A
                             333 Constitution Avenue NW
                             Washington, DC 20001


Proceedings reported by stenotype shorthand.
Transcript produced by computer-aided transcription.

P R O C E E D I N G S

THE DEPUTY CLERK:  Good morning, Your Honor.  This is criminal case No. 23-257, United States of America versus Donald J. Trump.

Counsel, please approach the lectern and state your appearances for the record.

MS. GASTON:  Good morning, Your Honor.  Molly Gaston and Thomas Windom for the United States, and with us at counsel table is Special Agent Jamie Garman.

THE COURT:  Good morning.

MR. LAURO:  Good morning, Your Honor.  John Lauro on behalf of President Trump, and with me is my partner, Greg Singer.

MR. BLANCHE:  And good morning, Your Honor.  Todd Blanche on behalf of President Trump.  I'm joined by two folks from my office, Emil Bove and Stephen Weiss.  Good morning.

THE COURT:  Good morning.  All right.  We are here for a hearing on the government's opposed motion to ensure that extrajudicial statements do not prejudice these proceedings.  And that was ECF 57.  I granted leave for the government to file that motion partially under seal to redact identifying information for certain individuals named in the motion.  The motion asks for two things:

First, an order restricting out-of-court statements.  Sometimes it's referred to as a gag order.  Specifically an

order prohibiting the parties, all parties, from making or
authorizing statements to the media or in public settings,
including through social media, that pose a substantial
likelihood of material prejudice to this case.

Such statements include but are not limited to, (a),
statements regarding the identity, testimony, or credibility
of prospective witnesses, and (b), disparaging and
inflammatory or intimidating statements about any party,
witness, attorney, court personnel or potential jurors.  The
defendant is also prohibited from causing surrogates to make
such statements on his behalf.

Second, the government seeks a court order establishing
rules for any pretrial surveys of the jury pool.  In
particular, the proposed order would require that the parties
notify me before conducting any survey, including (a) a brief
description of the intended methodology; (b) all questions
that will be asked in the pretrial survey, poll, or study; and
(c), the expected number of participants.

The parties could not begin the survey until I approved it,
possibly with my own modifications.  And the parties would be
required to record the name and address of each participant
contacted and submit them to the Court two weeks before jury
selection.

So I would like to address these issues in reverse order
today, because I think the issue of survey requirements will

1    be a simpler one to resolve.  As an initial matter, the

2    parties seem to agree that I have some authority to review

3    pretrial surveys as necessary to protect the integrity and

4    the fairness of these proceedings.  For example, *United States*

5    *v. Collins*, 972 F.2d 1385 at 1398.

6        But they don't cite to anything definitively setting a

7    standard for that review or offering guidance as to how I

8    should go about it, perhaps because judicial supervision of

9    surveys appears to be relatively unusual and so the law is not

10   very developed.

11       Ultimately, however, that may not matter very much here

12   because I see little reason to impose much in the way of

13   survey requirements.  At the hearing that we held on August 28

14   of this year, the defense agreed when I asked to submit an ex

15   parte notice before it conducted a survey.  And in its

16   opposition brief the defense states that it has no objection

17   to informing the Court of the dates and sample sizes of its

18   polling in the District of Columbia.

19       So, Ms. Gaston, are you going to be speaking for the

20   government?  So why isn't that sufficient at this point?

21           MS. GASTON:  Your Honor, if the Court believes that

22   that is sufficient, then that is sufficient for the

23   government.  Really, our position was -- what we proposed was

24   what we thought might be helpful to the Court in discerning

25   whether the questions posed in the course of any such study

1       might prejudice the jury pool.  But if the Court feels that

2       what the Court has already done is sufficient, then that is

3       sufficient for the government.

4               THE COURT:  All right.  Thank you.

5           So I think the defense agreement to notify the Court of

6       their intent to conduct a survey and the dates and sample

7       sizes of the proposed survey is enough for the moment.  So I'm

8       going to deny the government's motion as to that point.  I

9       don't see the need for anything more.  As the defense points

10      out, a survey's sample size would ordinarily include only a

11      few hundred people, which means it would not meaningfully

12      affect public opinion even if the questions were somewhat

13      slanted.

14          Likewise, there's a low probability that anyone polled

15      would end up in the jury venire, and if they were, a voir dire

16      question would reveal that.  So unless the defense tries to

17      poll 100,000 people or something, I don't foresee any issues

18      with it conducting surveys, just provided you abide your

19      representation that you let the Court know.

20          Now, of course, if the defense later chooses to rely on the

21      results of surveys to, for example, move for a change of

22      venue, then I may need to review the survey methodology in

23      greater detail, including the wording of the questions asked.

24      But that's not a reason for me to preemptively prevent or

25      micromanage defense's surveys.  So the motion is denied as it

1    pertains to additional survey requirements.

2        Now we go on to the government's request for an order

3    governing the parties' out-of-court statements.  I'll note

4    that Local Criminal Rule 57.7(c) states that "in a widely

5    publicized or sensational criminal case the Court may issue a

6    special order governing such matters as extrajudicial

7    statements by parties, witnesses, and attorneys likely to

8    interfere with the rights of the accused to a fair trial by an

9    impartial jury."

10       There is no question that this case is widely publicized.

11   And so the question is whether I should issue such an order,

12   and if so, what its contours should be.

13       At the outset, the parties disagree about the appropriate

14   standard that I should apply in this case.  The government

15   argues that the appropriate standard is the one set forth by

16   the Supreme Court in *Gentile v. State Bar of Nevada*, 501 U.S.

17   1030.  In that case the Supreme Court held that it does not

18   violate the First Amendment to prohibit a criminal defense

19   counsel's speech if the lawyer knows or reasonably should know

20   that it will have a substantial likelihood of materially

21   prejudicing an adjudicative proceeding.

22       The Court explained that those restrictions served the

23   integrity and fairness of the judicial system and imposed only

24   narrow and necessary limitations aimed at two principal evils:

25   one, comments that are likely to influence the actual outcome

of the trial, and two, comments that are likely to prejudice the jury venire.

By contrast, the defense argues that the *Gentile* standard only applies to defense lawyers, and that any speech restrictions on defendants themselves must satisfy a higher standard.  Specifically, the defense argues that any so-called gag orders must survive strict scrutiny, and that the government must prove that any prohibited speech would constitute a clear and present danger to the administration of justice.

Neither the Supreme Court nor the D.C. Circuit have addressed the issue of the standard that applies to criminal defendants in a case such as this.  However, the Fifth Circuit has expressly applied *Gentile's* substantial likelihood of material harm test to criminal defendants as well as their counsel.  And that case is *United States v. Brown*, 218 F.3d 415 at 428.

I'm not aware of any circuits that have declined to do so since *Gentile,* and, in addition, while courts in some other districts have adopted a higher standard for restricting defendant's speech than *Gentile*'s, it appears that courts in this district generally apply the substantial likelihood of material harm test.

In any event, I don't think I need to make a ruling on the question of which standard applies because I intend for any

order I issue to meet -- to satisfy either test.

So before considering whether additional restrictions are warranted, I want to briefly review the restrictions that are already in place as a result of this case.  So to begin with, Local Criminal Rule 57.7(b) limits the public statements of attorneys in criminal cases.

For instance, attorneys may not issue extrajudicial statements concerning the identity, testimony, or credibility of prospective witnesses, or any opinion as to the accused's guilt or innocence or as to the merits of the case or the evidence in the case.  And that's 57.7(b)(3).

The rule does not preclude attorneys, in the proper discharge of official or professional obligations, from describing the offenses charged, quoting from the case's public record, or announcing without further comment that the accused denies the charge.

As for Mr. Trump himself, his pretrial release conditions, which he signed, require that he not communicate about the facts of the case with any individual known to him to be a witness, except through counsel or in the presence of counsel. That's in ECF No. 13.

Mr. Trump's conditions of release also require him to abide by all federal, state, and local laws.  One such federal law is U.S. Code Title 18, § 1512, which broadly prohibits efforts to influence witness testimony, cause the withholding or

destruction of evidence, or hinder, delay, or prevent the communication to a law enforcement officer or judge of the United States of information relating to the commission or possible commission of a federal offense or a violation of conditions of release pending judicial proceedings.

Section 1512 bars not only physical force or the threat of physical force, as in subsection (a)(2), but also, under subsection (b), the knowing use of intimidation, threats, corrupt persuasion, or misleading conduct, and under subsection (d), the knowing harassment of another person. These prohibitions apply to everyone -- defendants, the government, their lawyers, and third parties.

In addition, the D.C. Circuit has held that Section 1512's prohibitions apply to foreseeable as well as actual witnesses, even when it is not certain whether they will testify.  In *United States v. Morrison*, the defendant challenged his conviction under Section 1512 by arguing that at the time that he contacted a witness the government had not yet announced that the person was a potential witness, and the defendant hadn't specifically asked the witness to testify for the defense.  That's 98 F.3d 619 at 630.

The D.C. Circuit squarely rejected that argument, concluding that it was foreseeable by the defendant that the government would use the witness because the witness had dealt with the defendant during the events at issue and would

testify regarding the defendant's actions and behavior at the time.  So long as a witness is foreseeable, then, attempts to unduly influence them may run afoul of Section 1512.

All that said, the government's motion does not seem to allege that Mr. Trump has actually violated any of his conditions of release or other federal law.  Rather, the government seems to contend that some of his statements nonetheless warrant imposing additional speech restrictions above and beyond any limits already in place.

Is that correct, Ms. Gaston?

MS. GASTON:  Yes, Your Honor.

THE COURT:  So with that backdrop in mind, I want to ask some general questions about the government's proposed order.  You can come up.

MS. GASTON:  Thank you, Your Honor.

THE COURT:  So first I want to understand exactly what your proposed order would prohibit that is not already prohibited by the local criminal rules, federal law or Mr. Trump's conditions of release.  And I'm just trying to nail down what the marginal change would be.

MS. GASTON:  Yes, Your Honor.  So I want to start by making clear that the government's sole objective with this motion is to ensure the fair administration of justice in this case, by preventing extrajudicial statements that prejudice the trial.  We have no interest in stopping the defendant from

running for office or defending his reputation, nor does our proposed order do that.

There are two specific sources of prejudice that the government's motion seeks to prevent, and this goes to the question that Your Honor just asked.  The first is derogatory and inflammatory or intimidating statements attacking witnesses.  These are statements that would not, for instance, go to Section 1512, as Your Honor just identified, but these are statements that risk influencing both the individual who has been publicly attacked, and other witnesses who see the public attack and are perhaps chilled in their own right.

And then the other source of prejudice is the trial of this case out in the public rather than in this courtroom, because when potential jurors are inundated by public and sometimes false renditions of the expected evidence, or attacks on witness credibility, or attacks on the motives of court personnel or the prosecutors, it risks biasing the jury before it is empaneled.

THE COURT:  Okay.  One part of the order that you have requested would prohibit, as you said, disparaging and inflammatory or intimidating statements about any party, witness, attorney, court personnel, or potential juror.  So let's set aside for a minute the potential subjects of those statements.  How do you define disparaging and inflammatory or intimidating?  And again, how different is that from the kinds

1       of intimidating statements that are already illegal?  I mean,

2       "disparaging" is pretty wide.

3              MS. GASTON:  Yes, Your Honor.  So the definitions that

4       we would propose for both of these are the commonly understood

5       definitions and the dictionary definitions.  So "disparaging"

6       means vilifying, bringing reproach, discredit.  "Inflammatory"

7       means inflaming anger or animosity.  And we combined

8       "disparaging" and "inflammatory" in this proposed order

9       because it is the combination of those things that might

10      prejudice the jury pool.

11         So there could be fair ways to disparage somebody, to say a

12      factual thing that is true about them.

13             THE COURT:  But you use the word "fair," and that

14      concerns me, because an order has to be narrowly tailored.

15      And when you use the word "fair," I am pretty sure that what

16      you consider fair is not what Mr. Lauro considers fair or his

17      client.  And then you're asking the Court to get involved in

18      making these kinds of decisions for what appears to be a very

19      wide variety of statements.  So what's your standard here?

20             MS. GASTON:  Right.  The standard, Your Honor, is that

21      this is about the participants, the witnesses in this trial.

22      It is limited to those individuals and it is limited to

23      statements that are meant to influence the venire or public

24      opinion.

25         And one thing I would like to point out, there was an

article in *The Washington Post* on Saturday that quoted the
defendant's spokesperson, and it quoted him saying that the
defendant's intent with his public statements regarding this
trial is to "try this case in the court of public opinion."
And that is exactly what the Supreme Court has said in cases
like *Sheppard* should not and cannot happen.

The Rule 57.7(c) order that we have proposed is narrowly
tailored to the two harms that I just mentioned, the attacks
on witnesses and the trial in the public sphere.  And it does
do so in a narrowly tailored and least restrictive way
possible.  And we are not wedded, Your Honor, to the exact
words in this order.  We stand ready to work with the Court
and the defense to get the order right.

But what can't be is that because this is hard -- and we
know that it is hard, because it is hard whenever one is
balancing constitutional rights and thinking about these
difficult questions -- but the answer cannot be that the
defendant is permitted to intentionally try this case in the
court of public opinion and intentionally prejudice the
venire.

THE COURT:  I'm going to get to you in a moment,
Mr. Lauro.  I already asked my question as to whether the
order could be overinclusive.  But I also have a question as
to whether it could be underinclusive.  Because only
prohibiting disparaging statements doesn't really cover an

1      attempt to unduly influence a witness by publicly praising

2      them before a trial.  Something like, you know, Mr. Jones is

3      great, I know Mr. Jones will do the right thing when the time

4      comes.  Would that be covered under the order?

5            MS. GASTON:  So that, Your Honor, is what we were

6      trying to get at with part 1(a), which is statements regarding

7      the testimony or credibility of expected witnesses, witness

8      bolstering in terms of trying to get out in the court of

9      public opinion that someone is particularly trustworthy so

10     that at trial, if a juror has heard that, they will regard the

11     witness in a different way from other witnesses.

12           THE COURT:  All right.  And finally -- well, not

13     finally because I'm going to have some more questions.  But

14     the proposed order has a carve-out for Mr. Trump or his

15     lawyers to announce without further comment that the defendant

16     denies the charges.  So, in effect, are you saying that the

17     defendant should be limited and his lawyers should be limited

18     to statements such as "I deny the charges" and "I have filed a

19     motion to dismiss"?  Sort of, that's it?  I mean, what would

20     be allowable?

21           MS. GASTON:  It would be statements like that, but it

22     would also, Your Honor, allow the defendant to campaign.  So

23     if he is asked generally by a nonparty to the case if he

24     committed the crimes he is accused of, he could say no, I

25     didn't and I acted appropriately in regard to those

1      activities.

2             THE COURT:  Oh, you're envisioning a very different

3      scenario than what is currently in existence, Ms. Gaston.

4        All right.  Mr. Lauro.  I have some further questions, but

5      I want to hear Mr. Lauro.

6             MR. LAURO:  I had to chuckle as well, Your Honor.

7      We're in the middle of a campaign.

8             THE COURT:  I know, Mr. Lauro.

9             MR. LAURO:  And we're dealing with prior restraint on

10     content-based political speech, which is the highest degree of

11     constitutional protection.  The prosecutor couldn't answer

12     your questions because she ignores the fact that the Biden

13     administration is seeking to censor a political candidate in

14     the middle of a political campaign.

15            THE COURT:  Mr. Lauro, let me stop you.  Mr. Trump is a

16     criminal defendant.  He is facing four felony charges.  He is

17     under the supervision of the criminal justice system, and he

18     must comply with the conditions of release.  He does not have

19     the right to say and do exactly as he pleases.  Do you agree

20     with that?

21            MR. LAURO:  Hundred percent.  And in fact, Your Honor,

22     you have installed a regimen of rules and regulations that

23     everybody's abiding by.  But like Mr. *Ford* --

24            THE COURT:  Wait.  Did you just say everybody's abiding

25     by?

1      MR. LAURO:  Yes, Your Honor.  And including -- and let

2  me just say this.  We have two cases, only two cases that have

3  dealt with this issue:  The *Ford* case, which dealt with

4  Congressman *Ford*.  And that was clearly an instance where the

5  Court ruled that he should not be censored during his

6  political campaign.

7      In fact, during his entire position in Congress he was

8  able to say that the case was racially based and racially

9  motivated.  He criticized the prosecution for that reason.

10  He criticized the prosecution for being politically motivated,

11  and that was permissible under the Sixth Amendment.

12      And the other case that you mentioned, *Brown*, what the

13  government doesn't tell you is that in that case the judge

14  specifically said there would be no order of censorship during

15  the political campaign.  Here, these prosecutors want to prevent

16  President Trump from speaking out on the issues of the day.  All

17  of the issues in this case are inextricably intertwined with

18  campaign issues:  Presidential competency, the role of

19  prosecutors, the role of the DOJ, the role of political

20  interference, the issue of appointment of judges.  Every single

21  issue that relates to this case also has political implications.

22      The prosecutors identify numerous social postings that they

23  say would violate some kind of order now --

24      THE COURT:  I'm going to ask you about them, but I'm

25  going to interrupt you for a minute because I want to make

1    sure that I'm clear on this recurring theme that you raise

2    that -- throughout the motion and throughout this case and

3    here this morning, that the fact that Mr. Trump is running for

4    president and his corresponding need to speak freely somehow

5    entitles him to make statements that would otherwise be

6    unlawful?  Is that what you're saying --

7              MR. LAURO:  No, Your Honor.

8              THE COURT:  -- that because he's running for

9    president --

10             MR. LAURO:  Of course not.

11             THE COURT:  -- he gets to --

12             MR. LAURO:  No.

13             THE COURT:  -- to make threats?

14             MR. LAURO:  Absolutely not.  And he hasn't made

15   threats.  But what I'm saying is if the Court follows the *Ford*

16   case and the *Brown* case, the Court will apply strictest

17   scrutiny with respect to any kind of censorship order that's a

18   prior restraint on campaign speech.  And that's what the law

19   requires.

20             THE COURT:  This is -- it's not just a prior restraint

21   on -- your argument is a prior restraint on campaign speech.

22   But he has restraints on his speech.  Do you disagree that

23   those restraints, the restraints that are in place, his

24   conditions of release, override his First Amendment rights in

25   his campaign?  In other words, if he wants to talk about the

1    subject matter of a witness's testimony in his campaign, he

2    can't because he's subject to conditions of release that

3    prevent him from doing that.

4    MR. LAURO:  I've said it twice, Your Honor.  He's

5    subject to Your Honor's conditions of release, which he has

6    abided by.  We don't disagree with that and we don't challenge

7    that.  What we challenge is an effort by the Biden

8    administration to censor their leading opponent during a

9    political campaign.  That is unheard of.  The strictest

10   scrutiny should be applied by the Court.

11   Mr. Trump is allowed to say things like this is a

12   politically motivated prosecution.  He's entitled to say

13   things that he's being treated unfairly.  He's entitled to

14   speak truth to oppression.  He's entitled to say that the

15   Department of Justice is acting unlawfully.  He's entitled to

16   even say things that are insulting to these prosecutors, as

17   difficult as it may be for them to hear.  But that is the

18   essence of free speech.

19   We have a marketplace -- a marketplace of free ideas in

20   our country, and free speech.  The answer to oppression, the

21   answer to tyranny, is the ability of Americans to speak

22   freely.  And here we have a situation where the Biden

23   administration, with all the powers --

24   THE COURT:  Mr. Lauro, I understand you have a message

25   you want to get out.

1          MR. LAURO:  No, it's not a message --

2          THE COURT:  I want to address the motion and the law.

3    I do not need to hear any campaign rhetoric in my courtroom.

4          MR. LAURO:  It is not campaign rhetoric, Your Honor.

5    What it is is the essence of how the courts have dealt with

6    these issues, both in the *Brown* case and in the *Ford* case.

7    And in both of those cases the courts have said we are not

8    going to censor political candidates.  There is not one case

9    in the United States, not one case in which a court has

10   entered a censorship order against a political candidate who

11   is a party to litigation.  Not once.  This would be the first

12   time.  And this is extraordinary, given the fact that we are

13   in the middle of a political campaign.

14       These prosecutors decided to bring this case in the middle

15   of a campaign.  They chose to have this case inextricably

16   intertwined with a political campaign, following President

17   Biden's statement in November 2022 that he would do anything

18   he could to prevent President Trump from assuming office

19   again.  That's in the public record.

20       President Trump is entitled to respond to that by saying

21   that these proceedings are unfair, it's an effort of political

22   interference, it's abhorrent to the basic structure of

23   American policy and the Constitution.  He's entitled to say

24   that as a political candidate.  And no court has ever

25   restricted a candidate from doing that.  What he is required

1    to do is abide by Your Honor's orders and he's done that.  And

2    one other --

3        THE COURT:  Well, I'm going to take issue with that.

4    I'm going to let you finish your point, but then I'm going to

5    have some specific questions about some specific statements

6    he's made.  But first I have some questions for Ms. Gaston.

7        MR. LAURO:  Okay.

8        THE COURT:  Finish your point.

9        MR. LAURO:  One last thing, Your Honor.  There is no

10   suggestion that the government has provided anything other

11   than speculation and conjecture that there's been any

12   influence on any jury pool with respect to these matters.

13   We're in the middle of a presidential campaign.  The easiest

14   solution to all of this is an obvious one.  And the Court in

15   *Landmark* and the courts have identified the easiest solution,

16   and that is to adjourn the case after the presidential

17   election.  That's the solution.

18     If these prosecutors were really interested in justice,

19   that's what would happen.  We would have a trial where

20   President Trump's right to effective assistance of counsel

21   would be guaranteed and provided for.  We wouldn't have a rush

22   to judgment.  We wouldn't have a trial immediately preceding

23   one of the most important days in the election cycle.  That's

24   the way to deal with this issue.

25       THE COURT:  This trial will not yield to the election

1    cycle and we're not revisiting the trial date, Mr. Lauro.

2         MR. LAURO:  Your Honor, I'm not asking that.  All I'm

3    saying is that President Trump, in the middle of a campaign,

4    that they chose to bring this case in, is entitled to exercise

5    his First Amendment rights.  We are talking about a censorship

6    order of a candidate that is unheard of in our constitutional

7    history.  It's never happened before.  Ever.

8         THE COURT:  There are a lot of things in this case that

9    have never happened before, Mr. Lauro.

10        MR. LAURO:  I understand, Your Honor.  Absolutely.

11        THE COURT:  All right.  Let me hear -- Ms. Gaston, let

12   me ask you -- and I'm going to come back to -- I have some

13   questions about some of these specific statements.  But I want

14   to ask Ms. Gaston about basically how this would work.

15     So let's say I entered the order as the government proposed

16   it, and Mr. Trump or one of the attorneys in this case makes a

17   statement that the government believes violates the order's

18   restrictions.  What are you proposing to happen next?  Would

19   you be asking for revocation of supervised release?  Financial

20   penalties?  Home detention?  Criminal contempt?  Moving the

21   trial date up?  How would that work?

22     You know, I've stressed that this case is going to proceed

23   as any other case, that this defendant is going to be treated

24   the same as any other defendant, but there are realities that

25   we have to face because the defendant is a former president.

1        There are accommodations I have made, for instance, allowing

2        the defendant to -- waiving his presence today, which I have

3        done occasionally but not often.

4           How does it work?  What do you propose?

5           MS. GASTON:  Yes, Your Honor.  The first thing I would

6        say is all of the options that you just mentioned are

7        available to the Court.  There are the options to -- the Court

8        could admonish the defendant, the Court could pursue financial

9        penalties.  The Court could, like in the *Stone* case, determine

10       that if the defendant violates this order then it's

11       appropriate to modify his conditions of release.

12          THE COURT:  What would be the procedural posture?  I'm

13       sorry.  Would it be an order to show cause?  The Court should

14       sua sponte find a violation?

15          MS. GASTON:  Either of those things is possible,

16       Your Honor.  The Court could take action sua sponte or the

17       government could move.  But what I would say is that is a

18       hypothetical that the defendant is going to violate the order,

19       and I would suggest in the first instance that we get in place

20       an order to see if --

21          THE COURT:  An order is sort of pointless if you don't

22       have a mechanism to enforce it.

23          MS. GASTON:  And as I said, Your Honor, there is an

24       array of options for enforcement.

25          THE COURT:  Mr. Lauro, assuming I were to issue such an

order and there was an allegation of a violation, what would
be the proper procedural posture?  Again, I know you disagree
that there should be an order, but assuming there was such an
order.

MR. LAURO:  Here's the problem.  It's asymmetrical.  It
doesn't prevent Joe Biden from making statements --

THE COURT:  Joe Biden is not a party to this court,
neither is he under --

MR. LAURO:  I'm sorry, Your Honor?

THE COURT:  He's not a party to this case; he's not
subject to conditions of release.

MR. LAURO:  Well, I understand.  We're not talking
about conditions of release.  We're talking about a censorship
order, and gag orders traditionally have applied to both
sides.  So what the prosecutors are not suggesting is that
President Biden would equally be subject to a censorship --

THE COURT:  I want you to answer my question.

MR. LAURO:  How to enforce an order in the middle of a
campaign is impossible under the circumstances that they've
alleged.  It's actually impossible.  How can Your Honor either
fathom or create an order that deals with all the issues that
might come up?

    Let me give you an example.  President Trump wants to
criticize Vice President Pence for his activities as vice
president.  Is he allowed to do that?  Is that disparaging?

1    Is that witness intimidation?  He says something contrary --

2         THE COURT:  I'm going to get to that, Mr. Lauro.  I'm

3    going to get to the parameters and the contours of any

4    proposed order and what type of speech it affects and what

5    type of speech it doesn't.

6    What I'm asking you for at this point is were there an

7    order, what is the procedural posture that you believe would

8    govern enforcement of such an order.

9         MR. LAURO:  Your Honor, that is impossible to say

10   because I can't conceive of an order that would be lawful.

11   Obviously, we would appeal it immediately.  But the bottom

12   line is what we're talking about is a procedure where Your

13   Honor is entertaining an order of the Court which, if

14   violated, would have civil or criminal consequences.

15   However, under the circumstances that the prosecutor has

16   described -- and she's not answered a single question in

17   response to your questions in terms of how this would be

18   organized -- it's absolutely ridiculous to think of an order

19   that would prevent a candidate from speaking out on these

20   issues.

21   I don't know what Your Honor would do under the

22   circumstances, but I do know that there's no limits to the

23   kind of order that's being suggested.  It's not narrowly

24   tailored, it's completely vague, it's overbreadth, it violates

25   every single aspect of the First Amendment.  You can't come

up with a better hypothetical for violating the First
Amendment than what these prosecutors have suggested under
the circumstances.

So I can't solve your problem, Your Honor, because in my
view the issue is there should not be an order under any
circumstances.  We have a free society where people can speak
freely.  What President Trump cannot do is violate the
conditions of his release.  He's not done that.  No one has
done that.  There's been no threats.  There's been no
accusations against any kinds of witnesses.  There's been
nothing that amounts to intimidation.

What you have put in place, respectfully, is working.
This --

THE COURT:  I'm going to have to take issue with that,
Mr. Lauro.

MR. LAURO:  Well, you know, it's politics, Your Honor,
and people say vituperative things or colorful things in
politics.  And that's what's going on.

THE COURT:  Politics stops at this courthouse door.

MR. LAURO:  Absolutely.  And there's no politics in
this courtroom.  But there is politics out there.  There's a
presidential election going on right now.

THE COURT:  All right.  Mr. Lauro --

MR. LAURO:  And people are entitled to speak about --

THE COURT:  -- I have some particular questions about

1   the specific type of statements that have been made at issue,

2   but I'm going to ask the government some things first.

3        MR. LAURO:  But one other thing if I may, Your Honor.

4   The harm that's being suggested by the prosecution or the

5   Biden administration is completely speculative and conclusory.

6   They have not come forward with any identifiable witness who

7   says I feel intimidated by these political discussions.  They

8   have not come forward with any data suggesting that the jury

9   pool is prejudiced in any way.

10        THE COURT:  The government filed along with its motion

11   redacted information from people who are involved in this case

12   who attested to what happened to them after they participated

13   and spoke out.  That's not sufficient?

14        MR. LAURO:  Of course not, Your Honor.  First of all,

15   that predated this case.  Second of all, President Trump's

16   speech cannot be censored by Your Honor because of some third

17   party that does something outside of his control.  That's

18   abhorrent to the First Amendment.  Are we going to tell

19   Americans they can't speak because there's a possibility that

20   some crazed person might do something inappropriate?  That

21   would end the First Amendment as we know it.

22        THE COURT:  All right.  Thank you, Mr. Lauro.  At this

23   point I'd like to review and discuss some of the statements

24   that Mr. Trump has made since his indictment, including some

25   that he made after the government filed this particular motion

1   for an order.

2        In my view the statements fall into roughly five

3   categories.  The first, statements about the District of

4   Columbia and its jury pool; the second, statements about the

5   Biden administration or the Justice Department; the third,

6   statements about Special Prosecutor Smith and his staff; the

7   fourth, statements about judges and their staff; and the fifth

8   is statements about political witnesses.

9        Now, I think our discussion would be most productive if I

10  walk through each of these categories.  So the first is

11  statements about the District of Columbia and the jury pool.

12  So let's begin with Mr. Trump's statements about the District

13  of Columbia.

14       On August 6, 2023 he posted this statement on social media:

15  "No way can I get a fair trial, or even close to a fair trial

16  in Washington, D.C.  There are many reasons for this but just

17  one is that I am calling for a federal takeover of this filthy

18  and crime-ridden embarrassment to our nation where murders

19  have just shattered the all-time record, other violent crimes

20  have never been worse, and tourists have fled.  The federal

21  takeover is very unpopular with potential area jurors but

22  necessary for safety, greatness, and for all the world to

23  see."

24       I don't think there's much question that calling the

25  District of Columbia a filthy and crime-ridden embarrassment

1    to our nation disparages the District and the people who live

2    in it, including those who could eventually make up the jury

3    pool in this case.  The government argues that such statements

4    must be prohibited lest they cause members of the D.C. jury

5    pool to become biased against Mr. Trump.

6        So, Ms. Gaston, let's assume that these statements have

7    affected some D.C. residents' impartiality.  Why can't that

8    problem be addressed through narrow measures such as careful

9    voir dire or cautionary jury instructions?

10            MS. GASTON:  Yes, Your Honor.  The issue there is that

11   *Sheppard* stands for the principle that the Court has an

12   obligation to prevent prejudice to the venire if it's possible

13   to do so, rather than just trying to fix it on the back end.

14   And the government fully expects the Court to engage in

15   searching voir dire as we suggested in a more recent motion.

16       But that doesn't solve the -- that doesn't really fix the

17   problem.  And it's not really fair for the defendant to issue

18   repeated public statements about the venire in the District of

19   Columbia and then later complain that jurors know about his

20   statements criticizing the venire in the District of Columbia,

21   which is no doubt what he plans to do, as he has stated

22   repeatedly that he intends to try to change venues.

23            THE COURT:  All right.  Mr. Lauro, just to clarify on

24   this limited question.  Do you disagree or agree that

25   Mr. Trump's statements could be understood as disparaging the

1    District of Columbia?

2         MR. LAURO:  Totally disagree, Your Honor.  What he is

3    disparaging is the Biden administration that has allowed this

4    great city --

5         THE COURT:  That's not what he said.  That's not what

6    he said.

7         MR. LAURO:  It's what --

8         THE COURT:  No, he called the District a filthy and

9    crime-ridden embarrassment to our nation.  I don't see

10   anything about the president in there.

11        MR. LAURO:  He's deeply concerned about what's happened

12   to the District of Columbia -- I may be the only person in the

13   well of this courtroom that's served as an advisory --

14        THE COURT:  I -- yes.

15        MR. LAURO:  -- commissioner in the District of

16   Columbia --

17        THE COURT:  Before it became a filthy and crime ridden

18   embarrassment?

19        MR. LAURO:  Well, Your Honor, before the Biden

20   administration allowed crime to go to the extent that it has.

21   And that's a perfect example.  And there's laughter in the

22   courtroom, and that's fine.  But the reality is, Your Honor,

23   that President Trump is entitled to speak out about what's

24   happened to the District of Columbia in the last three years

25   since the Biden administration has been in office.  And no one

1    can doubt that crime has gone up and the quality of life of

2    the people in the District of Columbia has been implicated, as

3    well as everybody who's a tourist coming to this great city.

4    Mr. Trump is allowed to speak out on those issues.

5        Now, his language may be language that the prosecution

6    doesn't like, but that's part of living with the First

7    Amendment.  He's entitled to draw attention to the fact that

8    there are deep problems in this city that need to be addressed

9    that haven't been addressed by the Biden administration.

10   That's in no way a suggestion or some kind of defamatory

11   comment with respect to the people that live in this great

12   city.

13       And by the way, if you suggest, as the prosecution

14   suggests, that it's an attack on jurors, then they would be

15   likely to be biased against President Trump, not for him.  So

16   the reality is that these comments on public policy highlight

17   why an order of censorship is impossible to enforce,

18   impossible to fathom.

19       But I don't look at those statements in any way as

20   disparaging as to the people of the District of Columbia.  It

21   goes to the people who are running the District of Columbia.

22           THE COURT:  Well, those statements can be a

23   double-edged sword when they are considered in light of a

24   motion to change venue.

25           MR. LAURO:  But isn't that the problem with censorship?

1    Isn't that the problem?  Because people --

2              THE COURT:  Mr. Lauro, you keep saying censorship.

3              MR. LAURO:  Right.

4              THE COURT:  There is no question that a court is

5    entitled to draw restrictions on a defendant's behavior and a

6    defendant's speech pending trial.  So you keep talking about

7    censorship like the defendant has unfettered First Amendment

8    rights.  He doesn't.  So -- I mean, you can keep using that

9    term for whatever reason you want to, but we're not talking

10   about censorship here; we're talking about restrictions to

11   ensure that there is a fair administration of justice in this

12   case.

13             MR. LAURO:  Your Honor, a prior restraint on

14   content-based political speech is censorship.  I think I'm

15   entitled to say that.  Whether you want to call it a gag

16   order -- if that's a better description, that's fine.

17        But what does a gag order do?  It censors speech.  And the

18   bottom line here is that as Your Honor struggles with these

19   comments, I think it's very helpful for all of us to see how

20   difficult it would be.  For example, if Your Honor entered an

21   order along the lines that the prosecution has suggested,

22   would that posting violate the order?

23             THE COURT:  If I were to enter an order saying he

24   couldn't disparage the District of Columbia, it might.

25             MR. LAURO:  It might.  But that chills speech during a

1    political campaign.  That's the problem.

2            THE COURT:  What would --

3            MR. LAURO:  That's the problem.

4            THE COURT:  But wait -- no.

5            MR. LAURO:  Okay.  I'll wait for you.

6            THE COURT:  An order such as the Government has

7    requested -- and I'm not by any means suggesting I would enter

8    an order having to do with the District --

9            MR. LAURO:  Right.

10           THE COURT:  -- of Columbia -- that would not stop

11    Mr. Trump from saying the Biden administration has neglected

12    the city, the Biden administration has resulted in all sorts

13    of problems for the District of Columbia.  That is different

14    from saying the District of Columbia is a filthy crime-ridden

15    embarrassment to the nation.  Those are two different types of

16    statements.

17           MR. LAURO:  So now we're going to have a court

18    directing how a presidential candidate should talk about

19    issues relative to the campaign.

20           THE COURT:  Under the order in this case, a defendant

21    would have to curb their speech so as to comply with an order.

22    And it is not a difficult or impossible task.

23           MR. LAURO:  But as Your Honor said, it might violate.

24    That's the problem with violating the First Amendment.  It

25    might violate it.  So now we're going to have a situation

1    where a presidential candidate cannot say that Washington,

2    D.C., is crime ridden and infested with rats even though we

3    know factually that's the truth.  So I consider that

4    censorship, Your Honor.

5        The truth is that anybody who lives in this city right now

6    understands what's happened in the last couple of years, and

7    if President Trump cannot speak to that issue, then he's not

8    able to talk about the leading questions in the campaign.  And

9    that's what's so harmful about what the prosecution is trying

10   to do.  They're trying to squelch political speech.

11       THE COURT:  Okay.  I'll get back to that.  Did you want

12   to respond to that, Ms. Gaston?

13       MS. GASTON:  Yes, Your Honor, there are multiple things

14   I'd like to respond to.  So what Mr. Lauro is saying is that

15   the defendant is above the law and he is not subject to the

16   rules of this court like any other defendant is.

17       So I'd like to talk first about Mr. Lauro's statement that

18   the defendant can't campaign if such an order is in place.

19   That's just not true.  All this order would do is prevent him

20   from using his campaign as an opportunity to broadcast

21   materially prejudicial statements about this case, statements

22   that risk improperly influencing witnesses and jurors.

23       The post that Your Honor just used is an example.  That was

24   not a criticism of the District of Columbia in general or the

25   Biden administration's governance of the District of Columbia.

1    That was attacking the jury pool in this case.  It explicitly

2    says it's about his trial in this district.

3         THE COURT:  All right.  I know you have some more

4    general comments, responses with regard to the political

5    speech issue, but there are five categories of statements, and

6    I want to get through them, and we just did one.  So let me

7    ask you while you're up here about statements about the Biden

8    administration or the Justice Department.

9        As I've said before, Mr. Trump, as someone under criminal

10   indictment, does not have unfettered First Amendment rights

11   when exercise of that right conflicts with his conditions of

12   release, the protection of witnesses, and the administration

13   of justice.  But I do have some concerns about the breadth of

14   the order that the government proposes.

15       Mr. Trump has repeatedly referred to the President of the

16   United States and the Department of Justice using such terms

17   as "Crooked Joe Biden" and the "Department of Injustice."

18   These kinds of statements would seem to fall within the

19   category of disparaging statements, as your motion lists them,

20   about one party, the government.

21       But again, wouldn't that be casting a rather broad net?

22   How would this kind of name calling affect the administration

23   of justice in this case?  And I'm simply referring here again

24   to the second category, which is name calling of the president

25   and Department of Justice.  I haven't gotten on to witnesses

1    and court staff and so on.

2         MS. GASTON:  So let me talk about that category in two

3    parts, because the first part, criticizing President Biden, is

4    an example of how this order really doesn't restrict the

5    defendant.

6         THE COURT:  I'm going to interrupt you.  So would

7    saying "Crooked Joe Biden," does that violate the order?

8         MS. GASTON:  So, Your Honor, the defendant talks about

9    "Crooked Joe Biden" all of the time.  His Truth Social page is

10   replete with that and other criticisms of President Biden.

11   That's the majority of his posts.  The vast majority of his

12   speech would be untouched.

13        THE COURT:  So your answer to my question then is, no,

14   that would not violate the order?  "Crooked Joe Biden"?

15        MS. GASTON:  His criticisms of "Crooked Joe Biden" are

16   not.

17        THE COURT:  What about the "Department of Injustice"?

18        MS. GASTON:  Your Honor, that does present a concern

19   that a juror will think, oh, the Department of Justice is

20   crooked.  But let me just -- I want to sort of confront one

21   thing head on that Mr. Lauro said, which is he suggested that

22   the government's criticisms of the post attacking special

23   counsel's office or prosecutors was because we didn't like

24   what the defendant was saying.  That's not what that is about.

25   Our concerns about those posts or the posts about the special

1    counsel's office or the Court are not because we're trying to

2    defend ourselves or defend the Court.  It's because of a

3    concern that a juror will come to jury selection and not be

4    able to follow the Court's instructions because of having read

5    these things.

6        THE COURT:  But, why wouldn't we be able to elicit that

7    through voir dire?

8        MS. GASTON:  We will certainly get at that through voir

9    dire, Your Honor, but *Sheppard* stands for the principle that

10   we can't just allow that to happen up until the point of voir

11   dire, allow the jury pool to be prejudiced and then try to

12   solve it on the back end.

13       THE COURT:  But again, I am -- Mr. Lauro has a point

14   that this order is broad.  What are disparaging statements?

15   So I'm trying to get a sense from you.  So "Crooked Joe Biden"

16   would not be a violation, but the "Department of Injustice"

17   would?

18       MS. GASTON:  He can criticize President Biden to his

19   heart's content, Your Honor, because President Biden has

20   nothing to do with this case.

21       THE COURT:  All right.  I take the basic message of

22   these statements -- and I'm still here on the subject of

23   statements about President Biden and the Department of

24   Justice.  I take the basic message of the statements to be

25   that Mr. Trump believes that his prosecution is politically

1    motivated.  But how do they materially prejudice this

2    proceeding?  You just talked about a juror coming in here, but

3    again, I think that issue could be developed and those

4    feelings would be raised and fleshed out during voir dire.

5        It seems awfully close to his right to assert his innocence

6    and criticize the government.  And the Supreme Court

7    emphasized in *Gentile* that speech critical of the exercise of

8    the state's power lies at the very center of the First

9    Amendment.

10       So again, the problem with your order as it is written at

11   the moment is it would seem to include statements like

12   "Crooked Joe Biden" because it's disparaging, and there's an

13   argument to be made that that's legitimate, I suppose,

14   criticism of a political opponent.  What's the answer to that?

15       MS. GASTON:  Your Honor, the answer to that is there is

16   a proper place for those claims in a criminal case, and that

17   is for the defendant to file the selective and vindictive

18   prosecution motion that he has stated that he is going to

19   file.  The proper place in a criminal case for the claims

20   about the Court were in --

21       THE COURT:  I'll get to those.  But I mean, there's a

22   political campaign going on, as Mr. Lauro reminds us.  How

23   does his criticism of the Biden administration and the

24   Department of Justice factor in to my assessment as to whether

25   he's violated the protective order if I simply issue an order

1  that says he's not allowed to make disparaging statements as

2  you've described them in the order?  Won't "Crooked Joe Biden"

3  or the "Department of Injustice" cause a problem?

4       MS. GASTON:  Yes.  Your Honor, if we look at the order,

5  disparaging and inflammatory or intimidating statements about

6  any party, witness, attorney, court personnel, or potential

7  jurors.  So we're talking about the participants in this case.

8  And so I can't say it again, the "Crooked Joe Biden" thing,

9  he's not a participant in this case.  The defendant can say

10  that.

11       THE COURT:  All right.  So I'm going to move on to the

12  third category, statements about the special prosecutor and

13  his staff.

14       MR. LAURO:  May I respond?

15       THE COURT:  Yes, you can.  You may.  I do take your

16  point about the problems with the very wide category of

17  disparaging.  But can you confine your response to the issue

18  of President Biden and the Department of Justice because I'm

19  moving on to statements about the special prosecutor.

20       MR. LAURO:  Thank you, Your Honor.  Thank you for the

21  time to respond.

22    What if President Trump were to say "Crooked Joe Biden, who

23  was bribed by millions of dollars, also approved of this

24  prosecution which I believe is politically motivated to

25  interfere in the election"?  What if he said that?  Does it

1    violate the prosecutor --

2            THE COURT:  Well, address your question to me.

3            MR. LAURO:  I'm sorry, Your Honor.  The reality is,

4    does it violate the order as joined by the prosecution?

5            THE COURT:  Ms. Gaston.  And you all can speak into the

6    microphone at counsel table if you like or come on up.

7            MS. GASTON:  Yes, Your Honor, because that is falsely

8    suggesting that President Biden directed this prosecution,

9    which he did not.  And that could prejudice the venire.

10           THE COURT:  Well, the problem, Ms. Gaston, is there is

11   a -- you know, there's an argument to be made the Department

12   of Justice is, you know, under the control of the Executive

13   Branch and -- I mean, it's going to be part of a campaign.

14   Is it your position that a statement by the defendant that this

15   campaign is politically motivated and brought about by his

16   political rival, that violates the gag order?

17           MS. GASTON:  That -- I'm sorry?

18           THE COURT:  A statement such as the one Mr. Lauro just

19   proposed or hypothesized, that the prosecution of the

20   defendant is directed by the president through his Justice

21   Department to silence a political rival or eliminate a

22   political rival, that would be barred by the order?

23           MS. GASTON:  Your Honor, by the plain language of the

24   order, it would not because Joe Biden is not a party, witness,

25   attorney, court personnel or potential juror.

1          THE COURT:  There's your answer, Mr. Lauro.

2          MR. LAURO:  They said in their papers, and they said

3     that what President Trump said was false, that Biden did

4     not --

5          THE COURT:  Get closer to the microphone.

6          MR. LAURO:  And they used that as an example of

7     something that would violate the order.  So they have to read

8     their own papers before they respond to the Court.

9        But the other issue is what if President Trump said "Hunter

10    Biden is allowed to sue witnesses in his case, and his lawyers

11    are allowed to talk publicly about Hunter Biden's case, but my

12    lawyers cannot, and I have an order against me where my speech

13    is being regulated"?  What if he said that during a political

14    campaign?

15         THE COURT:  You know, actually, Mr. Lauro, I have a

16    list of hypothetical statements I'm going to get to in a

17    moment, but not yet.

18         MR. LAURO:  Okay.

19         THE COURT:  As far as I know, Hunter Biden --

20         MR. LAURO:  We're just trying --

21         THE COURT:  -- is not before this court --

22         MR. LAURO:  I know, Your Honor.  But we're just trying

23    to struggle with the circumstances of what's being proposed

24    here.  And I know you're trying to struggle with it as well,

25    and you're asking excellent questions.  I'm sitting here

1     thinking George Orwell would have a field day with what we're

2     hearing from these prosecutors.

3              THE COURT:  George Orwell would definitely have a field

4     day.

5        All right.  The third category is statements about the

6     special prosecutor and his staff.  And Mr. Trump has

7     repeatedly targeted individual members of the prosecution in

8     this case.  In the examples cited in the government's motion,

9     the defendant repeatedly refers to Special Counsel Jack Smith

10    as "deranged" and his staff as "thugs," and he did so again

11    last night.  These statements are more troubling.

12       I know that counsel for both the defense and the government

13    have spent significant time as prosecutors.  And so I think

14    that we all understand that at some point a defendant's

15    targeted disparagement of government officials can go from

16    permissible criticism of those officials to encouraging harm

17    against them.  "Will no one rid me of this meddlesome priest"

18    comes to mind.

19       If you call certain people "thugs" enough times, doesn't

20    that suggest, Mr. Lauro, that someone should get them off the

21    streets?  How is calling a civil servant, doing their job, a

22    job which they've done through several administrations, a

23    thug, necessary to advance a political debate or campaign?

24       And I'm trying to understand the First Amendment values

25    here, because if the message Mr. Trump wants to express is my

prosecution is politically motivated, what additional purpose
does it serve to use derogatory labels about the prosecutors?
Again, public servants who are doing their job as they have
been doing for many years.  And not just derogatory labels but
highly charged language.  What does that advance?

MR. LAURO:  Yeah.  So Harold *Ford*, who was a
congressman from Tennessee, African American congressman,
accused his prosecutors of being racist.  And the Sixth
Circuit court of appeals said he's entitled to do that in
connection with his political activities.  Now, the words used
here are "deranged," which I looked up in Merriam dictionary.
That means insane or out of your mind.  "Thug" is another word
for bully.

I think it's fair for President Trump to say, number one,
this prosecution is insane and deranged, and number two, that
he is being bullied in the process, throughout these
proceedings, where the government has denied him due process
and effective assistance of counsel.  He's entitled to make
those statements.

But most importantly, even a criminal defendant, believe it
or not, still has First Amendment rights to criticize the
prosecutor that's bringing the case.  And in this case we have
Jack Smith, who made outrageous, outrageous statements the day
of the indictment trying to link President Trump to violence,
which Prosecutor Smith knew was incorrect and false.  He did

1    everything he could to tamper with this jury pool.  President

2    Trump is entitled to respond by saying that's deranged.

3            THE COURT:  Well, Mr. Lauro, I'm not getting into your

4    opinion as to whether Mr. Smith's statements were true or

5    false.  What I want to know is -- and you were a career

6    prosecutor.  Okay?  You were a career prosecutor --

7            MR. LAURO:  I've been called worse.

8            THE COURT:  -- and I want to know in what kind of case

9    do you think it would be appropriate for a criminal defendant

10    to call the prosecutor a thug and stay on the streets?

11            MR. LAURO:  Your Honor, first of all, whether or not

12    that is language that I would use is irrelevant.

13            THE COURT:  I'm not asking whether you would use it.

14    I'm asking if in a normal criminal prosecution a defendant

15    would be allowed to call the prosecutor a thug?

16            MR. LAURO:  Your Honor, this is not a normal

17    prosecution.  Look at it a moment -- and I know you were a

18    defense lawyer.  Look at it a moment from what President Trump

19    sees.  Okay?  He has Joe Biden in November 2022 saying I'm

20    going to take out President Trump, okay?  He says that.  He

21    makes a public statement.  Then we have a special prosecutor

22    appointed, not just any prosecutor but a prosecutor that went

23    after Bob McDonnell, a leading Republican candidate, and was

24    ultimately convicted, only to have his case reversed nine

25    nothing by the Supreme Court.

1          Then we have a prosecution here which is unprecedented,

2    which has never been brought in the history of the

3    United States, using statutes in all kinds of crazy ways to

4    take President Trump out of an election cycle.  What is a

5    candidate supposed to do under those circumstances?  Is he

6    supposed to just sit quietly?

7          And what the government is proposing here is an order not

8    just directed against President Trump but against the American

9    electorate that wants to hear from President Trump under these

10   circumstances.  What's happening in this courtroom right now

11   will affect this country for years to come.  Whether -- and

12   President Trump is entitled to respond to it.  This is the

13   first time we've had a sitting administration prosecute a

14   political opponent.  These are grave --

15          THE COURT:  Mr. Lauro, no.  I'm going to interrupt you.

16          MR. LAURO:  Okay.

17          THE COURT:  You have said that.  You have said it

18   repeatedly.  I have heard it.  Obviously, you have an audience

19   other than me in mind.

20          MR. LAURO:  I don't, Your Honor.

21          THE COURT:  I have heard you say now multiple times

22   that this is an unprecedented prosecution.  What I want you to

23   do is to answer my question as to why a criminal defendant

24   should be allowed to call a prosecutor a thug.  There are many

25   words you can use to criticize a prosecution or a prosecutor.

1    But when you start using language like "thug" to describe

2    someone doing their job, that wouldn't be allowed by any other

3    defendant.  And just because this defendant happens to be

4    running a political campaign does not give him the right to

5    use any kind of language that he wants.

6        So tell me how the word "thug" is justified here.

7    Politically based prosecution.  I mean, why this kind of

8    language that frankly risks a real possibility of violence?

9            MR. LAURO:  It certainly doesn't suggest that and

10   there's no imminent threat.  But what does someone do in the

11   face of oppression?  What kind of language do you use in a

12   system that now is bordering on totalitarianism and

13   authoritative actions that are being taken?  What does a

14   citizen say?  What does a citizen say in countries that are

15   veering towards tyranny?  What do you say?

16       What do we say in the history of the United States when

17   there have been issues of government oppression and brave

18   citizens have risen and said very, very vituperative speech in

19   response to powerful people that have oppressed rights?  What

20   is a citizen supposed to say when he's denied due process?  I

21   don't know, Your Honor.  I have never been confronted with

22   that, thank God.

23       But in President Trump's mind, that's what he's facing

24   right now.  He is facing every single right being taken away

25   from him: the right to due process, the right to free speech,

1    the right to effective assistance of counsel.

2         THE COURT:  Mr. Trump tweeted, posted -- whatever you

3    call it -- last night that he would be -- he's in Iowa

4    campaigning today while we are sitting here debating as to

5    whether he has violated his conditions of release and whether

6    there should be limits placed on his speech.  So, please,

7    Mr. Lauro, let's tone this down a bit.  Okay?

8         MR. LAURO:  Your Honor, it's toned down, but as an

9    advocate -- and my voice is toned down.  I know that Your

10   Honor has suggested before that it was not toned down.  My

11   voice is very toned down.  But I'm entitled to make arguments

12   on behalf of my client.  But if Your Honor wants to censor my

13   speech too --

14        THE COURT:  You're entitled to make arguments, but I

15   would ask that you answer my questions.

16        MR. LAURO:  And, Your Honor, the question is, under the

17   circumstances what is someone supposed to do when faced with

18   those circumstances?  And that was the word that President

19   Trump chose.  Now, it may not be the word that you like, or it

20   may not be the word that the prosecution likes, but he's

21   entitled under the First Amendment to make those statements,

22   particularly in connection with the circumstances of this

23   case.

24        THE COURT:  So what about statements disparaging the

25   prosecutors' families?  I don't think the government cited

1   this in their motion, but I believe Mr. Trump has publicly

2   targeted Special Counsel Smith's family in general and his

3   spouse in particular.  In what world is it permissible,

4   Mr. Lauro?  In what world, in what case would it be allowable

5   for a criminal defendant to attack a prosecutor's family?

6        MR. LAURO:  Your Honor, I don't think there was an

7   attack on a family member.  What it was was an indication that

8   there might be political bias in light of Mr. Smith, and

9   certainly a First Amendment exercise of speech would allow a

10   criminal defendant to observe that a prosecution is

11   politically biased --

12        THE COURT:  By mentioning their spouse, who has nothing

13   to do with this case?

14        MR. LAURO:  Well, it deals with political issues

15   relating to Mr. Smith.  And by the way, Your Honor, in terms

16   of whether or not those types of statements would violate an

17   order of the Court, there's no order in place that limits

18   President Trump from indicating that this is a politically

19   biased prosecution by a politically biased prosecutor.  He's

20   entitled to do that.  I know we're all uncomfortable about

21   that, but he's entitled to do that.

22        THE COURT:  I'm not uncomfortable.  I want to know why,

23   in criticizing the prosecution against him, he would feel it

24   necessary and you feel it appropriate for him to talk about a

25   prosecutor's spouse or family.

1          MR. LAURO:  You're asking two different questions.

2     You're asking whether I personally --

3          THE COURT:  No, no.  I'm asking whether you as his

4     lawyer standing here are going to tell me that that speech is

5     appropriate and should be allowed despite the fact that your

6     client is under conditions of release.

7          MR. LAURO:  Your Honor, what I'm saying is that it

8     meets the boundaries of the First Amendment.  I'm not saying

9     whether or not it's appropriate from a lawyer's standpoint,

10    okay?  My views as an attorney may be widely different than my

11    client's views as a candidate.  But he is certainly entitled

12    to describe why he believes this prosecution is politically

13    motivated.

14         THE COURT:  And he's allowed to do that in unfettered

15    terms, even if it means mentioning a prosecutor's family.

16         MR. LAURO:  I think it comes part and parcel of the

17    First Amendment.  I mean, certainly in my situation, people

18    have attacked me.  I'm not able to take any kind of action.

19    That's part of the reality of being involved in a case of this

20    nature.  And it's clearly within the First Amendment.  It's

21    not something that as an officer of the court that I would

22    engage in, and Your Honor knows I haven't engaged in anything

23    like that.

24         But President Trump firmly believes, firmly believes that

25    these proceedings are politically motivated by a politically

1    motivated prosecutor, and he has pointed out examples of how

2    this prosecutor is politically motivated.

3           THE COURT:  Ms. Gaston?

4           MS. GASTON:  Thank you, Your Honor.  I think you

5    identified the reason why the government paired "disparaging"

6    with "inflammatory" in the proposed order.  Because what the

7    defendant is doing here is not just disparaging; it is

8    inflammatory.  He knows and understands the effect of these

9    statements, and it is that they are amplified, it is that they

10    motivate people to threaten others, and it not only prejudices

11    the jury pool, but in the case of witnesses -- and I know

12    that's Your Honor's final category so I will save most of this

13    for that -- but in the case of witnesses, it threatens and

14    chills witnesses too.

15    And one thing I would like to say is that the defendant has

16    demonstrated that he has the ability to regulate his speech.

17    There is no reason to use false and inflam- -- to use

18    disparaging and inflammatory rhetoric to make these points in

19    such a prejudicial way.

20    So in the September 17th *Meet the Press* interview in which

21    the defendant said false things about the potential testimony

22    of one of the witnesses in this case, he also demonstrated his

23    ability to decline to answer questions when it suits him.  He

24    was asked repeatedly by the interviewer about his conduct on

25    the day of January 6, 2021, and he said, "Why would I tell you

1    that?  I'm not going to tell you anything."

2        He is able to not say these things.  But he is using his

3    campaign as a platform to make these statements with the

4    intention of trying the case in the court of public opinion

5    rather than in this courtroom.

6        THE COURT:  All right.  I want to turn to the fourth

7    category, which is the statements about the Court and its

8    staff.  The government's motion reports that at various times

9    Mr. Trump has issued or reposted statements labeling me as "a

10   fraud dressed up as a judge," "a radical Obama hack" or "a

11   biased Trump-hating judge."  And I noted that he did so again

12   last night.

13       Now, I am not the first judge to whom Mr. Trump has applied

14   such labels.  And candidly, I am less concerned about

15   shielding myself from those kinds of statements.  But as I've

16   already noted, Mr. Trump's free speech rights do not extend to

17   speech that knowingly invites threats or harassment,

18   especially when it could compromise the integrity of judicial

19   proceedings or result in the harassment or threats to people

20   who are simply doing their jobs.

21       So I was deeply disturbed to learn that just last week,

22   while the motion for a gag order in this case was pending,

23   Mr. Trump publicly targeted a staff member of a judge

24   presiding in another case.  During the trial in that case, he

25   made a social media post that identified the staff member by

1    name and included a photograph of her with Senator Schumer,

2    which apparently led Mr. Trump to call her "Schumer's

3    girlfriend" and claimed "she was running this case against

4    me."

5        The judge in that case immediately ordered the removal of

6    the post and prohibited any further public statements about

7    members of his staff.

8        Now, Mr. Lauro, I know you're not counsel in that case, but

9    do you think that a defendant posting a photograph of a

10   judge's law clerk on social media is acceptable?

11       MR. LAURO:  Your Honor, that is something that I

12   believe the Court in New York dealt with.

13       THE COURT:  I'm not asking about what happened in

14   New York.  I'm asking do you think it would be appropriate --

15   all right.  Let me give you a hypothetical.  Would it be

16   appropriate for Mr. Trump to post a photograph of a member of

17   my staff online while this case is pending?

18       MR. LAURO:  If President Trump asks for my advice with

19   respect to that issue, I would advise him strongly not to do

20   that, for a number of reasons.  So in answer to your

21   question --

22       THE COURT:  That really wasn't my question.

23       MR. LAURO:  Well, you know what my answer is.

24       THE COURT:  My question is would it be appropriate to

25   do that?

1          MR. LAURO:  I'm advising the Court that what I would

2     tell my client to do is not to do something like that.

3          THE COURT:  And why?

4          MR. LAURO:  Because, obviously, I believe that that's

5     not something that should be done in the course of a

6     campaign -- in the course of a court proceeding.  And that was

7     directed and that was ultimately addressed by the court in

8     New York.

9          THE COURT:  But that's what we're dealing with --

10          MR. LAURO:  But that has nothing to do with --

11          THE COURT:  Yes, Mr. Lauro, it does have something to

12     do with this case --

13          MR. LAURO:  Well, it's nothing --

14          THE COURT:  -- because that's the kind of behavior

15     we're dealing with here.

16          MR. LAURO:  But nothing has happened like that in this

17     case and nothing like that will happen.  What President Trump

18     has addressed is the issue of potential judicial bias, which

19     we raised very professionally and very appropriately with Your

20     Honor, and very respectfully, which is something we had to do

21     as a matter of our oath of office to adhere -- and represent a

22     client zealously.  And it was addressed by the Court.

23        But in terms of judicial bias, once again, that's something

24     that the Supreme Court dealt with in the *Landmark* case, which

25     said, you know, yes, judges are subject to criticism, and

1    that's something that is well within the core of the First

2    Amendment.

3         THE COURT:  So I guess even though this incident

4    occurred in another case, I want the parties' position on why

5    I shouldn't issue a similar order as Judge Engoron did in that

6    case, given the defendant's apparent willingness to post

7    personally identifying information, as well as disparaging and

8    obviously untrue remarks about court personnel, even after he

9    was on notice that the government was seeking a gag order in

10   this case.

11       Such behavior puts court staff, who are, again, just doing

12   their jobs, at tremendous risk of harassment, and it is

13   totally unnecessary for Mr. Trump in order for Mr. Trump to

14   publicly proclaim his innocence or to campaign for the

15   Republican nomination.  So in light of the fact that, as you

16   said, you would advise your client not to do it, why shouldn't

17   I have an order that says he can't do it?  Because he did it.

18       MR. LAURO:  There's no need to.  Because if Your Honor

19   makes that kind of admonition, it will be followed, and it has

20   been followed.  Every time that Your Honor has directed us in

21   terms of what you find acceptable, we have conveyed that to

22   the client.

23       So if Your Honor tells me, as an officer of the court, this

24   is what I believe -- and I will, under absolute circumstances,

25   as you have directed, I will instruct my client along with

1    what you have just suggested.

2        And I think the court dealt with that issue in New York.

3    There's no reason for the Court to have to deal with it here.

4    It's not an issue in Washington, D.C.  But the Court's

5    instructions and admonition is heard by all, and I will

6    certainly convey that to my client and he will understand that

7    the expectation is that he abide by Your Honor's instructions

8    in that regard.

9        Everything that's happened in this case, Your Honor, you've

10   had full control over this court, and you've been able to

11   issue orders that have been obeyed and have been followed, and

12   no one is suggesting that there's been a violation of any

13   order.  The prosecution refers to the *Sheppard* case, which was

14   a situation where there was press in the well of the

15   courtroom.  Nothing like that is going on here.  Your Honor is

16   in control of the process.

17           THE COURT:  All right.

18           MR. LAURO:  But I will say, Your Honor, that some of

19   the things written about you have been very complimentary.

20           THE COURT:  Don't believe everything you read.

21       (Laughter.)

22           THE COURT:  Ms. Gaston.

23           MS. GASTON:  Your Honor, Mr. Lauro suggests nothing

24   like what happened in New York has happened here.  That is not

25   true.  The defendant has repeatedly attacked this court in

disparaging and inflammatory ways, and this court has been the
subject of a criminal threat in relation to this case.

We are happy to have the Court enter an order preventing
the defendant from disparaging and inflaming comments
regarding court staff.  But we think that should also be part
of an order expanding it further to protect other parties and
witnesses.

And I'm not sure what Mr. Lauro is getting at in saying he
will convey the Court's expectations to his client.  That is
why we need an order expressing clearly on the record what the
Court's order is, not expectations.

THE COURT:  All right.  I want to talk about the final
category of statements, which is statements about prospective
witnesses in the case.  The government's briefing identifies
several instances of such statements.  I'll go over a few.

For example, on August 5th of this year, Mr. Trump stated
that former Vice President Pence had gone to the dark side, in
quotes, and publicly lied about conversations the two of them
had shared related to this case.

On September 5 of this year Mr. Trump repeated the
assertion that Mr. Pence had gone to the dark side and had
"made up stories about me which are absolutely false."

Mr. Trump also posted on social media a video attacking
former Attorney General William Barr and separately claimed in
an interview that Mr. Barr didn't do his job with respect to

the allegedly rigged election because he was afraid of being impeached.

On September 22, Mr. Trump posted a statement celebrating the retirement of the chairman of the Joint Chiefs of Staff General Mark Milley.  He stated, "This guy turned out to be a woke train wreck who if the fake news reporting is correct was actually dealing with China to give them a heads-up on the thinking of the President of the United States.  This is an act so egregious that in times gone by the punishment would have been death."

And Mr. Trump has said about Georgia's former Secretary of State Brad Raffensperger:  "I appreciate that he said that.  I didn't do anything wrong" during a phone call that was central to the indictment in this case.

The defense argues that these potential witnesses are public figures who have willingly entered into a hearty public debate with Mr. Trump and so are unlikely to be intimidated when Mr. Trump pushes back.  And that in any event, Mr. Trump has a right to engage with them politically.  The defense also claims that none of the statements directly threaten or call for harm to those potential witnesses, and Mr. Trump's speech shouldn't be limited based on speculation about what third parties might do based on the statements.

And the defense counsel further contends that limits on disparaging speech about prospective witnesses as the

1    government proposes is unworkable because the full set of

2    potential witnesses isn't yet known.

3        So I'm going to discuss each of these arguments in turn.

4    Let's start with the point about the witnesses who are

5    identified in the government's motion as being public figures.

6        Mr. Lauro, I take your point that it would be impossible

7    for Mr. Trump to not criticize Mike Pence, for example, since

8    both men are actively campaigning for the Republican

9    nomination.  But it doesn't appear that any of the other

10   potential witnesses in this case fit that description, and I

11   know the government hasn't listed the witnesses or their

12   identities, but I'll get to that issue.

13       So why shouldn't I at least prohibit Mr. Trump from making

14   public remarks about other witnesses who aren't running for

15   president?

16           MR. LAURO:  The government had every opportunity to get

17   affidavits from Mr. Barr, General Milley, or

18   Mr. Raffensperger --

19           THE COURT:  Why should they have to?

20           MR. LAURO:  Well, if they're claiming there is some

21   kind of intimidation, then they should have something more

22   than speculation and conjecture.  For example, all three have

23   been very, very, very prominent in criticizing President

24   Trump, very strongly worded comments.  Two of them have

25   written books about their experiences.  So they've monetized

1    their interaction with President Trump.  None of them have

2    ever suggested that the criticism of President Trump has led

3    to any diminution in their ability to do their job or testify

4    or do whatever they want to do in terms of criticizing

5    President Trump.  Just the opposite.  They give as good as

6    they take.

7            THE COURT:  Really?  And so you're suggesting that

8    Mr. Barr or Mr. Milley have suggested that Mr. Trump should be

9    executed?  Is that what you're suggesting?

10           MR. LAURO:  Well, Your Honor, first of all, the post

11   with respect to General Milley was not that he should be

12   executed.  It related to what was written about in a Bob

13   Woodward book where General Milley described a conversation

14   with the Chinese authorities, the Chinese military, where he

15   said that he would give advance notice if the United States

16   took any action.  Let me just finish, Your Honor.  If I can,

17   you asked me the question, if I can answer.

18           THE COURT:  But you're not answering it.

19           MR. LAURO:  I am answering it.  I am answering it.

20   So what President Trump responded -- and by the way, the

21   description in that book was General Milley, who apparently

22   leaked that information, went around the chain of civilian

23   command, did not tell the president, did not tell the

24   Secretary of Defense, and had a private conversation with our

25   enemy with respect to what the military was going to do.

1    In the middle of a campaign, President Trump, under his First

2    Amendment right, is entitled to say that that's inappropriate.

3    I would never have a joint chief of staff head that's engaging

4    in that kind of conduct.

5        THE COURT:  Sure he is.  Sure he is.  What he's not

6    entitled to say is that kind of punishment would be -- in days

7    gone by, that kind of activity would in days gone by be

8    punishable by death.

9        MR. LAURO:  It's true.

10       THE COURT:  That is an absolute suggestion that that

11   is an appropriate thing to happen.

12       MR. LAURO:  Your Honor, absolutely not.  Again, that's

13   taking words I think a bridge too far.  What he did say is

14   that the seriousness, the seriousness of that kind of

15   misconduct by a joint chief of staff is intolerable in a

16   democratic society where you have the military going around

17   the civilian chain of command -- can you imagine that?  The

18   military ignoring the civilian chain of command and conversing

19   directly with our enemy?  And President Trump in the middle of

20   a campaign is entitled to put the spotlight on it.  The

21   American people are entitled to understand that and understand

22   the consequences of that.  Can you imagine in days going

23   forward --

24       THE COURT:  Mr. Lauro, why is he entitled to do that --

25   why is he entitled to suggest that an appropriate punishment

1    would be death?

2          MR. LAURO:  Because we have a First --

3          THE COURT:  No.  As part of that.  But again, the First

4    Amendment protections must yield to the administration of

5    justice and the protection of witnesses.  And to write in all

6    caps "death" about someone who's a potential witness in this

7    case, doesn't that go too far?

8          MR. LAURO:  Your Honor, first of all, it's true,

9    factually true that in years gone by -- in fact, I think it

10   still may be the penalty.  It could be, where -- the death

11   penalty for treason.  But the bottom line is, what if somebody

12   who commits a murder and is subject to the death penalty and a

13   political candidate says, you know what, what you did, you're

14   subject to the death penalty?  That's factually true.  It's

15   not inciting that somebody's going to take action like that.

16         THE COURT:  That's right up to "Would no one rid me of

17   this meddlesome priest."  If you suggest that someone is

18   deserving of execution, then it's not a far stretch to imagine

19   a situation where one of the millions of followers of this

20   person decides to go ahead and do that.

21         MR. LAURO:  Well, you've hit the nail on the head

22   again.  And the reality of the First Amendment, as I read the

23   First Amendment, and most people do, is you can't be penalized

24   for First Amendment speech because of something someone else

25   can do in a deranged speech.

1      I mean, after all, we had Democratic politicians

2   criticizing a Republican administration, and someone went out

3   and took a gun and shot Representative Scalise.  Are we going

4   to say that Democrats can't criticize Republicans because it's

5   going to create the risk that somebody might do something

6   crazy?

7      And by the way, what President Trump was doing was

8   describing what existed in days gone past and indicating how

9   serious a breach that this was by General Milley.  Apparently

10   he admitted to it to Bob Woodward.

11      So again, Your Honor, again, we're in the zone of clear

12   First Amendment speech, political speech, that we have to

13   tolerate in a free society.  Even though there's criminal

14   prosecutions going on, under the circumstances that's core

15   First Amendment speech.  First of all, there's nothing

16   untruthful about it.  Second of all, under the *Brandenburg*

17   standard, it doesn't incite any type of action against any

18   individuals.

19          THE COURT:  All right.  Thank you.

20      Ms. Gaston.

21          MS. GASTON:  Thank you, Your Honor.  We both know that

22   the tweet or the post about General Milley was a threat.  It

23   was a threat to him, and it was a threat to all witnesses in

24   this case that if you come after the defendant, he will come

25   after you.  And Mr. Lauro is talking about all of these

nuances about chain of command when in truth, other witnesses
have come forward and said that General Milley was following
the chain of command and had permission for these
conversations.

THE COURT:  The problem is that's neither here nor
there.  There may be a legitimate conversation to have, a
debate, or statements to be made about what General Milley did
or didn't do.  That's really none of my concern.  What is my
concern is when potential witnesses are targeted.  And my
concern is using the word "death" in all caps in a post about
a disagreement or a criticism of a potential witness in this
case could incite violence.  But I want --

What is your response to Mr. Lauro's criticism that you
didn't provide any affidavits from either Mr. Barr or General
Milley?

MS. GASTON:  Your Honor, the *Sheppard* and *Gentile* cases
stand for the proposition that this -- of course this
prejudice is speculative.  We're not going to know if these
witnesses are intimidated or if this threatening activity is
intimidating other witnesses until folks testify at trial, and
we may not even know then because they may be chilled in ways
that we do not know.  But it is the Court's duty to prevent
this prejudice from occurring, not to wait and see if it has
happened.

I'd also just like to address a couple things.  So the post

1    about Mr. Raffensperger, who is a witness in this case,

2    misstated what Mr. Raffensperger said.  And it was about the

3    exact topic that Mr. Raffensperger would be expected to

4    testify --

5         THE COURT:  And that troubles me for a couple reasons.

6    It falls in the category of praising a witness with the

7    possible effect that the witness is given a message about what

8    their expected behavior should be.  But it also, because it

9    concerns the subject matter of a witness's testimony, it makes

10   statements about the witness's expected testimony that the

11   government cannot respond to.  And that subject matter is --

12   that testimony should happen in this courtroom, not out in the

13   public sphere.

14       So that's concerning.  But I also have a question with

15   regard to Mr. Trump's statements about Mr. Pence and Mr. Barr

16   in particular.  I'm not only concerned that he's talking about

17   them generally.  And I guess the statement about

18   Mr. Raffensperger is included.  I'm more concerned that he's

19   specifically disparaging what from the indictment appears

20   likely to be the subject matter of the expected testimony.

21       Mr. Trump is not campaigning against Mr. Barr, who by the

22   way previously served in his administration, nor is he

23   campaigning against Mr. Raffensperger or General Milley.  So

24   why should he be making public remarks about them at all as

25   far as it goes to his campaign?  They're not running against

1    him.

2        Mr. Trump is facing felony charges and he does not get to

3    respond to every criticism of him if that response could

4    affect a potential witness.  And that's the bottom line here.

5        His statements also have the very real potential to

6    misstate the facts in this case that are to be determined by a

7    jury, and the government cannot respond.  They can't respond

8    to what he posted about Mr. Raffensperger.  What am I going to

9    do with that, Mr. Lauro?

10        MR. LAURO:  Well, first of all, Your Honor, with

11    respect to General Barr, I think the president is entitled to

12    describe what he would like in an attorney general, and in

13    particular compare how Attorney General Barr conducted himself

14    with what kind of attorney general he would like.

15        THE COURT:  You know, Mr. Lauro, it appears that what

16    we're talking about here is really a question of language and

17    semantics, because no one -- I have not said, and I don't

18    think the government has said, that Mr. Trump cannot respond

19    to criticism or that Mr. Trump cannot campaign.  What the

20    issue is here is the language that Mr. Trump is using.  And

21    that's -- you know, he doesn't get to use all the words.

22        MR. LAURO:  Yeah.

23        THE COURT:  He is constrained.  And he is constrained

24    by not being able to use words that could be communicated as

25    threats or efforts to affect testimony.

1          MR. LAURO:  That's the problem with censorship, is that

2     the government doesn't like the language that the person is

3     using.  So none of these are threats, obviously --

4          THE COURT:  Well, no.  No.  I disagree.  I don't think

5     it's obvious.

6          MR. LAURO:  I don't think anybody feels threatened;

7     otherwise they would have come before Your Honor.  President

8     Trump certainly has a history of using forceful language and

9     creative language to draw attention to the problems of this

10    country.  That's what he's done since 2016.  He has every

11    right to criticize Mr. Barr.  In fairness to Mr. Barr, he was

12    limited by prosecutors in the Department of Justice who

13    obstructed investigations into election fraud.

14         But the bottom line is that President Trump is entitled to

15    say things that are critical of Mr. Barr and Mr. Raffensperger.

16    These are people in the political sphere.  These are public

17    officials.  We're entitled to criticize people who exercise

18    power as a public official.  There's nothing bad about that.

19    If anything, Your Honor, we need more speech, not less speech.

20         The reality is that the overwhelming amount of speech in

21    this case in this district has been anti-President Trump.  You

22    had J6 hearings, you had television, you had all kinds of

23    things.  In terms of the jury pool, if anything, this jury

24    pool is completely biased against President Trump.  To

25    suggest --

1    THE COURT:  And so repeatedly calling the District a

2    filthy crime-ridden embarrassment is going to aid in that

3    effort to make sure the venire isn't further tainted?

4    MR. LAURO:  Well, as I said, it's indicative of what's

5    happened under the Biden administration, and certainly

6    President Trump is going to change that in 2024 and take the

7    rats off the street.  But the bottom line is that what's

8    happened here, and this entire discussion, when you talk about

9    semantics and language, that's the problem that we have with a

10   censorship order.

11   You know what's going to happen, Your Honor?  We are going

12   to be litigating ad infinitum all of these issues instead of

13   dealing with the case.  We should be preparing for jury trial

14   right now instead of having these angels on a pin discussions

15   about what might violate a Biden administration censorship

16   order.  We should be dealing with the issues in the case, not

17   about hypotheticals about what could and could not do to

18   violate an order during a political campaign.

19   And again, Your Honor, one simple solution.  One simple

20   solution.  Let's have this trial after the election and solve

21   the problem.

22   THE COURT:  All right.  Mr. Lauro, your point seems to

23   be that if Mr. Trump were threatening witnesses directly in

24   his statements or telling his followers to threaten witnesses,

25   that would be one thing, but him simply calling certain people

1    out doesn't rise to that level.  But when Mr. Trump has

2    singled out certain people in public statements in the past,

3    hasn't that led to them being threatened and harassed, as

4    demonstrated in the statements attached by the government?

5         MR. LAURO:  Your Honor, that's totally irrelevant.

6    I had Biden surrogates call me deranged and I've had all kinds

7    of --

8         THE COURT:  No, no.  Mr. Lauro, you signed on to this

9    case I assume with full awareness of what that would mean.

10   These are people who are doing their jobs.  The transcripts

11   that were attached are people who were doing their jobs.  And

12   the government's motion cites several of them who averred in

13   the kinds of statements that you've asked for under oath that

14   threats and harassment toward them had increased significantly

15   as a result of Mr. Trump's statements about them.

16     So this statement -- you know, your argument seems to be,

17   well, you know, he's just responding to criticism, he doesn't

18   have any control over what all these people out there are

19   doing, is disingenuous.

20        MR. LAURO:  No, it's not, Your Honor.  First of all,

21   those people are public officials and they signed up for it

22   too.  Just like I signed up --

23        THE COURT:  Really?  Election poll workers?

24        MR. LAURO:  Well, with respect to that, I mean, first

25   of all, there's no suggestion that President Trump in the

1   course of this case has ever done anything that amounts to a

2   threat or an incitement with respect to anyone, and they can't

3   show that and they haven't shown that.

4       There's no question that someone who is exercising First

5   Amendment speech can't control what others do.  They just

6   simply can't.  If we're going to have a society where someone

7   is going to be penalized for free speech because of what a

8   third party can do, then the First Amendment will no longer

9   mean anything.  It will be exorcised out of the constitution.

10  So the bottom line here is that we have to tolerate -- we have

11  to tolerate as a free society a bit of colorful, vituperative

12  speech.  The Supreme Court is filled with opinions along those

13  lines.

14          THE COURT:  So if there's a little violence or some

15  threats, it's just the price we pay for robust debate?

16          MR. LAURO:  Absolutely not, Your Honor.  No one

17  condones violence or threats.  Absolutely not.  Those would be

18  unlawful.  There's ways of dealing with that.  And no one is

19  suggesting here that President Trump has suggested violence or

20  threats against anyone; otherwise we'd be dealing with much

21  different proceedings than a proposed censorship order.  And

22  there's been no suggestion that he's violated his terms of

23  release or that he's threatened a witness or anyone else.

24          THE COURT:  All right.  I have some questions regarding

25  some hypothetical statements, but I'll hear from Ms. Gaston

1    first.

2              MS. GASTON:  Your Honor, the Court does not have to

3    tolerate the defendant intimidating witnesses and polluting

4    the jury pool.  In fact, it is the Court's duty to prevent

5    those things.  And what Mr. Lauro is saying is that his client

6    is above the law, that he can say whatever he wants about this

7    case.  That's the thing.  The statements about Mr. Pence,

8    about Mr. Barr, about General Milley, about Mr. Raffensperger,

9    those were about them in the context of this case, because the

10   defendant isn't campaigning, he is using his campaign to try

11   to try this case outside of this courtroom and to pollute the

12   jury pool.  And that is improper and the Court has an

13   obligation to stop it.

14             THE COURT:  Mr. Lauro -- thank you.

15        Maybe it will help us establish some common ground, if

16   there's any to be found, if we were to use some examples.  So

17   let me ask you about some hypothetical public statements, and

18   you tell me if you think it would be appropriate for Mr. Trump

19   to make them.  Because the government has already used him as

20   an example of a potential witness, I'll use Mr. Barr as the

21   hypothetical subject of the statements just to keep things

22   simple.

23        So let's go through them.  So first, "Bill Barr should be

24   executed for his many treasonous acts."  Is that appropriate?

25             MR. LAURO:  Are you asking me what's appropriate or

1    what's lawful?

2         THE COURT:  If you think it would be lawful under the

3    existing conditions of release and whether you think it should

4    be permissible as a defendant facing a criminal trial.  "Bill

5    Barr should be executed for his many treasonous acts."

6      I'm not asking if it's nice.  I'm asking if you think he

7    should be allowed to make such statements.

8         MR. LAURO:  Your Honor, first of all, again, I would

9    advise anyone not to make statements like that.

10        THE COURT:  Why?  Why?

11        MR. LAURO:  Because I personally as an officer of the

12   court, okay, I personally as an officer of the court will

13   advise clients not to make statements like that.

14        THE COURT:  And again, why would you advise a client --

15        MR. LAURO:  Because I don't believe personally, okay,

16   as an officer of the court, that statements like that are --

17   necessarily need to be made in the context of a court

18   proceeding.  However, you need to ask the second question,

19   does it violate the First Amendment --

20        THE COURT:  No, no.

21        MR. LAURO:  -- and the answer is no.

22        THE COURT:  Well, you know, is it a threat?

23        MR. LAURO:  It is not a threat, Your Honor.

24        THE COURT:  Okay.

25        MR. LAURO:  It's absolutely not a threat.

1    THE COURT:  "I hope Bill Barr stays loyal to me or he

2    can forget about having a job in my next administration."

3    MR. LAURO:  Your Honor, you're asking me hypotheticals

4    or things that were asked?

5    THE COURT:  Hypotheticals.  This is a hypothetical.

6    MR. LAURO:  And when was that posted?

7    THE COURT:  No.  It's a hypothetical.

8    MR. LAURO:  Was it posted during the time of this case,

9    or was it posted previously?

10    THE COURT:  That's a statement that I am using as a

11    hypothetical.  I don't know if it's been made before.  But

12    assume your client was to make this statement during the

13    pendency of this case.  Is that permissible?

14    MR. LAURO:  Well, let me --

15    THE COURT:  Or is that an attempt to influence the

16    testimony of a potential witness?

17    MR. LAURO:  Well, here it's a clearly political

18    statement because it goes to the core of whether or not

19    somebody might have a position in a future administration.

20    So it certainly could be read understandably as I want Bill

21    Barr's support in the course of this campaign.  And that I

22    think is fair game.

23    THE COURT:  Okay.

24    MR. LAURO:  And if Bill Barr is not supporting me in

25    the campaign, then he doesn't have a position in 2024.  I

1      think that's fair game under the First Amendment.

2              THE COURT:  Okay.  Next hypothetical.  "Bill Barr is

3      a smart guy, but he better learn to keep his mouth shut."

4      Permissible?  Or an attempt to obstruct justice or intimidate

5      a witness?

6              MR. LAURO:  Well, first of all, I'm grateful for these

7      hypotheticals.

8              THE COURT:  Takes you back to law school.

9              MR. LAURO:  Ones I didn't ask for.  But as I would

10     tell the professor, it depends on the context, Your Honor.

11     And if it related to Bill Barr arguing with President Trump

12     and calling him out and calling him unfit for office, then

13     that might be a fair comment because Bill Barr has done that

14     repeatedly.  Bill Barr has attacked President Trump perhaps

15     more vociferously than Joe Biden has, and the hypotheticals

16     you're giving me are fair comment and fair response within

17     that context.

18         Now, if it happened the day before Bill Barr testified at

19     trial, that might be a different hypothetical.  But --

20             THE COURT:  "Bill Barr is a slimy liar and can't be

21     trusted."  Permissible?

22             MR. LAURO:  Well, I'm not going to say truth is a

23     defense, but I'm also going to say --

24         (Laughter.)

25         -- that the bottom line is that President Trump, I believe

1    in his public statements, has said that he was not told the

2    truth by Bill Barr with respect to what happened with the

3    Department of Justice investigation.

4        Now, I know Bill Barr was facing unusual circumstances

5    because there were people embedded in the department, in the

6    public integrity section that were blocking him from doing

7    what he wanted to do.  But the bottom bottom line is that

8    President Trump is allowed, I believe, under these

9    circumstances in the First Amendment, to comment on Bill

10   Barr's activity as attorney general.  Are we going to say that

11   he can't do that in the middle of a campaign?

12        THE COURT:  No.  No.  What we're talking about is

13   whether he's allowed to make comments that would go to

14   influencing or potentially influencing a witness's testimony

15   or intimidating or chilling that witness's participation.

16        MR. LAURO:  I wish Bill Barr were here.  He's a tough

17   guy.  He's not going to say he's intimidated by anything that

18   President Trump has ever said.  In fact, he's gone on TV

19   repeatedly, repeatedly saying that.

20        THE COURT:  But it also has the effect of casting

21   into doubt the truthfulness or veracity of a potential witness

22   in a way that the government cannot and is not allowed to

23   respond to.

24        MR. LAURO:  Your Honor, of course they can.  Mr. Barr

25   can, the White House surrogates can.  Everybody can.  The

1    bottom line is that these are tough-edged political people.

2    Bill Barr, Mike Pence, Milley, Raffensperger, these are

3    politicians.  These are people that are used to the rough and

4    tumble.  They're not lilies that get offended by any little

5    comment about being deranged or otherwise.  These are people

6    that have, as you have said, they signed up for it.  They know

7    what they're talking about.  And candidly, they're all

8    monetizing their relationship.

9        Do you think for a moment that anything President Trump

10   said prevented Mike Pence from writing a book, or Bill Barr,

11   or Mr. Raffensperger.  General Milley is probably going to

12   write his own book as well.

13           THE COURT:  Mr. Lauro, would your answers change if

14   Mr. Trump reposted or liked or re-truthed or whatever you call

15   it social media posts with those statements rather than

16   actually typing the words himself?

17           MR. LAURO:  Well, I think if Your Honor were to give a

18   statement to counsel in terms of what Your Honor would like to

19   see in the course of these proceedings, that is something that

20   we would certainly communicate to President Trump in no

21   uncertain terms -- circumstances.  But he should not be

22   prevented, should not be prevented from speaking his mind on

23   these issues.

24       And everything you have raised goes to what a vice

25   president should be, what an attorney general should be, what

a secretary of state in a state should be and what a member of
the joint chiefs of staff should be.  These are all pressing
public issues.  The public wants to know what kind of people
President Trump will have in his cabinet in 2024.

THE COURT:  All right.  Ms. Gaston?

MS. GASTON:  Thank you, Your Honor.  I will run through
your examples in order.

THE COURT:  I think I know your answers.

MS. GASTON:  So first, about Mr. Barr, "he should be
executed for many treasonous acts."  The defendant should not
be able to do that because that is intimidating and
threatening toward a known witness in this case who is in the
indictment, and it could chill not only his speech, his
testimony, but those of others who are watching what happens
to more powerful people.

In terms of "I hope he stays loyal," that is intimidating,
it impinges on his credibility and the contents of his
testimony at trial, and it's potentially a violation of the
defendant's conditions of release because it could be seen as
an indirect message to a witness in this case.

The same goes for "he's a smart guy but he needs to keep
his mouth shut."  That is intimidating, it has to do with his
potential testimony and credibility, and it could be a
violation of the defendant's conditions of release.

And again, the "slimy lawyer and cannot be trusted," that

1    goes to his credibility and the potential topics of his

2    testimony.

3        In addition to all of those, all of these statements could

4    cause these individuals to respond in kind, which is what has

5    happened in the past.  When these individuals are attacked,

6    they have responded.  And so that involves all of the details

7    of their potential testimony being out in the open in advance

8    of trial.  And as the Court identified, the government does

9    not respond because it does not make extrajudicial comments

10   like the defendant has been.

11       As I mentioned before, it also -- these kinds of statements

12   also chill other witnesses.  Mr. Lauro seems to suggest that

13   these powerful people have asked for these threats.  But what

14   about other witnesses who don't live on a military base and

15   have constant protection?  What are they to think about the

16   defendant's attacks publicly on more high-profile witnesses?

17       And Mr. Lauro again seems to be suggesting that the Court

18   should not enter an order because he'll just tell the

19   defendant what the Court wants.  I think that's because

20   Mr. Lauro does not want this to be enforceable.  The Court

21   should enter an order to protect the venire and to prevent

22   this case from being tried in the court of public opinion,

23   which is exactly the defendant's stated intent.

24           THE COURT:  All right.  I want to talk about the scope

25   of the government's proposed order, which would forbid

1    statements regarding the identity, testimony, or credibility

2    of prospective witnesses.  And naturally, it may be possible

3    to infer the identity of a least some people who are likely to

4    be witnesses in this case.  But the universe of prospective

5    witnesses seems quite large and almost certainly includes

6    public figures with whom Mr. Trump has public disagreements.

7    And his disagreement could reflect his view of the

8    credibility.

9        So how is he supposed to know with whom he can or can't

10   publicly disagree?  And I'm considering the D.C. Circuit's

11   holding in *Morrison* with regard to the foreseeability of

12   evidence and witnesses.

13        MS. GASTON:  Yes, Your Honor.  As an initial matter,

14   the witnesses whom the defendant has publicly attacked to date

15   are all folks who are identifiable in the indictment, and so

16   he knows these are witnesses.  But furthermore, in the

17   defendant's conditions of release there is a requirement that

18   he not contact any potential witnesses, and the government's

19   understanding is that the defendant is on notice of who are

20   potential witnesses based on the discovery that the government

21   has provided, which includes logs of the interviews that the

22   government conducted in the course of its investigation.

23        THE COURT:  All right.

24        MR. LAURO:  Your Honor, if I can very briefly.  The

25   courts have recognized that individuals, parties to a lawsuit

who are involved in a political campaign are to be treated differently. The courts have recognized that in *Brown* and in *Ford*. There's no doubt that this is a different equation than if we had a situation where President Trump was not running for office. That's just a given fact, and that is the law.

Any kind of order would be asymmetrical in the sense that Bill Barr could attack President Trump repeatedly during campaign --

THE COURT: But again, Bill Barr is not a criminal defendant. So, yes, there's going to be some asymmetry because your client is subject to restrictions that Bill Barr is not.

MR. LAURO: And both under *Ford* and under *Brown* the courts decided that in order to protect the electoral process, that censorship order should not be entered, full stop. Not even a narrowly tailored order was entered in either one of those cases during the campaign. So the Court would be embracing new ground which no court has ventured into with respect to First Amendment jurisprudence, which is entering even some kind of order that would regulate campaign speech. No court in the history of the United States has done that. This would be the first time in the context of what's going on in this case.

And Your Honor has struggled and you've asked me, you know, pointed hypotheticals. But it's not really a law school

1    exercise, Your Honor; it's what's playing out in a campaign

2    right now.  And what's going to happen if in the middle of a

3    heated debate President Trump says something about Mike Pence

4    or Bill Barr?  Are we going to be back here on a motion for

5    contempt?

6         THE COURT:  Depends on what he says.

7         MR. LAURO:  And then what's going to happen?  Is Your

8    Honor going to put President Trump in jail during the course

9    of a campaign?  I mean, look what they've opened up here.

10   This is a massive can of worms.  The better way to deal with

11   it, candidly, Your Honor --

12        THE COURT:  Is to move the trial date until after the

13   election.

14        MR. LAURO:  No, I wasn't going to say that only.  No, I

15   wasn't just going to say that.  I know you're mocking me, but

16   I wasn't going to say that.  What I was going to say is that

17   we can also deal with it, if there's something that's said,

18   after the fact Your Honor can --

19        THE COURT:  We're in here because of that.  We're in

20   here because he keeps calling the prosecutors thugs, deranged,

21   because he's made comments about court staff, because he's

22   made comments about the death penalty for a potential witness.

23   We are in here today because of statements that he's made, not

24   just before the government filed its motion but after, right

25   up to last night.  And so I -- I'm not confident that without

1    some kind of a restriction we won't be in here all the time.

2        MR. LAURO:  Well, the reality is that everything that

3    he has said with respect to these issues are protected First

4    Amendment speech.  So we're back to square one, Your Honor,

5    which is the reality is that he's entitled to do this under

6    the First Amendment as long as he doesn't violate the order of

7    the Court regarding his release and threaten or intimidate any

8    witness, which he hasn't done.

9        But in the context of a political campaign it's impossible

10   to fashion an order that is going to censor or control

11   political speech.  And that's why, in both the *Brown* and the

12   *Ford* cases, circuit courts of appeal have recognized that no

13   such order should be entered.

14       THE COURT:  All right.  Ms. Gaston, I'll let you finish

15   since it's your motion, and then I want to take a short

16   recess.

17       MS. GASTON:  Thank you very much, Your Honor.  I just

18   briefly want to address what Mr. Lauro just said about those

19   two cases.  First of all, the *Ford* case is a case in which the

20   court entered -- what the Sixth Circuit called "a broad

21   no-discussion-of-the-case order," and the Court did it sua

22   sponte.  There was not a motion by the parties.  There is

23   nothing in the decision along the lines of the incredibly

24   prolific and prejudicial statements that the defendant in this

25   case is making.  So that is really not analogous to this case.

1        And then with respect to the *Brown* case, that is actually a

2    cautionary tale for the Court.  In that case the court lifted

3    an order that was restricting the defendant's extrajudicial

4    statements.  And soon after he did, they began to disseminate

5    evidence from the case, recordings, and to talk about it.  And

6    he had to implement another order.

7        It's also important to remember that *Brown* happened in the

8    last two months leading up to that election.  Here our trial

9    will be completed well in advance of November 2024.

10       It is important to emphasize again that the statements at

11   issue here, these statements that we have been discussing are

12   a fraction of the defendant's speech.  He is talking about the

13   actual issues of the campaign freely, and he will be able to

14   continue to do so.  And he's demonstrated his ability to

15   regulate his speech, as I said before.  All the government

16   wants is for him to stop attacking witnesses in this case and

17   prejudicing the venire.

18        THE COURT:  All right.  Thank you all.  I'm going to

19   take a brief recess.

20        (Recess from 11:56 a.m. to 12:18 p.m.)

21        THE COURT:  All right.  Thank you for the argument and

22   the briefing.  After this hearing concludes I will issue an

23   order setting forth my ruling on the government's motion in

24   greater detail, but for now I will share the basic contours of

25   my decision.

1      First, as already noted, I am going to deny the
2 government's motion with respect to imposing additional jury
3 pool survey requirements.  The defense has already agreed to
4 notify me of the dates and sample sizes of surveys for this
5 case, and I'm not going to require anything more.

6      Second, I am going to grant in part and deny in part the
7 government's motion with respect to additional restrictions to
8 be placed on out-of-court statements by the parties or their
9 counsel.

10     The defense has sought to represent every statement as part
11 and parcel of Mr. Trump's First Amendment right to argue that
12 this prosecution is politically motivated.  One could come
13 away from these arguments with a mistaken understanding that
14 the First Amendment is an absolute right.

15     That is false.  First Amendment protections yield to the
16 administration of justice and to the protection of witnesses.
17 That is in fact the standard the defense took in its brief
18 when it acknowledged that some speech could be prohibited.

19     There is a compelling interest in the administration of
20 justice and in protecting potential witnesses in this case,
21 and it is possible to craft a narrowly tailored order to serve
22 that interest.

23     This is not about whether I like the language Mr. Trump
24 uses.  This is about language that presents a danger to the
25 administration of justice.  Accordingly, I will not impose any

additional restrictions about statements regarding the
District of Columbia or its jury pool.  I am confident that
the voir dire process and cautionary jury instructions can
filter out those statements' influence on the jury.  To the
extent that Mr. Trump continues to cast aspersions on the city
and its residents, his statements will be considered in
assessing any future motion for a change of venue.

I will not impose any additional restrictions on statements
criticizing the government generally, including the Biden
administration or the Justice Department, or statements
communicating that Mr. Trump believes this prosecution to be
politically motivated.

I will, however, prohibit all parties, including Mr. Trump,
along with the attorneys in this case, from making or
reposting any statements publicly targeting the special
counsel, his staff, including government counsel here today,
as well as any statements publicly targeting any of my staff
or any other court personnel.  It should go without saying
that statements targeting the families of any of these people
are absolutely prohibited as well.

Mr. Trump can certainly claim he's being unfairly
prosecuted, but I cannot imagine any other criminal case in
which a defendant is permitted to call the prosecutor
"deranged" or "a thug," and I will not permit it here simply
because the defendant is running a political campaign.  His

1   presidential candidacy does not give him carte blanche to

2   vilify and implicitly encourage violence against public

3   servants who are simply doing their job.

4       Finally, I will also prohibit statements from all parties

5   and attorneys about potential witnesses or the substance of

6   their expected testimony.  If Mr. Trump wants to criticize his

7   political rival, Mr. Pence, he may do so.  But he cannot make

8   statements about Mr. Pence's role in the events underlying

9   this case.

10      My review of past statements made by Mr. Trump in

11  particular, as well as the evidence that they have led to

12  harassment and threats for the people he has targeted,

13  persuades me that without this restriction there is a real

14  risk that witnesses may be intimidated or unduly influenced

15  and that other potential witnesses may be reluctant to come

16  forward lest they be subjected to the same harassment and

17  intimidation.

18      Now, let me be clear:  Mr. Trump may still vigorously seek

19  public support as a presidential candidate, debate policies

20  and people related to that candidacy, criticize the current

21  administration, and assert his belief that this prosecution is

22  politically motivated.  But those critical First Amendment

23  freedoms do not allow him to launch a pretrial smear campaign

24  against participating government staff, their families, and

25  foreseeable witnesses.  No other criminal defendant would be

1    allowed to do so, and I am not going to allow it in this case.

2        For the reasons discussed during this hearing, therefore, I

3    find that these measures are consistent with the rights

4    secured by the First, Fifth, and Sixth Amendments, and that

5    they are both necessary and narrowly tailored to safeguard the

6    integrity of these proceedings as well as to protect the

7    safety of the people assisting with them.

8        If any party or counsel violates these restrictions or the

9    other laws or obligations by which they are bound, I will,

10   either upon receipt of a motion or sua sponte, consider

11   sanctions as may be necessary.

12       Thank you.  We're adjourned.

13        (Proceedings adjourned at 12:25 p.m.)

\* \* \* \* \* \*

CERTIFICATE

    I, BRYAN A. WAYNE, Official Court Reporter, certify that the foregoing pages are a correct transcript from the record of proceedings in the above-entitled matter.


*/s/ Bryan A. Wayne*
Bryan A. Wayne