**IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA**

| | | |
|---|---|---|
| **UNITED STATES OF AMERICA** | * | |
| | * | |
| v. | * | **CRIMINAL NO. 23-cr-257 (TSC)** |
| | * | |
| **DONALD J. TRUMP,** | * | |
| | * | |
| **Defendant.** | * | |
| | * | |

**GOVERNMENT'S RESPONSE IN OPPOSITION TO DEFENDANT'S MOTION TO
DISMISS ON PRESIDENTIAL IMMUNITY GROUNDS**

# TABLE OF CONTENTS

I.   Introduction ........................................................................................................... 1

II.  Factual and Procedural Background............................................................................ 1

III. Argument .............................................................................................................. 3

    A.     Legal Background ........................................................................................ 5

    B.     A Former President Has No Immunity from Federal Criminal Prosecution............................................................................................... 7

          1.     No constitutional provision or historical practice supports conferring absolute immunity from criminal prosecution on a former president. ................................................................................ 8

               a.     The Constitution does not support absolute immunity from criminal prosecution for a former president for conduct while in office.................................................. 9

               b.     Historical practice does not support absolute immunity from criminal prosecution for a former president for conduct while in office.............................................. 15

          2.     The immunity from civil liability for a former president's official conduct recognized in *Fitzgerald* does not extend to criminal liability. ................................................................................. 19

               a.     Applying *Fitzgerald* in the criminal context would place a former president above the law. .................................. 19

               b.     *Fitzgerald*'s reasoning does not apply in the criminal context........................................................................... 21

               c.     *Fitzgerald*'s analogy to judges and prosecutors—who are not immune from criminal prosecution—applies here. ............... 23

               d.     Adequate safeguards protect the unique role of the presidency without immunizing a former president from criminal prosecution.................................................... 28

    C.     Creating a Novel Immunity from Criminal Prosecution for a Former President Would Pose Significant Challenges, But at a Minimum Any Such Immunity Should Be Narrower Than Immunity from Civil Liability and Would Be Inapplicable Here. ......................................................... 34

1.      The scope of any immunity in this context would have to account for the substantially greater public interest in federal criminal prosecutions and other relevant differences from private civil suits.. ....................................................................... 34

2.      The defendant cannot establish that he would be entitled to dismissal of the indictment under any plausible view of a former president's immunity from criminal prosecution.................................... 36

D.      Even If a Former President Were Entitled to Immunity from Criminal Prosecution Comparable to His Immunity from Civil Liability, Dismissal Is Not Warranted Here. ...................................................... 40

IV.  Conclusion ................................................................................................... 43

# TABLE OF AUTHORITIES

**Cases**

*Anderson v. United States,*
    417 U.S. 211 (1974)............................................................................................................ 32

*Arthur Andersen LLP v. United States,*
    544 U.S. 696 (2005)............................................................................................................ 32

*Banneker Ventures, LLC v. Graham,*
    798 F.3d 1119 (D.C. Cir. 2015)........................................................................................ 39

*Barr v. Matteo,*
    360 U.S. 564 (1959)............................................................................................................ 35

*Berger v. United States,*
    295 U.S. 78 (1935).............................................................................................................. 23

*Blockburger v. United States,*
    284 U.S. 299 (1932)............................................................................................................ 13

*Butz v. Economou,*
    438 U.S. 478 (1978)................................................................................................ 17, 34, 37

*Cheney v. U.S. Dist. Court for Dist. of Columbia,*
    542 U.S. 367 (2004)................................................................................................ 22, 23, 34

*Clinton v. Jones,*
    520 U.S. 681 (1997)................................................................................................ 6, 10, 23

*Dennis v. Sparks,*
    449 U.S. 24 (1980).................................................................................................. 1, 24, 26

*Ex Parte Commonwealth of Virginia,*
    100 U.S. 339 (1879)............................................................................................................ 26

*Expeditions Unlimited Aquatic Enterprises, Inc. v. Smithsonian Inst.,*
    566 F.2d 289 (D.C. Cir. 1977).......................................................................................... 22

*Forrester v. White,*
    484 U.S. 219 (1988)............................................................................................................ 34

*Franklin v. Massachusetts,*
    505 U.S. 788 (1992)............................................................................................................ 32

*Gravel v. United States,*
    408 U.S. 606 (1972)...................................................................................................... 23, 35

*Hammerschmidt v. United States*,
    265 U.S. 182 (1924) ............................................................................................. 31

*Harlow v. Fitzgerald*,
    457 U.S. 800 (1982) ...................................................................................... 28, 34

*Hastings v. United States Senate*,
    716 F. Supp. 38 (D.D.C. 1989) ..................................................................... 11, 14

*Imbler v. Pachtman*,
    424 U.S. 409 (1976) ...................................................................................... 24, 25

*In re Lindsey*,
    158 F.3d 1263 (D.C. Cir. 1998) ............................................................................ 36

*In re Neagle*,
    135 U.S. 1 (1890) ................................................................................................. 40

*In re Sealed Case*,
    121 F.3d 729 (D.C. Cir. 1997) ............................................................................. 32

*Logan v. United States*,
    144 U.S. 263 (1892) ............................................................................................. 40

*Lucia v. SEC*,
    138 S. Ct. 2044 (2018) ........................................................................................ 40

*Marbury v. Madison*,
    5 U.S. 137 (1803) ................................................................................................. 17

*Martin v. Mott*,
    25 U.S. 19 (1827) ................................................................................................. 17

*Mireles v. Waco*,
    502 U.S. 9 (1991) .......................................................................................... 25, 26

*Missouri v. Hunter*,
    459 U.S. 359 (1983) ............................................................................................. 13

*Nixon v. Adm'r of Gen. Servs.*,
    433 U.S. 425 (1977) ............................................................................................. 35

*Nixon v. Fitzgerald*,
    457 U.S. 731 (1982) .................................................................................... passim

*Nixon v. Sirica*,
    487 F.2d 700 (D.C. Cir. 1973) (en banc) .............................................................. 16

*Nixon v. United States*,
    506 U.S. 224 (1993) .................................................................................. 11

*O'Shea v. Littleton*,
    414 U.S. 488 (1974) ............................................................................ 23, 35

*Screws v. United States*,
    325 U.S. 91 (1945) .................................................................................... 32

*Tennessee v. Davis*,
    100 U.S. 257 (1879) .................................................................................. 31

*Tenney v. Brandhove*,
    341 U.S. 367 (1951) .................................................................................... 9

*Thompson v. Trump*,
    590 F. Supp. 3d 46 (D.D.C. 2022) .......................................................... 14

*Trump v. Mazars USA, LLP*,
    140 S. Ct. 2019 (2019) ............................................................................. 36

*Trump v. Thompson*,
    20 F.4th 10 (D.C. Cir. 2021) .................................................................... 16

*Trump v. Thompson*,
    573 F. Supp. 3d 1 (D.D.C. 2021) ............................................................... 8

*Trump v. Vance*,
    140 S. Ct. 2412 (2020) ..................................................................... passim

*Turkiye Halk Bankasi A.S. v. United States*,
    598 U.S. 264 (2023) .................................................................................. 22

*United States ex rel. Epton v. Nenna*,
    446 F.2d 363 (2d Cir. 1971) ..................................................................... 38

*United States v. Armstrong*,
    517 U.S. 456 (1996) .................................................................................. 30

*United States v. Brewster*,
    408 U.S. 501 (1972) .................................................................................. 36

*United States v. Burr*,
    25 F. Cas. 187 (C.C.D. Va. 1807) ............................................................ 16

*United States v. Burr*,
    25 F. Cas. 30 (C.C.D. Va. 1807) .......................................................... 3, 16

*United States v. Chaplin*,
   54 F. Supp. 926 (S.D. Cal. 1944)....................................................................... 27

*United States v. Chemical Foundation, Inc.*,
   272 U.S. 1 (1926)............................................................................................... 30

*United States v. Claiborne*,
   727 F.2d 842 (9th Cir. 1984) ........................................................ 13, 23, 25, 26

*United States v. Collins*,
   972 F.2d 1385 (5th Cir. 1992) ........................................................................... 26

*United States v. Donner*,
   497 F.2d 184 (7th Cir. 1974) ............................................................................. 38

*United States v. Gillock*,
   445 U.S. 360 (1980)..................................................................................... 21, 25

*United States v. Hastings*,
   681 F.2d 706 (11th Cir. 1982) ....................................................... 23, 25, 26, 31

*United States v. Isaacs*,
   493 F.2d 1124 (7th Cir. 1974) ...................................................... 14, 23, 25, 26

*United States v. Klein*,
   80 U.S. (13 Wall.) 128 (1872) ........................................................................... 36

*United States v. Lanier*,
   920 F.2d 887 (11th Cir. 1991) ........................................................................... 38

*United States v. Lee*,
   106 U.S. 196 (1882)............................................................................... 1, 8, 17

*United States v. Manton*,
   107 F.2d 834 (2d Cir. 1939)............................................................................... 27

*United States v. Morrison*,
   98 F.3d 619 (D.C. Cir. 1996) ............................................................................. 32

*United States v. Nixon*,
   418 U.S. 683 (1974)................................................................................... passim

*United States v. Nixon*,
   816 F.2d 1022 (5th Cir. 1987) ........................................................................... 27

*United States v. North*,
   910 F.2d 843 (D.C. Cir. 1990), *opinion withdrawn and superseded in part on*
   *reh'g*, 920 F.2d 940 (D.C. Cir. 1990) ............................................................... 32

*United States v. R. Enterprises, Inc.*,
    498 U.S. 292 (1991) ........................................................................................ 31

*United States v. Rhodes*,
    610 F. Supp. 3d 29 (D.D.C. 2022) .................................................................. 31

*United States v. Vascular Sols., Inc.*,
    181 F. Supp. 3d 342 (W.D. Tex. 2016) ........................................................... 38

*United States v. Weeks*,
    636 F. Supp. 3d 117 (D.D.C. 2022) ............................................................ 1, 37

*Wisconsin v. Mitchell*,
    508 U.S. 476 (1993) ........................................................................................ 38

*Youngstown Sheet & Tube v. Sawyer*,
    343 U.S. 579 (1952) ................................................................................. 35, 40

*Zivotofsky v. Kerry*,
    576 U.S. 1 (2015) ............................................................................................ 35

## Constitutional Provisions

U.S. Const. amend. V .............................................................................................. 12

U.S. Const. art. I, § 3, cl. 7 ............................................................................. passim

U.S. Const. art. I, § 5, cl. 3 ................................................................................... 41

U.S. Const. art. I, § 6, cl. 1 .......................................................................... 5, 9, 36

U.S. Const. art. II, § 1, cl. 1 .................................................................................. 40

U.S. Const. art. II, § 2, cl. 2 .................................................................................. 40

U.S. Const. art. II, § 2, cl. 3 .................................................................................. 35

U.S. Const. art. II, § 3 ...................................................................................... 36, 40

U.S. Const. art. II, § 4 ........................................................................................ 5, 10

U.S. Const. art. III, § 2, cl. 1 ................................................................................ 41

U.S. Const. art. VI, cl. 2 ........................................................................................ 30

## Statutes and Rules

2 U.S.C. § 192 ......................................................................................................... 33

18 U.S.C. § 201 ................................................................................................. 34, 36

18 U.S.C. § 208 ................................................................................................. 33

18 U.S.C. § 371 ................................................................................................... 2

18 U.S.C. § 1512 ................................................................................................. 2

18 U.S.C. § 1913 ............................................................................................... 33

28 U.S.C. 1442 ................................................................................................. 31

28 U.S.C. § 364 ................................................................................................. 26

**Office of Legal Counsel Opinions**

Laurence H. Silberman, *Conflict of Interest Problems Arising out of the President's
    Nomination of Nelson A. Rockefeller to be Vice President under the Twenty-Fifth
    Amendment to the Constitution* (Aug. 28, 1974) ...................................................... 33

Randolph D. Moss, *A Sitting President's Amenability to Indictment and Criminal
    Prosecution*, 24 Op. O.L.C. 222 (Oct. 16, 2000) ......................................... 7, 29, 31

Randolph D. Moss, *Whether a Former President May Be Indicted and Tried for the
    Same Offenses for Which He Was Impeached by the House and Acquitted by the
    Senate*, 24 Op. O.L.C. 110 (Aug. 18, 2000) ........................................................ 13

Robert G. Dixon, Jr., *Amenability of the President, Vice President and other Civil Officers to
    Federal Criminal Prosecution while in Office* (Sept. 24, 1973)…………………………………..6

Theodore B. Olson, *Payment of Expenses Associated with Travel by the President and
    Vice President*, 6 O.L.C. Op. 214 (Mar. 24, 1982) ............................................... 35

Theodore B. Olson, *Prosecution for Contempt of Congress of an Executive Branch
    Officer Who Has Asserted a Claim of Executive Privilege*, 8 Op. O.L.C 101 (May
    30, 1984) ............................................................................................................... 33

Walter Dellinger, *Application of 28 U.S.C. § 458 to Presidential Appointments of
    Federal Judges*, 19 Op. O.L.C. 350 (Dec. 18, 1995) ............................................ 33

Walter Dellinger, *The Constitutional Separation of Powers Between the President and
    Congress*, 20 Op. O.L.C. 124 (May 7, 1996) ....................................................... 33

William Barr, *Constraints Imposed by 18 U.S.C. § 1913 on Lobbying Efforts*, 13 Op.
    O.L.C. 300 (Sept. 28, 1989) ................................................................................. 33

**Law Review Articles**

Akhil Reed Amar & Brian C. Kalt, *The Presidential Privilege Against Prosecution*, 2
    Nexus 11 (1997) ..................................................................................................... 8

Brett M. Kavanaugh, *Separation of Powers During the Forty-Fourth Presidency and Beyond*, 93 Minn. L. Rev. 1454 (2009) .................................................................. 29

Brian C. Kalt, *Criminal Immunity and Schrödinger's President: A Response to Prosecuting and Punishing Our Presidents*, 100 Tex. L. Rev. Online 79 (2021) .................... 9

Claire O. Finkelstein & Richard W. Painter, *Presidential Accountability and the Rule of Law: Can the President Claim Immunity If He Shoots Someone on Fifth Avenue?*, 24 U. Pa. J. Const. L. 93 (2022) ......................................................... 8, 30

J. Randolph Block, *Stump v. Sparkman and the History of Judicial Immunity*, 1980 Duke L.J. 879 (1980) .................................................................................... 26

Keith King, *Indicting the President: Can a Sitting President Be Criminally Indicted?*, 30 Sw. U. L. Rev. 417 (2001) ........................................................................... 9

Saikrishna Bangalore Prakash, *Prosecuting and Punishing Our Presidents*, 100 Tex. L. Rev. 55 (2021) ............................................................................................ 8, 9, 18

Timothy M. Stengel, *Absolute Judicial Immunity Makes Absolutely No Sense: An Argument for an Exception to Judicial Immunity*, 84 Temp. L. Rev. 1071 (2012) ............... 27

## Other Authorities

1 Samuel Johnson, *A Dictionary of the English Language* (1755) ............................................. 39

167 Cong. Rec. S601 (daily ed. Feb. 9, 2021) ........................................................................... 4, 12

167 Cong. Rec. S607 (daily ed. Feb. 9, 2021) ................................................................. 4, 12, 31

167 Cong. Rec. S736 (daily ed. Feb. 13, 2021) ..................................................................... 14

2 Joseph Story, *Commentaries on the Constitution of the United States* (1833) ........ 10, 11, 12, 13

3 Joseph Story, *Commentaries on the Constitution of the United States* (1833) ......................... 18

4 Debates on the Constitution 109 (J. Elliot ed. 1891) ..................................................... 16

46 Am. Jur. 2d Judges § 77 (2023) ........................................................................................ 26

*Ballentine's Law Dictionary* (3d ed. 1969) ........................................................................... 32

Gerald Ford, Presidential Statement (Sept. 8, 1974) ....................................................... 18

H.R. Res. 24, 117th Cong. at 3 (Jan. 11, 2021) ........................................................... 13

*In re Impeachment of Former President Donald J. Trump*, Trial Memorandum of Donald J. Trump, S. Doc. 117-2 (Feb. 8, 2021) ...................................................... 14

John F. Harris & Bill Miller, *In a Deal, Clinton Avoids Indictment*, Washington Post
(Jan. 20, 2001)................................................................................................................ 19

Richard Nixon, Statement by Former President Richard Nixon (Sept. 8, 1974)......................... 18

Sen. Mike Crapo, Crapo Statement on Impeachment Trial (Feb. 13, 2021) .............................. 15

Sen. Thom Tillis, Tillis Statement on Impeachment Trial (Feb. 13, 2021)................................. 15

*The Federalist No. 65* (Clinton Rossiter ed., 1999)............................................................. 10, 15

*The Federalist No. 69* (Clinton Rossiter ed., 1999).............................................................. 8, 15

*The Federalist No. 77* (Clinton Rossiter ed., 1999)................................................................. 15

## I.      Introduction

Defendant Donald J. Trump moves to dismiss the indictment, asking the Court to afford him absolute immunity from criminal prosecution for what he expansively claims was official conduct during his presidency.  ECF No. 74 ("Mot.").  That novel approach to immunity would contravene the fundamental principle that "[n]o man in this country is so high that he is above the law."  *United States v. Lee*, 106 U.S. 196, 220 (1882).  The defendant is not above the law.  He is subject to the federal criminal laws like more than 330 million other Americans, including Members of Congress, federal judges, and everyday citizens.  None of the sources the defendant points to in his motion—the Constitution's text and structure, history and tradition, or Supreme Court precedent—supports the absolute immunity he asks the Court to create for him.  In staking his claim, he purports (Mot. 29) to draw a parallel between his fraudulent efforts to overturn the results of an election that he lost and the likes of Abraham Lincoln's Gettysburg Address and George Washington's Farewell Address.  These things are not alike.  The more apt parallel the defendant identifies (Mot. 17-18) is to judges, who, like a former president, enjoy absolute immunity from civil damages liability for certain conduct but who are "subject to criminal prosecutions as are other citizens."  *Dennis v. Sparks*, 449 U.S. 24, 31 (1980).  The same is true for the defendant.  For the reasons set forth below, the defendant's motion to dismiss the indictment based upon presidential immunity should be denied.

## II.     Factual and Procedural Background

A grand jury charged the defendant in a four-count indictment.  ECF No. 1.  The defendant moved to dismiss the indictment on the ground that he "is absolutely immune from prosecution."  Mot. 1.  When considering a motion to dismiss, the Court must view the indictment "as a whole[,] and the allegations must be accepted as true."  *United States v. Weeks*, 636 F. Supp. 3d 117, 120 (D.D.C. 2022) (internal quotation marks omitted).

Count One, which charges a conspiracy to defraud the United States, in violation of 18 U.S.C. § 371, alleges that the defendant, then a candidate seeking re-election to the presidency, conspired with, among others, several individuals outside the Executive Branch to "overturn the legitimate results of the 2020 presidential election by using knowingly false claims of election fraud to obstruct the federal government function by which those results are collected, counted, and certified."  ECF No. 1 at ¶¶ 1, 7, 8.  The indictment further alleges that the defendant aimed at accomplishing the conspiracy's objectives in five ways: using deceit toward state officials to subvert the legitimate election results in those states, *id.* at ¶¶ 13-52; using deceit to organize fraudulent slates of electors in seven targeted states, and cause them to send false certificates to Congress, *id.* at ¶¶ 53-69; leveraging the Department of Justice to use deceit to get state officials to replace the legitimate electoral slate with electors who would cast their votes for the defendant, *id.* at ¶¶ 70-85; attempting to enlist the Vice President to fraudulently alter the election results during the certification proceeding on January 6, 2021, and directing supporters to the Capitol to obstruct the proceeding, *id.* at ¶¶ 86-105; and exploiting the violence and chaos that transpired at the United States Capitol on January 6, 2021, *id.* at ¶¶ 106-124.  Counts Two and Three, which incorporate allegations from Count One, charge conspiracy and substantive violations of 18 U.S.C. § 1512(c)(2) for corruptly obstructing the certification of the presidential election results on January 6, 2021.  *Id.* at ¶¶ 125-28.  Count Four, which likewise incorporates the allegations from Count One, alleges that the defendant conspired to violate one or more person's constitutional right to vote and have one's vote counted.  *Id.* at ¶¶ 129-30.

The defendant recognizes (Mot. 2) but fails to adhere to the legal standard applicable to a motion under Rule 12 of the Federal Rules of Criminal Procedure requiring that the indictment's allegations "be accepted as true."  Instead, the defendant inaccurately reframes the allegations in the indictment to suggest that his criminal conduct consisted solely of "public statements and

tweets about the federal election and certification," "communications with the U.S. Department of Justice about investigating elections crimes and possibly appointing a new Acting Attorney General," "communications with state officials about the federal election and the exercise of their official duties with respect to the election," "communications with the Vice President and Members of Congress about the exercise of their official duties in the election-certification proceedings," and "organizing slates of electors as part of the attempt to convince legislators not to certify the election against defendant." *Id.* at 3-8 (capitalization altered). Those characterizations are not consistent with the indictment.

## III. Argument

An individual who has served as President of the United States but is no longer in office may face investigation, indictment, trial, and, if convicted, punishment for conduct committed during the presidency. No court has ever alluded to the existence of absolute criminal immunity for former presidents, and legal principles, historical evidence, and policy rationales demonstrate that once out of office, a former president is subject to federal criminal prosecution like other citizens. *See United States v. Burr*, 25 F. Cas. 30, 34 (C.C.D. Va. 1807) ("[T]he president is elected from the mass of the people, and, on the expiration of the time for which he is elected, returns to the mass of the people again."). Indeed, a contrary rule would violate the fundamental principle that no one in this country, not even the president, is above the law.

The defendant's novel request for absolute immunity directly conflicts with the Constitution's Impeachment Judgment Clause, U.S. Const. art. I, § 3, cl. 7, which expressly contemplates the criminal prosecution of a former president for acts committed during—and ultimately resulting in the president's removal from—the presidency. That provision ensures, among other things, that an officer who has been removed through impeachment cannot seek refuge in principles of double jeopardy to avoid criminal prosecution. The defendant, however,

would turn the Impeachment Judgment Clause on its head and have the Court read it as a sweeping grant of immunity that forbids criminal prosecution in the absence of a Senate conviction—which, among other things, would effectively preclude any form of accountability for a president who commits crimes at the end of his term of office.  The defendant dismissed this very approach to the Impeachment Judgment Clause as "nonsense" and "a complete canard" during his second impeachment trial, *see* 167 Cong. Rec. S601, S607 (daily ed. Feb. 9, 2021), and the Court should do the same here.  A president already enjoys two forms of immunity designed to afford protections to the discharge of his wide-ranging duties.  But neither the temporary immunity from criminal liability that an incumbent president enjoys while in office nor the absolute immunity that current and former presidents enjoy from civil liability for their official conduct as president, *see Nixon v. Fitzgerald*, 457 U.S. 731, 749 (1982), suggests the existence of an unprecedented form of absolute immunity from criminal liability.  To the contrary, the existence of both immunities is premised on the availability of criminal liability once a former president is out of office.  The defendant's motion to dismiss should be denied on the ground that a former president cannot claim any immunity from federal criminal prosecution.[1]

Even if the defendant had satisfied his burden to establish that a former president could claim some heretofore unrecognized and novel immunity from criminal prosecution for certain acts committed during his presidency, denial of the defendant's motion is nonetheless warranted.  Recognizing immunity from federal criminal prosecution for a former president would pose substantial challenges regarding its scope and application, and the defendant provides no suggestion or support for how to navigate such challenges.  At a minimum, any such criminal immunity would, consistent with the reasoning in *Fitzgerald* and the balancing in *United States v.*

---

[1] This brief addresses only a former President's immunity from *federal* criminal prosecution.

*Nixon*, 418 U.S. 683 (1974), be narrower than the outer-perimeter immunity applicable in the civil context and would have to reflect a consideration of *mens rea*, since otherwise even clear cases like bribery would be excluded.  The defendant has not shown that the conduct alleged in the indictment would fall within the boundaries of any plausible understanding of such a novel immunity from federal criminal prosecution.  And even if he could claim immunity from criminal prosecution for official conduct while in office comparable to the broad immunity from civil liability recognized in *Fitzgerald*, dismissal is inappropriate because the defendant cannot plausibly claim that every allegation in the indictment involves acts within the outer perimeter of a president's official responsibility.

### A.     Legal Background

Unlike the express immunity conferred to legislators in the Speech or Debate Clause, *see* U.S. Const. art. I, § 6, cl. 1, no provision in the Constitution explicitly grants immunity to a sitting or former President of the United States.  The Constitution provides for a president's removal through "impeachment for, and conviction of, treason, bribery, or other high crimes and misdemeanors."  U.S. Const. art. II, § 4 (capitalization altered).  The Constitution's Impeachment Judgment Clause further provides that although the sole punishment the Senate may impose on a president (or other federal officer) impeached and convicted is removal from office and disqualification "to hold and enjoy any Office of honor, Trust or Profit under the United States," the impeached and convicted officer "shall nevertheless be liable to Indictment, Trial, Judgment and Punishment, according to Law."  U.S. Const. art. I, § 3, cl. 7.

The Supreme Court has not addressed a sitting or former president's claim of immunity from criminal liability, but it has addressed the issue in the civil context.  In *Fitzgerald*, 457 U.S. 731, the Court considered whether the plaintiff could seek damages in an employment discrimination suit against former President Nixon based on a reduction in force that Nixon had

undertaken in his "official capacity during his tenure in office." *Id.* at 733.  In light of the President's unique constitutional responsibilities and the "singular importance of the President's duties," *id.* at 750-51, as well as the risk that private damages actions could "diver[t]" the President's "energies" and diminish his "'ability to deal fearlessly and impartially with' the duties of his office," *id.* at 751-52, the Court held that the President "is entitled to absolute immunity from damages liability predicated on his official acts," *id.* at 749.  That "absolute Presidential immunity" encompassed "acts within the 'outer perimeter' of [the President's] official responsibility," which included the force reduction. *Id.* at 756-57.  In recognizing this immunity, the Court specifically noted that "there is a lesser public interest in actions for civil damages than, for example, in criminal prosecutions." *Id.* at 754 n.37.  Fifteen years later, the Supreme Court in *Clinton v. Jones*, 520 U.S. 681 (1997), rejected President Clinton's argument that the absolute presidential immunity recognized in *Fitzgerald* afforded him, while president, temporary immunity from civil claims arising from his time as the Governor of Arkansas because the immunity doctrine's "principal rationale"—allowing officials "to perform their designated functions effectively without fear that a particular decision may give rise to personal liability" and enabling them to "deal fearlessly and impartially with the public at large"—did not apply to unofficial conduct. *Id.* at 692-93 (internal quotation marks omitted).

Drawing support in part from the Supreme Court's decisions in *Fitzgerald* and *Clinton*, the Department of Justice's Office of Legal Counsel ("OLC") in 2000 reaffirmed its earlier conclusion[2] that the Constitution does not permit the indictment or criminal prosecution of a sitting president. *See* Randolph D. Moss, *A Sitting President's Amenability to Indictment and Criminal Prosecution*, 24 Op. O.L.C. 222, 244 (Oct. 16, 2000).  The reasoning employed by the OLC

---

[2] *See* Robert G. Dixon, Jr., *Amenability of the President, Vice President and other Civil Officers to Federal Criminal Prosecution while in Office* (Sept. 24, 1973).

strongly supports the conclusion that a former president may be prosecuted.  The OLC identified three burdens—a prison term, the "public stigma and opprobrium" resulting from an indictment, and the distraction of defending against the charges—that militated against prosecution of a sitting president given how those burdens might "severely hamper the President's performance of his official duties."  *Id.* at 246.  At the same time, the OLC observed that the President is not "'above the law,'" and that "[r]ecognizing an immunity from prosecution for a sitting President would not preclude such prosecution once the President's term is over or he is otherwise removed from office by resignation or impeachment."  *Id.* at 255, 257.

**B.     A Former President Has No Immunity from Federal Criminal Prosecution.**

No legal principle, case, or historical practice supports the conclusion that a former president is immune from federal criminal prosecution for conduct undertaken during his presidency.  Although the defendant suggests (Mot. 15-16) that the absence of any supporting materials stems from the lack of prior indictments of former presidents, the truth is that presidential amenability to criminal prosecution has been the subject of extensive debate ever since the founding.  And while some have disagreed with the Department of Justice's longstanding view that a *sitting* president may not be indicted, tried, convicted, and punished, there has been universal agreement that a *former* president may be subject to federal criminal prosecution—a principle recognized in the Constitution and rooted in historical practice.  Moreover, the justifications that caused the Supreme Court to recognize a former president's absolute immunity from *civil* liability in *Fitzgerald*, 457 U.S. 731, do not similarly require absolute immunity from federal *criminal* liability.  Extending absolute immunity from civil liability to encompass the criminal prosecution of a former president would be inconsistent with the reasoning and policy considerations identified in that case.

1.    **No constitutional provision or historical practice supports conferring absolute immunity from criminal prosecution on a former president.**

The defendant claims (Mot. 8-21) that his status as a former President of the United States entitles him to absolute immunity from criminal prosecution for any conduct undertaken while he was in office.  If accepted, that claim would undermine the bedrock principle that "[n]o man in this country is so high that he is above the law." *United States v. Lee*, 106 U.S. 196, 220 (1882). That principle extends to "[a]ll the officers of the government, from the highest to the lowest," and requires that "every man who by accepting office participates in its functions is only the more strongly bound to submit to that supremacy." *Id.*  And the principle that no one is above the law "applies, of course, to a President." *Trump v. Vance*, 140 S. Ct. 2412, 2432 (2020) (Kavanaugh, J., concurring).  In choosing to break from the British monarchy headed by a "sacred" and "inviolable" King not "amenable" to any "constitutional tribunal" and not subject to any punishment, the founders instead created a "President of the United States" who could be removed through impeachment and would be "liable to prosecution and punishment in the ordinary course of law." *The Federalist No. 69*, at 384 (Alexander Hamilton) (Clinton Rossiter ed., 1999); *see Trump v. Thompson*, 573 F. Supp. 3d 1, 16 (D.D.C. 2021) ("Presidents are not kings[.]").

The principle that no one is above the law underlies the universal consensus that a president may be subject to criminal prosecution at some point.  The United States has long taken the position that the Constitution affords a sitting president temporary immunity from criminal prosecution until the conclusion of his presidential term, though some have disagreed.[3]  But the defendant can

---

[3]  *Compare, e.g.*, Saikrishna Bangalore Prakash, *Prosecuting and Punishing Our Presidents*, 100 Tex. L. Rev. 55, 60 (2021) (arguing that a sitting president "may be arrested, indicted, prosecuted, and punished"); Claire O. Finkelstein & Richard W. Painter, *Presidential Accountability and the Rule of Law: Can the President Claim Immunity If He Shoots Someone on Fifth Avenue?*, 24 U. Pa. J. Const. L. 93, 97 (2022) (same), *with* Akhil Reed Amar & Brian C. Kalt, *The Presidential Privilege Against Prosecution*, 2 Nexus 11, 11 (1997) ("[W]e believe that

identify no support for his broad claim that he is forever entitled to absolute immunity for any conduct while he served as president.  In fact, "both sides in the immunity debate agree that presidents are unregally subject to criminal prosecution" and disagree only on "timing."  Brian C. Kalt, *Criminal Immunity and Schrödinger's President: A Response to* Prosecuting and Punishing Our Presidents, 100 Tex. L. Rev. Online 79, 83 (2021).  That a president may face criminal prosecution for conduct during his presidency when no longer in office draws support from the Constitution and historical practice.

> a. **The Constitution does not support absolute immunity from criminal prosecution for a former president for conduct while in office.**

Two constitutional provisions support the conclusion that a former president does not possess absolute immunity from criminal prosecution.  First, unlike the explicit textual immunity conferred to legislators under the Speech or Debate Clause, U.S. Const. art. I, § 6, cl. 1, which provides that "for any Speech or Debate in either House," members of Congress "shall not be questioned in any other Place," the Constitution does not expressly provide such protection for the President or any executive branch officials.[4]  To be sure, the Constitution's "silence . . . on this score is not dispositive," *Nixon*, 418 U.S. at 705 n.16, "in light of the 'presuppositions of our political history,'" *Fitzgerald*, 457 U.S. at 745 (quoting *Tenney v. Brandhove*, 341 U.S. 367, 376 (1951)).  But that silence is telling when placed against the Constitution's Impeachment Judgment Clause, which expressly contemplates criminal prosecution following impeachment and

---

the best view of constitutional text, history, structure, and precedent supports the conclusion that Justice Story reached: Sitting Presidents cannot be prosecuted."); Keith King, *Indicting the President: Can a Sitting President Be Criminally Indicted?*, 30 Sw. U. L. Rev. 417, 418 (2001) (same).

[4] By contrast, some state constitutions operative at the time of the founding did grant express criminal immunity to the state's chief executive officer.  *See* Prakash, *supra*, at 69-70 (discussing the 1776 Virginia Constitution and the 1776 Delaware Constitution).

conviction. *See* U.S. Const. art. I, § 3, cl. 7. Where a president—or any federal officer—has been impeached by the House and convicted at an impeachment trial in the Senate, the Impeachment Judgment Clause provides that the punishment for such impeachment and conviction "shall not extend further than to removal from Office, and disqualification to hold and enjoy any Office of honor, Trust or Profit under the United States: but the Party convicted shall nevertheless be liable and subject to Indictment, Trial, Judgment and Punishment, according to Law." *Id.* It would be incongruous to conclude that the Constitution or common law shields a former president from criminal prosecution when the Constitution expressly states that a former president may be subject to criminal prosecution after impeachment by the House and conviction by the Senate.

It would be all the more strained to reach that conclusion in light of the constitutional impeachment system. Under the Constitution, a president is subject to impeachment and Senate conviction for, among other things, "high crimes and misdemeanors." U.S. Const. art. II, § 4 (capitalization altered). When the Constitution was ratified, the phrase "high crimes and misdemeanors" was aimed at the "misconduct of public men," including the "abuse or violation of some public trust." *The Federalist No. 65*, at 364 (Hamilton). In that respect, "high crimes and misdemeanors" were offenses that "may with peculiar propriety be denominated POLITICAL, as they relate chiefly to injuries done immediately to the society itself." *Id.*; *accord* 2 Joseph Story, *Commentaries on the Constitution of the United States* § 783 (1833) (noting that the "offences, to which the remedy of impeachment has been, and will continue to be principally applied, are of a political nature"). The conduct that impeachment targets includes "acts taken in [the president's] 'public character'—that is, official acts[.]" *Clinton*, 520 U.S. at 696. As noted above, the Constitution's Impeachment Judgment Clause expressly contemplates the criminal prosecution of an impeached and convicted federal officer, including a president. *See* U.S. Const. art. I, § 3, cl. 7. In other words, given that the Constitution permits the impeachment and Senate conviction of

a president for official conduct taken in his public role and likewise explicitly provides for an impeached and Senate-convicted president's criminal prosecution for the same conduct, it would be implausible to posit that the Constitution also simultaneously (and implicitly) immunizes a former president from criminal prosecution for official acts.

The defendant's argument (Mot. 11-13) that impeachment is the "[e]xclusive [m]ethod" by which to hold a former president responsible for "[c]rimes in [o]ffice" is incorrect. As noted, the Impeachment Judgment Clause envisions both impeachment *and* criminal prosecution of a president who has been removed from office through impeachment. *See* U.S. Const. art. I, § 3, cl. 7; *see Nixon v. United States*, 506 U.S. 224, 234 (1993) ("[T]he Framers recognized that most likely there would be two sets of proceedings for individuals who commit impeachable offenses— the impeachment trial and a separate criminal trial."). The Impeachment Judgment Clause thus reflects the "separate and different roles for the executive's power of prosecution and the legislature's impeachment powers." *Hastings v. United States Senate*, 716 F. Supp. 38, 42 (D.D.C. 1989). It follows that neither branch can block the other from acting, and each has "different roles to play" when an officer subject to impeachment and criminal prosecution—such as a president— "engages in criminal behavior." *Id.*; *cf. Nixon*, 506 U.S. at 226-27 (federal judge convicted for making false statements after which Congress instituted impeachment proceedings).

Moreover, if the defendant's theory that criminal prosecution is available only when preceded by House impeachment and Senate conviction were correct, it would either completely shield a former president from criminal prosecution for crimes committed while in office but discovered afterwards or require that Congress initiate impeachment proceedings against a former president. But the Impeachment Judgment Clause does not empower Congress to control the core executive act of prosecution through the political impeachment process. *See* 2 Story, *supra*, at § 801 (explaining that even if an impeached party was no longer in office and therefore could no

longer be removed, "his offence was still liable to be tried and punished in the ordinary tribunals of justice").

The defendant's argument also flatly contradicts his claim during his second impeachment proceedings. At his impeachment trial in the Senate, the defendant aptly described the theory that he is now advocating as a "complete canard" because "[c]learly, a former civil officer who is not impeached is subject to" criminal prosecution as described in the Impeachment Judgment Clause. *See* 167 Cong. Rec. S607 (daily ed. Feb. 9, 2021). The defendant further contended that the "idea of a January amnesty [was] nonsense" because if he "committed a criminal offense" then "[a]fter he is out of office, you go and arrest him," adding, "[t]he Department of Justice does know what to do with such people." *Id.* at S601. In short, at his impeachment trial, the defendant argued that he could not be convicted by the Senate because he was no longer in office but that he was subject to post-presidency prosecution, and he now—when facing such a prosecution—argues that he cannot be prosecuted for criminal offenses concerning conduct while he was in office because he was not convicted by the Senate for that conduct. The Constitution does not countenance, let alone require, such a perverse outcome.

To the extent that the defendant separately grounds (Mot. 13) his immunity claim in the fact of a Senate *acquittal*, as distinct from the mere absence of a conviction, that argument fares no better. Neither the Impeachment Judgment Clause, U.S. Const. art. I, § 3, cl. 7, nor the Double Jeopardy Clause, U.S. Const. amend. V, supports that cursory claim. Indeed, Justice Story— whose ambiguous comment about presidential civil immunity the defendant otherwise relies on, *see infra* 17-18—explained that the Constitution wisely separated an impeachment trial (with its exclusive remedies of removal and disqualification) from a trial "in the common tribunals of justice" to ensure that "a second trial for the same offence could be had, either after an acquittal, or a conviction in the court of impeachments." 2 Story, *supra*, §§ 780-81. Otherwise, "if no such

second trial could be had, then the grossest official offenders might escape without any substantial punishment, even for crimes, which would subject their fellow citizens to capital punishment." *Id.* Impeachment and removal thus do not constitute "jeopardy" in a criminal sense, *see* Randolph D. Moss, *Whether a Former President May Be Indicted and Tried for the Same Offenses for Which He Was Impeached by the House and Acquitted by the Senate*, 24 Op. O.L.C. 110, 119-34 (Aug. 18, 2000), but even if they did, acquittal in the Senate would not preclude criminal prosecution based on the express constitutional text.[5]

The defendant's reliance (Mot. 11-12) on an asserted negative implication—that the phrase "Party convicted" in the Impeachment Judgment Clause requires that an officer be both impeached *and* convicted before that officer may face criminal prosecution—is therefore misplaced. The prior portion of the Clause specifies the permissible consequences for a party convicted by the Senate. The portion of the Clause on which the defendant relies then makes clear that such a party is subject to criminal prosecution. The best reading of the text thus is that it does not speak to acquittal at all. Moreover, the asserted negative implication cannot overcome historical evidence and structural considerations indicating that the Impeachment Judgment Clause was intended to limit congressional sanctions for impeachment to removal and disqualification from office, not to preclude the prosecution of an impeached but not convicted officer. *See United States v. Claiborne*, 727 F.2d 842, 846 (9th Cir. 1984) (per curiam) (Impeachment Judgment Clause "was

---

[5] And even if the Double Jeopardy Clause applied, it would not preclude this prosecution. The Clause protects against multiple punishments for the same offense, *see Missouri v. Hunter*, 459 U.S. 359, 365-66 (1983), and requires ascertaining whether each requires proof of an element that the other does not, *Blockburger v. United States*, 284 U.S. 299, 304 (1932). The offenses charged in this case are not the same as the "incitement of insurrection" article of impeachment at issue in the defendant's impeachment trial. *See* H.R. Res. 24, 117th Cong. at 3 (Jan. 11, 2021) (Single article of impeachment for high crimes and misdemeanors alleging that the defendant violated his "constitutional oath faithfully to execute the office of President of the United States . . . by inciting violence against the Government of the United States").

intended 'to assure that after impeachment a trial on criminal charges is not foreclosed by the principle of double jeopardy'") (quoting *United States v. Isaacs*, 493 F.2d 1124, 1142 (7th Cir. 1974) (per curiam)); *Thompson v. Trump*, 590 F. Supp. 3d 46, 86-87 (D.D.C. 2022).

Finally, the defendant's suggestion (Mot. 13) that a criminal prosecution "cannot second-guess" the Senate misstates the relationship between these two separate and distinct proceedings, *see Hastings*, 716 F. Supp. at 42, as emphasized by the reasons several Senators gave for their not-guilty votes in the defendant's own impeachment trial.  In that proceeding, the defendant argued that, because he was no longer in office, the Senate lacked jurisdiction to convict him.  *In re Impeachment of Former President Donald J. Trump*, Trial Memorandum of Donald J. Trump, S. Doc. 117-2 at 13-37 (Feb. 8, 2021).  At least 31 of the 43 Senators who voted to acquit explained that their decision to do so rested in whole or in part on their agreement with the defendant's jurisdictional argument,[6] underscoring that the defendant's claimed immunity from prosecution would create a yawning impunity gap: a president who leaves office before the House and Senate can consider impeachment would escape accountability altogether.  Further, some Senators explicitly referred to the availability of criminal prosecution as an alternative means of providing accountability.  *See, e.g.*, 167 Cong. Rec. S736 (daily ed. Feb. 13, 2021) (Sen. McConnell) (explaining that his vote was based on the view that the Senate lacked jurisdiction and stating that the defendant "is still liable for everything he did while he was in office, as an ordinary citizen" and that, "We have a criminal justice system in this country. We have civil litigation, and former presidents are not immune from being held accountable by either one."); Sen. Thom Tillis, Tillis

---

[6] *See* statements on February 13, 2021, from Senators Barrasso, Blunt, Boozman, Braun, Cornyn, Cramer, Crapo, Daines, Ernst, Fisher, Grassley, Hoeven, Hyde-Smith, Inhofe, Kennedy, Lankford, Lee, Lummis, McConnell, Moore, Moran, Portman, Risch, Rounds, Rubio, Shelby, Sullivan, Thune, Tillis, Tuberville, and Wicker.

Statement on Impeachment Trial (Feb. 13, 2021)[7] ("An impeachment trial is not the best or only way to hold a former elected official accountable for their actions. The ultimate accountability is through our criminal justice system where political passions are checked and due process is constitutionally mandated. No president is above the law or immune from criminal prosecution, and that includes former President Trump."); Sen. Mike Crapo, Crapo Statement on Impeachment Trial (Feb. 13, 2021)[8] ("Both by text and by precedent, the Constitution does not allow impeaching private citizens—even those who formerly occupied federal office.  Private citizens are subject to accountability for their actions under our legal justice system. . . . The violent, despicable acts of January 6th have shaken our republic to its core and must not go unpunished.").

>    **b.    Historical practice does not support absolute immunity from criminal prosecution for a former president for conduct while in office.**

Historical evidence from the time of the founding likewise confirms that a president was subject to prosecution when no longer in office.  Writing as Publius in support of the Constitution's adoption, Alexander Hamilton explained that an impeachment would not "terminate the chastisement of the offender" because "[a]fter having been sentenced to a perpetual ostracism from the esteem and confidence, and honors and emoluments of his country, he will still be liable to prosecution and punishment in the ordinary course of law."  *The Federalist No. 65*, at 365; *see id.* at *No. 69*, at 384 (Hamilton); *id.* at *No. 77* (Hamilton), at 432 (noting that the president is "at all times liable to impeachment, trial, [and] dismission from office" as well as "forfeiture of life and estate by subsequent prosecution in the common course of law").  Speaking at the North Carolina ratifying convention, James Iredell—who would go on to become a Supreme Court Justice—noted

---

[7] https://www.tillis.senate.gov/2021/2/tillis-statement-on-impeachment trial.

[8] https://www.crapo.senate.gov/media/newsreleases/crapo-statement-on-impeach-trial.

that "[i]f [the President] commits any crime, he is punishable by the laws of his country."  4 Debates on the Constitution 109 (J. Elliot ed. 1891); *see Trump*, 140 S. Ct. at 2435 (Thomas, J., dissenting) (discussing Iredell).

The reasoning in decisions declining to recognize absolute immunity for a sitting president with respect to subpoenas issued during the course of criminal proceedings bolsters this founding-era evidence.  More than 200 years ago, Chief Justice John Marshall concluded that because a sitting president does not "stand exempt from the general provisions of the constitution," a subpoena duces tecum could be issued to the president.  *See Burr*, 25 F. Cas. at 33-34.  Marshall refused to recognize for the sitting president the common-law immunity from criminal process recognized in "the case of king," and observed that "it is not known ever to have been doubted" that a chief executive could be served with a subpoena.  *Id.*; *see Nixon v. Sirica*, 487 F.2d 700, 709 (D.C. Cir. 1973) (en banc) (per curiam) (observing that in *Burr*, Chief Justice Marshall "squarely ruled that a subpoena may be directed to the President").[9]  In *Nixon*, 418 U.S. 683, the sitting president sought to quash the Special Prosecutor's trial subpoena seeking tape recordings of Oval Office meetings.  Although the Supreme Court recognized a qualified presidential communications privilege to "safeguard[] the public interest in candid, confidential deliberations within the Executive Branch," *Trump v. Thompson*, 20 F.4th 10, 26 (D.C. Cir. 2021) (internal quotation marks omitted), neither the separation of powers nor the need for confidentiality could "sustain an absolute, unqualified Presidential privilege of immunity from judicial process under all circumstances," *Nixon*, 418 U.S. at 706.  And in *Trump*, 140 S. Ct. 2412, the Court rejected the

---

[9] To be sure, Chief Justice Marshall in a subsequent opinion stated that "[i]n no case of this kind would a court be required to proceed against the president as against an ordinary individual." *United States v. Burr*, 25 F. Cas. 187, 192 (C.C.D. Va. 1807).  But as the Supreme Court later observed, Marshall's recognition in *Burr* that a sitting president differs from an "'ordinary individual'" "cannot be read to mean in any sense that a President is above the law." *Nixon*, 418 U.S. at 715.

sitting president's "*categorical* argument" that burdens associated with "diversion, stigma, and harassment" warranted immunity from responding to a state criminal subpoena, *id*. at 2425, instead concluding that under the reasoning in *Burr* and *Nixon*, "not even the President[] is categorically above the common duty to produce evidence when called upon in a criminal proceeding."  *Id.* at 2431.  In so holding, the Supreme Court reaffirmed the principle from *Nixon* that "the public interest in fair and accurate judicial proceedings is at its height in the criminal setting." *Id.* at 2424.  These cases thus recognize a heightened "commitment to justice" in the face of criminal law enforcement.  *Id.*

Largely ignoring these cases and the history on which they draw, the defendant advances two unpersuasive contentions (Mot. 13-16) that historical practice in fact supports a rule of absolute presidential immunity from criminal prosecution.  First, in adverting to (Mot. 13) "[e]arly [a]uthorities," the defendant extracts broad language expounding upon a president's powers from two civil cases, *Marbury v. Madison*, 5 U.S. 137 (1803) (Marshall, C.J.), and *Martin v. Mott*, 25 U.S. 19 (1827) (Story, J.), that do not address presidential immunity, let alone immunity from criminal prosecution.  The defendant's invocation of Chief Justice Marshall's opinion in *Marbury* fails to account for Marshall's opinion subjecting President Jefferson to a subpoena duces tecum in a criminal proceeding four years later in *Burr* and the Supreme Court's view—expressed in a case rejecting a claim of absolute civil immunity for certain federal officers—that *Marbury* stands for the propositions that "all individuals, whatever their position in government, are subject to federal law" and that "'[n]o man in this country is so high that he is above the law.'"  *Butz v. Economou*, 438 U.S. 478, 506 (1978) (citing *Marbury* and *Lee*, 106 U.S. at 220).  Moreover, the relevant language in the passage the defendant quotes (Mot. 14) from Justice Story's treatise—that "[t]he president cannot, therefore, be liable to arrest, imprisonment, or detention, while he is in the discharge of the duties of his office; and for this purpose his person must be deemed, in civil cases

at least, to possess an official inviolability," 3 Joseph Story, *Commentaries on the Constitution of the United States* § 1563 (1833)—by its terms applies to sitting presidents "while . . . in the discharge of the duties of [their] office." *Id.* The passage thus does not illuminate (let alone govern) whether a *former* president is entitled to immunity from criminal prosecution for conduct during his presidency. Even construed broadly, it at best supports principles that are not at issue in this case. *See supra* 6-7 (a sitting president may not be criminally prosecuted); *infra* 19-34 (noting that a former president has absolute immunity from civil liability for official conduct but explaining why comparable immunity does not apply in the criminal context).

Second, that no former president has been criminally prosecuted (*see* Mot. 15-16) reflects not a history and tradition implying the existence of criminal immunity but instead the fact that "most presidents have done nothing criminal, making it difficult to draw inferences from the absence of arrests or prosecutions." Saikrishna Bangalore Prakash, *Prosecuting and Punishing Our Presidents*, 100 Tex. L. Rev. 55, 82 (2021). In any event, the history is not as uniform as the defendant suggests. President Ford's pardon of former President Nixon covering acts during the latter's presidency rested on the assumption that no post-presidential immunity from criminal prosecution existed. *See* Gerald Ford, Presidential Statement at 7-8 (Sept. 8, 1974) (granting former President Nixon a "full, free, and absolute pardon . . . for all offenses against the United States which he, Richard Nixon, has committed or may have committed or taken part in during" his presidency)[10]; Richard Nixon, Statement by Former President Richard Nixon at 1 (Sept. 8, 1974) (former president accepting "full and absolute pardon for any charges which might be brought against me for actions taken during the time I was President of the United States").[11] The

---

[10] https://www.fordlibrarymuseum.gov/library/document/0067/1563096.pdf.

[11] https://www.fordlibrarymuseum.gov/library/document/0019/4520706.pdf.

same is true for President Clinton's "forthright admission that he gave false testimony under oath" about matters occurring during his presidency in order to avoid indictment after his presidency. *See* John F. Harris & Bill Miller, *In a Deal, Clinton Avoids Indictment*, Washington Post (Jan. 20, 2001).[12]

> ### 2. The immunity from civil liability for a former president's official conduct recognized in *Fitzgerald* does not extend to criminal liability.

In *Fitzgerald*, the Supreme Court concluded that a former President has absolute immunity from civil damages liability for "acts within the 'outer perimeter' of his official responsibility." 457 U.S. at 756. The Court considered such civil immunity a "functionally mandated incident of the President's unique office, rooted in the constitutional tradition of the separation of powers and supported by our history." *Id.* at 749. The defendant seeks to transplant *Fitzgerald*'s civil-damages-based immunity, for the first time, into the realm of criminal immunity. Not only would applying the absolute immunity from civil damages liability recognized in *Fitzgerald* functionally place a former president above the law, it would also be inconsistent with *Fitzgerald*'s reasoning and its analogy to judges and prosecutors, whose absolute immunity from civil suit is carefully balanced with liability to criminal prosecution to ensure accountability. Further, the "concerns of public policy, especially as illuminated by our history and the structure of our government," *id.* at 747-48, that supported absolute immunity in civil suits do not support such immunity in the criminal prosecution of a former president for his conduct while in office.

> #### a. Applying *Fitzgerald* in the criminal context would place a former president above the law.

Offering no more than a cursory footnote (Mot. 10 n.2) for the claim that the absolute civil immunity recognized in *Fitzgerald* should grant a former president comparable immunity from

---

[12] https://www.washingtonpost.com/archive/politics/2001/01/20/in-a-deal-clinton-avoids-indictment/bb80cc4c-e72c-40c1-bb72-55b2b81c3065/.

criminal prosecution, the defendant contends (*id.* at 27-45) that he is permanently immune from criminal liability for any conduct that falls within the outer perimeter of his official presidential duties—which, he maintains, should be assessed at a high level of abstraction and generality. Thus, in the defendant's view, a court should treat a president's conduct as absolutely immune from criminal prosecution as long as it takes the form of a statement on a matter of public concern, or a meeting with a member of the executive branch, or correspondence with a state official about a matter in which there is a federal interest. Moreover, even where the conduct at issue does not fit within the outer perimeter of the functions of his office, he is still immune, in the defendant's telling, so long as his conduct was "intertwined" with some conduct that does fit within that perimeter. *Id.* at 44-45. Once immunity attaches, he further claims (*id.* at 23-26), it is absolute, and no evidence of criminal purpose can overcome it or even be considered in evaluating its application.

The implications of the defendant's unbounded immunity theory are startling. It would grant absolute immunity from criminal prosecution to a president who accepts a bribe in exchange for a lucrative government contract for a family member; a president who instructs his FBI Director to plant incriminating evidence on a political enemy; a president who orders the National Guard to murder his most prominent critics; or a president who sells nuclear secrets to a foreign adversary. After all, in each of these scenarios, the president could assert that he was simply executing the laws; or communicating with the Department of Justice; or discharging his powers as commander-in-chief; or engaging in foreign diplomacy—and his felonious purposes and motives, as the defendant repeatedly insists, would be completely irrelevant and could never even be aired at trial. In addition to the profoundly troubling implications for the rule of law and the inconsistency with the fundamental principle that no man is above the law, that novel approach to immunity in the criminal context, as explained above, has no basis in law or history.

      **b.**    *Fitzgerald*'s reasoning does not apply in the criminal context.

The defendant's contention (Mot. 10 n.2) that the immunity recognized in *Fitzgerald* must "extend to" the criminal context does not withstand scrutiny.  Multiple opinions in *Fitzgerald* clarified that neither the case's holding nor its reasoning supported the conclusion that a former president could claim a comparable immunity from criminal prosecution.[13]   The five-Justice majority observed that the separation-of-powers rationale that often counsels judicial restraint toward a president applied with less force where the Court acts "to vindicate the public interest in an ongoing criminal prosecution" as it did in *United States v. Nixon*.  457 U.S. at 754.  By contrast, a "merely private suit for damages based on a President's official acts" did not implicate the "broad public interests" supporting "judicial action."  *Id.*  In a footnote, the majority also noted that the Court's prior decisions had recognized "a lesser public interest in actions for civil damages than, for example, in criminal prosecutions."  *Id.* at 754 n.37.  In addition to relying on *United States v. Nixon*, the majority cited *United States v. Gillock*, 445 U.S. 360 (1980), where the Court had declined to recognize absolute immunity from criminal prosecution for a state legislator prosecuted in federal court because "principles of comity" yielded "where important federal interests are at stake, as in the enforcement of federal criminal statutes."  *Id.* at 373.

The concurrence and principal dissent in *Fitzgerald* likewise understood the decision not to extend a former president's immunity from suit to the criminal context.  Chief Justice Burger rejected any implication that the majority opinion "recognize[d] sweeping immunity for a

---

[13] When discussing *Fitzgerald*, the defendant repeatedly relies on (Mot. 18, 19, 22, 23, 26, 37, 42) an amicus brief filed by the United States in a recent civil case, but that reliance is misplaced because that brief addressed "only a President's liability in a private suit for damages" and "d[id] not express any view regarding the potential criminal liability of any person for the events of January 6, 2021, or acts connected with those events."  Brief for the United States as Amicus Curiae, *Blassingame v. Trump*, Nos. 22-5069, 22-7030, 22-7031, at 3 n.1 (D.C. Cir.) (filed Mar. 2, 2023) (internal quotation marks omitted).

President for all acts"; instead, the former president's immunity recognized in that case was "limited to civil damages claims." *Fitzgerald*, 457 U.S. at 759 (Burger, C.J., concurring). Writing for three other Justices in dissent, Justice White observed that no party had contended that a former president "is immune from criminal prosecution in the courts under the criminal laws enacted by Congress or by the States," and any claim to that effect would not be "credible." *Id.* at 780 (White, J., dissenting). In sum, though the Supreme Court fractured over whether absolute presidential immunity from civil damages for a former president's official acts in office was appropriate, it was unanimous in recognizing that the broad public interest in the enforcement of criminal law militated against granting a former president absolute immunity from federal criminal prosecution.

Contrary to the defendant's passing suggestion (Mot. 10 n.2), the distinction noted in *Fitzgerald* between the civil and criminal context "is not just a matter of formalism." *Cheney v. U.S. Dist. Court for Dist. of Columbia*, 542 U.S. 367, 384 (2004). The absolute immunity of certain government officials from civil actions for damages finds no analogue under criminal law. *See Expeditions Unlimited Aquatic Enterprises, Inc. v. Smithsonian Inst.*, 566 F.2d 289, 305 (D.C. Cir. 1977) (Wilkey, J., concurring dubitante) (noting absolute civil immunity "does not foreclose any possible criminal prosecutions of government officials who violate the law"); *cf. Turkiye Halk Bankasi A.S. v. United States*, 598 U.S. 264, 272 (2023) (holding that the Foreign Sovereign Immunities Act of 1976, 28 U.S.C. §§ 1330, 1602 *et seq.*, "does not grant immunity to foreign states or their instrumentalities in criminal proceedings"). Although the interests at stake in civil litigation are "far from negligible," *Cheney*, 542 U.S. at 384, the courts' "primary constitutional duty" is "to do justice in criminal prosecutions," *Nixon*, 418 U.S. at 707. The Supreme Court in *Nixon* emphasized that "our historic[al] commitment to the rule of law . . . is nowhere more profoundly manifest than in our view that 'the twofold aim [of criminal justice] is that guilt shall not escape or innocence suffer.'" *Id*. at 708-09 (quoting *Berger v. United States*, 295 U.S. 78, 88

(1935)).  Extending immunity recognized for a former president in civil cases to the "much weightier" criminal context, *Cheney*, 542 U.S. at 384, would undermine that bedrock commitment to the rule of law.

Relatedly, the distinction for purposes of civil immunity analysis between "official" and "unofficial" conduct, *see Clinton*, 520 U.S. at 694, does not translate into the federal criminal context.  Stated concisely, "[c]riminal conduct is not"—and can never be—"part of the necessary functions performed by public officials."  *Isaacs*, 493 F.2d at 1144.  To hold otherwise would be to "carry a judicially fashioned privilege so far as to immunize criminal conduct proscribed by an Act of Congress."  *Gravel v. United States*, 408 U.S. 606, 627 (1972); *see O'Shea v. Littleton*, 414 U.S. 488, 503 (1974) ("[T]he judicially fashioned doctrine of official immunity does not reach 'so far as to immunize criminal conduct proscribed by an Act of Congress.'") (quoting *Gravel*, 408 U.S. at 627).  Consistent with that principle, courts of appeals have rejected arguments by federal judges seeking immunity from federal criminal prosecution even where the conduct in question implicated their official responsibilities as judges.  *See, e.g.*, *Claiborne*, 727 F.2d at 845; *United States v. Hastings*, 681 F.2d 706, 710-11 (11th Cir. 1982); *Isaacs*, 493 F.2d at 1143-44.

### c.    *Fitzgerald*'s analogy to judges and prosecutors—who are not immune from criminal prosecution—applies here.

The defendant correctly notes (Mot. 17-18) that the immunity granted to presidents is in some respects analogous to the immunity granted to judges and prosecutors.  But his claim that such immunity also protects judges and prosecutors—and by extension, former presidents—from criminal liability overlooks binding precedent and settled historical practice.

Throughout the majority opinion in *Fitzgerald*, the Court likened the absolute civil immunity for a former president to common-law immunity accorded judges and prosecutors.  *See* 457 U.S. at 746-48 (discussing prior cases holding that "the especially sensitive duties of certain

officials—notably judges and prosecutors—required the continued recognition of absolute immunity" and after "[a]pplying the principles of our cases to claims of this kind," holding "that petitioner, as a former President of the United States, is entitled to absolute immunity from damages liability predicated on his official acts"); *id.* at 751-52 ("As is the case with prosecutors and judges—for whom absolute immunity now is established—a President must concern himself with matters likely to 'arouse the most intense feelings.'"); *id.* at 758 ("For the President, as for judges and prosecutors, absolute immunity merely precludes a particular private remedy for alleged misconduct in order to advance compelling public ends."); *see also id.* at 763-64 (Burger, C.J., concurring) ("Far from placing a President above the law, the Court's holding places a President on essentially the same footing with judges and other officials whose absolute immunity we have recognized."). And when subsequently describing *Fitzgerald*, the Court recognized the parallel between presidential immunity from civil damages liability and comparable immunity for prosecutors and judges. *See Trump*, 140 S. Ct. at 2426 ("But *Fitzgerald* did not hold that distraction was sufficient to confer absolute immunity. We instead drew a careful analogy to the common law absolute immunity of judges and prosecutors, concluding that a President, like those officials, must 'deal fearlessly and impartially with the duties of his office'—not be made 'unduly cautious in the discharge of [those] duties' by the prospect of civil liability for official acts.").

That parallel is instructive because the Supreme Court has reasoned that, notwithstanding their absolute immunity from civil liability, prosecutors and judges are "subject to criminal prosecutions as are other citizens." *Dennis v. Sparks*, 449 U.S. 24, 31 (1980) (discussing judges); *see Imbler v. Pachtman*, 424 U.S. 409, 429 (1976) (observing, in a case holding that prosecutors are absolutely immune from civil damages liability, that the Supreme Court had "never suggested that the policy considerations which compel civil immunity for certain governmental officials also place them beyond the reach of the criminal law"); *see also Mireles v. Waco*, 502 U.S. 9, 9, 10 n.1

(1991) (per curiam) (noting that while "[a] long line of this Court's precedents acknowledges that, generally, a judge is immune from a suit for money damages," the Court has also "recognized that a judge is not absolutely immune from criminal liability").  Accordingly, courts have declined to recognize immunity in cases of federal judges criminally prosecuted for violations of federal law, even when the charges involved official, rather than private, conduct.  *See, e.g.*, *Claiborne*, 727 F.2d at 845; *Hastings*, 681 F.2d at 710-11; *Isaacs*, 493 F.2d at 1143-44.  Just as an active judge "no less than any other man is subject to the processes of the criminal law," *Hastings*, 681 F.2d at 711, so too is a former president.

Indeed, courts recognizing immunity from civil liability for certain officials, such as judges and prosecutors, have operated from the premise that civil immunity did not erect an absolute shield for misconduct precisely because those officials were subject to criminal prosecution.  *See Imbler*, 424 U.S. at 428-29 ("We emphasize that the immunity of prosecutors from liability in suits under § 1983 does not leave the public powerless to deter misconduct or to punish that which occurs."); *Gillock*, 445 U.S. at 372-73 ("[T]he cases in this Court which have recognized an immunity from civil suit for state officials have presumed the existence of federal criminal liability as a restraining factor on the conduct of state officials."); *see also Fitzgerald*, 457 U.S. at 757 n.38 ("The presence of alternative remedies has played an important role in our previous decisions in the area of official immunity.").[14]  In holding that a federal judge's civil immunity did not also insulate him from federal prosecution, the Eleventh Circuit reasoned that the "miniscule increment in judicial independence that might be derived" from a rule of absolute judicial immunity "would

---

[14] The defendant suggests (Mot. 13) that the omission of criminal prosecution from *Fitzgerald*'s list of alternative remedies is "[n]otabl[e]."  But as explained above, *Fitzgerald* acknowledged a different—and greater—public interest in criminal prosecution.  *See* 457 U.S. at 754 n.37.  Moreover, the Court's discussion of alternative remedies included impeachment, *id.* at 757 & n.38, which, as the Impeachment Judgment Clause makes evident, does not foreclose and in fact expressly contemplates criminal prosecution.

be outweighed by the tremendous harm that the rule would cause to another treasured value of our constitutional system," namely that no man is above the law.  *See Hastings*, 681 F.2d at 711; *accord id.* at 711 n.17 ("The rule of absolute immunity from criminal prosecution of active federal judges for acts committed in their official capacities poses too great a threat to the public interest in the rule of law.").

The defendant is therefore correct (Mot. 17) that judicial immunity is an appropriate analogue here but wrong to conclude (Mot. 17-18) that judges are immunized against criminal prosecution.  Whatever the English common-law approach to judicial immunity in the criminal context, *compare* J. Randolph Block, Stump v. Sparkman *and the History of Judicial Immunity*, 1980 Duke L.J. 879, 884 (1980) (suggesting that a "litigant" could not "make a judge civilly or criminally liable for an abuse of his jurisdiction") (internal quotation marks omitted), *with id.* at 888 (noting that justices of the peace had civil immunity but could "be punished *criminally*") (internal quotation marks omitted), the Supreme Court and federal courts of appeals have uniformly rejected any claim or suggestion of judicial immunity from criminal prosecution.  *See Dennis*, 449 U.S. at 31; *Mireles*, 502 U.S. at 10 n.1; *Ex Parte Commonwealth of Virginia*, 100 U.S. 339, 348 (1879); *Claiborne*, 727 F.2d at 845; *Hastings*, 681 F.2d at 710-11; *Isaacs*, 493 F.2d at 1143-44; 46 Am. Jur. 2d Judges § 77 (2023) ("The doctrine of judicial immunity is applicable only to civil actions for judicial acts and does not render judges immune to criminal proceedings in the event they are charged with the commission of a crime.  Judges are subject to criminal prosecutions as are other citizens and may be held responsible for the violation of a criminal statute to the same extent.") (footnotes omitted); *see also* 28 U.S.C. § 364 (statute addressing the effect of a federal judge's felony conviction).  As noted above, judges have regularly faced criminal prosecution.  *See also United States v. Collins*, 972 F.2d 1385, 1392-94, 1415 (5th Cir. 1992) (affirming criminal conviction of federal judge who accepted bribes in exchange for agreeing to impose a lenient

sentence); *United States v. Nixon*, 816 F.2d 1022, 1031 (5th Cir. 1987) (affirming criminal conviction of federal judge); *United States v. Manton*, 107 F.2d 834, 838, 850 (2d Cir. 1939) (same for federal judge who "would accept sums of money in return for corrupt judicial action by him favorable to the interests of those who paid").

The defendant's reliance on *United States v. Chaplin*, 54 F. Supp. 926 (S.D. Cal. 1944), to support the claim (Mot. 17) that courts have "universally rejected criminal charges against judges for their judicial acts" is misleading and disingenuous. *Chaplin*—an out-of-circuit district court decision from nearly 80 years ago whose reasoning is opaque—is apparently the sole case that conferred immunity on a judge facing criminal prosecution. *See* 54 F. Supp. at 934-35.   But even in reaching that one-of-a-kind result, the district court in *Chaplin* recognized that "[t]here is no judge, from the judge of the Supreme Court of the United States at Washington, to a justice of the peace in the smallest township of the state, who, acting on any judicial matter from corruption or from malice, but becomes amenable to the criminal law the same as any other man." *Id.* at 930; *accord id.* at 933 ("[W]here a judge violates a criminal statute, he is held to the same responsibility as any citizen.").   *Chaplin*'s analysis—which none of the courts affirming criminal convictions cited above has followed—does not survive the Supreme Court's more recent pronouncements on judicial immunity in the criminal context, *see* Timothy M. Stengel, *Absolute Judicial Immunity Makes Absolutely No Sense: An Argument for an Exception to Judicial Immunity*, 84 Temp. L. Rev. 1071, 1085 (2012) (arguing that the Supreme Court would not "adopt the reasoning of the *Chaplin* court" because the Court has expressly recognized that the civil-rights law charged in *Chaplin* can "be used to prosecute judges"), but even if it did, this Court should not extend its outlier reasoning to the context of presidential immunity.

> **d.** **Adequate safeguards protect the unique role of the presidency without immunizing a former president from criminal prosecution.**

The defendant's attempt (Mot. 18-21) to transplant the policy rationales that *Fitzgerald* identified as supporting absolute immunity from civil liability into the criminal context lacks merit. For one, the defendant's suggestion that an incumbent president would be inhibited by the prospect of future federal criminal prosecution lacks any historical or empirical support; indeed, it is at least equally plausible that the prospect of future criminal prosecution would have a salutary, not a chilling, effect. *See Harlow v. Fitzgerald*, 457 U.S. 800, 819 (1982) ("Where an official could be expected to know that certain conduct would violate statutory or constitutional rights, he should be made to hesitate."). Throughout American history, there have been federal criminal prosecutions of high-ranking officials from all three branches of the federal government—including the Vice President, members of the Cabinet, Senators, Representatives, and judges—as well as of governors, mayors, sheriffs, and more. Far from chilling public officials in the exercise of their duties, these prosecutions have helped ensure that officials and citizens alike know that ours is a system based on the rule of law, applicable without fear or favor to even the most powerful public officials.

Furthermore, the Impeachment Judgment Clause entirely undermines the defendant's claim (Mot. 10) that a former president's immunity from criminal prosecution should be "absolute"—as the defendant ultimately acknowledges (Mot. 11)—because a former president who has been impeached and convicted will be liable to criminal prosecution. It follows that at least two of the speculative concerns the defendant identifies (Mot. 18-20)—that a president will be constrained with respect to his "especially sensitive duties" and his need to take "bold and unhesitating action" (internal quotation marks omitted) if he fears prosecution—would remain even under the defendant's view because a former president would still be subject to criminal

prosecution following impeachment.  Thus, even on his own terms the defendant is unable to establish that "absolute immunity" is necessary or that meaningful functional benefits of such immunity for the presidency could justify its significant costs in terms of potential impunity, perverse incentives, and the undermining of the rule of law.

Indeed, no sound policy supports granting a former president blanket immunity from criminal prosecution for the time that he or she served as president.  The OLC recognized three burdens that counsel against permitting the criminal prosecution of a sitting president:  (1) imposition of a prison term, which "would make it physically impossible for the President to carry out his duties"; (2) the "public stigma and opprobrium occasioned by the initiation of criminal proceedings, which could compromise the President's ability to fulfill his constitutionally contemplated leadership role with respect to foreign and domestic affairs"; and (3) the "mental and physical burdens of assisting in the preparation of a defense for the various stages of the criminal proceedings, which might severely hamper the President's performance of his official duties."  *A Sitting President's Amenability to Indictment and Criminal Prosecution*, 24 Op. O.L.C. at 246.  None applies to a former president, who no longer has "duties" or a "leadership role" with which a criminal prosecution would interfere.  The argument that a president "is almost inevitably going to do a worse job as President" if concerned about "an ongoing criminal investigation," Brett M. Kavanaugh, *Separation of Powers During the Forty-Fourth Presidency and Beyond*, 93 Minn. L. Rev. 1454, 1461 (2009), is immaterial in the case of a former president.  It follows, as the OLC has observed, that "[r]ecognizing an immunity from prosecution for a sitting President would not preclude such prosecution once the President's term is over or he is otherwise removed from office by resignation or impeachment."  *A Sitting President's Amenability to Indictment and Criminal Prosecution*, 24 Op. O.L.C. at 255; *see also id.* at 257 (noting that unlike the "immunities claimed"

in *Nixon* and *Fitzgerald*, "the immunity from indictment and criminal prosecution for a sitting President would generally result in the delay, but not the forbearance, of any criminal trial").

Bestowing blanket immunity from criminal prosecution on a former president would also create troubling incentives. A president wholly immune from criminal prosecution for any conduct undertaken while in office—particularly one in a second term who would not face voters in another presidential election—could commit crimes with impunity that benefit himself, endanger the republic, or both. *See* Claire O. Finkelstein & Richard W. Painter, *Presidential Accountability and the Rule of Law: Can the President Claim Immunity If He Shoots Someone on Fifth Avenue?*, 24 U. Pa. J. Const. L. 93, 193 (2022) ("A President who is immune from criminal prosecution thus poses a very real danger that he will commit crimes that will secure not only his continuation in office, but also thereby allow him to protect himself against impeachment during his (next) term and immunize himself against prosecution once he is no longer in office."). Immunity from criminal prosecution would be particularly inappropriate where, as here, the former president is alleged to have engaged in criminal conduct aimed at overturning the results of a presidential election in order to remain in office.

Further, the Supreme Court's concern in *Fitzgerald* that a former president subject to civil suit could become "an easily identifiable target" for "highly intrusive" private lawsuits from "countless people," 457 U.S. at 753, 756, or "vexatious" civil actions (Mot. 20-21) does not translate to the criminal context. Courts generally apply a strong presumption of prosecutorial regularity in the criminal context precisely because prosecutors adhere to a strict code that prohibits vexatious or abusive prosecutions. *See United States v. Armstrong*, 517 U.S. 456, 464 (1996) (absent "clear evidence to the contrary, courts presume that [prosecutors] have properly discharged their official duties.") (quoting *United States v. Chemical Foundation, Inc.*, 272 U.S. 1, 14-15

(1926)).[15]  Further, former presidents "enjoy the same protection as do all citizens from vindictive

[or selective] prosecution."  *Hastings*, 681 F.2d at 711; *see also* 167 Cong. Rec. S607 (daily ed.

Feb. 9, 2021) (the defendant arguing at his impeachment trial that criminal investigation and

prosecution would be more "appropriate" than impeachment, because trial in the Senate "does not

and cannot offer the safeguards of the judicial system").  Additionally, unlike a civil lawsuit, a

federal felony prosecution of a former president may be brought only on the basis of an indictment

by a grand jury, which is "prohibited from engaging in 'arbitrary fishing expeditions' and initiating

investigations 'out of malice or an intent to harass.'"  *Trump*, 140 S. Ct. at 2428 (quoting *United

States v. R. Enterprises, Inc.*, 498 U.S. 292, 299 (1991)); *see A Sitting President's Amenability to

Indictment and Criminal Prosecution*, 24 Op. O.L.C. at 250 (noting that a criminal indictment "is

a public rather than private allegation of wrongdoing reflecting the official judgment of a grand

jury acting under the general supervision of the District Court").

Complementing those procedural protections are demanding *mens rea* standards required

to prove criminal offenses and evidentiary limitations that would come into play with respect to

any prosecution of a former president.  The offenses in this case, for example, require the

Government to prove beyond a reasonable doubt that the defendant undertook the charged conduct

with criminal intent.  *See Hammerschmidt v. United States*, 265 U.S. 182, 188 (1924) (defraud-

clause violation of Section 371 requires proof that the defendant agreed with others to obstruct a

lawful governmental function through deceitful and dishonest means); *United States v. North*, 910

F.2d 843, 881-82 (D.C. Cir. 1990) (per curiam) (obstruction of an official proceeding requires

---

[15] In addition, the Supremacy Clause, U.S. Const. art. VI, cl. 2, prevents state prosecutors "from interfering with a President's official duties."  *Trump*, 140 S. Ct. at 2428 (internal quotation marks omitted); *see Tennessee v. Davis*, 100 U.S. 257, 263 (1879) (a state government may not "obstruct [the] authorized officers" of the federal government).  To the extent a federal officer faces prosecution in state court, that officer may remove the case to federal court where the prosecution is "for or relating to any act under color of [federal] office."  28 U.S.C. § 1442(a)(1).

proof that the defendant acted with corrupt purpose by seeking an unlawful or improper benefit or advantage) (citing *Ballentine's Law Dictionary* 276 (3d ed. 1969)), *opinion withdrawn and superseded in part on reh'g*, 920 F.2d 940 (D.C. Cir. 1990) (per curiam); *id.* at 943 (Silberman, J., concurring in part and dissenting in part) (corrupt purpose can be shown through intending the use of unlawful means); *Arthur Andersen LLP v. United States,* 544 U.S. 696, 706-07 (2005) (corrupt purpose can be shown through dishonesty); *United States v. Morrison*, 98 F.3d 619, 630 (D.C. Cir. 1996) (corrupt purpose exists where defendant violated a legal duty); *Screws v. United States*, 325 U.S. 91, 105 (1945) (violation of Section 241 requires proof that the defendant acted willfully, which means to "act in open defiance or in reckless disregard of a constitutional requirement which has been made specific and definite"); *Anderson v. United States*, 417 U.S. 211, 223 (1974) (under Section 241, "the prosecution must show that the offender acted with a specific intent to interfere with the federal rights in question").  And the very process of obtaining evidence to establish whether a former president had a culpable *mens rea* would often require a showing of sufficient need to overcome any claim of executive privilege.  *See Nixon*, 418 U.S. at 712; *In re Sealed Case*, 121 F.3d 729, 754 (D.C. Cir. 1997).  These formidable safeguards counsel strongly against the need to extend a former president's civil immunity to the criminal context.

Nor would declining to recognize a novel immunity from criminal prosecution tantamount to the civil immunity conferred in *Fitzgerald* undermine other substantive protections available to a former president.  Courts construe statutes applied to a president for conduct during the presidency narrowly "[o]ut of respect for the separation of powers and the unique constitutional position of the President."  *Franklin v. Massachusetts*, 505 U.S. 788, 800-01 (1992).  That approach reflects two principles: statutes should be interpreted to avoid serious constitutional questions, and Congress should not be assumed to have altered the constitutional allocation of powers between branches without clear assurance that it intended the result.  *See* Walter Dellinger,

*The Constitutional Separation of Powers Between the President and Congress*, 20 Op. O.L.C. 124, 178 (May 7, 1996).  Relying on those principles, for example, the Department of Justice has concluded that three criminal statutes could not be applied against the president (or, in two cases, other Executive Branch officials).  *See* Laurence H. Silberman, *Conflict of Interest Problems Arising out of the President's Nomination of Nelson A. Rockefeller to be Vice President under the Twenty-Fifth Amendment to the Constitution*, at 5 (Aug. 28, 1974) (criminal conflict-of-interest statute, 18 U.S.C. § 208); Theodore B. Olson, *Prosecution for Contempt of Congress of an Executive Branch Officer Who Has Asserted a Claim of Executive Privilege*, 8 Op. O.L.C 101, 102, 140 (May 30, 1984) (the criminal contempt-of-Congress prohibition, 2 U.S.C. § 192); William Barr, *Constraints Imposed by 18 U.S.C. § 1913 on Lobbying Efforts*, 13 Op. O.L.C. 300, 305 (Sept. 28, 1989) (the Anti-Lobbying Act, 18 U.S.C. § 1913).

At the same time, just as application of the federal bribery statute "raises no separation of powers question, let alone a serious one," because "[t]he Constitution confers no power in the President to receive bribes," so too here the charged statutes raise no separation-of-powers issues because the Constitution grants a president no power to engage in a criminal conspiracy to defeat a federal government function through deceit, corruptly obstruct a congressional proceeding, or violate others' constitutional right to vote.[16]  Walter Dellinger, *Application of 28 U.S.C. § 458 to Presidential Appointments of Federal Judges*, 19 Op. O.L.C. 350, 357 n.11 (Dec. 18, 1995); *see also Conflict of Interest Problems Arising out of the President's Nomination of Nelson A. Rockefeller to be Vice President under the Twenty-Fifth Amendment to the Constitution*, at 5

---

[16] That is particularly true where, as here, the defendant offers no plausible argument that the federal government function and official proceeding that he is charged with obstructing envision a role for the president.  *See United States v. Rhodes*, 610 F. Supp. 3d 29, 41 (D.D.C. 2022) (Vice President in role as President of the Senate and Congress execute the "laws governing the transfer of power").

(concluding that separation-of-powers doctrine would not preclude criminal prosecution of the president under the federal bribery statute, 18 U.S.C. § 201, because given the "nature of the offense charged, no one, however exalted his position, should safely feel that he is above the law").

      **C.**      **Creating a Novel Immunity from Criminal Prosecution for a Former President Would Pose Significant Challenges, But at a Minimum Any Such Immunity Should Be Narrower Than Immunity from Civil Liability and Would Be Inapplicable Here.**

For all the reasons explained above, no immunity should shield the defendant from federal prosecution for criminal conduct undertaken while he served as president. An additional basis not to recognize an unprecedented immunity from criminal prosecution for a former president's—or any federal official's—conduct while in office are the significant definitional, substantive, and procedural challenges that any such novel immunity would pose. The defendant bears the burden of "showing that public policy requires an exemption of that scope," *Butz*, 438 U.S. at 506; *Forrester v. White*, 484 U.S. 219, 224 (1988), and he would not be able to carry that burden here.

      **1.**      **The scope of any immunity in this context would have to account for the substantially greater public interest in federal criminal prosecutions and other relevant differences from private civil suits.**

If the Court were to adopt a heretofore unrecognized immunity from criminal prosecution for former presidents, that immunity should balance interests differently than in the civil context at issue in *Fitzgerald*, operating in a manner that "maintain[s] the[] proper balance" of the separation of powers and "vindicate[s] the public interest in an ongoing criminal prosecution," *Fitzgerald*, 457 U.S. at 754; *see Harlow*, 457 U.S. at 810 (emphasizing the "'functional' approach to immunity law"). Although the "lesser public interest" at issue in a "merely private suit for damages," *Fitzgerald*, 457 U.S. at 754 & n.37, does not justify subjecting a president to civil liability, immunity doctrine in the "much weightier" criminal context, *Cheney*, 542 U.S. at 384, if it exists at all, must weigh the strong public interest in the rule of law and reflect the courts'

"primary constitutional duty . . . to do justice in criminal prosecutions," *Nixon*, 418 U.S. at 707, particularly, where, as here, a "judicially fashioned doctrine of official immunity" would risk "reach[ing] 'so far as to immunize criminal conduct proscribed by an Act of Congress.'" *O'Shea*, 414 U.S. at 503 (quoting *Gravel*, 408 U.S. at 627).

Any such immunity might assess the asserted presidential authority to act, if any. Where the criminal statute in question directly impinged on, or a generally applicable criminal statute was applied to, an area of responsibility where the president's power is "both 'exclusive' and 'conclusive' on the issue," *Zivotofsky v. Kerry*, 576 U.S. 1, 10 (2015) (citing *Youngstown Sheet & Tube v. Sawyer*, 343 U.S. 579, 637-38 (1952) (Jackson, J., concurring)), such as the president's authority to recognize foreign nations, *id.* at 9, 28, or to make a recess appointment, U.S. Const. art. II, § 2, cl. 3, or where application of a criminal statute would "prevent[] the Executive Branch from accomplishing its constitutionally assigned functions," *Nixon v. Adm'r of Gen. Servs.*, 433 U.S. 425, 443 (1977), that fact could weigh in favor of a finding of immunity in limited circumstances. But where the asserted presidential authority lay further from the president's core "line of duty," *Barr v. Matteo*, 360 U.S. 564, 575 (1959) (plurality opinion), or his power was "at its lowest ebb," *Youngstown Sheet & Tube*, 343 U.S. at 637 (Jackson, J., concurring), the justification for immunity would be more attenuated. For example, where a president was carrying out predominantly partisan electioneering activities that related only incidentally to his official activities as president, *see* Theodore B. Olson, *Payment of Expenses Associated with Travel by the President and Vice President*, 6 O.L.C. Op. 214, 215 (Mar. 24, 1982), no immunity from criminal prosecution should presumptively attach.

Another consideration should be the intent or motive animating the conduct in question. Although absolute civil immunity generally precludes judicial inquiry into whether a defendant acting within the scope of his duties acted "for a forbidden purpose," *Fitzgerald*, 457 U.S. at 756,

immunity in the criminal context should not preclude such an inquiry.  For example, where a statute prohibits engaging in certain conduct for a corrupt purpose, the statute's *mens rea* requirement tends to align, rather than conflict, with the president's Article II duty to "take Care that the Laws be faithfully executed," U.S. Const. art. II, § 3, which would weigh heavily against the need for immunity.  To illustrate, although the president's power to grant pardons is exclusive and not subject to congressional regulation, *see United States v. Klein*, 80 U.S. (13 Wall.) 128, 147-48 (1872), criminal immunity should not shield the corrupt use of a presidential pardon—which plainly constitutes "anything of value" for purposes of the federal bribery statute, *see* 18 U.S.C. § 201(b)(3)—to induce another person to testify falsely or not to testify at all in a judicial, congressional, or agency proceeding.  Just as the Speech or Debate Clause, U.S. Const. art. I, § 6, cl. 1, absolutely protects legislative acts, but not a legislator's "taking or agreeing to take money for a promise to act in a certain way . . . for it is taking the bribe, not performance of the illicit compact, that is a criminal act," *United States v. Brewster*, 408 U.S. 501, 526 (1972), the promise of a pardon to corruptly influence testimony would not be a constitutionally immunized act. Similarly, in those instances where the "line" between a president's "personal and official affairs" is "clear," *Trump v. Mazars USA, LLP*, 140 S. Ct. 2019, 2034 (2019), not "elusive and difficult to discern," *In re Lindsey*, 158 F.3d 1263, 1286 (D.C. Cir. 1998) (per curiam) (Tatel, J., concurring in part and dissenting in part), and it is plain that the president is acting corruptly to further his own personal benefit without regard to the best interests of the nation, no immunity from criminal prosecution should apply.

> **2.** **The defendant cannot establish that he would be entitled to dismissal of the indictment under any plausible view of a former president's immunity from criminal prosecution.**

Incorporating these considerations into a workable test would present line-drawing and administrability challenges.  These complications, as well as the existing protections described

above, *see supra* 30-33, counsel against creating "some [new] form of immunity" from criminal prosecution, *Fitzgerald*, 457 U.S. at 744.  At a minimum, the defendant has not carried his burden of showing that this is the sort of "exceptional situation[]" in which the recognition of an immunity from criminal prosecution is "essential for the conduct of the public business."  *Butz*, 438 U.S. at 507.

The indictment alleges a conspiracy to overturn the presidential election results, ECF No. 1 at ¶ 7, through targeting state officials, *id.* at ¶¶ 13-52; creating fraudulent slates of electors in seven states, *id.* at ¶¶ 53-69; leveraging the Department of Justice in the effort to target state officials through deceit and substitute the fraudulent elector slates for the legitimate ones, *id.* at ¶¶ 70-85; attempting to enlist the Vice President to fraudulently alter the election results during the certification proceeding on January 6, 2021, and directing supporters to the Capitol to obstruct the proceeding, *id.* at ¶¶ 86-105; and exploiting the violence and chaos that transpired at the United States Capitol on January 6, 2021, *id.* at ¶¶ 106-124.  Allowing a former President to face criminal prosecution for that alleged conduct would not encroach on an Article II power, let alone a core presidential responsibility.  Instead, the allegations focus principally on the defendant's actions as a candidate for elective office.  Furthermore, the indictment alleges that the defendant acted deceitfully or corruptly to secure a personal benefit to himself as a presidential candidate, not to carry out constitutional obligations entrusted to the presidency.  Immunity should not foreclose the Government from shouldering the burden to prove those demanding standards, *see supra* 31-32, beyond a reasonable doubt at trial.  The defendant's contrary arguments are unpersuasive.

First, the defendant's counterarguments (Mot. 27-45) rest on misrepresentations of the indictment's allegations.   Although the defendant acknowledges that the indictment "must be accepted as true at this stage of the proceedings," Mot. 2 (quoting *United States v. Weeks*, 636 F. Supp. 3d 117, 120 (D.D.C. 2022)), his ensuing discussion consistently misstates the allegations in

a manner designed to fit his capacious theory of presidential authority. For example, the defendant identifies (Mot. 3-4, 28-33) one of the "five basic categories" of allegations as his "public statements about the administration of the federal election" and "Tweets about the administration of the federal election." *Id.* at 3. That description mischaracterizes the indictment, as described in the preceding paragraph. Moreover, the fact that the defendant's public statements and tweets furthered the alleged conspiracy is uncontroversial because courts have long recognized that "constitutionally protected speech may nevertheless be an overt act in a conspiracy charge." *United States v. Donner*, 497 F.2d 184, 192 (7th Cir. 1974); *United States ex rel. Epton v. Nenna*, 446 F.2d 363, 368 (2d Cir. 1971); *United States v. Lanier*, 920 F.2d 887, 893 n.48 (11th Cir. 1991); *see also United States v. Vascular Sols., Inc.*, 181 F. Supp. 3d 342, 345 (W.D. Tex. 2016) (Lamberth, J.) (sitting by designation) (finding "ample support" to reject defendants' contention that "truthful speech" cannot be "an act taken to effect the object of the conspiracy") (internal quotation marks omitted); *see also Wisconsin v. Mitchell*, 508 U.S. 476, 489 (1993) ("[A] defendant's previous declarations or statements [are] commonly admitted in criminal trials subject to evidentiary rules dealing with relevancy, reliability, and the like.").

Similarly, the defendant's conclusory assertions (Mot. 3, 6, 28, 33, 35, 37, 39, 42) that the allegations involve his "official duties" rely entirely on his recasting of what the indictment in fact alleges. In his view, for example, the indictment encompasses merely "[m]eeting with state officials about the administration of a federal election," Mot. 35, when the actual allegations detail "knowingly false claims of election fraud aimed at interfering with the ascertainment of and voting by" electors made by the defendant and his coconspirators in several targeted states. ECF No. 1 at ¶ 15; *see id.* at ¶¶ 14-19 (Arizona); *id.* at ¶¶ 20-33 (Georgia); *id.* at ¶¶ 34-41 (Michigan); *id.* at ¶¶ 42-46 (Pennsylvania); *id.* at ¶¶ 47-52 (Wisconsin). The defendant further posits (Mot. 39) that the indictment encompasses his communications with the Vice President and other legislators

"about the exercise of their official duties regarding federal election certification." That is a gross mischaracterization. The indictment in fact alleges that the defendant and his conspirators sought to "enlist the Vice President to use his ceremonial role at the certification to fraudulently alter the election results," ECF No. 1 at ¶ 86; *see also id.* at ¶¶ 86-105, and then sought to "exploit the violence and chaos at the Capitol by calling lawmakers to convince them, based on knowingly false claims of election fraud, to delay the certification," *id.* at ¶ 119. Additionally, the defendant's claim to have been carrying out his "official duties" entirely ignores that, as a "candidate for re-election," ECF No. 1 at ¶ 1, he is alleged to have conspired to "overturn the legitimate results of" a "presidential election," *id.* at ¶ 7, and to have done so with at least five others who had absolutely no role in the federal government, including private attorneys and a political consultant, *id.* at ¶ 8(a), (b), (c), (e), (f). While the defendant is certainly entitled to challenge those allegations at trial, he is not permitted to reframe them in a dismissal motion into a version that more conveniently supports his legal arguments.

The defendant's arguments likewise fail because they describe presidential duties at a stratospheric level of generality. *See Banneker Ventures, LLC v. Graham*, 798 F.3d 1119, 1141 (D.C. Cir. 2015) (warning that "[a]t a high enough level of generality, almost any act that has any relationship to an overarching duty . . . will be immunized"). Take, for example, the defendant's repeated contention (Mot. 22, 32-34, 38) that his conduct between the election and January 6 broadly fell within his Article II "take-Care" power. The Constitution vests in the president "[t]he executive Power" and directs, among other things, that the president "take Care that the Laws be faithfully executed." U.S. Const. art. II, § 1, cl. 1; U.S. Const. art. II, § 3; *see also id.* at art. II, § 2, cl. 2 (empowering the president to appoint all officers with the advice and consent of the Senate); *see Lucia v. SEC*, 138 S. Ct. 2044, 2051 n.3 (2018). The concept of "faithful execution" connotes the use of power in the interest of the public, not in the office holder's personal interests. *See* 1

Samuel Johnson, *A Dictionary of the English Language* 763 (1755) ("faithfully" def. 3: "[w]ith strict adherence to duty and allegiance").  The principal case on which the defendant relies (Mot. 35-36, 38, 43-44) for his expansive conception of the Take Care Clause, *In re Neagle*, 135 U.S. 1 (1890), cannot bear the weight of his arguments.  In *Neagle*, the Supreme Court held that the Take Care Clause authorized the appointment of a deputy marshal to protect a Supreme Court Justice while traveling on circuit even in the absence of congressional authorization.  *Id.* at 67-68; *see Logan v. United States*, 144 U.S. 263, 294 (1892) (describing *Neagle*'s holding); *Youngstown Sheet & Tube*, 343 U.S. at 661 n.3 (Clark, J., concurring) (same).  Before reaching that conclusion, the Court in *Neagle* posed as a rhetorical question—which the defendant cites several times (Mot. 35, 38, 43, 44)—whether the president's duty under the Take Care Clause is "limited to the enforcement of acts of congress or of treaties of the United States according to their express terms; or does it include the rights, duties, and obligations growing out of the constitution itself, our international relations, and all the protection implied by the nature of the government under the constitution?"  135 U.S. at 64.  From the undisputed proposition that the president's powers under Article II are not limited only to laws and treaties, it does not follow, as the defendant seems to imply, that every "right, duty, or obligation[]" under the Constitution is necessarily coterminous with the president's powers under the Take Care Clause.  Under that theory, for example, the president could superintend Congress's constitutional obligation to keep a journal of its proceedings, U.S. Const. art. I, § 5, cl. 3, or the judiciary's duty to adjudicate cases and controversies, U.S. Const. art. III, § 2, cl. 1.

> **D.     Even If a Former President Were Entitled to Immunity from Criminal Prosecution Comparable to His Immunity from Civil Liability, Dismissal Is Not Warranted Here.**

Dismissal is at a minimum unwarranted because the defendant has no remotely viable claim that *all* of the indictment's allegations involve acts "within the 'outer perimeter' of his official

responsibility." *Fitzgerald*, 457 U.S. at 756.  For example, allegations that the defendant "acted purely in his capacity as a candidate for office" by, among other things, "directing his campaign staff" to further his efforts to overturn the election results do not fall within the outer perimeter of the presidency. *See* Brief for the United States as Amicus Curiae, *Blassingame v. Trump*, Nos. 22-5069, 22-7030, 22-7031, at 22 (D.C. Cir.) (filed Mar. 2, 2023).  That is particularly true with respect to allegations that the defendant conspired with and directed individuals outside the government to facilitate his effort to turn the election in his favor as a candidate. *See, e.g.*, ECF No. 1 at ¶¶ 8(a), 13 (alleging that the defendant "turned to Co-Conspirator 1," a private attorney who "was willing to spread knowingly false claims and pursue strategies that the Defendant's 2020 re-election campaign attorneys would not," to "spearhead his efforts going forward to challenge the election results"); *id.* at ¶¶ 8(b), 30 (alleging that the defendant and Co-Conspirator 2, a private attorney who "devised and attempted to implement a strategy to leverage the Vice President's ceremonial role overseeing the certification proceeding to obstruct the certification of the presidential election," caused the filing in a federal court of a "verification" signed by the defendant "affirming false election fraud allegations made on his behalf in a lawsuit filed in his name against the Georgia Governor"); *id.* at ¶¶ 8(e), 8(f), 61 (alleging that Co-Conspirator 1, Co-Conspirator 5, a private attorney "who assisted in devising and attempting to implement a plan to submit fraudulent slates of presidential electors to obstruct the certification proceeding," and Co-Conspirator 6, a "political consultant who helped implement a plan to submit fraudulent slates of presidential electors to obstruct the certification proceeding," participated in a call with the defendant's electors in Pennsylvania, during which Co-Conspirator 1 "falsely assured" the electors that the electoral certificates "would only be used if the Defendant succeeded in litigation").

The same is true for the allegations describing the conspirators' efforts to organize fraudulent electoral slates and cause them to transmit false certificates to Congress in anticipation

of the certification proceeding on January 6, 2021.  *See* ECF No. 1 at ¶¶ 53-69.  Again, those acts were carried out by and on behalf of the defendant in his capacity as a candidate, and the extensive involvement of private attorneys and campaign staff in procuring the fraudulent slates as alleged in the indictment underscores that those activities were not within the outer perimeter of the office of the presidency.  In response, the defendant suggests (Mot. 44) essentially that because both the presidency and presidential electors are defined in the Constitution, the former necessarily bears responsibility for "protecti[on]" of the latter.  But the defendant cites no legal principle or case that would extend the president's constitutional duties—or the scope of his office—to the preparation and submission of slates of electors supporting his candidacy for reelection.  Second, the defendant argues (*id.*) that organizing the fraudulent slates was "ancillary and preparatory" to "communicating with the Vice President and other Members of Congress."  But the defendant fails to explain how communications related to the preparation and submission of slates of electors on behalf of a candidate for office fall within the outer perimeter of a president's duties.  And because the indictment includes allegations that fall outside the outer perimeter of the president's powers even under the broadest understanding of that term, the remedy of dismissal is inappropriate.

IV.     **Conclusion**

For the foregoing reasons, the Court should deny the defendant's motion to dismiss the

indictment on the ground that a former president is immune from criminal prosecution.

Respectfully submitted,

JACK SMITH
Special Counsel

By:     /s/ James I. Pearce
James I. Pearce
Assistant Special Counsel
Molly Gaston
Thomas P. Windom
Senior Assistant Special Counsels
950 Pennsylvania Avenue NW
Room B-206
Washington, D.C. 20530