**IN THE UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF COLUMBIA**

| | |
|---|---|
| UNITED STATES OF AMERICA | |
| v. | Case No. 1:23-cr-00257-TSC |
| DONALD J. TRUMP, | |
| *Defendant*. | |

**PRESIDENT TRUMP'S MOTION TO DISMISS THE INDICTMENT BASED ON**
**STATUTORY GROUNDS AND MEMORANDUM IN SUPPORT**

## INTRODUCTION

Targeting an audience other than this Court, the prosecution's indictment in this matter rants endlessly about President Trump's politics and—in a shockingly un-American display of authoritarianism—accuses him of crimes for having and expressing the "wrong" opinions. Buried at the end of this diatribe are conclusory statements that President Trump's alleged actions somehow violated 18 U.S.C §§ 241, 371, 1512(k), 1512(c)(2), 2.

The prosecution does not explain how President Trump violated these statutes, beyond simply saying he has while regurgitating the statutory language. As explained herein, the reason the prosecution employed this tactic is plain—President Trump did not violate the charged statutes, even accepting the prosecution's false allegations as true. Accordingly, the Court should dismiss the indictment for failure to state an offense.

## ARGUMENT

"In ruling on a motion to dismiss for failure to state an offense, a district court is" typically "limited to reviewing the face of the indictment and, more specifically, the language used to charge the crimes." *United States v. Sunia*, 643 F. Supp. 2d 51, 60 (D.D.C. 2009). "When considering a motion to dismiss, the court must review the face of the indictment," and "the indictment must be viewed as a whole and the allegations must be accepted as true at this stage of the proceedings." *United States v. Weeks*, 636 F. Supp. 3d 117, 120 (D.D.C. 2022).

President Trump denies the allegations in the indictment in this motion and memorandum. Instead, this memorandum sets forth the facts alleged in the indictment so that their legal sufficiency may be assessed for a motion to dismiss. *Id.*

I.       **Count One Should Be Dismissed Because the Indictment Fails to Allege a Violation of 18 U.S.C. § 371.**

Count One of the indictment charges President Trump with conspiracy to defraud the United States under 18 U.S.C. § 371. As relevant here, that statute provides: "If two or more persons conspire … to *defraud the United States*, or any agency thereof in any manner or for any purpose, and one or more of such persons do any act to effect the object of the conspiracy, each shall be fined under this title or imprisoned not more than five years, or both." 18 U.S.C. § 371 (emphasis added). The statute does not define the phrase "defraud the United States" or provide further textual guidance about its meaning of scope. At bare minimum, however, the statute requires a showing of trickery or deceit, which the indictment does not allege. Further, for cases outside the heartland of financial fraud—*i.e.*, cases involving fraudulently obtaining money or property from the United States—the statute requires an additional showing of "obstruction" or "interference" in a government function. Again, the indictment does not allege this.

A.       **A Conspiracy to "Defraud the United States" Requires a Showing of "Deceit or Trickery."**

The Supreme Court has long interpreted the word "defraud" in § 371 to require, not just any false statement, but a showing of "deceit or trickery." *Hammerschmidt v. United States*, 265 U.S. 182, 187 (1924). In *Hammerschmidt*, the Government charged political activists who opposed the draft for allegedly defrauding the United States "by impairing, obstructing, and defeating a lawful function of its government" in printing and circulating handbills urging others to refuse to register for the draft. *Id.* at 185. In other words, prosecutors relied on the broad language of the statute to criminalize advocacy of disfavored viewpoints on a hotly disputed political and social question. *Id.* Citing *Haas v. Henkel*, 216 U.S. 462, 479 (1910), the Government argued that "[t]he statute is broad enough in its terms to include any conspiracy for the purpose of impairing, obstructing or defeating the lawful function of any department of government." *Hammerschmidt*,

265 U.S. at 185-86. The Supreme Court rejected this argument, holding that the indictment was deficient because the word "defraud" requires a showing of "deceit or trickery," not just advocacy of a viewpoint that the Government disfavors and views as false:

> It is obvious that the writer of the opinion [in *Haas*] and the court were not considering whether *deceit or trickery* was essential to satisfy the defrauding required under the statute. The facts in the case were such that that question was not presented. The *deceit* of the public, the *trickery* in the advance publication secured by bribery of an official, and the falsification of the reports made the fraud and deceit so clear as the gist of the offenses actually charged that their presence was not in dispute.

*Hammerschmidt*, 265 U.S. at 187 (emphases added). Thus, the Court held, the statute's core application is to trick or deceive the Government into paying money under false pretenses, and this requirement of trickery or deceit applies in all other cases as well: "To conspire to defraud the United States means primarily to cheat the government out of property or money, but it also means to interfere with or obstruct one of its lawful governmental functions by *deceit, craft or trickery*, or at least by means that are dishonest." *Id.* at 188 (emphasis added). This requirement of "trickery" or "deceit" is well-established. *United States v. Concord Mgmt. & Consulting LLC*, 347 F. Supp. 3d 38, 46 (D.D.C. 2018) ("As long as the conspiracy aims to obstruct the lawful functions of a government agency through some form of 'deceit, craft or trickery, or at least by means that are dishonest,' it falls within § 371's reach") (quoting *Hammerschmidt*, 265 U.S. at 188).

### B. The Indictment Does Not Allege Acts Constituting Deceit or Trickery.

Here, the indictment does not allege any acts that constitute "deceit" or "trickery" within the meaning of *Hammerschmidt*. As relevant here, the indictment alleges three types of conduct that supposedly involved making a false statement: (1) claims that the 2020 Presidential election was rigged or tainted by fraud or other irregularities, made both in public and in communications with public officials; (2) organizing and submitting contingent slates of electors to the President

4

of the U.S. Senate and the Archivist of the United States; and (3) making public claims about the scope of the Vice President's legal authority with respect to the election certification.

**_Allegedly false claims of fraud and irregularities in the election._** First, the indictment alleges that President Trump claimed that the 2020 election's outcome was tainted by fraud and other irregularities. It alleges he made such claims publicly. *See* Doc. 1, ¶¶ 3, 4, 10(a), 11, 12, 19, 20, 22, 28, 32, 33, 34, 37, 41, 42, 46, 50, 52, 104, 116, 118. It also alleges that he made such claims in meetings and communications with state officials, DOJ, officials, and federal elected officials. *See* Doc. 1, ¶¶ 13, 15, 16, 21, 26, 31, 35, 36, 38, 43 (alleging that President Trump and others urged that the election's outcome was tainted in meetings with state officials); *id.* ¶¶ 27, 29, 45, 51, 74, 75, 77, 78, 79, 84 (alleging similar claims of fraud and irregularity in meetings with DOJ officials); *id.* ¶¶ 86, 90, 92-93, 97 (alleging similar claims of fraud and irregularity in meetings with the Vice President). The indictment also alleges that President Trump made supposedly "false" *legal* claims about the scope of the Vice President's authority under the Constitution. Doc. 1, ¶¶ 88, 96, 99, 100, 102, 103, 104.

These claims cannot support an allegation of attempting to "defraud" the United States under § 371. Unlike ordinary "fraud" cases, the supposedly "false" claims alleged in the indictment all related to the most publicly visible, vigorously disputed, and widely reported debates of the day—*i.e.*, whether the 2020 Presidential election was "rigged" or "stolen" against President Trump. Whatever one thinks of President Trump's expressed opinions on this issue, his assertion of them does not constitute "deceit" or "trickery."

Every official listed in the indictment unquestionably knew that election fraud and irregularities were (and are) vigorously disputed topics and that President Trump's opinion on the subject was just that—an opinion formed based on his view of the available information. Virtually

every American, including the cited public officials, had similar access to much of this same information, including a mountain of publicly reported facts and opinions, which were the subject of wall-to-wall media coverage throughout the post-election period and beyond. Each official thus had every opportunity to form his or her own conclusions, just like President Trump. To assert that President Trump, as one voice among countless millions, was somehow capable of unilaterally "tricking" or "deceiving" these individuals, who include some of the most informed politicians on the planet, simply by advocating his opinions on this contentious issue, is beyond absurd. *Id.*

It is therefore entirely unsurprising that this type of conduct—involving pure advocacy directed to public officials—bears no resemblance to cases in which courts have found "deceit" or "trickery" within the meaning of § 371. *Compare, e.g., United States v. Milton*, 8 F.3d 39, 41 (D.C. Cir. 1993) (defendant used position in EEOC and control of eligibility for claims over a certain settlement fund to solicit false claims for funds and take a share of the proceeds); *United States v. Baxter*, 761 F.3d 17, 20-21 (D.C. Cir. 2014) (defendant used position as Treasurer for Washington Teachers Union to defraud the Union of millions of dollars through signing fraudulent checks, writing checks to himself, using Union credit card for personal expenses, and attempting to conceal the crimes by falsely allocating debits); *United States v. Cisneros*, 169 F.3d 763, 765 (D.C. Cir. 1999) (defendant indicted for "deceiv[ing] the FBI and the Department of Justice" to ensure "his nomination" to Cabinet position by repeatedly lying to the FBI in background interviews and concealing large payments to a blackmailer, and by similarly failing to pay gift tax on the payments as well as "illegally structure[ing]" some of them to avoid filing a Currency Transaction Report); *Concord Mgmt. & Consulting LLC*, 347 F.Supp.3d at 49-50 (defendant indicted for, *inter alia*, failing to report expenditures to FEC or register as foreign agents with DOJ, as well as making "affirmative misrepresentations by submitting false statements on visa applications to DOS" and

"destroy[ing] evidence" to impede investigations and hiding foreign origins to avoid detection by regulators). In each such case, the defendant's conduct was based on concealment and exclusive control of information that raised the real risk that government officials might be *deceived* to the government's detriment. Here, in disputing the outcome of the 2020 Presidential election, President Trump vigorously advocated his viewpoint on a widely disputed political controversy. Even if one disagrees with his view that the election was stolen, to advocate that view does not constitute "trickery" or "deceit."

As noted above, the implications of the prosecution's overbroad view of "fraud" is staggering. The prosecution's theory would criminalize a group of citizens who oppose mask mandates and insist to public officials that masks are ineffective in curbing the spread of COVID-19, and stoutly adhere to that view even when shown CDC studies that supposedly contradict it. Such activists, in the prosecution's view, would be "conspiring to defraud the United States" by making supposedly "false" statements in attempt to "influence" or "obstruct" government policies. Likewise, the prosecution's theory would criminalize advocates for criminal-justice reform who met with members of Congress and presented supposedly "false" statistics about the impact of incarceration on minority communities to advocate for the passage of a criminal-justice reform bill. So long as prosecutors could allege that the advocates had reason to know the statistics were incorrect—or were supposedly "notified" of that by government officials—those advocates could be charged with "conspiring to defraud the United States" under § 371. *See* Doc. 1 at ¶ 11. Anyone who lobbies federal officials to act based on vigorously disputed, not-readily-verifiable "facts" faces the pall of prosecution—and imprisonment up to 20 years—under this theory, *see* 18 U.S.C § 371, plainly suggesting it must be incorrect. Applied as the prosecution suggests, the statute would criminalize an enormous amount of ordinary, routine political activity by millions of

American citizens, exalting the government's assessment of facts over our most sacred right to state our political opinions and make them known to our elected leadership.

For this reason, in *McDonnell*, the Supreme Court unanimously rejected a similarly "expansive interpretation" of 18 U.S.C. § 201 that threatened to criminalize broad swaths of ordinary political interactions, including "even the most commonplace requests for assistance" from citizens to public officials. *McDonnell v. United States*, 579 U.S. 550, 575 (2016). As in *McDonnell*, so also here, "[t]he Government's position could cast a pall of potential prosecution over these relationships," as someone lobbying the government on a hotly disputed political issue "might wonder" if they would be prosecuted for taking a supposedly "false" position on a disputed political question—and thus "citizens with legitimate concerns might shrink from participating in democratic discourse." *Id.*

In short, § 371 does not proscribe advocacy on political issues in the manner described in the indictment, as such actions are neither "deceit" nor "trickery," and cannot be considered as such without improperly criminalizing vast swaths of the citizenry. Therefore, the indictment does not state an offense and should be dismissed.

***Allegedly false statements about the scope of the Vice President's legal authority.*** The indictment's allegations of supposedly false statements about the scope of the Vice President's legal authority under the Constitution suffer from the same problems as the statements about the election's outcome, *see supra*, plus an additional problem: "'It is … well settled, as a general rule, that fraud cannot be predicated upon misrepresentations of law or misrepresentations as to matters of law.' Statements of domestic law are normally regarded as expressions of opinion which are generally not actionable in fraud even if they are false." *Miller v. Yokohama Tire Corp.*, 358 F.3d 616, 621 (9th Cir. 2004) (holding that a "a misrepresentation of law" does not constitute fraud

under the federal wire fraud statute) (quoting AM. JUR. 2D OF FRAUD AND DECEIT § 97 (2001)); *see also, e.g., Little v. Dufour Yachts SAS*, No. 19 C 5411, 2020 WL 5763621, at *8 (N.D. Ill. Sept. 28, 2020) ("[T]he Court fails to see how allegations of a misstatement of law, as opposed to a misstatement of fact, could ever constitute wire fraud"); *Tronsgard v. FBL Fin. Grp., Inc.*, 312 F. Supp. 3d 982, 993 (D. Kan. 2018) (holding that misrepresentations of law … are not actionable in fraud"). These are disputed legal claims relating to a widely disputed political issue. Whatever one thinks of the scope of the Vice President's authority, to advocate for a broad view of that authority does not constitute "trickery" or "deceit." In fact, it was not until 2022 that Congress, for the first time in our history, sought to limit the Vice President's duties in presiding over the electoral vote counting.

***Organizing and submitting contingent slates of electors.*** Next, the indictment alleges that President Trump was involved in organizing and submitting contingent slates of electors from disputed States to the President of the Senate and the Archivist of the United States. *See* Doc. 1, ¶¶ 53, 56, 57-69. But the indictment does not allege any *trickery* or *deceit* in the submission of these alternate slates of electors to public officials. *See* Doc. 1, ¶¶ 67-68 (failing to allege any trickery or deceit to federal officials in the submission of the alternate slates of electors). On the contrary, the indictment plainly and repeatedly alleges, in at least three places, that the submission of these electors did *not* involve any trickery or deceit.

First, the indictment alleges that there was a clear difference in form between the state-certified electors and the alternate slates of electors; and that this difference appeared on the face of the certificates submitted for the rival slates of electors, making the slates readily distinguishable to federal officials: "Unlike those of the fraudulent electors, consistent with the ECA, the

legitimate electors' signed certificates were annexed to the state executives' certificates of ascertainment before being sent to the President of the Senate and others." Doc. 1, ¶ 68.

Next, the indictment alleges that when an unnamed "agent of the Defendant" attempted to deliver alternate slates of electors to the Vice President through a U.S. Senator's office, both President Trump's "agent" and the Senator's staff made clear that what was being submitted were "*alternate* slates of electors," leading the Vice President's staff to refuse to accept them:

> On the morning of January 6, an agent of the Defendant contacted a United States Senator to ask him to hand-deliver documents to the Vice President. The agent then facilitated the receipt by the Senator's staff of the fraudulent certificates signed by the Defendant's fraudulent electors in Michigan and Wisconsin, which were believed not to have been delivered to the Vice President or Archivist by mail. When one of the Senator's staffers contacted a staffer for the Vice President by text message to arrange for delivery of what the Senator's staffer had been told were ***"alternate slate[s] of electors for MI and WI*** because archivist didn't receive them," the Vice President's staffer rejected them.

Doc. 1, ¶ 101 (emphasis added).

Third, the indictment quotes from internal communications involving the alternate elector(s) that make clear that, according to the plan, federal officials would be fully aware that these would be *alternate* slates of electors, not the electors certified by the relevant officials from the disputed States. Doc. 1, ¶ 58. The indictment alleges that a prospective elector stated:

> His idea is basically that all of us (GA, WI, AZ, PA, etc.) have our electors send in their votes (even though the votes aren't legal under federal law ~ because they're not signed by the Governor); *so that members of Congress can fight about whether they should be counted on January 6th*. (They could potentially argue that they're not bound by federal law because they're Congress and make the law, etc.) Kind of wild/creative ~ I'm happy to discuss. My comment to him was that I guess there's no harm in it, (legally at least) ~ i.e. we would just be sending in "fake" electoral votes to Pence so that "someone" in Congress *can make an objection when they start counting votes, and start arguing that the "fake" votes should be counted*.

Id. ¶ 58. Thus, the alternate slates of electors were to be submitted on the understanding that members of Congress would fully understand that they are alternate electors and would *debate* whether the alternate electors should be certified. The prosecution might think this approach was

based on a baseless *legal* theory—which is not a basis for fraud, *see supra*—but the indictment does not allege any trickery or deceit in the submission of these electors to federal officials.

Thus, there is no question that every relevant public official identified in the indictment fully understood which slate of electors the relevant states had certified, and no allegations in the indictment suggest that President Trump attempted to cast any doubt whatsoever on this issue. Rather, the indictment alleges that President Trump attempted to *persuade* officials to consider alternate slates, notwithstanding any earlier certifications. This did not involve "deceit" or "trickery" as to the electors, in and of themselves, but rather protected speech regarding the conduct of the election itself.

Given this, it is clearly no accident that the indictment fails to allege "trickery" or "deceit" in the submission of the alternate slates of electors. It could not plausibly do so, because the plan to submit alternate slates of electors was openly discussed by those involved and widely reported at the time. The Washington Post reported that those involved in organizing pro-Trump slates of electors in disputed States "boasted publicly" about the plan: "In the weeks before Jan. 6, Trump supporters *boasted publicly* that they had submitted [so-called] fake electors on his behalf, but the Justice Department declined to investigate the matter in February 2021…." Carol D. Leonnig, et al., *FBI Resisted Opening Probe Into Trump's Role in Jan. 6 For More Than a Year*, WASHINGTON POST (June 20, 2023), at https://www.washingtonpost.com/investigations/2023/06/19/fbi-resisted-opening-probe-into-trumps-role-jan-6-more-than-year/. Indeed, the alternate-elector plan was broadcast on nationwide media, touted on Fox News by President Trump's senior advisor, and subject to contemporaneous op-eds in the New York Times.[1]

---

[1] *See, e.g.,* Amy Gardner, et al., *Trump Asks Pennsylvania House Speaker for Help Overturning Election Results, Personally Intervening in a Third State*, THE WASHINGTON POST (Dec. 8, 2020), *at*                                        https://www.washingtonpost.com/politics/trump-pennsylvania-speaker-

To be sure, the indictment repeatedly attaches the labels "fraudulent," "fake," and "sham" to the alternate slates of electors, *see* Doc. 1, ¶ 54(b), 54(c), 59, 60, 66, 67—but it uses the words "fraudulent" and "sham" to mean "legally unauthorized," not submitted through trickery or deceit. *See id.* And, of course, submitting *legally unauthorized* alternate electors cannot constitute "fraud" as a matter of law—especially not to highly sophisticated public officials represented by counsel, such as the Vice President and Archivist of the United States. *See supra*; *Miller*, 358 F.3d at 621.

**Allegedly false statements to the electors themselves.** Next, the indictment alleges that one or more of the fraudulent electors may have been induced to participate in the plan through alleged

_____

call/2020/12/07/d65fe8c4-38bf-11eb-98c4-25dc9f4987e8_story.html (reporting that President Trump called officials in Pennsylvania, Michigan, and Georgia about "replac[ing]" each state's "chosen slate of electors"); Alison Durkee, *Trump Campaign Assembling Alternate Electors in Key States in Far-Fetched Attempt to Overturn Election*, FORBES (Dec. 14, 2020), *at* https://www.forbes.com/sites/alisondurkee/2020/12/14/trump-campaign-assembling-alternate-electors-in-key-states-in-far-fetched-attempt-to-overturn-election/?sh=980b0a03213a (reporting that Trump advisor Stephen Miller described "alternate slate of electors" to allow "legal remedies [to] remain open" during pendency of lawsuits challenging election results, "to ensure their votes will count" before Congress should the legal challenges prove successful); Brett Samuels, *Stephen Miller: "Alternate" Electors Will Keep Trump Election Challenge Alive*, THE HILL (Dec. 14, 2020), *at* https://thehill.com/homenews/campaign/530092-stephen-miller-alternate-electors-will-keep-trump-challenge-alive-post/ (reporting the "alternate" "alternate' slate of electors, which would submit "unofficial results" to Congress to, as explained by Trump advisor Stephen Miller, "ensure that all of our legal remedies remain open" should Trump succeed in election challenge lawsuits); Aishvarya Kavi, *No, Republican Attempts to Organize Alternate Electors Won't Affect the Official Electoral College Tally*, N.Y. Times (Dec. 14, 2020), *at* https://www.nytimes.com/2020/12/14/us/no-republican-attempts-to-organize-alternate-electors-wont-affect-the-official-electoral-college-tally.html ("Stephen Miller, a senior adviser in the White House, appeared on Fox News on Monday morning, before the Electoral College had begun the official process of voting, to promote the so-called 'alternate' electors."); Nick Corasiniti et al., *No, There Aren't 'Alternate Electors' Who Can Vote for President Trump*, N.Y. Times (Dec. 15, 2020), *at* https://www.nytimes.com/2020/12/15/technology/fake-dueling-slates-of-electors.html (reporting that "Republicans in Georgia, Pennsylvania, Wisconsin, Nevada and Michigan followed the White House's lead, making or discussing moves to form their own competing slates of pro-Trump electors," but claiming this "was a theatrical effort with no legal pathway," because "all five of those states have certified their results in favor of … Biden").

false promises made by others, not the Defendant.[2] *See* Doc. 1, ¶ 61 ("When the Defendant's electors expressed concern about signing certificates representing themselves as legitimate electors, Co-Conspirator 1 falsely assured them that their certificates would be used only if the Defendant succeeded in litigation."); ¶ 67 (alleging that the elector certificates were used "contrary to how fraudulent electors were told they would be used"). But even if this allegation were true, which it is not, and even if it somehow alleged trickery or deceit, it does not constitute "defraud[ing] the *United States*," as the statute requires. 18 U.S.C. § 371. These allegations do not identify any supposedly deceitful statement to any federal official—only to other participants in the alleged scheme. Doc. 1, ¶¶ 61, 67. Accordingly, they cannot constitute fraud against *the United States*.

As the Supreme Court held in *Tanner v. United States*, "[t]he conspiracies criminalized by § 371 are defined not only by the nature of the injury intended by the conspiracy, and the method used to effectuate the conspiracy, but also—and most importantly—by the *target* of the conspiracy. *Tanner v. United States*, 483 U.S. 107, 130 (1987). Thus, an allegedly fraudulent misrepresentation directed and designed to induce reliance by a private third party does not constitute fraud against the United States. *Id.* at 130-31. In fact, an interpretation that would criminalize defrauding a private third party under § 371 "has not even an arguable basis in the plain language of § 371." *Id.* at 131. Unless the conspirator intends that the third party will *relay* the alleged misrepresentation to federal officials, or the third party is acting as an agent of the federal government, *id.* at 129-30—neither of which is alleged here—no attempt to "defraud the United States" is at stake. 18 U.S.C. § 371.

---

[2] The indictment does not allege that President Trump either made these statements or even knew that they were being made. *See* Doc. 1, ¶¶ 61, 67.

**C.      Political Advocacy Conducted in Public and to Government Officials Does Not Constitute "Obstructing" or "Interfering With" a Government Function.**

For similar reasons, the indictment fails to allege any conduct that constitutes "obstructing" or "interfering with" a government function. Political advocacy to public officials—even if the one lobbying them makes claims on widely disputed issues that federal officials deem to be "false"—does not constitute obstruction or interference within the meaning of § 371.

For § 371 cases that go beyond the heartland of common-law fraud (*i.e.*, cheating the government out of money or property), the Supreme Court has adopted a narrowing construction of the statute that requires a showing of an attempt to "obstruct" or "interfere with" a lawful government function. "To conspire to defraud the United States means primarily to cheat the government out of property or money, but it also means to *interfere with or obstruct* one of its lawful governmental functions by deceit, craft or trickery…." *Hammerschmidt*, 265 U.S. at 188 (emphasis added). The Supreme Court has "stated repeatedly that the fraud covered by the statute reaches any conspiracy for the purpose of impairing, obstructing or defeating the lawful function of any department of Government." *Tanner*, 483 U.S. at 128 (quoting *Dennis v. United States*, 384 U.S. 855, 861 (1966), and *Haas v. Henkel*, 216 U.S. 462, 479 (1910)) (cleaned up). Thus, "a defraud-clause conspiracy requires four elements: that (1) [the defendants] entered into an agreement, (2) to *obstruct* a lawful function of the government or an agency of the government, (3) by deceitful or dishonest means, and (4) at least one overt act was taken in furtherance of that conspiracy." *United States v. Concord Mgmt. & Consulting LLC*, 347 F. Supp. 3d 38, 46 (D.D.C. 2018) (emphasis added).

To "obstruct" means to "place an obstacle in or fill with obstacles or impediments," or to "hinder from passing, action, or operation: impede, retard." WEBSTER'S THIRD NEW

INTERNATIONAL DICTIONARY 1559 (2002). One does not "obstruct" Congress's operations by lobbying members of Congress to act in a certain way; on the contrary, such political advocacy is inherent and essential to the system. After all, "conscientious public officials arrange meetings for constituents, contact other officials on their behalf, and include them in events all the time. The basic compact underlying representative government assumes that public officials will hear from their constituents and act appropriately on their concerns…. The Government's position could cast a pall of potential prosecution over these relationships." *McDonnell*, 579 U.S. at 575. And a constituent does not "obstruct" governmental functions by asserting views on a widely reported, controversial topic that the prosecution does not share and thinks are "false." *See id.* On such widely disputed topics, members of Congress and other government officials have the full resources and opportunity to form their own opinions and draw their own conclusions.

> ### D. The Statute Should Be Construed Narrowly to Avoid Criminalizing Vast Swaths of Ordinary Political Activity and First Amendment-Protected Speech.

Several principles of statutory interpretation all support the same conclusion—*i.e.*, that the conduct alleged in the indictment does not fall within § 371 as a matter of law.

> #### 1. Courts interpret § 371 narrowly to offset its potential overbreadth.

First, courts routinely observe that 18 U.S.C. § 371 is an extremely broad statute, and they interpret it narrowly in individual cases to offset its potential overbreadth. Unlike the mail and wire fraud statutes, which have been interpreted to incorporate elements of common-law fraud, *see McNally v. United States*, 483 U.S. 350 (1987), Section 371 has been interpreted to "criminalize any willful impairment of a legitimate government function, whether or not the improper acts or objective are criminal under another statute." *United States v. Tuohey*, 867 F.2d 534, 537 (9th Cir. 1989). Precisely because it is so broad—to the point of raising serious vagueness concerns, *see infra*—courts adopt narrower and more cautious interpretations of § 371 to foreclose

novel applications of the statute, especially where those applications risk criminalizing ordinary conduct or political advocacy. As the Ninth Circuit holds, "[r]ecognizing the broad scope of section 371, we review indictments under it carefully, and construe it narrowly." *Id.* at 537. The Supreme Court has likewise emphasized that "indictments under the broad language of the general conspiracy statute [§ 371] must be scrutinized carefully as to each of the charged defendants because of the possibility … that its wide net may ensnare the innocent as well as the culpable." *Dennis v. United States*, 384 U.S. 855, 860 (1966). This caution applies here, where the prosecution advances an interpretation that would cast the "wide net" of § 371 to "ensnare" large numbers of people engaging in perfectly ordinary conduct.

>2.    **The canon of constitutional avoidance requires narrow interpretation.**

Second, the Court must construe § 371 narrowly to avoid the grave constitutional questions that criminalizing the charged conduct would raise under the First Amendment. As discussed in President Trump's separately filed Motion to Dismiss Based on Constitutional Grounds, and incorporated by reference here, all the alleged conduct constitutes First Amendment-protected speech, advocacy, and association; and the application of the statute in this context violates the fair-notice requirement of the Due Process Clause. Accordingly, applying the statute to this conduct would, at very least, raise grave constitutional questions. *See id.*

"[W]here an otherwise acceptable construction of a statute would raise serious constitutional problems, the Court will construe the statute to avoid such problems unless such construction is plainly contrary to the intent of Congress." *Edward J. DeBartolo Corp. v. Fla. Gulf Coast Bldg. & Const. Trades Council*, 485 U.S. 568, 575 (1988). "The elementary rule is that every reasonable construction must be resorted to, in order to save a statute from unconstitutionality. This approach not only reflects the prudential concern that constitutional issues not be needlessly

confronted, but also recognizes that Congress, like this Court, is bound by and swears an oath to uphold the Constitution. The courts will therefore not lightly assume that Congress intended to infringe constitutionally protected liberties…." *Id.* (quotation marks omitted); *see also, e.g., Clark v. Martinez*, 543 U.S. 371, 381 (2005) (holding that this canon of interpretation "is a tool for choosing between competing plausible interpretations of a statutory text, resting on the reasonable presumption that Congress did not intend the alternative which raises serious constitutional doubts").

Here, for the reasons discussed above, the interpretation of § 371 that does not criminalize President Trump's alleged conduct—and, by extension, the conduct of millions and millions of other Americans citizens—is at least "plausible." *Clark*, 543 U.S. at 381. By contrast, the prosecution's alternate interpretation would raise grave constitutional concerns—in fact, it would criminalize conduct directly protected by the First Amendment. *See supra*, Part I. Under these circumstances, the Court must adopt the narrower interpretation.

### 3.      The prosecution's interpretation creates fatal vagueness problems.

Likewise, the narrower interpretation of the statute is necessary to avoid fatal vagueness problems. If, as the prosecution contends, any statement made in the course of advocating one's position to federal officials on a hotly disputed political topic may constitute a "conspiracy to defraud the United States" so long as the prosecution later deems the statement "false," the statute fails to satisfy the basic precepts of due process. *See* Part III of President Trump's Motion to Dismiss Based on Constitutional Grounds. This interpretation, if adopted, would render the statute unconstitutionally vague, because it would not provide fair notice of the conduct prohibited and would lend itself to arbitrary and discriminatory enforcement—as the present case demonstrates. *See also infra*, Part VI.

"To satisfy due process, 'a penal statute [must] define the criminal offense [1] with sufficient definiteness that ordinary people can understand what conduct is prohibited and [2] in a manner that does not encourage arbitrary and discriminatory enforcement.'" *Skilling v. United States*, 561 U.S. 358, 402–03 (2010) (quoting *Kolender v. Lawson*, 461 U.S. 352, 357 (1983)). "The void-for-vagueness doctrine embraces these requirements." *Id.* An interpretation that leaves the statute's "outer boundaries ambiguous," and effectively grants prosecutors wide discretion to determine what conduct is criminal, is unconstitutionally vague. *McNally*, 483 U.S. at 360 ("Rather than construe the statute in a manner that leaves its outer boundaries ambiguous and involves the Federal Government in setting standards of disclosure and good government for local and state officials, we read § 1341 as limited in scope to the protection of property rights. If Congress desires to go further, it must speak more clearly than it has."). As discussed in more detail in President Trump's Motion to Dismiss Based on Constitutional Grounds, if interpreted to cover the charged conduct, the statute violates Due Process.

### 4.      The rules of lenity and restraint favor a narrower interpretation.

It is well-established that "ambiguity concerning the ambit of criminal statutes should be resolved in favor of lenity." *Cleveland v. United States*, 531 U.S. 12, 25 (2000) (quoting *Rewis v. United States*, 401 U.S. 808, 812 (1971)). The Supreme Court has repeatedly applied the rule of lenity to prevent overbroad applications of federal fraud statutes. *See id.*; *Skilling*, 561 U.S. at 410-11 ("Further dispelling doubt on this point is the familiar principle that ambiguity concerning the ambit of criminal statutes should be resolved in favor of lenity.... [W]e resist the Government's less constrained construction absent Congress' clear instruction otherwise."); *McNally*, 483 U.S. at 360 ("If Congress desires to go further, it must speak more clearly than it has."). The rule of lenity provides that, where two interpretations of a criminal statute are available, the Court must

adopt the one that favors the criminal defendant. *Cleveland*, 531 U.S. at 25. Likewise, the principle of restraint in interpreting criminal statutes calls for the adoption of a less harsh alternative. "Thus, the [Supreme] Court has stressed repeatedly that 'when choice has to be made between two readings of what conduct Congress has made a crime, it is appropriate, before we choose the harsher alternative, to require that Congress should have spoken in language that is clear and definite.'" *Dowling v. United States*, 473 U.S. 207, 214 (1985) (quoting *Williams v. United States*, 458 U.S. 279, 290 (1982)).

In *Cleveland*, the Supreme Court held that the federal mail-fraud statute could not be applied to a scheme to procure a state video-poker license through false statements to a state agency. *Id.* In applying the rule of lenity, the Court emphasized that the rule prevents an interpretation that "would appear to arm federal prosecutors with power to police false statements in an enormous range of submissions to state and local authorities." *Id.* at 26. The Court "decline[d] to attribute to § 1341 a purpose so encompassing where Congress has not made such a design clear." *Id.* The same reasoning applies here—the prosecution's interpretation would "appear to arm federal prosecutors with power to police false statements in an enormous range of [communications]" with federal and state officials. *Id.* The rule of lenity counsels against such an interpretation. *Id.*

### 5.   18 U.S.C. § 1001's legislative advocacy exclusion precludes an interpretation of § 371 that would prohibit such advocacy.

The—wholly false—premise of the indictment is that President Trump made allegedly false statements to congressional officials (including Vice President Pence in his capacity as President of the Senate) to induce official action that would alter or delay congressional certification. Doc. 1 at ¶ 10. Yet conspicuously absent from the indictment is any charge under the federal false statements statute, 18 U.S.C. § 1001. The reason why becomes clear when examining

the plain text of this statute, which expressly *excludes* any purportedly false statements regarding "any matter within the jurisdiction of the legislative branch" except two non-applicable exceptions for (1) administrative matters, or (2) "any investigation or review, conducted pursuant to the authority of any committee, subcommittee, commission or office of the Congress, consistent with applicable rules of the House or Senate." 18 U.S.C. § 1001(c).[3]

The purpose of this broad exclusion is plain—although Congress may have a specific need to regulate statements made, typically under oath, to its committees, broadly proscribing *all* allegedly false statements made to legislators would potentially criminalize vast swaths of speech and conflict with the First Amendment's guarantee that citizens may petition our leaders for a redress of grievances. That is a guarantee that always applies, no matter how much our leaders or other government officials disagree with such grievances or believe they are baseless.

It is a "fundamental canon of statutory construction that the words of a statute must be read in their context and with a view to their place in the overall statutory scheme. A court must therefore interpret the statute as a symmetrical and coherent regulatory scheme, and fit, if possible, all parts into an harmonious whole. Similarly, the meaning of one statute may be affected by other Acts, particularly where Congress has spoken subsequently and more specifically to the topic at hand." *Food & Drug Admin. v. Brown & Williamson Tobacco Corp.*, 529 U.S. 120, 133, 120 S. Ct. 1291, 1301, 146 L. Ed. 2d 121 (2000) (citations and quotation marks omitted, cleaned up).

Here, the prosecution asks the Court to ignore § 1001's place in the regulatory scheme and conclude that, notwithstanding that Congress's direct exclusion of legislatively directed statements, strained interpretations of other statutes (none of which have any direct application)

---

[3] As certification of electoral college votes are neither an "investigation or review" nor a process conducted by a "committee, subcommittee, commission or office of the Congress," the statute does not apply, and hence the prosecution did not and could not charge President Trump under § 1001.

may nonetheless criminalize the same alleged conduct. The Court should reject this argument. Congress, for good reasons, chose to limit § 1001's reach. Other, more general statutes—including § 371 and all others charged—must be interpreted with this limitation in mind, foreclosing any construction sufficient to support the allegations herein.

Accordingly, for all these reasons, Count One of the indictment should be dismissed with prejudice.

## II. Counts Two and Three Should Be Dismissed Because the Indictment Fails to Allege an Offense Under 18 U.S.C. § 1512(c)(2) or (k).

Count Two of the indictment alleges conspiracy to obstruct an official proceeding under 18 U.S.C. § 1512(k). Doc. 1, at 43. Count Three of the indictment alleges obstruction and attempted obstruction of an official proceeding under 18 U.S.C. §§ 1512(c)(2). Doc. 1, at 44. Section 1512 was enacted as part of the Sarbanes-Oxley Act of 2002 in response to the Enron scandal, to close a loophole in federal criminal law on evidence tampering. "Congress enacted § 1512(c)(2) as part of the Sarbanes-Oxley Act," which "was prompted by the exposure of Enron's massive accounting fraud and revelations that the company's outside auditor, Arthur Andersen LLP, had systematically destroyed potentially incriminating documents." *United States v. Fischer*, 64 F.4th 329, 346 (D.C. Cir. 2023) (opinion of Pan, J.) (citing *Yates v. United States*, 574 U.S. 528, 535–36 (2015)). "The Enron prosecutions revealed a critical gap in the U.S. Code: The then-current version of § 1512(b) prohibited a defendant from persuading another person to destroy records in connection with an investigation or other proceeding but imposed no liability on those who personally destroyed evidence." *Id.* at 346-47. Thus the indictment takes a statute directed at the destruction of records in accounting fraud and applies it to disputing the outcome of a Presidential election. This stretches the statutory language beyond any plausible mooring to its text, which violates the canons of avoidance, lenity, and restraint discussed above.

Section 1512(c)(2) provides that "[w]hoever corruptly … obstructs, influences, or impedes an official proceeding, or attempts to do so," commits a felony offense. 18 U.S.C. § 1512(c)(2). Section 1512(k) provides that "[w]hoever conspires to commit any offense under this section shall be subject to the same penalties as those prescribed for the offense the commission of which was the object of the conspiracy." 18 U.S.C. § 1512(k). Counts Two and Three fail as a matter of law because the indictment does not properly allege that President Trump acted "corruptly," or that his conduct attempted to, conspired to, or did "obstruct[]" or "impede[]" the 2021 election-certification proceeding in Congress.

### A. The Indictment Does Not Allege Any Conduct That Would "Obstruct" or "Impede" an Official Proceeding.

First, the indictment does not allege any conduct that could constitute "obstructing" or "impeding" an official proceeding.

As noted above, to "obstruct" means to "place an obstacle in or fill with obstacles or impediments," or to "hinder from passing, action, or operation: impede, retard." WEBSTER'S THIRD NEW INTERNATIONAL DICTIONARY 1559 (2002). To "impede" means virtually the same thing as to "obstruct," *i.e.*, "to interfere with or get in the way of the progress of … hold up: block." *Id.* at 1132. The definition of "obstruct" makes clear the virtual identity of meaning by defining "obstruct" in terms of "impede"—to "fill with … impediments" or "impede." *Id.* at 1559.[4]

---

[4] The statute also uses the word "influence," but the indictment charges only that President Trump conspired to "obstruct and impede an official proceeding," Doc. 1, at 43 (Count Two), and that he "attempted to, and did, corruptly obstruct and impede an official proceeding," *id.* at 44 (Count Three). It does not allege that he conspired to, attempted to, or did "influence" an official proceeding. *See id.* In any event, the verb "influence" is sandwiched on a list of verbs between two other verbs of near-identical meaning—"obstruct" and "impede." 18 U.S.C. § 1512(c). Under the canon *noscitur a sociis*, "influence" should be given a meaning similar to those other two verbs—*i.e.*, to exert influence upon by blocking, impeding, or obstructing. *See, e.g., Yates v. United States*, 574 U.S. 528, 543 (2015) (plurality op.) (applying the canon *noscitur a sociis* to the

As discussed above, lobbying members of Congress and state officials to act in a certain way when they conduct an official proceeding does not "obstruct" or "impede" that official proceeding. Nothing about lobbying Congress to act a certain way "places an obstacle" or "impediments," "hinders … from action," "gets in the way of the progress of," "holds up," or "blocks" Congress from acting. *See id.* at 1132, 1159. On the contrary, lobbying Congress to act in a certain way presupposes that Congress *will* conduct an official proceeding, and it seeks to persuade Congress to act in a certain way during that official proceeding. That is the antithesis of "obstructing" or "impeding" the proceeding.

The canons of interpretation that apply to 18 U.S.C. § 371 discussed above, *see supra* Part I.D, apply equally to Section 1512. The canon of constitutional avoidance instructs that the statute should be interpreted to avoid criminalizing First Amendment-protected speech and activity. *Supra* Part I.D.2. The narrower interpretation of § 1512 avoids potentially fatal vagueness and fair-notice problems. *Supra* Part I.D.3. The rules of lenity and restraint counsel in favor of the narrower interpretation as well. *Supra* Part I.D.4. And § 1001's more specific exclusion of legislative lobbying forecloses a general interpretation of § 1512 that would include such conduct.

By contrast, the prosecution's alternative interpretation—that someone who lobbies Congress to act based on views and opinions that the prosecution disfavors is somehow "obstructing" and "impeding" Congress—is novel and unprecedented, and it again threatens to criminalize broad swaths of ordinary political activity. On the prosecution's view, an activist who lobbied Congress to oppose COVID vaccine mandates on the ground that the vaccines do not prevent the spread of COVID would be "obstructing" Congress and committing a felony

Sarbanes-Oxley Act "avoid ascribing to one word a meaning so broad that it is inconsistent with its accompanying words, thus giving unintended breadth to the Acts of Congress").

punishable by 20 years if the government deemed such views "false"—which it has. As *McDonnell* instructs, such interpretations that cast the pall of criminal prosecution over ordinary lobbying activities should be avoided. *McDonnell*, 579 U.S. at 575.

> **B.      The indictment does not allege that President Trump acted "corruptly."**

On October 20, 2023, the D.C. Circuit issued its opinion in *United States v. Robertson*, which addresses the meaning of the word "corruptly" in section 1512. *United States v. Robertson*, -- F.4th --, No. 22-3062, -- F.4th --, 2023 WL 6932346 (D.C. Cir. Oct. 20, 2023). That opinion confirms that the indictment here is deficient in failing to properly allege that President Trump acted "corruptly." *See id.*

In *Robertson*, the Court held that "corruptly" "must be construed according to its plain meaning," that "there are a range of ways to prove a defendant's 'corrupt' intent or action," and that a jury could find that a defendant acted "corruptly" "based on evidence that he used felonious 'unlawful means' to obstruct, impede, or influence the Electoral College vote certification." *Id.* at *5. Relying on the Supreme Court's opinion in *Arthur Andersen LLP v. United States*, 544 U.S. 696 (2005), and the D.C. Circuit's opinion in *United States v. North*, 910 F.2d 843, 881 (D.C. Cir. 1990), *Robertson* held that "corruptly" means "wrongful, immoral, depraved, or evil," or "depraved, evil: perverted into a state of moral weakness or wickedness." *Id.* at *6.

*Robertson* held that "that proof of 'corrupt' intent or action may vary depending on circumstances," including the nature of the proceeding and the nature of the defendant's actions and/or purpose. *Id.* But *Robertson* took pains to emphasize that lobbying government officials and similar political activities—*i.e.*, trying to convince government officials to act in accord with one's preferences—do not fall within the definition of "corruptly." *See id.* "[T]o assert that all endeavors to influence, obstruct or impede the proceedings of congressional committees are, as a matter of

24

law, corrupt would undoubtedly criminalize some innocent behavior." *Id.* (quoting *North*, 910 F.2d at 882). "That is because 'congressional committees are part and parcel of a political branch of government' that is engaged in making legislative and policy choices. It is thus commonplace for people — such as lobbyists, protesters, and constituents — to lawfully 'attempt, in innumerable ways, to obstruct or impede congressional committees.'" *Id.* (quoting *North*, 910 F.2d at 882).

Thus, "[t]he 'corruptly' element protects non-culpable conduct — such as … lobbyists and protestors exercising their rights to influence a congressional committee hearing — from being swept up by the statute's broad prohibition on 'obstructing, influencing or impeding an official proceeding.'" *Id.* at *7 (citation omitted). "Those cases confirm, moreover, that the requirement that a defendant act 'corruptly' is met by establishing that the defendant acted with a corrupt purpose or via independently corrupt means." *Id.* at *7. And that test encompasses actions where the defendant acts through "independently unlawful means," *i.e.*, the means themselves are independently criminal, such as (as in *Robertson*) where the defendant allegedly assaulted police officers with a dangerous weapon in attempting to obstruct an official proceeding: "[T]he ordinary meaning of the word "corruptly" in 18 U.S.C. § 1512(c)(2) encompasses acting through independently unlawful means…." *Id.* at *9.

Importantly, the "corrupt purpose" and "corrupt means" tests cannot be satisfied by simply pointing to lobbying and similar political activities, even where the defendant advocated a viewpoint that the prosecution disfavors: "The element of 'corrupt' intent or action, as we construe it, protects the right of peaceful advocacy and protest — *i.e.*, the legitimate efforts of lobbyists and protestors to influence policymaking or to express political views do not fit the ordinary meaning of 'corruptly.' That is so even in the case of protestors who passionately, but lawfully, voice displeasure, suspicion, or outrage over election results." *Id.* at *12. By the same reasoning,

"corruptly" does not extend to persons lobbying government officials who "voice … suspicion, or outrage over election results," *id.*—which is exactly what the indictment charges against President Trump. The indictment alleges, in effect, that President Trump engaged in "a peaceful effort to convince members of Congress to raise objections to the vote certification," *id.*, which *Robertson* explicitly states is *not* covered by the statute, even when the objectors "voice … suspicion" and "outrage" over the election results. *Id.*

Any broader reading of "corruptly" in this context, moreover, is constitutionally untenable and must be eschewed under the canons of avoidance, lenity, and restraint. *See supra* Part I. As noted in President Trump's Motion to Dismiss the Indictment Based on Constitutional Grounds, President Trump and others have a First Amendment right to state that the election was stolen and advocate for members of Congress and other government officials to act in accordance with that view. Criminalizing such advocacy under section 1512 would raise grave constitutional questions to say the least, and such an interpretation should be rejected. As noted above, the rules of lenity and restraint also favor the narrower interpretation. As a matter of law, such political activity cannot be viewed as "wrongful, immoral, depraved, or evil," no matter how much the prosecution disapproves the viewpoint expressed. *Robertson*, at *5.

Further, if the holding of *Robertson* is broadened to include political advocacy based on disputed viewpoints on political questions that the prosecution disfavors, the statute would be incurably vague and violate principles of Due Process. To be sure, *Robertson* stated that "there are a range of ways to prove a defendant's 'corrupt' intent or action," *id.* at *5; "that proof of 'corrupt' intent or action may vary depending on circumstances," *id.* at *6; and "there are multiple ways to prove that a defendant acted 'corruptly.'" *Id.* at *8; *see also id.* (suggesting that there may be "myriad ways" to establish the "corruptly" element). But these statements cannot be construed as

a blank check to authorize prosecutors to criminalize any lobbying and political activities based on the prosecution's view that the viewpoints advocated are supposedly "immoral" or "false." If the word "corruptly" is so broad that it is "limited only by the imagination of the criminally inclined," *id.* at *8 (quoting *Poindexter*, 951 F.2d 369, 382 (D.C. Cir. 1991)), then the statute fails to provide fair notice of the conduct proscribed and is incurably vague. Thus, *Robertson*'s caution against applying the statute to criminalize "efforts of lobbyists and protestors to influence policymaking or to express political views," *id.* at *12, must be taken seriously and given full effect to avoid rendering the statute unconstitutional in this context.

## III.    Count IV of the Indictment Should Be Dismissed.

Count IV fails as a matter of law for several reasons. First, President Trump was lawfully exercising his rights under the Electoral Count Act, and lawful exercise of his own civil rights cannot violate 18 U.S.C. § 241. Second, President Trump did not have fair notice that he was interfering with a constitutionally protected right by seeking to examine and preserve election fraud challenges. Third, the indictment fails to plead that President Trump acted with the specific intent to interfere with another's constitutional rights. For these reasons, Count IV should be dismissed.

### A.  President Trump's lawful exercise of his own civil rights does not violate § 241.

Count IV incorporates by reference the allegations in Indictment paragraphs 1 through 4 and 8 through 123. Doc. 1, ¶ 129. Based on these factual allegations, the Indictment charges President Trump with conspiracy to "injure, oppress, threaten, and intimidate" one or more persons in "the right to vote, and to have one's vote counted." *Id.* at ¶ 130.

The Supreme Court "has repeatedly said that the essence of a conspiracy is 'an agreement to commit an unlawful act.'" *United States v. Jimenez Recio*, 537 U.S. 270, 274 (2003). "To prove

a conspiracy charge, the government must show that the defendant agreed to engage in criminal activity and knowingly participated in the conspiracy with the intent to commit the offense, as well as that at least one overt act took place in furtherance of the conspiracy." *United States v. Hemphill*, 514 F.3d 1350, 1362 (D.C. Cir. 2008) (internal quotation omitted). Based on this clear precedent, an indictment cannot succeed without an agreement to commit an unlawful act.

No agreement to commit an unlawful act is identified in the indictment. The indictment recognizes that President Trump had the right to speak publicly about the election, to raise concerns about election fraud, to claim election victory, and to formally challenge the results of the election through "lawful and appropriate means." Doc. 1, ¶ 3. As set forth in President Trump's separate Motion to Dismiss on the Basis of Presidential Immunity, all of the Indictment's factual allegations relating to President Trump involved him lawfully carrying out his presidential duties. They were also all protected by the First Amendment, for the reasons discussed in President Trump's Motion to Dismiss Based on Constitutional Grounds. Without the agreement to commit an unlawful act, Count IV fails as a matter of law. For these reasons, both Count IV and all the conspiracy claims in the indictment fail as a matter of law.

### B. President Trump did not have fair notice that lawfully contesting the election could be prosecuted as a civil rights violation.

As discussed in Part III of President Trump's Motion to Dismiss Based on Constitutional Grounds, "a criminal statute must give fair warning of the conduct it makes a crime." *Bouie v. City of Columbia*, 378 U.S. 347, 350–51 (1964). "The underlying principle is that no man shall be held criminally responsible for conduct which he could not reasonably understand to be proscribed." *United States v. Harriss*, 347 U.S. 612, 617 (1954).

With respect to 18 U.S.C. § 241, criminal liability "may be imposed for deprivation of a constitutional right if, but only if, in the light of pre-existing law the unlawfulness [under the

Constitution is] apparent." *United States v. Lanier*, 520 U.S. 259, 271–72 (1997) (internal

quotation omitted).[5] The Supreme Court has compared the "fair warning" standard to the "clearly

established" standard applied to civil cases under § 1983 or *Bivens* cases. *Id.* at 271. To be clearly

established, "existing precedent must have placed the statutory or constitutional question beyond

debate." *Ashcroft v. al-Kidd*, 563 U.S. 731, 741 (2011).

In 2020, no court decision had stated that contesting an election through lawful means,

including by public statements, court challenges, or alternate slates of electors, was

unconstitutional or an infringement of the right to vote or to have one's vote counted. To be sure,

in a previous contested presidential election, the Supreme Court concluded, "[t]he individual

citizen has no federal constitutional right to vote for electors for the President of the United States

unless and until the state legislature chooses a statewide election as the means to implement its

power to appoint members of the electoral college." *Bush v. Gore*, 531 U.S. 98, 104 (2000). But

the Court did not consider whether either then-Governor Bush or then-Vice President Gore had

individually infringed any constitutional rights under criminal or civil law by using lawful means

to advance their interests through post-election activities. *See id.* at 111 ("None are more conscious

of the vital limits on judicial authority than are the Members of this Court, and none stand more in

admiration of the Constitution's design to leave the selection of the President to the people, through

their legislatures, and to the political sphere."). To the contrary, the Court indicated that the parties

had taken an appropriate route to resolve the dispute. *Id.* ("When contending parties invoke the

process of the courts, however, it becomes our unsought responsibility to resolve the federal and

constitutional issues the judicial system has been forced to confront.").

---

[5] *Lanier* involved a prosecution under 18 U.S.C. § 242, but both it and other cases have analyzed 18 U.S.C. §§ 241 and 242 under the same standards. *See, e.g.*, *id.* at 265, 269; *Chapman v. Houston Welfare Rts. Org.*, 441 U.S. 600, 661–62 (1979).

Historic precedent in close and contested elections supports the lawfulness of the actions alleged in the indictment. For example, in the disputed elections of both 1876 and 1960, competing slates of electors were sent to Congress. William Josephson & Beverly J. Ross, *Repairing the Electoral College*, 22 J. LEGIS. 145, 156-57, 166 (1996); *see also* 146 CONG. REC. E2180 (daily ed. Dec. 13, 2000) (statement of Rep. Mink) ("Based on the earlier certified results [in Hawaii in 1960], the Republican electors met and cast their three votes for Nixon. The Democratic electors also met and cast their votes for Kennedy *even though they did not have a certificate of election from the State*.") (emphasis added). In 1800, Vice President Jefferson unilaterally made the decision to accept questionable electoral votes from Georgia that favored him. Bruce Ackerman and David Fontana, *How Jefferson Counted Himself In*, THE ATLANTIC (Mar. 2004), *at* https://www.theatlantic.com/magazine/archive/2004/03/how-jefferson-counted-himself-in/302888/. And in 1960, Vice President Nixon—himself a candidate—decided which competing slate of electors to accept from Hawaii. Herb Jackson, *What Happens When a State Can't Decide on its Electors*, ROLL CALL (Oct. 26, 2020), *at* https://rollcall.com/2020/10/26/we-the-people-what-happens-when-a-state-cant-decide-on-its-electors/; *see also* 146 CONG. REC. E2180 (daily ed. Dec. 13, 2000) (statement of Rep. Mink) ("Vice President Nixon, sitting as the presiding officer of the joint convention of the two Houses, suggested that the electors named in the certificate of the Governor dated January 4, 1961 be considered the lawful electors from Hawaii. There was no objection to the Vice President's suggestion . . ."). In the 2000 election contest, three Supreme Court justices pointed to the Hawaii situation in 1960 to emphasize that competing slates of electors could be submitted to Congress and that Congress could make the decision on which slate to accept:

> But, as I have already noted, those provisions [of the Electoral Count Act] merely provide rules of decision *for Congress to follow when*

> *selecting among conflicting slates of electors*. They do not prohibit
> a State from counting what the majority concedes to be legal votes
> until a bona fide winner is determined. Indeed, in 1960, *Hawaii*
> *appointed two slates of electors and Congress chose to count* the
> one appointed on January 4, 1961, well after the Title 3 deadlines.

*Bush*, 531 U.S. 98, 127 (2000) (Stevens, J., dissenting) (internal citations omitted) (emphasis

added).

Courts have rejected prosecutions under 18 U.S.C. § 241 for election-related issues that

did not have clearly established federal constitutional protection. For example, the Supreme Court

affirmed dismissal of an indictment based on alleged bribery of voters. *United States v. Bathgate*,

246 U.S. 220, 226 (1918). In another case, the Seventh Circuit reversed a conviction for interfering

in a local election. *United States v. Bradberry*, 517 F.2d 498, 499 (7th Cir. 1975). No matter what

the courts thought of the conduct involved, they dismissed the prosecutions because the defendant

did not have fair notice that the alleged actions would violate federally protected constitutional

rights.

Thus, at the time of the allegations in the indictment, the only relevant judicial precedent,

from 2000, treated post-election challenges as lawful and included a dissent arguing that

competing elector slates could be submitted to Congress for Congress to decide which to accept.

Furthermore, the actions listed in the Indictment had been performed in among others, 1800, 1876,

and 1960 without any suggestion they were violating constitutionally protected rights. The issue

certainly had not been placed "beyond debate."

For these reasons, President Trump did not have fair notice that lawfully contesting the

election could be prosecuted as a civil rights violation. In fact, prosecuting him on the grounds

specified in the indictment stretches the statutory language beyond any recognizable bounds.

Count IV should be dismissed.

### C.  The Indictment does not charge the necessary specific intent.

Section 241 requires proof of specific intent to violate a constitutional right. *Bray v. Alexandria Women's Health Clinic*, 506 U.S. 263, 335 (1993). "It is established that since the gravamen of the offense under § 241 is conspiracy, the prosecution must show that the offender acted with a specific intent to interfere with the federal rights in question." *Anderson v. United States*, 417 U.S. 211, 223–24 (1974) (citing *United States v. Guest*, 383 U.S. 745, 753—754 (1966); *Screws v. United States*, 325 U.S. 91 (1945)). "[A] specific intent to interfere with a federal right [must] be alleged in the indictment...." *Wilkins v. United States*, 376 F.2d 552, 562 (5th Cir. 1967).

Because of the specific-intent requirement, not every conspiracy affecting an individual's constitutional rights is within 18 U.S.C. § 241. *United States v. Guest*, 383 U.S. 745, 760 (1966). For example, "a conspiracy to rob an interstate traveler would not, of itself, violate § 241." *Id.* Likewise, the alleged conspiracy to contest the 2020 election does not, of itself, violate 18 U.S.C. § 241. Instead, the prosecution must show that President Trump specifically intended to interfere with someone's constitutional right to vote. The prosecution has failed to allege President Trump's specific intent, and thus Count IV should be dismissed.

Furthermore, to prove the charge under 18 U.S.C. § 241, the prosecution must prove that President Trump acted to accomplish a governmental purpose. *United States v. Ehrlichman*, 546 F.2d 910, 928 (D.C. Cir. 1976). *Ehrlichman* involved a charge under 18 U.S.C. § 241 against a Watergate conspirator. *Id.* The D.C. Circuit explained that it "is not a violation of section 241 for individuals who happen to be government agents to burglarize a doctor's office for purely personal gain. It is a civil rights conspiracy in violation of that section, however, if they enter his office in their capacity as government agents without proper authorization to secure information for an

ostensible government purpose." *Id.* Importantly, "[t]he objective must be governmental even though section 241, unlike section 242, does not require that conspirators act under color of law. The states can deal with those who kill or mug or burglarize out of passion or greed for purely personal reasons." *Id.*

To convict President Trump under 18 U.S.C. § 241, then, the prosecution must prove that President Trump took post-election actions to accomplish a *governmental* objective, and not for any personal gain. Proving this, however, directly implicates Presidential immunity. Accordingly, the prosecution's charge under 18 U.S.C. § 241 will fail because it did not prove action for a governmental objective, or it will fail because proving a governmental objective will confirm that the charge is barred under presidential immunity. Either way, the prosecution's claim under § 18 U.S.C. 241 cannot prevail. In any event, the indictment itself is not neutral on this point—it plainly alleges that President Trump acted for *personal* purposes, not governmental purposes. Count IV, therefore, is deficient on its face.

## CONCLUSION

The Court should dismiss the indictment with prejudice.

Dated: October 23, 2023                Respectfully submitted,

Todd Blanche, Esq. (PHV)             */s/John F. Lauro*
toddblanche@blanchelaw.com        John F. Lauro, Esq.
Emil Bove, Esq. (PHV)                 D.C. Bar No. 392830
Emil.Bove@blanchelaw.com          jlauro@laurosinger.com
BLANCHE LAW                       Gregory M. Singer, Esq. (PHV)
99 Wall St., Suite 4460               gsinger@laurosinger.com
New York, NY 10005                 Filzah I. Pavalon, Esq. (PHV)
(212) 716-1250                       fpavalon@laurosinger.com
                                 LAURO & SINGER
                                 400 N. Tampa St., 15th Floor
                                 Tampa, FL 33602
                                 (813) 222-8990
                                 *Counsel for President Trump*