# EXHIBIT 1

EXCLUSIVE

# FBI resisted opening probe into Trump's role in Jan. 6 for more than a year

In the DOJ's investigation of Jan. 6, key Justice officials also quashed an early plan for a task force focused on people in Trump's orbit

By Carol D. Leonnig and Aaron C. Davis
Updated June 20, 2023 at 8:15 p.m. EDT | Published June 19, 2023 at 8:00 a.m. EDT

Hours after he was sworn in as attorney general, Merrick Garland and his deputies gathered in a wood-paneled conference room in the Justice Department for a private briefing on the investigation he had promised to make his highest priority: bringing to justice those responsible for the attack on the U.S. Capitol on Jan. 6, 2021.

In the two months since the siege, federal agents had conducted 709 searches, charged 278 rioters and identified 885 likely suspects, said Michael R. Sherwin, then-acting U.S. attorney for the District of Columbia, ticking through a slide presentation. Garland and some of his deputies nodded approvingly at the stats, and the new attorney general called the progress "remarkable," according to people in the room.

Sherwin's office, with the help of the FBI, was responsible for prosecuting all crimes stemming from the Jan. 6 attack. He had made headlines the day after by refusing to rule out the possibility that President Donald Trump himself could be culpable. "We are looking at all actors, not only the people who went into the building," Sherwin said in response to a reporter's question about Trump. "If the evidence fits the elements of a crime, they're going to be charged."

But according to a copy of the briefing document, absent from Sherwin's 11-page presentation to Garland on March 11, 2021, was any reference to Trump or his advisers — those who did not go to the Capitol riot but orchestrated events that led to it.

A Washington Post investigation found that more than a year would pass before prosecutors and FBI agents jointly embarked on a formal probe of actions directed from the White House to try to steal the election. Even then, the FBI stopped short of identifying the former president as a focus of that investigation.

A wariness about appearing partisan, institutional caution, and clashes over how much evidence was sufficient to investigate the actions of Trump and those around him all contributed to the slow pace. Garland and the deputy attorney general, Lisa Monaco, charted a cautious course aimed at restoring public trust in the department while some prosecutors below them chafed, feeling top officials were shying away from looking at evidence of potential crimes by Trump and those close to him, The Post found.

In November 2022, after Trump announced he was again running for president, making him a potential 2024 rival to President Biden, Garland appointed special counsel Jack Smith to take over the investigation into Trump's attempt to overturn the 2020 election.

On June 8, in a separate investigation that was also turned over to the special counsel, Smith secured a grand jury indictment against the former president for mishandling classified documents after leaving office. Trump was charged with 31 counts of violating a part of the Espionage Act, as well as six counts arising from alleged efforts to mislead federal investigators.

The effort to investigate Trump over classified records has had its own obstacles, including FBI agents who resisted raiding the former president's home. But the discovery of top-secret documents in Trump's possession triggered an urgent national security investigation that laid out a well-defined legal path for prosecutors, compared with the unprecedented task of building a case against Trump for trying to steal the election.

Whether a decision about Trump's culpability for Jan. 6 could have come any earlier is unclear. The delays in examining that question began before Garland was even confirmed. Sherwin, senior Justice Department officials and Paul Abbate, the top deputy to FBI Director Christopher A. Wray, quashed a plan by prosecutors in the U.S. attorney's office to directly investigate Trump associates for any links to the riot, deeming it premature, according to five individuals familiar with the decision. Instead, they insisted on a methodical approach — focusing first on rioters and going up the ladder.

The strategy was embraced by Garland, Monaco and Wray. They remained committed to it even as evidence emerged of an organized, weeks-long effort by Trump and his advisers before Jan. 6 to pressure state leaders, Justice officials and Vice President Mike Pence to block the certification of Biden's victory.

In the weeks before Jan. 6, Trump supporters boasted publicly that they had submitted fake electors on his behalf, but the Justice Department declined to investigate the matter in February 2021, The Post found. The department did not actively probe the effort for nearly a year, and the FBI did not open an investigation of the electors scheme until April 2022, about 15 months after the attack.

The Justice Department's painstaking approach to investigating Trump can be traced to Garland's desire to turn the page from missteps, bruising attacks and allegations of partisanship in the department's recent investigations of both Russia's interference in the 2016 presidential election and Hillary Clinton's use of a private email server.

Inside Justice, however, some lawyers have complained that the attorney general's determination to steer clear of any claims of political motive has chilled efforts to investigate the former president. "You couldn't use the T word," said one former Justice official briefed on prosecutors' discussions.

This account is based on internal documents, court files, congressional records, handwritten contemporaneous notes, and interviews with more than two dozen current and former prosecutors, investigators, and others with knowledge of the probe. Most of the people interviewed for this story spoke on the condition of anonymity to discuss internal decision-making related to the investigation.

Spokespeople at the Justice Department and FBI declined to comment or make Garland, Monaco or Wray available for interviews.

Garland, 70, whose department includes the FBI, has maintained that DOJ would follow the facts in investigating the attack on the Capitol, starting with "the people on the ground" and working up. In a speech he was heavily involved with writing to mark the first anniversary of the attack, Garland lauded the department's progress, while also nodding to public scrutiny of the pace of the investigation.

"In circumstances like those of January 6th, a full accounting does not suddenly materialize," Garland said. "We follow the facts, not an agenda or an assumption. The facts tell us where to go next."

Asked about prosecuting Trump, Garland generally has expressed the same sentiment as Sherwin that no one is above the law. The Justice Department will hold accountable anyone "criminally responsible for attempting to interfere with the … lawful transfer of power from one administration to the next," Garland said in the summer of 2022.

In an interview with The Post, Matthew M. Graves, who succeeded Sherwin as the U.S. attorney for the District of Columbia, cautioned against drawing conclusions about the government's approach while its work is ongoing. He noted that 23 of 29 affiliates and members of the Oath Keepers charged in connection with the attack had been convicted so far, several for seditious conspiracy, the first such convictions since 2009.

"I hear everybody kind of wants everything to go faster," Graves said. "But I think if you kind of look at this in historical perspective — what the department has been able to achieve — I think when people get some distance from it, it will stand as something unprecedented."

Still, there were consequences to moving at a slower pace. For many months after the attack, prosecutors did not interview White House aides or other key witnesses, according to authorities and attorneys for some of those who have since been contacted by the special counsel. In that time, communications were put at risk of being lost or deleted and memories left to fade.

Peter Zeidenberg, who helped lead a special counsel probe of the George W. Bush White House, said Garland and Monaco had to tread carefully because investigating a president's attempts to overturn an election is a novel case, and they did not want to appear partisan. "But you can take it to the extreme … you work so hard not to be a partisan that you're failing to do your job."

## 'Everybody keeps asking, "Where the hell is the FBI?"'

Outnumbered and desperate to regain control of the Capitol following the Jan. 6 attack, Capitol Police had for the most part let the rioters walk away. The task of identifying the thousands of attackers — let alone building cases against them — fell to a Justice Department whose leadership was in transition.

William P. Barr had left his post as attorney general two weeks before the attack amid a growing rift with Trump. His successor, Jeffrey Rosen, held the office for less than a month, and Garland would not be sworn in until March 11. Biden's pick to replace Sherwin as the U.S. attorney in D.C. would not take office for another 10 months.

At the FBI, Trump, over the previous year, had repeatedly threatened to fire Wray, 56, who had in turn tried to keep a low profile. The investigations of Clinton's email and Russia's interference in the 2016 election had been run out of FBI headquarters and created firestorms. Since then, Wray and his team sought to avoid even an appearance of top-down influence by having local field offices run investigations and make day-to-day decisions. In fact, when it came to the Jan. 6 investigation, agents noticed that Wray did not travel the five blocks from FBI headquarters to the bureau's Washington field office running the investigation for more than 21 months after the attack. In that time, people familiar with the investigation said, he had never received a detailed briefing on the topic directly from the assistant director in charge of the office, Steven D'Antuono.

Against that backdrop, a key partnership formed on the night of the insurrection between D'Antuono and Sherwin that would set the direction for the early phase of the investigation.

The two agreed they needed to round up as many Jan. 6 rioters as possible to dissuade extremists from disrupting Biden's inauguration in two weeks.

Prosecuting violent Trump supporters wasn't the job Sherwin had signed up for. The longtime Miami federal prosecutor and former naval intelligence officer had come to D.C. the previous year on a short-term assignment as a top adviser to Barr on national security matters. Barr then named him in May 2020 to be acting U.S. attorney in Washington, raising concerns that the office — which was then handling multiple investigations of interest to Trump — would continue to be politicized. But Sherwin had experience with domestic extremists, as well as with Trump. In 2018, he had helped track, interrogate and charge a Florida Trump supporter who sent mail bombs to Democratic Party officials and media organizations. The following year, he won the conviction of a Chinese trespasser at Trump's Mar-a-Lago Club in Palm Beach, Fla.

For D'Antuono, 51, an unlikely series of past tests now seemed like practice for the glare of Jan. 6, he told colleagues. An accountant by training, he had been promoted to a senior post in the FBI's St. Louis field office in 2014, just as the police shooting of Michael Brown touched off protests in nearby Ferguson and his office was called to investigate the shooting. D'Antuono then took over the Detroit field office before the pandemic hit. Michigan became a hotbed of lockdown protests, and he oversaw an investigation of militia members accused of plotting to kidnap Gov. Gretchen Whitmer (D). Weeks before the 2020 presidential election, Wray named him head of the D.C. office.

Two days after the Capitol attack, the FBI began announcing charges that were meant to send a message. Agents arrested the man pictured propping his feet on a desk in House Speaker Nancy Pelosi's office suite. The next day it was the man in the horned headdress who was known as the "QAnon shaman." The goal was to "show confidence in the system," Sherwin told a colleague.

Beyond short written or video statements denouncing the Jan. 6 violence in general, however, neither Wray nor Rosen came out publicly to reinforce that message.

D'Antuono, who was interacting with lawmakers and reporters, told colleagues: "Everybody keeps asking, 'Where the hell is the FBI?'"

The answer they heard did not instill confidence. Top FBI aides told D'Antuono and Sherwin that Wray wanted to stay on as Biden's FBI director. They said they would not put the top boss "out there" — in the public eye — because they feared any public comments might spur Trump to unceremoniously fire him.

People close to Rosen and Wray said they preferred to let the local investigators running probes discuss the specifics of their cases.

> **Key officials in DOJ's Jan. 6 investigation**
>
> **Merrick Garland** was confirmed as President Biden's attorney general on March 10, 2021. He had served for almost 24 years on the federal appeals court in D.C., including seven as its chief judge. President Barack Obama nominated Garland to the Supreme Court in 2016, but his nomination was blocked by then-Senate Majority Leader Mitch McConnell.

On Jan. 12, the Justice Department's public affairs team informed Sherwin and D'Antuono that they would lead the department's first live on-camera news conference about the investigation.

The pair said investigators were prioritizing the arrest of violent actors, whom Sherwin called the "alligators closest to the boat."

When asked whether the department would also investigate Trump's role in urging supporters to come to Washington and inciting the crowd to march on the Capitol, Sherwin again said Trump was not off-limits.

## A plan to focus on Trump's orbit is batted down

By the end of January, with Biden sworn in as president, the scope of the Jan. 6 investigation was rapidly expanding inside the U.S. attorney's office. Scores of prosecutors and FBI agents from around the country — most still working remotely because of the pandemic — had been tasked with continuing to identify and charge rioters.

The U.S. attorney's office and the FBI had specialized teams probing the death of Capitol Police officer Brian D. Sicknick and the police shooting of rioter Ashli Babbitt. Another team, searching for the person who had planted pipe bombs near the Capitol, had almost 50 FBI agents. A "complex conspiracy" team, a group of 15 prosecutors and agents, zeroed in on members of militia groups who appeared to have coordinated and plotted aspects of the attack, internal briefing documents show.

But a group of prosecutors led by J.P. Cooney, the head of the fraud and public corruption section at the U.S. attorney's office, argued that the existing structure of the probe overlooked a key investigative angle. They sought to open a new front, based partly on publicly available evidence, including from social media, that linked some extremists involved in the riot to people in Trump's orbit — including Roger Stone, Trump's longest-serving political adviser; Ali Alexander, an organizer of the "Stop the Steal" rally that preceded the riot; and Alex Jones, the Infowars host.

In a decade in the U.S. attorney's office, Cooney, 46, had gained a reputation as a bold prosecutor who took on big cases. In 2017, he argued the government's bribery case against Sen. Robert Menendez (D-N.J.), which ended in a mistrial and with the Justice Department withdrawing the charges. In 2019, he oversaw the team that convicted Stone on charges of witness tampering and lying to Congress. Cooney signed off on recommending a prison sentence of seven to nine years, but Barr pressed to cut it by more than half after Trump tweeted that it was "horrible and very unfair." Trump later pardoned Stone.

In February 2021, Cooney took his proposal to investigate the ties with people in Trump's orbit directly to a group of senior agents in the FBI's public corruption division, a group he'd worked with over the years and who were enmeshed in some of the most sensitive Jan. 6 cases underway.

According to three people who either viewed or were briefed on Cooney's plan, it called for a task force to embark on a wide-ranging effort, including seeking phone records for Stone, as well as Alexander. Cooney wanted investigators to follow the money — to trace who had financed the false claims of a stolen election and paid for the travel of rallygoers-turned-rioters. He was urging investigators to probe the connection between Stone and members of the Oath Keepers, who were photographed together outside the Willard hotel in downtown Washington on the morning of Jan. 6.

Inside the FBI's Washington Field Office, agents recognized Cooney's presentation for the major course change that it presented. Investigators were already looking for evidence that might bubble up from rioter cases to implicate Stone and others. Cooney's plan would have started agents looking from the top down as well, including directly investigating a senior Trump ally. They alerted D'Antuono to their concerns, according to people familiar with the discussions.

D'Antuono called Sherwin. The two agreed Cooney did not provide evidence that Stone had likely committed a crime — the standard they considered appropriate for looking at a political figure. Investigating Stone simply because he spent time with Oath Keepers could expose the department to accusations that it had politicized the probe, they told colleagues.

D'Antuono took the matter to Abbate, Wray's newly named deputy director. Abbate agreed the plan was premature.

Sherwin similarly went up his chain of command, alerting Matt Axelrod, one of the senior-most officials Biden installed on his landing team at "Main Justice," as the DOJ headquarters on Pennsylvania Avenue NW is known. Axelrod, a top Justice Department official during the Obama administration, had been tapped by Biden's transition committee to help run the department day-to-day until Garland and Monaco could be confirmed.

Axelrod called a meeting for the last week of February with Sherwin, D'Antuono, Abbate and other top deputies. Cooney wasn't there to defend his plan, according to three people familiar with the discussion, but Axelrod and Abbate reacted allergically to one aspect of it: Cooney wanted membership rolls for Oath Keepers as well as groups that had obtained permits for rallies on Jan. 6, looking for possible links and witnesses. The two saw those steps as treading on First Amendment-protected activities, the people said.

Axelrod saw an uncomfortable analogy to Black Lives Matter protests that had ended in vandalism in D.C. and elsewhere a year earlier. "Imagine if we had requested membership lists for BLM" in the middle of the George Floyd protests, he would say later, people said.

Axelrod later told colleagues that he knew Jan. 6 was an unprecedented attack, but he feared deviating from the standard investigative playbook — doing so had landed the DOJ in hot water before. Former FBI director James B. Comey's controversial decision to break protocol — by publicly announcing he was reopening the investigation into Clinton's emails days before the 2016 presidential election — was widely viewed as swinging the contest in Trump's favor.

Some in the group also acknowledged the political risks during the meeting or in subsequent conversations, according to people familiar with the discussions. Seeking the communications of a high-profile Trump ally such as Stone could trigger a social media post from Trump decrying yet another FBI investigation as a "witch hunt." And what if the probe turned up nothing? Some were mindful, too, that investigating public figures demanded a high degree of confidence, because even a probe that finds no crime can unfairly impugn them.

All who assembled for the late February meeting were in agreement, with Axelrod making the final call: Cooney's plan would not go forward.

Aspects of the proposal were reported in 2021 by The Post and the New York Times. But the identity of the prosecutor who pushed for the plan, several of its details and the full story of how it galvanized the Justice Department's approach to the Jan. 6 investigation have not been previously revealed.

Inside the FBI's Washington Field Office, buzz about who might join the task force to investigate those around Trump dissipated as word spread that plans for the team had been shelved. In the U.S. attorney's office, budding investigative work around the finances of Trump backers was halted, an internal record shows, including into Jones, who had boasted of paying a half-million dollars for the president's Jan. 6 rally and claimed the White House had asked him to lead the march to the Capitol.

About the same time, attorneys at Main Justice declined another proposal that would have squarely focused prosecutors on documents that Trump used to pressure Pence not to certify the election for Biden, The Post found.

Officials at the National Archives had discovered similarities in fraudulent slates of electors for Trump that his Republican allies had submitted to Congress and the Archives. The National Archives inspector general's office asked the Justice Department's election crimes branch to consider investigating the seemingly coordinated effort in swing states. Citing its prosecutors' discretion, the department told the Archives it would not pursue the topic, according to two people with knowledge of the decision.

## A prosecutor missteps with talk of seditious conspiracy

The Justice Department didn't expound at the time on why they turned down the elector probe, but the department made clear its strategy on the riot. Investigators would rely on the traditional method for prosecuting organized crime cases — rolling up of smaller criminals to implicate bigger ones.

To make it work, however, Sherwin began agitating that the government would need a hammer — a charge that would fit the historic nature of the crime and potentially carry decades in prison — to leverage rioters to tell everything they knew about the planning.

On Feb. 19, Sherwin signed an indictment charging nine Oath Keepers with conspiring to obstruct a government proceeding. In meetings, he instructed his top deputies to rapidly draft a superseding indictment charging some of them with seditious conspiracy and present it to DOJ headquarters so they could weigh applying this novel charge.

The Justice Department's most recent attempt to prosecute using the Civil War-era statute — in accusing militia group members of plotting to kill a police officer and harm others — had resulted in embarrassment when a judge acquitted defendants in 2012.

Sherwin, though, had seen the charge as appropriate for Jan. 6 rioters from early on; the main file folder in the U.S. attorney's office computer system, where line prosecutors shared charging papers and other filings, was named "riots and seditious conspiracy." Sherwin had begun carrying around a copy of the seditious conspiracy criminal statute, 18 USC 2384: "if two or more persons … conspire to overthrow, put down, or to destroy by force the Government of the United States," he would read, shrugging his shoulders as though it was obvious.

Sherwin had announced he would step down, making way for Biden to nominate a new U.S. attorney, but he felt so strongly about the seditious conspiracy approach that it figured into his briefing for the new attorney general on Garland's first day on the job.

Sherwin emphasized that most of the rioters were "stand-alone" actors who got caught up in the mob mentality. He said he was worried prosecutors risked getting bogged down trying hundreds of defendants and recommended the government plead out hundreds of lesser Jan. 6 cases. He stressed that the department should focus on the planners and leaders of the attack and consider using the little-used charge of attempting to violently overthrow their government.

Garland thanked Sherwin but did not reveal his thinking on seditious conspiracy, according to two people familiar with the meeting. It would become the norm in Garland's buttoned-down Justice Department to share information on only a need-to-know basis.

Addressing staff on his first day, Garland made clear he expected the department to speak through its conduct and court filings. "We will show the American people by word and deed that the Department of Justice pursues equal justice and adheres to the rule of law," he said.

Garland began arriving at the office each day before 8:30 a.m. and staying until after 7 p.m. When it came to charging decisions, even senior members of his team wouldn't be read in unless they had an operational reason to be involved. But just 10 days in, his pursuit of a drama-free tenure faced a jolt.

Before returning to Miami, Sherwin agreed to tape an interview with CBS's "60 Minutes."

Sherwin suggested to CBS that investigators had obtained enough evidence to prove some rioters engaged in sedition. "I personally believe the evidence is trending toward that, and probably meets those elements," he said.

Amit Mehta, the federal judge overseeing the prosecution of several members of the Oath Keepers involved in the Jan. 6 attack, watched Sherwin's March 21, 2021, interview.

On six hours' notice, he called a video hearing with lawyers on the Oath Keepers' case and said he was more than a little "surprised" to see Sherwin publicly forecasting future charges on a nationally televised broadcast.

"Whether his interview violated Justice Department policy is really not for me to say, but it is something I hope the Department of Justice is looking into," Mehta said.

Garland's top deputies were livid, and the attorney general himself was visibly upset, several people familiar with his reaction said. The attorney general, who was painstaking in preparing his own public remarks, was especially angry at Sherwin for speaking off the cuff. In the hearing with Mehta, John Crabb, chief of the criminal division of the U.S. attorney's office, said it appeared that "rules and procedures were not complied with" regarding the television interview, and that Sherwin had been referred to the department's internal affairs office for an ethics probe. Sherwin later told people he thought he'd had the department's support to tape the interview.

Sherwin heard from a close Justice Department ally that Garland and his deputies now felt boxed into the seditious conspiracy charges — or to tough questions if they didn't bring them.

## The 'bottom-up' approach faces internal roadblocks

As the six-month mark from the attack passed, several prosecutors felt increasingly overwhelmed by the growing workload and the extended wait for a permanent U.S. attorney. Prosecutors had begun recommending plea deals for dozens of Jan. 6 defendants but told colleagues weeks would pass without decisions from superiors.

Taking Sherwin's place until Biden's nominee could be named and confirmed was Channing D. Phillips, 65, who had twice served as the U.S. attorney in D.C. Phillips expressed to people that he saw his role as a placeholder with limited power to make decisions about Jan. 6 cases.

A permanent replacement was slow in coming, leaving some prosecutors describing the investigation as "rudderless" throughout the summer of 2021. Near the end of July, Biden nominated Graves, a lawyer in private practice who had once led the office's fraud section.

During that time, Justice officials continued to have conflicting views over whether to pursue people in Trump's orbit. The debate reached the deputy attorney general's office.

Monaco, 55, had begun her career as a staffer in Biden's Senate Judiciary Committee, and had herself worked as a federal prosecutor in the D.C. office. Monaco later rose to be the chief of staff to FBI Director Robert S. Mueller III and subsequently was President Barack Obama's homeland security adviser. By design, conflicts that arise between the U.S. attorney's office, the FBI or other branches of the Justice Department are managed by the deputy attorney general's office.

Monaco warned her aides that the department could not begin probing political actors linked to Trump based on assumptions, according to two individuals familiar with the discussions.

"A decision was made early on to focus DOJ resources on the riot," said one former Justice Department official familiar with the debates. "The notion of opening up on Trump and high-level political operatives was seen as fraught with peril. When Lisa and Garland came on board, they were fully onboard with that approach."

Some prosecutors even had the impression that Trump had become a taboo topic at Main Justice. Colleagues responsible for preparing briefing materials and updates for Garland and Monaco were warned to focus on foot soldiers and to avoid mentioning Trump or his close allies.

Late that summer, members of the team leading one of the most high-profile parts of the bottom-up probe into members of the Oath Keepers became frustrated, according to people familiar with the investigation.

Prosecutors wanted to charge Stewart Rhodes, the group's founder, and several lieutenants with seditious conspiracy. But by fall, the decision remained in limbo. Prosecutors had put Rhodes in their sights since February, when they first referred to him as "Person One" in court records, but still hadn't arrested him.

"The agents kept asking, 'What's going on?'" recalled one of those familiar with the case. "They were ready to pick up Rhodes."

While FBI agents and line prosecutors wanted to move forward with the charge, a decision was delayed in part because of wariness and debate among some officials inside Monaco's and Garland's offices about the risk of sedition charges being overturned on appeal. On top of that, the department still lacked Senate confirmation for two of Biden's nominees — for U.S. attorney in D.C. and an assistant attorney general for national security, the key supervisors over the investigation.

## 'At some point, there was no ladder from here to there'

By fall, some of Biden's Justice Department nominees began to finally win Senate confirmation.

On Nov. 1, 2021, Matthew G. Olsen was sworn in as assistant attorney general for national security. He was returning to an office he helped build from scratch two decades earlier in the Bush administration, in the wake of the Sept. 11, 2001, terrorist attacks.

Four days later, Graves, 47, was sworn in as U.S. attorney for the District of Columbia. With that, 10 months after the attack on the Capitol, Garland finally had a permanent team of chief prosecutors in place to guide the investigation.

Olsen, 61, pressed to take on a role in the Jan. 6 casework, which had been led until then by the D.C. U.S. attorney's office, according to people familiar with the offices at the time. He argued to senior Justice Department officials that an effort to block the peaceful transfer of power was squarely in the vein of what the national security division should be focused on. Monaco agreed. By mid-November, both Olsen and Graves were sitting with D'Antuono, receiving an exhaustive briefing on the state of the Jan. 6 investigations.

The outstanding issue of whether to charge Rhodes and other militia leaders with seditious conspiracy quickly rose to the top of to-do lists for the two new appointees. It had been eight months since Sherwin directed his deputies to raise the idea in a memo to the office of the deputy attorney general.

Since then, with successive new indictments, the government's evidence had grown stronger.

Graves and Olsen agreed seditious conspiracy charges "fit like a glove" for the alleged criminal acts of Rhodes and key deputies, one individual briefed on the discussion said, but they disagreed on how many people to charge. Olsen urged they charge a smaller number for whom the evidence was stronger.

But investigators were beginning to doubt whether such charges would implicate anyone higher than Rhodes. The bottom-up approach that had dominated nearly a year of the government's time had not yielded any significant connection to Trump's orbit.

"It had become clear that the odds were very low that 'bottom-up' was ever going to get very high," said one of those individuals. "At some point, there was no ladder from here to there."

In the meantime, public knowledge of the actions in the White House that precipitated Jan. 6 was building rapidly. A book by The Post's Bob Woodward and Robert Costa detailed a memo by Trump legal adviser John Eastman purporting to show a legal basis for Pence to block the certification of Biden's win on Jan. 6. It called for the vice president to rely on fake slates of electors for Trump from seven states to declare that the election outcome was in dispute. A separate Post story also revealed numerous details of a "war room" that Trump's closest advisers had been running out of the Willard hotel. The president's backers used the space as a hub to push members of state legislatures to take steps to support Eastman's plan, and to urge Pence not to certify the results.

## 'I'm not serving subpoenas on the friggin' Willard'

Inside the U.S. attorney's office and at Main Justice, prosecutors noticed the developments and grew troubled that the office was still putting too few resources into probing evidence of a broad, Trump-led conspiracy to overturn the election.

Soon after Graves arrived, prosecutors had highlighted the challenges of preparing for rioter trials while also reviewing thousands of hours of video and other digital data for evidence of other crimes.

Graves relayed to Monaco's office that he planned to stand up a new investigative unit, marking the government's first major pivot to look beyond the riots. It would be charged with pulling together strands of evidence that investigators had obtained from various rioter cases, including leads on the effort to block the certification.

The office was stretched thin, but among the many documents awaiting Graves's review when he arrived was one that would transfer a little-known Maryland federal prosecutor to his office.

Thomas Windom, 45, who had won plaudits for investigating a domestic extremist group called "The Base," had appealed to higher-ups for a move. The deputy attorney general's office saw the U.S. attorney's office in D.C. as being in need of help.

Graves put Windom on the new investigations team.

With Graves's support, Windom soon approached the FBI's Washington Field Office for additional help.

At a meeting in November 2021, Windom asked D'Antuono to assist in a grand jury investigation, which would include subpoenaing the Willard hotel for billing information from the time when Trump lawyer Rudy Giuliani was working with Stephen K. Bannon, Boris Epshteyn and other Trump associates in their "war room." Stone was staying there around Jan. 6 as well, in a different suite.

D'Antuono was skeptical. The investigative track sounded eerily similar to the Cooney proposal that had been shot down in February, he later confided to colleagues.

"I'm not serving subpoenas on the friggin' Willard," D'Antuono told Windom, according to a person familiar with their discussions. "You don't have enough to issue subpoenas."

Windom seemed surprised at the flat rejection, according to people familiar with the meeting. D'Antuono offered instead to give Windom full access to the FBI's trove of evidence about Oath Keeper and Proud Boy extremists involved in the riot. Maybe Windom would find a communication or financial link between rioters and Trump deputies, D'Antuono suggested. The two also briefly discussed fake electors, but the FBI wasn't ready to move forward on that topic either. Windom thanked him and left.

In the next several weeks, Windom would turn to consider the fake electors and discreetly inquire if another agency might help: the U.S. Postal Service inspector.

At the same time, Graves's and Olsen's debate over who to charge with sedition stretched into December, and a growing chorus of former public officials, lawmakers and others criticized Garland for what they saw as a lack of progress on the events that ignited the attack and the roles of Trump and his allies. In one of several examples, three former military generals warned in The Post that the country had to prepare for the next insurrection after not a single leader who incited the violence had been held to account, and they pressed the Justice Department to "show more urgency."

That fall and winter, a House committee pursuing its own investigation into Jan. 6 conducted interviews with top Trump administration officials. Privately, its chief investigator, Timothy Heaphy, a former U.S. attorney, had alerted prosecutors in the D.C. U.S. attorney's office to a few details his team had uncovered about Trump's pressure on Justice Department officials and Pence to block the election results, according to a person familiar with the exchanges. But eye-grabbing news accounts about the committee's discoveries fueled public criticism that the Justice Department appeared to be lagging.

In late December, amid that wave of criticism, Olsen briefed the attorney general that he had reached a decision on the sedition question: Rhodes and 10 other Oath Keepers would face that rarely brought charge.

Garland had gotten deep into the weeds on the charge in previous briefings, cracking open his statute book and asking numerous questions about the risks of it being overturned. Monaco told the attorney general that Olsen's team had done a good job stress-testing the case.

Days later, Garland delivered a speech on the eve of the anniversary of the Jan. 6 attack. One line stood out as a promise to his critics: "The actions we have taken thus far will not be our last."

# The FBI investigation is opened

On Jan. 13, 2022, the department indicted Rhodes and 10 other Oath Keepers on charges of seditious conspiracy. It did not quiet the criticism, but instead put a spotlight on signs the Justice Department was not, in comparison with the House committee, working as actively to investigate Trump's role in the attempted coup.

Politico had reported that week that the House committee had demanded and received documents from several states about fake electors as well as other efforts Trump advisers had taken to pressure state officials ahead of Jan. 6. A wave of news reports and commentary followed, including by MSNBC's Rachel Maddow, who devoted several nights of her show to reporting on clues that suggested Trump allies ran a coordinated scheme to try to overturn the election.

In the last of those episodes, on Jan. 13, Michigan Attorney General Dana Nessel (D) announced that she had referred the matter of fake electors to federal prosecutors — that day. She called the scheme "forgery of a public record" under Michigan law but said the Justice Department would be best suited to prosecute a multistate effort.

About two weeks later, on Jan. 25, Monaco was asked during a televised interview about indications that the fake electors scheme had been coordinated by Trump allies. Monaco hinted there was an investigation underway.

"We've received those referrals," Monaco said on CNN. "Our prosecutors are looking at those. I can't say anything more on ongoing investigations."

Law enforcement officers, including some who would be called upon to join the investigation in ensuing months, were taken aback by Monaco's comments because they had not been told work was beginning, and it was extremely rare for Justice Department officials to comment on ongoing investigations.

Behind the scenes, federal prosecutors in Michigan who received Nessel's referral were waiting to hear from Monaco's office about how Main Justice wanted to proceed. National Archives officials were dumbstruck; the Justice Department was suddenly interested in the fake electors evidence it had declined to pursue a year earlier.

One person directly familiar with the department's new interest in the case said it felt as though the department was reacting to the House committee's work as well as heightened media coverage and commentary. "Only after they were embarrassed did they start looking," the person said.

When D'Antuono saw Monaco's comments, he turned to his deputies and offered a prediction: He would get a call soon from prosecutors asking him to begin investigating electors.

Within a few weeks, prosecutors from the U.S. attorney's office were again in a meeting with D'Antuono. This time, they did not attempt to link the electors scheme to violence on Jan. 6 but presented it as worthy of its own investigation. D'Antuono told colleagues he saw a path for opening a full investigation, as there was evidence of a potential crime — mail fraud: Documents that appeared fraudulent had been submitted through the mail to the National Archives and signed by people the FBI could trace.

D'Antuono agreed to run the FBI's multistate investigation.

The process did not go quickly. Lawyers at the FBI and Justice Department launched into what became many weeks of debate over the justification for the investigation and how it should be worded; one time-consuming issue became whether to name Trump as a subject.

With the FBI investigation still not opened, late in March a federal judge presiding over a civil case made a startling ruling: Trump "more likely than not" committed federal crimes in trying to obstruct the congressional count of electoral college votes.

The determination from U.S. District Judge David O. Carter came in a ruling addressing scores of sensitive emails that Eastman had resisted turning over to the House select committee. After reviewing the documents privately, Carter wrote that the actions by Trump and Eastman amounted to "a coup in search of a legal theory" and that "the illegality of the plan was obvious."

Carter, who was appointed by President Bill Clinton, took the opportunity to express frustration with the pace of the criminal investigation.

"More than a year after the attack on our Capitol, the public is still searching for accountability. … If the country does not commit to investigating and pursuing accountability for those responsible, the Court fears January 6 will repeat itself."

In April 2022, more than 15 months after the attack, Wray signed off on the authorization opening a criminal investigation into the fake electors plot.

Still, the FBI was tentative: Internally, some of the ex-president's advisers and his reelection campaign were identified as the focus of the bureau's probe, but not Trump.

## Starting from behind

On June 21, 2022, the House select committee held a nationally televised hearing on fake electors — a topic the committee had, in contrast to the Justice Department, identified early on as a major target for investigation. Testimony revealed what the committee had learned in nine months: The Trump campaign had requested that fake elector documents be flown to D.C. in time to help pressure Pence. The Republican speaker of the Arizona House, Russell "Rusty" Bowers, hushed the chamber, saying Giuliani had contacted him to try to remove Biden's electors in his state. "He pressed that point, and I said, 'Look, you are asking me to do something that is counter to my oath,'" Bowers said.

That day, FBI agents delivered subpoenas about electors for Trump to state lawmakers in Arizona. The next day, agents served subpoenas to people who signed documents claiming to be Trump electors in Georgia and Michigan.

Near the end of July, the Justice Department investigation into Trump's orbit gained new speed.

Graves decided the investigation was becoming too big to operate without a supervisor. The U.S. attorney turned to Cooney, the chief of the public corruption division who had sought to push investigators to begin looking at people in Trump's orbit almost a year and a half earlier. In an office-wide email on July 28, Graves was vague about Cooney's new role, saying he was leaving his post to help with "investigatory efforts" related to Jan. 6.

Over the next three months, subpoenas to former Trump campaign and White House officials sought information not only on fake electors but also on Trump's post-presidential fundraising efforts, hinting at how wide-ranging the investigation had become.

Then, on Nov. 18, Garland abruptly summoned to Main Justice the D.C.-based prosecutors working on the Jan. 6 conspiracy as well as those who had already gathered extensive evidence of Trump concealing classified records at his Mar-a-Lago resort. The attorney general told them that to ensure the appearance of independence into the two probes of a potential Biden rival, he would appoint a special counsel later that day. While the prosecutors could choose their next steps, Garland said he hoped they would continue the work under Smith.

Cooney, who had worked with Smith almost a decade earlier, as well as Windom and roughly 20 others, signed on.

A new chief prosecutor would typically need weeks or months to get up to speed on a high-priority investigation. But Smith issued subpoenas in the Jan. 6 probe after just four days, picking up where the U.S. attorney's office had left off, seeking communications between officials in three swing states and Trump, his campaign, and 19 advisers and attorneys who had worked to keep him in power.

Smith's office kept up a steady pace. Prosecutors issued flurries of subpoenas, including demands for records relating to Trump political action committees and his fundraising pitches around supposed election fraud. Smith's prosecutors also summoned a stream of witnesses for preliminary interviews and testimony before a D.C. grand jury.

In several cases, before the special counsel's office got in touch, witnesses in the fake electors scheme hadn't heard from the FBI in almost a year and thought the case was dead. Similarly, firsthand witnesses to Trump's Jan. 2, 2021, call to Georgia Secretary of State Brad Raffensperger — in which Trump asked him to "find" enough votes to win that state — were not interviewed by the Justice Department until this year, after Smith's team contacted them.

In late May, members of Trump's legal team began bracing for Smith to bring charges in his other line of investigation. On June 8, a grand jury in Miami endorsed Smith's evidence that Trump kept and withheld top-secret documents, indicting Trump.

On Tuesday, as Trump pleaded not guilty to those charges in federal court in Miami, Smith's investigation into efforts to steal the election continued: Michael McDonald and Jim DeGraffenreid, the chairman and vice chairman of the Nevada Republican Party who had signed a document claiming to be electors for Trump, entered the area of the D.C. federal courthouse where a grand jury has been meeting on cases related to Jan. 6.

**CORRECTION**

A previous version of this story incorrectly described the case in Michigan when the Justice Department most recently sought to bring a charge of seditious conspiracy against members of a militia group. The case involved the 2012 acquittal of members of the Hutaree nationalist group. This version has been updated.

*Spencer S. Hsu, Alice Crites and Magda Jean-Louis contributed to this report.*