**IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA**

UNITED STATES OF AMERICA

v.

DONALD J. TRUMP,

*Defendant*.

Case No. 1:23-cr-00257-TSC

**PRESIDENT TRUMP'S REPLY BRIEF IN SUPPORT OF HIS MOTION TO DISMISS
THE INDICTMENT BASED ON PRESIDENTIAL IMMUNITY**

**INTRODUCTION**

The question of presidential criminal immunity is a weighty one, intertwined with fundamental issues regarding our Constitution's structure, our history and traditions, and the President's unique role as the leader of our country. Although not yet resolved by the Supreme Court or any Circuit—because all prosecutors until now have respected Presidential immunity— the legal underpinnings and need for such protections are manifest. As the Supreme Court held in *Nixon* v. *Fitzgerald*, the President must have the ability to make decisive—and often unpopular— decisions regarding matters of public concern. 457 U.S. 731 (1982). Just as he cannot be constrained by fear of civil lawsuits, so too should he be protected from the much more potent specter of criminal prosecution. To hold otherwise would require the President to hesitate at every turn, conscious of the very real threat that one of many hundreds of prosecutors around the country may one day question his motives and seek to imprison him for his actions as President.

Nor would recognizing criminal immunity place the President above the law, as the prosecution contends. Rather, it would return us to the sensible process envisioned by the founders, where the People's representatives in Congress—not an unelected prosecutor—first decide whether a President's official actions are worthy of sanction and potential criminal liability. That has not occurred, and, in fact, the Senate acquitted President Trump of charges formed on the same basis as the indictment. Accordingly, the Court should hold that President Trump is immune from criminal prosecution for the acts described in the indictment and dismiss this case, with prejudice.

**ARGUMENT**

**I.      Presidential Immunity Bars Criminal Prosecution of a President for Official Acts.**

The prosecution argues that Presidential immunity does not extend to criminal prosecution of a President for his official acts. Response, at 7-34 ("Response"). The prosecution is wrong.

### A.     Presidential Immunity Does Not Place the President "Above the Law."

First, the prosecution argues that recognizing immunity from criminal prosecution would place the President "above the law." Response, at 1 (quoting *United States v. Lee*, 106 U.S. 196, 220 (1882)); *see also id.* at 1, 3, 7, 8, 15, 16 n.9, 17, 19, 20, 24, 26, 34.[1] Not so. As the prosecution recognizes, a President is subject to criminal prosecution for (1) "unofficial conduct" or purely private acts, Response, at 6; and (2) conduct within the scope of his official responsibilities, provided that he is first impeached by the House of Representatives and convicted by the Senate for such conduct, *id.* at 3-4. The Impeachment Judgment Clause states that, after a trial in the Senate, "*the Party convicted* shall nevertheless be liable and subject to Indictment, Trial, Judgment and Punishment, according to Law." U.S. CONST. art. I, § 3, cl. 7 (emphasis added). The Clause authorizes the prosecution of a President for conduct committed while in office, provided that the President is first "convicted" of such conduct by the United States Senate. *Id.*

The historical authorities cited by the prosecution contemplate this same sequencing. For example, the prosecution quotes Hamilton's Federalist No. 65, which states that "*[a]fter* having been sentenced to a perpetual ostracism from the esteem and confidence, and honors and emoluments of his country [through impeachment and conviction by the Senate], he will still be liable to prosecution and punishment in the ordinary course of law." THE FEDERALIST NO. 65, at 365 (emphasis added); *see also infra* at 4, 8–9 (discussing additional authorities).

Recognizing Presidential immunity from criminal prosecution, therefore, does not place a President "above the law," or mean that he may never be prosecuted for official acts. Instead, it

---

[1] The case that the Government cites for this argument, *United States v. Lee*, 106 U.S. 196, 220 (1882), was a property dispute between the federal government and Robert E. Lee's heirs over the lands that became Arlington National Cemetery; it has little or no application to the dispute here.

affirms the careful safeguards that the framers erected around the Presidency for the sake of the public good, and ensures that only Congress, as the People's representatives, may decide when and whether the President shall be "liable and subject to Indictment, Trial, Judgment and Punishment, according to Law." U.S. CONST. art. I, § 3, cl. 7.

**B.      The Text of the Constitution Requires Presidential Immunity to Prosecution.**

The prosecution next argues that immunity cannot lie because "no provision in the Constitution explicitly grants immunity to a sitting or former President of the United States." Response, at 5; *see also id.* at 9.  This is, again, incorrect. *See* Doc. 74, at 11-13. As an initial matter, even absent specific textual support, the Supreme Court has repeatedly recognized broad immunity doctrines, including both judicial immunity and the President's absolute civil immunity. *Fitzgerald*, 457 U.S. at 750 n.31 ("[A] specific textual basis has not been considered a prerequisite to the recognition of immunity. No provision expressly confers judicial immunity. Yet the immunity of judges is well settled."). Likewise, "the temporary immunity from criminal liability that an incumbent president enjoys while in office," Response, at 11, also lacks explicit support in the Constitution, but certainly exists, as the prosecution acknowledges here. Thus, the absence of a specific "Presidential Immunity Clause," is not determinative. Rather, the Court must look to the text of the constitution in conjunction with the "policies and principles that may be considered implicit in the nature of the President's office in a system structured to achieve effective government under a Constitutionally mandated separation of powers," *Fitzgerald,* 457 U.S. at 748. Likewise, the Court must consider the "history," the "common law," "public policy," and "our history and the structure of our government," *id.* at 747-48; Doc. 74, at 8-21.

Regardless, the text of the Constitution—namely the Impeachment Judgment Clause— straightforwardly supports Presidential immunity from criminal prosecution absent conviction in the Senate, *see* U.S. CONST. art. I, § 3, cl. 7. The Clause provides that "the Party *convicted* shall

nevertheless be liable and subject to Indictment, Trial, Judgment and Punishment, according to Law." U.S. CONST. art. I, § 3, cl. 7. The most natural interpretation is that this statement means exactly what it says—that a convicted party is liable to criminal prosecution. Thus, a President who is *not* "convicted" is *not* liable. *See* SCALIA & GARNER, READING LAW: THE INTERPRETATION OF LEGAL TEXTS 107 (2012) (discussing the "negative-implication canon" as "the principle that specification of the one implies exclusion of the other validly describes how people express themselves and understand verbal expression."); *Trump v. Vance*, 140 S. Ct. 2412, 2444 (2020) (Alito, J., dissenting) ("The plain implication [of the Impeachment Judgment Clause] is that criminal prosecution … is a consequence that can come about only after the Senate's judgment, not during or prior to the Senate trial.").

The prosecution attempts to evade this clear language by arguing that the Clause, in referencing criminal prosecution after conviction in the Senate, somehow *strips* the President of criminal immunity, regardless of the Senate's decision. Response, at 9-10. But this argument flips the plain text of the Clause on its head. Indeed, if the prosecution were correct, the phrase "Party convicted" would be rendered a nullity, as the President would be chargeable under any circumstances. This is clearly incorrect. *See Marbury v. Madison*, 5 U.S. (1 Cranch) 137, 174 (1803) (an interpretation under which "[a]ffirmative words" would "have no operation at all" should be rejected). Historical authorities—including those cited by the prosecution—likewise support the interpretation that a Senate conviction is a prerequisite for criminal prosecution. For example, Alexander Hamilton's comments in The Federalist No. 69, which the prosecution cites (Response, at 8), states in full: "The President of the United States would be liable to be impeached, tried, and, upon conviction of treason, bribery, or other high crimes or misdemeanors, removed

from office; and would *afterwards* be liable to prosecution and punishment in the ordinary course of law." THE FEDERALIST NO. 69 (emphasis added).

The word "afterwards," which the prosecution selectively omits from its brief, Response, at 8, forecloses any contention that a President may be criminally prosecuted regardless of the outcome of his impeachment trial (or even if never impeached). Instead, as Hamilton understood it, impeachment and conviction must come first, and only "afterwards" would criminal prosecution be possible. *Id.* Moreover, Hamilton's comments should be considered against the background of English common law, under which the criminal prosecution of the Chief Executive was virtually unthinkable. 3 BLACKSTONE'S COMMENTARIES ON THE LAWS OF ENGLAND ch. 17, pp. 254-55; *see also Marbury*, 5 U.S. (1 Cranch) at 164-65. As Hamilton emphasizes, the Impeachment Judgment Clause makes an important *exception* to that centuries-old rule—ensuring that the President would not be a "king," but instead responsible to the People's representatives, and subject to criminal prosecution upon impeachment and conviction.

For its part, the prosecution argues that it would be "incongruous" and "strained" for the Constitution to endorse Presidential immunity, but make an exception for Presidents who are convicted by the Senate. Response, at 10. On the contrary, the requirement of impeachment and conviction by the Senate assures that a President can be held criminally responsible for his actions in office, but only if there is a broad political consensus in Congress for doing so. To this end, the Constitution requires action by both Houses of Congress, including a supermajority of the Senators, providing the President with a critical structural protection from politically motivated prosecutions and those "new fangled and artificial treasons," which historically "have been the great engines, by which violent factions … have usually wreaked their alternate malignity on each other." THE FEDERALIST No. 47 (Madison).

However, once the charges against the President have been tested through this structural process, and found meritorious by the Senate, then it makes perfect sense to treat the former President on the same footing as other citizens subject to criminal prosecution. *See* U.S. CONST. art. I, § 3, cl. 7. Consistent with this, the Supreme Court has repeatedly emphasized that the primary check on the President for wrongdoing in official conduct is impeachment and trial by the Senate— including in *Fitzgerald* itself: "A rule of absolute immunity for the President will not leave the Nation without sufficient protection against misconduct on the part of the Chief Executive. There remains the constitutional remedy of impeachment." 457 U.S. at 757.

Therefore, the fact that some Presidents remain immune from prosecution for official acts because they are never impeached is not a "yawning impunity gap," Response, at 14, but a deliberate feature of the structural protections inherent in the separation of powers. "While the separation of powers may prevent us from righting every wrong, it does so in order to ensure that we do not lose liberty." *Morrison v. Olson*, 487 U.S. 654, 710 (1988) (Scalia, J., dissenting).

The prosecution next argues that there is not a perfect fit between the "high crimes and misdemeanors" for which impeachment is authorized under Article II, § 4, and the complete universe of crimes for which a citizen might be prosecuted. Response, at 10-11. But the "high crimes and misdemeanors" for which a President can be impeached include alleged crimes of a "political nature" and other serious abuses of the President's official responsibilities, as the prosecution concedes. *See id.* ("When the Constitution was ratified, the phrase 'high crimes and misdemeanors' was aimed at the 'misconduct of public men,' including the 'abuse or violation of some public trust.' . . . The conduct that impeachment targets includes 'acts taken in [the president's] 'public character'—that is, official acts[.]" (quoting THE FEDERALIST No. 65 (Hamilton), 2 Joseph Story, COMMENTARIES ON THE CONSTITUTION OF THE UNITED STATES § 783 (1833), and *Clinton v. Jones*, 520 U.S. 681, 696 (1997)). Thus, the political offenses for which a President might be impeached

match the scope of his immunity, while still ensuring the President "is otherwise subject to the laws for his purely private acts." *Clinton*, 520 U.S. at 696.[2]

Finally, the prosecution speculates that the Impeachment Judgment Clause's "Party convicted" provision "was intended 'to assure that after impeachment a trial on criminal charges is not foreclosed by the principle of double jeopardy.'" Response, at 13-14 (quoting *United States v. Claiborne*, 727 F.2d 842, 846 (9th Cir. 1984)). But this inference directly contradicts the prosecution's own argument, made on the previous page, that Double Jeopardy does not attach to impeachment proceedings because their consequences are limited to removal from office and disqualification from future office. *Id.* at 12-13 (citing 2 Story, COMMENTARIES §§ 780-81). If impeachment does not, in fact, result in jeopardy (as the prosecution contends, *see id.*), there would be no need for the Impeachment Judgment Clause to specify that subsequent prosecutions are

---

[2] Straining to find an argument outside the text of the Constitution, the prosecution claims that President Trump's argument here "flatly contradicts his claim during his second impeachment proceedings." Response, at 12 (citing 167 Cong. Rec. S607 (Feb. 9, 2021)). This, too, is incorrect. The prosecution thoroughly misrepresents the arguments made by President Trump's impeachment counsel. The topic under dispute was whether a President can be impeached after he leaves office, not the scope of Presidential immunity. *See* 167 Cong. Rec. at S607. What impeachment counsel described as a "complete canard" was the argument that "any official who betrayed the public trust and was impeached could avoid accountability simply by resigning one minute before the Senate's final conviction vote." *Id.* Counsel then referred to the "judicial process in this country" and the "investigative process in this country to which no former officeholder is immune," and emphasized that those processes include "the safeguards of the judicial system." *Id.* Counsel never addressed whether former Presidents have absolute immunity from prosecution for official acts, and the "safeguards of the judicial system," *id.*, plainly include the right to assert Presidential immunity as a defense in a future prosecution.

Relatedly, the prosecution argues that "some Senators explicitly referred to the availability of criminal prosecution as an alternative means of providing accountability." Doc. 109, at 14. But it cites statements from only three Senators—a bloc whose votes were not necessary to reach acquittal. *Id.* at 14-15. The views of three Senators do not reflect the views of the whole body, but each "represent[s] at most the views of a single Senator." *Hamdan v. Rumsfeld*, 548 U.S. 557, 666 (2006) (Scalia, J., dissenting). In any event, in the context of this criminal case, it is "emphatically the province and duty of the judicial department," not the Senate, "to state what the law is." *Marbury*, 5 U.S. (1 Cranch) at 177.

permitted for convictions, as prosecution would be permitted in all cases (conviction or acquittal). Again, this leaves the "Party convicted" phrase a nullity, which cannot be the correct reading.

In total, the prosecution wishes to re-write the Impeachment Judgment Clause to say "[*all parties*] shall nevertheless be liable and subject to Indictment, Trial, Judgment and Punishment, according to Law." U.S. CONST. art. I, § 3, cl. 7. The prosecution may not do so. The clause states "*the party convicted*" *id*. The Court must, therefore, give effect to those words and recognize the President's immunity from criminal prosecution for official acts absent conviction by the Senate.

### C.   Historical Evidence Strongly Supports Criminal Immunity.

The prosecution argues that "[h]istorical evidence from the time of the founding … confirms that a president was subject to prosecution when no longer in office." Response, at 15. On the contrary, the prosecution's cited sources indicate that a President is "subject to prosecution when no longer in office," *id.*, only if he has been impeached and convicted by the Senate.

First, the prosecution cites several statements from Alexander Hamilton in The Federalist Nos. 65, 69, and 77, all of which support President Trump's interpretation. As noted above, Hamilton's statements in Federalist Nos. 65 and 69 both contemplate criminal liability only after a Senate conviction. Likewise, in Federalist No. 77, Hamilton wrote that the President is "at all times liable to impeachment, trial, dismission from office, incapacity to serve in any other, and to forfeiture of life and estate by *subsequent* prosecution in the common course of law." THE FEDERALIST NO. 77 (emphasis added). In each case, Hamilton makes clear that prosecution of the President would occur only "after[]" or "subsequent" to Senate conviction. Next, the prosecution cites James Iredell's comments at the North Carolina ratifying convention. Response, at 15-16. As with Hamilton, Iredell's comments strongly imply that criminal prosecution would *follow* conviction upon impeachment: "If [the President] commits any misdemeanor in office, he is

impeachable, removable from office, and incapacitated to hold any office of honor, trust, or profit. If he commits any crime, he is punishable by the laws of this country…." 4 DEBATES ON THE CONSTITUTION 109 (J. Elliot ed. 1891). The prosecution cites Justice Thomas's opinion in *Vance* discussing these comments, Response, at 16, but Justice Thomas cited them in arguing that the President may be immune even from the enforcement of a state criminal subpoena—hardly a position that supports the Government here. *Vance*, 140 S. Ct. at 2435 (Thomas, J., dissenting).

The prosecution also relies on the fact that Chief Justice Marshall's holding in the trial of Aaron Burr that "a subpoena duces tecum could be issued to" President Jefferson. Response, at 16 (citing *United States v. Burr*, 25 F. Cas. at 33-34). But the amenability of a President to respond to criminal subpoenas bears no resemblance to a President's exposure to be personally tried, convicted, and imprisoned for *official acts*, which would create a debilitating chill on a President's ability to fearlessly perform his duties. Further, in *Marbury v. Madison*, the same author, Chief Justice Marshall, emphasized that the courts could never sit in judgment on the President's official acts: "The acts of such an officer [*i.e.*, the President], as an officer, can never be examinable by the courts." *Marbury*, 5 U.S. (1 Cranch) at 166.

Cognizant of this clear statement, the prosecution seeks to distinguish *Marbury*, but its attempts fail. Doc. 105, at 17. Here is what Chief Justice Marshall wrote in *Marbury*:

> By the constitution of the United States, the President is invested with certain important political powers, in the exercise of which he is to use his own discretion, and *is accountable only to his country in his political character, and to his own conscience*. To aid him in the performance of these duties, he is authorized to appoint certain officers, who act by his authority and in conformity with his orders.
>
> In such cases, their acts are his acts; and whatever opinion may be entertained of the manner in which executive discretion may be used, still there exists, and can exist, *no power to control that discretion*. The subjects are political. They respect the nation, not individual rights, and being intrusted to the executive, *the decision of the executive is conclusive*. The application of this remark will be perceived by adverting to the act of congress for establishing the department of foreign affairs.

> This officer, as his duties were prescribed by that act, is to conform precisely to the will of the President. He is the mere organ by whom that will is communicated. *The acts of such an officer, as an officer, can never be examinable by the courts*.

*Marbury*, 5 U.S. (1 Cranch) at 165–66 (emphases added). Thus, Chief Justice Marshall asserts that a President's official acts "can never be examinable by the courts." *Id.* A criminal prosecution of a President for his official acts is, of course, the most extreme method of "examin[ation] by the courts." *Id.* Justice Story's opinion in *Martin v. Mott*, 25 U.S. 19 (1827), reinforced this holding of *Marbury*, and further emphasized that it would be particularly inappropriate to allow a *jury* to sit in judgment on a President's official acts. *Id.* at 33 (rejecting the notion that "the legality of the orders of the President would depend, not on his own judgment of the facts, but upon the finding of those facts upon the proofs submitted to a jury").[3]

Finally, the Government relies on *Butz v. Economou*, 438 U.S. 478 (1978), for the proposition that "no man in this country is so high that he is above the law." Response, at 17 (quoting *Lee*, 106 U.S. at 220). But *Butz* immediately went on to acknowledge that this principle is perfectly consistent with the recognition of absolute immunity, when history and public policy warrant. "In light of this principle," *Butz* held, "federal officials who seek absolute exemption from personal liability for unconstitutional conduct must bear the burden of showing that public policy requires an exemption of that scope." *Butz*, 438 U.S. at 506. The Court then added, "This is not to

---

[3] The Government dismisses § 1563 of Justice Story's Commentaries as supposedly addressing only a *sitting* President's immunity from prosecution. Response, at 17-18. But in that section (quoted in full at Doc. 74, at 28), Justice Story wrote *both* that a sitting President "cannot … be liable to arrest, imprisonment, or detention, while he is in the discharge of the duties of his office," *and* that "[i]n the exercise of his political powers he is to use his own discretion, and is accountable only to his country, and to his own conscience. His decision, in relation to these powers, is subject to no control; and his discretion, when exercised, is conclusive." 3 J. Story, COMMENTARIES ON THE CONSTITUTION OF THE UNITED STATES ch. 37, § 1563 (1833). Justice Story's Commentaries, therefore, come to the very same conclusion as *Marbury* and *Martin v. Mott*—that a President's discretion in the exercise of official acts is "conclusive," *id.*, and official acts are generally not "examinable by the courts." *Marbury*, 5 U.S. at 165-66.

say that considerations of public policy fail to support a limited immunity for federal executive officials." *Id.* The Court then explicitly stated that absolute immunity applies in "those exceptional situations where it is demonstrated that absolute immunity is essential for the conduct of the public business." *Id.* at 507. The Presidency, of course, presents the most "essential" of all possible cases. *Id.*; *see also Fitzgerald*, 457 U.S. at 750 (citing *Butz* and holding that "[t]he President's unique status under the Constitution distinguishes him from other executive officials"). And, as explained above, recognizing such immunity does not place the President "above the law," but instead embraces the Constitution's design that it is for the People, through Congress, to decide whether the President should be criminally liable for his actions.

### D.     Prosecuting President Trump Breaches Centuries of Unbroken Tradition.

The Government argues that the fact "that no former president has been criminally prosecuted … reflects not a history and tradition implying the existence of criminal immunity but instead the fact that 'most presidents have done nothing criminal, making it difficult to draw inferences from the absence of arrests and prosecutions.'" Response, at 18 (citation omitted). On the contrary, American history teems with situations where the opposing party vigorously contended that a sitting President acted criminally in the exercise of his official responsibilities. Yet, when the opposing party took power, none of these Presidents was ever prosecuted, until 2023.

For example, in the 1824 election, Andrew Jackson's supporters accused President John Quincy Adams of effecting a "corrupt bargain" with Henry Clay by appointing him Secretary of State in exchange for using his influence as Speaker of the House to deliver the election to Adams.[4] In the 1876 election, President Grant dispatched federal troops to disputed States to ensure that

---

[4] *See, e.g.,* Jessie Kratz, *The 1824 Presidential Election and the "Corrupt Bargain"*, National Archives (Oct. 22, 2020), at https://prologue.blogs.archives.gov/2020/10/22/the-1824-presidential-election-and-the-corrupt-bargain/.

Republican-controlled canvassing committees could organize just enough pro-Republican slates of electors to elect Rutherford B. Hayes, after Hayes lost the popular vote to Tilden and trailed greatly in the electoral college.[5] President Nixon was widely accused of criminal obstruction of justice for the exercise of his official duties in the so-called "Saturday Night Massacre," when he ordered three subsequent Attorneys General to fire the Watergate Special Prosecutor.[6] President George W. Bush's critics widely accused him of lying to Congress to induce the Iraq War on false allegedly pretenses by claiming that Saddam Hussein's regime in Iraq was hoarding stockpiles of "weapons of mass destruction," which turned out to be non-existent.[7] President Obama was criticized for personally authorizing the extrajudicial killing of a U.S. citizen located abroad through a CIA "kill list" and a drone strike that killed both the citizen and his 16 year-old son, also a U.S. citizen.[8] American history provides many further examples. Though many at the time believed these official actions were criminal, and their political opponents eventually took power in every case, none of these Presidents were ever charged with any crime for official acts. Our history thus reflects a strong tradition *against* prosecuting Presidents for their official acts.[9]

---

[5] *See, e.g.,* Lina Mann, *The Election of 1876*, The White House Historical Association (Apr. 22, 2021), at https://www.whitehousehistory.org/the-election-of-1876.

[6] *See, e.g.,* Carroll Kilpatrick, *Nixon Forces Firing of Cox; Richardson, Ruckelshaus Quit*, Washington Post (Oct. 21, 1973), at https://www.washingtonpost.com/wp-srv/national/longterm/watergate/articles/102173-2.htm.

[7] *See, e.g.,* Gary L. Gregg II, *George W. Bush: Foreign Affairs*, UVA Miller Center, at https://millercenter.org/president/gwbush/foreign-affairs.

[8] *See, e.g.,* Spencer Ackerman, *US Cited Controversial Law in Decision to Kill American Citizen by Drone*, The Guardian (June 23, 2014), at https://www.theguardian.com/world/2014/jun/23/us-justification-drone-killing-american-citizen-awlaki.

[9] The Government relies on President Ford's pardon of President Nixon, arguing that it presupposes that Nixon could have been prosecuted for acts he committed as President. Doc. 109, at 18. Not so. The fact that Nixon was never prosecuted—despite widespread public outrage and compelling evidence of wrongdoing—provides compelling evidence of the *strength* of the historical tradition against prosecuting former Presidents for their official acts, not its weakness. Moreover, this argument overlooks that much of the conduct at issue in the Watergate scandal—

Conversely, and as the prosecution recognizes, "[t]hroughout American history, there have been federal criminal prosecutions of high-ranking officials from all three branches of the federal government—including the Vice President, members of the Cabinet, Senators, Representatives, and judges—as well as of governors, mayors, sheriffs, and more." Doc. 109, at 28. The Presidency's absence from this list, despite ample opportunity, proves the point that the President is immune until and unless the Senate strips the President of that immunity.[10]

The prosecution next argues that it is "startling" that a President's "purposes and motives … would be completely irrelevant" to the immunity determination. Response, at 20. On the contrary, the principle that an official's allegedly unlawful motive or purpose is irrelevant to the immunity determination has been black-letter law for over a century, and repeatedly reaffirmed.

_____

such as ordering the burglary of the Democratic National Committee headquarters—may well have been purely private acts, not shielded by immunity at all, thus necessitating a pardon. (Both of these points apply equally to President Clinton's admitted perjury in the Paula Jones litigation, for which he was never prosecuted. Response, at 19.)

Next, even if the acts were within the outer perimeter of President Nixon's official responsibilities (which is entirely unclear), immunity once again would not have provided a permanent shield against all criminal prosecution. Rather, Congress, through impeachment and conviction, could have stripped President Nixon's immunity, leaving him susceptible to potential criminal prosecution and providing logical cause for a pardon.

Finally, President Ford's decision—which may have been motivated by numerous factors beyond protecting President Nixon from prosecution, such as attempting to heal political divides or move forward from Nixon's presidency—does not and cannot control whether presidential immunity from criminal prosecution does or should exist. Rather, the Judiciary must make that determination. *Marbury*, 5 U.S. (1 Cranch) at 177.

[10] Ignoring actual lessons from history, the Government provides a list of lurid hypotheticals that have never happened—including treason and murder. Response, at 20 (speculating that a President might "murder his most prominent critics" or "sell[] nuclear secrets to a foreign adversary"). Some or all of these hypotheticals, depending on the facts, would likely involve purely private conduct, rendering them irrelevant here. *See id.* Yet even if such examples somehow were within the outer perimeter of a President's duties, it is overwhelmingly likely the House impeach and the Senate would convict, and the offending President would then be subject to "Indictment, Trial, Judgment and Punishment" by criminal prosecution. U.S. CONST. art. I, § 3, cl. 7. That is the process the Constitution provides, and the prosecution may not ignore it here.

*See, e.g., Fitgerald*, 457 U.S. at 745-46, 756; *see also United States v. Johnson*, 383 U.S. 169, 180 (1966) ("The claim of an unworthy purpose does not destroy the privilege."); *Spalding v. Vilas*, 161 U.S. 483, 498 (1896) (holding that an officer "cannot be held liable to a civil suit for damages … by reason of any personal motive that might be alleged to have prompted his action, for personal motives cannot be imputed to duly-authorized official conduct"); *Pierson v. Ray*, 386 U.S. 547, 554 (1967) ("This immunity applies even when the judge is accused of acting maliciously and corruptly….") (quotation omitted); *Barr v. Matteo*, 360 U.S. 564, 575 (1959) (holding that immunity applied "despite the allegations of malice in the complaint"); *Bradley v. Fisher*, 80 U.S. 335, 346–48 (1871) (the "exemption of the judges from civil liability [cannot] be affected by the motives with which their judicial acts are performed. The purity of their motives cannot in this way be the subject of judicial inquiry").

Thus, far from "startling," ignoring motive in deciding *whether immunity applies in the first instance* is simply the process working as the Constitution provides. To wit—we start from the presumption that all acts within the outer perimeter acts are immunized. Evidence of bad faith or unlawful motive is then presented to Congress, which decides through impeachment and removal proceedings, whether the conduct was egregious to warrant criminal liability. If so, the President may be charged. If not, as here, the prosecution must accept the People's judgment.

###    E.    *Fitgerald*'s Reasoning Strongly Supports Criminal Immunity.

The prosecution argues that *Fitgerald* "clarified that neither the case's holding nor its reasoning supported the conclusion that a former president could claim a comparable immunity from criminal prosecution." Response, at 21. This is incorrect. The majority opinion in *Fitgerald* merely stated, quite correctly, that it was not deciding the question of immunity from criminal prosecution, because it was not presented in that case. *See* 457 U.S. at 754 & n.37. Although the

Court commented in a footnote that "[t]he Court has recognized before that there is a lesser public interest in actions for civil damages than, for example, in criminal prosecutions," *id.* at 754 n.37, it did not suggest that the greater "public interest" in criminal prosecutions warrants stripping the Presidency of criminal immunity. *See id.* On the contrary, in the same footnote, the Court went on to state that "[i]t never has been denied that absolute immunity may impose a regrettable cost on individuals whose rights have been violated." *Id.* Emphasizing that "it is not true that our jurisprudence ordinarily provides a remedy in civil damages for every legal wrong," the Court further noted that "*victims of statutory crimes* ordinarily may not sue in federal court in the absence of expressed congressional intent to provide a damages remedy." *Id.* (emphasis added).

The reasoning of *Fitzgerald* strongly supports the finding of criminal immunity here. Virtually every consideration cited in that case applies with equal or greater force in the criminal context. *Fitzgerald* rested on "policies and principles that may be considered implicit in the nature of the President's office in a system structured to achieve effective government under a constitutionally mandated separation of powers," *id.* at 748; these "policies and principles" are the same regardless of whether the President is prosecuted civilly or criminally. *Fitzgerald* emphasized that "[t]he President occupies a unique position in the constitutional scheme," *id.*, which is true in both civil and criminal cases. *Fitzgerald* also considered that the President is "entrusted with supervisory and policy responsibilities of utmost discretion and sensitivity," and civil suits "would raise unique risks to the effective functioning of government." *Id.* at 750-51. These concerns are even greater when the President is threatened with criminal prosecution.

*Fitzgerald* noted that "a President must concern himself with matters likely to 'arouse the most intense feelings.'" *Id.* at 752 (quoting *Pierson*, 386 U.S. at 554). These "intense feelings" make him at least as great a target of politically motivated prosecution as civil lawsuit. "[I]t is in

precisely such cases that there exists the greatest public interest in providing an official 'the maximum ability to deal fearlessly and impartially with' the duties of his office." *Id.* at 752 (quoting *Ferri v. Ackerman*, 444 U.S. 193, 203 (1979)). The threat of criminal prosecution is far more likely to inspire such "fear[]" than civil lawsuit. "This concern is compelling where the officeholder must make the most sensitive and far-reaching decisions entrusted to any official under our constitutional system." *Id.* The President's duties are just as "sensitive and far-reaching" when he is threatened with imprisonment for his exercise of them. "Nor can the sheer prominence of the President's office be ignored." *Id.* at 752-53. "In view of the visibility of his office and the effect of his actions on countless people, the President would be an easily identifiable target for suits for civil damages," *id.* at 753—and for political prosecutions as well. "Cognizance of this personal vulnerability frequently could distract a President from his public duties, to the detriment of not only the President and his office but also the Nation that the Presidency was designed to serve." *Id.* Again, this concern applies with greater force to criminal liability.

F.      **Analogous Immunity Doctrines Support Criminal Immunity for the President.**

The prosecution contends that analogous immunity doctrines undermine the claim of Presidential immunity from criminal prosecution. Response, at 22-27. For example, the prosecution argues that judicial immunity does not extend to criminal prosecution for judicial acts. Response, at 24-28. The Supreme Court disagrees. In *Spalding v. Vilas*, the Supreme Court recognized that "[t]he doctrine which holds a judge exempt from a civil suit *or indictment* for any act done or omitted to be done by him, *sitting as judge*, has a deep root in the common law." 161 U.S. at 494 (emphasis added); *see also Ex parte Virginia*, 100 U.S. 339, 348–49 (1879) (upholding the indictment of a judge on the ground that the actions charged were *not* "judicial acts"); *In re Kendall*, 712 F.3d 814, 835 (3d Cir. 2013) (Roth, J., concurring) ("Exposing judges to criminal

liability for judicial acts performed within their jurisdiction poses the same type of threat to judicial independence as does exposing them to civil suit for money damages.").

At common law, a judge could not be made "criminally liable for an abuse of his jurisdiction," and Coke's commentary foreclosed "criminal prosecution for judicial acts." J. Randolph Block, *Stump v. Sparkman and the History of Judicial Immunity*, 1980 DUKE L.J. 879, 884, 887 n.39 (emphasis added) (quoting 6 W. Holdsworth, A HISTORY OF ENGLISH LAW 235-36 (2d ed. 1937)). The prosecution contends that American courts have departed from this tradition, but *all* the cases it cites involved classic bribery of judges and solicitation of bribes by judges.[11] Bribery of judges is a unique case that could be prosecuted under common law. *See Perrin v. United States*, 444 U.S. 37, 43 (1979) ("At early common law, the crime of bribery extended only to the corruption of judges. By the time of Blackstone, bribery was defined as an offense involving a judge or 'other person concerned in the administration of justice' and included the giver as well as *the receiver of the bribe*.") (emphasis added).

Although the *purpose* of the bribe may be to induce some judicial act, in no circumstances are judges criminally prosecuted for making the wrong decisions. Accordingly, while judicial bribery prosecutions are entirely unsurprising, each time an overzealous prosecutor has attempted to charge a judge for purely *judicial* acts, those acts have been held immune. *See United States v. Chaplin*, 54 F. Supp. 926 (S.D. Cal. 1944).[12]

---

[11] *See Claiborne*, 727 F.2d at 843; *United States v. Hastings*, 681 F.2d 706, 707 (11th Cir. 1982); *United States v. Isaacs*, 493 F.2d 1124, 1131 (7th Cir. 1974); *United States v. Collins*, 972 F.2d 1385, 1388–95 (5th Cir. 1992); *United States v. Nixon*, 816 F.2d 1022, 1024 (5th Cir. 1987); *United States v. Manton*, 107 F.2d 834, 838, 850 (2d Cir. 1939).

[12] The prosecution cites a footnote in *Mireles v. Waco*, for the statement that "a judge is not absolutely immune from criminal liability." 502 U.S. 9, 10 n.1 (1991). But this statement, if it had any relevance outside of bribery or other non-judicial acts (which is unclear), was plain dicta: the question whether judicial immunity attaches in criminal proceedings had no bearing on the resolution of the case and was not briefed or argued. *See Tyler v. Cain*, 533 U.S. 656, 663 n.4

### G.     Constitutional Structures Provide Immunity as an "Adequate Safeguard."

The prosecution contends that the Presidency has "[a]dequate safeguards" without immunity from criminal prosecution for official acts. Response, at 28-34. The Supreme Court anticipated and rejected this argument in *Fitzgerald*:

> A rule of absolute immunity for the President will not leave the Nation without sufficient protection against misconduct on the part of the Chief Executive. There remains the constitutional remedy of impeachment. In addition, there are formal and informal checks on Presidential action that do not apply with equal force to other executive officials. The President is subjected to constant scrutiny by the press. Vigilant oversight by Congress also may serve to deter Presidential abuses of office, as well as to make credible the threat of impeachment. Other incentives to avoid misconduct may include a desire to earn reelection, the need to maintain prestige as an element of Presidential influence, and a President's traditional concern for his historical stature.

*Fitzgerald,* 457 U.S. at 757. Those are the "adequate safeguards" that the Constitution provides. Foremost on this list of safeguards is "the constitutional remedy of impeachment," *id.*, which, if it results in a Senate conviction, authorizes the criminal prosecution of a former President. U.S. CONST. art. I, § 3, cl. 7. Absent from the list is any other criminal prosecution.

The prosecution next argues that the various protections of the criminal process—*i.e.*, those available to ordinary citizens—suffice to protect the President from politically motivated prosecutions. Response, at 30-32. As *Fitzgerald* notes, this argument ignores "[t]he President's unique status under the Constitution," 457 U.S. at 750. Further, the prosecution's claim that the threat of facing criminal charges upon leaving office will be "immaterial in the case of former President," Response, at 29. That argument is nonsensical at best. "[A] President who is concerned about an ongoing criminal investigation is almost inevitably going to do a worse job as President," Brett M. Kavanaugh, *Separation of Powers During the Forty-Fourth Presidency and Beyond*, 93

---

(2001) (explaining that binding precedent includes only the final disposition of a case and the determinations "necessary to that result").

MINN. L. REV. 1454, 1461 (2009)—and so is a President who anticipates facing charges after he leaves office. "[I]t is unrealistic to think that the prospect of possible criminal prosecution will not interfere with the performance of the duties of the office." *Id.* at 2447. "There is no question that a criminal prosecution holds far greater potential for distracting a President and diminishing his ability to carry out his responsibilities than does the average civil suit." *Id.* at 2452.

## II.    The "Outer Perimeter" Test Provides the Appropriate and Workable Standard.

The prosecution argues that any standard for criminal immunity should be lesser than civil immunity. On the contrary, the "outer perimeter" test that the Supreme Court adopted in *Fitzgerald* provides the obvious, appropriate, and workable standard. As an initial matter, the prosecution's proposal of a lesser standard of immunity for criminal cases has no support in law. As noted above, the scope of immunity for both civil and criminal cases is historically the same. *See, e.g., Spalding*, 161 U.S. at 494 (describing the "doctrine which holds a judge exempt from *a civil suit or indictment* for any act done … by him, sitting as a judge") (emphasis added, quotation omitted); *see also Gravel v. United States*, 408 U.S. 606, 616–18 (1972); *Johnson*, 383 U.S. at 180–82. *Johnson* adopted criminal immunity for legislators for the very same conduct that civil immunity protects, *i.e.*, the "legislative acts" of members of Congress. 383 U.S. at 185; *see also* Response, at 36 (prosecution admitting that legislative immunity "absolutely protects legislative acts"). The Government's two-standard approach would be novel and unprecedented.

The "outer perimeter" test of *Fitzgerald*, moreover, makes perfect sense in this context. It is the test that the Supreme Court has already adopted for the closely related doctrine of civil Presidential immunity. And it is also closely akin to the "clear absence of all jurisdiction" test for judicial immunity, which distinguishes judicial acts from purely private acts. *Stump v. Sparkman*,

435 U.S. 349, 356-57 (1978). Both tests grant a scope of immunity that focuses on the outer reaches of the immune official's authority. *See id.*; *Bradley*, 80 U.S. at 351.

As the Supreme Court necessarily determined in adopting it, the "outer perimeter" test is reasonable and workable. *See Fitzgerald*, 457 U.S. at 756. The test was not invented in *Fitzgerald* but drawn from prior cases addressing lower-level executive officials. *See Barr*, 360 U.S. at 575 ("The fact that the action here taken was within the outer perimeter of petitioner's line of duty is enough to render the privilege applicable….") (quoted in *Fitzgerald*, 457 U.S. at 755). Moreover, in adopting the test, *Fitzgerald* observed that "the Court also has refused to draw functional lines finer than history and reason would support." 457 U.S. at 755. Finally, the scope of immunity for the President should not be narrower than for other officials, such as the Director of the Office of Rent Stabilization, for whom the "outer perimeter" test was adopted in *Barr*.[13]

By contrast, the prosecution offers no plausible alternative standard—as it ultimately admits. Among other things, the prosecution proposes that its never-defined standard would consider "the asserted presidential authority to act," on an apparent sliding scale, Response, at 35; "the intent or motive animating the conduct in question," *id.* at 35-36; the relevant criminal "statute's *mens rea* requirement," *id.* at 36; and/or whether the conduct occurs in an area where "the 'line' between a president's 'personal and official affairs' is 'clear,' not 'elusive and difficult to discern,'" *id.* at 36 (citations omitted). Needless to say, this elusive "test" is indeterminate, multi-factored, sliding-scaled, and irreducibly subjective in its application—the very opposite of what an immunity doctrine should be. This approach, the prosecution concedes, is unworkable:

---

[13] The Government contends that there is a greater public interest in criminal prosecutions than in civil suits. Response, at 34. But this concern is more than offset by the potential for greater chilling effect and interference from criminal prosecutions than from civil suits. *See supra* Part I.E.

"Incorporating these considerations into a workable test would present line-drawing and administrability problems." *Id.*

More significantly, the prosecution insists that, among other factors, the reviewing court should consider "the intent or motive animating the conduct in question." Response, at 35. The Supreme Court has rejected this argument in every other immunity context, for the obvious reason that it would completely defeat the concept of immunity. *See, e.g., Fitzgerald*, 457 U.S. at 745 ("In exercising the functions of his office, the head of an Executive Department … should not be under an apprehension that the motives that control his official conduct may, at any time, become the subject of inquiry in a civil suit for damages."); *id.* at 756 (rejecting the notion that "an inquiry into the President's motives," which "could be highly intrusive," could be conducted in a civil suit); *Johnson*, 383 U.S. at 180 ("The claim of an unworthy purpose does not destroy the privilege."); *Tenney v. Brandhove*, 341 U.S. at 367, 377 (1951) (same); *Pierson*, 386 U.S. at 554 ("This immunity applies even when the judge is accused of acting maliciously and corruptly….") *Spalding*, 161 U.S. at 498 ("[P]ersonal motives cannot be imputed to duly-authorized official conduct"); *Bradley*, 80 U.S. at 346–48 ("The purity of [judge's] motives cannot in this way be the subject of judicial inquiry."); *see also supra* Part I.D. This is yet another fatal flaw in the prosecution's alternative. The primary purpose of immunity is to ensure a President may act *without fear* of his motives being later questioned by prosecutors who disagree with his decisions. Allowing such prosecutors to circumvent such immunity (which necessarily attaches pretrial) merely by making allegations of bad faith would render the doctrine meaningless.

## III.    The Acts Alleged in the Indictment Are Immune Under the Outer Perimeter Test.

Unable to deny that the vast majority of President Trump's alleged conduct was within the "outer perimeter" of his duties, the prosecution does not try. Instead, it devotes the bulk of its brief

to arguing Presidential criminal immunity does not exist, or should apply with less force than *Fitzgerald* and the Impeachment Judgment Clause provide. Indeed, the prosecution presents no argument at all regarding most of its allegations, apparently conceding they would meet the *Fitzgerald* test, consistent with the appropriately broad view of Presidential duties the Government advanced in *Blassingame v. Trump*, Nos. 22-5069, 22-7030, 22-7031 (D.C. Cir.) (amicus brief filed March 2, 2023). The few remaining arguments that the prosecution does make on the test's application are meritless.

### A.   President Trump Characterizes the Indictment's Allegations Properly.

The prosecution argues that President Trump "misrepresent[s] … the indictment's allegations," by characterizing them "at a stratospheric level of generality." Response, at 37-39. On the contrary, President Trump's descriptions closely follow the Supreme Court's guidance in *Fitzgerald*, which rejected the plaintiff's loaded, narrowly specific description of President Nixon's conduct—*i.e.*, "ordering the discharge of an employee who was lawfully entitled to retain his job." *Fitzgerald*, 457 U.S. at 756. In doing so, the Supreme Court held that the plaintiff could not remove conduct from the "outer perimeter" simply by casting it in nefarious terms, as such a "construction would subject the President to trial on virtually every allegation that an action was unlawful, or was taken for a forbidden purpose" and thereby "deprive absolute immunity of its intended effect." *Id.* Instead, the Supreme Court considered the President's action in far more general terms, holding that a personnel decision, regardless of motive, was the President "prescrib[ing] the manner in which the Secretary will conduct the business of the Air Force." *Id.* at 757. The fact that President Nixon was alleged to have acted in an unlawful manner, and for an unlawful purpose, was excluded from the Supreme Court's description of President Nixon's conduct because those concerns are irrelevant to the question whether immunity applies. *See id.*;

*see also Stump*, 435 U.S. at 362 ("[T]he factors determining whether an act by a judge is a 'judicial' one relate to the nature of the act itself").

Under *Fitzgerald*'s guidance, President Trump's description of the *objective* conduct alleged in the indictment is clearly proper. Doc. 74, at 2-8. The prosecution, by contrast, seeks to subvert *Fitzgerald* by describing President Trump's conduct *solely* in terms of the allegations of unlawful purpose and manner—the exact opposite of what *Fitzgerald* prescribes. The prosecution repeatedly alleges that President Trump acted in an unlawful *manner* and for an unlawful *motive or purpose*. *See* Response, at 37 (characterizing the alleged conduct in specific detail with specific reference to allegedly unlawful motives); *id.* (describing President Trump's conduct as supposedly "acting deceitfully or corruptly to secure a personal benefit for himself"); *id.* at 38 (claiming that President Trump engaged in "knowingly false claims of election fraud aimed at interfering with" a federal function); *id.* at 39 (further descriptions of acting in a supposedly unlawful manner for a supposedly unlawful purpose); *see also id.* at 33 ("[T]he Constitution grants a president no power to engage in a criminal conspiracy to defeat a federal government function through deceit, corruptly obstruct a congressional proceeding, or violate others' constitutional right to vote.").

Thus, the prosecution adopts *exactly* the kind of loaded, gerrymandered description of alleged conduct that the Supreme Court rejected in *Fitzgerald*. 457 U.S. at 756. So too, here, the prosecution's loaded descriptions "would subject the President to trial on virtually every allegation that an action was unlawful, or was taken for a forbidden purpose," which would "deprive absolute immunity of its intended effect." *Id.*[14]

---

[14] The prosecution's related contention that President Trump's actions fall outside the "Take Care" power, Response, at 39-40, likewise illustrates this deficiency. The prosecution is incapable of articulating its argument on this point without referring to President Trump's alleged *motives*: "The concept of 'faithful execution' connotes the use of power in the interest of the public, *not in the office holder's personal interests*." Response, at 39 (emphasis added). But the question whether

### B.    Allegedly Organizing Alternate Slates of Electors Is Immune Conduct.

Finally, the prosecution argues that complete dismissal is unwarranted under the "outer perimeter" test because at least *some* of President Trump's conduct is supposedly purely private. Response, at 40-42. As noted above, the prosecution makes no specific argument to contend that the vast majority of President Trump's alleged conduct—including alleged public statements, meetings with DOJ, meetings with state officials, and communications with the Vice President and members of Congress—falls outside the outer perimeter of President Trump's official duties. Instead, the prosecution focuses exclusively on the alleged organization of alternate slates of electors and coordination with non-government personnel in those efforts. Response, at 40-42.

These arguments fail because organizing alternate slates of electors is both immune Presidential conduct in itself, and preparatory to the immune Presidential conduct of communicating with Congress about the election-certification proceedings. First, organizing slates of electors in attempt, as the indictment alleges, to persuade Congressional officials to act is part of "the rights, duties, and obligations growing out of the constitution itself … and all the protection implied by the nature of the government under the constitution." *Cunningham v. Neagle*, 135 U.S. 1, 64 (1890). History confirms that organizing alternate slates of electors falls within the outer perimeter of Presidential duty, because President Grant was directly involved in and supported the organization of slates of Republican electors in the disputed Hayes-Tilden election of 1876. *See* Doc. 74, at 42. In that election, both sides claimed fraud and both sides organized alternate slates of electors in the key disputed States of Louisiana, Florida, South Carolina, and Oregon. Though Tilden had large leads in the popular vote and electoral college after Election Day, President Grant

---

President Trump's actions were supposedly motivated by his "personal interests," *id.*, is irrelevant to the question whether immunity applies. That question turns on the objective nature of his acts, not their alleged purpose or supposed manner. *Fitzgerald*, 475 U.S. at 756.

directly supported the Republicans' efforts to organize alternate slates of electors by deploying federal troops to Louisiana and Florida to protect the efforts of Republican-controlled committees in those States to certify pro-Hayes slates of electors, and he also directed federal troops to observe and report fraud. See 28 THE PAPERS OF ULYSSES S. GRANT 19-20 (John Y. Simon ed. 2005), *at* https://scholarsjunction.msstate.edu/cgi/viewcontent.cgi?article=1026-&context=usg-volumes. These were Presidential acts, not purely private deeds, and they reflected President Grant's direct involvement in organizing the disputed Republican slates of electors, to avoid the certification of an election tainted by what he viewed as fraud.

Further, as the indictment claims, the alleged organization of slates of electors was ancillary and preparatory to the plainly immune conduct of advocating to the Vice President and members of Congress that they exercise their official duties in a certain way. Such ancillary and preparatory acts are equivalent to the "administrative and investigative acts necessary for a prosecutor to initiate or maintain the criminal prosecution," and thus they share in the latter's absolute immunity. *Prince v. Hicks*, 198 F.3d 607, 612 (6th Cir. 1999) (quoting *Ireland v. Tunis*, 113 F.3d 1435, 1447 (6th Cir. 1997)); *see also, e.g., Guzman–Rivera v. Rivera–Cruz*, 55 F.3d 26, 29 (1st Cir.1995) ("[A]bsolute immunity may attach even to ... administrative or investigative activities when these functions are *necessary* so that a prosecutor may fulfill his function as an officer of the court." (emphasis in original)). Duties involved in "[p]reparing to initiate a prosecution" such as "obtaining, reviewing and evaluating evidence," share in the immunity that attaches to the prosecution itself. *Snell v. Tunnell*, 920 F.2d 673, 693 (10th Cir. 1990). So also here.

## **CONCLUSION**

The indictment should be dismissed with prejudice based on the doctrine of Presidential immunity.

Dated: October 26, 2023                    Respectfully submitted,

Todd Blanche, Esq. (PHV)                   */s/John F. Lauro*
toddblanche@blanchelaw.com                 John F. Lauro, Esq.
Emil Bove, Esq. (PHV)                      D.C. Bar No. 392830
Emil.Bove@blanchelaw.com                   jlauro@laurosinger.com
BLANCHE LAW                                Gregory M. Singer, Esq. (PHV)
99 Wall St., Suite 4460                    gsinger@laurosinger.com
New York, NY 10005                         Filzah I. Pavalon, Esq. (PHV)
(212) 716-1250                             fpavalon@laurosinger.com
                                           LAURO & SINGER
                                           400 N. Tampa St., 15th Floor
                                           Tampa, FL 33602
                                           (813) 222-8990
                                           *Counsel for President Trump*