**IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA**

| | |
|---|---|
| UNITED STATES OF AMERICA | |
| v. | Case No. 1:23-cr-00257-TSC |
| DONALD J. TRUMP, | |
| *Defendant*. | |

**PRESIDENT TRUMP'S REPLY IN SUPPORT OF MOTION
<u>FOR STAY OF GAG ORDER PENDING APPEAL</u>**

## INTRODUCTION

The Court's Order, Doc. 105 (the "Gag Order"), imposes sweeping prior restraints on President Trump, the leading candidate in the 2024 presidential campaign. If reinstated, the Gag Order would prohibit President Trump from discussing nearly anything about this case—a key campaign issue—with the American public, including "reasonably foreseeable" witnesses and testimony, as well as valid criticisms of the prosecutors (whom he believes, with good reason, are politically biased, as laid out in Doc. 116 (Motion to Dismiss Based on Selective Prosecution)).

Never in American history has any Court censored the speech of a political candidate, least of all in the extraordinarily broad and vague terms of the Gag Order. In reaching this unprecedented decision, the Court rejected and did not rely on any of the prosecution's false, unsupported, and unconstitutional claims that prior restraints are necessary to avoid "undermin[g] confidence in the criminal justice system," Doc. 57 at 2, or otherwise "influenc[ing] the actual outcome of trial," or "prejudic[ing] the venire," Doc. 64 at 7.

Rather, the Court's sole justification is its unsupported conclusion that President Trump's protected speech about this case may lead to third parties threatening or harassing prosecutors, witnesses, or court staff. Doc. 105 at 2. The prosecution echoes this theoretical and conclusory argument. *See, e.g.,* Doc. 120, Response in Opposition to Stay ("Response"), at 1, 3, 5-8, 11-12, 17-30. As discussed below, however, this purported reason for the prior restraint is entirely unconstitutional. Moreover, neither the Court nor the prosecution suggest that President Trump himself has threatened or harassed anyone, or directed anyone to do so. The only cited concern is that unidentified "followers" of President Trump (numbering over a hundred million U.S. Citizens) may do so unprompted at some future date. Response at 28.

Thus, the relevant questions on appeal are: (1) whether the Court may prohibit a leading candidate for president from commenting on critical public issues relating to his defense of this case out of a concern for what unsolicited third parties might do; (2) whether the evidence presented is sufficient to justify such a content-based prior restriction, as measured by the appropriate standard of proof (i.e., a clear and present danger of harm); and (3) whether the Gag Order is narrowly tailored, accounting for invariable Constitutional prohibitions on vague or overbroad prior restraints.

President Trump is nearly certain to succeed on each of these arguments. The Supreme Court has held, time and time again, that a person may not be prohibited from speaking because of the unsolicited actions of others. Rather, only speech "directed to inciting or producing imminent lawless action and [which] is likely to incite or produce such action" may be censored. *Brandenburg v. Ohio*, 395 U.S. 444, 447 (1969). Moreover, where, as here, the speech at issue is inextricably political, the Constitution holds no tolerance for censorship. President Trump has a right to speak his mind and the public has a right to hear what he has to say. The prosecution and the Court may not like the content of these statements, but President Trump has an inarguable and inalienable right to make them.

Nor is conceded prosecutorial speculation that some individuals might feel harassed or threatened is hardly a constitutional justification for limiting free speech. Doc. 103 at 62 (October 16, 2023, H'rg. Tr., hereafter "Tr.") ("of course this prejudice is speculative."). Without a demonstrable "clear and present danger," *Landmark Comm's, Inc. v. Virginia*, 435 U.S. 829, 844-45 (1978), or even a "substantial likelihood of material" harm, *Gentile v. State Bar of Nevada*, 501 U.S. 1030, 1066 (1991), the Gag Order will not be upheld on appeal. Tr. at 7–8 ([The Court]: "I intend for any order I issue to meet -- to satisfy either test.").

Finally, the Gag Order is not tailored at all, let alone narrowly. It uses undefined, ambiguous terms such as "target" that arguably (and unconstitutionally) encompass essentially all statements regarding this case, no matter how innocuous, unless they fall within three narrow (and equally vague) safe harbors. "[T]he seriousness with which the regulation of core political speech is viewed under the First Amendment requires such regulation to be as precisely tailored as possible." *Republican Party of Minnesota v. White*, 416 F.3d 738, 751 (8th Cir. 2005) (emphasis in original). The Gag Order is anything but narrowly tailored and precise; and it is therefore unconstitutional.

As the Gag Order is highly unlikely to survive appeal, the Court should stay its application pending a decision from the D.C. Circuit. Doing so will prevent irreparable harm to President Trump and the public's First Amendment rights, cause no cognizable harm to any party, and serve the interests of the public.

## ARGUMENT

### I.     Unsolicited Third-Party Actions Do Not Justify Censorship of a Political Candidate

#### A.     The Gag Order Imposes a Quintessential Heckler's Veto.

The prosecution repeatedly insists that President Trump's speech must be gagged because, in the prosecution's estimation, it might—despite not requesting or encouraging such conduct—cause independent third parties to "threaten" or "harass" others. Response, at 1, 3, 5-8, 11-12, 17-30. This concern, which our case law describes as a "heckler's veto," cannot justify censorship. Just the opposite, even where an audience "might react with disorder or violence" to a speaker's statements, the Supreme Court repeatedly rejects government attempts at censorship. *Brown v. Louisiana*, 383 U.S. 131, 133 n.1 (1966) (plurality op.); *see also Cox v. Louisiana*, 379 U.S. 536, 551 (1965) ("[T]he 'compelling answer … is that constitutional rights may not be denied simply because of hostility to their assertion or exercise.'") (quoting *Watson v. City of Memphis*, 373 U.S.

526, 535 (1963)); *Collin v. Chicago Park Dist.*, 460 F.2d 746, 754 (7th Cir. 1972) ("As to the possibility of there being hostile audience members causing violence, the law is quite clear that such considerations are impermissible….").[1]

The prosecution devotes only a single sentence of its brief to this fatal problem, arguing for the first time that the Court must silence President Trump's speech not because of "violent *disagreement* of the audience," but rather "the clear pattern of a portion of the audience *agreeing* with the defendant's implicit wishes." Response, at 21. The prosecution cites no authority to support this supposed distinction between the risk of unruly "disagreement" and unruly "agreement," and none exists. In fact, the prosecution's argument directly contradicts the Supreme Court's incitement cases, which plainly instruct that speech falling short of incitement may *not* be silenced solely because it might inspire crimes or violence by those "agreeing," *id.*, with the speaker. "These … decisions have fashioned the principle that the constitutional guarantees of free speech and free press do not permit a State to forbid or proscribe advocacy of the use of force or of law violation except where such advocacy is directed to inciting or producing imminent lawless action and is likely to incite or produce such action." *Brandenburg*, 395 U.S. at 447.

Thus, under settled law, a speech restriction that seeks to silence speech because it might provoke "the use of force or of law violation" from the audience "impermissibly intrudes upon the

---

[1] Here, the prosecution's position is even worse, because the prosecution's dominant concern is not preventing actual "violence" or "disorder," *Brown*, 383 U.S. 133 n.1, but preventing "harassment"—a word that appears 30 times in their brief—and ill-defined "threats." Response, at 1, 3, 5-8, 11-12, 17-30. Further, much of the alleged "harassment" concerns public statements disparaging other prominent public officials, such as the former Vice President and Attorney General—conduct that is itself core First Amendment-protected speech. Thus, the prosecution urges the Court to silence President Trump's First Amendment-protected speech to prevent others from engaging in First Amendment-protected speech. Needless to say, if potential violence cannot justify censorship, it is without question that non-violent criticism of public figures cannot either.

freedoms guaranteed by the First and Fourteenth Amendments. It sweeps within its condemnation speech which our Constitution has immunized from governmental control." *Id.* (citing eight cases).

Here, these cases are controlling, because President Trump's speech does not constitute incitement, and the prosecution never contends that it does. Indeed, the prosecution ignores this point by entirely failing to: (1) identify any alleged violence; (2) demonstrate that President Trump's speech caused or was otherwise "directed to inciting or producing imminent" violence; or (3) explain how the Gag Order is narrowly tailored to prohibit only those statements.

In short, "[t]he Government may not insulate a law from charges of viewpoint discrimination by tying censorship to the reaction of the speaker's audience," *Matal v. Tam*, 582 U.S. 218, 250 (2017) (Kennedy, J., concurring in part and concurring in the judgment)—regardless of whether the audience is supportive or hostile to the speaker. "Indeed, a speech burden based on audience reactions is simply government hostility and intervention in a different guise." *Id.* To justify the Gag Order based on the actions of others, the prosecution must meet the *Brandenburg* test by demonstrating the Gag order is needed to, and does, prevent the actual incitement of violence. 395 U.S. at 447. It has failed to do so. Therefore, the Gag Order is unconstitutional.

**B.    The Gag Order Violates President Trump's Right to Campaign and the Rights of Hundreds of Millions of President Trump's Listeners to Receive His Message.**

The Gag Order violates two more fundamental principles of the First Amendment: (1) the protection of President Trump's campaign speech meriting the highest level of protection, and (2) the right of President Trump's supporters and adversaries to have an equal and reciprocal right to receive his speech and make informed judgments about the presidential election. Doc. 110, at 12-18. On the former point, the Supreme Court has emphasized that the freedom of speech "has its fullest and most urgent application precisely to the conduct of campaigns for political office."

*Susan B. Anthony List v. Driehaus*, 573 U.S. 149, 162 (2014) (quoting *Monitor Patriot Co. v. Roy*, 401 U.S. 265, 272 (1971)).

The Fifth Circuit in *Brown* and the Sixth Circuit in *Ford* fully accommodated this interest. *See United States v. Ford*, 830 F.2d 596, 600 (6th Cir. 1987) ("[T]he defendant, a Democrat, … is entitled to attack the alleged political motives of the Republican administration which he claims is persecuting him because of his political views and his race."); *United States v. Brown*, 218 F.3d 415, 419 (5th Cir. 2000) ("[T]he district court … lifted the gag order in this case to avoid interfering with Brown's re-election campaign…."). The Gag Order gives no weight to these compelling interests, and the Court declined to consider them. Tr. 17, 83. In its Response, the prosecution says nothing to address this fatal deficiency.

Likewise, in silencing President Trump, the Gag Order violates the reciprocal First Amendment rights of the electorate to receive his messages. The First Amendment's "protection afforded is to the communication, to its source and its recipients both." *Va. State Bd. of Pharm. v. Va. Citizens Consumer Council, Inc.*, 425 U.S. 748, 756 (1976). "It is now well established that the Constitution protects the right to receive information and ideas. This freedom (of speech and press) … necessarily protects the right to receive…." *Kleindienst v. Mandel*, 408 U.S. 753, 762–63 (1972) (alterations omitted) (quoting *Martin v. City of Struthers*, 319 U.S. 141, 143 (1943)).

*Ford* and *Brown* both emphasized this paramount interest. *Ford*, 830 F.2d at 601 ("[R]eciprocally, his constituents will have no access to the views of their congressman on this issue of undoubted public importance."); *Brown*, 218 F.3d at 430 ("The urgency of a campaign … may well require that a candidate, for the benefit of the electorate as well as himself, have absolute freedom to discuss his qualifications."). As *Brown* suggests, when the audiences are listeners to political campaign speech, they should have "absolute freedom" to receive the candidate's messages. *Id.* Here, where the gagged speaker is the leading candidate for President of the United States with

6

audiences in the hundreds of millions, and the gagged speech is core political speech that lies at the heart of his campaign, the magnitude of the First Amendment violation to his audiences is truly staggering. Yet the Gag Order gives the issue no consideration at all aside from a cursory exclusion of "statements criticizing the government generally . . . [and] the campaign platforms or policies of Defendant's current political rivals." Doc. 105, at 1-3.

The Court has repeatedly stated that it will ignore the obvious fact that President Trump is a candidate for the presidency. In following this flawed approach, the Gag Order fails to consider that the allegations in the case are themselves central political questions, discussed at length by media, President Trump's political opponents (some of whom are witnesses), the Biden Administration, and the citizenry writ large in connection with the 2024 campaign. This is precisely where the Gag Order runs headlong into unconstitutional shoals. President Trump is absolutely entitled to defend himself publicly and explain with specificity why the charges against him are false and meritless. That is not "try[ing] his case in the media," Response at 11, it is political campaigning—our most sacred and inviolable category of protected speech.

The prosecution, likewise, gives short shrift to the American electorate itself, including President Trump's supporters. Response, at 25 & n.11. First, the prosecution contends that President Trump did not raise his audiences' interests in opposing the Gag Order. *Id.* n.11. Not so. President Trump raised this very issue multiple times, both in his opposition brief and at oral argument. *See, e.g.*, Doc. 60, at 3-4 (arguing that the proposed gag order would "prevent President Trump from presenting his side of the story to the American people during a political campaign"); *id.* at 9 (arguing that neither the prosecution nor the Court "are the filter for what the public may hear"); *id.* at 22 (arguing that "the public has an interest in receiving information about matters that are in litigation" as part of the "interests … of free expression") (quoting D.C. Bar Rule 3.6,

7

Cmt. 1); Tr. 44 ("[W]hat the government is proposing here is on order not just directed against President Trump but against the American electorate that wants to hear from President Trump under these circumstances"); Tr. 59-60 ("President Trump in the middle of a campaign is entitled to put the spotlight on it. The American people are entitled to understand that and understand the consequences of that.").

Substantively, the prosecution's only response to this problem is to point out that the Gag Order does not silence *all* of President Trump's campaign-related core political speech, so his listeners will be able to receive *some* of his speech. Response, at 25. Again, the prosecution cites no cases to support this argument, and for good reason—it directly contravenes Supreme Court precedent. In *White*, 536 U.S. 765, the Supreme Court rejected a restriction on campaign speech that prohibited candidates for judicial office from discussing their "views on disputed legal or political issues." *Id.* at 768. Like the prosecution here, Minnesota defended the restriction on the ground that the law "still leaves plenty of topics for discussion on the campaign trail . . . Indeed, the Judicial Board has printed a list of preapproved questions which judicial candidates are allowed to answer." *Id.* at 774. The Supreme Court rejected the argument that the First Amendment was satisfied by permitting some, but not all, core political speech:

> [T]he notion that the special context of electioneering justifies an abridgment of the right to speak out on disputed issues sets our First Amendment jurisprudence on its head. Debate on the qualifications of candidates is at the core of our electoral process and of the First Amendment freedoms, not at the edges. The role that elected officials play in our society makes it all the more imperative that they be allowed freely to express themselves on matters of current public importance. It is simply not the function of government to select which issues are worth discussing or debating in the course of a political campaign. *We have never allowed the government to prohibit candidates from communicating relevant information to voters during an election*.

*Id.* at 781–82 (emphasis added) (citations and quotation marks omitted). So also here, President Trump's audiences are entitled to receive *all* his messages, not just the topics that the prosecution

picks and chooses. The Gag Order violates this core American freedom and is therefore unconstitutional.

## II.     The Prosecution's Speculation Cannot Justify the Gag Order Under Either Constitutional Test.

As described above, preventing unsolicited, third-party "harassment" or "threats" against other third parties is not a compelling government interest under any circumstances and is wholly incapable of overcoming both the First Amendment right of a Presidential candidate to speak on matters of public concern and the public's right to hear what he has to say. Yet even assuming, *arguendo*, that a compelling interest could exist, the prosecution has utterly failed to establish it.

The prosecution contends that its "uncontradicted filings" in Doc. 57, at 2-13, and Doc. 64, at 9-12, provide the basis it needs to establish the existence of "harassment" or "threats." Response, at 18. The prosecution is wrong.

First, screenshots of social-media posts from "between the Presidential election on November 3, 2020, and the congressional certification proceeding on January 6, 2021," *i.e.*, almost three years ago, Doc. 62, at 2; *id.* at 3-5, do not prove that anyone has been harassed or threatened due to President Trump's statements. Although the prosecution provided public statements from three individuals claiming that they allegedly received harassment and threats in the same time frame (2020 and 2021), the prosecution did not draw any causal connection between these claims and President Trump's statements. Nor could the prosecution do so. Countless others made statements regarding the same individuals during the same timeframe. Moreover, President Trump's statements, again, did not direct or request that any harassment or threats occur. *Id.* Thus, the prosecution cannot say with any degree of certainty why such alleged events happened (if they

even did), or that they would not have occurred but for President Trump's statements. (This, of course, is part of why the *Brandenburg* test is so stringent—to avoid just such speculation.)[2]

Next, the prosecution provided screenshots of posts by President Trump from August 2, 4, 6, 7, 8, 21, 23, 25, and 28, 2023. *Id.* at 3-12. Likewise, in its reply brief supporting the proposed gag order, the prosecution then provided quotes from social-media posts by President Trump from September 5, 6, 22, 23, and 26, 2023, and cited a nationally publicized media interview on September 17, 2023. Doc. 64, at 9-10. Finally, in its response to the stay motion, the prosecution refers to two more social media posts by President Trump—a post regarding Mark Meadows on October 24, 2023, and a post and public statement supposedly about a court clerk in New York in another case, dated October 20 and 25, 2023. Response, at 4 n.4, 9.[3]

---

[2] The prosecution repeatedly presupposes, without evidence, that any supposed "threats" or "harassment" that might occur *after* President Trump's speech must have been *caused* by President Trump's speech. *See* Response, at 3; *id.* at 5 (arguing that threats and harassment "often follow" President Trump's speech); *id.* at 12 (these results "predictably follow"); *id.* at 18 ("reliably follow"). To be sure, the absence of evidence of any threats or harassment in the last three months of continuous public statements by President Trump refutes the prosecution's inferences that such results "predictably," "reliably," or even "often" follow. *See id.* More importantly, President Trump is not the only speaker in the country addressing this case and the issues it raises—it is subject to wall-to-wall media coverage and endless commentary and debate on social media and elsewhere, much of it elevated and heated. To infer that President Trump's speech must be the *cause* of any "threats" or "harassment" that might ensue, as opposed to the influence of any number of unidentified, independent speakers and actors, is pure fallacy. Especially when it comes to prior restraints, "more than *post hoc, ergo propter hoc* must be shown." *Pub. L. Educ. Inst. v. U.S. Dep't of Just.*, 744 F.2d 181, 183 (D.C. Cir. 1984); *see also Conservation Force v. Jewell*, 160 F. Supp. 3d 194, 205 (D.D.C. 2016) ("[V]ague assertions of *post hoc, ergo propter hoc* are insufficient…") (citing Black's Law Dictionary 1355 (10th ed. 2014) (defining *post hoc ergo propter hoc* as the "logical fallacy of assuming that a causal relationship exists when acts or events are merely sequential")).

[3] Recent leaks regarding Meadows' alleged testimony, which received wide media attention, demonstrate why the Gag Order is unworkable. If the Gag order had been in effect, President Trump would have been unable to respond to, or rebut, the false claims about his interactions with his former chief of staff—an issue that is important to many Americans in connection with the 2024 election. The key question is, for what legitimate constitutional purpose? It is not as though President Trump started the recent national discussion on Meadows. The media did that itself, presumably prompted by a source other than President Trump. The Gag Order would not have

For these more recent posts, the prosecution's argument is even weaker. The prosecution presents no evidence (or even argument) that any prosecutor, court staffer, or potential witness has actually received any threats or harassment after public criticism by President Trump, or even *felt* threatened or harassed. *Id*. To the contrary, the prosecution stated that "[t]he defendant's baseless attacks on the Court and two individual prosecutors … *could* subject them to threats…." *Id.* at 10 (emphasis added).

Thus, the prosecution has presented at least seventeen examples of President Trump's posts and public statements about this case, dating from the day after the indictment was filed until the present—a period of 88 days—for which the prosecution presents no evidence of any ensuing threats or harassment. Moreover, the prosecution presented no evidence that any potential witness even *feels* threatened or harassed, however subjectively. Indeed, when the Court asked prosecutors why it had not submitted evidence of threats, harassment, or witness intimidation, the prosecution admitted that its prediction of "prejudice is speculative." Tr. 62.

***

As the Court indicated at oral argument, there are two possible standards for assessing the prosecution's proffer—either the "clear and present danger" test of *Landmark Comm's*, 435 U.S. at 844-45, or the ambiguously lower (but still very high) "substantial likelihood of material prejudice" of *Gentile*, 501 U.S. at 1066.

The Sixth, Seventh, and Ninth Circuits each agree the "clear and present danger" test is the correct standard, particularly, as the Sixth Circuit holds, in the political context. *See Ford*, 830

---

done anything to prevent a national discussion of this issue during a campaign. Thus, the only thing the Gag Order would accomplish is ensuring that President Trump could not respond to inappropriate prosecutorial or witness leaks, an obviously impermissible and wholly unconstitutional goal.

F.2d at 600 ("[T]he clear and present danger' standard should apply to the District Court's 'no discussion' order is reinforced by the divisive political context of this case."). The prosecution disagrees, spilling much ink arguing the Court should apply the *Gentile* standard. Specifically, relying on *Gentile*, the prosecution argues that criminal defendants have diminished First Amendment rights to criticize the prosecutors, judges, and court proceedings against them. Response, at 14-15. But the prosecution misreads *Gentile*. That case held that a lower level of protection applies to the First Amendment rights of *attorneys*, not of all "trial participants," because attorneys are officers of the court. 501 U.S. at 1066.[4]

Regardless, as the Court has stated, it intends for the Gag Order "to satisfy either test." Tr. at 7–8. It does not. Even allowing for the possibility that the "substantial likelihood" test applied (and it does not), the prosecution is still subject to the Supreme Court's instruction that the party seeking the gag order bears a "heavy burden of demonstrating" the need for a prior restraint through an evidentiary "record." *Nebraska Press Ass'n v. Stuart*, 427 U.S. 539, at 569 (1976). For the reasons stated above, the prosecution met absolutely *no* burden of showing a risk of prejudice because it presented no competent evidence to that effect, admitting instead, "of course this prejudice is speculative." Tr. 62.

---

[4] This lower standard for attorneys, in the Supreme Court's view, was appropriate because "[l]awyers representing clients in pending cases are key participants *in the criminal justice system*, and the State may demand some adherence to the precepts of that system in regulating their speech as well as their conduct." *Id.* (emphasis added).

Conversely, *Gentile* strongly implies that a citizen like President Trump is entitled to the same level of protection as the media. *Gentile* repeatedly contrasted the rights of an "attorney" with the rights of an "ordinary citizen" or "private citizen." *Id.* at 1071, 1072 n.5, 1074. Here, as the criminal defendant, President Trump is participating as a citizen, not an attorney. Moreover, as a Presidential candidate, President Trump has a constitutional right to discuss this case with the hundreds of millions of "people, who wish to be informed" not by the prosecution or the media, but by President Trump himself. *Id.*

For the same reason, the prosecution cannot hope to satisfy the "clear and present danger" test. The prosecution presents no facts proving *any* danger, to say nothing of a "clear and present" one. Speculation is not evidence, and the Constitution does not allow prior restraints on that basis. Accordingly, even if the prosecution had articulated a compelling interest (and it has not), its meager factual showing cannot justify the Gag Order.

## III.    The Gag Order Is Incurably Vague and Overbroad.

All prior restraints—even those intended to prevent a clear and present danger to a compelling government interest—must be precisely targeted to resolve that harm. *White*, 416 F.3d at 751. Vagueness or overbreadth are fatal deficiencies. *Id*. Here, the Gag Order presents both issues.

### A.    Vagueness

The prosecution, for its part, argues that the Gag Order is not vague, Response, at 26-28. In support, the prosecution writes page upon page of supposed clarifications that are found nowhere in the Order itself. But, even accepting the untenable position that the prosecution could unilaterally clarify a court order through self-serving arguments in response to a stay motion, its attempts to do so would only compound the Order's vagueness. As President Trump's stay motion discussed, the Gag Order's key operative word, "target," has at least five competing definitions in Merriam-Webster Online, reflecting a wide range of possible meanings. Doc. 110, at 25 ("target" can mean "a mark to shoot at," "something or someone marked for attack," "a goal to be achieved," "an object of ridicule or criticism," or "something or someone to be affected by an action or development").

The prosecution responds that *none* of these definitions applies, but that it is somehow "clear" (the prosecution doesn't explain why) that a *sixth* definition is what the Court meant:

"singling out a trial participant as 'the object of general abuse, scorn, derision, or the like.'" Response, at 27 (quoting *Oxford English Dictionary* at 640, "sense 3.b").

The prosecution's preferred definition, which it selectively plucks from the United Kingdom-based Oxford English Dictionary, is seldom used by ordinary Americans, contradicting the prosecution's claim that the Gag Order should be given a "plain, obvious and common sense meaning." *Id.* at 27 (quoting *United States v. Bronstein*, 849 F.3d 1101, 1108 (D.C. Cir. 2017)). Moreover, O.E.D. includes *fifteen* definitions of "target," *see* Oxford English Dictionary Online, *at* https://www.oed.com/dictionary/target_n1?tab=factsheet#18985107 ("There are 15 meanings listed in OED's entry for the noun *target*…."). The prosecution does not explain why its chosen definition ("sense 3.b") is better than the other fourteen. A reasonable reader will remain at a loss to know which of a range of perfectly ordinary statements might constitute "targeting" the prosecutors, court staff, or potential witnesses. This problem gets even worse when the prosecution "clarifies" that the Gag Order applies to any "language that presents a danger to the administration of justice," Response, at 27—a standard that is hopelessly vague.

Unsurprisingly, the Supreme Court has rejected such *ex-post* attempts to provide narrowing constructions to prior restraints to save them on appeal—which is exactly what the prosecution attempts here. "If the line drawn" by a prior restraint "is an ambiguous one, we will not presume that the statute curtails constitutionally protected activity as little as possible. For standards of permissible statutory vagueness are strict in the area of free expression." *NAACP v. Button*, 371 U.S. 415, 432 (1963).

Moreover, even if one were to adopt the prosecution's preferred definition of "target" as to "singl[e] out" as "the object of general abuse, scorn, derision, or *the like*," Response, at 27, that definition renders the Gag Order both staggeringly broad and inherently subjective. The

14

prosecution would interpret the Gag Order to cover virtually any *negative* speech, provided that the Court would later deem it to be a bit *too* negative. "Abuse" means "language that condemns or vilifies *usually unjustly*, intemperately, and angrily." *Abuse*, Merriam-Webster Online Dictionary, *at* https://www.merriam-webster.com/dictionary/abuse. "Intemperate" means not "marked by moderation: such as keeping or held within limits: not extreme or excessive." *Temperate*, Merriam-Webster Online, *at* https://www.merriam-webster.com/dictionary/temperate. "Like" (as in "and the like") means "similar to." *Like*, Merriam-Webster Online, *at* https://www.merriam-webster.com/dictionary/like.

Thus, in the prosecution's interpretation, the Gag Order prevents President Trump from criticizing the listed parties "unjustly," or doing so in a way that is not "marked by moderation," or saying anything "similar to" such forbidden speech. Enforcing such terms requires the exercise of inherently subjective judgment.[5] The elimination of such subjective enforcement is one of the most fundamental precepts of the vagueness doctrine. *See, e.g. Grayned v. City of Rockford*, 408 U.S. 104, 108–09 (1972) ("A vague law impermissibly delegates basic policy matters … on an ad hoc and subjective basis, with the attendant dangers of arbitrary and discriminatory application.").

In a third attempt to resolve the Gag Order's irresolvable vagueness, the prosecution contends, without textual support, that the Gag Order restricts only "fact-free, disparaging,

---

[5] And this is just the beginning of the vagueness. Words like "scorn," "derision," "ridicule," and "the like" are similarly vague and require inherently subjective enforcement. "Scorn" means "open dislike and disrespect or mockery often mixed with indignation" or "an expression of contempt or derision." *Scorn*, Merriam-Webster Online, *at* https://www.merriam-webster.com/dictionary/scorn. "Derision" means "the use of ridicule or scorn to show contempt" or "an object of ridicule or scorn." Derision, Merriam-Webster Online, *at* https://www.merriam-webster.com/dictionary/derision. "Ridicule" means "derision, mockery." Ridicule, Merriam-Webster Online, *at* https://www.merriam-webster.com/dictionary/ridicule. Even setting aside the circularity of these definitions, prior restraint cannot be based on subjective judgments about whether speech expresses "dislike," "disrespect," "ridicule," or "indignation."

inflammatory, *ad hominem* attacks." Response, at 28. This "clarification" simply piles vagueness upon vagueness. Will enforcement of the Gag Order require a judicial determination that President Trump's political rhetoric is "fact-free" or "*ad hominem*"? *See id.* Likewise, the prosecution's most-preferred term for the speech it seeks to prohibit, the word "disparaging," *see also* Response, at 2, 12, 18, 24, 28, is nowhere in the order itself (despite the prosecution's request) and is in any event vague itself. In *Matal v. Tam*, addressing a law that prohibited the registration of trademarks that "disparage" anyone, the Supreme Court noted that "[t]he admitted vagueness of the disparagement test" resulted in "a haphazard record of enforcement," 582 U.S. at 233 (plurality op.); and even the Government admitted that the "disparagement" analysis was "somewhat vague" and subject to "necessarily … highly subjective" enforcement, *id.* at 233 n.5. This prosecution's standard is not one that "may, in some circumstances, present close cases," Response, at 28; it is vague down to its core.

The prosecution's legally prohibited and misplaced attempts to clarify the Gag Order's remaining terms fare no better. Again, contradicting its own instruction that the Gag Order's terms should "receive their plain, obvious and common sense meaning," Response, at 27, the prosecution ignores Webster's definition of "interested" party and opts for a technical definition from Black's Law Dictionary, without explaining why one should be favored over the other. *Id.* at 28. This violates the Supreme Court's instruction in *Button* that an appellate Court should not "presume that" the Gag Order "curtails constitutionally protected activity as little as possible." 371 U.S. at 432. And even if the Court were to adopt the prosecution's narrowing construction (which it cannot do at this point as President Trump's appeal divested the Court of jurisdiction to amend the Order), the scope of the persons covered by the Gag Order would remain unclear.

The prosecution also contends that the phrase "reasonably foreseeable witnesses" is not vague because "the discovery includes a list of potential witnesses." Response, at 29. But the prosecution pointedly does *not* contend that its "list of potential witnesses" includes *all* the "reasonably foreseeable" witnesses in the case, so this claim does nothing to eliminate the phrase's vagueness. In fact, by claiming that it has disclosed "a list of potential witnesses," but leaving open the option enforcing the Gag Order against President Trump's statements about *other* "witnesses," the Government vividly illustrates that the Gag Order is subject to "arbitrary and discriminatory enforcement"—the hallmark of vagueness. *Grayned*, 408 U.S. at 109.

As for the Gag Order's prohibition regarding the "substance of their testimony," Doc. 105, at 3, the prosecution makes no argument that this phrase is not vague, other than to assert it is not. Response, at 29. In fact, this phrase is inherently vague and renders enforcement-by-hindsight virtually inevitable. Months before trial, President Trump and others have no way of predicting what "the substance of their testimony" will be for any number of witnesses, whether foreseeable or unforeseeable.

In its vagueness argument, the prosecution relies heavily on *United States v. Bronstein*, which upheld a statute prohibiting "mak[ing] a harangue or oration … in the Supreme Court building or grounds," as enforced against protestors who shouted protest slogans during a Supreme Court oral argument session. 849 F.3d at 1102. *Bronstein* is distinguishable because, unlike the Gag Order, it involved a restriction on speech that was already extremely circumscribed—it applied only to speech on "the Supreme Court building or grounds." *Id.* And the D.C. Circuit held that the words "harangue" and "oration" had a simple, commonsense meaning—"public speeches." *Id.* at 1108. This straightforward meaning was rendered even more narrow and specific by the statute's immediate context, which clarified that the words meant "public speeches that tend

to disrupt the Court's operations, and no others." *Id.* at 1109. The Gag Order differs from the statute in *Bronstein* because its key terms (e.g., "target") are vague from the outset, and they draw no clarification from the Gag Order's immediate context. *See id.*

Moreover, the statute at issue in *Bronstein* was not a prior restraint, since it sought to impose penalties after the fact, not to silence speech in advance. The D.C. Circuit did not analyze it as a prior restraint. *See id.* at 1102. The Gag Order, by contrast, is a quintessential prior restraint, "the most serious and the least tolerable infringement on First Amendment rights." *Nebraska Press Ass'n*, 427 U.S. at 559. Thus, *Bronstein* consciously sought to employ every possible interpretative tool to narrow the statute and eliminate its vagueness. *Id.* at 1106 ("'Only if no construction can save the Act from this claim of unconstitutionality are we willing to' strike the statute.") (citation omitted).

For a prior restraint, by contrast, the reviewing court "will not presume that the [restraint] curtails constitutionally protected activity as little as possible." *Button*, 371 U.S. at 432. The Supreme Court has repeatedly instructed that such restrictions on First Amendment rights are subject to the strictest standards of clarity. *Hynes v. Mayor & Council of Borough of Oradell*, 425 U.S. 610, 620 (1976) ("Stricter standards of permissible statutory vagueness may be applied to a statute having a potentially inhibiting effect on speech.") (modifications omitted); *Buckley v. Valeo*, 424 U.S. 1, 77 (1976) ("Where First Amendment rights are involved, an even 'greater degree of specificity' is required."); *Smith v. Goguen*, 415 U.S. 566, 573 (1974) ("Where a statute's literal scope … is capable of reaching expression sheltered by the First Amendment, the doctrine demands a greater degree of specificity than in other contexts."); *Button*, 371 U.S. at 432 ("[S]tandards of permissible statutory vagueness are strict in the area of free expression."). *Bronstein* did not rely on such standards because of its narrow application, but they are applicable here.

### B. Overbreadth

The prosecution also cannot show narrow tailoring because the Gag Order is sweepingly overbroad.  Not all statements "targeting" the prosecution, potential witnesses, or the substance of those witnesses' testimony, however defined, can possibly present a "clear and present danger" to a compelling government interest. Rather the Court must, but did not, delineate the specific statements where the prosecution has met its factual burden (which in this case is none) and impose restrictions only in those narrow areas. *White*, 416 F.3d at 751.

Seeking to justify the Gag Order's overbroad scope, the prosecution repeatedly claims that President Trump's speech is supposedly "disparaging" and "inflammatory" toward those he criticizes.  Doc. 120, at 2, 3, 12, 18, 24, 28.  In doing so, the prosecution echoes the Court's repeated scrutiny of "why … it was necessary for the defendant to use 'derogatory labels' and 'highly charged language'" in his political speech, such as calling people "thugs" or "deranged," *Id.* at 3-4 (quoting Doc. 103, at 41-42, 44-45, 50-51).  Indeed, the prosecution seeks to silence President Trump precisely *because* his speech is supposedly "disparaging" and "inflammatory."  *Id.* at 2, 3, 12, 18, 24, 28.  The Gag Order adopts this rationale.  Doc. 105, at 2.

The First Amendment does not permit censorship because the prosecution or the Court thinks that President Trump used "mean" or "intemperate" language. Just the opposite, suppressing speech only because it is supposedly "disparaging" and "inflammatory" is forbidden viewpoint discrimination, violating bedrock First Amendment principles:

> [A] function of free speech under our system of government is to invite dispute.  It may indeed best serve its high purpose when it induces a condition of unrest, creates dissatisfaction with conditions as they are, or even stirs people to anger.  Speech is often provocative and challenging. It may strike at prejudices and preconceptions and have profound unsettling effects as it presses for acceptance of an idea.  That is why freedom of speech is protected against censorship or punishment.  There is no room under our Constitution for a more restrictive view. For the alternative

> would lead to standardization of ideas either by legislatures, courts, or dominant political or community groups.

*Cox*, 379 U.S. at 551–52 (cleaned up) (quoting *Terminiello v. City of Chicago*, 337 U.S. 1, 4–5 (1949)).

Recently, the Supreme Court applied these principles to unanimously invalidate a statutory restriction on speech that "disparage[s]" any person. *Matal*, 582 U.S. at 223 ("Speech may not be banned on the ground that it expresses ideas that offend."). In *Matal*, the four-Justice plurality opinion emphasized that a prohibition against "disparaging" speech constitutes forbidden viewpoint discrimination. *Id.* at 243. "We have said time and again that 'the public expression of ideas may not be prohibited merely because the ideas are themselves offensive to some of their hearers.'" *Id.* at 244 (quoting *Street v. New York*, 394 U.S. 576, 592 (1969) and citing ten other cases); *see also Texas v. Johnson*, 491 U.S. 397, 414 (1989) ("If there is a bedrock principle underlying the First Amendment, it is that the government may not prohibit the expression of an idea simply because society finds the idea itself offensive or disagreeable"). The idea that "[t]he Government has an interest in preventing speech expressing ideas that offend … strikes at the heart of the First Amendment." *Matal*, 582 U.S. at 246.

*Matal*'s four-Justice concurrence was, if anything, more emphatic on this point, holding that the "disparagement" clause "constitutes viewpoint discrimination—a form of speech suppression so potent that it must be subject to rigorous constitutional scrutiny." *Id.* at 247 (Kennedy, J., concurring in part and concurring in the judgment). To prohibit "disparaging" speech "reflects the Government's disapproval of a subset of messages it finds offensive. This is the essence of viewpoint discrimination." *Id.* at 249.

Here, the viewpoint discrimination is particularly pernicious because it selectively disadvantages President Trump in the forum of public debate without imposing any similar

disadvantage on his political opponents.  President Biden, his Administration, his campaign, former Vice President Pence, former Attorney General Barr, General Milley, and many others who routinely attack President Trump in public statements, books, and national news media remain free to use whatever rhetoric or methods of communication they prefer.  Even the Special Prosecutor's team remains free to continue to regularly leak confidential details of its investigation to the media to drive endless negative media coverage about President Trump.[6]  The First Amendment does not permit a one-sided, government-induced disadvantage on President Trump.  The government "has no such authority to license one side of a debate to fight freestyle, while requiring the other to follow Marquis of Queensberry rules."  *R.A.V. v. City of St. Paul*, 505 U.S. 377, 391–92 (1992).

Similarly, the Gag Order's prohibition of public criticism of the Special Prosecutor and other prosecutors is indefensible under the First Amendment. Those attorneys knowingly volunteered to participate in the most high-profile, politically charged prosecution in modern American history, and thus each "thrust himself into the vortex of this public issue."  *Gertz v. Robert Welch, Inc.*, 418 U.S. 323, 352 (1974). The same applies to the numerous potential witnesses who are high-level government officials and quintessential public figures.  Restricting criticism of the Special Counsel and his staff as well as other public officials, including any number of potential witnesses, is clearly inconsistent with the First Amendment.  Criticisms of judges—

---

[6] A long series of negative news stories about the Special Counsel's prosecution of President Trump have reported on inside information obtained from "sources close to the prosecution," often in circumstances where it is clear that only source(s) within the Special Prosecutor's team could have provided the information—such as reporting on grand jury matters or the timing of the indictment. *See, e.g.,* Katherine Faulders, *Ex-Chief of Staff Mark Meadows Granted Immunity, Tells Special Counsel He Warned Trump About 2020 Claims: Sources*, ABC News (Oct. 24, 2023), https://abcnews.go.com/US/chief-staff-mark-meadows-granted-immunity-tells-special/story?id=104231281 ("Former President Donald Trump's final chief of staff in the White House, Mark Meadows, has spoken with special counsel Jack Smith's team at least three times this year, including once before a federal grand jury, which came only after Smith granted Meadows immunity to testify under oath, according to sources familiar with the matter.").

even criticism that uses "strong language, intemperate language" and is "unfair"—cannot constitutionally be the subject of contempt. *Craig v. Harney*, 331 U.S. 367, 376 (1947). The same is true of other government officials, like the Special Counsel and his staff, former Vice President, former Attorney General, former Chief of Staff and others. Restrictions on criticisms of those officials thus cannot rest on mere "electricity in the atmosphere . . . generated by the facts" of the case. *Bridges v. California*, 314 U.S. 252, 278 (1941).

## IV.    The Other Equitable Factors Favor a Stay Pending Appeal.

The prosecution admits that "the loss of [First Amendment] freedoms, for even minimal periods of time, unquestionably constitutes irreparable injury." Response, at 29. And it admits that "the strength of [President Trump's] showing on public interest rises and falls with the strength of his showing of likelihood of success on the merits." *Id.* (cleaned up). Because President Trump has shown a likelihood of success on the merits, a stay should follow.[7]

## V.    The Prosecution's Request to Modify the Conditions of Release is Meritless.

Finally, the prosecution (while not proceeding by notice and motion) for the first time asks the Court to "modify the defendant's conditions of release by making compliance with the Order a condition" of release or by incorporating the terms of the Gag Order. Response, at 31. This relief is unconstitutional for the reasons discussed above. The Court cannot cure the infirmities of the

---

[7] The prosecution argues that the public interest favors "a right to a fair trial by impartial jurors." Response, at 29 (quoting *Gentile*, 501 U.S. at 1075). But, as explained above, the Court did not grant the prosecution's request for a gag order regarding statements that the prosecution thinks might affect the jury pool, *see* Doc. 105, at 2, so the prosecution's invocation of "impartial jurors" is inapt. In any event, the prosecution has presented no evidence that any potential witness has received threats or harassment, or even subjectively feels threatened by President Trump's statements, so the prosecution's fear of prejudice to its right to a "fair trial," Response, at 29, is "of course … speculative." Tr. 62.

Gag Order simply by reincorporating the same directives into President Trump's terms of release. Moreover, the issue of amending conditions of release has not been briefed by the parties.

The prosecution's request is also jurisdictionally improper. The Court entered the Gag Order, and President Trump promptly filed a notice of appeal. The prosecution does not dispute that the Gag Order is an appealable order. *See* Doc. 110, at 8. Thus, when President Trump filed his notice of appeal, it divested the Court of jurisdiction to amend or modify the Gag Order: "The filing of a notice of appeal is an event of jurisdictional significance—it confers jurisdiction on the court of appeals and divests the district court of its control over those aspects of the case involved in the appeal." *Griggs v. Provident Consumer Disc. Co.*, 459 U.S. 56, 58 (1982). The prosecution's latest proposal seeks to end-run around the Court of Appeals' jurisdiction by modifying and reasserting the Gag Order as a condition of release while it is being challenged on appeal, which the Court lacks jurisdiction to do. *See id.*

Moreover, by seeking to, effectively, impose sanctions on President Trump for speech occurring while the Gag Order is stayed, the prosecution not only violates the Court's administrative stay, but highlights the prosecution's unconstitutional and deeply troubling goal of silencing President Trump's core political speech. The prosecution does not seek modification of the terms of release because it believes President Trump has violated his existing terms. Instead, it hopes the threat of bond revocation and imprisonment will force President Trump into silence. This exponentially compounds the Constitutional burdens imposed by the Gag Order, as "[u]ncertain meanings inevitably lead citizens to 'steer far wider of the unlawful zone than if the

boundaries of the forbidden areas were clearly marked.'" *Grayned*, 408 U.S. at 109 (cleaned up)

(quoting *Baggett v. Bullitt*, 377 U.S. 360, 372 (1964)).[8]

## CONCLUSION

The prosecution's undeniable goal is to silence its primary political opponent, President

Trump, during his campaign against the Biden Administration. The Court should not countenance

such a blatant and unjustifiable attack on the First Amendment. Accordingly, the Court should deny

the prosecution's bond modification request and stay the Gag Order pending appeal.

Dated: October 28, 2023                           Respectfully submitted,

Todd Blanche, Esq. (PHV)                          */s/John F. Lauro*
toddblanche@blanchelaw.com                        John F. Lauro, Esq.
Emil Bove, Esq. (PHV)                             D.C. Bar No. 392830
Emil.Bove@blanchelaw.com                          jlauro@laurosinger.com
Blanche Law                                       Gregory M. Singer, Esq. (PHV)
99 Wall St., Suite 4460                           gsinger@laurosinger.com
New York, NY 10005                                Filzah I. Pavalon, Esq. (PHV)
(212) 716-1250                                    fpavalon@laurosinger.com
                                                  Lauro & Singer
                                                  400 N. Tampa St., 15th Floor
                                                  Tampa, FL 33602
                                                  (813) 222-8990
                                                  *Counsel for President Trump*

---

[8] The prosecution's justification for this request is baseless. Response, at 30-31. The prosecution contends that "within hours of a news report about the purported testimony in this case of the defendant's former Chief of Staff," Mark Meadows, "the defendant issued multiple prejudicial and threatening Truth Social posts to influence and intimidate the Chief of Staff…." *Id.* at 30; *see also id.* at 9 (screen shot of Truth Social post). Setting aside the fact that a likely source for this leak about Meadows' supposedly confidential grand jury testimony—calculated to generate news coverage negative for President Trump—is the Special Prosecutor and/or his team. The prosecution offers no evidence that Meadows—a former U.S. Congressman and White House Chief of Staff—is somehow threatened or intimidated by President Trump's public statements, or has received any "threats" or "harassment," or that there is any reasonable prospect that President Trump's posts might affect him in any way.