**IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA**

| | |
|---|---|
| UNITED STATES OF AMERICA | |
| v. | Case No. 1:23-cr-00257-TSC |
| DONALD J. TRUMP, | |
| *Defendant*. | |

**PRESIDENT DONALD J. TRUMP'S MOTION TO COMPEL DISCOVERY**

**TABLE OF CONTENTS**

INTRODUCTION ................................................................................................................... 1

APPLICABLE LAW ............................................................................................................. 2

   I.    "Favorable" Evidence Under *Brady* ............................................................... 2

   II.   Local Criminal Rule 5.1 And D.C. Rule 3.8 ................................................... 4

   III.  "Materiality" Evidence Under Rule 16 ........................................................... 5

BACKGROUND ................................................................................................................... 6

   I.    The Prosecution's Untenable Theory Of The Case ...................................... 6

   II.   Relevant Facts ............................................................................................ 7

       A.    Foreign Influence Findings Relating To The 2016 Election ....................... 7

       B.    President Trump's Executive Order 13848 ................................................... 8

       C.    The 2020 Election CISA Statement .............................................................. 9

       D.    The Solar Winds "SUNBURST" Attack ...................................................... 9

       E.    The Classified Briefing To Co-Conspirator 4 By The Director Of National
Intelligence ............................................................................................................ 11

       F.    Ombudsman Findings Regarding Biased Intelligence Products ................... 12

       G.    The "Minority View" In The 2020 Election ICA ........................................ 13

       H.    The DNI's Concerns Regarding The 2020 Election ICA ............................ 13

       I.    2020 Election DOJ-DHS Report .................................................................. 14

       J.    The January 6 Committee Report ................................................................. 15

   III.  Procedural History........................................................................................ 16

DISCUSSION ...................................................................................................................... 17

   I.    Evidence Relating To January 6, 2021 Protests ........................................... 17

       A.    Inconsistent Assertions By Government Actors .......................................... 18

       B.    Requests For Security At The Capitol .......................................................... 19

       C.    Presence Of Government Agents At The Capitol ........................................ 20

   II.   President Trump's Response To Foreign Influence In The 2016 Election........ 21

   III.  Foreign Influence Efforts Relating To The 2020 Election And January 6 ................... 23

   IV.  Reports Relied Upon By The Prosecution And Prepared By Its Witnesses ................. 24

       A.    2020 Election CISA Statement ..................................................................... 25

       B.    2020 Election ICA ......................................................................................... 25

       C.    2020 Election DOJ-DHS Report .................................................................. 26

   V.   Evidence Relating to Infrastructure Compromises, Voting Fraud, And Irregularities...... 27

   VI.  ODNI Materials Relating To The DNI's Briefing Of "Co-Conspirator 4" .................... 29

VII.    *Giglio* Material Relating To Mike Pence's Mishandling Of Classified Information ..... 29

VIII.   Evidence Of Bias And Investigative Misconduct........................................................ 31

   A.   Coordination With The Biden Administration............................................................ 31

   B.   FISA Abuses ........................................................................................................... 32

   C.   Other Investigative Misconduct................................................................................ 32

CONCLUSION.......................................................................................................................... 34

## <u>INTRODUCTION</u>

President Donald J. Trump respectfully submits this motion, and the accompanying Classified Supplement, seeking to compel the Special Counsel's Office to provide the information and evidence discussed herein, which is subject to the Office's obligations under *Brady*, *Giglio*, Rule 16(a)(1)(E), and the Jencks Act.

The indictment in this case reflects little more than partisan advocacy designed to sabotage President Trump's leading campaign for the 2024 President Election.  Consistent with that improper and unlawful goal, the Special Counsel's Office has chosen to rely on the views of witnesses who aligned with the Biden Administration's political viewpoints, and to treat those biased opinions as objective and irrefutable truths regarding the integrity of the 2020 election and the events of January 6, 2021.  The problem with that approach is that President Trump and others—indeed, hundreds of millions of voters—are not obligated to accept at face value the Office's politically motivated narrative.  It was not unreasonable at the time, and certainly not criminal, for President Trump to disagree with officials now favored by the prosecution and to rely instead on the independent judgment that the American people elected him to use while leading the country.

For purposes of this motion, we accept the prosecution's contention that whether President Trump "genuinely believed that the election was stolen" is a "matter for trial."  Doc. 139 at 24 (cleaned up).  However, what we cannot accept, and what the Court is obligated to prevent, is the Office's efforts to suppress and withhold from President Trump information that supports this defense and related arguments regarding good faith and the absence of criminal intent.

Likewise, the Special Counsel's Office cannot contend that President Trump is "responsible" for January 6 while suppressing public and private statements to the contrary by

other prosecutors and officials during prior cases, information relating to security measures that informed President Trump's remarks and assessment of the situation, and instances of undercovers and informants who infiltrated the crowd on that day.  The Office cannot blame President Trump for public discord and distrust of the 2020 election results while refusing to turn over evidence that foreign actors stoked the very same flames that the Office identifies as inculpatory in the indictment.  The Office cannot rely on selected guidance and judgments by officials it favors from the Intelligence Community and law enforcement while ignoring evidence of political bias in those officials' decision-making as well as cyberattacks and other interference, both actual and attempted, that targeted critical infrastructure and election facilities before, during, and after the 2020 election.  Finally, the Office must disclose information that is discoverable under Supreme Court precedent, Local Criminal Rule 5.1, and other authorities for the purpose of impeaching prosecution witnesses and the lack of integrity in the shoddy investigations that led to this prosecution.

For all of these reasons, and as explained in more detail below, we require judicial intervention to ensure that the prosecution is not permitted to continue to rely on any of these strategies and is instead held to the constitutional, statutory, and ethical obligations that are intended to ensure the fairness of these proceedings.

## APPLICABLE LAW

### I.   "Favorable" Evidence Under *Brady*

"[I]n the pretrial setting, *Brady* requires disclosure of any information 'favorable to the accused' . . . without regard to whether the failure to disclose it likely would affect the outcome of the upcoming trial.'" *United States v. Singhal*, 876 F. Supp. 2d 82, 103-04 (D.D.C. 2012) (quoting *United States v. Safavian*, 233 F.R.D. 12, 16-17 (D.D.C. 2005)).

2

> The meaning of the term "favorable" under *Brady* is not difficult to discern. It is any information in the possession of the government—broadly defined to include all Executive Branch agencies—that relates to guilt or punishment and that tends to help the defense by either bolstering the defense case or impeaching potential prosecution witnesses. It covers both exculpatory and impeachment evidence.

*Safavian*, 233 F.R.D. at 16-17; *see also United States v. Chansley*, No. 21-cr-3, 2023 WL 4637312, at *8 (D.D.C. July 20, 2023) ("Favorable evidence tends to help the defense by either bolstering the defense case or impeaching potential prosecution witnesses.") (cleaned up). "It is . . . clear that *Brady* and its progeny may require disclosure of exculpatory and/or impeachment materials whether those materials concern a testifying witness or a hearsay declarant." *United States v. Jackson*, 345 F.3d 59, 71 (2d Cir. 2003). "A contrary conclusion would permit the government to avoid disclosure of exculpatory or impeachment material simply by not calling the relevant witness to testify." *Id.*

"The government is obligated to disclose such favorable evidence even in the absence of a defense request." *United States v. Sutton*, No. 21-cr-598, 2022 WL 2383974, at *4 (D.D.C. July 1, 2022) (cleaned up). "[B]ecause the significance of an item of evidence can seldom be predicted accurately until the entire record is complete, the prudent prosecutor will resolve doubtful questions in favor of disclosure." *United States v. Agurs*, 427 U.S. 97, 108 (1976).

> It is demonstrably not the responsibility of a prosecutor to test the credibility or trustworthiness of an exculpatory statement given by a witness or to weigh that statement against their assessment of the inculpatory evidence in the case. It is their responsibility to disclose exculpatory evidence promptly no matter what they may think of its reliability or trustworthiness."

*Sutton*, 2022 WL 2383974, at *7.

## II.     Local Criminal Rule 5.1 And D.C. Rule 3.8

Pursuant to Local Criminal Rule 5.1, the prosecution's *Brady* obligation "applies regardless of whether the information would itself constitute admissible evidence."   Local Rule 5.1 also specifies that the prosecution's *Brady* obligation includes:

- "Information that is inconsistent with or tends to negate the defendant's guilt as to any element";

- "Information that tends to mitigate the charged offense(s)";

- "Information that tends to establish an articulated and legally cognizable defense theory";

- "Information that casts doubt on the credibility or accuracy of any evidence, including witness testimony"; and/or

- "Impeachment information."

Local Crim. R. 5.1(a)-(b); *see also Cone v. Bell*, 556 U.S. 449, 470 n.15 (2009) ("[T]he obligation to disclose evidence favorable to the defense may arise more broadly under a prosecutor's ethical or statutory obligations.").   Evidence within these categories must be produced "as soon as reasonably possible after its existence is known."   Local Crim. R. 5.1(a).

"[G]overnment counsel's ethical obligations impose disclosure requirements broader than what is constitutionally mandated."   *Sutton*, 2022 WL 2383974 at *8.   Specifically, "[u]nder the applicable rules of professional conduct, '[t]he prosecutor in a criminal case shall not . . . [i]ntentionally fail to disclose to the defense, upon request and at a time when use by the defense is reasonably feasible, any evidence or information that the prosecutor knows or reasonably should know tends to negate the guilt of the accused or to mitigate the offense."   *Id.* (quoting Rule 3.8(e) of the D.C. Rules of Pro. Conduct).

### III.    "Materiality" Evidence Under Rule 16

Evidence that is "material to preparing the defense" is subject to disclosure under Rule 16(a)(1)(E)(i).  Materiality is "not a heavy burden." *United States v. George*, 786 F. Supp. 56, 58 (D.D.C. 1993).  It only requires "some abstract logical relationship to the issues in the case." *United States v. Caicedo-Llanos*, 960 F.2d 158, 164 n.4 (D.C. Cir. 1992) (citing *United States v. Ross*, 511 F.2d 757, 762 (5th Cir. 1975).  "[E]vidence is material as long as there is a strong indication that it will play an important role in uncovering admissible evidence, aiding witness preparation, corroborating testimony, or assisting impeachment or rebuttal." *United States v. Lloyd*, 992 F.2d 348, 351 (D.C. Cir. 1993) (cleaned up); *United States v. Marshall*, 132 F.3d 63, 68 (D.C. Cir. 1998) (reasoning that evidence can be "material" in "several ways: by preparing a strategy to confront the damaging evidence at trial; by conducting an investigation to attempt to discredit that evidence; or by not presenting a defense which is undercut by such evidence").  Thus, "the documents need not directly relate to the defendant's guilt or innocence." *United States v. George*, 786 F. Supp. 11, 13 (D.D.C. 1991).

The prosecution "cannot take a narrow reading of the term 'material' in making its decisions on what to disclose under Rule 16." *United States v. O'Keefe*, 2007 WL 1239204, at *2 (D.D.C. Apr. 27, 2007).  "[B]urdensomeness," "logistical difficulty," and "concerns about confidentiality and the privacy rights of others" do not "trump the right of one charged with a crime to present a fair defense." *Id.*  "The language and the spirit of the Rule are designed to provide to a criminal defendant, in the interest of fairness, the widest possible opportunity to inspect and receive such materials in the possession of the government as may aid him in presenting his side of the case." *United States v. Poindexter*, 727 F. Supp. 1470, 1473 (D.D.C. 1989).

## BACKGROUND

### I.    The Prosecution's Untenable Theory Of The Case

"[A] court must first start with the indictment when determining what is material, as the indictment delineates the evidence to which the defendant's case must respond." *United States v. Libby*, 429 F. Supp. 2d 1, 7 (D.D.C. 2006); *see also United States v. Williamson*, No. 14-cr-151, 2014 WL 12695538, at *3 (D.D.C. 2014); *United States v. George*, 786 F. Supp. 11, 14 (D.D.C. 1991) (discussing discovery implications of "the independent counsel's decision to frame its indictment broadly").

The indictment in this case contains broad and baseless allegations that President Trump will disprove at trial, including claims relating to creation of "an intense national atmosphere of mistrust and anger" and efforts to "erode public faith in the administration of the election." Indictment ¶ 2.  To prop up the Biden Administration's preferred political advocacy regarding the 2020 election, the indictment endorses the alleged views of "Senior White House Attorneys," "senior leaders of the Justice Department," "the Intelligence Community," the "Department of Homeland Security's Cybersecurity and Infrastructure Security Agency" (CISA), a former CISA director, and others. *Id.* ¶¶ 11(b)-(e).

More recently, the Special Counsel's Office asserted that the indictment contains "clear allegations" that President Trump "directed" and is "responsible for the events at the Capitol on January 6." Doc. 140 at 1.  As we have noted, this claim is contradicted by President Trump's speech at the White House Ellipse that day, during which he referenced supporters seeking to "peacefully and patriotically make [their] voices heard." Doc. 156 at 2.  The Office's new position is also contradicted by arguments from other prosecutors, who have contended, for example, that

6

President Trump "didn't take action." *Id.* at 12; *see also id.* (arguing that Stewart Rhodes' "words [were] not contingent upon anything the President may do").

Significant and serious discovery obligations flow from the ill-advised decision of the Special Counsel's Office to pursue a criminal case based on broad allegations relating to the "national atmosphere," the Office's perceptions of "public faith," and subjective views of personnel at a host of federal agencies.  It is one thing to publicize a politically motivated narrative in a one-sided indictment.  It is quite another—indeed, unlawful and unethical—to try to restrict discovery based on that biased view in an effort to gain a tactical advantage at trial.

## II.    Relevant Facts

### A.  Foreign Influence Findings Relating To The 2016 Election

In January 2017, the National Intelligence Council issued an Intelligence Community Assessment titled "Assessing Russian Activities and Intentions in Recent US Elections" (the "2016 Election ICA").  A public version of the 2016 Election ICA states that it is a "declassified version of a highly classified assessment," which "does not include the full supporting information, including specific intelligence on key elements of the influence campaign." *E.g.*, Ex. A at i (noting that the conclusions in the declassified and classified versions are "identical").

One of the "Key Judgements" in the declassified version of the 2016 Election ICA was that Russia engaged in foreign influence operations relating to the 2016 election that reflected a "significant escalation" and sought to "undermine public faith in the US democratic process."  Ex. A at ii.  The declassified version of the 2016 Election ICA also described efforts by RT America TV, "a Kremlin-financed channel operated from within the United States," to execute a "Kremlin-directed campaign to undermine faith in the US Government and fuel political protest." *Id.* at 6.

**B. President Trump's Executive Order 13848**

In 2018, President Trump issued Executive Order 13848, titled "Imposing Certain Sanctions in the Event of Foreign Interference in a United States Election." Relying on the 2016 Election ICA, President Trump declared:

> the ability of persons located, in whole or in substantial part, outside the United States to interfere in or undermine public confidence in United States elections, including through the unauthorized accessing of election and campaign infrastructure or the covert distribution of propaganda and disinformation, constitutes an unusual and extraordinary threat to the national security and foreign policy of the United States.

Exec. Order No. 13848 (Sept. 12, 2018). President Trump also expressed concern that "the proliferation of digital devices and internet-based communications has created significant vulnerabilities and magnified the scope and intensity of the threat of foreign interference." *Id.* Executive Order 13848 defined the term "foreign interference" broadly, to include any effort with the "effect of influencing, undermining confidence in, or altering the result or reported result of, the election, or undermining public confidence in election processes or institutions." *Id.* § 8(f).

Section 1(a) of Executive Order 13848 instructed the Director of National Intelligence to coordinate the preparation of an assessment, within 45 days of the 2020 election, of "any information indicating that a foreign government, or any person acting as an agent of or on behalf of a foreign government, has acted with the intent or purpose of interfering in that election." The assessment issued pursuant to this instruction is referred to below as the 2020 Election ICA. *See* Indictment ¶ 11(c).

Section 1(b) of Executive Order 13848 instructed the Attorney General and the Secretary of Homeland Security to prepare a report, within 45 days of the 2020 Election ICA, regarding whether foreign interference "targeted election infrastructure" or "target[ed] the infrastructure of

. . . a political organization campaign or candidate."  The report issued pursuant to this instruction is referred to below as the 2020 Election DOJ-DHS Report.

### C.  The 2020 Election CISA Statement

Less than two weeks after the 2020 election, CISA joined a public statement regarding election security (the "2020 Election CISA Statement").  *See* Ex. B; *see also* Indictment ¶ 11(d).  The 2020 Election CISA Statement claimed, falsely, that "there was no evidence any voting system had been comprised" and "declared the 2020 election 'the most secure in American history.'"

On November 17, 2020, President Trump fired CISA's Director.  In a public statement, President Trump explained that he terminated the Director because the CISA Election Statement was "highly inaccurate."[1]

### D.  The Solar Winds "SUNBURST" Attack

One of the reasons that the CISA Election Statement was inaccurate is that, between January 2019 and at least December 2020, parties reportedly linked to Russia's Foreign Intelligence Service, the SVR, perpetrated what the SEC recently described as "one of the worst cybersecurity incidents in history."  Ex. C ¶ 11.  In connection with what is now known as the "SUNBURST attack,"

> [T]he threat actors inserted malicious code into three software builds for SolarWinds' Orion products.  SolarWinds then delivered these compromised products to more than 18,000 customers across the globe.  The malicious code provided the threat actors with the ability to access the systems of these compromised customers, provided certain other conditions were met, and became known as the SUNBURST attack.

*Id.* ¶ 13.  During the attack:

> [T]hreat actors conducted reconnaissance, exfiltration, and data collection; identified product and network vulnerabilities; harvested credentials of SolarWinds employees and

---

[1]  President Donald Trump (@realDonaldTrump), Twitter (Nov. 17, 2020, 7:07 pm), https://twitter.com/realDonaldTrump/status/1328852352787484677.

customers; and planned additional attacks against SolarWinds' products that would be deployed during later stages of the campaign.

*Id.* ¶ 140.   "The malicious code provided the threat actors a backdoor into the network environments of SolarWinds' customers who downloaded and installed the infected versions of the software to systems that were connected to the internet." *Id.* ¶ 143.  By May 2020, at least one government agency had identified evidence relating to the SUNBURST attack using SolarWinds' Orion software.  *Id.* ¶ 153.  In July 2020, a SolarWinds employee expressed concern that "the attack was looking closely at Orion 'for methods to utilize it in larger attacks.'"  *Id.* ¶ 156.

"[T]he poor state of SolarWinds' cybersecurity posture seemed to be a joke for employees in its InfoSec group, at least prior to the SUNBURST hack being revealed."  *Id.* ¶ 124.  In November 2020, around the time of the election, a SolarWinds employee noted in an email that the company's "'products are riddled and obviously have been for many years.'"  *Id.* ¶ 8(j).  According to the SEC, "Once SolarWinds learned of the SUNBURST attack, it did not fully disclose its known impact."  *Id.* at 55.

On December 13, 2020, CISA issued Emergency Directive 21-01, titled "Mitigate SolarWinds Orion Code Compromise."  Ex. D.  The Directive noted that "SolarWinds Orion products . . . are currently being exploited by malicious actors," which posed "an unacceptable risk to Federal Civilian Executive Branch agencies and requires emergency action."  *Id.*  CISA made those findings based on, among other things, the "[h]igh potential for a compromise of agency information systems" and "[g]rave impact of a successful compromise."  *Id.*  As a result, CISA directed "[a]ffected agencies" to "immediately disconnect or power down SolarWinds Orion products."  *Id.*  The next day, the *New York Times* reported that the attack had impacted the DOJ,

DHS, the State Department, the Treasury Department, the Commerce Department, the National Security Agency, parts of the Pentagon, and many others.[2]

In December 2020 and January 2021, CISA issued joint statements regarding the attack with the FBI, the National Security Agency, and the Office of the Director of National Intelligence.[3]   On January 6, 2021, CISA "determined that this threat poses a grave risk to the Federal Government and state, local, tribal, and territorial governments as well as critical infrastructure entities and other private sector organizations."[4]

Following the termination of the CISA Director, he formed a consultancy that was retained by SolarWinds in early 2021.[5]

### E. The Classified Briefing To Co-Conspirator 4 By The Director Of National Intelligence

In late 2020 and early 2021, there were disagreements within the Intelligence Community regarding the scope and content of the 2020 Election ICA.  During that process, on January 1, 2021, the Acting Attorney General asked the Director of National Intelligence ("DNI") to provide

---

[2] David E. Sanger, et al., *Scope of Russian Hacking Becomes Clear: Multiple U.S. Agencies Were Hit*, N.Y. TIMES (Dec. 14, 2020), https://www.nytimes.com/2020/12/14/us/politics/russia-hack-nsa-homeland-security-pentagon.html?unlocked_article_code=1.BU0.Z-JL.1KCtKgRVIwyS&smid=nytcore-ios-share&referringSource=articleShare.

[3] Press Release, Cybersecurity & Infrastructure Security Agency, Joint Statement by the Federal Bureau of Investigation (FBI), the Cybersecurity and Infrastructure Security Agency (CISA), the Office of the Director of National Intelligence (ODNI), and the National Security Agency (NSA) (Jan. 5, 2021), https://www.cisa.gov/news-events/news/joint-statement-federal-bureau-investigation-fbi-cybersecurity-and-infrastructure.

[4] Press Release, Cybersecurity & Infrastructure Security Agency, Advanced Persistent Threat Compromise of Government Agencies, Critical Infrastructure, and Private Sector Organizations (Apr. 15, 2021), https://www.cisa.gov/news-events/cybersecurity-advisories/aa20-352a.

[5] Eduard Kovacs, *SolarWinds Taps Firm Started by Ex-CISA Chief Chris Krebs, Former Facebook CSO Alex Stamos*, SECURITY WEEK (Jan. 8, 2021), www.securityweek.com/solarwinds-taps-firm-launched-cisa-chief-chris-krebs-former-facebook-cso-alex-stamos.

a classified briefing to the individual referred to in the indictment as "Co-Conspirator 4."  On the same day, the DNI's chief of staff made a classified draft of the 2020 Election ICA available to Co-Conspirator 4 so that Co-Conspirator 4 could review the document and speak to the DNI the following day.

On January 2, 2021, the DNI used secure facilities to provide a classified briefing to Co-Conspirator 4 via telephone.  The Indictment alleges that, on the day after that briefing, Co-Conspirator 4 transmitted an "edited version of his draft letter," "which included a change from its previous claim that the Justice Department had 'concerns'" to a "stronger" assertion that "'[a]s of today, there is evidence of significant irregularities that may have impacted the outcome of the election in multiple States . . . ."  Indictment ¶ 79.

### F.  Ombudsman Findings Regarding Biased Intelligence Products

On January 6, 2021, the Intelligence Community Analytic Ombudsman, Dr. Barry Zulauf, submitted a letter to the Senate Select Committee on Intelligence in which he responded in the affirmative to a question from the Committee regarding whether "ODNI officials had politicized or attempted to politicize intelligence, exercised or attempted to exercise undue influence on the analysis, production, or dissemination process of ODNI-published intelligence products related to election security."  Ex. E at 1.  Dr. Zulauf's submission stated that "the Intelligence Community recognizes where we have not met our responsibilities for objective intelligence."  *Id.* at 2.  Dr. Zulauf added:

- "China analysts appeared hesitant to assess Chinese actions as undue influence or interference.  These analysts appeared reluctant to have their analysis on China brought forward because they tended to disagree with the Administration's policies."  Ex. E at 3.

- "These foundational analytic shortcomings contributed to instances of, and led to other instances of, at least the perceived politicization of intelligence, needlessly long review

times, and differences between analytic conclusions in public statements on the one hand and established IC positions on the other." *Id*. at 4.

- "DNI Ratcliffe just disagreed with the established analytic line on China, insisting 'we are missing China's influence in the US and that Chinese actions ARE intended to affect the election.  DNI Ratcliffe wrote as much in his *Wall Street Journal* op-ed." *Id*. at 6.

- "Ombudsmen from CIA, NSA, and ODNI report the widely shared perspective among IC analysts that analysis on foreign election interference was delayed, distorted, or obstructed out of concern over policymaker reactions or for political reasons. . . ." *Id*. at 6.

### G.  The "Minority View" In The 2020 Election ICA

Consistent with Dr. Zulauf's concerns about China-related reporting, the unclassified version of the 2020 Election ICA contains a "Minority View," attributed to the National Intelligence Officer for Cyber, indicating "some of Beijing's influence efforts were intended to at least indirectly affect US candidates, political processes, and voter preferences."  Ex. F at 8.  The "Minority View" gave "more weight to indications that Beijing preferred former President Trump's defeat . . . ." *Id.*

### H.  The DNI's Concerns Regarding The 2020 Election ICA

On January 7, 2021, the DNI submitted a letter to Congress regarding the 2020 Election ICA.  The DNI's letter stated: "I do not believe the majority view expressed by Intelligence Community (IC) analysts fully and accurately reflects the scope of the Chinese government's efforts to influence the 2020 U.S. federal elections."  Ex. G at 1.  "[S]imilar actions by Russia and China are assessed and communicated to policymakers differently, potentially leading to the false impression that Russia sought to influence the election but China did not."  *Id*. at 2.

The DNI joined the "Minority View" in the 2020 Election ICA: "I am adding my voice in support of the stated minority view – based on all available sources of intelligence, with definitions consistently applied, and reached independent of political considerations or undue pressure – that

the People's Republic of China sought to influence the 2020 U.S. federal elections." *Id*. at 3. The

DNI also argued that the public description of the "Minority View" "gives the false impression

that the NIO Cyber is the only analyst who holds the minority view on China." *Id.* at 2.

> He is not, a fact that the Ombudsman found during his research and interviews with
> stakeholders.  Placing the NIO Cyber on a metaphorical island by attaching his name alone
> to the minority view is a testament to both his courage and to the effectiveness of the
> institutional pressures that have been brought to bear on others who agree with him.

*Id.*  Relatedly, the DNI emphasized Dr. Zulauf's finding that "CIA Management took actions

'pressuring [analysts] to withdraw their support' from the alternative viewpoint on China 'in an

attempt to suppress it.'" *Id.*

## I.  2020 Election DOJ-DHS Report

In February 2021, the 2020 Election DOJ-DHS Report was submitted to Congress as a

"classified joint report" by the United States Department of Justice ("DOJ"), which includes the

FBI, and the Department of Homeland Security ("DHS"), which includes CISA.  Ex. H.  The 2020

Election DOJ-DHS Report "address[ed] the impact of activities by foreign governments and their

agents targeting election infrastructure or infrastructure pertaining to political organizations,

candidates, or campaigns used in the 2020 US federal elections on the security or integrity of such

infrastructure." *Id.* at 2.

A "declassified overview" of the Report was released to the public.  Ex. H at 1.  The

unclassified summary disclaimed evidence of foreign activities that "altered any technical aspect

of the voting process; or otherwise compromised the integrity of voter registration information of

any ballots cast during 2020 federal elections." *Id.* at 2.  The summary acknowledged, however,

that:

- "Broad Russian and Iranian campaigns targeting multiple critical infrastructure sectors did compromise the security of several networks that managed some election functions . . . ."

- "Iranian claims . . . sought to undermine the public's confidence in US election infrastructure . . . ."

*Id.*

### J.  The January 6 Committee Report

The January 6 Committee issued its final report on December 22, 2022.[6]  In an appendix titled "Malign Foreign Influence," the January 6 Committee further politicized the findings of the 2020 Election ICA by cherry-picking excerpts from the document and ignoring contrary evidence regarding the role of foreign influence in the 2020 election.

The January 6 Committee exaggerated the conclusion of the 2020 Election ICA by claiming that the Intelligence Community "found no factual basis for any allegation of technical interference with the 2020 U.S. election."  January 6 Comm. Report at 806.  The January 6 Committee referred to the ICA as "definitive," without addressing, for example, the ICA's "Minority View" regarding China or Dr. Zulauf's report regarding bias in the reporting.

Nevertheless, several concessions in the January 6 Committee's Report suggest that the Committee collected exculpatory information from the Intelligence Community that supports President Trump's defense.  For example:

---

[6] Final Report of Select Committee to Investigate the January 6th Attack on the United States Capitol, H.R. Rep. No. 117-663 (2022) ("January 6 Comm. Report"), *available at* https://www.govinfo.gov/content/pkg/GPO-J6-REPORT/pdf/GPO-J6-REPORT.pdf.

- "2020 U.S. elections saw an increase in the number of foreign state and non-state entities that attempted to influence the U.S. electorate."  January 6 Comm. Report at 807.

- The Committee also acknowledged that "Russia, China, and Iran . . . engage, to varying degrees, in disguised efforts to influence U.S. public opinion," and "U.S. elections offer special opportunities."  *Id.*

- "Russia and China will, for the foreseeable future, continue to press their disinformation campaigns attempting to undermine the U.S. population's confidence in their government and society."  *Id.* at 808.

- "Russian malign disinformation efforts are both strategic in scope and opportunistic in nature. They aim to corrode the power and appeal of the U.S. democratic processes, worsen U.S. domestic divisions, and weaken America at home and abroad."  *Id.* at 807.

- "Foreign state adversaries of the United States generally disguise their efforts to influence U.S. audiences, particularly when they seek to influence U.S. voters' views in the run-up to an election."  *Id.* at 810.

## III.   Procedural History

President Trump served a classified discovery letter on the Special Counsel's Office on October 15, 2023, which is an Exhibit to the Classified Supplement, and three unclassified letters on October 4, 2023, Doc. 166-1, Ex. A; October 23, 2023, Doc. 166-1, Ex. B; and November 15, 2023, Doc. 166-1, Ex. C.  The Office responded in writing on October 24, Doc. 166-1, Ex. D; November 3, Doc. 166-1, Ex. E; and November 25, Doc. 166-1, Ex. F.  The parties have attempted to resolve the disputes at issue in this motion to no avail.[7]

---

[7] By necessity, the defense will continue to make requests of the prosecution and file motions to compel if necessary.  President Trump has a right to discovery and a fair trial, and "a myopic insistence upon expeditiousness in the face of a justifiable request for delay can render the right to defend with counsel an empty formality."  *Ungar v. Sarafite*, 376 U.S. 575, 589 (1964).  "It is the manifest duty of the courts to vindicate those guarantees, and to accomplish that it is essential that all relevant and admissible evidence be produced."  *United States v. Nixon*, 418 U.S. 683, 711 (1974); *Dennis v. United States*, 384 U.S. 855, 875 (1966) ("The determination of what may be useful to the defense can properly and effectively be made only by an advocate.").

## **DISCUSSION**

We note at the outset that the prosecution's response to this motion, and its approach to discovery in general, cannot proceed on the basis of beliefs or assumptions that President Trump's defenses lack merit. *See United States v. Edwards*, 887 F. Supp. 2d 63, 68 (D.D.C. 2012) ("It is not for the prosecutor to decide not to disclose information that is on its face exculpatory based on an assessment of how that evidence might be explained away or discredited at trial, or ultimately rejected by the fact finder.") (cleaned up); *United States v. Stevens*, Case No. 08-cr-213, 2008 WL 8743218, at *5 n.1 (D.D.C. 2008) ("Obviously, a statement may be exculpatory and subject to disclosure to the defense, even if the government believes the statement is untrue . . . ."). This motion raises matters of fundamental fairness and the integrity of these proceedings, not the Special Counsel's unjustified confidence in the indictment.

> A conspiracy case carries with it the inevitable risk of wrongful attribution of responsibility . . . . Under these circumstances, it is especially important that the defense, the judge and the jury should have the assurance that the doors that may lead to truth have been unlocked. In our adversary system for determining guilt or innocence, it is rarely justifiable for the prosecution to have exclusive access to a storehouse of relevant fact.

*Dennis v. United States*, 384 U.S. 855, 873 (1966) (citation omitted). Accordingly, the Court should compel the Special Counsel's Office to produce information that supports President Trump's defenses relating to the events of January 6, the impact of foreign influence, actual and attempted compromises of election infrastructure, and Jencks Act and *Giglio* disclosures relating to prosecution witnesses and the lack of integrity of the shoddy investigations that gave rise to this case.

### I.     Evidence Relating To January 6, 2021 Protests

The January 6 protests at the Capitol are irrelevant to this case and, if necessary, will be the subject of defense motions *in limine*. Nonetheless, because the Special Counsel's Office has

recently suggested that it will attempt to introduce evidence related to the protests, the Office must also produce all materials that are inconsistent with the prosecution's new theory that President Trump "directed" and is "responsible for the events at the Capitol on January 6." Doc. 140 at 1. This includes any materials suggesting that non-parties "directed" events on January 6 or are otherwise "responsible"—in whole or in part—for the violence that President Trump sought to prevent. *See, e.g.*, Local Crim. R. 5.1(b)(2) (mandating that *Brady* obligations include "[i]nformation that tends to mitigate the charged offense(s)").

## A. Inconsistent Assertions By Government Actors

President Trump is entitled to all documents, including private communications, in which prosecutors, law enforcement, and other officials made statements that are inconsistent with the prosecution's position regarding responsibility for January 6. Such documents are "material" under Rule 16(a)(1)(E) because they will aid in the preparation of the defense, and they are exculpatory under *Brady* because they undercut one of the prosecution's arguments. For example, statements by government officials are admissible at trial pursuant to Rule 801(d)(2)(A). *See United States v. Morgan*, 581 F.2d 933, 937 n.10 (D.C. Cir. 1978) ("[T]he Federal Rules clearly contemplate that the federal government is a party-opponent of the defendant in criminal cases, and specifically provide that in certain circumstances statements made by government agents are admissible against the government as substantive evidence."); *see also United States v. Warren*, 42 F.3d 647, 655 (D.C. Cir. 1994). The Court need not resolve admissibility at this juncture, but we raise the point to illustrate the importance of this aspect of the prosecution's *Brady* obligation.

There is ample reason to believe that responsive materials exist. Prosecutors from the United States Attorney's Office for the District of Columbia ("USAO-DC") repeatedly took positions in public that are inconsistent with the Special Counsel's new contention. *See* Doc. 156

at 9-13 (identifying instances); *see also, e.g.*, Mot. in *Limine* at 2, *United States v. Carpenter*, No. 21-cr-305 (D.D.C. Dec. 21, 2022) (ECF No. 56) ("Nor can there be any reasonable claim that President Trump intended to or actually authorized the Defendant's particular criminal conduct."); *id.* at 3 ("The Defendant will be unable to identify any remarks made by former President Trump that authorized that illegal conduct.").

This weekend, seeking to avoid the obvious discovery implications, the prosecution sought to revise the USAO-DC's position:

> The Department's position in other January 6 cases that the defendant's actions did not absolve any individual rioter of responsibility for that rioter's actions—even if the rioter took them at the defendant's direction—is in no way inconsistent with the indictment's allegations here.

Ex. 166-1, Ex. F at 4.  This was a blatant mischaracterization of the positions the government took in the prior cases, which—like the Office's crabbed view of the "prosecution team"—calls for heightened skepticism of the prosecution's approach to discovery and commitment to fairness.  It strains credulity to suggest that the Office's current position regarding responsibility for January 6 is consistent with, for example, the prior contention that there was "an intent to fight to stop that [election] result *with or without somebody like President Trump calling them into action*."  Hr'g T. at 14, *United States v. Rhodes*, No. 22-cr-15 (D.D.C. March 2, 2022) (ECF No. 53).  The prosecution must produce all such statements.

### B.  Requests For Security At The Capitol

President Trump is entitled to all information relating to security at the Capitol on January 6, including documents and communications regarding requests for security and the timing of the National Guard's deployment that day.  *See* Doc. 166-1, Ex. B at 2 (Request No. 4).  This information is material to the defense and favorable to President Trump because it suggests that (1) federal and local officials believed adequate measures were in place to facilitate a lawful and

peaceful protest at the Capitol, including during the speech at the Ellipse, and (2) the delayed arrival of the National Guard contributed to the violence that President Trump sought to prevent.

For example, according to the U.S. Department of Defense Office of the Inspector General ("DOD-OIG"), there were "a number of meetings from Saturday, January 2, 2021, through Monday, January 4, 2021, within the DoD and with the DoJ, the DHS, and the DoI" regarding security at the Capitol.[8]  According to General Mark Milley, President Trump directed the Acting Secretary of Defense during one of those meetings to "ensure sufficient National Guard or Soldiers would be there to make sure it was a safe event," and the Acting Secretary responded, "We've got a plan and we've got it covered."[9]

President Trump is entitled to not only information relating to events and communications in which he participated, but also interactions in which he was not directly involved.  *See United States v. Safavian*, 233 F.R.D. 12, 18 (D.D.C. 2005) (reasoning that "[s]imply because the e-mails themselves were not sent to or received by [defendant] . . . does not mean that they are not material to the preparation of a defense" because such documents "may very well include information helpful to the defendant in finding witnesses or documents that could support his contention").

**C.  Presence Of Government Agents At The Capitol**

President Trump is entitled to all information regarding undercover agents and individuals acting at the direction of official authorities at the Capitol on January 6.  *See* Doc. 166-1, Ex. B at 2 (Request Nos. 1-3); *United States v. Zink*, No. 21-cr-191, 2023 WL 5206143, at *3 (D.D.C. Aug. 14, 2023) ("[Defendant] is certainly right that the identity of a potential undercover actor —

---

[8] Inspector General, U.S. Dep't of Defense, Review Of The DOD's Role, Responsibilities, And Actions To Prepare For And Respond To The Protests And Its Aftermath At The U.S. Capitol Campus On January 6, 2021, at 4 (Nov. 16, 2021), https://media.defense.gov/2021/Nov/19/2002896088/-1/-1/1/DODIG-2022-039%20V2%20508.pdf.

[9] *Id.* at 31.

assuming any were present at the Capitol on January 6 — could be exculpatory evidence that the Government must disclose under [*Brady*].").  In cases like *Zink*, courts have required a direct connection between informants and the decisions of people who were charged in connection with their physical presence on the grounds.  *See id*.  But here President Trump is not seeking to establish that he was induced to engage in the charged conduct.  Rather, in this case, information regarding individuals who were present in an official capacity is favorable to President Trump because it suggests that there were adequate controls in place and that the violence at issue resulted from a failure of those controls and/or failed sting operations rather than any directions from President Trump.  It strains credibility to assert that President Trump is not entitled to the production of this information, putting aside, for now, whether such information is admissible at trial, it certainly aids the preparation of President Trump's defense.

## II.    President Trump's Response To Foreign Influence In The 2016 Election

President Trump seeks the complete, classified version of the 2016 Election ICA and all source materials.  *See* Doc. 166-1, Ex. C at 3 (Request Nos. 8, 14).  In addition, as explained in the Classified Supplement, President Trump also seeks specific information relating to measures that he oversaw to mitigate cybersecurity threats and protect the integrity of the 2020 election.

These materials are discoverable because information relating to a "significant escalation" of foreign influence in the 2016 election motivated President Trump and his Administration to focus on foreign influence and cyber risks, as reflected in Executive Order 13848, and to be skeptical of claims about the absence of foreign influence in the 2020 election.  This evidence rebuts the position of the Special Counsel's Office that President Trump's actions between November 2020 and January 2021 were motivated by a desire to maintain office and undertaken with specific intent and unlawful purpose.  *See Poindexter*, 727 F. Supp. at 1475 ("[A]bsence of a

motive would, in turn, refute the claim that he intentionally entered into an agreement. . . . . Evidence regarding the absence of motive is usually admitted to negate specific intent."); *United States v. Childress*, 58 F.3d 693, 707-08 (D.C. Cir. 1995) ("[P]urposeful intent—or 'conscious desire' to achieve a 'result'—is the essence of conspiracy.") (quoting *United States v. Bailey*, 444 U.S. 394, 404 (1980) (cleaned up); *United States v. Ali*, 870 F. Supp. 2d 10, 21 (D.D.C. 2012) ("[T]o prove the particular offenses with which [defendant] is charged, an analysis of his purpose is necessary.") (cleaned up).

Moreover, whereas the Special Counsel's Office falsely alleges that President Trump "erode[d] public faith in the administration of the election," the 2016 Election ICA uses strikingly similar language to attribute the origins of that erosion to foreign influence—that is, foreign efforts to "undermine public faith in the US democratic process." *Compare* Indictment ¶ 2, *with* Ex. A at 1; *see also id.* at 6 (describing "Kremlin-directed campaign to undermine faith in the US Government and fuel political protest"). The Office has argued elsewhere that President Trump "had access to far more information than others in the country," including "the benefit of the full resources of the federal government." Doc. 139 at 8-9. The Office may be correct, but it cannot selectively present intelligence information that supports its narrative while suppressing intelligence that underscores President Trump's good faith. Thus, President Trump is entitled to the detailed information supporting the conclusions in the 2016 Election ICA—including "specific intelligence on key elements of the influence campaign," Ex. A at 1—in order to demonstrate to the jury that he did not create or cause the environment that the prosecution seeks to blame him for. For similar reasons, and because President Trump is entitled to evidence demonstrating that his concerns were genuine based on the steps he took in response to the 2016 Election ICA, the prosecution must disclose the additional materials described in the Classified Supplement.

### III.    Foreign Influence Efforts Relating To The 2020 Election And January 6

President Trump is also entitled to all information relating to foreign influence efforts targeting the 2020 election, including foreign influence relating to events on January 6, whether or not he was briefed contemporaneously regarding these issues.  Doc. 166-1, Ex. B at 4, 8 (Request Nos. 19 & 46(b)).

As with the 2016 Election ICA, efforts by foreign actors to influence public opinion and perceptions is discoverable in light of the prosecution's allegation that President Trump "create[d] an intense national atmosphere of mistrust and anger, and erode[d] public faith in the administration of the [2020] election."  Indictment ¶ 2; *see also id.* ¶ 4 (alleging that the charged conspiracies "built on the widespread mistrust the Defendant was creating").  Moreover, evidence of covert foreign disinformation campaigns relating to the 2020 election supports the defense argument that President Trump and others acted in good faith even if certain reports were ultimately determined to be inaccurate.

Similar to the findings in the 2016 Election ICA, even the unclassified version of the 2020 Election ICA supports these defenses.  For example:

- Russia had "conducted . . . influence operations aimed at . . . undermining public confidence in the electoral process, and exacerbating sociopolitical divisions in the US."

- Iran "carried out a multi-pronged covert influence campaign" in order to, among other objectives, "undermine public confidence in the electoral process and US institutions, and sow division and exacerbate societal tensions in the US."

- "[A] range of additional foreign actors—including Lebanese Hizballah, Cuba, and Venezuela—took some steps to attempt to influence the election."

Ex. A at i.

The January 6 Committee also referenced similar intelligence, which the prosecution has not yet produced, including an "increase in the number of foreign state and non-state entities that

23

attempted to influence the U.S. electorate," and that "disinformation campaigns attempting to undermine the U.S. population's confidence in their government and society."  January 6 Comm. Report at 807.  The January 6 Committee also warned that "[f]oreign state adversaries of the United States generally disguise their efforts to influence U.S. audiences," which supports President Trump's defense that foreign actors caused and contributed to the circumstances at issue in this case.  *Id.* at 810.  These are examples of public summaries of discoverable details of foreign efforts that are favorable to President Trump.  The prosecution must collect and produce all such information.

## IV.     Reports Relied Upon By The Prosecution And Prepared By Its Witnesses

President Trump is entitled to the complete versions of official statements and reports relating to the 2020 election: the 2020 Election CISA Statement, the 2020 Election ICA, and the 2020 Election DOJ-DHS Report.  The Special Counsel's Office should not be permitted to rely upon unclassified summaries of these documents that omit significant details that support President Trump's defense regarding foreign influence and efforts to compromise election infrastructure. The Office must also produce all materials that undercut the conclusions from these documents because the prosecution and its witnesses will no doubt rely upon those conclusions at trial.  *See United States v. Larrahondo*, 885 F. Supp. 2d 209, 218 (D.D.C. 2012) ("[U]nder *Brady*, the government has an obligation to turn over material information that would undermine the evidence it intends to admit at trial."); Local Crim. R. 5.1(b)(4) (requiring that "information to be disclosed" includes "[i]nformation that casts doubt on the credibility or accuracy of any evidence"); Justice Manual § 9-5.002 ("A prosecutor must disclose information that . . . casts a substantial doubt upon the accuracy of any evidence . . . .").

24

### A.  2020 Election CISA Statement

The Special Counsel's Office has adopted the inaccurate claims in the 2020 Election CISA Statement that the 2020 Election was the "most secure in American history."  Indictment ¶ 11(d) (quoting 2020 Election CISA Statement).  The 2020 Election CISA Statement also added the implausible claim—during the SolarWinds SUNBURST attack—that "[t]here is no evidence that any voting system . . . was in any way compromised."  Ex. B.

President Trump will argue at trial that the 2020 Election CISA Statement was part of a partisan effort to provide false assurances to the public that outpaced the government's understanding of the situation.  All information that undercuts the categorical claims in the 2020 Election CISA Statement, including drafts of the Statement that contained narrower language and communications relating to revisions, is favorable to President Trump and material to his defense. *See* Doc. 166-1, Ex. B at 5 (Request No. 29).

### B.  2020 Election ICA

As noted, the Special Counsel's Office has also endorsed selected "Intelligence community[] findings" from the 2020 Election ICA.  Indictment ¶ 11(c).  Information that is inconsistent with the judgments in the ICA relied upon by the Office is favorable to President Trump and therefore discoverable, including information regarding attempted compromises of election infrastructure as well as foreign influence efforts relating to the 2020 election.  *See* Doc. 166-1, Ex. B at 5 (Request No. 30).  For example, information relating to attempted compromises can be used to impeach the 2020 Election CISA Statement and to argue that President Trump and others had greater concerns about the impact of the attempts on the integrity of the election than the witnesses that the prosecution prefers.  Information relating to the SUNBURST attack is also discoverable to impeach anticipated testimony from the former CISA Director, as his subsequent

25

employment by SolarWinds suggests that he had a motive to understand and mislead regarding the impact and risks associated with the attack—including in the 2020 Election CISA Statement.

The Special Counsel's Office must also produce information concerning political bias and related disputes during the drafting of the 2020 Election ICA because President Trump is entitled to rely on that information to impeach the ICA's judgments.  To meet this obligation, the Office must produce (1) all drafts of the 2020 Election ICA; (2) communications regarding drafting and revisions; (3) all information and materials relating to Dr. Zulauf's conclusions, including evidence of efforts by "CIA Management" to "'pressur[e]" analysts and "suppress" reporting," Ex. E at 7; *see also, e.g., id.* at 4 (referencing classified materials); and (4) the additional materials discussed in the Classified Supplement.

### C.  2020 Election DOJ-DHS Report

President Trump seeks the complete, classified version of the 2020 Election DOJ-DHS Report and all source materials.  Doc. 166-1, Ex. B at 5 (Request No. 31).  While the prosecution's theory rests in part on the Report's heavily caveated "no evidence" finding in the public "declassified overview," even that summary acknowledges "[b]road Russian and Iranian campaigns" that "did compromise the security of several networks that managed some election functions."  Ex. H at 2.  The defense is entitled to those details, as "compromise[s]" of "election functions" supports President Trump's defense that he had good-faith concerns about the integrity of the election.  In addition, like the 2016 and 2020 Election ICAs, the "declassified overview" of the 2020 Election DOJ-DHS Report noted that Iran had "sought to undermine the public's confidence in US election infrastructure," which is in tension with the indictment's allegations regarding the atmosphere around the election.

Also, like the ICAs, the public overview of the 2020 Election DOJ-DHS Report reflects subjective judgment calls that President Trump is entitled to test through access to the complete document and its supporting materials.  First, the Report acknowledged "several incidents" that "materially impacted the security of networks associated with or pertaining to US political organizations, candidates, and campaigns during 2020 federal elections."  Ex. H at 2.   The overview concluded, however, that Intelligence Community "assesse[d]" that it was "unclear" whether the activities were "election-specific operations."  *Id*.  Second, the overview referred to "public claims that one or more foreign governments" had taken steps to "manipulate[] vote counts."  *Id*.  Here, the report stated that DOJ and DHS "determined" that these reports were "not credible."  *Id.*  President Trump was not obligated to credit these assessments and determinations at the time, nor must he do so at trial.  The defense must be permitted to draw attention to good-faith, non-criminal disagreements regarding the purported conclusions that the Special Counsel's Office seeks to present as infallible.  In order to do so, President Trump requires access to details regarding these conclusions.

## V.   Evidence Relating to Infrastructure Compromises, Voting Fraud, And Irregularities

President Trump is entitled to all information supporting his position that his concerns regarding fraud during the 2020 election—rather than "knowingly false" or criminal, *e.g.*, Indictment ¶ 10(a)—were plausible and maintained in good faith.

For example, the Special Counsel's Office must produce details regarding the evolving assessments of the impact of the SolarWinds "SUNBURST" attack that was made public just after the 2020 election.  *See* Doc. 166-1, Ex. B at 2 (Request No. 8(b)).  In November 2020, as CISA and others expressed complete-yet-unfounded confidence through the 2020 Election CISA Statement, a SolarWinds employee wrote, "'Can't really figure out how to unf**k this situation.'"

Ex. C ¶ 8(j).  In December 2020, the "situation" caused CISA to declare that customers were "currently being exploited."  Ex. D.  In January 2021, CISA warned that "state" and "local" governments, as well as "critical infrastructure entities" and others, faced a "grave risk."[10]  CISA's reference to "critical infrastructure" was telling, as that term includes "the infrastructure used to administer the Nation's elections."[11]  The SUNBURST attack has reportedly been attributed to the SVR, one of the Russian intelligence agencies that also participated in the exculpatory foreign influence operations described in several reports relating to the 2020 election.  Finally, just last month, the SEC alleged that SolarWinds defrauded the public regarding its cybersecurity practices and the impact of the attack.  Based on the foregoing, information relating to the attack is favorable to President Trump because it supports the argument that there were reasonable concerns about the integrity of the 2020 election and the possibility of technical penetrations of election infrastructure.

However, the SolarWinds compromise is not the only basis for those concerns.  The Special Counsel's Office should be required to produce information relating to the additional similar issues identified by President Trump, including any other threats that posed "risk to elections information housed on [U.S. state, local, territorial, and tribal] networks," Doc. 166-1, Ex. B at 2 (Request No. 8(d)); involved "targeting U.S. state websites," "to include election websites," *id.* at 3 (Request

---

[10] Advisory, Cybersecurity & Infrastructure Security Agency, Advanced Persistent Threat Compromise of Government Agencies, Critical Infrastructure, and Private Sector Organizations (updated Apr. 15, 2021), https://www.cisa.gov/news-events/cybersecurity-advisories/aa20-352a; *see also* Press Release, FBI, Joint Statement by the Federal Bureau of Investigation (FBI), the Cybersecurity and Infrastructure Security Agency (CISA), and the Office of the Director of National Intelligence (ODNI) (Dec. 16, 2020), https://www.fbi.gov/news/press-releases/joint-statement-by-the-federal-bureau-of-investigation-fbi-the-cybersecurity-and-infrastructure-security-agency-cisa-and-the-office-of-the-director-of-national-intelligence-odni.

[11] Cybersecurity & Infrastructure Security Agency, #Protect2020 Strategic Plan, at 4 (Feb. 2020), https://www.cisa.gov/sites/default/files/publications/ESI%2520Strategic%2520Plan_FINAL%25202.7.20%2520508.pdf.

No. 8(e)); and information relating to abuses of equipment from Dominion Voting Systems, *id.* at 2 (Request No. 8(c)).  *See generally id.* at 3 (Request No. 8(i)).

## VI.    ODNI Materials Relating To The DNI's Briefing Of "Co-Conspirator 4"

Anticipated testimony from the DNI regarding his classified briefing to "Co-Conspirator 4" on January 2, 2021, and related communications with President Trump and others is central to the prosecution's case.  *See* Indictment ¶ 11(c) (alleging that the DNI "disabused the Defendant of the notion that the Intelligence Community's findings regarding foreign interference would change the outcome of the election"); *id.* ¶¶ 78-85.  For example, the Special Counsel's Office claims inaccurately that, on the next "morning," Co-Conspirator 4 had "no additional evidence of election fraud."  *Id.* ¶ 79.  The DNI's classified briefing has obvious relevance to that false allegation and the related revisions by Co-Conspirator 4 to his "draft letter."  *Id.*

During an interview by the Special Counsel's Office and related grand jury testimony, the DNI indicated that he had prepared by reviewing materials maintained by his former employer, the Office of the Director of National Intelligence.  Particularly in light of the importance of the DNI's testimony, the Office must collect and produce all such materials and—as for all prosecution witnesses—all classified communications relating to the subject matter of their testimony.  *See* Doc. 166-1, Ex. B at 6 (Request No. 32).

## VII.   *Giglio* Material Relating To Mike Pence's Mishandling Of Classified Information

President Trump seeks evidence relating to unauthorized retention of classified documents by Vice President Mike Pence.  *See* Doc. 166-1, Ex. B at 5 (Request No. 28).  Under *Brady* and *Giglio*, the Special Counsel's Office has an obligation to collect and produce this impeachment information bearing on Pence's credibility and bias, and the Office is currently in violation of its obligation to do so "as soon as reasonably possible."  Local Crim. R. 5.1(a).

In January 2023, Vice President Pence reportedly turned over at least a "dozen" documents bearing classification markings.[12]   In February 2023, the FBI found at least one additional classified document at Vice President Pence's home in Indiana in connection with a search that was "described as consensual after negotiations between Pence's representatives and the Justice Department."[13]  DOJ's National Security Division, which also participated in the investigation of President Trump, reviewed the documents in question.   In June 2023, the National Security Division "informed Pence's attorney that it had closed its investigation and that based on the 'results' of that probe, no charges will be filed against the former vice president."[14]

The potential criminal charges faced by Vice President Pence gave him an incentive to curry favor with authorities by providing information that is consistent with the Biden Administration's preferred, and false, narrative regarding this case.   *See United States v. Larrahondo*, 885 F. Supp. 2d 209, 218 (D.D.C. 2012) ("If the government has information that indicates, as [defendant] suggests, that [a witness] had a motive to implicate [defendant] in a crime, that sort of information would seem to qualify as *Brady* material if the government will introduce inculpatory statements from [witness] at trial."); *see also* Justice Manual § 9-5.002 (reasoning that "known conditions that could affect the witness's bias" include "uncharged criminal conduct (that may provide an incentive to curry favor with a prosecutor)").   Accordingly, the Special Counsel's

---

[12] Katerine Faulders, et al., *Classified documents found at Mike Pence's home and turned over to DOJ: Lawyer*, ABC NEWS (Jan. 24, 2023, 6:57 pm), https://abcnews.go.com/Politics/classified-documents-found-mike-pences-home-turned-doj/story?id=96637301.

[13] Jill Colvin and Eric Tucker, *New Classified Document Found in FBI Search of Pence Home*, AP NEWS (Feb. 10, 2023, 6:58 pm), https://apnews.com/article/politics-michael-pence-classified-documents-indiana-7b3bfba7cdd8d9d8fd828045ab3208e6.

[14] Laura Jarrett, *DOJ Closes Pence Classified Documents Investigation with no Charges*, NBC NEWS (June 2, 2023, 10:30 am), https://www.nbcnews.com/politics/doj-closes-pence-classified-documents-investigation-no-charges-rcna87396.

Office must collect and disclose information maintained by the National Security Division and the FBI related to the Pence investigation, the "negotiations" relating to the FBI's search, and the decision not to bring charges.

## VIII.    Evidence Of Bias And Investigative Misconduct

The prosecution's *Brady* obligation also includes information that can be used to "attack[] the reliability of the investigation" and argue that it was "shoddy." *Kyles v. Whitley*, 514 U.S. 419, 442 n.13, 446 (1995); *United States v. Bagcho*, 151 F. Supp. 3d 60, 70 (D.D.C. 2015) ("Impeachment evidence can be damaging when it allows defense counsel to attack the reliability of an investigation."); *United States v. Quinn*, 537 F. Supp. 2d 99, 116 (D.D.C. 2008) (holding that *Brady* required disclosure of evidence that would support a "pointed attack on the government's investigation" and "uncritical reliance" on an informant); *Lindsey v. King*, 769 F.2d 1034, 1042 (5th Cir. 1985) (holding that *Brady* required disclosure of evidence that could be used in "discrediting, in some degree, of the police methods employed in assembling the case against him"). In order to prevent President Trump from being "robbed of the opportunity to attack the thoroughness and good faith of the government's investigation," the Court should compel the Special Counsel's Office to disclose the following information and all other instances of policy violations and/or misconduct during investigations relating to the 2020 election and January 6. *Quinn*, 537 F. Supp. 2d at 115.

### A.  Coordination With The Biden Administration

Communications regarding these investigations by members, relatives, or associates of the Biden Administration are discoverable because they support President Trump's defense regarding the politically motivated nature of the prosecution. *See* Doc. 166-1, Ex. B at 7 (Request No. 43); *Bowen v. Maynard*, 799 F.2d 593, 613 (10th Cir. 1986) ("A common trial tactic of defense lawyers

31

is to discredit the caliber of the investigation *or the decision to charge the defendant*, and we may consider such use in assessing a possible *Brady* violation." (emphasis added)).

**B.  FISA Abuses**

President Trump is entitled to evidence demonstrating that the FBI violated procedures relating to the Foreign Intelligence Surveillance Act ("FISA") in connection with investigations relating to this case.  *See* Doc. 166-1, Ex. B at 6 (Request No. 33).

In April 2022, the Foreign Intelligence Surveillance Court ("FISC") issued an opinion describing "significant violations of the [FISA § 702] querying standard, including several relating to the January 6, 2021 breach of the U.S. Capitol."  Ex. I at 28.  Information relating to these violations is discoverable because it can be used to impeach the integrity of the investigation under *Kyles* and related authorities in this District.  In addition, the FISC's opinion indicates that FBI personnel executed some of the queries to identify "possible foreign influence," "foreign ties" and activities "at the direction of a foreign power."  *Id.* at 28-29.  For the reasons already discussed, evidence that agents or analysts queried FISA databases because they suspected that the events of January 6 were influenced by foreign actors is favorable to President Trump because it suggests that, prior to this case, the government did not believe he was "responsible" for incidents on that day.

**C.  Other Investigative Misconduct**

For similar reasons, evidence relating to bias and other investigative misconduct is exculpatory and must be produced.  This includes:

- Information relating to the "conflicting views" at DOJ in mid-2021 regarding "whether to pursue people in [President] Trump's orbit," which "reached the deputy attorney general's office."  Doc. 116-1 at 7; Doc. 166-1, Ex. B at 4 (Request No. 10).

- Communications reflecting political bias or motivation relating to President Trump or the investigations that led to this case, including all documents and communications relating to the "policy disagreement" between DOJ leadership and the Public Integrity Section between November 2020 and March 2021. *See* Doc. Doc. 166-1, Ex. B at 4, 8 (Request Nos. 10-12, 55).

- Documents reflecting efforts or proposals by members of the prosecution team to target President Trump, his associates, uncharged co-conspirators, or people present at the Capitol on January 6 based on First-Amendment protected activities, including Cooney's February 2021 proposal, Doc. 116-1 at 5, and Windom's "eerily similar" plan later in 2021, *id.* at 9. Doc. 166-1, Ex. B at 4 (Request No. 10).

- Documents from 2021 relating to the decision by SASC Windom to "discreetly inquire" if the United States Postal Inspection Service would pursue a grand jury investigation that the FBI rejected. *See* Doc. 116-1 at 9; Doc. 166-1, Ex. B at 7 (Request No. 38).

- Documents relating to violations of DOJ policy and applicable ethics rules in connection with Sherwin's March 2021 *60 Minutes* interview, which reflected political bias against President Trump. *See* Doc. 116-1 at 9; Doc. 166-1, Ex. B at 7 (Request No. 40).

- Documents and communications from 2021 reflecting contact between Heaphy and prosecutors or investigators—"private[]" or otherwise—regarding the status of the Select Committee's investigation, which support President Trump's defense that DOJ's decision to target him was politically motivated. *See* Doc. 116-1 at 6-7; Doc. 166-1, Ex. B at 7 (Request No. 38).

The Special Counsel's Office has represented that it has "proceeded consistently with the Justice Manual." Doc. 166-1, Ex. E at 5. Based on Justice Manual § 9-5.002, the Supreme Court's guidance in *Kyles* regarding the discoverability of evidence for use in impeaching the investigation, and the "affirmative duty" to search for exculpatory evidence, *United States v. Safavian*, 233 F.R.D. 12, 17 (D.D.C. 2005), the Office must review case files—including substantive case-related communications—maintained by all members of the prosecution team and disclose these types of evidence.

## **CONCLUSION**

For the foregoing reasons, President Trump respectfully submits that the Court should compel the Special Counsel's Office to disclose the above-described documents and information. In the alternative, the Court should hold a hearing, classified as necessary, to address any factual disputes relating to these issues.

Dated: November 27, 2023

Respectfully submitted,

*/s/ Todd Blanche*

John F. Lauro, Esq.
D.C. Bar No. 392830
jlauro@laurosinger.com
Gregory M. Singer, Esq. (PHV)
gsinger@laurosinger.com
LAURO & SINGER
400 N. Tampa St., 15th Floor
Tampa, FL 33602
(813) 222-8990

Todd Blanche, Esq. (PHV)
ToddBlanche@blanchelaw.com
Emil Bove, Esq. (PHV)
Emil.Bove@blanchelaw.com
BLANCHE LAW PLLC
99 Wall St., Suite 4460
New York, NY 10005
(212) 716-1250

*Counsel for President Donald J. Trump*