### UNITED STATES DISTRICT COURT
### FOR THE DISTRICT OF COLUMBIA

<table>
<tr><td>

**UNITED STATES OF AMERICA**,

v.

**DONALD J. TRUMP**,

Defendant.

</td><td>

Criminal Action No. 23-257 (TSC)

</td></tr>
</table>

### <u>MEMORANDUM OPINION</u>

The United States has charged former President Donald J. Trump with four counts of criminal conduct that he allegedly committed during the waning days of his Presidency.  *See* Indictment, ECF No. 1.  He has moved to dismiss the charges against him based on Presidential immunity, ECF No. 74 ("Immunity Motion"), and on constitutional grounds, ECF No. 113 ("Constitutional Motion").[1]  For the reasons set forth below, the court will DENY both motions.

### I.    BACKGROUND

At the motion to dismiss stage, the court assumes the truth of the Indictment's allegations.  *See, e.g.*, *United States v. Weeks*, 636 F. Supp. 3d 117, 120 (D.D.C. 2022).  Defendant contends that the charges in the Indictment are based on his "public statements and tweets about the federal election and certification," "communications with the U.S. Department of Justice about investigating elections crimes and possibly appointing a new Acting Attorney

---

[1] Defendant has also moved to dismiss based on statutory grounds, ECF No. 114, and for selective and vindictive prosecution, ECF No. 116.  The court will address those motions separately.  The Supreme Court has "repeatedly . . . stressed the importance of resolving immunity questions at the earliest possible stage in litigation."  *Hunter v. Bryant*, 502 U.S. 224, 227 (1991) (citations omitted).  The court therefore rules first on the Immunity Motion and the Constitutional Motion—in which Defendant asserts "constitutional immunity from double jeopardy," *United States v. Scott*, 464 F.2d 832, 833 (D.C. Cir. 1972).

General," "communications with state officials about the federal election and the exercise of their official duties with respect to the election," "communications with the Vice President and Members of Congress about the exercise of their official duties in the election-certification proceedings," and "organizing slates of electors as part of the attempt to convince legislators not to certify the election against defendant."  Immunity Motion at 3–8 (formatting modified). Those generalized descriptions fail to properly portray the conduct with which he has been charged.  Accordingly, the court will briefly review the central allegations as set forth in the Indictment.

Defendant "was the forty-fifth President of the United States and a candidate for re-election in 2020."  Indictment ¶ 1.  "Despite having lost" that election, he "was determined to remain in power," so "for more than two months following election day on November 3, 2020, the Defendant spread lies that there had been outcome-determinative fraud in the election and that he had actually won."  *Id.* ¶ 2.  He "knew that [those claims] were false," but "repeatedly and widely disseminated them anyway—to make his knowingly false claims appear legitimate, create an intense national atmosphere of mistrust and anger, and erode public faith in the administration of the election."  *Id.*; *see id.* ¶ 12 (listing six such claims).  "In fact, the Defendant was notified repeatedly that his claims were untrue—often by the people on whom he relied for candid advice on important matters, and who were best positioned to know the facts and he deliberately disregarded the truth."  *Id.* ¶ 11.  Those people included the Vice President, "senior leaders of the Justice Department," the Director of National Intelligence, the Department of Homeland Security's Cybersecurity and Infrastructure Security Agency, "Senior White House attorneys," "Senior staffers on the Defendant's 2020 re-election campaign," state legislators and officials, and state and federal judges.  *Id.*

"Defendant also pursued unlawful means of discounting legitimate votes and subverting the election results." *Id.* ¶ 4. Specifically, he "targeted a bedrock function of the United States federal government: the nation's process of collecting, counting, and certifying the results of the presidential election." *Id.* The Indictment describes that process:

> The Constitution provided that individuals called electors select the president, and that each state determine for itself how to appoint the electors apportioned to it. Through state laws, each of the fifty states and the District of Columbia chose to select their electors based on the popular vote in the state. After election day, the [Electoral Count Act ("ECA")] required each state to formally determine—or 'ascertain'—the electors who would represent the state's voters by casting electoral votes on behalf of the candidate who had won the popular vote, and required the executive of each state to certify to the federal government the identities of those electors. Then, on a date set by the ECA, each state's ascertained electors were required to meet and collect the results of the presidential election—that is, to cast electoral votes based on their state's popular vote, and to send their electoral votes, along with the state executive's certification that they were the state's legitimate electors, to the United States Congress to be counted and certified in an official proceeding. Finally, the Constitution and ECA required that on the sixth of January following election day, the Congress meet in a Joint Session for a certification proceeding, presided over by the Vice President as President of the Senate, to count the electoral votes, resolve any objections, and announce the result—thus certifying the winner of the presidential election as president-elect.

*Id.* ¶ 9.

Defendant, along with at least six co-conspirators, *id.* ¶ 8, undertook efforts "to impair, obstruct, and defeat [that process] through dishonesty, fraud, and deceit," *id.* ¶ 10. Those efforts took five alleged forms:

*First*, they "used knowingly false claims of election fraud to get state legislators and election officials to subvert the legitimate election results and change electoral votes for the Defendant's opponent, Joseph R. Biden, Jr., to electoral votes for the Defendant." *Id.* ¶ 10(a). "That is, on the pretext of baseless fraud claims, the Defendant pushed officials in certain states to ignore the popular vote; disenfranchise millions of voters; dismiss legitimate electors; and

ultimately, cause the ascertainment of and voting by illegitimate electors in favor of the Defendant." *Id.*; *see id.* ¶¶ 13–52.

*Second*, they "organized fraudulent slates of electors in seven targeted states (Arizona, Georgia, Michigan, Nevada, New Mexico, Pennsylvania, and Wisconsin), attempting to mimic the procedures that the legitimate electors were supposed to follow under the Constitution and other federal and state laws." *Id.* ¶ 10(b). "This included causing the fraudulent electors to meet on the day appointed by federal law on which legitimate electors were to gather and cast their votes; cast fraudulent votes for the Defendant; and sign certificates falsely representing that they were legitimate electors." *Id.*; *see id.* ¶¶ 53–69. They "then caused these fraudulent electors to transmit their false certificates to the Vice President and other government officials to be counted at the certification proceeding on January 6," 2021. *Id.* ¶ 10(b); *see id.* ¶¶ 53–69.

*Third*, they "attempted to use the power and authority of the Justice Department to conduct sham election crime investigations and to send a letter to the targeted states that falsely claimed that the Justice Department had identified significant concerns that may have impacted the election outcome; that sought to advance the Defendant's fraudulent elector plan by using the Justice Department's authority to falsely present the fraudulent electors as a valid alternative to the legitimate electors; and that urged, on behalf of the Justice Department, the targeted states' legislatures to convene to create the opportunity to choose the fraudulent electors over the legitimate electors." *Id.* ¶ 10(c); *see id.* ¶¶ 70–85.

*Fourth*, "using knowingly false claims of election fraud," they "attempted to convince the Vice President to use the Defendant's fraudulent electors, reject legitimate electoral votes, or send legitimate electoral votes to state legislatures for review rather than counting them." *Id.* ¶ 10(d). "When that failed, on the morning of January 6," they "repeated knowingly false claims

of election fraud to gathered supporters, falsely told them that the Vice President had the authority to and might alter the election results, and directed them to the Capitol to obstruct the certification proceeding and exert pressure on the Vice President to take the fraudulent actions he had previously refused." *Id.*; *see id.* ¶¶ 86–105.

 *Fifth*, "on the afternoon of January 6," once "a large and angry crowd—including many individuals whom the Defendant had deceived into believing the Vice President could and might change the election results—violently attacked the Capitol and halted the proceeding," they "exploited the disruption by redoubling efforts to levy false claims of election fraud and convince members of Congress to further delay the certification based on those claims." *Id.* ¶ 10(e); *see id.* ¶¶ 106–124.

 Based on this conduct, the Indictment charges Defendant with four counts: Conspiracy to Defraud the United States, in violation of 18 U.S.C. § 371, *id.* ¶ 6; Conspiracy to Obstruct an Official Proceeding, in violation of 18 U.S.C. § 1512(k), *id.* ¶ 126; Obstruction of, and Attempt to Obstruct, an Official Proceeding, in violation of 18 U.S.C. §§ 1512(c)(2), 2, *id.* ¶ 128; and Conspiracy Against Rights, in violation of 18 U.S.C. § 241, *id.* ¶ 130.

## II. LEGAL STANDARD

 A criminal defendant may move to dismiss based on a "defect in the indictment," such as a "failure to state an offense." Fed. R. Crim. P. 12(b)(3)(B)(v).  That motion may be based—as it is here—on constitutional challenges to the prosecution, including the assertion of immunity. *See, e.g.*, *United States v. Stone*, 394 F. Supp. 3d 1, 8 (D.D.C. 2019).  "Because a court's use of its supervisory power to dismiss an indictment directly encroaches upon the fundamental role of the grand jury, dismissal is granted only in unusual circumstances." *United States v. Fischer*, 64 F.4th 329, 334–35 (D.C. Cir. 2023) (formatting modified).

### III.    EXECUTIVE IMMUNITY

Defendant contends that the Constitution grants him "absolute immunity from criminal prosecution for actions performed within the 'outer perimeter' of his official responsibility" while he served as President of the United States, so long as he was not both impeached and convicted for those actions.  Immunity Motion at 8, 11–13 (formatting modified).  The Constitution's text, structure, and history do not support that contention.  No court—or any other branch of government—has ever accepted it.  And this court will not so hold.  Whatever immunities a sitting President may enjoy, the United States has only one Chief Executive at a time, and that position does not confer a lifelong "get-out-of-jail-free" pass.  Former Presidents enjoy no special conditions on their federal criminal liability.  Defendant may be subject to federal investigation, indictment, prosecution, conviction, and punishment for any criminal acts undertaken while in office.

### A.  <u>Text</u>

In interpreting the Constitution, courts ordinarily "begin with its text," *City of Boerne v. Flores*, 521 U.S. 507, 519 (1997), but there is no provision in the Constitution conferring the immunity that Defendant claims.  The Supreme Court has already noted "the absence of explicit constitutional . . . guidance" on whether a President possesses any immunity.  *Nixon v. Fitzgerald*, 457 U.S. 731, 747 (1982) ("*Fitzgerald*"); *see also United States v. Nixon*, 418 U.S. 683, 705–06 n.16 (1974) ("*Nixon*") (observing "the silence of the Constitution" regarding a President's immunity from criminal subpoenas).  The Executive Branch has likewise recognized that "the Constitution provides no explicit immunity from criminal sanctions for any civil officer," including the current President.  *A Sitting President's Amenability to Indictment and Criminal Prosecution*, 24 U.S. Op. Off. Legal Counsel 222, 2000 WL 33711291, at *9 (2000) ("OLC Immunity Memo") (quoting Memorandum for the United States Concerning the Vice

President's Claim of Constitutional Immunity at 4 (filed Oct. 5, 1973), *In re Proceedings of the Grand Jury Impaneled December 5, 1972: Application of Spiro T. Agnew, Vice President of the United States* (D. Md. 1973) (No. 73-965) ("1973 SG Memo"), *available at* 27 Hofstra L. Rev. 677, 775–97 (Appendix)) (alterations adopted).  There is no "Presidential Immunity" Clause.

The lack of constitutional text is no accident; the Framers explicitly created immunity for other officials.  The Constitution's Speech and Debate Clause provides that "Senators and Representatives . . . shall in all Cases, except Treason, Felony and Breach of the Peace, be privileged from Arrest during their Attendance at the Session of their respective Houses, and in going to and returning from the same; and for any Speech or Debate in either House, they shall not be questioned in any other Place."  U.S. Const. art. I, § 6, cl. 1.  And some Founding-Era state constitutions, like those of Virginia and Delaware, unequivocally protected their Governor from certain penal sanctions, at least until "he [was] out of office."  Saikrishna Bangalore Prakash, *Prosecuting and Punishing Our Presidents*, 100 Tex. L. Rev. 55, 69 (2021) (quoting Va. Const. of 1776, art. XVI); *accord id.* at 69–70 (quoting Del. Const. of 1776, art. XXIII).  The U.S. Constitution contains no equivalent protections for the President.

Nor is the Constitution silent on the question because its drafters and ratifiers assumed the President would enjoy the immunity Defendant claims.  To the contrary, America's founding generation envisioned a Chief Executive wholly different from the unaccountable, almost omnipotent rulers of other nations at that time.  In Federalist No. 69—titled "The Real Character of the Executive"—Alexander Hamilton emphasized the "total dissimilitude between [the President] and the king of Great Britain," the latter being "sacred and inviolable" in that "there is no constitutional tribunal to which he is amenable; no punishment to which he can be subjected." *The Federalist Papers by Alexander Hamilton, James Madison and John Jay* 348–49 (Garry

Wills ed. 1982).[2]  Hamilton's contemporary commentators universally affirmed the crucial

distinction that the President would at some point be subject to criminal process.  *See* Prakash,

100 Tex. L. Rev. at 71–75 (collecting commentary); Response, Brian C. Kalt, *Criminal Immunity*

*and Schrödinger's President: A Response to* Prosecuting and Punishing Our Presidents, 100 Tex.

L. Rev. Online 79, 83–85 (2021) (acknowledging Founding-Era consensus that Presidents would

lack absolute criminal immunity, but noting that most commentary was ambiguous about

whether prosecution could occur during Presidency, or only after).  That widely acknowledged

contrast between the President and a king is even more compelling for a former President.  The

Constitution's silence on former Presidents' criminal immunity thus does not reflect an

understanding that such immunity existed.

Lacking an express constitutional provision, Defendant hangs his textual argument for

immunity on the Impeachment Judgment Clause, but it cannot bear the weight he places on it.

The Clause provides:

> Judgment in Cases of Impeachment shall not extend further than to removal from
> Office, and disqualification to hold and enjoy any Office of honor, Trust or Profit
> under the United States: but the Party convicted shall nevertheless be liable and
> subject to Indictment, Trial, Judgment and Punishment, according to Law.

U.S. Const. art. I, § 3, cl. 7.  From this language, Defendant concludes "that the President may be

charged by indictment only in cases where the President has been impeached and convicted by

trial in the Senate."  Immunity Motion at 11.  But Defendant is not President, and reading the

Clause to grant absolute criminal immunity to former Presidents would contravene its plain

meaning, original understanding, and common sense.

---

[2] All subsequent citations to the Federalist Papers refer to this edition, and the Papers are also
available online at https://avalon.law.yale.edu/subject_menus/fed.asp.

The Clause has two parts.  The first limits the penalties of impeachment to removal and disqualification from office.  That limit marked a deliberate departure from the prevailing British tradition, in which an impeachment conviction "might result in a wide array of criminal penalties, including fines, imprisonment, and even execution."  *Whether A Former President May Be Indicted and Tried for the Same Offenses for Which He Was Impeached by the House and Acquitted by the Senate*, 24 U.S. Op. Off. Legal Counsel 110, 2000 WL 33711290, at *7 (2000) ("OLC Double Jeopardy Memo") (citing 2 Joseph Story, *Commentaries on the Constitution of the United States* 251–2 (1833; reprint 1994) ("*Story's Commentaries*"); 2 Richard Wooddeson, *A Systematical View of the Laws of England* 611–14 (1792); Raoul Berger, *Impeachment: The Constitutional Problems* 67 (1974)).  The second part of the Clause provides, however, that impeachment's limits do not preclude "the Party convicted" from later criminal prosecution in the courts—*i.e.*, that "further punishment[] . . . would still be available but simply not to the legislature."  *Id.* at *10.

Both parts of the Clause undercut Defendant's interpretation of it.  The first begins by defining the Clause's scope: "Judgment in Cases of Impeachment," indicating that the Clause is aimed primarily at identifying the permissible penalties associated with impeachment itself.  The Clause's second part confirms that purview.  Rather than stating that "the Party convicted shall *only then* be liable" to criminal prosecution, the Clause states that "the Party convicted shall *nevertheless* be liable."  U.S. Const. art. I, § 3, cl. 7 (emphasis added).  At the Founding, as now, "nevertheless" meant "notwithstanding that," and "notwithstanding that" meant "[w]ithout hindrance or obstruction from."  *Neverthele'ss*, Samuel Johnson, *A Dictionary Of The English Language* (1978) (4th ed. 1773), *available at* https://perma.cc/ST8E-RCMB; *id.*, *Notwithsta'nding*, *available at* https://perma.cc/A9ML-QK4Y.  In the Impeachment Judgment

Clause, the word "nevertheless" in the second part thus signifies that the first part—constraining impeachment's penalties—does not bear on whether the Party would also be subject to criminal prosecution.  *See* OLC Immunity Memo at *2 (citing *Amenability of the President, Vice President and other Civil Officers to Federal Criminal Prosecution while in Office* (1973) ("1973 OLC Memo"), *available at* https://perma.cc/DM28-LHT9).  As discussed at greater length below, the Clause's manifest purpose—and originally understood effect—was therefore "to permit criminal prosecution in spite of the prior adjudication by the Senate, *i.e.*, to forestall a double jeopardy argument."  *Id.* (citation omitted); *see infra* Section V.B.  That is quite different from establishing impeachment and conviction as a prerequisite to a former President's criminal prosecution.

The historical sources that Defendant cites do not move the needle.  First, he quotes Alexander Hamilton's twin statements in *The Federalist* that the "President of the United States would be liable to be impeached, tried, and, upon conviction of treason, bribery, or other high crimes or misdemeanors, removed from office; and would afterwards be liable to prosecution and punishment in the ordinary course of law," Federalist No. 69 at 348, and that the President would be "at all times liable to impeachment, trial, dismission from office, incapacity to serve in any other, and to forfeiture of life and estate by subsequent prosecution in the common course of law,"  Federalist No. 77 at 392.  Immunity Motion at 12.  But those statements merely echo the Clause's clarification that prosecution *may* follow impeachment; they do not say that those events *must* happen in that order.  Second, Defendant cites Founding Father James Wilson's remark during the ratification debates that the President "is amenable to [the laws] in his private character as a citizen, and in his public character by impeachment." J. Elliot, *Debates on The Federal Constitution* 480 (2d ed. 1863).  But Wilson was describing a President in office, *see id.*,

and that description is entirely consistent with a former President—having returned to life "as a citizen"—being subject to criminal prosecution.  There is no evidence that any of the Constitution's drafters or ratifiers intended or understood former Presidents to be criminally immune unless they had been impeached and convicted, much less a widespread consensus that the Impeachment Judgment Clause would have that effect.

In addition to lacking textual or historical support, Defendant's interpretation of the Clause collapses under the application of common sense.  For one, his reasoning is based on the logical fallacy of "denying the antecedent."  *See, e.g.*, *New LifeCare Hosps. of N.C. LLC v. Azar*, 466 F. Supp. 3d 124, 136 n.7 (D.D.C. 2020).  From the statement "if the animal is a cat, it can be a pet," it does not follow that "if the animal is not a cat, it cannot be a pet."  Yet Defendant argues that because a President who is impeached and convicted may be subject to criminal prosecution, "a President who is *not* convicted may *not* be subject to criminal prosecution."  Immunity Motion at 11.  Even assuming that negative implication finds some traction when applied to sitting Presidents, *see, e.g.*, *Trump v. Vance*, 140 S. Ct. 2412, 2444–45 (2020) (Alito, J., dissenting) (discussing that implication); *but see* OLC Immunity Memo at *2–3 (restating the 1973 OLC Memo's rejection of the implication); *see also infra* Section V.B (discussing the implication for double jeopardy purposes), the logic certainly does not hold for former Presidents.  That is because there is another way, besides impeachment and conviction, for a President to be removed from office and thus subjected to "the ordinary course of law," Federalist No. 69 at 348:  As in Defendant's case, he may be voted out.  The President "shall hold his Office during the Term of four Years."  U.S. Const. art. II, § 1, cl. 1.  Without reelection, the expiration of that term ends a Presidency as surely as impeachment and conviction.  *See United States v. Burr*, 25 F. Cas. 30, 34 (C.C.D. Va. 1807) (Marshall, Circuit

Justice) ("[T]he president is elected from the mass of the people, and, on the expiration of the time for which he is elected, returns to the mass of the people again.").  Nothing in the Impeachment Judgment Clause prevents criminal prosecution thereafter.

Defendant's reading of the Impeachment Judgment Clause also proves too much.  If the Clause required impeachment and conviction to precede criminal prosecution, then that requirement would apply not only to the President, but also to the "Vice President and all civil Officers of the United States"—who may likewise be impeached.  U.S. Const. art. II, § 4.  "The constitutional practice since the Founding, however, has been to prosecute and even imprison civil officers other than the President . . . prior to their impeachment."  OLC Immunity Memo at *2 (citing 1973 OLC Memo at 4–7 (collecting sources)).  For instance, then-Vice President Aaron Burr was indicted without being impeached, *see* 1973 SG Memo at 12, and the same fate might have befallen Vice President Spiro Agnew had he not resigned and entered a *nolo contendere* plea, *see United States v. Agnew*, 428 F. Supp. 1293, 1293 (D. Md. 1977).  Not only would Defendant's interpretation contradict that long-settled practice, it would also introduce significant "complications into criminal proceedings" for all current and former federal officials, including "threshold constitutional questions" of "whether the suspect is or was an officer of the United States," and "whether the offense is one for which he could be impeached."  OLC Immunity Memo at *3 (citing 1973 OLC Memo at 7).  The clash with historical practice and difficulties in application that would flow from Defendant's interpretation further confirm that it cannot be the correct reading of the Clause.

Finally, Defendant's interpretation of the Impeachment Judgment Clause would produce implausibly perverse results.  The Constitution permits impeachment and conviction for a limited category of offenses: "Treason, Bribery, or other high Crimes and Misdemeanors."  U.S. Const.

art. II, § 4.  Under Defendant's reading, if a President commits a crime that does not fall within that limited category, and so could not be impeached and convicted, the President could never be prosecuted for that crime.  Alternatively, if Congress does not have the opportunity to impeach or convict a sitting President—perhaps because the crime occurred near the end of their term, or is covered up until after the President has left office—the former President similarly could not be prosecuted.  Defendant seems to suggest that this scenario, in which the former President would be utterly unaccountable for their crimes, is simply the price we pay for the separation of powers. *See* Reply in Support of Immunity Motion, ECF No. 122, at 6 (quoting *Morrison v. Olson*, 487 U.S. 654, 710 (1988) (Scalia, J., dissenting) ("While the separation of powers may prevent us from righting every wrong, it does so in order to ensure that we do not lose liberty.")).[3]  That cannot be the Clause's meaning.  The constitutional limits on impeachment's penalties do not license a President's criminal impunity.

In sum, nothing in the Constitution's text supplies the immunity that Defendant claims. To be sure, "a specific textual basis has not been considered a prerequisite to the recognition of immunity," and so the inquiry is not confined to the express terms of our founding charter. *Fitzgerald*, 457 U.S. at 750 n.31.  But the lack of supporting constitutional text does mean that a former President's federal criminal immunity, if it exists, must arise entirely from "concerns of public policy, especially as illuminated by our history and the structure of our government."  *Id.* at 747–48.  Defendant's resort to those principles fares no better.

---

[3] Even assuming that former as well as sitting Presidents may be impeached, this hypothetical would still produce problematic results.  Congress could enable a former President's criminal prosecution by impeaching them after they have left office.  But it would raise serious separation of powers concerns to restrain the core executive act of prosecuting a private citizen—as a former President would then be—until Congress chose to do so.  *See infra* Section III.B.2.

B.  **Structure**

The Supreme Court has cautioned against forms of Presidential liability that "rise to the level of constitutionally forbidden impairment of the Executive's ability to perform its constitutionally mandated functions." *Clinton v. Jones*, 520 U.S. 681, 702 (1997).  But the prospect of federal criminal liability for a former President does not violate that structural principle, either by imposing unacceptable risks of vexatious litigation or by otherwise chilling the Executive's decision-making process.  Indeed, it is likely that a President who knows that their actions may one day be held to criminal account will be motivated to take greater care that the laws are faithfully executed.  More fundamentally, federal criminal liability is essential to the public's interest in our "historic commitment to the rule of law . . . nowhere more profoundly manifest than in our view that 'the twofold aim of criminal justice is that guilt shall not escape or innocence suffer.'"  *Nixon*, 418 U.S. at 708–09 (quoting *Berger v. United States*, 295 U.S. 78, 88 (1935)) (formatting modified).  The Presidency's unique responsibilities do not exempt its former occupants from that commitment.

In *Fitzgerald*, the Supreme Court explained the structural analysis for Presidential immunity.  In that case, civil plaintiff A. Ernest Fitzgerald claimed that President Richard Nixon had been involved in unlawfully firing him from his government job and sought money damages against the former President.  457 U.S. at 733–41.  The five-Justice majority noted it was "settled law that the separation-of-powers doctrine does not bar every exercise of jurisdiction over the President of the United States." *Id.* at 753–54 (citations omitted).  But it instructed that "a court, before exercising jurisdiction, must balance the constitutional weight of the interest to be served against the dangers of intrusion on the authority and functions of the Executive Branch." *Id.* at 754 (citations omitted).  "When judicial action is needed to serve broad public interests—as when the Court acts, not in derogation of the separation of powers, but to maintain their proper

balance, or to vindicate the public interest in an ongoing criminal prosecution—the exercise of jurisdiction has been held warranted." *Id.* (first citing *Youngstown Sheet & Tube Co. v. Sawyer*, 343 U.S. 579 (1952), then citing *Nixon*, 418 U.S. 731). Ultimately, the Court found that a "merely private suit for damages based on a President's official acts" did not serve those interests, and held that a former President could remain immune from such suits. *Id.* For a federal criminal prosecution, however, the analysis comes out the other way.

1.   Burdens on the Presidency

At the outset, it bears noting that it is far less intrusive on the functions of the Executive Branch to prosecute a former President than a sitting one. The Supreme Court has accepted at least "the initial premise" that the President "occupies a unique office with powers and responsibilities so vast and important that the public interest demands that he devote his undivided time and attention to his public duties." *Clinton*, 520 U.S. at 697–98. And the Office of Legal Counsel has identified three burdens of criminal prosecution that could impede the performance of that constitutional role:

> (a) the actual imposition of a criminal sentence of incarceration, which would make it physically impossible for the President to carry out his duties; (b) the public stigma and opprobrium occasioned by the initiation of criminal proceedings, which could compromise the President's ability to fulfill his constitutionally contemplated leadership role with respect to foreign and domestic affairs; and (c) the mental and physical burdens of assisting in the preparation of a defense for the various stages of the criminal proceedings, which might severely hamper the President's performance of his official duties.

OLC Immunity Memo at *19. But none of those burdens would result from the criminal prosecution of a former President, who is no longer performing official duties. Accordingly, the separation-of-powers concerns are significantly diminished in this context.

*Fitzgerald* nonetheless suggested that the prospect of post-Presidency civil liability might "distract a President from his public duties, to the detriment of not only the President and his

office but also the Nation that the Presidency was designed to serve." 457 U.S. at 753. The

Supreme Court highlighted two concerns: (1) the public interest in providing the President "the

maximum ability to deal fearlessly and impartially with the duties of his office," and (2) the fact

that given the "visibility of his office and the effect of his actions on countless people, the

President would be an easily identifiable target for suits for civil damages." *Id.* at 752–53

(quotation omitted). Defendant correspondingly focuses his arguments for immunity on (1) "the

chilling effect personal liability would have on the President's decision-making," and (2) the

"potential criminal prosecutions" former Presidents could face from "local, state, or subsequent

federal officials." Immunity Motion at 9–10. He contends that "[c]ognizance of this personal

vulnerability frequently could distract a President from his public duties, to the detriment of not

only the President and his office but also the Nation that the Presidency was designed to serve."

*Id.* at 10 (quoting *Fitzgerald*, 457 U.S. at 753).

Those concerns do not carry the same weight in the context of a former President's

federal criminal prosecution. First, the Supreme Court has largely rejected similar claims of a

"chilling effect" from the possibility of future criminal proceedings. During the Watergate

prosecution, President Nixon argued that if recordings of his conversations were subject to

criminal subpoena, the Presidential decision-making process would be compromised because his

staff would be less candid. *Nixon*, 418 U.S. at 705–06. The Court disagreed, stating that it

"cannot conclude that advisers will be moved to temper the candor of their remarks by the

infrequent occasions of disclosure because of the possibility that such conversations will be

called for in the context of a criminal prosecution." *Id.* at 712. The Court quoted Justice

Cardozo's unanimous opinion finding that a jury's decision-making process would not be

meaningfully chilled if jurors' conduct were later subject to criminal prosecution:

> A juror of integrity and reasonable firmness will not fear to speak his mind if the confidences of debate are barred to the ears of mere impertinence of malice. He will not expect to be shielded against the disclosure of his conduct in the event that there is evidence reflecting upon his honor. The chance that now and then there may be found some timid soul who will take counsel of his fears and give way to their repressive power is too remote and shadowy to shape the course of justice.

*Id.* n.20 (quoting *Clark v. United States*, 289 U.S. 1, 16 (1933)).

The same reasoning applies here. There is no doubt that "a President must concern himself with matters likely to arouse the most intense feelings." *Fitzgerald*, 457 U.S. at 752 (internal quotation marks omitted). But "[c]riminal conduct is not part of the necessary functions performed by public officials." *United States v. Isaacs*, 493 F.2d 1124, 1144 (7th Cir. 1974). By definition, the President's duty to "take Care that the Laws be faithfully executed" does not grant special latitude to violate them. U.S. Const., art. II, § 3. That is especially true when the violations require criminal intent, as is the case here, *see* Opp'n to Immunity Motion, ECF No. 109, at 31–32 (reviewing *mens rea* requirements for the Indictment's four counts); *cf. Imbler v. Pachtman*, 424 U.S. 409, 429 (1976) (noting that even public officials "cloaked with absolute civil immunity . . . could be punished criminally" for their "willful acts"). Like his fellow citizens serving on juries, then, a President "of integrity and reasonable firmness" will not fear to carry out his lawful decision-making duties—even on hot-button political issues—and "will not expect to be shielded against the disclosure of his conduct in the event that there is evidence reflecting upon his honor." *Clark*, 289 U.S. at 16. The rationale for immunizing a President's controversial decisions from civil liability does not extend to sheltering his criminality.

Indeed, the possibility of future criminal liability might encourage the kind of sober reflection that would reinforce rather than defeat important constitutional values. If the specter of subsequent prosecution encourages a sitting President to reconsider before deciding to act with criminal intent, that is a benefit, not a defect. "Where an official could be expected to know

that certain conduct would violate statutory or constitutional rights, he should be made to hesitate." *Harlow v. Fitzgerald*, 457 U.S. 800, 819 (1982). Consequently, to the extent that there are any cognizable "chilling effects" on Presidential decision-making from the prospect of criminal liability, they raise far lesser concerns than those discussed in the civil context of *Fitzgerald*. Every President will face difficult decisions; whether to intentionally commit a federal crime should not be one of them.

Second, the possibility of vexatious post-Presidency litigation is much reduced in the criminal context. Defendant protests that denying him immunity would subject future Presidents to "prosecution in countless federal, state, and local jurisdictions across the country," Immunity Motion at 10, but that is incorrect. To begin, Defendant is only charged with federal crimes in this case, so any ruling here will be limited to that context and would not extend to state or local prosecutions—which in any event might run afoul of the Supremacy Clause, *see Vance*, 140 S. Ct. at 2428 ("The Supremacy Clause prohibits state judges and prosecutors from interfering with a President's official duties. . . . Any effort to manipulate a President's policy decisions or to 'retaliat[e]' against a President for official acts . . . would thus be an unconstitutional attempt to 'influence' a superior sovereign 'exempt' from such obstacles." (citations omitted)). And as Defendant well knows, *see infra* Section V.A, a person cannot "be subject for the same offence to be twice put in jeopardy of life or limb," U.S. Const., amend. V. Consequently, denying Defendant immunity here means only that a former President may face one federal prosecution, in one jurisdiction, for each criminal offense allegedly committed while in office. That consequence stands in contrast to the civil context, where "the effect of [the President's] actions on countless people" could result in untold numbers of private plaintiffs suing for damages based on any number of Presidential acts. *Fitzgerald*, 457 U.S. at 753.

Defendant also warns that if he is not given immunity here, criminal prosecutions will "bedevil[] every future Presidential administration and usher[] in a new era of political recrimination and division."  Immunity Motion at 11.  But, as the Supreme Court noted when faced with a similar argument in *Clinton*, that "predictive judgment finds little support in either history or the relatively narrow compass of the issues raised in this particular case."  520 U.S. at 702.  As Defendant acknowledges, he is the only former President in United States history to face criminal charges for acts committed while in office.  *See* Immunity Motion at 15.  "If the past is any indicator, it seems unlikely that a deluge of such litigation will ever engulf the Presidency."  *Clinton*, 520 U.S. at 702.  Despite Defendant's doomsaying, he points to no evidence that his criminal liability in this case will open the gates to a waiting flood of future federal prosecutions.

The robust procedural safeguards attendant to federal criminal prosecutions further reduce the likelihood that former Presidents will be unjustly harassed.  Prosecutors themselves are constitutionally bound to not abuse their office, which is why "courts presume that they have properly discharged their official duties."  *United States v. Armstrong*, 517 U.S. 456, 464 (1996) (quoting *United States v. Chem. Found., Inc.,* 272 U.S. 1, 14–15 (1926)).  And a federal indictment is issued by a grand jury, which is similarly "prohibited from engaging in 'arbitrary fishing expeditions' and initiating investigations 'out of malice or an intent to harass.'"  *Vance*, 140 S. Ct. at 2428 (quoting *United States v. R. Enters., Inc.*, 498 U.S. 292, 299 (1991)).  Even after indictment, "in the event of such harassment, a [former] President would be entitled to the protection of federal courts," which "have the tools to deter and, where necessary, dismiss" vexatious prosecutions.  *Id*.  For instance, if a prosecution is politically motivated, as Defendant has argued in this case, that alone may warrant dismissal.  *See* Motion to Dismiss Case for

Selective and Vindictive Prosecution, ECF No. 116.  And if a meritless prosecution somehow reached trial, a former President would still have the opportunity to put the government's proof to the test.  *See* U.S. Const., art. III, § 2, cl. 3.

In short, the concerns discussed in the civil context of *Fitzgerald* find no meaningful purchase here.  A former President accused of committing a crime while in office will be subject to only one federal prosecution for that offense, which in turn will only result in conviction if the grand jury finds probable cause and the prosecutor, judge, and all twelve petit jurors agree that the charges are legitimate and have been proven beyond a reasonable doubt.  Throughout that process, a former President "may avail himself of the same protections available to every other citizen." *Vance*, 140 S. Ct. at 2430.  In the rare case when a former President must do so, the Constitution does not proffer the sledgehammer of absolute immunity where the scalpel of procedural protections will suffice.  *See Burr*, 25 F. Cas. at 34 ("The guard, furnished to this high officer [the President], to protect him from being harassed by vexatious and unnecessary subpoenas, is to be looked for in the conduct of a court after those subpoenas have issued; not in any circumstance which is to [] precede their being issued.").  The possibility of future harassing federal criminal prosecution will not cast so "serious" a shadow on the Presidency that its current occupant cannot fulfill its duties.  *Clinton*, 520 U.S. at 708.

2.  Public interest

On the other of side of the scale, the public interest in the prosecution of this case carries grave weight.  The Supreme Court has repeatedly underscored its judgment that "the public interest in fair and accurate judicial proceedings is at its height in the criminal setting." *Vance*, 140 S. Ct. at 2424.  It has correspondingly refused to permit other concerns, including those asserted by Presidents, to "prevail over the fundamental demands of due process of law in the fair administration of criminal justice." *Nixon*, 418 U.S. at 713; *see United States v. Gillock*, 445

U.S. 360, 373 (1980) (concluding that "principles of comity" must yield "where important federal interests are at stake, as in the enforcement of federal criminal statutes").  Despite their other vehement disagreements in *Fitzgerald*, all nine Justices unanimously endorsed that judgment with respect to former Presidents.  Justice Powell's majority opinion specifically contrasted the "lesser public interest in actions for civil damages than . . . in criminal prosecutions."  457 at 754 n.37.  Chief Justice Burger's concurrence made the same distinction. *Id.* at 759–60 (distinguishing immunity "limited to civil damages claims" from "a *criminal* prosecution," as in *Burr* or *Nixon* (emphasis in original)).  And Justice White's four-member dissent stressed that no party had argued "that the President is immune from criminal prosecution in the courts[,] . . . [n]or would such a claim be credible."  *Id.* at 780.  *Fitzgerald* was thus undivided in contemplating that the public interest could require a former President's criminal liability.

Defendant resists that consensus in *Fitzgerald* by pointing to a single passage in the majority opinion where, in listing the "formal and informal checks" that could replace civil liability as a deterrent for Presidential misconduct, the Court did not specifically list criminal liability.  *Id.* at 757.  From that omission, Defendant infers that the Court intended to suggest that criminal liability would not be available either.  Immunity Motion at 13.  But the Court's unanimous emphasis that it was not immunizing former Presidents from federal criminal liability squarely refutes that inference.  If anything, the omission underscores that civil and criminal liability are so fundamentally distinct that they cannot be understood as substitutes for one another.  Accordingly, in the parallel context of cases "which have recognized an immunity from civil suit for state officials," the Supreme Court has explicitly "presumed the existence of federal

criminal liability as a restraining factor on the conduct of state officials." *Gillock*, 445 U.S. at 372.

It is no surprise that the Supreme Court has long recognized the special public interest in criminal law because of its distinctly communal character; that character is reflected in both the Constitution itself and the legal tradition from which it arose.  Unlike defendants in a civil matter, for example, federal criminal defendants are constitutionally guaranteed "a speedy and public trial" before a jury drawn from their community.  U.S. Const., amend VI; *id.*, art. III, § 2, cl. 3.  And the preeminent 18th-century legal commentator William Blackstone explained the reason for the community's special involvement in criminal cases:  Whereas civil injuries "are an infringement or privation of the civil rights which belong to individuals, considered merely as individuals," crimes "are a breach and violation of the public rights and duties due to the whole community, considered as a community."  4 William Blackstone, *Commentaries* *5.  The fundamentally public interest in a criminal prosecution explains why it "may proceed without the consent of the victim and why it is brought in the name of the sovereign rather than the person immediately injured by the wrong."  OLC Immunity Memo at *22.  Put differently, the very name of this case confirms the public's particular stake in its adjudication: it is the *United States of America v. Donald J. Trump*.

Congress has also affirmed the special public interests in enforcing the criminal law.  In the Sentencing Reform Act of 1984, it required every federal court to consider certain factors in imposing sentence, and declared "the need for the sentence imposed":

> (A) to reflect the seriousness of the offense, to promote respect for the law, and to provide just punishment for the offense;
>
> (B) to afford adequate deterrence to criminal conduct;
>
> (C) to protect the public from further crimes of the defendant; and

(D) to provide the defendant with needed educational or vocational training, medical care, or other correctional treatment in the most effective manner.

18 U.S.C. § 3553(a)(2); *see* Pub. L. 98-473, title II, § 212(a)(2) (1984).  The public has an undisputed interest in promoting respect for the law, deterring crime, protecting itself, and rehabilitating offenders.  All of those interests would be thwarted by granting former Presidents absolute criminal immunity.

The fact that Congress has spoken by criminalizing the conduct with which Defendant is charged also highlights the separation of powers principles that counsel in favor of the court retaining jurisdiction over this case.  "When the President takes measures incompatible with the expressed or implied will of Congress, his power is at its lowest ebb."  *Youngstown*, 343 U.S. at 637 (Jackson, J., concurring).  Congress could have penalized the conduct alleged in this case— if it chose to penalize it at all—with mere civil liability, perhaps allowing for monetary damages should a private plaintiff choose to bring suit.  Instead, it expressed a far stronger condemnation by subjecting that conduct to the severe consequences of the criminal law.  "Whatever may be the case with respect to civil liability" for former Presidents, then, "the judicially fashioned doctrine of official immunity does not reach 'so far as to immunize criminal conduct proscribed by an Act of Congress.'"  *O'Shea v. Littleton*, 414 U.S. 488, 503 (1974) (quoting *Gravel v. United States*, 408 U.S. 606, 627 (1972)).  Indeed, stretching the doctrine so far would also "imped[e] . . . the primary constitutional duty of the Judicial Branch to do justice in criminal prosecutions," *Nixon*, 418 U.S. at 707, not to mention the current President's duty to enforce the criminal law, *see* U.S. Const., art. II, § 3.  Holding a former President absolutely immune would thus impinge on the functions of all three branches with respect to the criminal law: Congress's province to make it, the Executive's prerogative to enforce it, and the Judiciary's charge to apply it.

Most importantly, a former President's exposure to federal criminal liability is essential to fulfilling our constitutional promise of equal justice under the law.  "The government of the United States has been emphatically termed a government of laws, and not of men."  *Marbury v. Madison*, 5 U.S. 137, 163 (1803).  As the Supreme Court has stated, that principle must govern citizens and officials alike:

> No officer of the law may set that law at defiance with impunity.  All the officers of the government, from the highest to the lowest, are creatures of the law, and are bound to obey it.  It is the only supreme power in our system of government, and every man who by accepting office participates in its functions is only the more strongly bound to submit to that supremacy, and to observe the limitations which it imposes upon the exercise of the authority which it gives.

*United States v. Lee*, 106 U.S. 196, 220 (1882).

Perhaps no one understood the compelling public interest in the rule of law better than our first former President, George Washington.  His decision to voluntarily leave office after two terms marked an extraordinary divergence from nearly every world leader who had preceded him, ushering in the sacred American tradition of peacefully transitioning Presidential power—a tradition that stood unbroken until January 6, 2021.  In announcing that decision, however, Washington counseled that the newfound American independence carried with it a responsibility. "The very idea of the power and the right of the people to establish government presupposes the duty of every individual to obey the established government."  Washington's Farewell Address, S. Doc. No. 106-21, at 13 (2d Sess. 2000), *available at* https://perma.cc/E5CZ-7NNP.  He issued a sober warning: "All obstructions to the execution of the laws," including group arrangements to "counteract" the "regular deliberation and action of the constituted authorities, are destructive of this fundamental principle."  *Id.* at 14.  In Washington's view, such obstructions would prove "fatal" to the Republic, as "cunning, ambitious, and unprincipled men will be enabled to subvert

the power of the people and to usurp for themselves the reins of government, destroying afterwards the very engines which have lifted them to unjust dominion." *Id.*

In this case, Defendant is charged with attempting to usurp the reins of government as Washington forewarned:  The Government alleges that, with the help of political associates, he "spread lies that there had been outcome-determinative fraud in the election and that he had actually won," and "pursued unlawful means of discounting legitimate votes and subverting the election results," all because he "was determined to remain in power."  Indictment ¶¶ 2, 4.  In asserting absolute executive immunity, Defendant asks not for an opportunity to disprove those allegations, but for a categorical exemption from criminal liability because, in his view, "the indictment is based solely on President Trump's official acts."  Immunity Motion at 27–28.  That obstruction to the execution of the laws would betray the public interest.  "If one man can be allowed to determine for himself what is law, every man can.  That means first chaos, then tyranny."  *United States v. United Mine Workers of Am.*, 330 U.S. 258, 312 (1947) (Frankfurter, J., concurring in the judgment).

For all these reasons, the constitutional consequences of federal criminal liability differ sharply from those of the civil liability at issue in *Fitzgerald*.  Federal criminal liability will not impermissibly chill the decision-making of a dutiful Chief Executive or subject them to endless post-Presidency litigation.  It will, however, uphold the vital constitutional values that *Fitzgerald* identified as warranting the exercise of jurisdiction: maintaining the separation of powers and vindicating "the public interest in an ongoing criminal prosecution."  457 U.S. at 753–54. Exempting former Presidents from the ordinary operation of the criminal justice system, on the other hand, would undermine the foundation of the rule of law that our first former President described: "Respect for its authority, compliance with its laws, [and] acquiescence in its

measures"—"duties enjoined by the fundamental maxims of true liberty."  Washington's

Farewell Address at 13.  Consequently, the constitutional structure of our government does not

require absolute federal criminal immunity for former Presidents.

## C. **History**

Nothing in American history justifies the absolute immunity Defendant seeks.  As

discussed above, *supra* Section III.A, there is no evidence that the Founders understood the

Constitution to grant it, and since that time the Supreme Court "has never suggested that the

policy considerations which compel civil immunity for certain governmental officials also place

them beyond the reach of the criminal law."  *Imbler*, 424 U.S. at 429.  Moreover, the notion that

former Presidents cannot face federal criminal charges for acts they took in office is refuted by

the "presuppositions of our political history."  *Fitzgerald*, 457 U.S. at 745 (quoting *Tenney v.*

*Brandhove*, 341 U.S. 367, 376 (1951)).

Start with the Executive Branch itself.  "In the performance of assigned constitutional

duties each branch of the Government must initially interpret the Constitution, and the

interpretation of its powers by any branch is due great respect from the others."  *Nixon*, 418 U.S.

at 703.  The Executive's legal representatives—the Solicitor General and Office of Legal

Counsel—have expressly and repeatedly concluded that a former President may "be subject to

criminal process . . . after he leaves office or is removed therefrom through the impeachment

process."  OLC Immunity Memo at *12 (citing 1973 OLC Memo and 1973 SG Memo).

Naturally, the Special Counsel's decision to bring this case also reflects that judgment,

distinguishing the Department of Justice's position that former Presidents retain civil immunity.

*See* Brief for the United States as Amicus Curiae at 3 n.1 (filed Mar. 2, 2023), *Blassingame v.*

*Trump*, Nos. 22-5069, 22-7030, 22-7031 (D.C. Cir.).  Even on its own, the Executive's

longstanding and unwavering position on this issue weighs against this court unilaterally

blocking a considered prosecution by conferring absolute immunity.[4]

Historical practice also indicates that a President's actions may later be criminally

prosecuted.  In the aftermath of Watergate, for example, President Ford granted former President

Nixon "full, free, and absolute pardon . . . for all offenses against the United States which he,

Richard Nixon, has committed or may have committed or taken part in during" while in office.

Gerald Ford, Presidential Statement at 7–8 (Sept. 8, 1974), *available at* https://perma.cc/2GNZ-

QQ3D.  In so doing, President Ford specifically noted the "serious allegations" that, without a

pardon, would "hang like a sword over our former President's head" until he could "obtain a fair

trial by jury."  *Id.* at 3; *see id. at* 4–5 (expressing concern about Nixon's rights to a presumption

of innocence and a speedy trial).  And former President Nixon formally accepted that "full and

absolute pardon for any charges which might be brought against me for actions taken during the

time I was President of the United States," calling the pardon a "compassionate act."  Richard

Nixon, Statement by Former President Richard Nixon at 1 (Sept. 8, 1974), *available at*

https://perma.cc/WV43-6E69.  Both Ford's pardon and Nixon's acceptance arose from the desire

to prevent the former President's potential criminal prosecution, and both specifically refer to

that possibility—without which the pardon would have been largely unnecessary.  Defendant's

view of his own immunity thus stands at odds with that of his predecessors in the Oval Office.

---

[4] Congress, the other political branch, has not spoken directly to this issue.  But it has not
exempted actions taken during the Presidency from the criminal law, and "[u]nder the authority
of Art. II, § 2," it "has vested in the Attorney General the power to conduct the criminal
litigation of the United States Government" and "to appoint subordinate officers to assist him,"
which he has done "in th[is] particular matter[]" by appointing "a Special Prosecutor."  *Nixon*,
418 U.S. at 694.  The Government also notes the statements of individual members of
Congress—including some who voted to acquit Defendant during his impeachment trial—
anticipating that Defendant could later be criminally prosecuted for the conduct at issue.  *See*
Opp'n to Immunity Motion at 14–15.

Granting the immunity Defendant seeks would also break with longstanding legal precedent that all government officials—even those immune from civil claims—may be held to criminal account.  In *Fitzgerald*, for instance, the Supreme Court analogized former President Nixon's civil immunity to the similar protections provided to judges and prosecutors.  457 U.S. at 745–48.  Unlike most government officials, who only receive "qualified" civil immunity, prosecutors and judges have absolute civil immunity due to "the especially sensitive duties" of their office and the public interest in their "liberty to exercise their functions with independence and without fear of consequences."  *Id.* at 745–46 (quotation omitted); *see, e.g.*, *Imbler*, 424 U.S. at 431 (state prosecutors possess absolute civil immunity for prosecutions); *Stump v. Sparkman*, 435 U.S. 349, 359–60 (1978) (state judges possess absolute civil immunity for judicial acts).  But notwithstanding their absolute civil immunity, prosecutors and judges are "subject to criminal prosecutions as are other citizens."  *Dennis v. Sparks*, 449 U.S. 24, 31 (1980); *see Imbler*, 424 U.S. at 429.  Thus, while in *Fitzgerald* the "careful analogy to the common law absolute immunity of judges and prosecutors" demonstrated history's support for the former President's civil immunity, *Vance*, 140 S. Ct. at 2426, here that same history compels the denial of a former President's criminal immunity.

Against the weight of that history, Defendant argues in essence that because no other former Presidents have been criminally prosecuted, it would be unconstitutional to start now.  Immunity Motion at 15–16.  But while a former President's prosecution is unprecedented, so too are the allegations that a President committed the crimes with which Defendant is charged.  *See infra* Section VI.B.  The Supreme Court has never immunized Presidents—much less former Presidents—from judicial process merely because it was the first time that process had been

necessary.  *See, e.g.*, *Vance*, 140 S. Ct. at 2424–25; *Clinton*, 520 U.S. at 692; *Nixon*, 418 U.S. at 703; *Burr*, 25 F. Cas. at 32.  The court will not do so here.

In any event, Defendant's reasoning turns the relevant historical analysis on its head.  In *Clinton*, the President likewise argued that the relative dearth of cases in which "sitting Presidents ha[d] been defendants in civil litigation involving their actions prior to taking office" meant that the Constitution afforded him temporary immunity for such claims.  520 U.S. at 692; *see* Brief for the Petitioner, 1996 WL 448096, at *17–18, *Clinton v. Jones*, No. 95-1853 (U.S.).  The Court found instead that the dearth of similar cases meant that there was no "basis of precedent" for the immunity that President Clinton sought—and in fact showed that there was little risk of such litigation impeding the Presidency going forward.  *Clinton*, 520 U.S. at 692, 702.  In other words, a defendant cannot claim that history supports their immunity by pointing to the fact that their immunity has never been asserted.  Here, as in *Clinton*, that absence of precedent negates rather than validates Defendant's argument that history establishes his immunity from criminal prosecution.

\*     \*     \*

For these reasons, the court cannot conclude that our Constitution cloaks former Presidents with absolute immunity for any federal crimes they committed while in office.  Our nation's "historic commitment to the rule of law" is "nowhere more profoundly manifest than in our view that 'the twofold aim of criminal justice is that guilt shall not escape or innocence suffer.'"  *Nixon*, 418 U.S. at 708–09 (quoting *Berger*, 295 U.S. at 88) (formatting modified).  Nothing in the Constitution's text or allocation of government powers requires exempting former Presidents from that solemn process.  And neither the People who adopted the Constitution nor those who have safeguarded it across generations have ever understood it to do so.  Defendant's

four-year service as Commander in Chief did not bestow on him the divine right of kings to

evade the criminal accountability that governs his fellow citizens.  "No man in this country," not

even the former President, "is so high that he is above the law."  *Lee*, 106 U.S. at 220.

Consistent with its duty to not "decide questions of a constitutional nature unless

absolutely necessary to a decision," *Clinton*, 520 U.S. at 690 & n.11 (quoting *Burton v. United*

*States,* 196 U.S. 283, 295 (1905)), the court emphasizes the limits of its holding here.  It does not

decide whether former Presidents retain absolute criminal immunity from non-federal

prosecutions, or whether sitting Presidents are entitled to greater immunity than former ones.

Similarly, the court expresses no opinion on the additional constitutional questions attendant to

Defendant's assertion that former Presidents retain absolute criminal immunity for acts "within

the outer perimeter of the President's official" responsibility.  Immunity Motion at 21

(formatting modified).  Even if the court were to accept that assertion, it could not grant

Defendant immunity here without resolving several separate and disputed constitutional

questions of first impression, including: whether the President's duty to "take Care that the Laws

be faithfully executed" includes within its "outer perimeter" at least five different forms of

indicted conduct;[5] whether inquiring into the President's purpose for undertaking each form of

that allegedly criminal conduct is constitutionally permissible in an immunity analysis, and

whether any Presidential conduct "intertwined" with otherwise constitutionally immune actions

---

[5] As another court in this district observed in a decision regarding Defendant's civil immunity,
"[t]his is not an easy issue.  It is one that implicates fundamental norms of separation of powers
and calls on the court to assess the limits of a President's functions.  And, historical examples
to serve as guideposts are few."  *Thompson v. Trump*, 590 F. Supp. 3d 46, 74 (D.D.C. 2022);
*see id*. at 81–84 (performing that constitutional analysis).  The D.C. Circuit recently affirmed
that district court's decision with an extensive analysis of just one form of conduct—"speech
on matters of public concern."  *Blassingame v. Trump*, Nos. 22-5069, 22-7030, 22-7031, slip
op. at 23–42 (D.C. Cir. Dec. 1, 2023).

also receives criminal immunity. *See id.* at 21–45. Because it concludes that former Presidents do not possess absolute federal criminal immunity for any acts committed while in office, however, the court need not reach those additional constitutional issues, and it expresses no opinion on them.

## IV.   FIRST AMENDMENT

In his Constitutional Motion, Defendant first argues that the Indictment should be dismissed because it criminalizes his speech and therefore violates the First Amendment. But it is well established that the First Amendment does not protect speech that is used as an instrument of a crime, and consequently the Indictment—which charges Defendant with, among other things, making statements in furtherance of a crime—does not violate Defendant's First Amendment rights.

### A.  The First Amendment and criminal prosecutions

The First Amendment provides, in relevant part, that "Congress shall make no law . . . abridging the freedom of speech." U.S. Const. amend. I. Generally, "the First Amendment means that government has no power to restrict expression because of its message, its ideas, its subject matter, or its content." *United States v. Stevens*, 559 U.S. 460, 468 (2010) (quoting *Ashcroft v. Am. Civ. Liberties Union*, 535 U.S. 564, 573 (2002)). In restricting the government's power to control speech, the First Amendment "embodies 'our profound national commitment to the free exchange of ideas.'" *Ashcroft*, 535 U.S. at 573 (citation omitted).

The right to freedom of speech is "not absolute," however. *Id.* It is fundamental First Amendment jurisprudence that prohibiting and punishing speech "integral to criminal conduct" does not "raise any Constitutional problem." *Stevens*, 559 U.S. at 468–69 (citation omitted); *accord Giboney v. Empire Storage & Ice Co.*, 336 U.S. 490, 498–502 (1949). "Many long established" criminal laws permissibly "criminalize speech . . . that is intended to induce or

commence illegal activities," *United States v. Williams*, 553 U.S. 285, 298 (2008), such as fraud, bribery, perjury, extortion, threats, incitement, solicitation, and blackmail, *see, e.g.*, *Stevens*, 559 U.S. at 468–69 (fraud); *Williams*, 553 U.S. at 298 (incitement, solicitation); *Citizens United v. Fed. Election Comm'n*, 558 U.S. 310, 356 (2010) (bribery); *Rice v. Paladin Enters., Inc.*, 128 F.3d 233, 244 (4th Cir. 1997) (extortion, threats, blackmail, perjury). Prosecutions for conspiring, directing, and aiding and abetting do not run afoul of the Constitution when those offenses are "carried out through speech." *Nat'l Org. for Women v. Operation Rescue*, 37 F.3d 646, 655–56 (D.C. Cir. 1994) (directing and aiding and abetting); *see Williams*, 553 U.S. at 298 (conspiring).

**B.  The Indictment does not violate the First Amendment**

The Indictment alleges that Defendant used specific statements as instruments of the criminal offenses with which he is charged: conspiring to fraudulently obstruct the federal function for collecting, counting, and certifying the results of the Presidential election, in violation of 18 U.S.C. § 371 (Count I); corruptly obstructing and conspiring to obstruct Congress's certification of the election results, in violation of 18 U.S.C. §§ 1512(c)(2) and (k) (Counts II and III); and conspiring to deprive citizens of their constitutional right to have their votes counted, in violation of 18 U.S.C § 241 (Count IV). *See* Indictment ¶¶ 5–130.

That Defendant's alleged criminal conduct involved speech does not render the Indictment unconstitutional. The Indictment notes that "Defendant had a right, like every American, to speak publicly about the election and even to claim, falsely, that there had been outcome-determinative fraud during the election and that he had won." *Id.* ¶ 3. And it enumerates Defendant's specific statements only to support the allegations that Defendant joined conspiracies and attempted to obstruct the election certification, such as the allegations that Defendant knowingly made false claims about the election results, *id.* ¶¶ 11–12, and deceived

state officials to subvert the election results, *id.* ¶¶ 13–52.  *See, e.g.*, *id.* ¶¶ 12, 19, 22, 31–35, 37, 41, 46, 50, 52 (referencing Defendant's statements).  The Indictment therefore properly alleges Defendant's statements were made in furtherance of a criminal scheme.

Defendant argues that the Indictment violates the First Amendment for three primary reasons: (1) the government may not prohibit Defendant's core political speech on matters of public concern, Constitutional Motion at 4–11; (2) "First Amendment protection . . . extends to statements advocating the government to act," *id.* at 12–14 (formatting modified); and (3) Defendant reasonably believed that the 2020 Presidential Election was stolen, *id.* at 15–17.

1.  <u>Core political speech on matters of public concern</u>

Defendant first claims that his statements disputing the outcome of the 2020 election is "core political speech" that addresses a "matter[] of public concern."  *Id.* at 8–10.  Even assuming that is true, "core political speech" addressing "matters of public concern" is not "immunized from prosecution" if it is used to further criminal activity.  *United States v. Rahman*, 189 F.3d 88, 117 (2d Cir. 1999); *see Stevens*, 559 U.S. at 468–69.  That is the case even though Defendant was the President at the time.  *See Blassingame v. Trump*, Nos. 22-5069, 22-7030, 22-7031, slip op. at 50 (D.C. Cir. Dec. 1, 2023) (Defendant is not entitled to immunity when he "engages in speech" that "removes him[] from the First Amendment's protections.").  As the D.C. Circuit has recognized, "an immunity for all presidential speech on matters of public concern …. is 'unsupported by precedent.'"  *Id.* at 27 (quoting *Clinton*, 520 U.S. at 695).

In support of his argument, Defendant first invokes various Justices' opinions in *United States v. Alvarez*, 567 U.S. 709 (2012).  Constitutional Motion at 4–7.  There was no majority opinion in *Alvarez*; a majority of the Justices agreed only that the Stolen Valor Act, which prohibits an individual from falsely representing that they have received "any decoration or medal authorized by Congress for the Armed Forces of the United States," violated the First

Amendment.  567 U.S. at 716, 729–30 (plurality opinion) (Kennedy, J., joined by Roberts. C.J.,

Ginsburg, J., and Sotomayor, J.); *id.* at 730 (Breyer, J. concurring in the judgment, joined by

Kagan, J.).  One theme common to both the plurality and concurring opinions, however, was the

concern that the Stolen Valor Act prohibited only false statements and *only because of their*

*falsity*.  *See id.* at 717–22 (plurality opinion); *id.* at 732 (Breyer, J. concurring).  Indeed, each

opinion reiterated that laws "implicat[ing] fraud or speech integral to criminal conduct" are

constitutional.  *Id.* at 721 (plurality opinion); *accord id.* at 734–36 (Breyer, J., concurring in the

judgment); *id.* at 747 (Alito, J., dissenting).  Because it confirmed that speech involved in the

commission of a crime was not protected by the First Amendment, *Alvarez* did not undermine

settled precedent allowing the prosecution of speech in furtherance of criminal activity.

Second, Defendant contends that "attempts to prohibit or criminalize claims on political

disputes" constitute viewpoint discrimination.  Constitutional Motion at 9–10.  But Defendant is

not being prosecuted for his "view" on a political dispute; he is being prosecuted for acts

constituting criminal conspiracy and obstruction of the electoral process.  *Supra* Section I.  And

any political motives Defendant may have had in doing so do not insulate his conduct from

prosecution.  *E.g.*, *Rahman*, 189 F.3d at 116–17 (mixed motives do not insulate speech from

prosecution); *see* Gov.'s Omnibus Opp'n to Def.'s Motions to Dismiss the Indictment on

Statutory and Constitutional Grounds, ECF No. 139 at 33 (Opp'n to Constitutional Motion)

(collecting other Circuit cases).  The Indictment does not unconstitutionally discriminate against

Defendant based on viewpoint.

Third, Defendant argues that even if a higher level of scrutiny does not apply to the

Indictment, it nonetheless is invalid "under any level of scrutiny" because it is "tailored to violate

free-speech rights."  Constitutional Motion at 11.  Here, however, there is no level of scrutiny

that applies, because speech in furtherance of criminal conduct does not receive *any* First

Amendment protection.  *E.g.*, *Stevens*, 559 U.S. at 468–69.  Moreover, Defendant cites no

support for his argument that the Indictment is "tailored to *violate* free-speech rights," nor does

he explain how the Indictment is so tailored.  *See* Constitutional Motion at 11 (emphasis added).

　　　　Finally, Defendant argues that the Indictment violates the First Amendment because "*all*

the charged conduct constitutes First Amendment protected speech."  Def.'s Reply in Support of

Motion to Dismiss Based on Constitutional Grounds, ECF No. 162 at 7–8 ("Constitutional

Reply") (emphasis in original).  He contends that to qualify as speech in furtherance of criminal

conduct, "the speech in question must 'be integral to' some criminal 'conduct' that *is not itself a*

*form of First Amendment-protected speech or expression*."  *Id.* (emphasis added).  But again, the

Indictment does not need to list other kinds of criminal conduct in addition to speech to comply

with the First Amendment; the crimes Defendant is charged with violating may be carried out

through speech alone.  *See Nat'l Org. for Women*, 37 F.3d at 656; *supra* Section IV.A.

　　2.　Statements advocating government action

　　　　Defendant next claims the First Amendment protects "statements advocating the

government to act."  Constitutional Motion at 12–14 (formatting modified).  He first contends

the Petition Clause of the First Amendment provides an absolute right to make statements

encouraging the government to act in a public forum, citing *McDonald v. Smith*, 472 U.S. 479

(1985).  Constitutional Motion at 12–13.  The Petition Clause provides that "Congress shall

make no law . . . abridging . . . the right of the people . . . to petition the Government for a

redress of grievances."  U.S. Const. amend. I.  The Clause protects individuals' ability to

"'communicate their will' through direct petitions to the legislature and government officials."

*McDonald*, 472 U.S. at 482 (quoting 1 *Annals of Congress* 738 (1789) (James Madison)).  In

*McDonald*, however, the Supreme Court concluded that the Petition Clause did *not* immunize a

person from a libel suit based on letters the individual had sent to the President. *Id.* at 480–81; *see also* Opp'n to Constitutional Motion at 34. The Court explained that the Petition Clause does not have "special First Amendment status," so "there is no sound basis for granting greater constitutional protection" under the Petition Clause "than other First Amendment expressions." *McDonald*, 472 U.S. at 484–85. Defendant's reliance on the Clause and its interpretation in *McDonald* is therefore unavailing, as the Petition Clause does not prohibit prosecuting Defendant's speech any more than the Speech Clause does. The Petition Clause does not insulate speech from prosecution merely because that speech also petitions the government.

Defendant also invokes *McDonnell v. United States*, 579 U.S. 550 (2016), to argue that allowing this prosecution would risk criminalizing statements once thought to be false that turned out to be true, such as statements made early in the COVID-19 pandemic that masks do not stop the transmission of the virus. Constitutional Motion at 13–14. Not so. First, *McDonnell* did not involve the First Amendment but rather the proper interpretation of "official act" under the federal bribery statute, 18 U.S.C. § 201(b)(2). *McDonell*, 579 U.S. at 566; *see* Opp'n to Constitutional Motion at 34 n.14. And neither the Indictment nor the federal statutes under which Defendant is charged involve an "official act." Second, Defendant is not being prosecuted simply for making false statements, *see supra* at 33–34, but rather for knowingly making false statements in furtherance of a criminal conspiracy and obstructing the electoral process. Consequently, there is no danger of a slippery slope in which inadvertent false statements alone are alleged to be the basis for criminal prosecution.

In his Reply brief, Defendant also raises overbreadth, arguing that under the Government's interpretation, the underlying statutes charged in the Indictment are unconstitutional because they "criminalize a wide range of perfectly ordinary acts of public

speech and petitioning the government."  Constitutional Reply at 9–10.  Assuming Defendant's

overbreadth challenge was properly raised for the first time in his Reply brief, the statutes are not

overbroad under the Government's view.  As an initial matter, Defendant's actions are not

entitled to First Amendment protection as "perfectly ordinary acts of public speech and

petitioning the government."  *Supra* Section IV.B.1–2; *infra* Section IV.B.3.  Moreover,

Defendant fails to identify any protected acts or speech that the statutes might render

impermissible under the Government's interpretation.  *See, e.g.*, *United States v. Hansen*, 599

U.S. 762, 769–70 (2023) (A litigant must "demonstrate[] that the statute 'prohibits a substantial

amount of protected speech' relative to its 'plainly legitimate sweep'" to succeed in overbreadth

challenge (citation omitted)).

3.  Defendant's statements on the 2020 Presidential Election

Finally, Defendant claims the First Amendment does not permit the government to

prosecute him for his reasonable belief that the 2020 Presidential Election was stolen.

Constitutional Motion at 15–17.  He argues that the truth or falsity of his belief is not "easily

verifiable" and there is "abundant public evidence providing a reasonable basis" for his view.  *Id.*

at 15–16.  He contends that he is "entitled to mistrust the word of . . . establishment-based

government officials and draw [his] own inferences from the facts."  *Id.* at 17.  At this stage,

however, the court must take the allegations in the Indictment as true, *supra* Section II, and the

Indictment alleges that Defendant made statements that he knew were false, *e.g.*, Indictment

¶¶ 11–12; *see also* Opp'n to Constitutional Motion at 26–27.  While Defendant challenges that

allegation in his Motion, and may do so at trial, his claim that his belief was reasonable does not

implicate the First Amendment.  If the Government cannot prove beyond a reasonable doubt at

trial that Defendant knowingly made false statements, he will not be convicted; that would not

mean the Indictment violated the First Amendment.

## V.    DOUBLE JEOPARDY

Defendant's Constitutional Motion next posits that the prosecution violates double jeopardy because Defendant was tried—and acquitted—in earlier impeachment proceedings arising out of the same course of conduct.  Constitutional Motion at 18–24.  But neither traditional double jeopardy principles nor the Impeachment Judgment Clause provide that a prosecution following impeachment acquittal violates double jeopardy.

### A.  **Double Jeopardy Clause**

The Fifth Amendment provides that "[n]o person shall . . . be subject for the same offense to be twice put in jeopardy of life or limb."  U.S. Const. amend. V.  To "be twice put in jeopardy of life or limb" means to face the possibility of "multiple *criminal* punishments for the same offense."  *Hudson v. United States*, 522 U.S. 93, 99 (citation omitted) (emphasis in original).  A purportedly civil penalty only counts in the double jeopardy context if "the statutory scheme was so punitive in either purpose or effect . . . as to 'transform'" it into a criminal penalty.  *Id.* (citation omitted).

As long as separate prosecutions charge an individual with violating different laws, the prosecutions are considered separate "offenses" under the Double Jeopardy Clause and the second prosecution passes constitutional muster.  *Denezpi v. United States*, 596 U.S. 591, 597–98 (2022).  When the same "act or transaction" violates two distinct provisions of the same statute, there are distinct offenses only if "each provision requires proof of a fact which the other does not."  *Blockburger v. United States*, 284 U.S. 299, 304 (1932).  In contexts involving different sovereigns—such as the federal government and a state government—a person may be tried for violating laws that "have identical elements and could not be separately prosecuted if enacted by a single sovereign."  *Denezpi*, 596 U.S. at 597–98.

The Indictment here does not violate double jeopardy principles. First, impeachment threatens only "removal from Office, and disqualification to hold and enjoy any Office of honor, Trust or Profit under the United States," U.S. Const. art. I, § 3, cl. 7, neither of which is a criminal penalty. *See supra* at 9. Nor does Defendant argue that they are civil penalties that should be construed as criminal penalties. *See* Constitutional Motion at 23–24. Second, the impeachment proceedings charged Defendant with "Incitement of Insurrection," which is not charged in the Indictment. *See* Opp'n to Constitutional Motion at 60–62 (citing H.R. Res. 24, 117th Cong. (Jan. 11, 2021)). Although there are few decisions interpreting the analogous federal statute that prohibits inciting "any . . . insurrection against the authority of the United States or the laws thereof," 18 U.S.C. § 2383, it is well-established that "incitement" typically means "advocacy . . . directed to inciting or producing imminent lawless action" that is "likely to incite or produce such action," *Brandenburg v. Ohio*, 395 U.S. 444, 447 (1969). None of the statutes under which Defendant is charged require the Government to prove incitement. *See* 18 U.S.C. § 371; *id.* §§ 1512(c)(2), (k); *id.* § 241; *accord* Indictment ¶¶ 6, 126, 128, 130. The impeachment proceedings and this prosecution therefore did not "twice put" Defendant "in jeopardy of life or limb" for the "same offense."

Defendant also contends his prosecution violates double jeopardy principles because the distinct branches of government are part of one single sovereign. Constitutional Motion at 24. But even assuming that is true, Defendant does not argue that impeachment carries a criminal sanction or that the impeachment proceedings were based on the same offense as charged in the Indictment. *See id.* at 23–24. Instead, he argues that different double jeopardy principles would apply to prosecutions following impeachments, referencing only the Impeachment Judgment Clause for support. Constitutional Reply at 18–20. But, as discussed below, the Impeachment

Judgment Clause provides only that prosecutions following convictions at impeachment are constitutionally permissible; it does not create special double jeopardy principles.  *See* U.S. Const. art. I, § 3, cl. 7; *infra* Section V.B.  Consequently, the Indictment does not violate the Double Jeopardy Clause.

**B.  Impeachment Judgment Clause**

The Impeachment Judgment Clause provides that "Judgment in Cases of Impeachment shall not extend further than to removal from Office, and disqualification to hold and enjoy any Office of honor, Trust or Profit under the United States: but the Party convicted shall nevertheless be liable and subject to Indictment, Trial, Judgment and Punishment, according to Law."  U.S. Const. art. I, § 3, cl. 7.  As explained above, the first part of the Clause limits the remedies available in impeachment, and the second part provides that even if a person is convicted in impeachment proceedings, they may still be subject to criminal prosecution.  *See supra* at 8–10.  As the Office of Legal Counsel noted, the "second part makes clear that the restriction on sanctions in the first part was not a prohibition on further punishments; rather, those punishments would still be available but simply not to the legislature."  OLC Double Jeopardy Memo at *10.

Defendant contends the Impeachment Judgment Clause contains a negative implication: if a person is *not* convicted in impeachment proceedings, they may *not* be prosecuted.  Constitutional Motion at 18–23; Constitutional Reply at 10–11.  In statutory interpretation, the *expressio unius* canon, which provides that "expressing one item of an associated group or series excludes another left unmentioned," does not apply unless "circumstances support a sensible inference that the term left out must have been meant to be excluded."  *NLRB v. SW General, Inc.*, 580 U.S. 288, 302 (2017) (citations omitted).  Because Defendant's reading is not supported by the structure of the Constitution, the historical context of the impeachment clauses, or prior

constitutional precedents, *expressio unius* does not apply. *Accord Thompson v. Trump*, 590 F. Supp. 3d 46, 86–87 (D.D.C. 2022). The Impeachment Judgment Clause does not provide that acquittal by the Senate during impeachment proceedings shields a President from criminal prosecution after he leaves office.

    1. <u>Structure</u>

    Structural considerations support reading the Impeachment Judgment Clause as the plain language suggests. First, as the Government notes, impeachment and prosecution serve distinct goals within the separation of powers. *See* Opp'n to Constitutional Motion at 52–53. Impeachment "is designed to enable Congress to protect the nation against officers who have demonstrated that they are unfit to carry out important public responsibilities," whereas prosecution is designed to "penalize individuals for their criminal misdeeds." OLC Double Jeopardy Memo at *13. Impeachment proceedings provide far fewer procedural safeguards than do prosecutions, *see id.*, and accordingly, Congress may not dispense criminal penalties in impeachment proceedings, *supra* Section V.A. Impeachment is not a substitute for prosecution.

    Second, the Senate may acquit in impeachment proceedings even when it finds that an official committed the acts alleged. For example, the Senate may acquit because it believes the acts committed do not amount to "high Crimes and Misdemeanors," U.S. Const. art. II, § 4; because the Senate believes it lacks authority to try the official; or for partisan reasons. OLC Double Jeopardy Memo at *14–15. Indeed, the Framers anticipated that impeachments might spark partisan division. *See* The Federalist No. 65, at 330–31 (Alexander Hamilton); Letter from Edmund Pendleton to James Madison, Oct. 8, 1787, 10 *The Documentary History of the Ratification of the Constitution* 1773 (1976); 10 *The Papers of James Madison* 223 (Rutland et al. ed., 1977); *accord* OLC Double Jeopardy Memo at *15. Acquittal on impeachment does not establish the defendant's innocence.

Defendant contends that impeachment serves to protect officials from political attacks by their enemies, and allowing prosecution following impeachment acquittal would undermine that protection.  Constitutional Reply at 15–18.  But politics are likely to play even larger a role in impeachments than in prosecutions, given that impeachments are conducted by elected officials politically accountable to their constituents, whereas prosecutions are conducted by appointed officials, most of whom may not be removed without cause, *see Free Enter. Fund v. Public Co. Accounting Oversight Bd.*, 561 U.S. 477, 492–93 (2010) (explaining for-cause removal).  And former officials like Defendant, rather than current officials, are also less likely to be politically attacked, because they no longer hold the power and authority of political office.

2. Historical context

Defendant claims that his interpretation of the Impeachment Judgment Clause reflects the original public meaning of the impeachment clauses.  Constitutional Motion at 20–21; Constitutional Reply at 12–15.  Considerable historical research undermines that contention.  *See* OLC Double Jeopardy Memo at *7–12 ("We are unaware of any evidence suggesting that the framers and ratifiers of the Constitution chose the phrase 'the party convicted' with a negative implication in mind."); *accord Thompson*, 590 F. Supp. 3d at 87.  Most notably, the Founders repeatedly acknowledged that impeachment acquittals would not bar subsequent prosecutions.  For example, James Wilson, who participated in the Constitutional Convention, observed that officials who "may not be convicted on impeachment . . . may be tried by their country." 2 *The Documentary History of the Ratification of the Constitution* 492.  Edward Pendleton, who was President of the Virginia Ratifying Convention, similarly observed that "an Acquital would not bar," a "resort to the Courts of Justice," Letter from Edmund Pendleton to James Madison, Oct. 8, 1787, 10 *The Documentary History of the Ratification of the Constitution* 1773, a conclusion that James Madison called "extremely well founded," 10 *The Papers of James Madison* 223.

Justice Story too described that, following impeachment, "a second trial for the same offence could be had, either after an acquittal, or a conviction in the court of impeachments." 2 *Story's Commentaries* § 780.

Founding-era officials similarly acknowledged that an acquittal at impeachment proceedings would not bar a subsequent prosecution. For example, during the first federal impeachment trial, Representative Samuel Dana contrasted impeachment proceedings with criminal trials, stating that impeachment had "no conne[ct]ion with punishment or crime, as, whether a person tried under an impeachment be found guilty or acquitted, he is still liable to a prosecution at common law." 9 *Annals of Congress* 2475 (1798). None of the sources Defendant cites refute that conclusion. *See* Constitutional Motion at 20–21.

3. Prior precedent

Defendant's additional arguments invoking past constitutional precedents are similarly unavailing. He first cites Justice Alito's dissent in *Vance*. Constitutional Motion at 19–20. In *Vance*, the Supreme Court held that a sitting President is not immune from state criminal subpoenas, nor does a heightened standard apply to such requests. 140 S. Ct. at 2431. In so holding, the majority opinion reiterated that "no citizen, not even the President, is categorically above the common duty to produce evidence when called upon in a criminal proceeding." *Id.* Justice Alito's dissent, moreover, noted that under the Impeachment Judgement Clause, "criminal prosecution, like removal from the Presidency and disqualification from other offices, is a consequence that can come about only after the Senate's judgment, not during or prior to the Senate trial." *Id.* at 2444 (Alito, J., dissenting); *see* Constitutional Motion at 19. All Justice Alito's dissent observed is that, temporally, any prosecution must follow the judgment on impeachment; no official shall be subject to simultaneous impeachment proceedings and

criminal prosecution.  The dissent does not support the view that if impeachment proceedings

end in acquittal, subsequent prosecution violates double jeopardy.

Defendant also cites *Fitzgerald* for the proposition that the threat of impeachment alone

is the proper remedy against a President for any "official misfeasance."  Constitutional Motion

at 22.  But as already explained, *Fitzgerald* is meaningfully distinguishable; it addressed

immunity from civil suit, and all nine Justices took care to emphasize that their reasoning did not

extend to the criminal context.  *See supra* Section III.B.1.

In sum, neither the Double Jeopardy Clause nor the Impeachment Judgment Clause

prevent Defendant, who while President was acquitted in impeachment proceedings for

incitement, from being prosecuted after leaving office for different offenses.

## VI.     DUE PROCESS

Finally, Defendant contends that the Indictment violates the Due Process Clause because

he lacked fair notice that his conduct was unlawful.  Constitutional Motion at 25–31.

## A.  Due process principles

The Due Process Clause of the Fifth Amendment provides that "[n]o person shall . . . be

deprived of life, liberty, or property, without due process of law."  U.S. Const. amend. V.  To

comply with due process, a law must give "fair warning" of the prohibited conduct.  *United*

*States v. Lanier*, 520 U.S. 259, 265 (1997) (citation omitted).  A law fails to give fair warning if

the text of a statute is so unclear that it requires the Judicial and Executive Branches to "define

what conduct is sanctionable and what is not," *Sessions v. Dimaya*, 138 S. Ct. 1204, 1212 (2018);

*see Lanier*, 520 U.S. at 266 (citation omitted), or a judge construes the statute in a manner that is

"clearly at variance with the statutory language," *Bouie v. City of Columbia*, 378 U.S. 347, 356

(1964); *see Rogers v. Tennessee*, 532 U.S. 451, 457 (2001); *see also Lanier*, 520 U.S. at 266.

For instance, in 2015, the Supreme Court concluded that the residual clause of the Armed Career Criminal Act violated due process because it was so vague—and difficult to administer—that defendants lacked notice of how it would be applied in any given case. *Johnson v. United States*, 576 U.S. 591, 597 (2015). The Court explained that the residual clause required judges to imagine an "ordinary case" involving the crime with which the defendant was charged, and compare the defendant's actions to that "ordinary case." *Id.* at 597, 599. It further emphasized that its "repeated attempts and repeated failures to craft a principled and objective standard out of the residual clause confirm[ed] its hopeless indeterminacy," *id.* at 598, noting that the clause had caused "numerous splits among the lower federal courts," *id.* at 601 (citation omitted).

A statute does not fail to give fair warning just "because it 'does not mean the same thing to all people, all the time, everywhere.'" *United States v. Bronstein*, 849 F.3d 1101, 1107 (D.C. Cir. 2017) (citation omitted). "Since words, by their nature, are imprecise instruments," laws "may have gray areas at the margins" without violating due process. *United States v. Barnes*, 295 F.3d 1354, 1366 (D.C. Cir. 2002). Indeed, statutes are rarely found unconstitutional because their text fails to give fair warning. *See, e.g.*, *Bronstein*, 849 F.3d at 1107 (statute upheld); *Barnes*, 259 F.3d at 1366 (same); *Woodhull Freedom Found. v. United States*, 72 F.4th 1286, 1303–05 (D.C. Cir. 2023) (same); *Kincaid v. Gov't of D.C.*, 854 F.3d 721, 728–30 (D.C. Cir. 2017) (same); *Agnew v. Gov't of D.C.*, 920 F.3d 49, 55–61 (D.C. Cir. 2019) (same).

Applying a novel judicial construction of a statute may also fail to give fair warning if it "unexpectedly broadens" the statute's reach and applies that expanded reach "retroactively." *Bouie*, 378 U.S. at 353–57; *see Rogers*, 532 U.S. at 457; *Reed v. Goertz*, 143 S. Ct. 955, 960–61 (2023). In *Bouie*, for example, defendants were convicted of violating a state law prohibiting "entry upon the lands of another . . . after notice from the other . . . prohibiting such entry" after

they remained on premises after being asked to leave, even though they did not re-enter the premises. 378 U.S. at 355. The Supreme Court held that the state supreme court's construction of the statute failed to give the defendants fair notice because it was "clearly at variance with the statutory language" and had "not the slightest support in prior [state] decisions." *Id.* at 356.

## B. The Indictment does not violate due process

Defendant had fair notice that his conduct might be unlawful. None of the criminal laws he is accused of violating—18 U.S.C. § 371; *id.* § 1512(k); *id.* § 1512(c)(2); and *id.* § 241— require the Executive or Judicial Branch to "guess" at the prohibited conduct, *Lanier*, 520 U.S. at 266. Nor does finding that the Indictment complies with due process require the court to create a novel judicial construction of any statute.

Defendant notes that the "principle of fair notice has special force" in the First Amendment Context. Constitutional Motion at 26–27. While that may be true, even "special force" does not place Defendant's alleged conduct "outside the plain language of the charged statutes" as he alleges. *See id.* at 27. First, his argument does not contrast the allegations in the Indictment with the plain language of the statutes, but instead attempts to recast the factual allegations in the Indictment itself as no more than routine efforts to challenge an election. *See id.* at 31 (claiming that "post-election challenges" like Defendant's "had been performed in 1800, 1824, 1876, and 1960 . . . without any suggestion [it was] criminal"). But again, at this stage, the court must take the allegations in the Indictment as true. *Supra* Section II, IV.B.3. The fact that Defendant disputes the allegations in the Indictment do not render them unconstitutional. Second, the meaning of statutory terms "need not be immediately obvious to an average person; indeed, 'even trained lawyers may find it necessary to consult legal dictionaries, treatises, and judicial opinions before they may say with any certainty what some statutes may compel or forbid.'" *Agnew*, 920 F.3d at 57 (citation omitted). And due process does not entitle Defendant

to advance warning that his precise conduct is unlawful, so long as the law plainly forbids it. *See Lanier*, 520 U.S. at 271; *cf. United States v. Int'l Mins. & Chem. Corp.*, 402 U.S. 558, 563 (1971) ("ignorance of the law is no defense").

Defendant also claims he lacked fair notice because there is a "long history" of government officials "publicly claiming that election results were tainted by fraud" or questioning election results, yet he is "the first person to face criminal charges for such core political behavior." Constitutional Motion at 25; *see id.* at 27–30. But there is also a long history of prosecutions for interfering with the outcome of elections; that history provided Defendant with notice that his conduct could be prosecuted. *See* Opp'n to Constitutional Motion at 39–40 (citing six examples of 18 U.S.C. § 241 prosecutions). Indeed, the Supreme Court has addressed more than one case in which officials were prosecuted for interfering with or discarding election ballots. *United States v. Mosley*, 238 U.S. 383, 385 (1915); *United States v. Saylor*, 322 U.S. 385, 386 (1944).

In addition, none of the contested elections Defendant invokes is analogous to this case. *See* Opp'n to Constitutional Motion at 40–47 (detailing the history of each election). As noted above, Defendant is not being prosecuted for publicly contesting the results of the election; he is being prosecuted for knowingly making false statements in furtherance of a criminal conspiracy and for obstruction of election certification proceedings. And in none of these earlier circumstances was there any allegation that any official engaged in criminal conduct to obstruct the electoral process. For instance, following the 2004 Presidential election, Representative Stephanie Tubbs Jones raised an objection to Ohio's electoral votes at the joint session; Senator Boxer signed the objection. 151 Cong. Rec. 199 (Jan. 6, 2005). As Representative Jones explained in a separate session, that objection was to allow "a necessary, timely, and appropriate

opportunity to review and remedy . . . the right to vote." *Id.*  Ohio's electoral votes were then counted for President Bush.  Defendant points to no allegation that Representative Jones' objection was in furtherance of a criminal conspiracy or designed to obstruct the electoral process.

Moreover, even if there were an analogous circumstance in which an official had escaped prosecution, the mere absence of prior prosecution in a similar circumstance would not necessarily mean that Defendant's conduct was lawful or that his prosecution lacks due process. The "exclusive authority and absolute discretion to decide whether to prosecute a case"—within bounds, *supra* at 19–20—is a cornerstone of the Executive Branch.  *Nixon*, 418 U.S. at 693 (citation omitted).

Finally, Defendant argues that, for the Indictment to comply with due process, the prosecution bears the burden to "provide examples where similar conduct was found criminal." Constitutional Reply at 21.  Under that theory, novel criminal acts would never be prosecuted. The Constitution does not so constrain the Executive Branch.

## VII.   CONCLUSION

For the foregoing reasons, the court will DENY Defendant's Motion to Dismiss Indictment Based on Presidential Immunity, ECF No. 74, and Motion to Dismiss the Indictment Based on Constitutional Grounds, ECF No. 113.  A corresponding Order will accompany this Memorandum Opinion.

Date: December 1, 2023

*Tanya S. Chutkan*
TANYA S. CHUTKAN
United States District Judge