**IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA**

| | | |
|---|---|---|
| **UNITED STATES OF AMERICA** | * | |
| | * | |
| **v.** | * | **CRIMINAL NO. 23-cr-257 (TSC)** |
| | * | |
| **DONALD J. TRUMP,** | * | |
| | * | |
| **Defendant.** | * | |
| | * | |

**GOVERNMENT'S OPPOSITION TO DEFENDANT'S DISCOVERY MOTIONS**

The defendant demands an unprecedented expansion of the Government's discovery obligations that would provide special treatment for him and result in delay. He asks this Court to find that a wide array of entities both inside and outside the Executive Branch are part of the Government's prosecution team. ECF No. 166-1. And he further demands that the Government search the files of those separate entities for broad categories of information that are not relevant to this case. ECF No. 167. The defendant's view of discovery is untethered to any statute, rule, or case, and lacks both specificity and justification. The information he seeks is not in the Government's possession, in many cases does not appear to exist, and in any event is not discoverable pursuant to *Brady,* Federal Rule of Criminal Procedure 16, or any other authority. The defendant's motions should be denied.

I.      **Applicable Law**

To camouflage that his demands are unsupported by the facts or the law, the defendant confusingly separates his discovery claim into two separate motions: one to determine in the abstract the scope of the prosecution team, without reference to any documents claimed to be discoverable, and a second to describe broad categories of information that he speculates exist and asserts are material. But making separate filings betrays the defendant's true intent, which is to

disjoin the conjunctive analysis properly undertaken by courts in this district: (1) whether the requested documents are held by an entity that is "closely aligned with the prosecution," and thus can be easily and fairly obtained by the Government, and (2) whether the defendant has established that the requested documents meet the test of materiality. *See United States v. Libby*, 429 F. Supp. 2d 1, 8-16 (D.D.C. 2006) (assessing both scope and materiality). The Government sets forth below the applicable law regarding the scope of the prosecution team in this case, and the test for whether the information demanded by the defendant is material to preparing the defense. The defendant's contentions on both fronts fail.

### A.      Scope of Prosecution Team

The Government's *Brady* and Rule 16 obligations extend to all material in the possession, custody, or control of the "prosecution team," which includes only the prosecution itself and those entities that are "closely aligned with the prosecution." *United States v. Brooks*, 966 F.2d 1500, 1503 (D.C. Cir. 1992) ("The cases finding a duty to search [for *Brady* material] have involved files maintained by branches of government closely aligned with the prosecution.") (citation omitted); *Libby*, 429 F. Supp. 2d at 6 (applying the "closely aligned" test to Rule 16).

The "closely aligned with the prosecution" inquiry is "fact-intensive and must be resolved on a case-by-case basis." *Id.* at 9. It is limited to entities that have significantly cooperated with, and provided substantial information to, the Government's investigation. *Id.* at 10-11 (assessing the cooperation and assistance of the Office of the Vice President and the CIA). Only where such a relationship exists, and the Government has access to the documents, will courts in this district consider whether the Government should be required to obtain documents that meet the materiality requirement. *Id.* at 5-6 ("[C]ourts have in the main been more concerned with fairness to the defendant, on the one hand, and the government's ease of access to the documents sought, on the

other, than with the issue whether the documents are actually within the physical possession of the prosecutor.") (citation omitted); *United States v. Griffith*, 900 F.2d 1377, at *5 (D.C. Cir. 1993) (denying request for government to search for records because "the documents were not within the control of the United States Attorney's Office or another government office that would allow the prosecutors easy access"). Because cooperation and access are key to assessing whether an entity is "closely aligned with the prosecution," where the Government has only obtained documents from another entity by way of subpoena or other compulsory process, it does not have "access" to additional documents from that entity for purposes of discovery. *See United States v. Sayler*, 271 F.R.D. 148, 156 (E.D. Cal. 2010) ("The need for formal process in the acquisition of documents is the antithesis of 'access' as defined by the above cases."); *Weems v. United States*, 191 A.3d 296, 302-03 (D.C. 2018) ("Similarly, the fact that the government (like the defendant or any other party) might obtain or gain access to an item from its possessor by means of a subpoena *duces tecum* or other discovery mechanism cannot be enough to establish that the government has 'control' over the item within the meaning of Rule 16; on the contrary, the need to resort to such legal process would show that the basic indicia of control are absent. And it goes without saying that the government's ability to take a thing by force without right does not equate to Rule 16 control.").[1]

The fact-intensive inquiry necessarily considers reasonableness because "to require the government to search the files of every agency in the Executive Branch would not only wreak

---

[1] *Cf. United States v. Sarras,* 575 F.3d 1191, 1215 (11th Cir. 2009) (no government "possession, custody, or control" of evidence that could have been subpoenaed from third parties; "[i]t was not the government's responsibility to track down third-party evidence for [the defendant]"); *United States v. Graham*, 484 F.3d 413, 417-18 (6th Cir. 2007) (obligation to disclose exculpatory evidence does not extend to material the government would have to obtain from a witness by subpoena, even though the witness is cooperating with the prosecution pursuant to a plea agreement, because such material is not within the government's control).

havoc but would give the defense access to information not readily available to the prosecution." *Libby*, 429 F. Supp. 2d at 6 (quotation omitted); *United States v. Avellino*, 136 F.3d 249, 255 (2d Cir. 1988) (rejecting "a monolithic view of government that would condemn the prosecution of criminal cases to a state of paralysis") (citation omitted).

Properly applied, and as set forth in detail below, the applicable test demonstrates that none of the entities identified by the defendant are part of the "prosecution team." Because he cannot satisfy the relevant test, the defendant invents his own standard, misapplies district caselaw, and contorts facts to his liking.

First, the defendant advances his argument largely by creating, and then repeatedly relying on, a new test that is not the law of this or any other Circuit: whether "another entity actually contributed to the investigation by locating evidence or assisted in some other way." ECF No. 166-1 at 3.[2] In support of his new test, the defendant cites to *United States v. Michel*, 2023 WL 7140001, at *1 (D.D.C. 2023), which quotes a discussion in *Libby* about the Ninth Circuit's factual—not legal—analysis in *United States v. Santiago*, 46 F.3d 885, 894 (9th Cir. 1995). But the legal test established by that Ninth Circuit case is whether "the prosecutor has knowledge of and access to the documents." *Santiago*, 46 F.3d at 894. The test invented by the defendant is not an accurate statement of the law and is plainly unworkable, as even courts in the Ninth Circuit have found. *See United States v. Corbett*, 2023 WL 1930642, at *3 (E.D. Cal. 2023) ("Defendant cites *Santiago* . . . for the proposition that 'an agency's files are deemed within the possession of the prosecution . . . if the agency contributed to the investigation.' . . . This formulation goes too far."). It would sweep into the prosecution team any entity that in any way provided information

---

[2] For only ECF Nos. 166-1 and 167, the page citations are to the pagination of the briefs, not the ECF header.

to or assisted the investigation, which is neither practical nor legally justified. It would, in the words of *Libby*, only "wreak havoc." 429 F. Supp. 2d at 6.

Second, the defendant cites *United States v. Safavian*, 233 F.R.D. 205 (D.D.C. 2006), for the notion that the prosecution team is "broadly defined to include all Executive Branch agencies." ECF No. 167 at 3. But the lone sentence from another court in this district is an outlier and not the law of the D.C. Circuit. *See, e.g.*, *Libby*, 429 F. Supp. 2d at *6 n.10 ("By its own admission, [the *Safavian*] holding expands the government's obligation to search for documents beyond agencies 'closely aligned' with the prosecution. . . . This Court need not (nor does it believe it could) adopt such a broad reading of the applicable caselaw in this Circuit to properly resolve the pending motions."). The court's holding in *Safavian* also was narrower than the defendant lets on. There, the court required disclosure only from two closely-aligned agencies, and acknowledged in a subsequent decision that both "the duty to search and the imputation of knowledge necessarily are bounded by a rule of reason." 233 F.R.D. at 207 n.1.

Third, the defendant relies on factors that have nothing to do with whether the entity in question is "closely aligned with the prosecution," as that test has been interpreted and applied by courts in this district. For example, relying largely on a newspaper article, the defendant spends pages tracing the movements of personnel who might have worked in different offices. ECF No. 166-1 at 9-14. But staff shifts occur within the Department of Justice and across Executive branch entities with some frequency, and they do not bear on whether an outside entity is "closely aligned with the prosecution." Likewise, as discussed below, the delineation of matters within the Special Counsel's Office has no bearing on the defendant's discovery demands because he has been provided with the materials to which he is entitled.

### B.    Materiality

Even if the defendant could prove that the scope of the prosecution team was boundless, he is not entitled to discovery unless he can meet his burden of showing materiality—*i.e.*, that the requested discovery "enables the defendant significantly to alter the quantum of proof in his favor." *United States v. Graham*, 83 F.3d 1466, 1474 (D.C. Cir. 1996) (quoting *United States v. Caicedo-Llanos*, 960 F.2d 158, 164 n.4 (D.C. Cir. 1993)); *United States v. Neely*, 2023 WL 1778198, at *8 (D.D.C. 2023) (same). Said differently, an item is material only if "there is a strong indication that it will play an important role in uncovering admissible evidence, aiding witness preparation, or assisting impeachment or rebuttal." *Graham*, 83 F.3d at 1474 (quoting *United States v. Lloyd*, 992 F.2d 348, 351 (D.C. Cir. 1993)).

In the context of Rule 16, the trial court "start[s] with the indictment when determining what is material." *Libby*, 429 F. Supp. 2d at 7 (citing *United States v. George*, 786 F. Supp. 11, 13-15 (D.D.C. 1991)). The phrase "the defense," as it appears in Rule 16, means the "defendant's response to the Government's case in chief." *Libby*, 429 F. Supp. 2d at 6 (quoting *United States v. Armstrong*, 517 U.S. 456, 462 (1996)). Where the defendant makes no showing that the requested information will be in service to a valid defense, the corresponding discovery request fails. *See, e.g.*, *United States v. George*, 786 F. Supp. 56, 64 (D.D.C. 1992) (denying motion to compel where it was "unlikely that the defendant would be permitted to use such evidence at trial").

Overbroad discovery requests, like the defendant's here, also fail. *See id*. at 65 ("The court does not know how it could have deemed any of defendant's vastly overbroad document requests to be material to his defense."); *United States v. Nichols*, 2023 WL 6809937, at *1 (D.D.C. Oct. 16, 2023) (denying motion where defendant made "a sweeping set of fourteen demands for information" after government already produced voluminous discovery). So too do requests that

"rely on mere speculation, rather than facts." *Nichols*, 2023 WL 6809937, at *1; *see also Brooks*, 966 F.2d at 1504 ("mere speculation that a government file may contain *Brady* material was not enough to require an in camera examination"). Moreover, by definition, cumulative information is not discoverable because it cannot significantly alter the quantum of proof in a given case. *See, e.g.*, *United States v. Cousin*, 2022 WL 314853, at *21 (D. Mass. 2022) ("information in the other redacted portions of the SRT report is cumulative and not material under either *Brady* or Rule 16(a)(1)(E)(i)."). And when the requested discovery is "only tangentially relevant, the court may consider other factors, such as the burden on the government that production would entail or the national security interests at stake, in deciding the issue of materiality." *George*, 786 F. Supp. at 58; *Neely*, 2023 WL 1778198, at *10 (in January 6 case, denying request for "photographs and measurements of the nonpublic areas of the Capitol . . . Without a stronger showing of materiality, the Court will not require the prosecution and Capitol Police to expend further resources and potentially compromise national security"). Finally, even if something is material, district courts retain discretion to narrow discovery. *Neely*, 2023 WL 1778198, at *8 (citing FED. R. CRIM. P. 16(d)(1)); *George*, 786 F. Supp. at 61 (denying motion to compel where "the documents are marginally relevant at best and all other factors counsel against compelling production") (citing *United States v. Poindexter*, 727 F. Supp. 1470, 1473 (D.D.C. 1989)).

　　As he has done elsewhere, the defendant miscasts relevant caselaw and incorrectly asserts that materiality "only requires 'some abstract logical relationship to the issues in the case.'" ECF No. 167 at 5 (citing *Caicedo-Llanos*, 960 F.2d at 164 n.4). Here, the defendant is actually stating the opposite of what the law requires. In *United States v. Ross*, which the *Caicedo-Llanos* court's footnote misquoted, the Fifth Circuit held that materiality "means more than that the evidence in question bears some abstract logical relationship to the issues in the case." *Id.* Subsequent courts

in this district have recognized the actual test. *See George*, 786 F. Supp. at 58 ("An 'abstract logical relationship to the issues in the case' is not, however, sufficient to force the production of discovery under Rule 16."); *Libby*, 429 F. Supp. 2d at 7 (evidence is not material if it only bears "some abstract relationship to the issues in the case"). If the defendant cannot show a meaningful link between the information he requests and a legitimate defense, the demand should be rejected. *See United States v. Sturgeon*, 2023 WL 3203092, at *8 (D.D.C. 2023) (denying motion to compel where requested communication would be "entirely irrelevant to [defendants'] state of mind"); *George*, 786 F. Supp. at 64 ("Without this crucial link, the discovery was not material to the defense because it revealed nothing about the defendant's state of mind.").

The defendant also raises the specter of material, yet hidden, classified information. But as the defendant has elsewhere recognized, classified material is not discoverable unless both "relevant" and "helpful" to the defense. ECF No. 62 at 1. Fatal to the defendant's insinuations, classified discovery requests are considered under the same framework as unclassified discovery. *See United States v. Yunis*, 867 F.2d 617, 621 (D.C. Cir. 1989) (CIPA "creates no new rights of or limits on discovery of a specific area of classified information").

## II.     The Court Should Reject the Defendant's Arguments for an Unprecedented and Unsupported Expansion of the Scope of the Prosecution Team

The defendant seeks to add to the prosecution team a separate investigation, distinct components of the Department of Justice, the Department of Homeland Security ("DHS") (and its quarter-million employees), the nation's entire military apparatus (three million strong), the 18 federal agencies that comprise the intelligence community, and a defunct committee of a separate branch of government. The defendant already has received the discovery in the possession of the Government and agencies that are "closely aligned with the prosecution." *Brooks*, 966 F.2d at

1503. The Court should reject the defendant's boundless arguments, based on factual misstatements and his invented legal test, to extend the Government's discovery obligations.

### A.       Special Counsel's Office (ECF No. 166-1 at 8)

The defendant first argues that the prosecution team should encompass the entire Special Counsel's Office, including staff working on the defendant's criminal case in the Southern District of Florida. But precise delineation of the investigative teams within the Office is immaterial given the factual record and the defendant's failure to identify any specific material from the Florida investigation to which he is entitled in discovery in this case and does not already have.

The Government has taken a broad approach to discovery, providing voluminous, comprehensive, and early productions that exceed its obligations. *See, e.g.*, ECF No. 166-8, Sealed Ex. G (Aug. 11, 2023, discovery production letter with 41 pages of detailed Source Logs). And as the defendant knows, the Government in this case produced statements (grand jury or interview) given by witnesses in the investigation leading to the defendant's criminal case in the Southern District of Florida, where the witness also was interviewed or testified in the investigation underlying this case. ECF No. 166-7 at 1. The Government also included in discovery in this case other items of overlapping relevance with the Florida case. This practice will continue, including for disclosures of Jencks Act materials. Moreover, as the defendant's motion makes clear, discovery in both cases has been provided to a common set of attorneys and to the same defendant. The defendant has not identified a single document from the Florida case that he believes also should be discoverable here and that he does not already have, despite the Government's invitation that he do just that, *see id.* In sum, the defendant demands relief for a problem that does not exist.

**B.     United States Attorney's Office for the District of Columbia
          (ECF No. 166-1 at 9-11)**

The defendant next tries to define the prosecution team to include "personnel at the United States Attorney's Office for the District of Columbia ('USAO-DC') who participated in any investigation relating to the 2020 election or January 6, 2021." ECF No. 166-1 at 9. The defendant's request is misplaced.

The Special Counsel's Office is, by regulation, separate from other components within the Department of Justice. *See* 28 C.F.R. § 600.1, 600.6-7. The Special Counsel does not answer to the U.S. Attorney for the District of Columbia, who in turn does not answer to the Special Counsel. The investigation assumed by the Special Counsel had been conducted primarily within USAO-DC, and all case files from that investigation were transferred to the Special Counsel upon his appointment. Thereafter, when the Government has received discoverable information from USAO-DC, it has made it available to the defendant—as the defendant well knows from multiple discovery letters.

The defendant's principal complaint appears to be related to documents from Capitol breach cases. *See* ECF No. 166-1 at 9-11. The Government has produced in this case discovery related to the Capitol siege, which includes material generated in USAO-DC's Capitol breach cases. In addition, the Government twice has offered to provide the defendant access to the highly organized, searchable database for discovery populated by USAO-DC in those cases. *See* ECF No. 166-8 at 6; ECF No. 166-7 at 2-3. This is the same database access provided as global discovery to counsel for Capitol breach defendants, which contains law enforcement reports, videos, search warrant returns, and other evidence. The defendant has never responded to the Government's offers. His complaint on this issue is thus undercut by his failure to access the searchable database of material he claims to want.

Rather than pursue and review discovery available to him, the defendant attempts to use as a cudgel the Government's unaccepted offers of access to claim the Government and USAO-DC are one and the same. They are not. And his scope arguments, irrelevant in the abstract, do not explain why he believes he is entitled to more than any other January 6 defendant—when functionally, he is in the same position, having received both case-specific discovery and database access—or what more he seeks.

Next, the defendant cites *United States v. Hsia*, 24 F. Supp. 2d 14 (D.D.C. 1998), and *United States v. Saffarinia*, 424 F. Supp. 3d 46 (D.D.C. 2020), for the anodyne point that the Government cannot satisfy its discovery obligations by leaving a defendant to search for a needle in a haystack. But the provision of both substantial case-specific discovery and access to USAO-DC's searchable database meets and exceeds the Government's obligations while highlighting information pertinent to the Government's anticipated case-in-chief. *See United States v. Vo*, No. 21-cr-509, Trial Tr. at 91-92 (D.D.C. Sept. 18, 2023) (TSC) (noting that materials sought by a Capitol breach defendant were provided in global discovery, and articulating the Court's expectation that defense counsel look for relevant materials in the Capitol siege discovery database). The Court should reject the defendant's undefined demands for more, especially when he has not accessed the discovery already offered.

### C.    FBI Washington Field Office (ECF No. 166-1 at 14-15)

The defendant's argument regarding the FBI's Washington Field Office echoes those about the Special Counsel's Office and USAO-DC. He makes no effort to identify information he seeks, pointing instead to items he has already received in discovery and assertions about the FBI from a newspaper article. ECF No. 166-1 at 15. The Government already has made clear that the prosecution team in this case consists of the law enforcement officers working on it, *see* ECF No.

166-5 at 1, which includes agents from the FBI's Washington Field Office. The defendant has received, or will receive by relevant upcoming deadlines, *see* ECF No. 28, ample discovery from prosecution team members who are part of the FBI's Washington Field Office. To the extent other individual agents in that office may have worked on charged Capitol breach cases, any theoretically relevant discovery in those cases has either been produced or offered to the defendant via the discovery database that he has chosen not to access.

### D.    DOJ Headquarters (ECF No. 166-1 at 11-14)

The defendant claims that several Department of Justice components, including leadership offices, should be included in the prosecution team.[3] ECF No. 166-1 at 11. But his argument begins and ends in the abstract, and he fails to establish that any of these components are closely aligned with the prosecution. Notwithstanding the defendant's speculation that "there are strong indications that some discoverable material exists," *id.* at 23, he points to no withheld information from these components that is material to the charges against him.

To complain about information that he did not receive in discovery, the defendant appends information that he *did* receive in discovery. ECF No. 166-1 at 11-12 (citing Bates-stamped exhibits). Nowhere does he state with any specificity what other information he believes should be produced. He further asserts that "[c]urrent and former senior leaders of the Justice Department are likely witnesses in the case," *id.* at 11 (quotations omitted), but these fact witnesses—who are not current officials—will testify about events alleged in the indictment.[4]  This is distinct from and has no bearing on whether the offices where fact witnesses once worked are closely aligned with

---

[3] As the defendant acknowledges, the Government has already stated that agents from DOJ-OIG and NARA-OIG participated in this investigation, and has produced related discovery. ECF No. 166-1 at 12-13.

[4] No current Department of Justice official will be a witness at trial.

the prosecution in this case. The defendant's argument about "high-level DOJ participation" in the development of this investigation, *id.* at 13, similarly fails to show close alignment, particularly where it only amounts to an assertion that some DOJ officials were, unremarkably, briefed on the investigation or—as required by the Justice Manual, § 9-90.020—were consulted during other cases separately investigated by USAO-DC.

Aside from making a broad assertion about Jencks Act and *Giglio* materials—which the Government has produced and will continue to produce—the defendant does not request any particular information that is material to the indictment, instead claiming that there are "emails and electronic records" that "appear to be missing." ECF No. 166-1 at 23. In making this claim, the defendant fails to inform the Court of (or include as an attachment) the Government's August 22, 2023, discovery production letter in which the Government details that it was producing that day exactly what the defendant now claims is missing—"relevant materials from the email boxes, mobile devices, and select files" of senior Department of Justice leadership during the defendant's administration, broken out in the Source Log by specific custodian.

In sum, the absence of any specific request for additional information material to the charges—particularly in light of the comprehensive discovery already produced—provides no ground for subsuming an array of Department components into the prosecution team.

### E.      Department of Homeland Security (ECF No. 166-1 at 15-17)

The defendant moves next to DHS, focusing his scope-of-the-prosecution-team arguments on the United States Secret Service ("USSS") and the Cybersecurity and Infrastructure Security Agency ("CISA"). ECF No. 166-1 at 15. Here again his argument fails because they are not part of the prosecution team and he has already been provided with the material related to those agencies that is in the possession of the Government.

First, regarding the USSS, much—if not all—discoverable material from it was obtained through compulsory process, demonstrating that the agency is not part of the prosecution team. *See, e.g.*, *Sayler*, 271 F.R.D. at 156. In addition, that material—which is only marginally relevant and yet constitutes a sizable portion of the discovery—has already been provided to the defendant. Though the defendant points to the fact that the Government obtained during the investigation "several official phones from USSS employees," ECF No. 166-1 at 16, he fails to inform the Court that the phones did not contain any recoverable information and that, though informed that the Government intended to return the phones to USSS by a certain date, he failed to interpose an objection. *See, e.g.*, ECF No. 166-8 at 6. Finally, additional USSS information is contained in USAO-DC's discovery database. Against this backdrop, the defendant fails to identify a single item, or category of items, from the USSS or DHS more broadly that he does not already have, that he says he needs, or that will significantly alter the quantum of proof in his favor.

The defendant's arguments over material from CISA are also unavailing. The defendant suggests that CISA "assisted the investigations," ECF No. 166-1 at 26, and thus must be part of the prosecution team simply because CISA documents were produced to the Special Counsel's Office and because the charges against the defendant include reference to CISA, *id.* at 16-17. Even under the defendant's telling, though, the facts do not show the "easy access" necessary to bring CISA within the scope of the prosecution team. *Griffith*, 900 F.2d 1377, at *5. As shown by the exhibit the defendant cites in support, the agency produced documents—which have been provided to the defendant—in response to compulsory process. *See* ECF No. 166-14, Sealed Ex. M at 3-5 (Bates SCO-06615568 through -70). In addition, as part of its investigation, the Government interviewed a single current CISA employee and did so in the presence of the agency's attorneys. *See id.* at 4. That interview has been provided in discovery, and these limited interactions do not

constitute the significant cooperation and access that would lead to finding an entity "closely aligned" with the prosecution team.

**F.      Department of Defense, Office of Director of National Intelligence, and CIA (ECF No. 166-1 at 17-19)**

The defendant seeks to draw three additional agencies—the Department of Defense ("DOD"), the Office of the Director of National Intelligence ("ODNI"), and the Central Intelligence Agency ("CIA")—into the prosecution team based on a vague assertion of "coordination and sharing between" these agencies and the Government.[5] ECF No. 166-1 at 27. Yet the defendant's motion is devoid of facts to support such a finding. *Nichols*, 2023 WL 6809937, at *8 (in January 6 case, denying motion to compel where defendant relies on "unverified factual allegations" and "baseless conjecture"). Rather, the defendant's assertions show only that individuals formerly with some of those agencies may be fact witnesses in this case. *See, e.g.*, ECF No. 166-1 at 18-19 (describing purported contact between Capitol Police, MPD, and DOD officials, and citing indictment allegation that a former Director of National Intelligence facilitated a briefing to Co-Conspirator 4 at the defendant's direction).

With respect to DOD, the defendant asserts that "components" of DOD assisted in the Government's investigation, ECF No. 166-1 at 17, but fails to identify those components, much less specify any items from DOD that are material to this case. Absent such specificity, what the defendant requests is for the Government to search the holdings of a military apparatus that employs three million people for information related to the events of January 6. *Id.* at 18. In its investigation, the Government has interviewed one then-current, now-former DOD official and a

---

[5] ODNI collects and analyzes information from the entire intelligence community. Thus, the defendant here demands that the Court functionally make the entire intelligence community part of the prosecution team.

small number of former DOD officials—all of whom were fact witnesses to the defendant's conduct during the charged conspiracies—and provided the defense with discoverable items produced by DOD, as well as everything related to DOD received from the House Select Committee to Investigate the January 6th Attack on the U.S. Capitol ("Select Committee").

The defendant's one-sentence assertion regarding the CIA, *id.* at 19, similarly calls for an impermissibly broad interpretation of the prosecution team.[6] The defendant tries to import the CIA into the prosecution team based only on implied coordination between the CIA and Special Counsel's Office prosecutors in the Florida case. ECF No. 166-1 at 19. But like a U.S. Attorney's Office in which the existence of a tax unit that works with IRS agents does not require a search of all IRS records in all other cases handled by that U.S. Attorney's Office, the CIA's relevance to a separate investigation, even within the Special Counsel's Office, does not sweep the agency into the scope of the prosecution team here.

With respect to ODNI, the Government interviewed two ODNI witnesses, neither of whom was employed by the agency at the time. It issued compulsory process to both witnesses prior to voluntary interviews, and thereafter produced transcripts and exhibits to the defense.

These limited contacts provide no justification for an expansive order designating these defense and intelligence agencies as part of the prosecution team for all purposes. The defendant's authorities do not suggest otherwise. For instance, *United States v. Karake* involved Rwandan nationals alleged to have committed crimes in Uganda. 281 F. Supp. 2d 302, 305 (D.D.C. 2003). To resolve whether the Rwandan government was an agent of the U.S. government when it investigated the case, the court ordered the prosecution to make good faith efforts to obtain information about the relationship between the two governments. *Id* at 309. The case does not

---

[6] The Government responds further in a short classified supplement filed today.

impose on the Government, as the defendant suggests, a generalized obligation to obtain information for the defense from entities that are not part of the prosecution team. Likewise, the defendant cites (ECF No. 166-1 at 28) *United States v. Oseguera Gonzalez*, 507 F. Supp. 3d 137 (D.D.C. 2020), but that case did not bear on the scope of the prosecution team. Rather, at issue was simply whether the prosecution had reviewed documents obtained from the Treasury Department's Office of Foreign Assets Control ("OFAC"). *Id*. at 169-70. The court did not designate OFAC or the Treasury Department as part of the prosecution team nor did it order broad disclosure, as demanded by the defendant here. These cases thus provide no support for the contention that DOD, ODNI, or the CIA are part of the prosecution team.

### G.    Congressional Select Committee (ECF No. 166-1 at 20-21)

Finally, the defendant speculates about "coordination" and "extensive access," ECF No. 166-1 at 28, to argue that the prosecution team here includes the Select Committee. This argument relies on one newspaper article, *id.* (citing ECF No. 116-1), while dismissing reporting that contradicts the defendant's narrative as "based on self-serving leaks," *id.* at 20. It also rests on an assertion that USAO-DC "acted as the Committee's enforcer," *id.*, simply by prosecuting contempt-of-Congress charges following proper criminal referrals.[7]

The defendant's speculation provides no authority for this Court to redefine the prosecution team to include a legislative body from another branch of government—something no other court has done. *Libby*, 429 F. Supp. 2d at 7 ("[I]t is settled that the government generally need not produce documents that are in the possession, custody, or control of a separate branch of government such as Congress."); *United States v. Bannon*, No. 21-cr-670, ECF No. 147 at 5

---

[7] The defendant ignores that other referrals from the Select Committee did not give rise to criminal contempt prosecutions.

(D.D.C. Sept. 2, 2022) (rejecting defense claim that Select Committee materials were in Government's possession). In the context of Capitol breach cases specifically, courts in this district have rejected requests, like this one, that would bring the Select Committee within the ambit of the prosecution team. *See Nichols*, 2023 WL 6809937, at *12 (Select Committee not part of prosecution team because, while it had an "investigative" function, its purpose was legislative); *United States v. Zink*, 2023 WL 5672555, at *2 (D.D.C. 2023) (finding no duty for the government to produce Select Committee materials that were "never possessed by any entity other than Congress," and noting that defendant's motion was thinly "based entirely on one news article reporting a dispute between two Congressmen"); *United States v. Nordean*, 2022 WL 2292062, at *2 n.4 (D.D.C. 2022) ("the Government need not—indeed, it cannot—produce information or materials in the possession of Congress but not in the possession of the Department of Justice.").

In any event, the Government already has produced to the defendant the items it obtained from the Select Committee, which the defendant's motion admits includes "nonpublic items" and "transcripts of witness interviews." ECF No. 166-1 at 21; *see also* ECF No. 165 at 5 (Court's order on Rule 17(c) subpoena request, noting that the defendant does not dispute that he received the Select Committee interview transcripts he sought).[8] The defendant offers no reason to extend the Government's obligations to cover unidentified items solely in Congress's possession.

---

[8] The defendant makes much of a witness's offer to provide classified material to the Select Committee. ECF No. 166-1 at 28-29. Nowhere, though, does the defendant confirm whether the Select Committee accepted the offered material or ever possessed it. And to the extent that the defendant believes classified information in Appendix 4 of the Select Committee Report is exculpatory, *id.* at 29, he fails to explain how such classified material would not be cumulative of other information in his possession, including, as described below, the 2020 ICA report.

III.    **The Court Should Deny the Defendant's Discovery Demands Because He Fails to Establish Their Materiality**

As the defendant admits, any materiality analysis begins with the indictment. *See* ECF No. 167 at 6; *Libby*, 429 F. Supp. 2d at 7; *Nichols*, 2023 WL 6809937, at *8. The indictment alleges specific false assertions of fact, and the Government has provided substantial discovery regarding those allegations. One would think that the defendant's discovery requests, therefore, would focus on specific documents, information, and intelligence that he was aware of and relied on at the time he made his false statements, perhaps in an effort to show good-faith reliance on that information or to support a claim regarding his veracity. But the defendant's discovery requests do not do so because no such evidence exists. Instead, the defendant tries a variety of speculative diversions to matters irrelevant to the indictment, seeking information that is not material within the meaning of Rule 16. The defendant attempts to justify his broad requests with the unremarkable proposition that the Government's discovery obligations cannot be cabined by "beliefs or assumptions that [the defendant's] defenses lack merit." ECF No. 167 at 17. Contrary to the defendant's unsupported claim, the Government is not shirking its discovery obligations; rather, he seeks non-discoverable information that is not in the prosecution team's possession and that, in some cases, does not exist.

A.    **Foreign Meddling in 2020 Election**

The defendant's discovery motions conflate two distinct concepts—foreign interference and foreign influence—while claiming inaccurately that the Government has withheld evidence of both. Since the defendant weaves this false narrative through many of his discovery categories, the Government briefly addresses here the concepts as they relate to the 2020 presidential election and to the indictment. "Interference" is defined by the intelligence community as foreign efforts targeting the technical aspects of voting, tabulation, or reporting. *See* ECF No. 167-6 at 4 (Unclassified Intelligence Community Assessment ("ICA")). For example, if a foreign or cyber

actor hacked into a voting machine and flipped votes from the defendant to candidate Biden (something for which no evidence exists), this would have been interference. In contrast, "influence" describes foreign efforts to spread disinformation, often to falsely denigrate or support a candidate, sow confusion, exacerbate political tensions, undermine confidence in the electoral process, or otherwise influence the hearts and minds of American citizens. *See, e.g.*, ECF No. 167-6 at 14, 21-22 (describing types of foreign influence).

The indictment alleges that the defendant spread knowing lies regarding foreign interference when he falsely claimed that "voting machines had changed votes for the Defendant to votes for Biden," ECF No. 1 at ¶¶ 11 & 12(f), and the defendant has been provided with the relevant discovery on this topic. As explained further below, the defendant's discovery motions contain inaccurate information about foreign interference in the 2020 election, discuss irrelevant foreign influence in an attempt to blame others for his own conduct, and fails entirely to establish the materiality of any information he demands beyond that which he already has been provided.

### 1.     Foreign Interference

The unanimous conclusion of the intelligence community, which includes 18 federal agencies, 50 U.S.C. § 3003(4), was that there was no evidence of foreign interference in voting registration, voting, or vote counting in the 2020 presidential election. This conclusion was reflected in an ICA titled "Foreign Threats to the 2020 US Federal Elections," prepared by ODNI under the direction of the defendant's Director of National Intelligence ("DNI") and principal intelligence advisor. The ICA synthesized evidence collected by the intelligence community writ large and addressed foreign attempts to (1) interfere with and (2) influence the 2020 presidential election. On January 7, 2021, the DNI sent the defendant and Congress the ICA on foreign

meddling in the 2020 election. A declassified version of the assessment was published two months

later. ECF No. 167-6. The report laid out five key judgments:

- **Key Judgment 1**: "We have no indications that any foreign actor attempted to alter any technical aspect of the voting process in the 2020 US elections, including voter registration, casting ballots, vote tabulation, or reporting results."

- **Key Judgment 2**: Russia deployed influence operations to help the defendant, denigrate candidate Biden, undermine confidence in the electoral process, and exacerbate sociopolitical divisions in the United States. Unlike in 2016, the intelligence community did not see persistent Russian cyber efforts to gain access to election infrastructure.

- **Key Judgment 3**: Iran deployed an influence campaign to hurt the defendant (without promoting another candidate), undermine public confidence in the electoral process, and exacerbate societal tensions in the United States.

- **Key Judgment 4**: China did not deploy interference efforts. China considered but did not deploy influence efforts. The minority view, shared by the National Intelligence Officer ("NIO") for Cyber and the DNI, was that China engaged in some influence efforts, but not interference.

- **Key Judgment 5**: A range of foreign actors, including Hizballah, Cuba, and Venezuela, made some attempts to influence the election.

ECF No. 167-6 at 5.

The intelligence community was not alone in its assessment that no foreign country

interfered with the election. In the weeks following the defendant's electoral defeat, he publicly

declared the 2020 election had been "virtually impenetrable" from foreign interference. Nov. 17,

2020 @RealDonaldTrump Tweet. The defendant was joined in this view by every other

knowledgeable official from his administration who the Government has interviewed.

Furthermore, in February 2021, after the defendant left office, the Department of Justice

and DHS published a joint Materiality Assessment discrediting any claims of interference with the

election, writing that collectively, federal law enforcement had "no evidence that any foreign

government-affiliated actor prevented voting, changed votes, or disrupted the ability to tally votes

or to transmit election results in a timely manner; altered any technical aspect of the voting process;

- 21 -

or otherwise compromised the integrity of voter registration information of any ballots cast during 2020 federal elections." ECF No. 167-8 at 2 (DOJ-DHS Materiality Assessment). In short, and relevant to the indictment, there is no evidence to support the defendant's false claims of voting machine fraud.

In support of his Motion to Compel, the defendant suggests that the Government relied only on a selection of politically biased officials (ECF No. 167 at 1-2), but he does not and cannot substantiate this theatrical claim. To the contrary, as the defendant is aware from the discovery that has been provided, the Government asked every pertinent witness—including the former DNI, former Acting Secretary of DHS, former Acting Deputy Secretary of DHS, former CISA Director, former Acting CISA Director, former CISA Senior Cyber Counsel, former National Security Advisor ("NSA"), former Deputy NSA, former Chief of Staff to the National Security Council, former Chairman of the Election Assistance Commission ("EAC"), Presidential Intelligence Briefer, former Secretary of Defense, and former senior DOJ leadership—if they were aware of any evidence that a domestic or foreign actor flipped a single vote in a voting machine during the presidential election. The answer from every single official was no.

To create the false impression that there might actually be support for his lies about voting machines, the defendant, without context, threads his filing with discussion of irrelevant network breaches around the time of the 2020 election. *See* ECF No. 167 at 15, 26 (arguing that compromises of "several networks that managed some election functions" were enough to call into question the security of the election). In doing so, the defendant attempts to manufacture confusion by willfully ignoring the distinction between voting machines (charged in the indictment) and registration websites (not charged in the indictment). Voting machines, like those manufactured by Dominion, are the systems used to cast and tabulate votes. They are not connected to the

internet, cannot be accessed remotely, and are secured through redundant protections, such as logic and accuracy testing, paper-ballot audits, forensic scans, robust physical security, and federal certification. The states also run voter registration databases, which can be remotely accessed but are not used for voting or tabulation. While no country or cyber actor changed a single vote in a machine, there were isolated cases of foreign countries stealing registration data to target voters with disinformation—actions that constituted foreign influence, not interference.

Ignoring this distinction, the defendant argues the DOJ-DHS Materiality Assessment is inconsistent and "heavily caveated" on foreign interference (ECF No. 167 at 13-14, 25-27), but omits what the report actually says. For instance, the defendant tells the Court that the agencies acknowledged "broad Russian and Iranian campaigns" that "did compromise the security of several networks that managed some election functions" (ECF No. 167 at 15), but misleadingly chops off the second half of the sentence, which made clear that the network compromises "did not materially affect the integrity of voter data, the ability to vote, the tabulation of votes, or the timely transmission of election results." ECF No. 167-8 at 2; *see also* ECF No. 167-6 at 4-5 (compromises of state networks "were not directed at altering election processes. . . . Such efforts are common and we have no indications they were aimed at interfering in the election."). In other words, the network breaches had nothing to do with the defendant's false claims about the machines used to cast and tabulate votes.

To summarize, following the 2020 election, the defendant persistently spread lies that voting machines were fraudulently used to change his votes to candidate Biden. Federal law enforcement, the intelligence community, state officials, and councils of government and private-sector entities universally stated in real time that there was no evidence that a foreign or cyber actor changed a single vote or otherwise interfered with technical election processes, conclusively

showing the defendant told specific lies to his followers about voting machines. In his discovery motions, the defendant, in part based on his deliberate misinterpretation of the Materiality Assessment, wrongly insinuates there might have been interference with the technical aspects of voting, then says he wants to use unidentified foreign interference evidence at trial. He is moving to compel something that does not exist, is not in the prosecution team's possession, and could not have been known to the defendant at the time he inspired his followers with pernicious claims of voting machine fraud. The Court should not entertain the defendant's attempts to inject confusion into the record when it does not exist.

### 2.     Foreign Influence (ECF No. 167 at 7, 12-16, 21-25)

Next, the defendant mischaracterizes the facts regarding foreign influence, by exploiting a largely irrelevant and minor point of disagreement in the ICA. In particular, although the intelligence community enjoyed widespread agreement on Key Judgments 1, 2, 3, and 5 of the ICA, some disagreement stemmed from Key Judgment 4, relating to the extent of China's influence efforts. The majority view was that China drew up a plan to spread disinformation, but did not act on that plan. The minority view held by the DNI and the Cyber NIO, as articulated in the unclassified ICA and the DNI's public dissent letter, was that China took steps to act on its disinformation plan. ECF No. 167-6 at 13-14. The defendant, without explaining the context of the full report, cites only this minority view that "some of Beijing's influence efforts were intended to at least indirectly affect US candidates, political processes, and voter preferences" and that "Beijing preferred [the defendant's] defeat." ECF No. 167 at 13. But the defendant omits the conclusion of the same minority view: the DNI and the Cyber NIO unequivocally stated they "have no information suggesting China tried to interfere with election processes," and that disagreement about China pertained only to influence attempts, not interference. ECF No. 167-6 at 14.

With this spin in hand, the defendant demands information on foreign influence that is neither within the possession of the prosecution team nor tethered to a legitimate defense. He claims he needs this unspecified category of evidence for two reasons: to show (1) "efforts by foreign actors to influence public opinion" on January 6, and (2) that the defendant relied in good faith on—*i.e.*, was tricked by—foreign disinformation. ECF No. 167 at 23-24. His claims are meritless.

First, the request is incomprehensibly broad. The defendant demands "all information relating to foreign influence efforts targeting the 2020 election . . . whether or not he was briefed contemporaneously regarding these issues." ECF No. 167 at 23; *cf. United States v. Sheppard*, 2022 WL 17978837, at *12-13 (D.D.C. 2022) (ordering Government to provide narrow discovery only directly pertinent to defendant's mens rea defense). Paired with the defendant's re-imagining of the prosecution team, the defendant is asking for all information (regardless of classification level) in the possession of the Executive Branch and Congress on foreign efforts to influence opinion—of any individual voter, anywhere in the country, even in states won by the defendant— with respect to the 2020 election. His boundless demand should be denied for this reason alone. *See George*, 786 F. Supp. at 65 ("The court does not know how it could have deemed any of defendant's vastly overbroad document requests to be material to his defense. Defendant asks the court to be permitted to search for a needle in a haystack of the country's most classified secrets, without the slightest indication of what the needle might be and how it might be material to his defense.").

Second, the defendant's attempt to launch a fishing expedition is particularly impermissible since the requests are not tied to admissible evidence or a legitimate defense. *United States v. Williamson*, 2014 WL 12695538, at *3 (D.D.C. 2014) ("Rule 16 is broad, but it does not permit a

defendant to 'see' the prosecutor's file and the Rule cannot be used to engage in a 'fishing expedition.'"). As described below, the defendant seeks discovery in service of improper third-party guilt and reliance defenses, something he cannot do under Rule 16. *Libby*, 429 F. Supp. 2d at 16 n.25 (denying motion to compel detailed national security information where it was "unlikely that [the] Court would permit anything other than the general topic areas of these documents to be introduced at trial"); *George*, 786 F. Supp. at 64 (denying motion to compel where it was "unlikely that the defendant would be permitted to use such evidence at trial"); *Nichols*, 2023 WL 6809937, at *1 (denying motion to compel discovery to develop an unfounded entrapment defense).

### a.      Third-Party Guilt Defense

The defendant's first argument, that foreign countries spun up the defendant's followers and caused the Capitol siege, ECF No. 167 at 23-24, is a thinly-veiled argument of third-party guilt. Evidence of third-party guilt normally fails the balancing test prescribed by Rule 403 where the accused does not sufficiently connect the third party to the crime, the probative value of the evidence is speculative, or the evidence of the third party's guilt would not actually exculpate the defendant. *United States v. Moore*, 590 F. Supp. 3d 277, 283 (D.D.C. 2022) ("The admissibility of third-party-perpetrator evidence turns not on the likelihood of the 'third party's guilt or innocence, but [rather] on 'the effect the evidence has upon the defendant's culpability.'"") (quoting *Winfield v. United States*, 676 A.2d 1, 4 (D.C. 1996)); *Johnson v. United States*, 552 A.2d 513, 517 (D.C. 1989).

Here, the defendant's third-party guilt argument contravenes Rule 403, and for that reason alone cannot form the basis for his indiscriminate demands for classified documents that are not in the prosecution team's possession. No one disputes that certain foreign countries, to varying extents, attempted to influence Americans and spread disinformation. But the lies told by others in

no way exonerate the defendant for the specific lies he told to his followers or the criminal steps he took to illegally retain power. *United States v. Cabrerra*, 1996 WL 135718, at *2 (D.C. Cir. 1996) (admission of third-party-perpetrator evidence depends in part on "whether the third party's guilt would establish the defendant's innocence").

Even if the actions of a third party could legally excuse the defendant's crimes (and they cannot), the defendant's assertion that foreign countries somehow inspired the Capitol siege is both speculative and far-fetched, particularly in light of his own deliberate actions that caused the attack. His overbroad discovery request should be denied. *See United States v. Williams-Davis*, 90 F.3d 490, 514 (D.C. Cir. 1996) (rejecting "bare speculation [of] . . . the existence of favorable materials"); *United States v. Apodaca*, 287 F. Supp. 3d 21, 40 (D.D.C. 2017) (rejecting "defendants' vague asserted need for potentially exculpatory evidence"). The indictment sets forth extensive evidence of the defendant's lies to influence his supporters, leading to the events of January 6. The notion that the rioters who sieged the Capitol were inspired by foreign countries rather than the defendant's drumbeat of inflammatory and false rhetoric is, at best, a counterfactual guess—an "unsubstantiated possibility" that cannot justify the defendant's vague and sprawling requests for "all information" related to foreign influence possessed by every federal employee outside the judiciary. *See Apodaca*, 287 F. Supp. 3d at 40 (citing *United States v. Sims*, 508 F. App'x 452, 460-61 (6th Cir. 2012), which denied of a motion to compel discovery because it was predicated on "a series of generalities based upon an unsubstantiated possibility"). And that unsupported guess is flatly contradicted by the defendant's persistent embrace and validation of the rioters' conduct, to this day. *See, e.g.*, ECF No. 140 at 10-11; ECF No. 176 at 8-9.

### b.       Foreign Influence Reliance Defense

The defendant's second proffered reason for introducing foreign influence evidence is that, according to his discovery motion, the defendant—then the President of the United States with the full intelligence community apparatus at his disposal—was fooled by rumors that foreign adversaries spread following the 2020 election. ECF No. 167 at 23 ("evidence of covert foreign disinformation campaigns relating to the 2020 election supports the defense argument that [the defendant] and others acted in good faith even if certain reports were ultimately determined to be inaccurate."). But the defendant does not point to a single one of his false statements that he might have derived from a foreign nation, which renders the material irrelevant under this district's caselaw. *See Libby*, 475 F. Supp. 2d at 73 (excluding evidence that defendant could not foundationally tie to his defense). Until the defendant can show he earnestly bought into foreign disinformation and establish which foreign rumors were "of specific concern to him" (*id.* at 91), and on which he relied to make his dozens of false fraud claims described in the indictment, evidence of foreign influence is not relevant and cannot justify his vague demand for production of documents the prosecution team does not have.

### B.       The CISA Statement, 2020 ICA, and DOJ-DHS Materiality Statement (ECF No. 167 at 24-27)

The defendant requests the "reports relied upon by the prosecution and prepared by its witnesses," including the 2020 CISA Statement, the 2020 Election ICA, and the DOJ-DHS Materiality Assessment. ECF No. 167 at 27-28. To be clear, the authors of these reports are fact witnesses who do not work for or answer to the prosecution team. The reports represent the findings of the intelligence community, DOJ, DHS, and councils of public and private-sector entities devoted to election security. The relevant federal components were led by officials the defendant appointed and promoted. The Government anticipates these witnesses will provide

testimony that incriminates the defendant, but their reports were prepared while they worked under the defendant's leadership, not the prosecution team's.

Moreover, attempting to evade a cumulative analysis that defeats materiality, the defendant mischaracterizes the documents as mere "summaries" of classified reports. What the defendant calls the 2020 CISA statement is available in its entirety online and is appended to the defendant's motion. ECF No. 167-2. Similarly, the public iteration of the 2020 ICA is a "declassified version" of the classified report, with "analytic judgments" that "are identical to those in the classified version." ECF No. 167-6 at 4. In considerable detail, the declassified ICA provides the extent of foreign interference (none), the countries that engaged in influence efforts, the goals of the influence campaigns, mechanics of the foreign operations, and the dissenting views on China's influence efforts. The public version simply omits classified sources and methods—which the defendant does not explain why he needs. And though not clear from the defendant's motion to compel, the Government has already given the defendant two versions of the classified ICA, including a draft made available to Co-Conspirator 4 prior to his briefing with the DNI and a final classified version, save for the endnotes that have never been provided to the Government and contain extremely sensitive information on covert operations, sourcing, and methodology.

Next, the defendant makes three misleading claims. First, the defendant invokes a completely unrelated event—the SolarWinds attack (ECF No. 167 at 25-26)—to support his speculative and conspiratorial theory that there was foreign interference in the election, contrary to the universal consensus of the officials he appointed. Even if the defendant is correct that Russia breached federal networks as part of the SolarWinds incident, ECF No. 167 at 9, he omits two critical details: (1) states, not the federal government, operated the machines that were used for voting and tabulation, and (2) the SolarWinds attack had nothing to do with the 2020 election, as

the defendant knows through uncontradicted statements of senior knowledgeable officials provided in discovery.[9]

Second, the defendant claims the 2020 CISA statement was "part of a partisan effort to provide false assurances to the public." ECF No. 167 at 25. This counterfactual assertion is bewildering. The defendant created CISA through an executive order. *See* Exec. Order No. 13800. He personally appointed the Director of CISA, and when he terminated that director, went out of his way to pick the replacement under the federal Vacancies Reform Act. In signing the November 12 statement, CISA was joined by the EAC, National Association of Secretaries of State, National Association of Election Directors, and a half dozen other entities. The joint statement (that there was "no evidence that any voting system deleted or lost votes, changed votes, or was in any way compromised") was identical to the conclusions of the intelligence community, federal law enforcement community, and the National Security Council, all of which were led by officials the defendant appointed. The defendant himself proudly tweeted five days later that the election was "virtually impenetrable" from foreign interference. There is no evidence the November 12 statement was a partisan effort to mislead the public, and the defendant fails to establish materiality for the additional information he requests.

Third, the defendant attempts to bolster his argument by again asserting partisan bias in intelligence. ECF No. 167 at 12-14, 26. To that end, he cites a January 6, 2021, letter to Congress from an Intelligence Community Analytic Ombudsman within ODNI describing politicization in the intelligence community. ECF No. 167-5. What the defendant does not mention to the Court, however, is that the Ombudsman's letter describes politicization of intelligence not to the defendant's detriment, and not during the time period of the charged conduct, but by the

---

[9] The Government responds further in a short classified supplement filed today.

defendant's own hand-selected Acting DNI. ECF No. 167-5 at 5 ("Subsequently, the draft was held up by [Acting] DNI Grenell for weeks before publication, and underwent what appears to be politically motivated editing.").

C.   **Infrastructure Compromises, Voting Fraud, and Irregularities (ECF No. 167 at 27-29)**

The defendant requests "all information supporting his position that his concerns regarding fraud during the 2020 election . . . were plausible and maintained in good faith." ECF No. 167 at 27. This demand is simply an unspecified request for all Rule 16 and *Brady* material, and thus "gives the prosecutor no better notice than if no request [were] made." *United States v. Agurs*, 427 U.S. 97, 106 (1976), modified by *United States v. Bagley*, 473 U.S. 667 (1985). The demand adds nothing to the motion, and is so vague as to be meaningless, particularly in light of the Government's full compliance with its discovery obligations. *United States v. Kim*, 2013 WL 3866542, at *2 (D.D.C. 2013) (denying "somewhat vague" discovery request for classified information where defendant "failed to meet his burden to show the Government is required to produce the broad swath of documents sought in the Defendant's present motion"). Otherwise, the defendant recycles the same misleading claims about SolarWinds and election websites, neither of which related to voting or tabulation in 2020 or the lies the defendant told following his defeat.

D.   **ODNI Materials Relating to the DNI's Briefing of Co-Conspirator 4 (ECF No. 167 at 29)**

Referring to the DNI and Co-Conspirator 4, the defendant demands "all classified communications relating to the subject matter of their testimony." ECF No. 167 at 29. The Government has already produced a relevant interview transcript, the agent notes from the interview, the documents shown during the interview (including Co-Conspirator 4's notes), an FBI report of the classified portion of the interview, the relevant grand jury testimony, the unclassified

ICA, the draft version of the classified ICA Co-Conspirator 4 reviewed prior to the DNI briefing, and the final classified ICA. In all respects, the Government has turned over everything in its possession related to anticipated testimony by any party to these communications.

To the extent the defendant is requesting the materials a potential witness reviewed at ODNI, those materials are not in the prosecution team's possession, and the defendant has made no showing that the viewed materials—apparently to refresh memory[10]—would "significantly alter the quantum of proof." *Cf. Agurs*, 427 U.S. at 109 (There is "no constitutional requirement that the prosecution make a complete and detailed accounting to the defense of all police investigatory work on a case") (cleaned up). Instead, this request amounts to a fishing expedition for unspecified information with no "strong indication that it will play an important role" in putting on a defense. *Graham*, 83 F.3d at 1474 (cleaned up); *Agurs*, 427 U.S. at 110 ("The mere possibility that an item of undisclosed information might have helped the defense, or might have affected the outcome of the trial, does not establish 'materiality' in the constitutional sense."); *cf. United States v. Barrow*, 2021 WL 3602859, at *1 (D.D.C. 2021) ("Defendant requests extensive discovery from the District Court, in a fishing expedition to substantiate his vague claims of technological shortcomings."). Such speculation cannot be the basis for a compulsion order, especially for records the Government has never possessed.

### E.   Russian Meddling in the 2016 Election (ECF No. 167 at 21-22)

The defendant has moved to compel production of the classified version of the ICA on Russian meddling in the 2016 election, along with "all source materials," which would include classified assets, methods, and operational details. ECF No. 167 at 21-22. None of these materials

---

[10] The Government did not coordinate the potential witness's visit to ODNI and has no knowledge of what documents were reviewed there.

are in the possession of the prosecution team, nor are they relevant to the charges in the indictment. *Libby*, 429 F. Supp. 2d at 7 (the "indictment delineates the evidence" to which the defendant will respond at trial and for that reason governs the resolution of discovery requests); *United States v. McElroy*, 697 F.2d 459, 464 (2d Cir. 1982) (Rule 16 generally does not permit discovery "unrelated to the crime charged or completely separate from the government's trial evidence").

This demand is for classified information on events that occurred four years before the conspiracy, and in fact, before the defendant was even President. *See Libby*, 429 F. Supp. 2d at 16 ("This Court cannot agree that documents covering such a sweeping time period are material to the preparation of the defense."). It relates to a different election and requests closely guarded secrets of national security about the illicit activity of actors who are not implicated in the indictment. *George*, 786 F. Supp. at 65 (denying discovery motion where the defendant sought access to "a needle in a haystack of the country's most classified secrets"). Worse, the defendant does not explain how such information is not cumulative, nowhere addressing the unclassified 2016 ICA or the 448-page Mueller report, both of which recite Russia's 2016 election meddling in significant detail. Indeed, the defendant never explains what point he can only make with, for instance, the intelligence community's highly classified source material, that he cannot make with the nearly 500 pages of official reporting on the same topic. *Libby*, 429 F. Supp. 2d at 7-8 (classified material not discoverable unless actually helpful to defense). Though the defendant admits that as President he had unfettered access to the documents he now wants, he does not point to anything in the classified report that supports his defense. Specifically, he never claims that he saw the "detailed information supporting" the report, ECF No. 167 at 22, undercutting any argument that he relied on the information when making his false claims.

Finally, the defendant claims that, based on his understanding of what occurred in 2016, he ordered certain cyber operations to prevent foreign interference, and suggests that he is entitled to obtain and introduce significant classified details on those cyber operations. But the defendant is charged with making false claims of election fraud to obstruct the Congressional certification and deprive Americans of their civil rights. There is no meaningful connection between the charges in the indictment and "specific information relating to measures" the defendant "oversaw to mitigate cybersecurity threats." ECF No. 167 at 21; *see also United States v. Flynn*, 411 F. Supp. 3d 15, 30 (D.D.C. 2019) ("Because the Court agrees that the requested information is irrelevant to Mr. Flynn's underlying offense and it is not favorable to his guilt or punishment, the Court need not consider the other two elements."). The defendant's demand for wholly irrelevant, but highly sensitive and classified, information on this front serves only two improper purposes: first, an effort to delay trial with improper discovery requests designed to "graymail" the Government, and second, an effort to admit irrelevant evidence of the defendant's other good acts at trial. *See United States v. Dimora*, 750 F.3d 619, 630 (6th Cir. 2014) ("For the same reason that prior 'bad acts' may not be used to show a predisposition to commit crimes, prior 'good acts' generally may not be used to show a predisposition not to commit crimes."); *United States v. Carpenter*, 2023 WL 1860978, at *1-2 (D.D.C. 2023) (excluding evidence of prior good conduct).

### F.     Evidence Relating to January 6 Protests (ECF No. 167 at 17-21)

Though professing its irrelevance, ECF No. 167 at 17, the defendant seeks material related to January 6 that he already has, to which he is not entitled, or both. The Court should reject his request for more.

#### 1.     Assertions by Government Actors (ECF No. 167 at 18-19)

The defendant seeks "all documents, including private communications, in which

prosecutors, law enforcement, and other officials made statements that are inconsistent with the prosecution's position regarding responsibility for January 6." ECF No. 167 at 18. As a legal matter, neither Rule 16 nor *Brady* requires the Government to scour publicly available court documents for statements by federal prosecutors in different cases, from a different office, that the defendant incorrectly claims are inconsistent with the indictment in this case. *See United States v. Flores*, 540 F.2d 432, 437 (9th Cir. 1976) (Rule 16 does not require the government to "fish through public records and collate information which was equally available to the defense."); *accord United States v. Smith*, 2009 WL 3584944, at *8 (E.D. Tenn. Oct. 22, 2009) (Rule 16 does not require government to provide documents filed in separate case that "defense counsel can easily access"). Likewise, "publicly available court record[s]" available to the defendant "with reasonable diligence" cannot form the basis of a *Brady* motion. *Lee v. Watson*, 964 F.3d 663, 667 (7th Cir. 2020). The public records of court proceedings in prosecutions arising from the Capitol breach are not favorable or exculpatory to the defendant, let alone materially so, but regardless, the defendant is well aware of those records and has chosen not to use his ready access to them.

Moreover, as a factual matter, none of the defendant's misleading and inaccurate references to other January 6 cases help his cause. For instance, through incorporation of arguments made in one of his previous filings, the defendant cites the record in *United States v. Thompson* to point out that the prosecution there made the unremarkable and accurate argument that the defendant's actions on January 6 did not absolve Thompson of responsibility for his own crimes. *See* ECF No. 167 (citing ECF No. 156 at 11 (citing prosecutor's argument that defendant's conduct was irrelevant to the jury's consideration of charges against Thompson)). And the defendant's motion fails to recognize that far from being exculpatory, the record in the *Thompson* case shows that Thompson claimed that he was acting at the defendant's direction. For example, while the defense

selectively quotes from pages 524 and 527 of Thompson's cross-examination, *see* ECF No. 156 at 10, it omits Thompson's claim, on page 525, when asked whether he chose to go into the Capitol (as opposed to being forced by the defendant), that "I was following presidential orders, but yes." *United States v. Thompson*, No. 21-cr-161, ECF No. 108 at 525 (D.D.C. Aug. 8, 2022).

Next, the defendant again references out-of-context statements from the closing argument in *United States v. Rhodes*, in which the prosecution said that Rhodes—the leader of the extremist group the Oath Keepers—acted despite the fact that defendant Trump "didn't take action." ECF No. 167 (citing ECF No. 156 at 12). But the defendant fails to disclose that the referenced "action" was Rhodes's desire that the defendant "stop the election, to call up the military and groups like the Oath Keepers to seize voting machines, to throw out the result, and to hold a new election" by invoking the Insurrection Act and putting militias like the Oath Keepers in power. *See United States v. Rhodes*, No. 22-cr-15, Trial Tr. at 9918-9922, 9925-27 (D.D.C. Nov. 18, 2022). The defendant's failure to subvert the democratic process in the wholly different way that Rhodes hoped he would neither exculpates the defendant nor means that he did not subvert it in the way charged in the indictment.

Finally, the defendant misrepresents the Government's legal argument in other cases that the defendant did not authorize rioters' actions—meaning that the rioters could not properly invoke the legal defense of public authority or entrapment-by-estoppel—as a claim that no government attorney has made: that the defendant is not responsible for the events of January 6. *See* ECF No. 167 at 18-19 (selectively quoting a motion in limine by a prosecutor to exclude an invalid entrapment-by-estoppel defense). There is nothing legally or factually inconsistent or exculpatory about efforts to hold accountable all offenders criminally responsible for January 6—whether they be the rioters who attacked the Capitol, or the defendant here, who directed rioters to do so.

Expanding even beyond his request for public records, the defendant also claims he is entitled to "private communications" of "prosecutors, law enforcement, and" unidentified "other officials" within the government supposedly containing statements about the defendant's role in the attack on the Capitol on January 6. ECF No. 167 at 18. But Rule 16 "does not authorize the discovery or inspection of reports, memoranda, or other internal government documents made by an attorney for the government or other government agent in connection with investigating or prosecuting the case." FED. R. CRIM. P. 16(a)(2). In short, "under Rule 16(a)(2), [a defendant] may not examine Government work product in connection with his case." *Armstrong*, 517 U.S. at 463. Similarly, "a prosecutor's opinions and mental impressions of the case are not discoverable under *Brady* unless they contain underlying exculpatory facts." *Morris v. Ylst*, 447 F.3d 735, 742 (9th Cir. 2006); *see also United States v. NYNEX Corp.*, 781 F. Supp. 19, 25-26 (D.D.C. 1991) (distinguishing attorney opinions from exculpatory facts). The Government has provided the defendant with discoverable facts in its possession; he is entitled to nothing more.

### 2.      Requests for Security at the Capitol (ECF No. 167 at 19-20)

The defendant claims that he "is entitled to all information relating to security at the Capitol on January 6, including documents and communications regarding requests for security and the timing of the National Guard's deployment that day." ECF No. 167 at 19. In his telling, the information would show that unnamed "federal and local officials believed adequate measures" existed that day to protect the Capitol during the riot that the defendant fostered, and any "delayed arrival of the National Guard" contributed to the violence. *Id.* at 19-20. The defendant further claims that he is entitled to information from the Government about which he was not even aware on January 6. ECF No. 167 at 20. The defendant's demand should be rejected.

First, though the defendant does not tell the Court this, he already has a substantial amount of information that he seeks. Whether or not discoverable, the Government has provided in its discovery productions: (1) interviews of witnesses who discuss deployment of the National Guard on January 6, including senior members of DOD, the leadership at the Department of Justice during the defendant's administration, senior commissioned personnel in the Executive Office of the President appointed by the defendant, and others; (2) multiple timelines, some of which are publicly available, regarding DOD and National Guard actions on January 6;[11] and (3) substantial Select Committee materials on this very topic, including interviews with the U.S. Capitol Police Chief, the House Sergeant-at-Arms, the Secretary of the Army, the Commanding General of the D.C. National Guard, and the Mayor of Washington, D.C., as well as Appendix 2 to the Select Committee Report (titled "DC National Guard Preparation For and Response to January 6th"). Also available to the public and the defendant is the extensive report prepared by the House Committee on Homeland Security and Governmental Affairs titled "Examining the U.S. Capitol Attack: A Review of the Security, Planning, and Response Failures on January 6."[12] The defendant does not specify what else exists that would not be cumulative (and thus even potentially material) of the ample information already at his disposal.

Second, the defendant is not entitled to information that did not affect his state of mind when he took the actions charged in the indictment. To support his contention that he deserves all information on every event that he did not know about at the time, the defendant relies on a snippet

---

[11] *See, e.g.*, https://media.defense.gov/2021/jan/11/2002563151/-1/-1/0/planning-and-execution-timeline-for-the-national-guards-involvement-in-the-january-6-2021-violent-attack-at-the-us-capitol.pdf (Department of Defense); https://www.govinfo.gov/content/pkg/gpo-j6-doc-ctrl0000000056/pdf/gpo-j6-doc-ctrl0000000056.pdf (U.S. Capitol Police).

[12] https://www.hsgac.senate.gov/wp-content/uploads/imo/media/doc/HSGAC&RulesFull Report_ExaminingU.S.CapitolAttack.pdf.

from *Safavian*, ECF No. 167 at 20, in which the court determined that a discrete set of emails between certain of Safavian's "named associates," in the possession of Safavian's former employer (the General Services Administration) regarding projects about which Safavian otherwise had knowledge or were integral to the indictment, were material to preparing the defense. *Safavian*, 233 F.R.D. at 18. Here, the defendant asks for an undefined universe of information unconnected to any action he took on or leading up to January 6 and unknown to him at the time he undertook the criminal actions in the indictment, making *Safavian* inapposite even on the facts. Moreover, since the defendant stakes the entirety of his discovery requests on needing information to support his "independent judgment" that specific election fraud existed, and thus his "good faith and the absence of criminal intent," ECF No. 167 at 1, his request for information unknown to him in the relevant time period that could not have anything to do with his state of mind rings hollow. *See George*, 786 F. Supp. at 64 ("Without this crucial link, the discovery was not material to the defense because it revealed nothing about the defendant's state of mind."); *Sturgeon*, 2023 WL 3203092, at *8 (denying motion to compel where requested communication would be "entirely irrelevant to [defendants'] state of mind").

### 3.  Government Agents at the Capitol (ECF No. 167 at 20-21)

The defendant attempts to compel "all information regarding undercover agents" and cooperators or government sources at the U.S. Capitol on January 6. ECF No. 167 at 20. Acknowledging that, in response to similar discovery requests, "courts have required a direct connection between informants and the decisions" of Capitol breach defendants, the defendant argues that he still is entitled to the information because it shows that violence on January 6 resulted either from the inability of undercover officers to prevent it or from unexplained "failed sting operations." *Id.* at 21.

The defendant's simple declaration that, admissibility aside, the evidence "certainly aids" his defense does not make it so. ECF No. 167 at 21. Any such information is not relevant to the charged conduct or a valid defense in this case, and the defendant has provided no support for his requests. *See Nichols*, 2023 WL 6809937, at *10 (denying defendant's conspiracy theory-based "demands for disclosure concerning alleged government informants" as "baseless, heavy on conjecture but light on facts"). And the defendant's effort to blame law enforcement for the riot of which they were victims fares no better than the attempt of a bank robber to blame security guards who failed to stop his crime. Ultimately, law enforcement's inability to prevent the Capitol siege has no bearing on the allegations, pled in the indictment, that the defendant fueled his supporters with knowingly false election-fraud claims, directed an angry crowd to the Capitol, did not try to stop or quell the crowd when it violently breached the Capitol building and halted the Congressional certification proceeding, and sought to leverage the resulting delay in proceedings.

The sole case the defendant cites on this issue, *United States v. Zink*, 2023 WL 5206143 (D.D.C. 2023), does not change this conclusion. The defendant in *Zink* moved to compel disclosure of "all undercover agents, Antifa activists, and confidential human sources" within his sphere of conduct on January 6. *Id.* at *3. Despite acknowledging that an undercover officer's identity could possibly be relevant—*i.e.*, if he "directed or encouraged the Defendant to enter the Capitol"—the court denied the defendant's motion, finding it "far too broad," and noting that it sought identification of "any and all undercover" officers "regardless of whether these purported actors could have affected or did affect Zink's conduct or state of mind." *Id.* As in *Zink*, the defendant has not identified any scenario in which any undercover officer or source "could have affected or did affect [his] conduct or state of mind." *Id*. The presence of undercover officers or sources at the Capitol cannot excuse the defendant's conduct in mobilizing angry supporters and directing them

there, and nothing suggests that the defendant had any knowledge of undercover officers or sources at the Capitol at the time of the charged conduct. *Cf. United States v. Williams*, No. 21-cr-377, ECF No. 87 at 3 (D.D.C. June 8, 2022) (finding in Capitol breach case evidence of law enforcement action cannot be relevant to a defendant's mens rea when the defendant was unaware of it).

### G.    Giglio Material Relating to Mike Pence (ECF No. 167 at 29-31)

The defendant seeks as purported *Giglio* information "evidence relating to unauthorized retention of classified documents by Vice President Mike Pence." ECF No. 167 at 29. The Special Counsel's Office did not investigate the former Vice President for his handling of classified information, and the defendant has the same public information about the matter as does the Special Counsel's Office. Per public reporting, the inquiry was closed with no charges, and if Pence is a witness, the defendant cannot impeach him with mere accusations. *See United States v. Maynard*, 476 F.2d 1170, 1174 (D.C. Cir. 1973) ("As a general rule it is improper to impeach a witness by showing an outstanding indictment without a final conviction. The reasons behind this rule are that the mere fact of arrest or indictment is still consistent with innocence.").

The defendant further speculates that the former Vice President sought to curry favor with the Government when (as has been publicly reported) he moved to quash the grand jury subpoena and then testified only after a federal court ordered him to do so. *See* ECF No. 167 at 30. This claim is factually wrong and illogical. The Special Counsel's mandate was to investigate certain crimes related to the 2020 election. The prosecution team had no involvement with or influence over the Pence investigation, and the prosecution team has no discoverable information beyond what has been publicly reported. In any event, even assuming that some limited cross-examination on this topic was permissible, the defendant can pursue it based on the public fact of the

investigation alone. *Cf. United States v. Cuffie*, 80 F.3d 514, 518 (D.C. Cir. 1996) (impeachment evidence cumulative if witness "already impeached at trial by the same kind of evidence").

### H.      Purported Bias and Misconduct (ECF No. 167 at 31-33)

The defendant next seeks to compel purported "evidence of bias and investigative misconduct." ECF No. 167 at 31-33. This demand merely repackages the deficient request for a hearing that the defendant previously made in connection with his motion to dismiss for selective prosecution. *See* ECF No. 116 at 9. As the Government noted in its response to that motion (ECF No. 141 at 2-4, 6-11, 14), the Supreme Court's decision in *Armstrong* supplies the governing framework for discovery requests of this nature and imposes a "rigorous standard" requiring the defendant to present "some evidence" to support each prong of a selective prosecution claim. 517 U.S. at 468-70. Because the defendant failed to make the requisite showing for discovery under *Armstrong* (*see* ECF No. 141 at 2-4, 6-11, 14), his motion to compel must be denied.

The defendant attempts to evade *Armstrong*'s requirements by invoking (ECF No. 167 at 31-32) inapposite case law discussing the *Brady* doctrine in cases involving undisclosed evidence that would have allowed defense counsel to "attack[] the reliability of the investigation" at trial, *Kyles v. Whitley*, 514 U.S. 419, 446 (1995). The cases he relies on stand for the unremarkable and inapposite proposition that if evidence regarding the quality or shoddiness of an investigation could shed light at trial on the factual guilt or innocence of the defendant, the failure to disclose such evidence can be a *Brady* violation. *See id.* at 445-47 (suppressed evidence showing that the police failed to investigate the key informant, despite ample reason to think that the informant in fact perpetrated the crime and planted evidence on the defendant, was material for *Brady* purposes, since it could have been used at trial to "attack[] the reliability of the investigation"); *United States v. McVeigh*, 153 F.3d 1166, 1192 (10th Cir. 1998) ("[T]he quality or bias of a criminal

investigation occasionally may affect the reliability of particular evidence in a trial, and hence, the facts surrounding the government's investigation may become relevant," but otherwise the jury is not "normally asked to render a verdict on the government's investigation.").[13]   But the defendant advances no suggestion that the information he seeks concerning the investigation would illuminate the identity of a separate principal suspect or otherwise shed light on any question of factual guilt or innocence, as opposed to his unsupported claim of selective prosecution. *Cf.* ECF No. 167 at 31 (arguing that communications "are discoverable because they support [the defendant's] defense regarding the politically motivated nature of the prosecution").

Nothing in *Kyles*, or any of the other cases the defendant relies on, suggests that attempts to attack the investigation are automatically admissible at trial or subject to the disclosure requirements of the *Brady* doctrine. *See United States v. Patrick*, 248 F.3d 11, 22 (1st Cir. 2001) (rejecting similar argument); *United States v. Veal*, 23 F.3d 985, 989 (6th Cir. 1994) (per curiam)

---

[13]   Indeed, all of the cases on which the defendant relies reflect this straightforward proposition. *See Bowen v. Maynard*, 799 F.2d 593, 610-13 (10th Cir. 1986) (suppressed evidence showing that police failed to adequately investigate a known alternative suspect, and presented the eyewitnesses with a photo array making it more likely they would identify the defendant and less likely they would identify the alternative suspect, was material for *Brady* purposes, since it could have been used at trial "to discredit the caliber of the investigation or the decision to charge the defendant"); *Lindsey v. King*, 769 F.2d 1034, 1042-43 (5th Cir. 1985) (suppressed evidence showing that police failed to investigate a known alternative suspect and that a crucial identification witness initially said that "he did not see the perpetrator's face," was material for *Brady* purposes, since it could have been used at trial to "discredit[] . . . the police methods employed in assembling the case against" the defendant); *United States v. Bagcho*, 151 F. Supp. 3d 60, 67-70 (D.D.C. 2015) (suppressed evidence showing that "a U.S. government agency characterized the most prominent witness against [the defendant] as a fabricator after that witness made non-credible statements about an individual who was a subject of his testimony at trial, and then proceeded to notify the DEA of that assessment," was material for *Brady* purposes, since it could have been used at trial "to attack the reliability of [the] investigation"); *United States v. Quinn*, 537 F. Supp. 2d 99 (D.D.C. 2008) (when the government concluded before trial that its anticipated key witness had likely lied when he implicated the defendant and could no longer be relied on, the government "was obliged by basic principles of fairness to inform [the defendant] in a timely manner," since the defendant could have used that information at trial "to conduct a pointed attack on the government's investigation, with its uncritical reliance on" the key witness).

(affirming exclusion of evidence about the purportedly "sloppy" investigation, since "the jury would not be called upon to determine whether the government's investigation had been good or bad"). To the contrary, the *Brady* doctrine is concerned with evidence "material either to guilt or to punishment," *Kyles*, 514 U.S. at 432; a selective prosecution claim, by contrast, "is not a defense on the merits to the criminal charge itself," *Armstrong*, 517 U.S. at 463, and presents a question "to be determined by the court," not the jury, "as it relates to an issue of law entirely independent of the ultimate issue of whether the defendant actually committed the crimes for which she was charged," *United States v. Washington*, 705 F.2d 489, 495 (D.C. Cir. 1983). Accordingly, where, as here, there is no "connection between the allegedly 'shoddy' and 'slanted' investigation and any evidence [to be] introduced at trial," a defendant's attempt to attack the investigation would only serve to "divert the jury's attention from the issues of the trial." *McVeigh*, 153 F.3d at 1192; *see United States v. Guzman Loera*, 24 F.4th 144, 160-61 (2d Cir. 2022) (explaining that while "*Kyles* concerned the use of police negligence or misconduct to question the quality of the investigation," "arguments concerning prosecutorial bias amount to claims of selective prosecution and outrageous Government conduct, both of which must be decided by the trial court, not the jury"); *United States v. Cousins*, 2014 WL 5023485, at *6 (N.D. Ill. Oct. 7, 2014) (rejecting discovery request under *Brady* where ordering the discovery "would allow [the defendant] to engage in the type of fishing expedition rejected by the Supreme Court in *Amstrong*" (cleaned up)).

A clear illustration of the Rule 403-barred sideshow the defendant wants to bring to the trial's main stage is his demand for discovery regarding "FISA Abuses." ECF No. 167 at 32. The defendant claims that the "FBI"—without identifying any individual in particular, much less anyone on the prosecution team—"violated procedures relating to the Foreign Intelligence Surveillance Act . . . in connection with investigations relating to this case." *Id.* The defendant

nowhere explains what "investigations relating to this case" mean, but the underlying exhibit appears to reference rioters in Capitol siege cases investigated by a separate office more than two years before the grand jury returned the indictment in this case. ECF No. 167-9 at 28-29. Such evidence could have no relevance to whether the defendant conspired with others, intended to defraud the government, intended to obstruct the certification proceeding, and intended to deprive millions of their right to vote and have their votes counted. Any marginal relevance (there is none) could not survive a Rule 403 analysis. Thus, any evidence—setting aside that it is not within the possession of the prosecution team—is neither material nor discoverable.

## IV.    Conclusion

The Court should decline the defendant's request for an unprecedented expansion of the prosecution team beyond reason or basis, ECF No. 166-1, and deny the defendant's demands for additional discovery because he has failed to establish the materiality of any of them, ECF No. 167.

Respectfully submitted,

JACK SMITH
Special Counsel

/s/ Thomas P. Windom
Thomas P. Windom
Molly Gaston
Senior Assistant Special Counsels
950 Pennsylvania Avenue NW
Room B-206
Washington, D.C. 20530
