IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA

| | |
|---|---|
| UNITED STATES OF AMERICA<br><br>v.<br><br>DONALD J. TRUMP,<br><br>  *Defendant*. | Case No. 1:23-cr-00257-TSC |

**PRESIDENT DONALD J. TRUMP'S OPPOSED MOTION FOR ORDER TO SHOW CAUSE WHY PROSECUTORS SHOULD NOT BE HELD IN CONTEMPT**

President Donald J. Trump respectfully moves this Court for an order to show cause why prosecutors Jack Smith, Molly Gaston, and Thomas Windom (collectively, the "prosecutors") should not be held in contempt for violating the Court's order "stay[ing] any further proceedings that would move this case towards trial or impose additional burdens of litigation on Defendant." Doc. 186 at 2 (the "Stay Order").

**INTRODUCTION**

The Stay Order is clear, straightforward, and unambiguous. All substantive proceedings in this Court are halted. Despite this clarity, the prosecutors began violating the Stay almost immediately. First, within five days of the Court entering the Stay Order, the prosecutors served thousands of pages of additional discovery, together with a purported draft exhibit list. Doc. 188. Through counsel, President Trump advised that he rejected the prosecutors' unlawful productions, that their actions violated the Stay Order, and that he would seek relief if their malicious conduct continued. Docs. 189, 189-1.

Ignoring this warning, the prosecutors filed an expansive motion *in limine* less than 10 days later. Doc. 191 (the "MIL"). This document teems with partisan rhetoric, including false claims that President Trump "propagates irrelevant disinformation" both "within the courtroom" and

1

"outside of it." *Id*. at 1, 9. Moreover, the MIL mirrors the Biden Administration's dishonest talking points, asserting, again falsely, that President Trump was responsible for the events of January 6, 2021, when in truth he called for peaceful and patriotic assembly and protest. In this manner, the prosecutors seek to weaponize the Stay to spread political propaganda, knowing that President Trump would not fully respond because the Court relieved him of the burdens of litigation during the Stay. Worse, the prosecutors have announced their intention to continue this partisan-driven misconduct indefinitely, effectively converting this Court's docket into an arm of the Biden Campaign.

To remedy this outrageous conduct, the Court should issue an order to show cause why the prosecutors should not be: (1) held in contempt; (2) required to immediately withdraw their MIL and improper productions; (3) forbidden from submitting any further filing or production absent the Court's express permission while the Stay Order is in effect; and (4) assessed monetary sanctions in the amount of President Trump's reasonable attorneys' fees and expenses incurred in responding to the prosecutors' improper productions and filings, including in litigating this Motion (collectively, the "Requested Sanctions").

**BACKGROUND**

This case presents weighty questions of first impression concerning the scope of Presidential immunity, the Impeachment Judgment Clause, and double jeopardy. *See* Doc. 171 at 30 n.5 ("[T]his is not an easy issue." (quoting *Thompson v. Trump*, 590 F. Supp. 3d 46, 74 (D.D.C. 2022)). President Trump moved to dismiss on these and other grounds, Docs. 74, 113, which the Court denied. Docs. 171, 172. Thereafter, President Trump timely noticed an appeal, Doc. 177, and moved for a stay of all proceedings, Doc. 178.

As "the entire case is essentially 'involved in the appeal,'" we explained that the entire case must be stayed. *Coinbase, Inc. v. Bielski*, 599 U.S. 736, 741 (2023) (quoting *Griggs v. Provident Consumer Disc. Co.*, 459 U.S. 56, 58 (1982)); *see also id*. at 738 (where the entire case is involved in the appeal, "the district court must stay its pre-trial and trial proceedings"). Additionally, we explained that President Trump's immunity and double jeopardy arguments relieve him of the "burdens of litigation" until the appeal is resolved. *Blassingame v. Trump*, 87 F.4th 1, 29 (D.C. Cir. 2023) (quoting *Mitchell v. Forsyth*, 472 U.S. 511, 526 (1985)). This doctrine protects both President Trump personally, and also serves the vital public interest of minimizing the chilling effect that litigation would have on the discretionary conduct of public officials. *See Mitchell*, 472 U.S. at 526.

In response, the prosecutors agreed that "while the appeal is pending . . . the defendant will not be subjected to the 'burdens of litigation,'" but improperly suggested that the prosecution could somehow "continue to shoulder its own burden" and advance the case in President Trump's absence. Doc. 182 at 3. By this, the prosecutors meant that they would attempt to unconstitutionally try President Trump *in absentia* by continuing to submit filings "and other pleadings pertaining to the Government's trial presentation." *Id*. The prosecutors further invited error by suggesting, wrongly, that the Court could "make headway" on motions, despite its lack of jurisdiction. *Id*. at 2.

The Court rejected this unprecedented and unlawful approach, and instead stayed "any further proceedings that would move this case towards trial or impose additional burdens of litigation on Defendant." Doc. 186 at 2. "[F]or clarity," the Court expounded, this stay included all "deadlines and proceedings scheduled by its Pretrial Order, as amended." *Id*. at 2.

3

To ensure that the prosecutors did not incorrectly believe that the Court had tacitly endorsed its lawless request for *in absentia* proceedings, the Court provided two—and only two—"limits on the stay," stating that: (1) "the stayed deadlines and proceedings are 'held in abeyance,' Motion at 1, rather than permanently vacated," and (2) "the court does not understand the required stay of further proceedings to divest it of jurisdiction to enforce the measures it has already imposed to safeguard the integrity of these Proceedings." *Id*.

Driving this point home, the Court distinguished the above exceptions, which it held do "not advance the case towards trial or impose burdens of litigation on Defendant beyond those he already carries," from "additional discovery or briefing," which do impose such burdens. *Id*. at 3.

Despite this clear guidance, the prosecutors immediately violated the Stay Order by serving nearly 4,000 pages of "additional discovery" on December 17, 2023, including what the prosecutors' production letter described as several hundred video and audio recordings. *See* Doc. 189. The next day, on December 18, 2023, the prosecutors continued their brazen misconduct by serving a purported exhibit list. Doc. 188. The prosecutors' only explanation for this harassment of President Trump was their already-rejected claim that violating the Stay Order was necessary "to help ensure that trial proceeds promptly if and when the mandate returns." *Id*. Worse, the prosecutors misrepresented the Stay Order, claiming that only "the deadlines in the Pretrial Order are 'held in abeyance,'" *id*., when, in fact, the Court stayed "the deadlines **and** proceedings scheduled by its Pretrial Order," and held that "**any** further proceedings that would move this case towards trial or impose additional burdens of litigation on Defendant" are prohibited, Doc. 186 at 2 (emphasis added).

Thus, the prosecution's claimed justification—that continued filings and discovery are necessary to prepare this case for a potential trial—is precisely what the Stay Order forbids.

4

President Trump patiently explained this to the prosecutors, both in a Response to the Prosecutors' Notice of Service, Doc. 189 (the "Response"), and a separate letter, Doc. 189-1 (the "Letter"). Specifically, President Trump stated:

> [T]here is no question that your present discovery and draft exhibit list productions, and any future productions, are "proceeding[s]" that violate the Stay Order by advancing the case "towards trial" and "impos[ing] additional burdens of litigation" on President Trump. [Doc. 186] at 2. Indeed, the prosecution admits as much in its filing this evening, which states it produced the draft exhibit list "to help ensure the trial proceeds promptly if and when the mandate returns." Doc. 188. Both the Stay Order and binding precedent forbid these unlawful actions.
>
> Although the prosecution may wish to rush this case to an early and unconstitutional trial in hopes of undermining President Trump's commanding lead in the upcoming Presidential election, it must nonetheless abide by the Stay Order. As such, we will not accept or review the present production, or any additional productions, until and unless the Court lifts the Stay Order. If the prosecution continues to violate the Stay Order, we will seek appropriate relief.

Doc. 189-1 at 2.

The prosecutors did not respond to either the Letter or the Response. The prosecutors did, however, attempt to wrongfully exploit the Stay Order in seeking *certiorari* before judgment from the Supreme Court. Namely, the prosecutors advised the Supreme Court that: (1) President Trump's "appeal has halted progress towards trial," (2) "[t]he effect of that appeal, as the [Court] recognized, is to automatically stay[] any further proceedings that would move this case towards trial or impose additional burdens of litigation on [President Trump]," (3) the "deadlines and proceedings" specified in the prior pretrial order are stayed, and (4) "[i]n short, the case is now on hold." *United States v. Trump,* No. 23-624, 2023 WL 8869789 at *5 (U.S.) (cleaned up).

Nowhere in this recitation did the prosecutors adopt their discredited and unsupportable claims that only "deadlines" and not "proceedings" are stayed, or that they are somehow permitted to continue advancing the case toward trial through preparatory filings or discovery productions.

5

Just the opposite, the prosecutors argued that the Stay Order was effectively all-encompassing and therefore necessitated urgent intervention by the Supreme Court. *Id*.

Unpersuaded, the Supreme Court denied the prosecutors' desperate ploy for early review. 23-624, 601 U.S. ___ (Dec. 22, 2023). Having failed above, the prosecutors resumed their strategy of violating the Stay Order, filing the MIL on December 27, 2023. Doc. 191. Aware that their submission was improper, the prosecutors tellingly did not confer with President Trump before filing, as required. *See* September 5, 2023, Second Minute Order; September 11, 2023, Minute Order. Moreover, and unsurprisingly, the prosecutors suddenly forgot their histrionics regarding the all-encompassing scope of the Stay Order. Instead, the prosecutors returned to their twisted view that the Stay Order is merely a suggestion meaning less than the paper it is written on. Once again, the prosecutors falsely claimed that only "deadlines" are held in abeyance, Doc. 191 at 1 n.1, and not "**any** further proceedings that would move this case towards trial or impose additional burdens of litigation on Defendant," Doc. 186 at 2 (emphasis added). And once more, the prosecutors admitted their goal is to achieve exactly what the Stay Order forbids—preparing this case for a potential trial, which the prosecutors arrogantly presuppose will occur. Doc. 191 at 1 n.1.

Yet this is not the prosecutors' only unlawful goal. Unstated, but obvious, is the prosecutors' desperate effort to harass President Trump and prevent his likely victory in the 2024 Presidential Election. A significant part of this strategy, which the prosecutors have employed from the outset, is to use this case as a platform to advance the Biden Campaign's dishonest political talking points, including, for example, echoing the false and defamatory claims that President Trump spreads "disinformation." *Compare* Doc. 191 at 1 (claiming President Trump "propagates irrelevant disinformation") *with* Brooke Singman, *Biden campaign to launch account*

6

*on Trump's Truth Social*, Fox News (October 16, 2023) ("Biden campaign officials say they are 'injecting our message' into GOP primary coverage and plan to combat 'mis and disinformation' about President Biden that may appear on [President Trump's] social media platform [Truth Social].").

Likewise, the prosecutors dutifully repeat the Biden Administration's long-debunked claim that President Trump somehow caused the events of January 6, 2021, when in truth President Trump called only for peaceful and patriotic protest and assembly. *Compare Transcript of Trump's Speech at Rally Before US Capitol Riot*, AP (Jan. 13, 2021) (encouraging crowd to "peacefully and patriotically make your voices heard," and "cheer on our brave senators and congressmen and women") *with* Doc. 191 at 13 (claiming President Trump was "responsible for inflaming his followers and causing the Capitol riot") and *Lisa Mascaro, Zeke Miller, Mary Clare Jalonick, Biden warns of US peril from Trump's 'dagger' at democracy*, Los Angeles Daily News (Jan. 6, 2022) ("President Joe Biden forcefully blamed Donald Trump and his supporters Thursday for holding a 'dagger at the throat of democracy' with election lies that sparked last year's deadly assault on the U.S. Capitol.").

As it did on Truth Social, the Biden Campaign improperly seeks to "inject [its] message" into this case, and the prosecutors are more than happy to oblige, notwithstanding the Stay Order. Indeed, as the prosecutors undoubtedly anticipated, the political talking points they strategically placed in the MIL spread like wildfire, reaching every major news outlet in the country within minutes. *See, e.g.,* Katelyn Polantz and Hannah Rabinowitz, *Trump should not be allowed to use courtroom to sow disinformation, special counsel argues*, CNN (Dec. 27, 2023); Rachel Weiner and Perry Stein, *Special counsel asks D.C. judge to bar Trump misinformation at trial*, THE

7

WASHINGTON POST (Dec. 27, 2023); Katherine Faulders and Alexander Mallin, *Trump should be barred from blaming others for Jan. 6 riot at trial: Special counsel*, ABC News (Dec. 27, 2023).

## APPLICABLE LAW

"Courts possess 'inherent power to enforce compliance with their lawful orders through civil contempt.'" *Commodity Futures Trading Comm'n v. Trade Exch. Network Ltd.*, 117 F. Supp. 3d 22, 26 (D.D.C. 2015) (quoting *Shillitani v. United States*, 384 U.S. 364, 370 (1966)). Doing so, "is essential to 'the enforcement of the judgments, orders and writs of the courts, and consequently to the due administration of justice.'" *Id.* (quoting *Broderick v. Donaldson*, 437 F.3d 1226, 1234 (D.C. Cir. 2006)). Accordingly:

> A party moving for civil contempt must show, by clear and convincing evidence, that (1) there was a clear and unambiguous court order in place; (2) that order required certain conduct by [respondents]; and (3) [respondents] failed to comply with that order. A clear and unambiguous order does not leave any reasonable doubt as to what behavior was expected and who was expected to behave in the indicated fashion. Once the [moving party] has made a prima facie case demonstrating that the [respondent] failed to comply with the Court's order, the burden shifts to [the respondent] to produce evidence justifying its noncompliance.
>
> The [respondents'] intent in failing to comply with a court order is irrelevant. However, the [respondents] may justify [their] failure to comply with a court order by establishing [their] inability to comply or good faith substantial compliance. To demonstrate good faith substantial compliance, the [respondents] have to show that they took all reasonable steps within [their] power to comply with the court's order.

*Id.* (citations and quotation marks omitted).

Although President Trump's Notice of Appeal divested the Court of jurisdiction regarding the substantive aspects of this case, the Court held that it retains "jurisdiction to enforce the measures it has already imposed to safeguard the integrity of these proceedings." *See* Doc. 186 at 2. It is currently unnecessary to decide whether the Court retains such residual jurisdiction over certain prior orders, *see id.* at 3; however, there is no dispute that the Court retains jurisdiction over the Stay Order itself, and thus any contempt proceedings flowing from the prosecutors'

8

violation of the Stay Order. *See In re Grand Jury Subpoena No. 7409*, No. 18-41 (BAH), 2018 WL 8334866, at *2 (D.D.C. Oct. 5, 2018), *aff'd sub nom. In re Grand Jury Subpoena*, 749 F. App'x 1 (D.C. Cir. 2018) (collecting "voluminous and convincing" case law that a district court possesses "jurisdiction to enforce its orders pending appeal," including through civil contempt proceedings, unless a stay of those orders are entered pending appeal); *In re Grand Jury Investigation of Possible Violations of 18 U.S.C. § 1956 & 50 U.S.C. § 1705*, No. MC 18-175, 2019 WL 2182436, at *2 (D.D.C. Apr. 10, 2019), *aff'd sub nom. In re Sealed Case*, 932 F.3d 915 (D.C. Cir. 2019) (same); *see also United States v. Ruiz*, 536 U.S. 622, 628 (2002) ("[A] federal court always has jurisdiction to determine its own jurisdiction.").

## ARGUMENT

### A. The Court Should Order the Prosecutors to Show Cause Why They Should Not Be Held in Contempt

As with other orders, the Court may remedy the violation of a stay through civil contempt proceedings. *See, e.g., In re Robinson*, No. 06-10618-SSM, 2008 WL 4526183, at *2 (Bankr. E.D. Va. Sept. 29, 2008) ("A violation of the automatic stay may be redressed by the bankruptcy court under its civil contempt powers."); *In re Walker*, 551 B.R. 679, 692 (Bankr. M.D. Ga. 2016) ("Beyond undermining the court's jurisdiction, a violation of the automatic stay constitutes contempt of the court."); *In re Miller*, 22 B.R. 479, 480 (D. Md. 1982) (noting "near unanimity that the" knowing violation of an automatic stay is contemptuous).

Here, the prosecutors' repeated and willful violations of the Stay Order warrant contempt. *First*, "there was a clear and unambiguous court order in place." *Commodity Futures*, 117 F. Supp. 3d at 26. Citing the "automatic divestiture rule of *Griggs*," the prosecutors initially urged the Court not to enter the Stay Order, claiming that doing so would be "unnecessary and duplicative." Doc.

182 at 1, 3. It is now clear that the prosecutors planned from the outset to violate the Stay, and only wished to avoid a Court order specifically forbidding them from doing so.

Wisely, the Court did not leave the prosecutors' obligations under the Stay to chance or interpretation, but instead issued a straightforward Order that allowed only one category of litigation—the enforcement of existing orders. Doc. 186 at 2. Likewise, the Court was equally clear about what would not be allowed—all other "proceedings that would move this case towards trial or impose additional burdens of litigation on Defendant," including all "deadlines and proceedings scheduled by [the] Pretrial Order, as amended." *Id*. In setting these boundaries, the Court was explicit: both "additional discovery" and "briefing" on non-excepted topics would violate the Stay Order by improperly "advanc[ing] the case towards trial" and wrongfully "impos[ing] burdens of litigation on Defendant." *Id*. at 3. Proving the clarity of these instructions, the prosecutors accurately explained the scope of the Stay Order to the Supreme Court, bemoaning, *inter alia*, that "the case is now on hold," together with all "deadlines and proceedings." *Trump*, No. 23-624, 2023 WL 8869789 at *5. Thus, there is no doubt the Stay Order is "clear and unambiguous" to everyone, including the prosecutors. *Commodity Futures*, 117 F. Supp. 3d at 26.

*Second*, the Stay Order "required certain conduct by [the prosecutors]." *Id*. Specifically, the Stay Order required, and requires, that the prosecution abstain from attempting to "move this case towards trial" or "impose additional burdens of litigation on Defendant." Doc. 186 at 2. Although the Stay Order does not require the prosecutors to perform specific acts, "[a] party is in contempt of court when he violates a definite and specific court order requiring him to perform *or refrain* from performing a particular act or acts with knowledge of that order." *MasTec Advanced Techs. v. Nat'l Lab. Rels. Bd.*, No. 11-1274, 2021 WL 4935618, at *3 (D.D.C. June 3, 2021) (citation and quotation marks omitted) (emphasis added). There is no "reasonable doubt as to what

behavior was expected and who was expected to behave in the indicated fashion." *Commodity Futures*, 117 F. Supp. 3d at 26. Thus, the conduct element is satisfied.

*Third*, the prosecutors "failed to comply with" the Stay Order. *Id*. "[T]he party seeking a finding of civil contempt must make a *prima facie* showing that the putative contemnor has violated an order through a showing of clear and convincing evidence." *MasTec*, 2021 WL 4935618, at *3 (citations and quotation marks omitted). In this case, there is no doubt. Despite the Court's explicit holding that "additional discovery" and "briefing" would violate the Stay Order, Doc. 186 at 3, the prosecutors repeatedly engaged in that exact conduct, disobeying the Stay Order at least three times in just two weeks. By themselves, each of the prosecutors' violations—including a large discovery production, an extensive exhibit list production, and lengthy MIL briefing—would be substantial and warrant sanction. Taken together with the prosecutors' threat to continue violating the Stay Order indefinitely, there is no question here that the prosecutors' actions are purposely contemptuous. This conduct is beyond the pale and must be sanctioned.

*Fourth*, the prosecutors have no justification for their misconduct. As noted, "intent in failing to comply with a court order is irrelevant." *Commodity Futures*, 117 F. Supp. 3d at 26. However, even if intent were a consideration, the prosecutors did not violate the Stay Order inadvertently. President Trump explained the scope of the Stay Order to the prosecutors and warned them to stop their violations. Afterward, the prosecutors submitted a brief to the Supreme Court, demonstrating that they knew full well what the Court expected of them. Yet they violated the Stay Order again. These were no accidents. The submissions were fully planned, intentional violations of the Stay Order, which the prosecutors freely admit they perpetrated in hopes of unlawfully advancing this case. Doc. 191 at 1 n.1 (stating the MIL was filed to "promote the prompt resumption of the pretrial schedule," notwithstanding the Stay Order).

11

For the same reason, the prosecutors cannot "show that they took all reasonable steps within [their] power to comply with the court's order." *Commodity Futures*, 117 F. Supp. 3d at 26 (citation and quotation marks omitted). For instance, the prosecutors "never sought any clarification of the order" and never asked permission to make any filings. *Id*. at 27. Likewise, recognizing that their actions were plainly unlawful, the prosecutors purposely did not confer with opposing counsel before filing the MIL. These repeated, intentional, and malicious actions demonstrate that the prosecutors have not once attempted to comply with the Stay Order, but have instead openly defied it from day one. "Accordingly, the [prosecutors] did not take all reasonable steps to comply with the [Stay] Order and therefore were not in good faith substantial compliance with the [O]rder." *Id*.

### B. The Requested Sanctions Would Be Appropriate

"A civil contempt action is characterized as remedial in nature, used to obtain compliance with a court order or to compensate for damages sustained as a result from noncompliance." *United States v. Latney's Funeral Home, Inc.*, 41 F. Supp. 3d 24, 29 (D.D.C. 2014) (citations omitted). Thus, "Federal courts have broad equitable powers to craft remedial sanctions for civil contempt," and "[a] court's goal is to fashion a remedy that will coerce the contemnor into compliance, compensate the complainant for losses due to the noncompliance, or both." *Id*. at 36 (citation omitted). The Requested Sanctions are sufficient, but not greater than necessary, to accomplish these goals.

As an initial matter, the Court should order the prosecutors to immediately withdraw their MIL and improper productions. These are the primary violations of the Stay Order, and they continue to cause additional harm to President Trump and to the due administration of justice each day that they remain outstanding. Although President Trump has, consistent with his rights under

the Stay Order, refused to accept or substantively respond to these violative documents, the only way to obtain compliance from recalcitrant prosecutors such as these is to force them to acknowledge their wrongdoing and affirmatively withdraw their offensive actions.

Next, the Court should require that the prosecutors seek and obtain permission from the Court before submitting any filings or productions for the duration of the Stay Order to ensure that any further attempts to violate the Stay Order will be summarily denied. The prosecutors have shown, repeatedly, that they are unwilling to act in good faith and have announced their intention to continue violating the Stay Order if left to their own devices. A pre-clearance requirement will ensure that only permissible documents are filed or served, while imposing minimal administrative burden, as such documents should be very few and far between, if not nonexistent.

Last, the Court should require the prosecutors to "compensate [President Trump] for damages sustained as a result from noncompliance." *Latney's Funeral Home*, 41 F. Supp. 3d at 29 (citation omitted). Namely, the prosecutors should reimburse President Trump for all reasonable attorneys' fees and other expenses that he has incurred responding to the prosecutor's improper productions and filings. This would include the costs of preparing his prior Response and Letter, Docs. 189, 189-1, and in preparing and litigating this Motion. In this District, a contempt "award will often consist of reasonable costs (including attorneys' fees) incurred in bringing the civil contempt proceeding." *Landmark Legal Found. v. E.P.A.*, 272 F. Supp. 2d 70, 76 (D.D.C. 2003) (citations omitted). This is sensible, as "attorneys fees and costs caused by [an offending party's] contumacious conduct, is designed to compensate [the injured party], rather than punish [the offending party]." *Id.*; *see also id.* at 86 ("It is well-established that courts may award attorneys' fees and expenses in conjunction with a civil contempt proceeding."). An award of fees is, therefore, entirely appropriate and necessary to remedy the financial injuries caused by the

prosecutors' misconduct. Indeed, considering the equally significant harms the prosecutors' actions have imposed on the public by undermining the purpose of the stay—ensuring immune officials can confidently exercise their discretion without fear of litigation—this request is quite modest.

Nor would a lesser award adequately deter the prosecutors' misconduct. The Special Counsel's Office has spent untold tens of millions prosecuting President Trump, including over $9.2 million in just the approximately 4 months from November 18, 2022, through March 31, 2023 (when the Office ceased its disclosures).[1] Although the prosecutors may scarcely feel the impact of paying President Trump's reasonable attorneys' fees and expenses given the Biden Administration's blank check, at the very least it will signal that their continued violations will not come without cost.

## CONCLUSION

The prosecutors are not "ordinary part[ies] to a controversy," but representatives of "a sovereignty whose obligation to govern impartially is as compelling as its obligation to govern at all; and whose interest, therefore, in a criminal prosecution is not that it shall win a case, but that justice shall be done." *Berger v. United States*, 295 U.S. 78, 88 (1935). The prosecutors have cast these hallowed mandates aside to score cheap political points against President Trump on behalf of the Biden Campaign. In so doing, the prosecutors have repeatedly and willfully disregarded the Court's explicit instructions. Such malignant conduct undermines the integrity of this proceeding and warrants severe sanction.

---

[1] *See* U.S. Department of Justice, Special Counsel's Office – Smith Statement of Expenditures November 18, 2022 through March 31, 2023, (reporting approximately $5.4 million in direct expenditures and an additional $3.8 million "DOJ component expenses," through March 31, 2023 only, the majority of which relate to salaries and benefits).

14

The Court cannot allow the prosecutors to continue to operate lawlessly, in defiance of well-established protocol and this Court's authority. The Requested Sanctions are appropriate and likely to deter any further transgressions, and if not, the Court retains the ability to impose more severe sanctions, including dismissal of this action. *See Guantanamera Cigar Co. v. Corporacion Habanos, S.A.,* 750 F. Supp. 2d 31, 34 (D.D.C. 2010) ("A court has the inherent power to protect its integrity and prevent abuses of the judicial process, including the use of dismissal or default judgment as a sanction for misconduct. (citation and quotation marks omitted)); *Shepherd v. Am. Broad. Companies, Inc.*, 62 F.3d 1469, 1475 (D.C. Cir. 1995) ("Other inherent power sanctions available to courts include . . . disqualifications or suspensions of counsel, and drawing adverse evidentiary inferences or precluding the admission of evidence." (citation omitted)).

Accordingly, the Court should order the prosecutors to show cause why the Court should not hold them in contempt and impose the Requested Sanctions.

## CERTIFICATE OF CONFERRAL

Counsel for President Trump conferred with counsel for the prosecution, who oppose the relief requested herein.

Dated: January 4, 2024

Todd Blanche, Esq. (PHV)
toddblanche@blanchelaw.com
Emil Bove, Esq. (PHV)
Emil.Bove@blanchelaw.com
BLANCHE LAW
99 Wall St., Suite 4460
New York, NY 10005
(212) 716-1250

Respectfully submitted,

*/s/John F. Lauro*
John F. Lauro, Esq.
D.C. Bar No. 392830
jlauro@laurosinger.com
Gregory M. Singer, Esq. (PHV)
gsinger@laurosinger.com
Filzah I. Pavalon, Esq. (PHV)
fpavalon@laurosinger.com
LAURO & SINGER
400 N. Tampa St., 15th Floor
Tampa, FL 33602
(813) 222-8990
*Counsel for President Donald J. Trump*

15