**IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA**

| | | |
|---|---|---|
| **UNITED STATES OF AMERICA** | * | |
| | * | |
| **v.** | * | **CRIMINAL NO. 23-cr-257 (TSC)** |
| | * | |
| **DONALD J. TRUMP,** | * | |
| | * | |
| **Defendant.** | * | |
| | * | |

**GOVERNMENT'S MOTION FOR IMMUNITY DETERMINATIONS**

The defendant asserts that he is immune from prosecution for his criminal scheme to overturn the 2020 presidential election because, he claims, it entailed official conduct. Not so. Although the defendant was the incumbent President during the charged conspiracies, his scheme was fundamentally a private one. Working with a team of private co-conspirators, the defendant acted as a candidate when he pursued multiple criminal means to disrupt, through fraud and deceit, the government function by which votes are collected and counted—a function in which the defendant, as President, had no official role. In *Trump v. United States*, 144 S. Ct. 2312 (2024), the Supreme Court held that presidents are immune from prosecution for certain official conduct— including the defendant's use of the Justice Department in furtherance of his scheme, as was alleged in the original indictment—and remanded to this Court to determine whether the remaining allegations against the defendant are immunized. The answer to that question is no. This motion provides a comprehensive account of the defendant's private criminal conduct; sets forth the legal framework created by *Trump* for resolving immunity claims; applies that framework to establish that none of the defendant's charged conduct is immunized because it either was unofficial or any presumptive immunity is rebutted; and requests the relief the Government seeks, which is, at bottom, this: that the Court determine that the defendant must stand trial for his private crimes as would any other citizen.

This motion provides the framework for conducting the "necessarily factbound" immunity analysis required by the Supreme Court's remand order. *Trump*, 144 S. Ct. at 2340. It proceeds in four parts.

Section I provides a detailed statement of the case that the Government intends to prove at trial. This includes the conduct alleged in the superseding indictment, as well as other categories of evidence that the Government intends to present in its case-in-chief. This detailed statement reflects the Supreme Court's ruling that presidential immunity contains an evidentiary component, *id.*, which should be "addressed at the outset of a proceeding," *id.* at 2334.

Section II sets forth the legal principles governing claims of presidential immunity. It explains that, for each category of conduct that the Supreme Court has not yet addressed, this Court should first determine whether it was official or unofficial by analyzing the relevant "content, form, and context," *id.* at 2340, to determine whether the defendant was acting in his official capacity or instead "in his capacity as a candidate for re-election." *Blassingame v. Trump*, 87 F.4th 1, 17 (D.C. Cir. 2023). Where the defendant was acting "as office-*seeker*, not office-*holder*," no immunity attaches. *Id.* (emphasis in original). For any conduct deemed official, the Court should next determine whether the presumption of immunity is rebutted, which requires the Government to show that "applying a criminal prohibition to that act would pose no 'dangers of intrusion on the authority and functions of the Executive Branch.'" *Trump*, 144 S. Ct. at 2331-32 (quoting *Nixon v. Fitzgerald*, 457 U.S. 731, 754 (1982)).

Section III then applies those legal principles to the defendant's conduct and establishes that nothing the Government intends to present to the jury is protected by presidential immunity. Although the defendant's discussions with the Vice President about "their official responsibilities" qualify as official, *see Trump*, 144 S. Ct. at 2336, the Government rebuts the presumption of

immunity.  And all of the defendant's remaining conduct was unofficial: as content, form, and context show, the defendant was acting in his capacity as a candidate for reelection, not in his capacity as President.  In the alternative, if any of this conduct were deemed official, the Government could rebut the presumption of immunity.

Finally, Section IV explains the relief sought by the Government and specifies the findings the Court should make in a single order—namely, that the defendant's conduct set forth in Section I is not immunized, and that as a result, the defendant must stand trial on the superseding indictment and the Government is not prohibited at trial from using evidence of the conduct described in Section I.

## I.    Factual Proffer

When the defendant lost the 2020 presidential election, he resorted to crimes to try to stay in office.  With private co-conspirators, the defendant launched a series of increasingly desperate plans to overturn the legitimate election results in seven states that he had lost—Arizona, Georgia, Michigan, Nevada, New Mexico, Pennsylvania, and Wisconsin (the "targeted states").  His efforts included lying to state officials in order to induce them to ignore true vote counts; manufacturing fraudulent electoral votes in the targeted states; attempting to enlist Vice President Michael R. Pence, in his role as President of the Senate, to obstruct Congress's certification of the election by using the defendant's fraudulent electoral votes; and when all else had failed, on January 6, 2021, directing an angry crowd of supporters to the United States Capitol to obstruct the congressional certification.  The throughline of these efforts was deceit: the defendant's and co-conspirators' knowingly false claims of election fraud.  They used these lies in furtherance of three conspiracies: 1) a conspiracy to interfere with the federal government function by which the nation collects and counts election results, which is set forth in the Constitution and the Electoral Count Act (ECA); 2) a conspiracy to obstruct the official proceeding in which Congress certifies the legitimate results

of the presidential election; and 3) a conspiracy against the rights of millions of Americans to vote and have their votes counted.

At its core, the defendant's scheme was a private criminal effort. In his capacity as a candidate, the defendant used deceit to target every stage of the electoral process, which through the Constitution, ECA, and state laws includes the states' notification to the federal government of the selection of their representative electors based on the popular vote in the state; the meeting of those electors to cast their votes consistent with the popular vote; and Congress's counting of the electors' votes at a certification proceeding. As set forth in detail below, the defendant worked with private co-conspirators, including private attorneys ███ CC1 ███ ███ CC2 ███ ███ CC3 ███ and ███ CC5 ███ and private political operatives ███ CC6 ███ and ███ P1 ███ The defendant also relied heavily on private agents, such as his Campaign employees and volunteers, like Campaign Manager ███ P2 ███ Deputy Campaign Manager ███ P3 ███ Senior Campaign Advisor ███ P4 ███ and Campaign operative ███ P5 ███

In this section, the Government sets forth detailed facts supporting the charges against the defendant,[1] before addressing in the next section why none of this conduct is subject to immunity under the Supreme Court's decision in *Trump*. The conduct set forth below includes the defendant's formation of the conspiracies leading up to and immediately following the 2020 presidential election; certain information regarding his knowledge that there had not been outcome-determinative fraud in the election as he persistently claimed; and his increasingly desperate efforts to use knowingly false claims of election fraud to disrupt the electoral process.

---

[1] Section I represents the Government's efforts to provide the Court and the defendant with all of the categories of evidence that it may offer in its case-in-chief at trial. It does not include citations to every potential exhibit, nor does it account for any additional evidence that may be developed before trial.

The Government does not consider any of the following conduct to be subject to immunity for the reasons set forth in Section III.

### A. Formation of the Conspiracies

Although his multiple conspiracies began after election day in 2020, the defendant laid the groundwork for his crimes well before then. Leading into the election, the defendant's private and Campaign advisors, including **P6** (then a private citizen) and **P2** (the defendant's Campaign manager), informed him that it would be a close contest and that it was unlikely to be finalized on election day—in part because of the time needed to process large numbers of mail-in ballots prompted by the COVID-19 pandemic.[2] They also told the defendant that the initial returns on election night might be misleading—that is, that he might take an early lead in the vote count that would diminish as mail-in ballots were counted because his own supporters favored in-person voting, while supporters of his opponent, Joseph R. Biden, favored mail-in ballots.[3]

Privately, the defendant told advisors—including **P6** Campaign personnel, **P7** (a White House staffer and Campaign volunteer), and **P8** (the Vice President's Chief of Staff)—that in such a scenario, he would simply declare victory before all the ballots were counted and any winner was projected.[4] Publicly, the defendant began to plant the seeds for that false declaration. In the months leading up to the election, he refused to say whether he would accept the election results, insisted that he could lose the election only because of fraud, falsely

---

[2] GA 501-510 (███████████); GA 591-599 (███████████████); GA 246-247 (███████).

[3] GA 501-512 (███████████); GA 591-599 (███████████████); GA 246-249 (███████████); GA 132-153 (███████████).

[4] GA 505-507 (███████████); GA 250-255 (███████████); GA 588-589 (███████████).

claimed that mail-in ballots were inherently fraudulent, and asserted that only votes counted by election day were valid.  For instance:

- In an interview on July 19, 2020, when asked repeatedly if he would accept the results of the election, the defendant said he would "have to see" and "it depends."[5]

- On July 30, despite having voted by mail himself earlier that year, the defendant suggested that widespread mail-in voting provided cause for delaying the election, tweeting, "With Universal Mail-In Voting (not Absentee Voting, which is good), 2020 will be the most INACCURATE & FRAUDULENT Election in history.  It will be a great embarrassment to the USA.  Delay the Election until people can properly, securely and safely vote???"[6]

- In an interview on August 2, the defendant claimed, without any basis, that "[t]here is no way you can go through a mail-in vote without massive cheating."[7]

- At a campaign event in Wisconsin on August 17, the defendant told his supporters, "[t]he only way we're going to lose this election is if the election is rigged, remember that.  It's the only way we're going to lose this election, so we have to be very careful."[8]

- In his acceptance speech at the Republican National Convention on August 24, the defendant said that "[t]he only way they can take this election away from us is if this is a rigged election."[9]

- On October 27, during remarks regarding his campaign, the defendant said, "[i]t would be very, very proper and very nice if a winner were declared on November 3rd, instead of counting ballots for two weeks, which is totally inappropriate, and I don't believe that that's by our laws.  I don't believe that.  So we'll see what happens."[10]  The defendant said this despite—or perhaps because—his private advisors had informed him that it was unlikely that the winner of the election would be declared on November 3.

---

[5] GA 1968 at 37:20 (Video of Trump Interview with Chris Wallace 07/19/2020).

[6] *See* https://x.com/realDonaldTrump/status/1288818160389558273 (Donald J. Trump Tweet 07/30/2020).

[7] *See Donald Trump Interview Transcript with Jonathan Swan of Axios on HBO*, Rev (Aug. 3, 2020)  https://www.rev.com/blog/transcripts/donald-trump-interview-transcript-with-axios-on-hbo.

[8] GA 1943 at 57:33 (Video of Oshkosh Rally 08/17/2020).

[9] GA 1951 at 22:08 (Video of RNC Speech 08/24/2020).

[10] GA 1927 at 3:11-3:28 (Video of Donald J. Trump Statement 10/27/2020).

By October 2020, `P1` a private political advisor who had worked for the defendant's 2016 presidential campaign, began to assist with the defendant's re-election effort. Three days before election day, `P1` described the defendant's plan to a private gathering of supporters: "And what Trump's going to do is just declare victory. Right? He's going to declare victory. That doesn't mean he's the winner, he's just going to say he's the winner."[11] After explaining that Biden's supporters favored voting by mail, `P1` stated further, "And so they're going to have a natural disadvantage and Trump's going to take advantage of it—that's our strategy. He's going to declare himself a winner."[12]

Immediately following election day on November 3, the defendant did exactly that. As his private and Campaign advisors had predicted to him, in certain states, the defendant took an early lead on election day that began to erode. At approximately 11:20 p.m., Fox News projected that Biden would prevail in the state of Arizona, and according to Campaign advisor `P4` he and the defendant were shocked and angry at this development.[13] As election day turned to November 4, the contest was too close to project a winner, and in discussions about what the defendant should say publicly regarding the election, senior advisors suggested that the defendant should show restraint while counting continued.[14] Two private advisors, however, advocated a different course: `CC1` and `CC6` suggested that the defendant just declare victory.[15] And at about 2:20 a.m., the defendant gave televised remarks to a crowd of his campaign supporters in which he falsely

---

[11] GA 1886 at 0:00 (⬛⬛⬛⬛).
[12] *Id.* at 0:20 (⬛⬛⬛⬛).
[13] GA 376-380 at 70-74 (⬛⬛⬛⬛).
[14] GA 600-602 (⬛⬛⬛⬛); GA 610-614 (⬛⬛⬛⬛); GA 380-383 (⬛⬛⬛⬛); GA 128-130 (⬛⬛⬛⬛); GA 161 (⬛⬛⬛⬛); GA 370 (⬛⬛⬛⬛).
[15] GA 154 (⬛⬛⬛⬛); GA 600 (⬛⬛⬛⬛); GA 181-182 (⬛⬛⬛⬛).

claimed, without evidence or specificity, that there had been fraud in the election and that he had won: "This is a fraud on the American public.  This is an embarrassment to our country.  We were getting ready to win this election.  Frankly, we did win this election.  We did win this election."[16]

In the immediate post-election period, while the defendant claimed fraud without proof, his private operatives sought to create chaos, rather than seek clarity, at polling places where states were continuing to tabulate votes.  For example, on November 4, ██P5██—a Campaign employee, agent, and co-conspirator of the defendant—tried to sow confusion when the ongoing vote count at the TCF Center in Detroit, Michigan, looked unfavorable for the defendant.  There, when a colleague at the TCF Center told ██P5██ "We think [a batch of votes heavily in Biden's favor is] right,"[17] ██P5██ responded, "find a reason it isnt," "give me options to file litigation," and "even if itbis [sic]."[18]  When the colleague suggested that there was about to be unrest reminiscent of the Brooks Brothers Riot,[19] a violent effort to stop the vote count in Florida after the 2000 presidential election, ██P5██ responded, "Make them riot" and "Do it!!!"[20]  The defendant's Campaign operatives and supporters used similar tactics at other tabulation centers, including in Philadelphia, Pennsylvania,[21] and the defendant sometimes used the resulting confrontations to falsely claim

---

[16] GA 1974 at 7:44 (Video of White House Speech 11/04/2020).
[17] GA 968-996 (████████████████████████████████).
[18] *Id.*
[19] *Id.*
[20] *Id.*
[21] GA 997-999 (████████████████████████████████████).
████████████████████████████████████████████
████████████.

that his election observers were being denied proper access, thus serving as a predicate to the defendant's claim that fraud must have occurred in the observers' absence.[22]

Contrary to the defendant's public claims of victory immediately following election day, his advisors informed him that he would likely lose. On November 7, in a private Campaign meeting that included ▮P2▮ ▮P3▮ ▮P4▮ and White House staffer ▮P9▮ who came to serve as a conduit for information from the Campaign to the defendant, Campaign staff told the defendant that he had only a slim chance of prevailing in the election, and that any potential success was contingent on the defendant winning all ongoing vote counts or litigation in Arizona, Georgia, and Wisconsin.[23] Within a week of that assessment, on November 13, the defendant's Campaign conceded its litigation in Arizona[24]—meaning that based on his Campaign advisors' previous assessment, the defendant had lost the election.

That same day, in an implicit acknowledgment that he had no lawful way to prevail, the defendant sidelined the existing Campaign staff responsible for mounting his legal election challenges. From ▮P2▮ ▮P3▮ and others who were telling the defendant the truth that he did not want to hear—that he had lost—the defendant turned to ▮CC1▮, a private attorney who was willing to falsely claim victory and spread knowingly false claims of election fraud.

As the defendant placed alternating phone calls to ▮P3▮ and ▮CC1▮ throughout November 13,[25] ▮P1▮ informed ▮CC6▮, another private Campaign advisor, of the change, writing, "Close hold don't tell anyone Trump just fired ▮P3▮ and put ▮CC1▮ in charge" and

---

[22]   GA   774-775   (Donald   J.   Trump   Tweet   11/06/2020);   GA   776, https://x.com/realDonaldTrump/status/1325194709443080192   (Donald   J.   Trump   Tweet 11/07/2020).

[23] GA 155-158 (▮▮▮▮▮▮▮▮▮▮▮▮).

[24] GA 1001 (*Donald J. Trump for President, Inc. v. Hobbs* Hearing Transcript 11/13/2020); GA 1002-1003 (Minute entry and order dismissing *Donald J. Trump for President, Inc. v. Hobbs*).

[25] GA 731-734 (▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮).

"You are to report to ▮CC1▮ [26] When ▮CC6▮ asked if ▮P2▮ was "gone too?", ▮P1▮ replied that "[t]hey all report to ▮CC1▮ and that ▮P1▮ had "made a recommendation directly that if ▮CC1▮ was not in charge this thing is over[.] Trump is in to the end."[27] The next day, consistent with ▮P1▮ description, the defendant announced his staff change by Tweet, writing, "I look forward to ▮CC1▮ spearheading the legal effort to defend OUR RIGHT to FREE and FAIR ELECTIONS! ▮CC1▮ ▮P10▮ ▮P11▮ ▮CC3▮ and ▮P12▮ ▮▮ a truly great team, added to our other wonderful lawyers and representatives!"[28]

## B. The Defendant Knew that His Claims of Outcome-Determinative Fraud Were False

Following election day and throughout the charged conspiracies, the defendant, his co-conspirators, and their agents spread lies that there had been outcome-determinative fraud in the election and that he had actually won. These lies included dozens of specific claims that there had been substantial fraud in certain states, such as that large numbers of dead, non-resident, non-citizen, or otherwise ineligible voters had cast ballots, or that voting machines had changed votes for the defendant to votes for Biden. And the defendant and co-conspirators continued to make these unsupported, objectively unreasonable, and ever-changing claims even after they had been publicly disproven or after advisors had directly informed the defendant that they were untrue.

The evidence demonstrates that the defendant knew his fraud claims were false because he continued to make those claims even after his close advisors—acting not in an official capacity but in a private or Campaign-related capacity—told him they were not true. These advisors

---

[26] GA 1004 (▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮).

[27] *Id.*

[28] GA 784-785 (Donald J. Trump Tweet 11/14/2020).

included [P9] the White House staffer and Campaign conduit, and Pence, the defendant's running mate.

[P9] relationship with the defendant began before [P9] worked for him in the White House. [P9] had known [P13] the defendant's son-in-law, since [P13] was a child, and through [P13] met [P14] and then the defendant.[29] [P9] was one of several attorneys who represented the defendant in his first impeachment trial in the Senate in 2019 and 2020, including presenting argument on the Senate floor on January 27, 2020. [P9] began working in the White House as an Assistant to the President in August 2020.[30] In October 2020, [P9] became interested in learning more about the defendant's Campaign, and in early November 2020, after he began interfacing with Campaign staff, [P9] consulted with the White House Counsel's Office to ensure he complied with any applicable laws regarding Campaign activity.[31] Thereafter, and throughout the post-election period, [P9] became a conduit of information from the Campaign to the defendant, and over the course of the conspiracies, [P9] told the defendant the unvarnished truth about his Campaign legal team and the claims of fraud that they and the defendant were making. Examples of these instances include:

- [P9] repeatedly gave the defendant his honest assessment that [CC1] could not mount successful legal challenges to the election. For instance, when the defendant told [P9] that he was going to put [CC1] in charge of the Campaign's legal efforts but pay him only if he succeeded, [P9] told the defendant he would never have to pay [CC1] anything;[32] in response, the defendant laughed and said, "we'll see."[33] Thereafter, in Oval Office meetings with the defendant, [CC1] and others, in which [CC1] made speculative claims, [P9] told [CC1]—in front of the defendant—that [CC1]

---

[29] GA 699 (▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮).

[30] GA 671 (▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮).

[31] GA 672-673; GA 686 (▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮).

[32] GA 205 (▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮).

[33] *Id.*

would be unable to prove his allegations in a courtroom.[34]   In a separate private conversation, when [P9] reiterated to the defendant that [CC1] would be unable to prove his false fraud allegations in court, the defendant responded, "The details don't matter."[35]

- In the post-election period, [P9] also took on the role of updating the defendant on a near-daily basis on the Campaign's unsuccessful efforts to support any fraud claims.[36] [P9] told the defendant that the Campaign was looking into his fraud claims, and had even hired external experts to do so, but could find no support for them.  He told the defendant that if the Campaign took these claims to court, they would get slaughtered, because the claims are all "bullshit."[37] [P9] was privy in real time to the findings of the two expert consulting firms the Campaign retained to investigate fraud claims— [C1] and [C2] —and discussed with the defendant their debunkings on all major claims.[38]   For example, [P9] told the defendant that Georgia's audit disproved claims that [C3] had altered votes.[39]

In the post-election time period, Pence—the defendant's own running mate, who he had directed to assess fraud allegations—told the defendant that he had seen no evidence of outcome-determinative fraud in the election.[40]  This was in one of the many conversations the defendant and Pence had as running mates, in which they discussed their shared electoral interests.  Pence gradually and gently tried to convince the defendant to accept the lawful results of the election, even if it meant they lost.  These conversations included:

- A conversation on November 4 in which the defendant asked Pence to "study up" claims of voter fraud in states that they had won together in 2016 to determine whether they could bring legal challenges as candidates in those states.[41]  Pence described the conversation as follows: "Well, I think, I think it was broadly.  It was just look at all of it.  Let me know what you think.  But he told me that the Campaign was going to fight, was going to go to

---

[34] GA 198-204 (███████████).

[35] GA 715, 718 (███████████).

[36] GA 213-214 (███████████).

[37] GA 718 (███████████).

[38] GA  715-721  (███████████████); GA  207-213  (████████████ ███████).

[39] GA 211-212 (███████████).

[40] GA 414-420 (███████████).

[41] GA 412-413 (███████████).

court and make challenges . . . . And then he just said we're going to fight this and take a look at it. Let me know what you think."[42]

- A call between the defendant and Pence on November 7, the day that media organizations began to project Biden as the winner of the election. Pence "tried to encourage" the defendant "as a friend," reminding him, "you took a dying political party and gave it a new lease on life."[43]

- A November 11 meeting among the defendant, Pence, Campaign staff, and some White House staff during which Pence asked when most of the lawsuits would be resolved ("when does this come to a head?") and the Campaign staff responded, the "week after Thanksgiving."[44]

- A November 12 meeting among the defendant, Pence, Campaign staff, and some White House staff during which, Pence recalls, the "Campaign lawyers gave a sober and somewhat pessimistic report on the state of election challenges."[45]

- A private lunch on November 12 in which Pence reiterated a face-saving option for the defendant: "don't concede but recognize process is over."[46]

- A private lunch on November 16 in which Pence tried to encourage the defendant to accept the results of the election and run again in 2024, to which the defendant responded, "I don't know, 2024 is so far off."[47]

- A November 23 phone call in which the defendant told Pence that the defendant's private attorney, ▮▮P76▮▮, was not optimistic about the election challenges.[48]

- A December 21 private lunch in which Pence "encouraged" the defendant "not to look at the election 'as a loss – just an intermission.'" This was followed later in the day by a private discussion in the Oval Office in which the defendant asked Pence, "what do you think we should do?" Pence said, "after we have exhausted every legal process in the courts and Congress, if we still came up short, [the defendant] should 'take a bow.'"[49]

---

[42] GA 413-414 (▮▮▮▮▮▮▮).
[43] GA 421 (▮▮▮▮▮▮▮). *See* GA 1016 (Pence, *So Help Me God* p. 430).
[44] GA 1036 (▮▮▮▮▮▮▮); GA 1034-1035 (▮▮▮▮▮▮▮
▮▮▮▮▮▮▮).
[45] GA 422-424 (▮▮▮▮▮▮▮). *See* GA 1017 (Pence, *So Help Me God* p. 431).
[46] GA 1037 (▮▮▮▮▮▮▮).
[47] GA 425-426 (▮▮▮▮▮▮▮). *See* GA 1018 (Pence, *So Help Me God* p. 432).
[48] GA 430 (▮▮▮▮▮▮▮); GA 736 (▮▮▮▮▮▮▮).
[49] GA 442-448 (▮▮▮▮▮▮▮). *See* GA 1020-1022 (Pence, *So Help Me God* p. 437-

- Discussions in which Pence apprised the defendant of conversations he had had with governors in Arizona and Georgia in the context of "election challenges," in which Pence had called the governors "simply to gather information and share it with the president,"[50] and in which the governors did not report evidence of fraud in the elections in their states and explained that they could not take actions to convene their states' legislatures.[51]

But the defendant disregarded ▮▮P9▮▮ and Pence in the same way that he disregarded dozens of court decisions that unanimously rejected his and his allies' legal claims, and that he disregarded officials in the targeted states—including those in his own party—who stated publicly that he had lost and that his specific fraud allegations were false.[52] Election officials, for instance, issued press releases and other public statements to combat the disinformation that the defendant and allies were spreading.[53] At one point long after the defendant had begun spreading false fraud

---

439).

[50] GA 1039 (▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮).  *See* GA 1018 (Pence, *So Help Me God* p. 432).

[51] GA 427-429, GA431-435 (▮▮▮▮▮▮▮▮▮▮▮).  *See* GA 1018 (Pence, *So Help Me God* p. 432).

[52] GA 1040 (Joint Statement 11/20/2020); GA 1041 (Statement 12/04/2020).

[53] *See, e.g.*, GA 1043 (Letter to Maricopa County voters 11/17/2020); GA 838 (Arizona Governor's Tweet 12/01/2020); GA 1041 (Arizona Legislator's Statement 12/04/2020); GA 1044-1046 (Georgia Secretary of State News Release 10/23/2020); GA 1047-1048 (Georgia Secretary of State News Release 11/05/2020); GA 1947 (Video of Georgia Press Conference 11/06/2020); GA 1959 (Video of Georgia Press Conference 11/09/2020); GA 1960 (Video of Georgia Press Conference 11/12/2020); GA 1049-1050 (Georgia Secretary of State News Release 11/18/2020); GA 1051-1052 (Georgia Secretary of State News Release 11/19/2020); GA 1053-1054 (Georgia Secretary of State News Release 12/07/2020); GA 1946 (Video of Georgia News Conference 12/07/2020); GA 1948 (Video of Georgia Press Conference 12/16/2020); GA 1055-1057 (Georgia Secretary of State News Release 12/29/2020); GA 1949 (Video of Georgia Secretary of State Interview with Cavuto 01/02/2021); GA 1958 (Video of Georgia Press Conference 01/04/2021); GA 1058-1059 (Michigan Secretary of State web page 11/06/2020); GA 1040 (Michigan Legislators' Joint Statement 11/20/2020); GA 1060-1062 (Michigan Attorney General and Secretary of State News Release 12/14/2020); GA 1063-1064 (Michigan Secretary of State web page 12/17/2020); GA 1065 (Michigan Secretary of State web page 12/18/2020); GA 1066 (Michigan Secretary of State web page); GA 1907 (Video of Michigan Clerk's Statement); GA 1068-1070 (New Mexico Secretary of State News Release 12/14/2020); GA 1953 (Video of ▮▮P47▮▮ Interview with CNN 11/11/2020); GA 822 (▮▮P47▮▮ Tweet 11/27/2020); GA 1071-1072 (Pennsylvania Department of State Public Response Statement 12/29/2020); GA 1073-1076

claims, ▮▮P15▮▮ a White House staffer traveling with the defendant, overheard him tell family members that "it doesn't matter if you won or lost the election. You still have to fight like hell."[54]

The defendant and his co-conspirators also demonstrated their deliberate disregard for the truth—and thus their knowledge of falsity—when they repeatedly changed the numbers in their baseless fraud allegations from day to day. At trial, the Government will introduce several instances of this pattern, in which the defendant and conspirators' lies were proved by the fact that they made up figures from whole cloth. One example concerns the defendant and conspirators' claims about non-citizen voters in Arizona. The conspirators started with the allegation that 36,000 non-citizens voted in Arizona;[55] five days later, it was "beyond credulity that a few hundred thousand didn't vote";[56] three weeks later, "the bare minimum [was] 40 or 50,000. The reality is about 250,000";[57] days after that, the assertion was 32,000;[58] and ultimately, the conspirators landed back where they started, at 36,000—a false figure that they never verified or corroborated.[59]

Ultimately, the defendant's steady stream of disinformation in the post-election period culminated in the speech he gave at a privately-funded, privately-organized rally at the Ellipse on the morning of January 6, 2021, in advance of the official proceeding in which Congress was to certify the election in favor of Biden.[60] In his speech, the defendant repeated the same lies about

---

(Wisconsin Elections Commission web page 11/05/2020); GA 1077-1081 (Wisconsin Elections Commission web page 11/10/2020); GA 1082-1087 (Wisconsin Elections Commission web page).

[54] GA 308 (▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮).

[55] GA 1890 at 20:46 (Common Sense with ▮▮▮▮▮▮ 11/25/2020).

[56] GA 1906 at 2:06:25 (Video of Arizona Hotel Hearing 11/30/2020).

[57] GA 1980 at 18:52 (▮▮▮▮▮▮▮▮▮▮▮▮▮).

[58] GA 1981 at 35:19 (▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮).

[59] GA 1106 (Dalton Rally Speech Draft Tr. 01/04/2021); GA 1134 (Ellipse Rally Speech Draft Tr. 01/06/2021).

[60] GA 1114-1141 (Ellipse Rally Speech Draft Tr. 01/06/2021); GA 1142 (▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮).

election fraud in Arizona, Georgia, Michigan, Nevada, Pennsylvania, and Wisconsin that had been publicly, or directly, debunked.[61]  The defendant used these lies to inflame and motivate the large and angry crowd of his supporters to march to the Capitol and disrupt the certification proceeding.[62]

### C.  The Defendant Aimed Deceit at the Targeted States to Alter Their Ascertainment and Appointment of Electors

Shortly after election day, the defendant began to target the electoral process at the state level by attempting to deceive state officials and to prevent or overturn the legitimate ascertainment and appointment of Biden's electors.  As President, the defendant had no official responsibilities related to the states' administration of the election or the appointment of their electors, and instead contacted state officials in his capacity as a candidate.  Tellingly, the defendant contacted only state officials who were in his political party and were his political supporters, and only in states he had lost.  The defendant's attempts to use deceit to target the states' electoral process played out in Arizona, Georgia, Michigan, Nevada, Pennsylvania, and Wisconsin, as well as across these and other states that used certain voting machines.  In addition to the following evidence of the defendant's conduct during the charged conspiracies, at trial the Government will elicit testimony from election officials from the targeted states to establish the objective falsity—and often, impossibility—of the defendant's fraud claims.  Notably, although these election officials would have been the best sources of information to determine whether there was any merit to specific allegations of election fraud in their states, the defendant never contacted any of them to ask.

---

[61] GA 1126-1129, GA 1131-1136 (Ellipse Rally Speech Draft Tr. 01/06/2021).
[62] GA 1140 (Ellipse Rally Speech Draft Tr. 01/06/2021).

### 1.   Arizona

The defendant was on notice that there was no evidence of widespread election fraud in Arizona within a week of the election. On November 9, for instance, two days after news networks projected that Biden had won, the defendant called Arizona Governor ▆P16▆ to ask him what was happening at the state level with the presidential vote count in Arizona.[63] At that point, though Fox News had projected that Biden had won the state, several other news outlets— including ABC, NBC, CNN, and the *New York Times*—had not yet made a projection.[64] ▆P16▆ walked the defendant through the margins and the votes remaining to be counted, which were primarily from Pima County, which favored Biden, and Maricopa County, which was split.[65] ▆P16▆ described the situation to the defendant as "the ninth inning, two outs, and [the defendant] was several runs down."[66] The defendant also raised claims of election fraud, and ▆P16▆ asked the defendant to send him supporting evidence.[67] Although the defendant said he would—stating, "we're packaging it up"—he never did.[68] Shortly thereafter, on November 13, Campaign Manager ▆P2▆ told the defendant directly that a false fraud claim that had been circulating—that a

---

[63] GA 656-658 (▆▆▆▆▆); GA 727 (▆▆▆▆▆▆▆▆).

[64] *See, e.g.*, *Democrats flip Arizona as Biden, Kelly score key election wins*, Fox News, Nov. 3, 2020, available at https://www.foxnews.com/video/6206934979001; Dan Merica, *Biden carries Arizona, flipping a longtime Republican stronghold*, CNN.com, Nov. 13, 2020, available at https://www.cnn.com/2020/11/12/politics/biden-wins-arizona/index.html; Luis Ferré-Sadurni et al., *Biden flips Arizona, further cementing his presidential victory*, N.Y. Times, Nov. 12, 2020, available at https://www.nytimes.com/2020/11/12/us/biden-wins-arizona.html; *Election Latest: Biden Projected Winner in Arizona*, NBC 4 New York, Nov. 12, 2020, available at https://www.nbcnewyork.com/news/politics/decision-2020/election-latest-biden-talks-to-world-leaders-about-virus/2718671/.

[65] GA 667 (▆▆▆▆▆).

[66] *Id.*

[67] GA 657 (▆▆▆▆▆).

[68] *Id.*

substantial number of non-citizens had voted in Arizona—was false.[69]  The same day, as noted previously, Campaign attorneys conceded in court that the remaining election lawsuit in Arizona was moot.

The defendant and ▉CC1▉ continued to try to influence ▉P16▉  For example, ▉CC1▉ tried to contact ▉P16▉ on November 22—the same day the defendant and ▉CC1▉ reached out to the Arizona Speaker of the House, as described below.[70]  And on November 30, the day ▉P16▉ signed the Arizona certificate of ascertainment formally declaring Biden's electors as the legitimate electors for Arizona, ▉P16▉ received a call from the defendant and Pence.[71] ▉P16▉ advised them that Arizona had certified the election; when the defendant brought up fraud claims, ▉P16▉—eager to see the evidence—again asked the defendant to provide it, but the defendant never did.[72]  Instead, later that evening and into the following morning, the defendant repeatedly publicly attacked ▉P16▉ (as well as Georgia Governor ▉P17▉) on Twitter, re-tweeting posts by others, such as "Who needs Democrats when you have Republicans like ▉P17▉ and ▉P16▉ ▉"[73]; "Watching the Arizona hearings and then watching Gov. ▉P16▉ sign those papers, why bother voting for Republicans if what you get is ▉P16▉ and ▉P17▉"[74]; "▉P17▉ 'My state ran the most corrupt election in American history.' ▉P16▉ 'Hold my beer,'"[75]; and "Why is ▉P16▉ still pretending he's a member of the Republican Party after he just certified fraudulent election results in Arizona that disenfranchised millions of Republicans?"[76]

---

[69] GA 603-608 (▉▉▉▉▉▉▉▉▉▉).

[70] GA 661 (▉▉▉▉▉▉▉▉).

[71] GA 658 (▉▉▉▉▉▉▉▉).

[72] GA 658, GA 667-668 (▉▉▉▉▉▉▉▉▉).

[73] GA 840 (Trump Twitter Archive 11/30/2020).

[74] GA 833-834 (Donald J. Trump Tweet 11/30/2020).

[75] GA 831-832 (Donald J. Trump Tweet 11/30/2020).

[76] GA 839 (Trump Twitter Archive 12/01/2020).

The defendant and co-conspirators also attempted to use false fraud claims to convince political allies in the Arizona state legislature to ignore the popular vote and appoint illegitimate electors. On November 22, the defendant and [CC1] called [P18] the Speaker of the Arizona House of Representatives.[77] [CC1] did most of the talking.[78] During the call, the defendant and [CC1] levied multiple false fraud claims—including of non-citizen, non-resident, and dead voters that affected the defendant's race—and asked [P18] to use them as a basis to call the state legislature into session to replace Arizona's legitimate electors with illegitimate ones for the defendant.[79] When [P18] voiced his deep skepticism, [CC1] said, "well, you know, we're all kind of Republicans and we need to be working together."[80] [P18] refused, and asked [CC1] to provide evidence supporting his fraud claims.[81] [CC1] never did.[82]

Indeed, [CC1] met with [P18] in person approximately a week later and still had nothing to back up his claims. On November 30, [CC1] [P12] and others arrived in Arizona for a "hotel hearing"—an unofficial meeting with Republican legislators—during which they promoted false fraud allegations.[83] In a meeting the day after the hearing, when state legislators pressed [CC1] and [P12] for evidence to support their claims, [CC1] conceded that even on that late date, "[w]e don't have the evidence, but we have lots of theories."[84] When the legislators were frustrated that [CC1] had no support for his claims and asked him tough questions, [CC1] expressed surprise at the way he was being treated, stating "Man, I thought we were all

---

[77] GA 735 (⬛⬛⬛⬛); GA 21-22 (⬛⬛⬛⬛).
[78] *See* GA 30 (⬛⬛⬛).
[79] GA 22-24 (⬛⬛⬛).
[80] GA 28 (⬛⬛⬛).
[81] GA 22-33 (⬛⬛⬛).
[82] GA 25 (⬛⬛⬛).
[83] GA 1906 at 56:19 (Video of Arizona Hotel Hearing 11/30/2020).
[84] GA 36 (⬛⬛⬛).

Republicans. . . . [T]his is a little more hostile a reception.  I'm amazed at the reception I'm getting here."[85]

On December 4, [P18] released a public statement in which he explained that he did not have the authority to use the legislature "to reverse the results of the election" and that doing so would constitute an attempt "to nullify the people's vote based on unsupported theories of fraud."[86] [P18] made clear that he was disappointed with the legitimate election results because he "voted for President Trump and worked hard to reelect him" but would not "violate current law to change the outcome of a certified election."[87]  On Twitter, [P19] a Campaign staffer who worked with [CC6] attacked [P18] for his statement, writing that [P18] "is intentionally misleading the people of Arizona to avoid the inevitable."  The defendant re-tweeted [P19] false post and praised her.[88]

A month later, just two days before January 6, [CC2]—another of the defendant's private attorneys and a co-conspirator—called [P18] and [P18] counsel, [P20] and urged [P18] one last time to use the legislature to decertify Arizona's legitimate electors and overturn the valid election results.[89]  When [P18] told [CC2] that there was no evidence of substantial fraud in Arizona, and that he could not legally call the legislature into session, [CC2] was undeterred.  He conceded that he "[didn't] know enough about the facts on the ground" regarding

---

[85] GA 35 (▮▮▮▮▮▮▮▮▮▮).

[86] GA 1041-1042 (▮▮▮▮ Statement 12/04/2020).

[87] GA 1042 (▮▮▮▮ Statement 12/04/2020).

[88] GA 854-855 (Donald J. Trump Tweet 12/06/2020); GA 852-853 (Donald J. Trump Tweet 12/06/2020).

[89] GA 37-44 (▮▮▮▮▮▮▮▮▮▮); GA 408-409 (▮▮▮▮▮▮▮▮▮▮).

fraud in Arizona, and said that [P18] should nonetheless falsely claim that he had the authority to convene the legislature and "let the courts sort it out."[90]  [P18] again refused.[91]

In the post-election period, [P18] was harassed; on several occasions, individuals gathered outside [P18] home with bullhorns and screamed and honked their vehicle horns to create noise.[92]  Once, an individual in visible possession of a pistol and wearing a t-shirt in support of a militia group came onto [P18] property and screamed at him.[93]  At the time of these events, [P18] daughter was at home and was very ill, and the noise caused her "disruption and angst."[94]

### 2. Georgia

The defendant had early notice that his claims of election fraud in Georgia were false. Around mid-November, Campaign advisor [P4] told the defendant that his claim that a large number of dead people had voted in Georgia was false.[95]  The defendant continued to press the claim anyway, including in a press appearance on November 29, when he suggested that a large enough number of dead voters had cast ballots to change the outcome of the election in Georgia.[96]

Four days later, on December 3, [CC1] orchestrated a presentation to a Judiciary Subcommittee of the Georgia State Senate.[97]  In the morning in advance of it, [CC1] had spoken to the defendant on the phone for almost twenty minutes.[98]  And at the hearing, [CC1] arranged for co-conspirators and agents to repeat the false dead voter claim.  The claim was so patently false

---

[90] GA 1144 (⬛⬛⬛⬛⬛⬛⬛⬛); GA 39 (⬛⬛⬛⬛⬛⬛⬛⬛⬛).
[91] GA 41-42 (⬛⬛⬛⬛⬛⬛⬛⬛⬛).
[92] GA 45-47 (⬛⬛⬛⬛⬛⬛⬛⬛⬛).
[93] GA 46-47 (⬛⬛⬛⬛⬛⬛⬛⬛⬛).
[94] GA 47 (⬛⬛⬛⬛⬛⬛⬛⬛).
[95] GA 388-390 (⬛⬛⬛⬛⬛⬛⬛⬛).
[96] GA 1969 at 22:43–23:51 (Video of Trump Interview with Maria Bartiromo 11/29/2020).
[97] GA 1934 (Video of Georgia Senate Judiciary Subcommittee Hearing 12/03/2020).
[98] GA 739 at 1 (⬛⬛⬛⬛⬛⬛⬛⬛⬛⬛).

that everyone around the defendant knew it: during the hearing, Chief of Staff ▉P21▉ and ▉P9▉ exchanged text messages on their personal phones confirming that a Campaign attorney, ▉P22▉ had verified that ▉CC1▉ claim of more than 10,000 dead voters was false and that the actual number was around 12 and could not be outcome-determinative.[99]

During the subcommittee hearing, the conspirators also set in motion a sensational and dangerous lie about election workers at State Farm Arena that would result in the defendant's supporters harassing and threatening those workers.   First, ▉P23▉ one of the defendant's private attorneys, claimed that more than 10,000 dead people had voted in Georgia.[100]  Next, ▉P24▉ ▉▉ an agent of the defendant, played misleading excerpts of closed-circuit camera footage from State Farm Arena and insinuated that it showed election workers committing misconduct— counting "suitcases" of illegal ballots.[101]  Lastly, based on the false fraud allegations, ▉CC2▉ who had already been engaged as a private lawyer for the defendant but did not disclose that at the hearing—encouraged the Georgia legislators to decertify the state's legitimate electors.[102]

While the hearing was ongoing, the defendant simultaneously amplified the misinformation about the State Farm Arena election workers, falsely tweeting, "Wow! Blockbuster testimony taking place right now in Georgia.   Ballot stuffing by Dems when Republicans were forced to leave the large counting room.  Plenty more coming, but this alone

---

[99] ECF No. 226 ¶ 26(a); GA 1146 (▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉ ▉▉▉▉▉▉); *see also* GA 364-365 (▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉).

[100] GA 1934 at 30:54 (Video of Georgia Senate Judiciary Subcommittee Hearing 12/03/2020); GA 1146 (▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉).

[101] GA 1934 at 34:06 (Video of Georgia Senate Judiciary Subcommittee Hearing 12/03/2020); ECF No. 226 ¶ 26(b).

[102] GA 1934 at 4:44:05 (Video of Georgia Senate Judiciary Subcommittee Hearing 12/03/2020).

leads to an easy win of the State!"[103]  He did this just after re-tweeting two of his Campaign account's Tweets that promoted the false claim about election workers at State Farm Arena.[104]

Over the next week, the claim of misconduct at State Farm Arena was disproven publicly as well as directly to the defendant.  The day after the hearing, ██ P25 ██ the Chief Operating Officer of the Georgia Secretary of State's Office, posted a Tweet explaining that Secretary of State officers had watched the video in its entirety and confirmed that it showed "normal ballot processing."[105]  ██ P25 ██ again forcefully debunked the conspirators' claim about the State Farm video in a press conference on December 7, explaining at length the election workers' innocent conduct depicted in the closed-circuit camera footage and stating:

> And what's really frustrating is the President's attorneys had this same videotape.
> They saw the exact same things the rest of us could see.  And they chose to mislead
> state senators and the public about what was on that video.  I'm quite sure that they
> will not characterize the video if they try to enter it into evidence because that's the
> kind of thing that could lead to sanctions because it is obviously untrue.  They knew
> it was untrue and they continue to do things like this.[106]

On December 8, the defendant called Georgia Attorney General ██ P26 ██[107] ██ P26 ██ had advance notice that the topic of the call was *Texas v. Pennsylvania*, an election lawsuit in which Texas was suing other states—including Georgia—to attempt to prevent the certification of the election.[108]  U.S. Senator ██ P27 ██ told ██ P26 ██ that the defendant had heard that ██ P26 ██ was "whipping," or lobbying, other state attorneys general against filing amicus briefs in support of

---

[103] GA 846-847 (Donald J. Trump Tweet 12/03/2020).

[104] GA 845, GA 1893 (Donald J. Trump Tweet 12/03/2020); GA 844, GA 1894 (Donald J. Trump Tweet 12/03/2020).

[105] GA 848 (██ P25 ██ Tweet 12/04/2020).

[106] GA 1933 at 8:43 (Video of Georgia Secretary of State Press Conference 12/07/2020).

[107] GA 742 (████████████).

[108] GA 61-62 (████████).

Texas.[109] **P26** was not lobbying against the suit, and told **P27** so; **P27** asked **P26** if he would speak with the defendant about it, and **P26** agreed.[110] Shortly thereafter, the defendant called **P26** and immediately raised *Texas v. Pennsylvania*, saying, "I hope you're not talking to your AGs and encouraging them not to get on the lawsuit."[111] **P26** told the defendant that he was not affirmatively calling other state attorneys general, but that if they called him, he was telling them what he was seeing in his state—which was something that the defendant probably did not want to hear: **P26** was just not seeing evidence of fraud in Georgia.[112] The defendant nonetheless raised various fraud claims. **P26** told him that state authorities had investigated the State Farm Arena allegations and found no wrongdoing, and that he thought another claim the defendant raised about Coffee County, Georgia, had been similarly resolved, but would check.[113] The defendant asked **P26** to look at them again "because we're running out of time."[114] **P26** tried to steer the call to an end by thanking the defendant and telling him that he had voted for him twice and appreciated the defendant, to which the defendant responded, "Yeah, I did a hell of a job, didn't I?"[115] At one point, the defendant raised with **P26** the impending run-off election for Georgia's U.S. Senate seats and how important it was to re-elect **P27** and **P28**[116] The day after the call, the defendant—in his private capacity as a candidate for president—intervened in support of *Texas v. Pennsylvania*; his attorney for that matter was **CC2**[117]

---



[109] GA 62 (██).

[110] GA 61-62 (██).

[111] GA 64 (██).

[112] *Id.*

[113] GA 65-66 (██).

[114] GA 66 (██ 2023).

[115] GA 67 (██).

[116] *Id.*

[117] Mot. to Intervene, *Texas v. Pennsylvania*, No. 22-O-155 (S. Ct. Dec. 9, 2020).

On the same day as the defendant's call with P26 the defendant's Campaign staff acknowledged that the State Farm Arena claim was unsupported, emailing one another about the fact that television networks may decline to run Campaign advertisements promoting it. In frustration regarding the claim and others like it, P4 —who spoke with the defendant on a daily basis and had informed him on multiple occasions that various fraud claims were false—wrote, "When our research and campaign legal team can't back up any of the claims made by our Elite Strike Force Legal Team, you can see why we're 0-32 on our cases. I'll obviously hustle to help on all fronts, but it's tough to own any of this when it's all just conspiracy shit beamed down from the mothership."[118]

On December 10, however, CC1 further perpetuated the false State Farm Arena claim when he appeared at another hearing, this one before the Georgia House of Representatives' Government Affairs Committee. During it, he displayed some of the same footage as had been used in the December 3 hearing that had been debunked in the interim by Georgia officials, and nonetheless claimed that it showed "voter fraud right in front of people's eyes."[119] He then named two election workers— P29 and her mother, P30 —and baselessly accused them of "quite obviously surreptitiously passing around USB ports as if they are vials of heroin or cocaine," and suggested that they were criminals whose "places of work, their homes, should have been searched for evidence of ballots, for evidence of USB ports, for evidence of voter fraud."[120] As these false claims about P30 and P29 spread, the women were barraged by racist death threats. In the years since, they have spoken about the effect of the defendant and co-conspirators' lies about them; as P30 explained in an interview with congressional

---

[118] GA 1147 (                                              ).

[119] GA 1932 at 1:37:18–1:48:33 (Video of Georgia House Committee Hearing 12/10/2020).

[120] GA 1932 at 1:57:10–1:58:00 (Video of Georgia House Committee Hearing 12/10/2020).

investigators, "when someone as powerful as the President of the United States eggs on a mob, that mob will come. They came for us with their cruelty, their threats, their racism, and their hats. They haven't stopped even today."[121] Indeed, to this day, the defendant has never stopped falsely attacking P30 and P29 Although none of the false claims against them were ever corroborated, the defendant has continued to levy them on social media, including when the defendant attacked P30 in January 2023 just after her testimony to congressional investigators was made public.[122]

Throughout the post-election period, the defendant used Twitter to publicly attack Georgia Governor P17 with particular aggression. In the thirty-five days between November 30, 2020, and January 3, 2021, the defendant tweeted critically about P17 by name or title, more than forty times. These tweets included the ones also attacking P16 described above, as well as others particular to P17 like, "Why won't Governor @ P17 the hapless Governor of Georgia, use his emergency powers, which can be easily done, to overrule his obstinate Secretary of State, and do a match of signatures on envelopes. It will be a 'goldmine' of fraud, and we will easily WIN the state"[123]; "I will easily & quickly win Georgia if Governor @ P17 or the Secretary of State permit a simple signature verification. Has not been done and will show large scale discrepancies. Why are these two 'Republicans' saying no? If we win Georgia, everything else falls in place!"[124]; "The Republican Governor of Georgia refuses to do signature verification, which would give us an easy win. What's wrong with this guy? What is he

---

[121] GA 171 (                                    ).

[122] GA 966 (Donald J. Trump Truth Social Post 01/03/2023); GA 964 (Donald J. Trump Truth Social Post 01/02/2023); GA 965 (Donald J. Trump Truth Social Post 01/03/2023).

[123] GA 829-830 (Donald J. Trump Tweet 11/30/2020).

[124] GA 850-851 (Donald J. Trump Tweet 12/05/2020).

hiding?"[125]; and "How does Governor @ [P17] allow certification of votes without verifying signatures and despite the recently released tape of ballots being stuffed? His poll numbers have dropped like a rock. He is finished as governor!"[126]

In the post-election period, the defendant also made false claims in court about fraud in Georgia—unsuccessfully.   For example, in *Trump v. Kemp*, a federal lawsuit in which the defendant sued Georgia's Governor and Secretary of State, the defendant signed a verification of fraud allegations that he and his attorney on the case, [CC2] knew was inaccurate. [P9] spoke with the defendant and [CC2] in late December regarding the proposed verification.  First, he told [CC2] and another private attorney, [P31] that they could not have the defendant sign it because they could not verify any of the facts.[127]  And [P9] told the defendant that any lawyer that signed the complaint that the verification supported would get disbarred.[128]  [CC2] acknowledged this problem in an email on December 31 to [P32] lead counsel for the defendant as candidate in *Trump v. Kemp*, and another private attorney, writing that in the time since the defendant signed a previous verification in the case, he "had been made aware that some of the allegations (and evidence proffered by the experts) has been inaccurate" and that signing a new affirmation "with that knowledge (and incorporation by reference) would not be accurate."[129]   Nonetheless, on December 31, the defendant signed the verification, and [CC2] caused it to be filed.[130]

---

[125] GA 857, GA 859 (Donald J. Trump Tweet 12/07/2020).

[126] GA 864 (Donald J. Trump Tweet 12/10/2020).

[127] GA 238-239 ( ).

[128] GA 239 ( ).

[129] GA 1152 ( ).

[130] Complaint at 33-34, *Trump v. Kemp*, No. 1:20-cv-5310 (N.D. Ga. Dec. 31, 2020), ECF No. 1.

On January 2, Georgia Secretary of State █████P33█████ appeared on Fox News and said that various rumors of election fraud were false, and the defendant had lost in Georgia:

> Our office has been very busy with what I call the rumor whack-a-mole. Every day, a rumor will pop up and then we whack it down. What we do is, we basically whack it down with the truth. And people can't handle the truth sometimes because they're very disappointed in the results. And I get that. I voted for President Trump also, but at the end of the day, we did everything we could. We did an audit of the race; President Trump still lost. Then we did a full recount; President Trump still lost… we had a safe, secure process.[131]

█████P33█████ like █P17█ had been on the receiving end of the defendant's Tweets. These included: "Why isn't the @GASecofState █████P33█████ a so-called Republican, allowing us to look at signatures on envelopes for verification? We will find tens of thousands of fraudulent and illegal votes"; "RINOS @████P17████ @ ████P34████ & Secretary of State █P33█ █████████ will be solely responsible for the potential loss of our two GREAT Senators from Georgia, @████P27████ & @████P28████ Won't call a Special Session or check for Signature Verification! People are ANGRY!;" and "Georgia, where is signature verification approval? What do you have to lose? Must move quickly! @████P17████ @ ████P34████ @GaSecofState."[132]

Shortly after seeing the interview, the defendant set up a call with ████P33████ to discuss his pending private lawsuit, *Trump v. Kemp*, in which █████P33█████ was a named defendant.[133] For this reason, ████P33████ at first hoped to avoid speaking with the defendant but ultimately

---

[131] GA 1949 at 3:22 (Video of ████P33████ Interview with Cavuto 01/02/2021).
[132] GA 813-814 (Donald J. Trump Tweet 11/24/2020); GA 862-863 (Donald J. Trump Tweet 12/08/2020); GA 865-866 (Donald J. Trump Tweet 12/11/2020).
[133] GA 367-368 (████████████████████████);
████████████████████████████████████████████████████████
████████████████████████████████████████████████████████);
Complaint at 33-34, *Trump v. Kemp*, No. 1:20-cv-5310 (N.D. Ga. Dec. 31, 2020), ECF No. 1.

acquiesced because the defendant was persistent in seeking to set it up.[134]  Also because of the pending lawsuit, [P33] arranged for his general counsel, [P35] to participate.[135] Joining the defendant on the call were Chief of Staff [P21] and three private attorneys— [P32] and [P36] counsel of record in *Trump v. Kemp* and the attorneys whom [CC2] had emailed about the defendant's false verification, and [P31] whom [P21] introduced on the call as someone "who is not the attorney of record but has been involved."

The defendant began the call with an animated monologue in which he argued that he had won the election in Georgia, saying, "Okay, thank you very much.  Hello [P33] and [P35] and everybody.  We appreciate the time and the call.  So we've spent a lot of time on this, and if we could just go over some of the numbers, I think it's pretty clear that we won.  We won very substantially, uh, Georgia."[136]  Throughout the call, the defendant continued to state that he had won and referenced Biden's margin of victory that he needed to overcome to prevail in the state, including by asserting that "I just want to find 11,780 votes."[137]  He did not reference other elections on the same ballot.  After the defendant's opening salvo, [P33] stated, "Well, I listened to what the President has just said.  President Trump, we've had several lawsuits, and we've had to respond in court to the lawsuits and the contentions.  We don't agree that you have won."[138]

The defendant raised multiple false claims of election fraud, each of which [P33] refuted in turn.  When the defendant attacked [P30] called her "a professional vote scammer

---

[134] GA 514 (                                    ).
[135] GA 514-515 (                                    ).
[136] GA 1154 (Tr. of [P33] Call 01/02/2021).
[137] GA 1165 (Tr. of [P33] Call 01/02/2021).
[138] GA 1157 (Tr. of [P33] Call 01/02/2021).

and hustler,"[139] and mentioned her dozens of times throughout the call, [P33] said, "You're talking about the State Farm video.  And I think it's extremely unfortunate that [CC1] [____] or his people, they sliced and diced that video and took it out of context."[140]  He then offered the defendant a link to a video disproving the claim, to which the defendant responded, "I don't care about a link, I don't need it.  I have a much, [P33] I have a much better link."[141]  When the defendant claimed that 5,000 dead people had voted in Georgia, [P33] said, "Well, Mr. President, the challenge you have is the data you have is wrong . . . The actual number were two.  Two.  Two people that were dead that voted.  And so that's wrong, that was two."[142]  When the defendant claimed that thousands of out-of-state voters had cast ballots, [P33] counsel, [P35] responded, "We've been going through each of those as well, and those numbers that we got, that Ms. [P31] was just saying, they're not accurate."[143]

At one point, the defendant became frustrated after both [P33] and [P35] explained repeatedly that his claims had been investigated and were not true and stated, "And you're gonna to find that they are—which is totally illegal—it's, it's, it's more illegal for you than it is for them because, you know what they did and you're not reporting it.  That's a criminal, you know, that's a criminal offense.  And you know, you can't let that happen.  That's a big risk to you and to [P35] your lawyer.  That's a big risk."[144]  The call ended with [P35] stating that he

---

[139] GA 1155 (Tr. of [P33] Call 01/02/2021).
[140] GA 1160 (Tr. of [P33] Call 01/02/2021).
[141] GA 1161 (Tr. of [P33] Call 01/02/2021).
[142] GA 1159 (Tr. of [P33] Call 01/02/2021).
[143] GA 1162 (Tr. of [P33] Call 01/02/2021).
[144] GA 1165 (Tr. of [P33] Call 01/02/2021).

would coordinate with the lawyer representing ▮▮P33▮▮ office in the private lawsuit and get together with ▮P32▮ as agreed earlier in the call.[145]

The day after the call, on January 3, the defendant falsely tweeted, "I spoke to Secretary of State ▮▮P33▮▮ yesterday about Fulton County and voter fraud in Georgia.  He was unwilling, or unable, to answer questions such as the 'ballots under table' scam, ballot destruction, out of state 'voters', dead voters, and more.  He has no clue!"[146] ▮▮P33▮▮ promptly responded in a Tweet of his own: "Respectfully, President Trump: What you're saying is not true.  The truth will come out."[147]

### 3.  Michigan

On November 20, three days before Michigan's Governor signed a certificate of ascertainment appointing Biden's electors based on the popular vote, the defendant met with ▮P37▮ ▮▮▮ and ▮P38▮ Michigan's Senate Majority Leader and Speaker of the House, at the Oval Office.[148]  The defendant initiated the meeting by asking RNC Chairwoman ▮▮P39▮▮ to reach out to ▮P38▮ and gauge his receptivity to a meeting.[149]  The defendant also asked ▮P39▮ to participate in the meeting, but ▮P39▮ told him that she had consulted with her attorney and that she could not be involved in a meeting with legislators because it could be perceived as lobbying.[150]  After ▮P39▮ made the first contact, on November 18, the defendant reached out to ▮P37▮ and ▮P38▮ to extend an invitation.[151]  The same day that he contacted

---

[145] GA 1172-1173 (Tr. of ▮▮P33▮▮ Call 01/02/2021).

[146] GA 919-920 (Donald J. Trump Tweet 01/03/2021).

[147] GA 925 (▮▮P33▮▮ Tweet 01/03/2021).

[148] GA 555-557, 565 (▮▮▮▮▮▮▮); GA 15 (▮▮▮▮▮▮▮).

[149] GA 70-71 (▮▮▮▮▮▮).

[150] GA 330-337 (▮▮▮▮▮▮).

[151] GA 556-557 (▮▮▮▮▮▮).

[P37] and [P38] the defendant issued a false Tweet: "In Detroit, there are FAR MORE VOTES THAN PEOPLE.  Nothing can be done to cure that giant scam.  I win Michigan!"[152]

When the defendant called [P37] and [P38] to invite them to the White House, he did not provide the topic of the meeting, but he did ask about allegations of fraud in the election in Michigan.[153]  The legislators told him that they and the Michigan legislature were examining the allegations.[154]  Both [P37] and [P38] assumed that the defendant wanted to see them to discuss claims of election fraud, and they wanted to be firm that they had not seen evidence that would change the outcome of the election.[155]  For this reason, and to avoid talking only about election fraud, they prepared materials to raise regarding COVID-19, and planned in advance to release a statement once the meeting was over that said that the legislators were unaware of information that would change the outcome of the election.[156]

Over the course of the meeting, the defendant dialed in both [P39] —despite her request not to participate—and [CC1] [157] [P21] was present for some, but not all, of the meeting.[158] After some small talk with the legislators in the Oval Office, the defendant raised various fraud claims, including that he had lost Michigan because of fraud or misconduct in Wayne County, where Detroit is located.[159] [P37] corrected the defendant and told him that he had lost primarily because in two routinely Republican counties, the defendant had underperformed with educated

---

[152] GA 797-798 (Donald J. Trump Tweet 11/18/2020).
[153] GA 556-557 (                              ).
[154] GA 558 (                              ).
[155] GA 74-78 (                              ).
[156] GA 75 (                              ).
[157] GA 330-337 (                              ); GA 82 (                              ); GA 560-561 (                              ).
[158] GA 361-362 (                              ).
[159] GA 562-564 (                              ).

females, and if he had received the same number of votes there as the two winning local sheriffs, he likely would have won Michigan.[160] P37 could tell by the defendant's body language that he was not happy to hear P37 assessment.[161] Notably, the defendant only raised fraud claims to the extent that they affected the outcome in his own race, not those for other offices in Michigan.[162]

CC1 participation came after the legislators assured the defendant that they were looking into fraud claims; the defendant dialed CC1 into the meeting and said, " CC1 tell them what's going on." CC1 then launched into a fraud monologue.[163] Finally, P37 interrupted and asked, "So when are you going to file a lawsuit in Michigan?"—a question that CC1 ignored and did not answer.[164]

Immediately after the meeting, P37 and P38 released a public statement in which they stated that they had "not yet been made aware of any information that would change the outcome of the election in Michigan."[165] On November 21, the defendant acknowledged P37 and P38 statement when he tweeted, "This is true, but much different than reported by the media" and implicitly conceded that he had not provided evidence of fraud yet when he added, "We will show massive and unprecedented fraud!"[166]  Days later, the defendant's Campaign

---

[160] GA 564 (                                    ).
[161] GA 563-565 (                              ).
[162] GA 560-571 (                              ); GA 70-94 (                                        ).
[163] GA 575 (                              ); GA 567-569 (                              ).
[164] GA 569 (                              ); GA 575 (                              ).
[165] GA 1040 (                        Joint Statement 11/20/2020); GA 94-95 (                              ).
[166] GA 799-800 (Donald J. Trump Tweet 11/21/2020).

declined to request a state-wide recount in Michigan, for which it would have had to pay unless the recount succeeded in changing the outcome of the election.[167]

Despite failing to establish any valid fraud claims, CC1 followed up with P37 and P38 and attempted to pressure them to use the Michigan legislature to overturn the valid election results. On December 4, CC1 sent a message to P38 claiming that Georgia was poised to do so (based on CC1 and CC2 false advocacy there in the December 3 hearing) and asked P38 for help: "Looks like Georgia may well hold some factual hearings and change the certification under ArtII sec 1 cl 2 of the Constitution. As CC2 explained they don't just have the right to do it but the obligation. . . . Help me get this done in Michigan."[168] On December 7, CC1 attempted to send P37 a message (though failed because he typed the wrong number into his phone): "So I need you to pass a joint resolution from the Michigan legislature that states that, * the election is in dispute, * there's an ongoing investigation by the Legislature, and * the Electors sent by Governor Whitmer are not the official Electors of the State of Michigan and do not fall within the Safe Harbor deadline of Dec 8 under Michigan law."[169] Campaign operative P5 was involved in the drafting of this message with the assistance of P41 who was associated with the defendant's Campaign efforts in Michigan.[170] The following day, CC1 shared the draft with the defendant, sending it to his executive assistant, P42 by email.[171]

---

[167] GA 49-53 (████████████████); GA 15-19 (████████████████).
[168] GA 1175 (████████████████████████████████).
[169] GA 1177 (██████████████████████████████████████████); GA 1178-1187 (████████████████████████████████████).
[170] GA 1188 (██████████████████████).
[171] GA 1189 (████████████████████████).

These efforts failed.  On December 14, the day that duly-appointed electors across the country met and cast their electoral votes, [P37] and [P38] issued public statements confirming that the defendant had lost Michigan and the legislators still had not received evidence of outcome-determinative fraud in their state.[172] [P37] public statement included, "[W]e have not received evidence of fraud on a scale that would change the outcome of the election in Michigan."[173] [P38] stated, in part:

> We've diligently examined these reports of fraud to the best of our ability. . . I fought hard for President Trump.  Nobody wanted him to win more than me.  I think he's done an incredible job.  But I love our republic, too.  I can't fathom risking our norms, traditions and institutions to pass a resolution retroactively changing the electors for Trump, simply because some think there may have been enough widespread fraud to give him the win.  That's unprecedented for good reason.  And that's why there is not enough support in the House to cast a new slate of electors.  I fear we'd lose our country forever.  This truly would bring mutually assured destruction for every future election in regards to the Electoral College. And I can't stand for that.  I won't.[174]

On January 3, the defendant's Campaign publicly posted [P37] phone number, and attempted to post [P38] (but erred by one digit), in a Tweet urging, "Contact Speaker [ ] [P38] & Senate Majority Leader [P37] !"[175] [P37] received four thousand text messages in two hours, forcing him to get a new phone number.[176]

### 4. Nevada

On November 17, in *Law v. Whitmer*, agents of the defendant in Nevada filed suit, claiming "substantial irregularities, improprieties, and fraud" in the presidential election, including based

---

[172] GA 1190-1192 ( [ ] Press Releases 12/14/2020).

[173] GA 1191 ( [ ] Press Releases 12/14/2020).

[174] GA 1192 ( [ ] Press Releases 12/14/2020).

[175] GA 917 (Team Trump Tweet 01/03/2021); GA 918 (Team Trump Tweet 01/03/2021).

[176] GA 573-574, 576-577 ( [ ] ).

on machines used in ballot signature matching and votes by non-resident and dead voters.[177]  The defendant approved a press conference by his surrogates announcing the suit.[178]

On November 19,  ████ P43 ████  the RNC Chief Counsel, sent an email to  ████ P44 ████ ████  an RNC spokesperson, warning about inaccuracies in the suit: "Just FYI that I don't believe the claims in the contest regarding dead voters, those voting from out-of-state, etc. are substantiated.  We are working with the campaign on a data matching project and those numbers are going to be a lot lower than what the NV people have come up with.  They are also targeting our military voters.  To be frank, the contest has little chance of succeeding.  Happy to discuss this stuff if you want more info."[179]  ████ P44 ████  then sent a copy of  ████ P43 ████  email from her personal email account to the personal email account of ████ P45 ████  one of the defendant's White House staffers who also volunteered for the Campaign.[180]

Notwithstanding the RNC Chief Counsel's warning, the defendant re-tweeted and amplified news of the lawsuit on November 24, calling it "Big News!" that a Nevada Court had agreed to hear it.[181]  But the defendant did not similarly promote the fact that within two weeks, on December 4, the Nevada District Court dismissed *Law v. Whitmer*, finding in a detailed opinion that "there is no credible or reliable evidence that the 2020 General Election in Nevada was affected by fraud," including through the signature-match machines, and that Biden won the election in the state.[182]  Four days later, on December 8, Nevada's Supreme Court unanimously

---

[177] Complaint at 1, *Law v. Whitmer*, No. 20OC001631B (Nev. Dist. Ct. Nov. 17, 2020) available at:  https://electioncases.osu.edu/wp-content/uploads/2020/11/Law-v-Gloria-Complaint.pdf;  GA 1963 (Video of Trump Campaign Press Conference 11/17/2020).

[178] GA 1193-1194 (██████████████████████).

[179] GA 1195 (██████████████████████).

[180] GA 1196-1197, 1195 (██████████████████████████████████).

[181] GA 817-818 (Donald J. Trump Tweet 11/24/2020).

[182] Order at 13-24, 28-34, *Law v. Whitmer*, No. 20OC001631B (Nev. Dist. Ct. Dec. 4, 2020)

affirmed the District Court's decision, noting that despite its "earlier order asking appellants to identify specific findings with which they take issue, appellants have not pointed to any unsupported factual findings, and we have identified none."[183]  Later, in his Ellipse speech on January 6, the defendant repeated multiple claims explicitly rejected by Nevada courts.[184]

On December 18, the Nevada Secretary of State's Office released a "Facts vs. Myths" document to combat disinformation that the defendant and others were propagating about the election, including false claims that the Secretary of State's Office had not investigated claims of fraud even though it had "been presented with evidence of wide-spread fraud"—to which the Office responded, "While we are pursuing action in a number of isolated cases, we have yet to see any evidence of wide-spread fraud."[185]  The "Facts vs. Myths" document also stated publicly that courts had universally rejected fraud claims: "Four separate cases were heard by Nevada judges including the NV Supreme Court.  After examining records presented, each case was discounted due to a lack of evidence."[186]

### 5. Pennsylvania

Two days after the election, on November 6, the defendant called ██████P46██████ the Chairman of the Pennsylvania Republican Party—the entity responsible for supporting Republican

---

[183] *Law v. Whitmer,* 136 Nev. 840 (Nev. 2020).

[184] *Compare* Order at 18-20, *Law v. Whitmer,* No. 20OC001631B (Nev. Dist. Ct. Dec. 4, 2020) available at: https://electioncases.osu.edu/wp-content/uploads/2020/11/Law-v-Gloria-Order-Granting-Motion-to-Dismiss.pdf (finding no support for claims of double ballots, non-resident, and deceased voters) *with* GA 1134-1135 (Ellipse Rally Speech Draft Tr. 01/06/2021) ("There were also more than 42,000 double votes in Nevada"; "1,500 ballots were cast by individuals whose names and dates of birth match Nevada residents who died in 2020 prior to November 3rd election.  More than 8,000 votes were cast by individuals who had no address and probably didn't live there.").

[185] GA 1198 (Nevada Facts vs. Myths 12/18/2020).

[186] GA 1199 (Nevada Facts vs. Myths 12/18/2020).

candidates in the commonwealth at the federal, state, and local level.[187]  [P46] had a prior

relationship with the defendant, including having represented him in litigation in

Pennsylvania after the 2016 presidential election.[188]  The defendant asked [P46] how, without

fraud, he had gone from winning Pennsylvania on election day to trailing in the days

afterward.[189]  Consistent with what Campaign staff already had told the defendant, [P46]

confirmed that it was not fraud; it was that there were roughly 1,750,000 mail-in ballots still

being counted in Pennsylvania, which were expected to be eighty percent for Biden.[190]  Over the

following two months, the defendant spread false claims of fraud in Pennsylvania anyway.

In early November, in a Campaign meeting, when the defendant suggested that more

people in Pennsylvania voted than had checked in to vote, Deputy Campaign Manager [P3]

corrected him.[191]  Around the same time, Philadelphia City Commissioner [P47] appeared

on television and stated that there was no evidence of widespread fraud in Philadelphia.[192]  After

seeing the interview, the defendant targeted [P47] tweeting, "A guy named [P47] a

Philadelphia Commissioner and so-called Republican (RINO), is being used big time by the Fake

News Media to explain how honest things were with respect to the Election in Philadelphia.  He

refuses to look at a mountain of corruption & dishonesty.  We win!"[193]  As a result of the

defendant's attack, threats that [P47] already was receiving became more targeted and

detailed—and included his address and the names of his family members.[194]

---

[187] GA 618-619 (⬛); GA 723-724 (⬛).
[188] GA 616-617 (⬛).
[189] GA 619-620 (⬛).
[190] GA 620 (⬛).
[191] GA 159 (⬛).
[192] GA 1953 at 2:20–4:13 (Video of [P47] Interview with CNN 11/11/2020).
[193] GA 777-778 (Donald J. Trump Tweet 11/11/2020).
[194] GA 550-551 (⬛).

On the defendant's behalf, **CC1** too spread patently false claims about Pennsylvania. On November 25, **CC1** and **P12** attended an unofficial hearing with Republican state legislators in a Gettysburg hotel conference room.[195]  The defendant called in, claimed to have been watching, and demanded that the election in Pennsylvania "has to be turned around."[196] During the event, **CC1** falsely stated that Pennsylvania issued 1.8 million absentee ballots and received 2.5 million in return.[197]  The claim was rooted in an obvious error—the comparison of the number of ballots sent out in the primary election to the number of ballots received in the general election.  After seeing **CC1** make this claim, **P43** the RNC's Chief Counsel, tweeted publicly, "This is not true."[198]  In the following days, Campaign staff internally confirmed that **CC1** was lying; when one Campaign staffer wrote in an email that **CC1** claim was "just wrong" and "[t]here's no way to defend it," **P3** responded, "We have been saying this for a while.  It's very frustrating."[199]  Likewise, in late November or December, **P9** informed the defendant directly that a claim **CC1** was spreading, that "Pennsylvania received 700,000 more mail-in ballots than were mailed out," was "bullshit" and explained the error.[200]

**P43** followed up on his public Tweet in a private email on November 28 to **P44** the RNC spokesperson, expressing his concern about **CC1** and **P12** spread of disinformation: "I'm really not trying to give you a hard time but what **CC1** and **P12** are doing is a joke and they are getting laughed out of court.  It's setting us back in our fight for election integrity and

---

[195] GA 1945 (Video of Pennsylvania Hotel Hearing 11/25/2020).

[196] GA 1945 at 2:06:23–2:07:23 (Video of Pennsylvania Hotel Hearing 11/25/2020).

[197] GA 1945 at 2:21:30–2:21:53 (Video of Pennsylvania Hotel Hearing 11/25/2020).

[198] GA 819 ( **P43** Tweet 11/25/2020).

[199] GA 1203-1206 (                                                              ).

[200] GA 721 (                                        ); GA 1207-1208 (
                                        ).

they are misleading millions of people who have wishful thinking that the president is going to somehow win this thing."[201]  When ▮CC1▮ learned of ▮P43▮ Tweet and email, on November 28, he called ▮P43▮ and left a threatening voicemail, stating, "I really do need an explanation for what you said today because if there isn't a good one, you should resign.  Got it?  So call me or I'll call the boss and get you to resign.  Call me.  It'd be better for you if you do."[202]  ▮CC1▮ also contacted RNC Chairwoman ▮P39▮ to demand that ▮P43▮ be fired, and thereafter ▮P43▮ was relieved of his duties as RNC Chief Counsel.[203]

On December 3, four Republican leaders of the Pennsylvania legislature issued a public letter stating that the General Assembly lacked the authority to overturn the popular vote and appoint its own slate of electors, and that doing so would violate the state Election Code and Constitution.[204]  ▮P48▮ —an agent of the defendant who worked closely with ▮CC1▮ — issued a Tweet showing the four legislators' names and signatures and wrote, "These are the four cowardice Pennsylvania legislators that intend to allow the Democrat machine to #StealtheVote! #Cowards #Liars #Traitors" while linking to the legislators' Twitter accounts.[205]  On Sunday December 6, at 12:56 a.m., from the White House residence—having just returned from a political rally in Valdosta, Georgia—the defendant re-tweeted and amplified ▮P48▮ post.[206]

---

[201] GA 1209 (▮▮▮▮▮).
[202] GA 1976 (▮▮▮▮▮).
[203] GA 1210-1214 (▮▮▮▮▮); GA 1215 (▮▮▮▮▮); GA 342-346 (▮▮▮▮▮).
[204] GA 1222-1223 (Letter from Pennsylvania Legislators 12/03/2020); GA 173 (▮▮▮▮▮).
[205] GA 849 (▮▮ Tweet 12/04/2020).
[206] GA 856, 858 (Donald J. Trump Tweet 12/06/2020).

### 6. Wisconsin

On November 29, a recount that the defendant's Campaign had petitioned and paid for confirmed that Biden had won in Wisconsin—and increased the defendant's margin of defeat.[207] On December 14, the Wisconsin Supreme Court rejected the Campaign's election lawsuit there.[208] As a result, on December 21, Wisconsin's Governor signed a certificate of final determination confirming the prior certificate of ascertainment that established Biden's electors as the valid electors for the state.[209]

In response, the defendant issued a series of Tweets attacking ▮P49▮ the Wisconsin Supreme Court Justice who had written the majority opinion rejecting his Campaign's lawsuit and advocating that the Wisconsin legislature overturn the valid election results:

> Two years ago, the great people of Wisconsin asked me to endorse a man named ▮P49▮ for State Supreme Court Justice, when he was getting destroyed in the Polls against a tough Democrat Candidate who had no chance of losing. After my endorsement, ▮P49▮ easily won! WOW, he just voted against me in a Big Court Decision on voter fraud (of which there was much!), despite many pages of dissent from three highly respected Justices. One thing has nothing to do with another, but we ended up losing 4-3 in a really incorrect ruling! Great Republicans in Wisconsin should take these 3 strong decisions to their State Legislators and overturn this ridiculous State Election. We won in a LANDSLIDE![210]

After the defendant's Tweet, the state marshals responsible for ▮P49▮ safety arranged to provide ▮P49▮ with additional police protection based on social media traffic and other threatening communications.[211]

---

[207] GA 1224-1225 (Wisconsin Order for Recount 11/19/2020); GA 1226 (Wisconsin Statement of Canvass 11/30/2020); *Trump v. Biden*, 394 Wis. 2d 629, 633 (Wis. 2020).

[208] *Trump v. Biden*, 394 Wis. 2d 629, 633 (Wis. 2020).

[209] GA 1235 (Wisconsin Certificate of Ascertainment 11/03/2020).

[210] GA 875, GA 876, GA 877, GA 880, GA 879, and GA 878 (Donald J. Trump Tweets 12/21/2020).

[211] GA 184-186, GA 188-189 (▮▮▮▮▮▮▮▮).

### 7.  Voting Machines in Multiple States

Throughout the post-election period, the defendant and co-conspirators repeatedly made claims about the security and accuracy of voting machines across multiple states, despite the fact that they were on notice that the claims were false.  As early as November 12, for instance, the National Association of Secretaries of State, the National Association of State Election Directors, and other coordinated federal, state, and private entities issued a public statement declaring that the 2020 election was "the most secure in American history" and that there was "no evidence that any voting system deleted or lost votes, changed votes, or was in any way compromised."[212]

On November 14, in the Tweet announcing that ▆CC1▆ was to lead his Campaign legal efforts, the defendant also named ▆CC3▆ a private attorney who was fixated on voting machine claims, and ▆P10▆ another private attorney.[213]  Two days later, on November 16, on the defendant's behalf, executive assistant ▆P42▆ sent ▆CC3▆ and other private attorneys an email, titled "From POTUS," attaching a document containing bullet points critical of ▆C3▆ ▆▆ a company that manufactured voting machines used in certain states, and writing, "See attached – Please include as is, or almost as is, in lawsuit."[214] ▆CC3▆ responded nine minutes later, writing, "IT MUST GO IN ALL SUITS IN GA AND PA IMMEDIATELY WITH A FRAUD CLAIM THAT REQUIRES THE ENTIRE ELECTION TO BE SET ASIDE in those states and machines impounded for non-partisan professional inspection."[215]

On November 17, ▆P50▆ the director of the Department of Homeland Security's Cybersecurity and Infrastructure Security Agency (CISA), publicly tweeted that a group of private

---

[212] GA 1236 (Election Security Joint Statement 11/12/2020).

[213] GA 784-785 (Donald J. Trump Tweet 11/14/2020).

[214] GA 1238-1239 (▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆).

[215] GA 1240 (▆▆▆▆▆▆▆▆▆▆).

election security experts concluded that claims of computer-based election fraud "either have been unsubstantiated or are technically incoherent."[216]

Two days later, on November 19, [CC1] [CC3] [P10] and others held a press conference at the RNC headquarters, on behalf of the defendant and his Campaign.[217] During it, [CC3] made false and factually impossible claims regarding [C3] and the integrity of the country's election infrastructure.[218] That night, Fox News television personality [P51] stated on air that because of [CC3] incendiary comments about voting machines, he had invited her on his television program. He further stated, "[b]ut she never sent us any evidence, despite a lot of requests, polite requests. Not a page. When we kept pressing, she got angry and told us to stop contacting her. When we checked with others around the Trump Campaign, people in positions of authority, they told us [CC3] has never given them any evidence either . . . she never demonstrated that a single actual vote was moved illegitimately by software from one candidate to another. Not one."[219]

The defendant saw his private attorneys' RNC press conference and [P51] discussion of [CC3] and he acknowledged to [P4] that [CC3] had appeared "unhinged" in the press conference.[220] On November 20, the day after the press conference, the defendant made a similar comment to [P7] and [P45] two White House staffers who also volunteered for his Campaign.[221] In casual conversation after another meeting had ended, the defendant told [P7]

---

[216] GA 790 ([P50] Tweet 11/17/2020).

[217] GA 1950 (Video of RNC Press Conference 11/19/2020).

[218] GA 1950 at 38:58–52:34 (Video of RNC Press Conference 11/19/2020).

[219] GA 1972 at 9:18–10:02 (Video of [P51] Show 11/19/2020).

[220] GA 391-392 (███████████████).

[221] GA 248-249 (████████████████); GA 528 (█████████████████████).

and [P45] that [P51] had "eviscerated" or "destroyed" [CC3] [222] The defendant then had a

call with [CC3] on speakerphone, while [P7] and [P45] listened in, and mentioned the [P51]

segment to [CC3] [223] While [CC3] responded, the defendant placed the call on mute and to [P7]

and [P45] mocked and laughed at [CC3] called her claims "crazy," and made a reference to

the science fiction series Star Trek when describing her allegations.[224] In the same time period,

when [P9] told the defendant that [CC3] claims were unreliable and should not be

included in lawsuits, the defendant agreed that he had not seen anything to substantiate [CC3]

allegations.[225]

On November 22, notwithstanding the defendant's Tweet from eight days prior announcing

[CC3] involvement, [CC1] issued a statement on behalf of the Campaign distancing the

defendant from [CC3] " [CC3] is practicing law on her own.  She is not a member of the

Trump Legal Team.  She is also not a lawyer for the President in his personal capacity."[226]

Nonetheless, the defendant continued to support and publicize [CC3] knowingly false claims.

For example, within days of [CC1] statement, the defendant promoted a lawsuit that [CC3]

was about to file, tweeting on November 24, "BREAKING NEWS: @[CC3] says her

lawsuit in Georgia could be filed as soon as tomorrow and says there's no way there was anything

but widespread election fraud. #MAGA #AmericaFirst #Dobbs."[227] [CC3] filed a lawsuit the next

day against the Governor of Georgia falsely alleging "massive election fraud" accomplished

---

[222] GA 258-259 (███████████).
[223] GA 256-259 (███████████).
[224] GA 258-260 (███████████).
[225] GA 206 (███████████████).
[226] GA 1241 (Trump Campaign Statement 11/22/2020).
[227] GA 815-816 (Donald J. Trump Tweet 11/24/2020).

through **C3** election software and hardware.[228]  The defendant again promoted the lawsuit in a Tweet.[229]  The lawsuit was dismissed within two weeks, on December 7.[230]

On November 29, **P50** who was no longer the CISA Director, appeared on the television program *60 Minutes*.[231]  **P50** stated that he was confident that the election had been secure and "that there was no manipulation of the vote on the machine count side."[232]  In response, the defendant tweeted publicly about **P50** appearance: "@60Minutes never asked us for a comment about their ridiculous, one sided story on election security, which is an international joke. Our 2020 Election, from poorly rated **C3** to a Country FLOODED with unaccounted for Mail-In ballots, was probably our least secure EVER!"[233]  A few days later, **P10** appeared on a radio program as the defendant's agent and said that because of **P50** comments to promote confidence in the security of the election infrastructure, **P50** "should be drawn and quartered. Taken out at dawn and shot."[234]  Thereafter, **P50** was subjected to death threats.[235]  In a press conference on December 1 that the defendant acknowledged watching,[236] **P25** a Georgia election official, decried **P10** and the defendant's public statements spreading disinformation and said that if they did not stop, "someone is going to get killed."[237]

---

[228] Complaint at 2, *Pearson v. Kemp*, No. 1:20-cv-4809 (N.D. Ga. Nov. 25, 2020), ECF No. 1.

[229] GA 820-821 (Donald J. Trump Tweet 11/26/2020).

[230] Transcript of Mots. Hr'g at 41-44, *Pearson v. Kemp*, (N.D. Ga. Dec. 7, 2020), ECF No. 79.

[231] GA 1940 (Video of **P50** on 60 Minutes 11/29/2020).

[232] GA 1940 at 4:14–4:19 (Video of **P50** on 60 Minutes 11/29/2020).

[233] GA 825-826 (Donald J. Trump Tweet 11/29/2020).

[234] GA 1887 (Audio of **P10** on ▉▉▉▉▉ 11/30/2020).

[235] GA 295-296 (▉▉▉▉▉▉▉▉▉▉).

[236] GA 841-842 (Donald J. Trump Tweet 12/01/2020).

[237] GA 1961 at 3:32–3:55 (Video of **P25** Press Conference 12/01/2020).

On December 1, Attorney General [P52] stated publicly that the Justice Department had not seen evidence of fraud sufficient to change the election results.[238]  With respect to voting machines, he said, "There's been one assertion that would be systemic fraud and that would be the claim that machines were programmed essentially to skew the election results.  And the DHS and DOJ have looked into that, and so far, we haven't seen anything to substantiate that."[239]  [CC1] and [P12] immediately issued a formal Campaign statement attacking [P52] and the Justice Department, writing, "With all due respect to the Attorney General, there hasn't been any semblance of a Department of Justice Investigation . . . his opinion appears to be without any knowledge or investigation of the substantial irregularities and evidence of systemic fraud."[240]

In mid-December, the defendant spoke with RNC Chairwoman [P39] and asked her to publicize and promote a private report that had been released on December 13 that purported to identify flaws in the use of [C3] machines in Antrim County, Michigan.[241]  [P39] refused, telling the defendant that she already had discussed the report with [P38] Michigan's Speaker of the House, who had told her that the report was inaccurate.[242]  [P39] conveyed to the defendant [P38] exact assessment: the report was "fucking nuts."[243]

On January 2, during the defendant's call with Georgia Secretary of State [P33] said of false claims regarding voting machines, "I don't believe that you're really questioning the [C3] machines.  Because we did a hand re-tally, a 100 percent re-tally of all the ballots, and compared them to what the machines said and came up with virtually the same

---

[238] GA 12-13 ( ▮▮▮ ).

[239] GA 1242-1243 (Email from Comms Alert 12/01/2020).

[240] GA 1244 (Trump Campaign Press Release 12/01/2020).

[241] GA 338-339 ( ▮▮▮ ).

[242] GA 339-341 ( ▮▮▮ ).

[243] *Id.*

result. Then we did the recount, and we got virtually the same result. So I guess we can probably take that off the table."[244] In response, the defendant falsely claimed that "in other states, we think we found tremendous corruption with ▮C3▮ machines, but we'll have to see."[245]

At the Ellipse on January 6, the defendant and co-conspirators who spoke at the rally continued to make unsubstantiated and false claims about ▮C3▮ machines. ▮CC1▮ claimed that in the U.S. Senate run-off election in Georgia the day before, "the votes were deliberately changed by the same algorithm that was used in cheating President Trump and Vice President Pence."[246] ▮CC2▮ continued the false attack: "We now know because we caught it live last time in real time, how the machines contributed to that fraud. . . . They put those ballots in a secret folder in the machines sitting there waiting, until they know how many they need. And then the machine after the close of polls, we now know who's voted. And we know who hasn't. And I can now in that machine match those unvoted ballots with an unvoted voter and put them together in the machine. . . . We saw it happen in real time last night and it happened on November 3rd as well."[247] In his own speech, the defendant again raised the false specter of "the highly troubling matter of ▮C3▮ and lied about machines flipping votes from the defendant to Biden and an "astronomical and astounding" error rate in the machines' ballot scanning.[248]

### D. The Defendant Organized and Caused His Electors to Submit Fraudulent Certificates Creating the False Appearance That States Submitted Competing Electoral Slates

By late November 2020, every effort—both legitimate and illegitimate—that the defendant had made to challenge the results of the election had been unsuccessful. The defendant, his

---

[244] GA 1889 at 15:58–16:27 (Audio of Trump-▮P33▮ Call 01/02/2021).
[245] GA 1889 at 16:32–17:26 (Audio of Trump-▮P33▮ Call 01/02/2021).
[246] GA 1928 at 2:22:41–2:23:07 (Video of Ellipse Rally 01/06/2021).
[247] GA 1928 at 2:25:25–22:26:56 (Video of Ellipse Rally 01/06/2021).
[248] GA 1136 (Ellipse Rally Speech Draft Tr. 01/06/2021).

Campaign, and their allies had lost or withdrawn one election lawsuit after another in the seven targeted states. And the defendant and co-conspirators' efforts to overturn the legitimate vote count through a pressure campaign on state officials, and through false claims made directly to state legislators in formal or pseudo-hearings, continued to fail. So in early December, the defendant and his co-conspirators developed a new plan regarding the targeted states that the defendant had lost (Arizona, Georgia, Michigan, Nevada, New Mexico, Pennsylvania, and Wisconsin): to organize the people who would have served as the defendant's electors had he won the popular vote, and cause them to sign and send to Pence, as President of the Senate, certifications in which they falsely represented themselves as legitimate electors who had cast electoral votes for the defendant. Ultimately, the defendant and his co-conspirators would use these fraudulent electoral votes—mere pieces of paper without the lawful imprimatur of a state executive—to falsely claim that in his ministerial role presiding over the January 6 certification, Pence had the authority to choose the fraudulent slates over the legitimate ones, or to send the purportedly "dueling" slates to the state legislatures for consideration anew.

The fraudulent elector plan's arc and obstructive purpose is reflected in a series of memoranda drafted in late November and early December by ███ CC5 ███ an attorney who volunteered to assist the defendant's Campaign in lawsuits challenging the election in Wisconsin.[249] Beginning with a memorandum drafted on November 18, ███ CC5 ███ advocated that the defendant's elector nominees in Wisconsin meet and cast votes on the date required by the ECA (in 2020, December 14) in the event that an ongoing recount in the state reversed the defendant's loss there.[250] But this course of action—which ███ CC5 ███ Wisconsin memorandum

---

[249] GA 1245-1246 (██████████████████████████); GA 1247-1248 (██████ ██████████████████████████).

[250] GA 1249-1255 (██ CC5 ██ memo 11/18/2020).

presented as a contingency plan to preserve the possibility that the defendant's electors' votes be counted at the January 6 certification proceeding if he prevailed in the Wisconsin litigation and won the state—quickly transformed into a corrupt strategy to overturn the legitimate election results.[251] ▇CC5▇ revealed this obstructive plan in two additional memoranda, dated December 6[252] and December 9,[253] which proposed that the defendant's elector nominees in six of the targeted states—all but New Mexico, a state the defendant lost by more than ten percent of the popular vote, sparsely referenced in his false claims of voter fraud, and did not envision challenging at the inception of the elector scheme[254]—meet on December 14, sign fraudulent certifications, and send them to the Vice President to manufacture a fake controversy during the January 6 congressional certification.

The defendant personally set the fraudulent elector plan in motion in early December, ensured that it was carried out by co-conspirators and Campaign agents in the targeted states, and monitored its progress. By December 5, the defendant was starting to think about Congress's role in the election process; for the first time, he mentioned to Pence the possibility of challenging the election results in the House of Representatives.[255] In the same call, Pence told the defendant that the Georgia Bureau of Investigation was investigating their race.[256]

---

[251] GA 1256-1259 (▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇).

[252] GA 1260-1265 (▇CC5▇ ▇ memo 12/06/2020).

[253] GA 1266-1270 (▇CC5▇ ▇ memo 12/09/2020).

[254] GA 1271 (▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇); GA 1272 (New Mexico Certificate of Ascertainment); GA 1273-1282 (▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇ ▇▇▇▇▇).

[255] GA 1283-1284 (▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇); GA 436-437 (▇▇▇▇▇▇▇ ▇▇▇▇▇); GA 1019 (Pence, *So Help Me God*, p. 433).

[256] GA 1283-1284 (▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇); GA 438-439 (▇▇▇▇▇ ▇▇▇▇▇).

On December 6, the same day that `CC5` put the plan on paper,[257] the defendant and `CC2` called RNC Chairwoman `P39` out of the blue.[258] `P39` did not know `CC2` and the defendant introduced him to `P39` by saying that he was a professor and lawyer; thereafter, `CC2` was the primary speaker during the conversation.[259] `CC2` told `P39` that he and the defendant wanted the RNC "to help the campaign assemble the electors in the states where we had legal challenges, or litigation that was ongoing . . . in case any of that litigation changed the result of a state so that it would meet the constitutional requirement of electors meeting."[260] When the call ended, `P39` immediately called `P3` one of the defendant's deputy Campaign managers, and relayed her conversation with the defendant and `CC2`[261] After `P3` assured `P39` that the Campaign was "on it," `P39` called the defendant back and told him so.[262] On the same day, from his personal email account, `P21` forwarded to Campaign staff `CC5` November 18 memorandum and wrote, "We just need to have someone coordinating the electors for states."[263] And the following day, on the evening of December 7, `CC1` sent `P39` a text message stating in part, "I have lawyers assigned in each state working on Dec 14 electors meeting and what they need.  I will send you a list."[264]

The defendant's co-conspirators worked with his Campaign staff, and used his pre-election Campaign apparatus, to execute the fraudulent elector plan.[265]  The defendant communicated with

---

[257] GA 1260-1265 ( `CC5` memo 12/06/2020).

[258] GA 323-325 (██████████████).

[259] GA 324-325 (██████████████████).

[260] GA 325 (████████████).

[261] GA 325-327 (█████████████████).

[262] GA 326-327 (█████████████████).

[263] GA 1285 (██████████████████████).

[264] GA 1286-1287 (████████████████████████████████).

[265] GA 1288-1290 (███████████████████████████████████); GA 1247 (███████████████████████
████████████████████████).

[CC1] and [CC2] about the plan,[266] and they in turn communicated with [CC6] and [CC5][267] Ultimately, [P5] [P19] and other Campaign staff and agents helped carry out [CC5] plans.[268]

On December 8, [CC5] spoke on the phone with [P53][269] a private attorney whom [CC1] and [CC6] had identified as a contact for the plan in Arizona.[270] Following the call, [P53] recounted the conversation in an email:

> I just talked to the gentleman who did that memo, [CC5].  His idea is basically that all of us (GA, WI, AZ, PA, etc.) have our electors send in their votes (even though the votes aren't legal under federal law – because they're not signed by Governor); so that members of Congress can fight about whether they should be counted on January 6th.  (They could potentially argue that they're not bound by federal law because they're Congress and make the law, etc.)  Kind of wild/creative – I'm happy to discuss.  My comment to him is that I guess there's no harm in it, (legally at least) – i.e. we would just be sending in "fake" electoral votes to Pence so that "someone" in Congress can make an objection when they start counting votes, and start arguing that the "fake" votes should be counted.[271]

On December 9, [CC6] contacted [P39] for assistance with a request from [CC5] for "a list of our electors in each state and copies of the certificates sent in 4 years ago."[272]

[P39] responded that Campaign employees were already assisting in the effort and referred [CC6] to [P3][273] The next day, at [CC1] direction, [CC5] generated directions to the

---

[266] GA 1291-1295 ( ).

[267] GA 1296-1299 ( ); GA 1300-1309 ( ( ).

[268] GA 1312-1317 ( ); GA 1318-1320 ( ); GA 1321-1324 ( ).

[269] GA 1296-1299 ( ).

[270] GA 1325 ( ).

[271] GA 1296-1299 ( ).

[272] GA 1326-1327 ( ).

[273] GA 1288-1290 ( ).

electors in all of the targeted states except for Wisconsin (which had already received his memos) and New Mexico (which he had not yet been asked to do) on how best to mimic the manner in which valid electors were required by state law to gather and vote, along with fraudulent certificates of vote for the defendant's electors to sign.[274]

The day before the defendant's electors were scheduled to meet and sign fraudulent certificates of vote, the defendant asked Campaign advisor ▉P4▉ for an update on the elector plan and directed ▉P4▉ to issue a statement, and ▉CC1▉ asked ▉P4▉ to participate in a messaging conference call.[275] ▉P4▉ discussed these developments in a text thread with ▉P3▉ Campaign Staffer ▉P54▉ and ▉P9▉ After ▉P4▉ proposed a communications plan for the Campaign on the elector vote, ▉P9▉ wrote to ▉P3▉ "I'll call soon and we'll talk with boss."[276] The participants then discussed to whom a Campaign statement could be attributed. ▉P3▉ wrote, "Here's the thing the way this has morphed it's a crazy play so I don't know who wants to put their name on it."[277] ▉P4▉ then shared with those on the text thread the invitees to the call ▉CC1▉ was convening— ▉CC1▉ ▉CC6▉ ▉P12▉ ▉P19▉ ▉P55▉ and ▉P56▉ ▉▉ and derogatorily referred to them as the "Star Wars bar," meaning a motley assortment of characters, and in this case specifically ones whose professional competence ▉P4▉ doubted and

---

[274] GA 1328 (▉▉▉▉▉); GA 1310-1311 (▉▉▉▉▉▉); GA 1321-1324 (▉▉▉▉); GA 1334-1335 (▉▉▉▉); GA 1336-1338 (▉▉▉▉); GA 1339-1341 (▉▉▉▉ to ▉▉▉▉); GA 1342-1344 (▉▉▉▉); GA 1345-1346 (▉▉▉▉).
[275] GA 1300 (▉▉▉▉▉▉▉); GA 394-395 (▉▉▉▉▉).
[276] GA 1301 (▉▉▉▉▉▉▉▉).
[277] GA 1304 (▉▉▉▉▉▉▉▉).

whom he personally would not choose to hire.[278]  P9  responded, "Certifying illegal votes."[279]  Thereafter, the text participants collectively agreed that no message would go out under their names because they "can't stand by it."[280]  In the midst of these text messages,  P9   P4  and  P3  had a nineteen-minute phone call with the defendant.[281]

In practice, the fraudulent elector plan played out somewhat differently in each targeted state.  In general, the co-conspirators deceived the defendant's elector nominees in the same way that the defendant and  CC2  deceived  P39  by falsely claiming that their electoral votes would be used only if ongoing litigation were resolved in the defendant's favor.[282]  A select few of the defendant's agents and elector nominees, however, had insight into the ultimate plan to use the fraudulent elector certificates to disrupt the congressional certification on January 6.[283]  In several states, the defendant, his co-conspirators, and agents were unable to convince all of the defendant's elector nominees to participate.[284]  P57  for instance, a former U.S. Representative and U.S. Attorney and one of the defendant's elector nominees in Pennsylvania who opted out of the plan, told the state party vice chair trying to organize the defendant's electors

---

[278] GA 1305-1306 (███████████████████████████████████); GA 396-397 (███████████████████████).

[279] GA 1306 (███████████████████████████████████████████).

[280] GA 1308 (███████████████████████████████████████████).

[281] GA 744 (██████████████████████████).

[282] GA 1347-1349 (████████████████████████████████████); GA 1350-1356 (██████████████████2020); GA 97-98 (███████████); GA 517-518 (██████████████████).

[283] GA 1888 at 3:15–4:32 (████████████████████████2020); GA 1296-1299 (████████████████████████).

[284] *See, e.g.*, GA 625-633 (███████████████████); GA 320-321 (████████████████); GA 265 (██████████████████); GA 1362-1365 (Fraudulent "Georgia's Electoral Votes for President and Vice President");  GA 1372-1373 (Fraudulent "Michigan's Electoral Votes for President and Vice President");  GA 1383-1389 (Fraudulent "Pennsylvania's Electoral Votes for President and Vice President").

that he would not participate because the plan did not follow the proper process and was illegal.[285]
When electors like P57 declined, the conspirators and agents had to recruit substitutes willing
to go along with the plan.[286]   Other electors who participated based on the conspirators' false
assurances that their votes were only a contingency were later surprised to learn that they were
used on January 6—and would not have agreed to participate if the conspirators had been truthful
about their plan.[287]

In Pennsylvania, the defendant's elector nominees' concern about the propriety of the plan
presented a problem for the conspirators.   In text messages that P5 and CC6 exchanged
on December 11 into the early morning hours of December 12, P5 told CC6 that P46
the state Republican Party Chairman whom the defendant had called shortly after the election[288]—
"is winding up the electors.   Telling them if the[y] sign the petition they could be prosecuted.
Need a counter argument or someone has to call him and tell him to stop."[289] CC6 responded,
"Have someone who knows him call him to tell him to stop."[290] P5 replied, "That's the plan.
PA is squishy right now.  Going to need a call with [ CC1 tomorrow."[291]

On December 12, CC1 CC5 CC6 and others held a conference call
organized by the Campaign to placate the defendant's Pennsylvania electors.[292] CC1 falsely

---

[285] GA 320-321 (███████████████).
[286] GA 519-520 (████████████████024).
[287] GA 164-165 (████████████████); GA 522-523 (████████████████); GA 488-495 (████████████████).
[288] GA 618-619 (████████████████); GA 723-724, GA 726 (████████████████ 1██████).
[289] GA 1318 (███████████████████████████████████).
[290] GA 1319 (███████████████████████████████████).
[291] *Id.*
[292] GA 1394-1398 (███████████████████████████████); GA 1399 (████████████████).

assured them that their certificates of vote would be used only if the defendant succeeded in litigation.[293]   During the call, some of the defendant's conspirators and agents exchanged text messages expressing frustration at the electors' concerns.[294]   **P5** wrote, "Whoever selected this slate should be shot."   **P12** responded, "These people are making this so much more complicated than it needs to be omg" and "We couldn't have found 20 people better than this???"   **P5** agreed, writing, "We need good substitutes."[295]   When the possibility arose that the electors' certificates of vote include conditional language making clear that they were not yet the duly-appointed electors, **P5** wrote, "The other States are signing what [ **CC5** prepared - if it gets out we changed the language for PA it could snowball."[296]

On December 13, the eve of when the electors were to meet, the defendant was preoccupied with preventing the certification of the electoral vote.  He tweeted: "Swing States that have found massive VOTER FRAUD, which is all of them, CANNOT LEGALLY CERTIFY these votes as complete & correct without committing a severely punishable crime.  Everybody knows that dead people, below age people, illegal immigrants, fake signatures, prisoners, and many others voted illegally. Also, machine 'glitches' (another word for FRAUD), ballot harvesting, non-resident voters, fake ballots, 'stuffing the ballot box', votes for pay, roughed up Republican Poll Watchers, and sometimes even more votes than people voting, took place in Detroit, Philadelphia, Milwaukee, Atlanta, Pittsburgh, and elsewhere.  In all Swing State cases, there are far more votes



[293] GA 743 ( ▮▮▮▮▮▮▮▮▮ ); GA 1400 ( ▮▮▮▮▮▮▮ ); GA 621 ( ▮▮▮▮▮▮ ).

[294] GA 1407 ( ▮▮▮▮▮▮▮▮▮ ).

[295] GA 1407-1408 ( ▮▮▮▮▮▮▮▮▮ ).

[296] GA 1408 ( ▮▮▮▮▮▮▮ ).

than are necessary to win the State, and the Election itself.  Therefore, VOTES CANNOT BE CERTIFIED.  THIS ELECTION IS UNDER PROTEST!"[297]

Ultimately, the Pennsylvania electors insisted upon using conditional language in their elector certificates to avoid falsely certifying that they were duly-appointed electors.[298]  And in New Mexico—the state that ▮CC5▮'s memoranda did not even address[299]—the defendant's Campaign filed a pretextual lawsuit just minutes before the fraudulent electors met so that there was litigation pending at the time of the vote.[300]  Notwithstanding obstacles, the defendant and his co-conspirators successfully organized his elector nominees and substitutes to gather on December 14 in the targeted states, cast fraudulent electoral votes on his behalf, and send those fraudulent votes to Washington, D.C., in order to falsely claim at the congressional certification that certain states had sent competing slates of electors.[301]

When possible, the defendant and co-conspirators tried to have the fake electoral votes appear to be in compliance with state law governing how legitimate electors vote.[302]  For example,

---

[297] GA 867-872 (Donald J. Trump Tweets 12/13/2020).

[298] GA 1407-1408 (████████████████████████████████); GA 1409-1410 (████████████████ ██████████); GA 1411-1412 (██████████████████████); GA 1413-1415 (██████████ ████████████████); GA 622-625 (████████████████)).

[299] GA 1416 (██████████████████████████████); GA 1273-1282 (██████████████ ████████████████████).

[300] GA 1417-1419 (██████████████████████████████████████████ ████████).

[301] GA 1420-1424 (Fraudulent "Arizona's Electoral Votes for President and Vice President"); GA 1357-1368 (Fraudulent "Georgia's Electoral Votes for President and Vice President"); GA 1369-1379 (Fraudulent "Michigan's Electoral Votes for President and Vice President"); GA 1425-1444 (Fraudulent "Nevada's Electoral Votes for President and Vice President"); GA 1445-1450 (Fraudulent "New Mexico's Electoral Votes for President and Vice President"); GA 1380-1393 (Fraudulent "Pennsylvania's Electoral Votes for President and Vice President"); GA 1451-1457 (Fraudulent "Wisconsin's Electoral Votes for President and Vice President"); GA 1458-1472 ████████████████████████████████).

[302] GA 1266-1270 (▮CC5▮ memo 12/09/2020).

the co-conspirators knew that some states required that the duly-appointed electors meet and cast their votes in the state capitol building.[303]   To make it seem like they had complied with this requirement, state officials were enlisted to provide the fraudulent electors with access to state capitol buildings so that they could gather and vote there.[304]   In many cases, however, the conspirators and fraudulent electors were unable to comply with state law for legitimate electors.[305] For example, Pennsylvania law required the Governor to give notice whenever an elector was substituted, but the conspirators could not arrange for the Governor to give notice when P46 and others opted out and had to be replaced.[306]   Thereafter, CC5 and others brainstormed fake excuses for their failure to follow state law, writing, "maybe we can use Covid19 as an excuse for the Governor not giving notice."[307]

Then, on December 14—the date that duly-appointed electors across the country met to cast their votes, and when the defendant's fraudulent electors in seven states mimicked them— P39 followed up with the defendant.[308]   When she received an internal RNC email titled "Electors Recap - Final," which summarized the day's activities with respect to electors and included a list of six "contested" states in which the defendant's electors voted, she forwarded it to the defendant's executive assistant, P42 who responded, "It's in front of him!"[309]

---

[303] GA 1268-1270 ( CC5 memo 12/09/2020).
[304] GA 1473-1475 (█████); GA 1458-1472 (██████████); GA 1476 (█████).
[305] GA 1458-1472 (████████).
[306] GA 1270 ( CC5 memo 12/09/2020); GA 1390 (Fraudulent "Pennsylvania's Electoral Votes for President and Vice President").
[307] GA 1477-1482 (███████).
[308] GA 328-329 (█████).
[309] *Id; see also* GA 1483-1484 (██████).

[P39] also called the defendant to tell him that she had sent him the update,[310] and she spoke to [CC1] shortly before [CC1] spoke to the defendant.[311]

At the same time that the defendant's fraudulent electors were preparing to gather and cast fraudulent votes, the defendant's co-conspirators began planning how to use the fraudulent votes to overturn the election results at the January 6 certification. On December 13, [CC5] sent [CC1] a memorandum that envisioned a scenario in which Pence would use the fraudulent slates as a pretext to claim that there were dueling slates of electors from the targeted states and negotiate a solution to defeat Biden.[312] On the same day, the defendant resumed almost daily direct contact with [P1] who maintained a podcast that disseminated the defendant's false fraud claims.[313] On December 14, [P1] podcast focused on spreading lies about the defendant's fraudulent electors—including the false claim that their votes were merely a contingency in the event the defendant won legal challenges in the targeted states.[314]

On December 16, [CC5] traveled to Washington with a group of private attorneys who had done work for the defendant's Campaign in Wisconsin for a photo opportunity with the defendant in the Oval Office.[315] During the encounter, the defendant complained about Wisconsin

---

[310] GA 329 (███████████████).

[311] GA 745 (██████████████████████); GA 1485 (██████████████).

[312] GA 1486 (██████████████████████████████████████); GA 1487-1493 (███████████████████████████).

[313] *See, e.g.*, GA 744 (███████████████████); GA 749 (███████ ██████████); GA 750 (███████████████████); GA 751 (████ ██████); GA 753 (███████████████████); GA 756 (████ ██████); GA 758-759 (███████████████████████); GA 763 (███ ██████); GA 764 (███████████████████); GA 765 (███ ██████); GA 768, 770 (███████████████████████); GA 771 (███ ██████).

[314] GA 1979 (██████████████████).

[315] GA 1494 (██████████████████████████); GA 1495 (████ ██████████████████████████); GA 1498-1500 (████████████)

Supreme Court Justice ▅▅▅ who two days earlier had cast the deciding vote in rejecting the defendant's election challenge in the state.[316]   As the group was leaving, the defendant spoke directly—and privately—to ▅▅▅ [317]

As late as early January, the conspirators attempted to keep the full nature of the fraudulent elector plan secret.  On January 3, for instance, in a private text message exchange, ▅▅▅ wrote to ▅▅▅ "Careful with your texts on text groups.  No reason to text things about electors to anyone but ▅▅▅ and me."  ▅▅▅ responded, "K," and ▅▅▅ followed up, "I'm probably a bit paranoid haha."  ▅▅▅ wrote, "A valuable trait!"[318]

### E. The Defendant Attempted to Persuade Pence to Reject Votes Cast by Duly-Appointed Electors and Choose the Defendant's Fraudulent Ones

As the defendant's various attempts to target the states failed, and the January 6 congressional certification approached, the defendant and co-conspirators turned their attention to Pence, who as President of the Senate presided over the certification proceeding.  In service of a new plan—to enlist Pence to use his role to fraudulently alter the election results at the January 6 certification proceeding—the defendant and his co-conspirators again used deceit.  They lied to Pence, telling him that there was substantial election fraud and concealing their orchestration of the plan to manufacture fraudulent elector slates, as well as their intention to use the fake slates to attempt to obstruct the congressional certification.  And they lied to the public, falsely claiming that Pence had the authority during the certification proceeding to reject electoral votes, send them

---

▅▅▅▅▅▅▅▅▅▅ ); GA 746 (▅▅▅▅▅▅▅▅▅▅▅ ); GA 747-748 (▅▅▅▅▅▅▅▅▅▅ ); GA 100-101 (▅▅▅▅▅▅▅▅▅ ).

[316] GA 497-498 (▅▅▅▅▅▅ ).

[317] GA 498-500 (▅▅▅▅▅▅ ).

[318] GA 1501-1502 (▅▅▅▅▅▅▅▅▅▅▅▅▅ ).

back to the states, or overturn the election—and that Pence agreed he had these boundless powers. With these lies, the defendant created the tinderbox that he purposely ignited on January 6.

The defendant first publicly turned his sights toward January 6 in the early morning hours of December 19. At 1:42 a.m., the defendant posted on Twitter a copy of a report falsely alleging fraud and wrote, ". . . Statistically impossible to have lost the 2020 Election. Big protest in D.C. on January 6th. Be there, will be wild!"[319] When ▮▮CC5▮▮ learned about the Tweet, he sent a link about it to another of the Wisconsin attorneys who had met with the defendant in the Oval Office on December 16 and wrote, "Wow. Based on 3 days ago, I think we have unique understanding of this."[320] Later on December 19, the defendant called Pence and told him of plans for a rally on January 6 and said that he thought it would be a "big day" and good to have lots of their supporters in town.[321]

The defendant and his co-conspirators recognized that Pence, by virtue of his ministerial role presiding over the January 6 congressional certification, would need to be a key part of their plan to obstruct the certification proceeding. On December 23, in a memorandum drafted with ▮▮CC5▮▮ assistance, ▮▮CC2▮▮ outlined a plan for Pence to "gavel" in the defendant as the winner of the election based on the false claim that "7 states have transmitted dual slates of electors to the President of the Senate," and proposed that Pence announce that "because of the ongoing disputes in the 7 States, there are no electors that can be deemed validly appointed in those States."[322]

---

[319] GA 873-874 (Donald J. Trump Tweet 12/19/2020).
[320] GA 1504 (▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮).
[321] GA 440-441 (▮▮▮▮▮▮▮▮▮▮▮▮); GA 1020 (Pence, *So Help Me God* p. 437).
[322] GA 1506-1508 (▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮); GA 1509 (▮▮▮▮▮▮ ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮); GA 1510-1512 (▮▮▮▮ ▮▮▮▮▮▮▮); GA 1513-1515 (▮▮▮▮▮▮▮▮▮▮▮▮▮▮).

[CC2] emphasized concealment, writing that "the main thing here" was that Pence act without "asking for permission—either from a vote of the Joint Session or from the Court."[323]

[CC2] memorandum stood in stark contrast to concessions he had previously made about the Vice President's lack of authority in the certification proceeding.  Two months earlier, on October 11, he had written to a colleague that neither the Constitution nor the ECA provided the Vice President with discretion in the counting of electoral votes or permitted him to "make the determination on his own."[324]  And just one day earlier, on December 22, when asked by other private attorneys to provide views on a draft complaint that would, if filed, have raised the issue of the Vice President's authority on January 6, [CC2] had recommended that the complaint not be filed.[325]  He wrote that "the risk of getting a court ruling that Pence has no authority to reject the Biden-certified ballots [is] very high."[326]

On the evening of December 23, after [CC1] shared [CC2] and [CC5] plan with the defendant, the defendant publicly re-tweeted a document called "Operation Pence Card," which, like [CC2] memorandum, advocated that Pence block the lawful certification of the legitimate electoral votes.[327] Also on December 23, [CC2] emailed [P42] asking to speak to the defendant "to update him on our overall strategic thinking."[328]  The following day, December

---

[323] GA 1515 (████████████████████████).
[324] GA 1517 (███████████████████).
[325] GA 1521 (████████████████).
[326] *Id.*
[327] GA 1005 (███████████████████████████████);  GA 752, 754 (████████████████████); GA 1523 (███████ ██████████); GA 883 (Donald J. Trump Tweet 12/23/2020); GA 449 (███████████████); GA 1022-1023 (Pence, *So Help Me God* p. 439-40); *see also* GA 1524-1527 (████████████).
[328] GA 1528 (████████████████████████).

24, the defendant called [CC2] and they spoke for forty minutes.[329] Then on December 25, [CC5] proposed in a text message to [CC2] and [CC6] that Pence permit an unlimited filibuster of the certification, in violation of the ECA, and ultimately gavel in the defendant as president.[330] When [CC2] asked, "Is Pence really likely to be on board with this?" [CC6] responded, "Let's keep this off text for now."[331]

From that point on, the conspirators plotted to manipulate Pence. [CC1] [CC2] [CC6] and [P1] worked in concert to enlist Pence to act unlawfully, and to rachet up public pressure from the defendant's supporters that he do so. The defendant began to directly and repeatedly pressure Pence at the same time that he continued summoning his supporters to amass in Washington, D.C., on the day of the congressional certification. On December 25, when Pence called the defendant to wish him a Merry Christmas, the defendant raised the certification and told Pence that he had discretion in his role as President of the Senate.[332] Pence emphatically responded, "You know I don't think I have the authority to change the outcome."[333] The next day, the defendant tweeted, "Never give up. See everyone in D.C. on January 6th."[334] He also tweeted false fraud claims: "Time for Republican Senators to step up and fight for the Presidency, like the Democrats would do if they had actually won. The proof is irrefutable! Massive late night mail-in ballot drops in swing states, stuffing the ballot boxes (on video), double voters, dead voters, fake signatures, illegal immigrant voters, banned Republican vote watchers, MORE VOTES THAN ACTUAL VOTERS (check out Detroit & Philadelphia), and much more. The numbers

---

[329] GA 755 (                                    ).
[330] GA 1529 (                                                        ).
[331] *Id.*
[332] GA 450-452 (                          ); GA 1024-1025 (Pence, *So Help Me God* p. 441-42).
[333] *Id.*
[334] GA 886-887 (Donald J. Trump Tweet 12/26/2020).

are far greater than what is necessary to win the individual swing states, and cannot even be contested.  Courts are bad, the FBI and 'Justice' didn't do their job, and the United States Election System looks like that of a third world country.  Freedom of the press has been gone for a long time, it is Fake News, and now we have Big Tech (with Section 230) to deal with.  But when it is all over, and this period of time becomes just another ugly chapter in our Country's history, WE WILL WIN!!!"[335]

On December 28, █CC2█ █CC5█ and █CC6█ exchanged text messages in which █CC2█ expressed concern that *Gohmert v. Pence*—a lawsuit filed the day before that asserted that Pence had discretion to choose electoral votes during the certification proceeding—would prompt a federal court to publicly reject, and thus preclude, the plan that the conspirators were advancing in private.[336]  Thereafter, at 11:00 a.m. on January 1, the defendant called Pence to berate him because he had learned that Pence had filed a brief opposing the relief sought in *Gohmert*.[337]  When Pence explained, as he had before, that he did not believe that he had the power under the Constitution to decide which votes to accept, the defendant told him that "hundreds of thousands" of people "are gonna hate your guts" and "people are gonna think you're stupid," and berated him pointedly, "You're too honest."[338]  Immediately before the call, the defendant had spoken separately to █CC1█ (from 10:06 a.m. to 10:14 a.m.) and █P1█ (from 10:36 a.m. to 10:46 a.m.), and late that afternoon, the defendant spoke separately with █P1█ █CC2█ and

---

[335] GA 888-895 (Donald J. Trump Tweet 12/26/2020).

[336] GA 1530-1531 (███████████████████████████████████
███████).

[337] GA 453 (█████████████████); GA 1026-1027 (Pence, *So Help Me God* p. 446-47); GA 758 (██████████████████████).

[338] GA 1026 (Pence, *So Help Me God* p. 446).

<span style="background:black;color:white">CC1</span> [339] Within hours of the call with Pence, the defendant reminded supporters to travel to Washington for the certification proceeding, tweeting, "The BIG Protest Rally in Washington, D.C., will take place at 11.00 A.M. on January 6th.  Locational details to follow.  StopTheSteal!"[340]

The next day, on January 2, <span style="background:black;color:white">CC1</span> <span style="background:black;color:white">CC2</span> and <span style="background:black;color:white">CC6</span> appeared on <span style="background:black;color:white">P1</span> podcast.[341]  When <span style="background:black;color:white">P1</span> asked whether the January 6 certification would be "a climactic battle," <span style="background:black;color:white">CC2</span> responded that "a lot of that depends on the courage and the spine of the individuals involved."[342]  The defendant spoke to <span style="background:black;color:white">CC1</span> shortly after his appearance on the podcast.[343]  That afternoon, <span style="background:black;color:white">CC6</span> worked to arrange a meeting among the defendant, <span style="background:black;color:white">CC2</span> and Pence in order to enlist Pence to misuse his role as President of the Senate at the certification proceeding.[344]  When <span style="background:black;color:white">CC6</span> texted <span style="background:black;color:white">P1</span> about the meeting, <span style="background:black;color:white">P1</span> who had just finished a phone call with the defendant—reiterated that the defendant wanted Pence "briefed" by <span style="background:black;color:white">CC2</span> immediately.[345]  Thereafter, the defendant called Pence, informing him "that he had spent the day speaking to a secretary of state, state legislators, and members of Congress."[346]  (As described *supra* pp. 29-31, the defendant spoke with Georgia Secretary of State <span style="background:black;color:white">P33</span> the same day.)  On the call with Pence, the defendant said he had learned that a U.S. Senator was going to propose a ten-day delay in the certification proceeding, and told Pence, "you can make the decision" to

---

[339] GA 757-760 (▮▮▮▮▮▮▮▮▮▮▮▮▮).
[340] GA 905-906 (Donald J. Trump Tweet 01/01/2021).
[341] GA 1981 (▮▮▮▮▮▮▮▮▮▮▮).
[342] GA 1981 at 24:56–25:40 (▮▮▮▮▮▮▮▮▮▮▮▮).
[343] GA 761-762 (▮▮▮▮▮▮▮▮▮▮).
[344] GA 1006-1008, 1011-1014 (▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮).
[345] GA 763 (▮▮▮▮▮▮▮); GA 1007 (▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮ ▮▮▮▮).
[346] GA 1027 (Pence, *So Help Me God* p. 447); GA 1532-1533 (▮▮▮▮▮▮▮▮▮ ▮▮▮).

delay the count for ten days.[347] The defendant then referred Pence to ██CC2██ for the first time and asked if Pence would meet with him.[348]

On January 3, the defendant again told Pence that at the certification proceeding, Pence had the absolute right to reject electoral votes and the ability to overturn the election.[349] Pence responded that he had no such authority, and that a federal appeals court had rejected a lawsuit making that claim the previous day.[350] Then, the defendant took to Twitter to again falsely claim that fraud had permeated the election: "Sorry, but the number of votes in the Swing States that we are talking about is VERY LARGE and totally OUTCOME DETERMINATIVE!  Only the Democrats and some RINO'S would dare dispute this - even though they know it is true!"[351]  The same day, ██CC2██ circulated a second memorandum that included a new plan under which, in violation of the ECA, the Vice President would send the elector slates to the state legislatures to determine which slate to count.[352]

The meeting that ██CC6██ had organized so that the defendant and ██CC2██ could enlist Pence to reject Biden's legitimate electoral votes was scheduled late in the afternoon of January 4.[353] In advance of the meeting, ██CC1██ ██CC2██ ██CC6██ and ██P1██ gathered at the Willard Hotel near the White House, and from there, ██CC1██ called and spoke with the defendant.[354]

---

[347] *Id.*

[348] *Id.*

[349] GA 454-456 (████████████████████); GA 1534-1536 (████████████████████ ████████).

[350] *Id.*

[351] GA 926-927 (Donald J. Trump Tweet 01/03/2021).

[352] GA 1537-1543 (████████████████████████████).

[353] GA 1007-1012 (████████████████████████████); GA 766 (████████████████████).

[354] GA 1904 at row 909 (████████████████████); GA 1011 (████████████ ████████████████████); GA 765 (████████████); GA 1544-1546 (████████████); GA 1547-1548 (████████████).

When ██CC2██ arrived at the White House for the meeting, ██P9██ confronted ██CC2██ about the legal basis for his proposal.[355] ██P9██ went line by line through ██CC2██'s second memo, and ██CC2██ conceded that no court would support it; in response, ██P9██ warned ██CC2██ that pressing his admittedly unlawful plan would cause "riots in the streets."[356] ██P9██ then spoke to the defendant, telling him that the theory that ██CC2██ and others were promoting would not work, and that ██CC2██ had acknowledged that it was "not going to work"; the defendant responded, "other people disagree" but did not identify those other people.[357] ██P9██ also pointed out to the defendant that ██CC2██'s theory regarding a strategic Democratic plan to subvert the election was inconsistent with other allegations that had been floating around about ██C3██ and foreign interference.[358]

The meeting among the defendant, ██CC2██, Pence, and Pence staffers ██P8██ and ██P58██ ██ began around 4:45 p.m.[359] No one from the defendant's White House Counsel's Office attended.[360] During the meeting, the defendant asked ██CC2██ to explain his plan to Pence.[361] ██CC2██ presented two options: Pence could unilaterally decide objections to electors, or alternatively, in the plan that ██CC2██ had devised the prior day, Pence could send the elector slates to the targeted states' legislatures to determine which electors' votes should be counted.[362] In the defendant's presence, in response to Pence's questioning, ██CC2██ admitted that the ECA

---

[355] GA 215-221 (███████████████); GA 1901 at row 5745 (███████████████ ███████); GA 766 (███████████████).
[356] GA 215-218 (███████████████).
[357] GA 219-223 (███████████████).
[358] GA 224 (███████████).
[359] GA 766 (███████████████); GA 274-275 (███████████████).
[360] GA 120-121 (███████████████).
[361] GA 276-277 (███████████████); GA 579-580 (███████████████).
[362] GA 276-277 (███████████████); GA 580-585 (███████████████).

forbade what he proposed and that no one had tested ███CC2███ new plan to send elector slates to state legislatures for review.[363]  Nonetheless, the defendant repeatedly expressed a preference that Pence unilaterally reject valid elector slates.[364]

Throughout the meeting, the defendant repeated his knowingly false fraud claims as a purported basis for Pence to act illegally.  Pence's five pages of contemporaneous notes from the meeting reflect that the defendant said, "when there's fraud the rules get changed"; "bottom line – won every state by 100,000s of votes"; "this whole thing is up to MP"; "has to do w/you – you can be bold"; and "r[igh]t to do whatever you want to do."[365]  The meeting concluded with Pence—firm and clear—telling the defendant "I'm not seeing this argument working."[366]  Nonetheless, the defendant requested that Pence's staff meet with ███CC2███ again to discuss further, and Pence agreed.[367]

The conspirators were undeterred.  Immediately after leaving the White House, ███CC2███ gathered with ███CC6███ and ██P1██ back at the Willard Hotel.[368]  Over the days that followed, these conspirators strategized on how ███CC2███ could influence Pence through the Vice President's counsel, and normalized the unlawful plan by discussing it on ██P1██ podcast.[369]  Meanwhile, the defendant continued to pressure Pence publicly.

---

[363] GA 1028-1029 (Pence, *So Help Me God* p. 450-51); GA 278-279 (████████████████████).
[364] GA 277 (████████████████); GA 582-584 (████████████████).
[365] GA 1549-1553 (████████████████████████).
[366] GA 280-281 (████████████████).
[367] GA 1028-1029 (Pence, *So Help Me God* p. 450-51).
[368] GA 1011-1013 (████████████████████████████).
[369] GA 766 (████████████████████████); GA 1011-1014 (██████████████████████████████████████); GA 1559 (████████████); GA 1983 at 36:55–37:43 (████████████████████); GA 1984 at 9:09–9:55 (████████████████).

For his part, immediately upon leaving the meeting with Pence, the defendant traveled to Dalton, Georgia, to speak at a political rally at the invitation of two U.S. Senators engaged in run-off elections there.[370]   During his political speech, the defendant promoted many of the same falsehoods that he previously had been informed were untrue.  He said, "they're not taking the White House.  We're gonna fight like hell, I'll tell you right now," and remarked, "I hope Mike Pence comes through for us, I have to tell you.  I hope that our great Vice President, our great Vice President comes through for us . . . Of course, if he doesn't come through, I won't like him quite as much."[371]  He also used the Dalton Campaign speech as a call to action to his own supporters, telling the crowd that "[i]f you don't fight to save your country with everything you have, you're not going to have a country left,"[372] and demanded that his supporters take action to prevent what he falsely called "the outright stealing of elections, like they're trying to do with us,"[373] emphasizing, we "can't let that happen."[374]

The next morning, on January 5, the defendant spoke on the phone with ███ P1 ███ [375]  Less than two hours later, on his podcast, ███ P1 ███ said in anticipation of the January 6 certification proceeding, "All Hell is going to break loose tomorrow."[376]

Also on the morning of January 5, ███ CC2 ███ participated in a federal court hearing in *Trump v. Kemp*,[377] the Georgia lawsuit against ███ P17 ███ and ███ P33 ███ in which the defendant had

---

[370] GA 767 (██████████████████████); GA 930-931 (Donald J. Trump Tweet 01/04/2021).

[371] GA 1090 (Dalton Rally Speech Draft Tr. 01/04/2021).

[372] GA 1096 (Dalton Rally Speech Draft Tr. 01/04/2021).

[373] GA 1090 (Dalton Rally Speech Draft Tr. 01/04/2021).

[374] GA 1096 (Dalton Rally Speech Draft Tr. 01/04/2021).

[375] GA 768 (██████████████████).

[376] GA 1984 at 29:00–29:50 (██████████████████).

[377] Transcript of Mots. Hr'g, *Trump v. Kemp*, No. 1:20-cv-5310 (N.D. Ga. Jan. 5, 2021), ECF No. 21.

signed a false verification days earlier.[378]  **CC2**  on the defendant's behalf, asked the federal court to decertify the presidential election in Georgia and declare that the state legislature may choose the state's electors.[379]  During the hearing, the federal court denied the relief requested.[380]

Immediately following the federal court's rejection of the legal basis for the conspirators' plan,  **CC2**  went to the meeting that the defendant had requested that Pence's staff,  **P58**  and  **P8**  take.[381]  At the outset,  **CC2**  changed his tack and advocated that Pence simply reject the Biden electors outright.[382]  This was contrary to his primary recommendation the day before for Pence to send the slates to the state legislatures, but consistent with the preference the defendant had expressed.[383]  **CC2**  made additional concessions during this meeting.  For example,  **CC2**  agreed that the Supreme Court would unanimously reject his proposed action, consistent historical practice since the Founding was that the Vice President never asserted authority to reject electors, no reasonable person would want the Constitution read that way because the office would never switch political parties, no state legislature appeared poised to try to change its electors, and if Democrats were to claim the same authority,  **CC2**  would not credit it.[384]  **P58**  expressed to  **CC2**  that the defendant's plan would result in a "disastrous situation" where the election

---

[378] Complaint at 33-34, *Trump v. Kemp*, No. 1:20-cv-5310 (N.D. Ga. Dec. 31, 2020), ECF No. 1; GA 1152 (■■■■■■■■■■■■■■■■■■■■■■).

[379] Transcript of Mots. Hr'g at 29-34, *Trump v. Kemp*, No. 1:20-cv-5310 (N.D. Ga. Jan. 5, 2021), ECF No. 21.

[380] Transcript of Mots. Hr'g at 55-56, *Trump v. Kemp*, No. 1:20-cv-5310 (N.D. Ga. Jan. 5, 2021), ECF No. 21.

[381] GA 1563 (■■■■■■■■■■■■■■■■■■).

[382] GA 283-284 (■■■■■■■■■■■■■); GA 1939 at 1:20:00–1:21:30 (Video of Select Committee Testimony 06/16/2022); GA 1564 (■■■■■■■■■■■■).

[383] GA 283-284 (■■■■■■■■■■■■■); GA 1939 at 1:20:00–1:21:30 (Video of Select Committee Testimony 06/16/2022); GA 1564 (■■■■■■■■■■■■).

[384] GA 1939 at 56:53–57:36, 1:05:59–1:07:02, 1:21:55–1:29:50 (Video of Select Committee Testimony 06/16/2022); GA 267-272 (■■■■■■■■■■■■).

might "have to be decided in the streets."[385]   Having failed to enlist **P58** in the criminal conspiracy, **CC2** told him that the "team" was going to be "really disappointed."[386]   The "team," in fact, was disappointed; after **CC2** updated **CC1** on the meeting, **CC6** confirmed to **P1** that the "Pence lawyer"—that is, **P58** was "totally against us," prompting **P1** to respond, "Fuck his lawyer."[387]   That same day, **CC2** received an email confirming what he already had admitted to **P58** no chamber of any legislature in any state, including Arizona, Georgia, Pennsylvania, and Wisconsin, was requesting that its electoral votes be returned to the state for review.[388]

Meanwhile, **CC5** who had traveled to Washington as directed by the defendant's public messages, obtained duplicate originals of the fraudulent certificates signed by the defendant's fraudulent electors in Michigan and Wisconsin, which they believed had not been delivered by mail to the President of the Senate or Archivist.[389]   **CC5** received these duplicates from Campaign staff and surrogates, who flew them to Washington at private expense.[390]   He then

---

[385] GA 1939 at 1:26:01–1:26:32 (Video of Select Committee Testimony 06/16/2022).

[386] GA 289-290 (███████████████████████).

[387] GA 1014 (███████████████████████████████).

[388] GA 1565-1567 (█████████████████████████████████████).

[389] GA 1568-1574 (████████████████████████████████); GA 1575 (████████████████████████
████████████); GA 1576-1580 (████████████████████████████████████████);
GA 1581-1582 (███████████████████████████████████████); GA 1583-1585
(███████████████████████████████████████); GA 1586-1589
(███████████████████████████████████████); GA 1590-1593 (██████████████
██████████████████); GA 1595-1596 (████████████████████████████████
██████████).

[390] GA 1601-1607 (██████████████████████████████████); GA 1608 (██████
████████████).

hand-delivered them to staffers for a U.S. Representative at the Capitol as part of a plan to deliver them to Pence for use in the certification proceeding.[391]

The defendant did not leave the pressure campaign to his co-conspirators; he redoubled his own efforts. On January 5 at 11:06 a.m., shortly before CC2 meeting with P58 the defendant tweeted, "The Vice President has the power to reject fraudulently chosen electors"[392] and designate the defendant as the winner of the electoral college vote. That afternoon, the defendant met privately with Pence in the Oval Office.[393] During the meeting, the defendant once again told Pence, "I think you have the power to decertify."[394] When Pence was unmoved, the defendant threatened to criticize him publicly ("I'm gonna have to say you did a great disservice");[395] this concerned P8 to whom Pence had relayed the defendant's threat, to the point that he alerted Pence's Secret Service detail.[396] Next still, the defendant initiated a phone call with Pence, P8 P58 CC2 and one or two other private attorneys—likely including CC1 and again raised the scenario of the Vice President sending the elector slates to state legislatures.[398] P58 again pointed out that such a strategy violated the ECA, and Pence reaffirmed that he did not believe he had the authority to do so.[399] Shortly after the call that

---

[391] GA 1583-1585 (⬛⬛⬛⬛⬛⬛⬛⬛⬛⬛); GA 1586-1589 (⬛⬛⬛⬛⬛⬛⬛⬛⬛⬛); GA 1595-1596 (⬛⬛⬛⬛⬛⬛⬛⬛⬛).

[392] GA 934-935 (Donald J. Trump Tweet 01/05/2021).

[393] GA 461-462 (⬛⬛⬛⬛⬛⬛); GA 1031-1032 (Pence, *So Help Me God* p. 453-54).

[394] GA 461, 463 (⬛⬛⬛⬛⬛⬛); GA 1031-1032 (Pence, *So Help Me God* p. 453-54); GA 1656 (⬛⬛⬛⬛⬛).

[395] GA 461, 463-470 (⬛⬛⬛⬛⬛⬛); GA 1031-1032 (Pence, *So Help Me God* p. 453-54); GA 1656 (⬛⬛⬛⬛⬛).

[396] GA 586-587 (⬛⬛⬛⬛⬛⬛).

[397] GA 1657 (⬛⬛⬛⬛⬛); GA 1215 (⬛⬛⬛⬛⬛); GA 1658 (⬛⬛⬛⬛⬛); GA 1659 (⬛⬛⬛⬛⬛).

[398] GA 282-288 (⬛⬛⬛⬛⬛⬛).

[399] *Id.*

evening, at 5:43 p.m., the defendant tweeted, "I will be speaking at the SAVE AMERICA RALLY tomorrow on the Ellipse at 11AM Eastern.  Arrive early – doors open at 7AM Eastern.  BIG CROWDS!"[400]

The defendant continued his pressure campaign on Pence that evening.  After a *New York Times* article that night detailed the afternoon's private conversation in which Pence had rejected the defendant's demand to act unlawfully, the defendant directed ▆P4▆ to issue a statement rebutting it and approved the statement at 9:28 p.m.[401]  Minutes later, the defendant called Pence and told him, "you gotta be tough tomorrow."[402]  After concluding the call with Pence, the defendant sequentially spoke to ▆P1▆ followed by ▆CC2▆[403]  Then, at around 10:00 p.m. that night, the defendant issued the public statement, which read "the Vice President and I are in total agreement that the Vice President has the power to act"[404]—a statement that the defendant knew was a lie from Pence's repeated and firm rejections of his efforts, but that gave false hope to the defendant's supporters arriving in the city at the defendant's request, and maximized pressure on Pence.

### F. The Defendant Caused Unlawful Conduct on January 6 and Tried to Take Advantage of the Riot that Ensued

The defendant continued his intense pressure campaign against the Vice President into the early morning hours of January 6.  Around 1:00 a.m., the defendant tweeted, falsely: "If Vice President @Mike_Pence comes through for us, we will win the Presidency.  Many States want to

---

[400] GA 938-939 (Donald J. Trump Tweet 01/05/2021).

[401] GA 769 (▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆);  GA 1660-1661 (▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆);  GA 1662 (▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆);  GA 384-386 (▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆).

[402] GA 770 (▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆);  GA 1033 (Pence, *So Help Me God* p. 455).

[403] GA 770 (▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆).

[404] GA 1663 (Donald J. Trump Campaign Statement 01/05/2021).

decertify the mistake they made in certifying incorrect & even fraudulent numbers in a process NOT approved by their State Legislatures (which it must be).  Mike can send it back!"[405]  At 8:17 a.m., as the supporters he had summoned to the city gathered near the White House,[406] the defendant again falsely tweeted about the certification: "States want to correct their votes, which they now know were based on irregularities and fraud, plus corrupt process never received legislative approval.  All Mike Pence has to do is send them back to the States, AND WE WIN.  Do it, Mike, this is a time for extreme courage!"[407]

Later that morning, CC5 worked with another attorney for the defendant, who contacted a U.S. Senator to ask him to obtain the fraudulent Wisconsin and Michigan documents from the U.S. Representative's office and hand-deliver them to the Vice President.[408]  When one of the U.S. Senator's staffers contacted a Pence staffer by text message to arrange for delivery of what the U.S. Senator's staffer had been told were "[a]lternate slate[s] of electors for MI and WI because [the] archivist didn't receive them," Pence's staffer rejected them.[409]

At 11:15 a.m., shortly before traveling to the Ellipse to speak to his supporters, the defendant called Pence and made one last attempt to induce him to act unlawfully in the upcoming session.[410]  When Pence again refused, and told the defendant that he intended to make a statement to Congress before the certification proceeding confirming that he lacked the authority to do what

---

[405] GA 940-941 (Donald J. Trump Tweet 01/06/2021).

[406] GA 1929 at 02:16:45 (Video of Ellipse Rally 01/06/2021).

[407] GA 942-943 (Donald J. Trump Tweet 01/06/2021).

[408] GA 1664 (███████████████); GA 55-56 (████████████████ ████████████); GA 102-103 (███████████████); GA 262-263 (████████ ███████).

[409] GA 1665-1666 (██████████████████████); GA 1667 (███ ██████████████████).

[410] GA 359 (████████████████).

the defendant wanted, the defendant was incensed.[411]  He decided to re-insert into his Campaign speech at the Ellipse remarks targeting Pence for his refusal to misuse his role in the certification.[412]  And the defendant set into motion the last plan in furtherance of his conspiracies: if Pence would not do as he asked, the defendant needed to find another way to prevent the certification of Biden as president.  So on January 6, the defendant sent to the Capitol a crowd of angry supporters, whom the defendant had called to the city[413] and inundated with false claims of outcome-determinative election fraud, to induce Pence not to certify the legitimate electoral votes and to obstruct the certification.[414]

At the Ellipse Campaign rally, ███CC1███ and ███CC2███ spoke just before the defendant.  In his rally speech, ███CC1███ sought to cloak the conspiracies in an air of legitimacy, assuring the defendant's supporters that "every single thing that has been outlined as the plan for today is perfectly legal,"[415] and introducing ███CC2███ as a "preeminent constitutional scholar[]" who would further explain this plan.[416]  He falsely claimed that legislatures in five states were "begging" to have their electoral ballots returned.[417]  ███CC1███ then asserted that Pence could "decide on the

---

[411] GA 371-373 (████████████████); GA 227-228 (████████████████████);
GA 471-472 (██████████████); GA 1668-1669 (████████████████████).

[412] GA 405-406 (██████████████████); GA 1670 (████
████████ ); GA 638-642 (████████ ); GA 1680 (████
████████████ ); GA 1681 (████████████ ); GA 231
(████████████████ ); GA 371 (████████████████ ).

[413] *See, e.g.*, GA 886-887 (Donald J. Trump Tweet 12/26/2020); GA 897-898 (Donald J. Trump Tweet 12/27/2020); GA 899-900 (Donald J. Trump Tweet 12/30/2020); GA 905-906 (Donald J. Trump Tweet 01/01/2021); GA 907-908 (Donald J. Trump Tweet 01/01/2021); GA 913-914, GA 1891 (Donald J. Trump Tweet 01/01/2021); GA 928-929 (Donald J. Trump Tweet 01/04/2021); GA 932-933 (Donald J. Trump Tweet 01/05/2021); GA 938-939 (Donald J. Trump Tweet 01/05/2021).

[414] *See* GA 1928 (Video of Ellipse Rally 01/06/2021).

[415] GA 1928 at 2:19:27 (Video of Ellipse Rally 01/06/2021).

[416] GA 1928 at 2:19:40 (Video of Ellipse Rally 01/06/2021).

[417] GA 1928 at 2:20:13 (Video of Ellipse Rally 01/06/2021).

validity of these crooked ballots"[418] and told the crowd, "[l]et's have trial by combat."[419] CC2 in his speech, claimed that Pence must send electoral votes to state legislatures for "the American people [to] know whether we have control of the direction of our government or not,"[420] and decried that "[w]e no longer live in a self-governing republic if we can't get the answer to this question."[421]

When the defendant took the stage at the Ellipse rally to speak to the supporters who had gathered there at his urging, he knew that Pence had refused, once and for all, to use the defendant's fraudulent electors' certificates. The defendant also knew that he had only one last hope to prevent Biden's certification as President: the large and angry crowd standing in front of him. So for more than an hour, the defendant delivered a speech designed to inflame his supporters and motivate them to march to the Capitol.[422]

The defendant told his crowd many of the same lies he had been telling for months—publicly and privately, including to the officials in the targeted states—and that he knew were not true. In Arizona, he claimed, more than 36,000 ballots had been cast by non-citizens.[423] Regarding Georgia, the defendant repeated the falsehood that more than 10,300 dead people voted,[424] and he raised the publicly disproven claims about fraud by election workers at State Farm Arena.[425] He made baseless allegations of dead voters in Nevada and Michigan and false claims about illegally

---

[418] GA 1928 at 2:22:10 (Video of Ellipse Rally 01/06/2021).

[419] *Id.*

[420] GA 1928 at 2:27:08 (Video of Ellipse Rally 01/06/2021).

[421] GA 1928 at 2:27:21 (Video of Ellipse Rally 01/06/2021).

[422] GA 1928 at 3:31:20–4:42:50 (Video of Ellipse Rally 01/06/2021).

[423] GA 1134 (Ellipse Rally Speech Draft Tr. 01/06/2021).

[424] GA 1133-1134 (Ellipse Rally Speech Draft Tr. 01/06/2021).

[425] GA 1133 (Ellipse Rally Speech Draft Tr. 01/06/2021).

counted votes in Wisconsin.[426]   And in Pennsylvania, he claimed that there were hundreds of thousands more ballots counted than there had been voters.[427]

The defendant also lied to his rally supporters when he claimed that certain states wanted to reconsider or recertify their duly appointed electors.   For instance, he said, "By the way, Pennsylvania has now seen all of this.   They didn't know because it was so quick.   They had a vote.   They voted.   But now they see all this stuff, it's all come to light.   Doesn't happen that fast. And they want to recertify their votes.   They want to recertify.   But the only way that can happen is if Mike Pence agrees to send it back.   Mike Pence has to agree to send it back."[428]   In response to this lie about Pennsylvania, the defendant's crowd began to chant, "Send it back!   Send it back!"[429]

The defendant gave his supporters false hope that Pence would take action to change the results of the election and claimed that Pence had the authority to do so.   He falsely told the crowd that Pence could still "do the right thing"[430] and halt the certification, and he extemporized lines about the Vice President through the speech, including the indirect threat, "Mike Pence, I hope you're gonna stand up for the good of our Constitution and for the good of our country.   And if you're not, I'm gonna be very disappointed in you.   I will tell you right now.   I'm not hearing good stories."[431]

---

[426] GA 1131 (Ellipse Rally Speech Draft Tr. 01/06/2021).

[427] GA 1127, 1137 (Ellipse Rally Speech Draft Tr. 01/06/2021).

[428] GA 1128 (Ellipse Rally Speech Draft Tr. 01/06/2021).

[429] GA 1896 at 5:10 (Rallygoer Video 01/06/2021).

[430] GA 1116 (Ellipse Rally Speech Draft Tr. 01/06/2021).

[431] *Compare* GA 1133 (Ellipse Rally Speech Draft Tr. 01/06/2021) *with* GA 1683 (Ellipse Rally teleprompter speech excerpt).

The defendant galvanized his supporters by painting the stakes as critical and assuring them that "history [was] going to be made."[432]  He made clear that he expected his supporters to take action, telling them regarding his loss of the election that "we're not going to let that happen,"[433] calling on them to "fight"[434] and to "take back"[435] their country through strength, while suggesting that legal means were antiquated or insufficient to remedy the purported fraud, because "[w]hen you catch somebody in a fraud, you're allowed to go by very different rules."[436]  Throughout the speech—from as early as about fifteen minutes into it and twice in its final lines—the defendant directed his supporters to go to the Capitol and suggested that he would go with them.[437]

The overall impact of the defendant's speech—particularly in light of months of statements and Tweets falsely claiming election fraud and following on the heels of ▉CC1▉ and ▉CC2▉ speeches—was to fuel the crowd's anger.  For instance, when the defendant told his supporters that "[w]e will not let them silence your voices.  We're not going to let it happen,"[438] the crowd chanted, "Fight for Trump," in response.[439]  When the defendant soon after told supporters that "we're going to walk down to the Capitol,"[440] that they would "never take back our country with

---

[432] GA 1122 (Ellipse Rally Speech Draft Tr. 01/06/2021).

[433] GA 1116 (Ellipse Rally Speech Draft Tr. 01/06/2021).

[434] *See, e.g.*, GA 1120, 1140 (Ellipse Rally Speech Draft Tr. 01/06/2021).

[435] *Id.*

[436] GA 1137 (Ellipse Rally Speech Draft Tr. 01/06/2021).

[437] GA 1120, 1140, 1141 (Ellipse Rally Speech Draft Tr. 01/06/2021).

[438] GA 1116 (Ellipse Rally Speech Draft Tr. 01/06/2021).

[439] GA 1897 at 3:18 (Rallygoer Video 01/06/2021).

[440] GA 1120 (Ellipse Rally Speech Draft Tr. 01/06/2021).

weakness,"[441] and that they had "to show strength and [had] to be strong,"[442] members of the crowd shouted, "Invade the Capitol building!" and, "Take the Capitol!"[443]

Thousands of the defendant's supporters obeyed his directive and marched to the Capitol,[444] where the certification proceeding began around 1:00 p.m.[445] Minutes earlier, Pence had issued a public statement explaining that his role as President of the Senate did not include "unilateral authority to determine which electoral votes should be counted and which should not."[446] On the floor of the House of Representatives, Pence opened the certificates of vote and certificate of ascertainment from Arizona, consistent with the ECA. After an objection from a Senator and Representative, the House and Senate retired to their separate chambers to debate it.[447]

Outside of the Capitol building, a mass of people—including those who had traveled to Washington and the Capitol at the defendant's direction—broke through barriers cordoning off the Capitol grounds and advanced on the building.[448] Among these was ████ CC5 ████ who had attended the defendant's speech from the Washington Monument, marched with the crowd to the Capitol, and breached the restricted area surrounding the building.[449] A large portion of the crowd at the Capitol—including rioters who violently attacked law enforcement officers trying to secure the

---

[441] *Id.*

[442] *Id.*

[443] GA 1898 at 00:19 (Rallygoer Video 01/06/2021).

[444] *See, e.g.*, GA 1930 at 1:09:30 (Video of Ellipse Rally 01/06/2021); GA 1942 (Video of March to Capitol 01/06/2021); GA 1941 at 02:10–2:33 (Video of March to Capitol 01/06/2021).

[445] GA 1937 at 20:47 (Video of House Floor 01/06/2021).

[446] GA 1685 (Pence Dear Colleague Letter 01/06/2021).

[447] GA 1937 at 26:24 (Video of House Floor 01/06/2021).

[448] *See, e.g.*, GA 1915 at 3:25 (Video of Capitol Riot 01/06/2021).

[449] GA 1687 (████████████████); GA 1688 (██████ ██); GA 1689 (██████████████████); GA 1690 (██ ████████████); GA 1583-1585 (████████ ██).

building—wore clothing and carried items bearing the defendant's name and Campaign slogans, leaving no doubt that they were there on his behalf and at his direction.[450]

Beginning at about 1:30 p.m., the defendant settled in the dining room off of the Oval Office. He spent the afternoon there reviewing Twitter on his phone,[451] while the dining room television played Fox News' contemporaneous coverage of events at the Capitol.[452]

At 2:13 p.m., the crowd at the Capitol broke into the building, and forced the Senate to recess.[453] Within minutes, staffers fled the Senate chamber carrying the legitimate electors' physical certificates of vote and certificates of ascertainment.[454] Next to the Senate chamber, a group of rioters chased a U.S. Capitol Police officer up a flight of stairs to within forty feet of where Pence was sheltering with his family.[455] As they did so, the rioters shouted at the officer, in search of public officials, "Where the fuck they at? Where the fuck they counting the votes at? Why are you protecting them? You're a fucking traitor."[456] On the other side of the Capitol, the House was also forced to recess.[457]

---

[450] GA 1912 at 56:56 (Video of Capitol Riot 01/06/2021); GA 1924 at 38:48 (Video of Capitol Riot 01/06/2021); GA 1918 (Video of Capitol Riot 01/06/2021); GA 1919 (Video of Capitol Riot 01/06/2021); GA 1921 at 04:30 (Video of Capitol Riot 01/06/2021); *see also* GA 2-3 (▇▇▇▇ ▇▇▇▇).

[451] GA 1902 (▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇ ▇▇▇▇).

[452] GA 168-169 (▇▇▇▇▇▇▇▇▇▇▇▇▇▇); GA 292-293 (▇▇▇▇▇▇▇▇▇▇▇▇); GA 540, 541-544 (▇▇▇▇▇▇▇▇▇▇▇▇); GA 232, 236 (▇▇▇▇▇▇▇▇▇▇▇).

[453] GA 1957 at 1:04–1:25 (Video of Senate Wing Door CCTV 01/06/2021); GA 1954 at 44:16 (Video of Senate Floor 01/06/2021).

[454] *United States v. Hale-Cusanelli*, No. 21-cr-37, ECF No. 93 at 38-39 (D.D.C. June 3, 2022) (Trial Tr. 05/24/2022).

[455] GA 1923 (Video of Capitol Riot 01/06/2021); GA 177-178 (▇▇▇▇▇▇▇▇▇▇▇▇).

[456] GA 175 (▇▇▇▇▇▇▇▇▇▇); *see also* GA 176, 179 (▇▇▇▇▇▇▇▇▇▇▇); GA 1916 at 00:50 (Video of Capitol Riot 01/06/2021).

[457] GA 1937 at 1:34:00 (Video of House Floor 01/06/2021).

Fox News's coverage of events at the Capitol included, at about 2:12 p.m., reports of the Capitol being on lockdown and showed video footage of large crowds within the restricted area surrounding the Capitol; much of the crowd was wearing clothing and carrying flags evidencing their allegiance to the defendant.[458]  At about 2:20 p.m., video of crowds on the Capitol lawn and West Terrace were shown alongside a chyron stating, "CERTIFICATION VOTE PAUSED AS PROTESTS ERUPT ON CAPITOL HILL."[459]  At 2:21 p.m., an on-the-street reporter interviewed an individual marching from the Ellipse to the Capitol who claimed to have come to Washington "because President Trump told us we had something big to look forward to, and I believed that Vice President Pence was going to certify the electorial [sic] votes and, or not certify them, but I guess that's just changed, correct?  And it's a very big disappointment.  I think there's several hundred thousand people here who are very disappointed.  But I still believe President Trump has something else left."[460]  And at approximately 2:24 p.m., Fox News reported that a police officer may have been injured and that "protestors . . . have made their way inside the Capitol."[461]

At 2:24 p.m., Trump was alone in his dining room when he issued a Tweet attacking Pence and fueling the ongoing riot: "Mike Pence didn't have the courage to do what should have been done to protect our Country and our Constitution, giving States a chance to certify a corrected set of facts, not the fraudulent or inaccurate ones which they were asked to previously certify.  USA demands the truth!"[462]  That afternoon, at the Capitol, a rioter used a bullhorn to read the defendant's Tweet about the Vice President aloud to the crowd trying to gain entry to the

---

[458] GA 1931 at 12:12 (Video of Fox News Coverage 01/06/2021).

[459] GA 1931 at 20:11 (Video of Fox News Coverage 01/06/2021).

[460] GA 1931 at 21:47 (Video of Fox News Coverage 01/06/2021).

[461] GA 1931 at 24:05–24:17 (Video of Fox News Coverage 01/06/2021).

[462] GA 946-947 (Donald J. Trump Tweet 01/06/2021); GA 546 (███████████████).

building.[463]   The defendant issued the incendiary Tweet about Pence despite knowing—as he would later admit in an interview in 2023—that his supporters "listen to [him] like no one else."[464]

One minute later, at 2:25 p.m., the Secret Service was forced to evacuate Pence to a secure location.[465]   At the Capitol, throughout the afternoon, members of the crowd chanted, "Hang Mike Pence!"[466]; "Where is Pence?  Bring him out!"[467]; and "Traitor Pence!"[468]   Several rioters in those chanting crowds wore hats and carried flags evidencing their allegiance to the defendant.   In the years since January 6, the defendant has refused to take responsibility for putting Pence in danger, instead blaming Pence.   On March 13, 2023, he said, "Had Mike Pence sent the votes back to the legislatures, they wouldn't have had a problem with Jan. 6, so in many ways you can blame him for Jan. 6.  Had he sent them back to Pennsylvania, Georgia, Arizona, the states, I believe, number one, you would have had a different outcome.  But I also believe you wouldn't have had 'Jan. 6' as we call it."[469]

Rioters—again, many  bearing  pro-Trump  paraphernalia  indicating  their  allegiance— breached the Senate chamber,[470] rifled through the papers on the Senators' desks,[471] and stood on the dais where Pence had been presiding just minutes earlier.[472]   On the House side, rioters watched

---

[463] GA 1922 (Video of Capitol Riot 01/06/2021).

[464] GA 1693 (Transcript of CNN Town Hall 05/10/2023).

[465] GA 1944 (Video of Pence Evacuation 01/06/2021).

[466] GA 1914 (Video of Capitol Riot 01/06/2021).

[467] GA 1911 (Video of Capitol Riot 01/06/2021).

[468] GA 1910 (Video of Capitol Riot 01/06/2021).

[469] Isaac Arnsdorf and Maeve Reston, *Trump claims violence he inspired on Jan. 6 was Pence's fault*,  Wash.  Post,  (Mar.  13,  2023,  8:09  p.m.), https://www.washingtonpost.com/politics/2023/03/13/trump-pence-iowa/.

[470] GA 1956 (Video of Senate Gallery Doors CCTV 01/06/2021).

[471] GA 1955 at 16:20 (Video of Senate Floor 01/06/2021).

[472] GA 1955 at 29:15 (Video of Senate Floor 01/06/2021).

as police evacuated lawmakers from the House chamber, smashing glass windows surrounding a locked door that stood between them and the fleeing Members and staffers.[473]  At least one rioter recorded video showing Members being evacuated while the growing crowd screamed at the Capitol Police officers guarding the locked door to the House Speaker's Lobby.[474]

Some of the worst violence of the day took place outside of the Capitol on the Lower West Terrace—the side of the building facing the Ellipse where the defendant had given his speech. There, scaffolding placed in anticipation of the January 20 Inauguration created a tunnel leading to a set of double glass doors into the center of the Capitol building.  After rioters had forced their way onto restricted Capitol grounds and past the temporary barriers, including layers of snow fencing and bike racks, they attacked the law enforcement officers trying to protect the building with flag poles, bear spray, stolen police riot shields, and other improvised weapons.[475]  Of his time defending the Capitol, one Metropolitan Police Department Officer said:

> I feared for my life from the moment I got into that—we were walking into the crowd, when the Capitol Police officer was leading us into the front line.  And especially when I got sprayed in the middle of the crowd.  I—at that point, honestly, I thought, this is it.  Yeah, multiple times . . . You know, you're getting pushed, kicked, you know, people are throwing metal bats at you and all that stuff.  I was like, yeah, this is fucking it.[476]

The officer described that the rioters he encountered at the Capitol were wearing both "tactical gear" and "Trump paraphernalia" and appeared to be acting out of "pure, sheer anger."[477]

---

[473] GA 1938 at 00:05 (Video of House Floor 01/06/2021); GA 1905 (Video inside Capitol Building 01/06/2021).

[474] GA 1936 at 06:18 (Video of House Chamber Doors 01/06/2021).

[475] GA 1920 (Video of Capitol Riot 01/06/2021); GA 1917 at 54:30 (Video of Capitol Riot 01/06/2021).

[476] GA 5-6 (                              ).

[477] GA 4 (                         ).

In the years after January 6, the defendant has reiterated his support for and allegiance to rioters who broke into the Capitol, calling them "patriots"[478] and "hostages,"[479] providing them financial assistance,[480] and reminiscing about January 6 as "a beautiful day."[481]  At a rally in Waco, Texas, on March 25, 2023, the defendant started a tradition he has repeated several times—opening the event with a song called "Justice for All," recorded by a group of charged—and in many cases, convicted—January 6 offenders known as the "January 6 Choir" and who, because of their dangerousness, are held at the District of Columbia jail.[482]  At the Waco Rally, of the January 6 Choir, the defendant said, "our people love those people, they love those people."[483]  The defendant has also stated that if re-elected, he will pardon individuals convicted of crimes on January 6.[484]

On the evening of January 6, the defendant and ▉CC1▉ attempted to exploit the violence and chaos at the Capitol by having ▉CC1▉ call Senators and attempt to get them to further delay the certification.[485]  At around 7:00 p.m., ▉CC1▉ placed calls to five U.S. Senators and one U.S. Representative.[486]  ▉CC6▉ attempted to confirm phone numbers for Members of Congress whom

---

[478] GA 1973 at 16:52 (Video of Waco Rally 03/25/2023); GA 1962 at 48:29 (Video of Trump at Faith and Freedom Coalition 06/17/2022); GA 1971 (Video of Trump Interview 02/01/2022).

[479] GA 1935 at 35:50, 01:16:16 (Video of Greensboro Rally 03/02/2024).

[480] GA 1966 at 09:30 (Video of Trump Interview 09/01/2022).

[481] GA 1967 at 45:18 (Video of Trump Interview 08/23/2023); GA 1692 (Transcript of CNN Town Hall 05/10/2023).

[482] GA 1973 at 03:00 (Video of Waco Rally 03/25/2023).  *See, e.g.*, *United States v. Jordan Robert Mink*, 21-cr-25 (D.D.C. 2023); *United States v. Ronald Sandlin*, 21-cr-88 (D.D.C. 2022); *United States v. Barton Shively*, 21-cr-151 (D.D.C. 2022); *United States v. Julian Khater*, 21-cr-222 (D.D.C. 2022); *United States v. James McGrew*, 21-cr-398 (D.D.C. 2022).

[483] GA 1973 at 06:02 (Video of Waco Rally 03/25/2023).

[484] GA 1971 at 15:51 (Video of Trump Interview with Schmitt 02/01/2022).

[485] GA 1904 at row 1383 (▉▉▉▉▉▉); GA 1696 (▉▉▉▉▉▉▉▉).

[486] GA 1697 (▉▉▉▉▉▉▉); GA 1401-1406 (▉▉▉▉▉▉); GA 1698-1701 (▉▉▉▉).

the defendant had directed ███ to call.[487]  In a voicemail that ███ intended for one Senator, ███ said, "I'm calling you because I want to discuss with you how they're trying to rush this hearing and how we need you, our Republican friends, to try to just slow it down so we can get these legislatures to get more information to you.  And I know they're reconvening at eight tonight, but the only strategy we can follow is to object to numerous states and raise issues so that we can get ourselves into tomorrow—ideally until the end of tomorrow."[488]  He then asked the Senator to "object to every state" to "give us the opportunity to get the legislators who are very, very close to pulling their votes."  This concession—that legislatures had not yet asked to review their slates— stood in contrast to ███ and the defendant's lies at the Ellipse that they already had.[489]  Next, in a voicemail intended for another Senator, ███ told more lies.[490]  He falsely claimed that Pence's decision not to use the defendant's fraudulent electors' certificates had been surprising, and that in light of the surprise, "we could use a little time so that the state legislatures can prepare even more to come to you and say, 'Please give this back to us for a while so we can fix it.'"[491] ███ then repeated knowingly false claims of election fraud, including that non-citizens had voted in Arizona and an outcome-determinative number of underage voters had cast ballots in Georgia.[492]

Although the attack on the Capitol successfully delayed the certification for approximately six hours, the House and Senate resumed the Joint Session at 11:35 p.m.[493]  But the conspirators

---

[487] GA 1702 (██████████████████████████████████████).

[488] GA 1977 (████████████████████████).

[489] GA 1928 at 2:20:13, 3:37:54 (Video of Ellipse Rally 01/06/2021).

[490] GA 1975 (██████████████████████).

[491] *Id.*

[492] *Id.*

[493] GA 1703 (Congressional Record 01/06/2021).

were not done.  Within ten minutes, at 11:44 p.m., `CC2` who earlier that day wrote to `P58` that "[t]he 'siege' is because YOU and your boss did not do what was necessary"—emailed `P58` again and urged him to convince Pence to violate the law, writing, "I implore you to consider one more relatively minor violation [of the ECA] and adjourn for 10 days to allow the legislatures to finish their investigations, as well as to allow a full forensic audit of the massive amount of illegal activity that has occurred here."[494]

At 3:41 a.m. on January 7, as President of the Senate, Pence announced the certified results of the 2020 presidential election in favor of Biden.[495]

## II.    Legal Framework

In *Trump*, the Supreme Court held that former presidents are immune from prosecution for core official acts, enjoy at least a rebuttable presumption of immunity for other official acts, and have no immunity for unofficial acts, and remanded to this Court for further proceedings consistent with its holding.  144 S. Ct. at 2327, 2332, 2347.  This section sets forth the applicable legal principles and then Section III applies them to the categories of conduct that the superseding indictment alleges and that the Government intends to prove at trial in order to demonstrate that none of the defendant's conduct is immunized.

In *Trump*, the Supreme Court announced the principles that govern a former President's claim of constitutional immunity from federal criminal prosecution.  The Supreme Court divided presidential acts into three categories: (1) core presidential conduct that Congress has no power to regulate and for which a former President has absolute immunity; (2) other official presidential acts for which the President has at least presumptive immunity; and (3) unofficial conduct for

---

[494] GA 1705-1709 (                                        ).

[495] GA 1925 at 19:14, 20:34 (Video of Congress Joint Session 01/06/2021); GA 1704 at 41 (Congressional Record 01/06/2021).

which the President has no immunity. *Id.* at 2327, 2331-32. With respect to the first category of core official conduct, when the President's authority to act is "'conclusive and preclusive,'" Congress may not regulate his actions, and the President has absolute immunity from criminal prosecution. *Id.* at 2327 (quoting *Youngstown Sheet & Tube Co. v. Sawyer*, 343 U.S. 579, 638 (1952) (Jackson, J., concurring)). Applying those principles to the original indictment, the Supreme Court concluded that the defendant is "absolutely immune from prosecution for the alleged conduct involving his discussions with Justice Department officials" and his "threatened removal of the Acting Attorney General." *Id.* at 2335. The superseding indictment omits those allegations, and the Supreme Court did not find that any other conduct alleged in the original indictment implicated "conclusive and preclusive" presidential authority. *See id.* at 2335-40.

The threshold question here, then, is whether the defendant can carry his burden to establish that his acts were official and thus subject to presumptive immunity. *Id.* at 2332; *see Dennis v. Sparks*, 449 U.S. 24, 29 (1980) (noting that for immunity doctrines, "the burden is on the official claiming immunity to demonstrate his entitlement"). Official conduct includes acts taken within the "'outer perimeter' of the President's official responsibilities, covering actions so long as they are 'not manifestly or palpably beyond [his] authority.'" *Trump*, 144 S. Ct. at 2333 (quoting *Blassingame*, 87 F.4th at 13). But consistent with the D.C. Circuit's opinion in *Blassingame*, the Supreme Court suggested that a President who speaks "as a candidate for office or party leader"— as the defendant did here—does not act in his official, presidential capacity. *Id.* at 2340. As the D.C. Circuit explained, a President acting as a "candidate for re-election" is, to that extent, not carrying out an official responsibility. *Blassingame*, 87 F.4th at 17; *accord id.* at 5 ("When a sitting President running for re-election speaks in a campaign ad or in accepting his political party's nomination at the party convention, he typically speaks on matters of public concern. Yet he does

so in an unofficial, private capacity as office-seeker, not an official capacity as office-holder.  And actions taken in an *unofficial* capacity cannot qualify for *official*-act immunity.") (emphasis in original).  To assess whether a presidential action constitutes an "official" act, courts must apply an "objective analysis" that focuses on the "'content, form, and context'" of the conduct in question.  *Trump*, 144 S. Ct. at 2340 (quoting *Snyder v. Phelps*, 562 U.S. 443, 453 (2011)).  A President's motives for undertaking the conduct and the fact that the conduct is alleged to have violated a generally applicable law are not relevant considerations.  *Id.* at 2333-34.

If a President's actions constitute non-core official presidential conduct, he is at least presumptively immune from criminal prosecution for that conduct.  144 S. Ct. at 2328, 2331; *id.* at 2332 (reserving whether "this immunity is presumptive or absolute . . . [b]ecause we need not decide that question today").  The Government can overcome that presumptive immunity by demonstrating that "applying a criminal prohibition to that act would pose no 'dangers of intrusion on the authority and functions of the Executive Branch.'"  *Id.* at 2331-32 (quoting *Fitzgerald*, 457 U.S. at 754).  Just as the inquiry into whether conduct is official or unofficial is "necessarily factbound," *Trump*, 144 S. Ct. at 2340, with "[t]he necessary analysis [being] . . . fact specific," *id.* at 2339, so too should be the inquiry into whether any "presumption of immunity is rebutted under the circumstances," *id.* at 2337.  The analysis should first identify the specific alleged act at issue, and then determine whether criminal liability for the act intrudes on a relevant Executive Branch authority or function, taking care not to "conceive[] of the inquiry at too high a level of generality." *Banneker Ventures, LLC v. Graham*, 798 F.3d 1119, 1141 (D.C. Cir. 2015) (reversing district court in civil immunity case).  Such an approach recognizes that Executive authority has limits—boundaries imposed by constitutional text, the separation of powers, and precedent—and that application of criminal law to the President's official conduct does not *per se* intrude

impermissibly on Executive Branch authority and functions. *Cf. Trump*, 144 S. Ct. at 2327 ("If the President claims authority to act but in fact exercises mere 'individual will' and 'authority without law,' the courts may say so.") (quoting *Youngstown*, 343 U.S. at 655 (Jackson, J., concurring)).

These principles for assessing whether the conduct alleged in the superseding indictment is immune apply equally to evidence. The Government may not introduce evidence of immunized official conduct against a former President at a trial, even to prove that the former President committed a crime predicated on unofficial conduct. *Id.* at 2340-41.

## III. None of the Allegations or Evidence Is Protected by Presidential Immunity

At its core, the defendant's scheme was a private one; he extensively used private actors and his Campaign infrastructure to attempt to overturn the election results and operated in a private capacity as a candidate for office. To the limited extent that the superseding indictment and proffered evidence reflect official conduct, however, the Government can rebut the presumption of immunity because relying on that conduct in this prosecution will not pose a danger of intrusion on the authority or functions of the Executive Branch. Below, the Government categorizes the conduct outlined in Section I and provides "content, form, and context" for this Court to determine that the defendant's conduct was private or that, in the alternative, any presumptive immunity is rebutted "under the circumstances." *Trump*, 144 S. Ct. at 2337. This analysis is necessarily fact-intensive, and all of the Government's analysis below is based on the unique facts and circumstances of this case.

This section first addresses the defendant's interactions with Pence, because in *Trump*, the Supreme Court held that when the defendant conversed with Pence about "their official responsibilities," the conduct was official. 144 S. Ct. at 2336. Accordingly, the Government explains below why any presumptive immunity as to the defendant's official conduct regarding

Pence is rebutted.  Other than the specific official conduct related to Pence that the Supreme Court held to be official, none of the defendant's other actions were official.  This section categorizes that conduct and provides the "content, form, and context" that establishes its unofficial nature. These categories are: a) the defendant's interactions, as a candidate, with state officials; b) the defendant's efforts, as a candidate, to organize fraudulent electors; c) the defendant's public speeches, Tweets, and other public statements as a candidate; d) the defendant's interactions, as a candidate, with White House staff; and e) other evidence of the defendant's knowledge and intent. Lastly, even if these categories of conduct and evidence were to be deemed official, the Government can rebut the attendant presumption of immunity as described below.

### A.  The Defendant's Interactions with Pence

The only conduct alleged in the original indictment that the Supreme Court held was official, and subject to at least a rebuttable presumption of immunity, was the defendant's attempts to lie to and pressure Vice President Pence to misuse his role as President of the Senate at the congressional certification.  The Supreme Court stated that "[w]henever the President and Vice President discuss their official responsibilities, they engage in official conduct," and further explained that because Pence's role at the certification was "a constitutional and statutory duty of the Vice President," the defendant was "at least presumptively immune from prosecution for such conduct."  144 S. Ct. at 2336.  Accordingly, unlike all of the other threshold determinations that the Court will have to make about whether the defendant's conduct alleged in the superseding indictment was official, with respect to the defendant's conversations with Pence about Pence's official role at the certification proceeding, the Court can skip to the second step: whether the Government can rebut the presumption of immunity that the Supreme Court held applies to such conversations.  Because the Executive Branch has no role in the certification proceeding—and indeed, the President was purposely excluded from it by design—prosecuting the defendant for his

corrupt efforts regarding Pence poses no danger to the Executive Branch's authority or functioning.

As described below, the Government also intends to introduce at trial evidence regarding conversations between the defendant and Pence in which they did not discuss Pence's official responsibilities as President of the Senate and instead acted in their private capacities as running mates. And the Government intends to elicit at trial evidence about a Pence staffer's conversations with co-conspirator CC2 Those conversations were unofficial and therefore not immune.

### 1. The defendant's interactions with Pence as the President of the Senate were official, but the rebuttable presumption of immunity is overcome

The superseding indictment and the Government's trial evidence include the defendant's attempts to influence Pence's "oversight of the certification proceeding in his capacity as President of the Senate." *Trump*, 144 S. Ct. at 2337. These conversations included one-on-one conversations between the defendant and Pence (*see, e.g., supra* pp. 49, 63-65, 72-74, describing conversations on December 5 and 25, 2020, and January 1, 3, 5, and 6, 2021[496]), as well as conversations in which the defendant included private actors, such as co-conspirator CC2 in his attempts to convince Pence to participate in the conspiracies (*see, e.g., supra* pp. 66-67 and 71-72, describing conversations on January 4 and 5, 2021).

The Supreme Court held that discussions between the defendant and Pence concerning Pence's role at the certification proceeding qualify as official conduct, and therefore are subject to

---

[496] The Government's factual proffer also describes a conversation between the defendant and Pence on December 19—the same day that the defendant issued his "will be wild!" Tweet calling supporters to Washington—in which the defendant told Pence that it would be good to have lots of their supporters in town on January 6. *See supra* p. 60. At trial, the Government intends to use this unofficial portion of the conversation, held between running mates, but not Pence's response, which included a reference to the certification proceeding on January 6. GA 440-441 (                              ); GA 1020 (Pence, *So Help Me God* p. 437). *See infra* p. 145-146.

a rebuttable presumption of immunity, because they involved "the President and the Vice President discuss[ing] their official responsibilities." *Id.* at 2336. Those discussions qualify as official because "[p]residing over the January 6 certification proceeding at which Members of Congress count the electoral votes is a constitutional and statutory duty of the Vice President." *See id.* at 2336; U.S. Const. Art. I, § 3, cl. 4. The discussions at issue did not pertain to Pence's role as President of the Senate writ large, however, but instead focused only on his discrete duties in presiding over the certification proceeding—a process in which the Executive Branch, by design, plays no direct role. *Trump*, 144 S. Ct. at 2337. A prosecution involving the defendant's efforts to influence Pence in the discharge of this particular duty, housed in the Legislative Branch, would not "pose any dangers of intrusion on the authority and functions of the Executive Branch." *Id.*

The Executive Branch has no authority or function to choose the next President. *Blassingame*, 87 F.4th at 17. To the contrary, the Constitution provides that the States will appoint electors to vote for the President and Vice President. U.S. Const. Art. II, § 1, cl. 2. And all States have chosen to make such appointments based on the ballots cast by the people in their respective states. *See Chiafalo v. Washington*, 591 U.S. 578, 581 (2020). "The Congress may determine the Time of chusing the Electors, and the Day on which they shall give their Votes," U.S. Const. Art. II, § 1, cl. 4, but the Executive Branch has no direct role in that process. The next step in the process established by the Constitution similarly provides no role for the Executive Branch: the House and Senate meet in joint session, with the President of the Senate present to "open all the certificates" of the state-appointed electors in the presence of the House and Senate, for them to be counted. U.S. Const. Amend. XII. "The person having the greatest number of votes for President, shall be the President, if such number be a majority of the whole number of Electors appointed." *Id.* Only if the state-appointed electors have failed to make a choice, *i.e.*, no candidate

has such a majority, does the choice fall to the House of Representatives, who, voting by state delegation, "choose immediately, by ballot," from the three presidential candidates receiving the most electoral votes.  *Id.*  There, too, the Executive Branch plays no role in the process.

The exclusion of the Executive Branch reflects fundamental constitutional principles.  The "executive Power" is "vested in a President" only for "the Term of four Years," U.S. Const. Art. II, § 1, cl. 1, and it transfers to his successor, by operation of law, "at noon on the 20th day of January," U.S. Const. Amend. XX.  Permitting the incumbent President to choose his own successor—or, worse still, to perpetuate himself in power—would contradict the entire constitutional system that the Framers created.  "In free Governments," Benjamin Franklin explained, "the rulers are the servants, and the people their superiors [and] sovereigns."  2 *The Records of the Federal Convention of 1787*, at 120 (Max Farrand ed., 1911).  A government could not be considered a "genuine republic," Madison argued, unless "the persons administering it," including the President, "be appointed, either directly or indirectly, by the people; and that they hold their appointments" for a "definite period."  The Federalist No. 39 (J. Madison).  Thus, while the Framers recognized "the necessity of an energetic Executive," they justified and checked his power by ensuring that he always retained "a due dependence on the people."  The Federalist No. 70 (A. Hamilton); *see Seila Law LLC v. CFPB*, 591 U.S. 197, 223-24 (2020).  The Framers further recognized that while regular elections would serve as "the primary control on the government," "experience has taught mankind the necessity of auxiliary precautions" as well.  The Federalist No. 51 (J. Madison).

Some of those precautions are reflected in the design of the Electoral College itself.  "[W]ary of 'cabal, intrigue, and corruption,'" the Framers "specifically excluded from service as electors 'all those who from situation might be suspected of too great devotion to the president in

office.'" *Trump*, 144 S. Ct. at 2339 (quoting The Federalist No. 68 (A. Hamilton)).  They were keenly aware, as Justice Story later explained, that "an ambitious candidate" could hold out "the rewards of office, or other sources of patronage," in an effort "to influence a majority of votes; and, thus, by his own bold and unprincipled conduct, to secure a choice, to the exclusion of the highest, and purest, and most enlightened men in the country."  Joseph Story, 3 *Commentaries on the Constitution of the United States § 1450*, at 314 (1833 ed.).  To guard against that possibility, Article II provides that "no Senator or Representative, or Person holding an Office of Trust or Profit under the United States, shall be appointed an Elector."  U.S. Const. Art. II, § 1, cl. 2.  As a leading early American commentator observed, these limitations serve "to prevent the person in office, at the time of the election, from having any improper influence on his re-election, by his ordinary agency in the government."  *See* 1 James Kent, *Commentaries on American Law* *276 (8th ed. 1854).

The Constitution's structure further reflects the Framers' considered choice to exclude the incumbent President from playing a role in choosing the next President.  The Constitution reflects an abiding concern that governmental "power is of an encroaching nature, and that it ought to be effectually restrained from passing the limits assigned to it," not least to protect against "the danger to liberty from the overgrown and all-grasping prerogative of an hereditary magistrate."  The Federalist No. 48 (J. Madison); *see Metro. Wash. Airports Auth. v. Citizens for Abatement of Aircraft Noise, Inc.*, 501 U.S. 252, 273 (1991) ("The abuses by the monarch recounted in the Declaration of Independence provide dramatic evidence of the threat to liberty posed by a too powerful executive.").  The Framers therefore designed a system of separated powers in part to ensure that "[n]o man is allowed to be a judge in his own cause, because his interest would certainly bias his judgment, and, not improbably, corrupt his integrity."  The Federalist No. 10 (J. Madison).

The defendant's charged conduct directly contravenes these foundational principles.  He sought to encroach on powers specifically assigned by the Constitution to other branches, to advance his own self-interest and perpetuate himself in power, contrary to the will of the people. As such, applying a criminal prohibition to the defendant's conduct would not pose any danger of intrusion on the authority and functions of the Executive Branch; rather, it would advance the Constitution's structural design to prevent one Branch from usurping or impairing the performance of the constitutional responsibilities of another Branch.  *See Clinton v. Jones*, 520 U.S. 681, 699-702 (1997).

History confirms that presidents have never understood their wide-ranging duties to encompass any direct role in the function of collecting, counting, and certifying the results of a presidential election.  As President Lincoln explained in 1864, "[b]y the Constitution and laws the President is charged with no duty in the conduct of a presidential election in any State," and "[i]f any election shall be held, and any votes shall be cast in the State of Tennessee for President and Vice President of the United States, it will belong, not to the military agents, nor yet to the Executive Department, but exclusively to another department of the Government, to determine whether they are entitled to be counted, in conformity with the Constitution and laws of the United States."  8 *Collected Works of Abraham Lincoln*, 71-72 (1953).  When Congress later sent to Lincoln for his signature a "Joint resolution declaring certain States not entitled to representation in the electoral college," Lincoln signed the resolution "in deference to the view of Congress implied in its passage and presentation to him," but "disclaim[ed] all right of the Executive to interfere in any way in the matter of canvassing or counting electoral votes."  House Special Committee, *Counting Electoral* Votes, H.R. Misc. Doc. No. 44-13, at 229-230 (1877).  The Government is aware of no contrary evidence, including of any President, other than the defendant,

seeking to influence his Vice President in the discharge of his duties as President of the Senate in presiding over the joint session. The absence of any such historical tradition is reinforced by the fact that in 22 of the 59 certification proceedings the Vice President has not presided at all. *See* Joel K. Goldstein, *The Ministerial Role of the President of the Senate in Counting Electoral Votes: A Post-January 6 Perspective*, 21 U. N.H. L. REV. 369, 402 & App'x 1 (2023).

When it comes to the certification proceeding specifically, not only has the President been deliberately excluded from the process, but the Vice President's role, as President of the Senate, is highly circumscribed and ministerial in nature. The Twelfth Amendment gives the President of the Senate no substantive role in determining how to count the votes of the electors appointed by the states. Rather, it provides only that he "shall, in the presence of the Senate and House of Representatives, open all the certificates," and then shifts to the passive voice: "and the votes shall then be counted." Nothing in the Constitution remotely suggests that the single individual serving as President of the Senate would have the momentous responsibility to decide which votes to count and how they should be counted. Indeed, as Pence himself explained on January 6, 2021, giving the President of the Senate such a role "would be entirely antithetical to the [Constitution's] design."[497] And, removing any possible doubt, "Congress has legislated extensively to define the Vice President's role in the counting of the electoral votes," *Trump*, 144 S. Ct. at 2337 (citing 3 U.S.C. § 15), and it has never provided any substantive role for the Vice President, instead assigning the resolution of disputes to the two Houses of Congress.[498] Moreover, Congress has

---

[497] GA 1685 (Pence Dear Colleague Letter 01/06/2021).

[498] Legislation confirming the ministerial nature of that role dates to the Electoral Count Act of 1887, Pub. L. 49-90, 24 Stat. 373 (1887). *See* 3 U.S.C. §§ 15-18 (2020 ed.) (assigning all power to resolve vote-counting disputes to the two Houses of Congress, while assigning to the President of the Senate only the ministerial duties of "presiding," "preserv[ing] order," "open[ing] . . . the certificates," "call[ing] for objections," and "announc[ing] the state of the vote" after receiving the results from the tellers).

now made explicit—echoing and reaffirming constitutional tradition and practice—that, with limited exceptions of no relevance to this case, "the role of the President of the Senate while presiding over the joint session shall be limited to performing solely ministerial duties," 3 U.S.C. § 15(b)(1).  He "shall have no power to solely determine, accept, reject, or otherwise adjudicate or resolve disputes over the proper certificate of ascertainment of appointment of electors, the validity of electors, or the votes of electors."  *Id.* § 15(b)(2).[499]  Because the Vice President's role is and has always been ministerial, rather than substantive or discretionary, it is difficult to imagine an occasion in which a President would have any valid reason to try to influence it.  As such, criminalizing a President's efforts to affect the Vice President's role as the President of the Senate overseeing the certification of Electoral College results would not jeopardize an Executive Branch function or authority.

Critically, applying a criminal prohibition to the discrete and distinctive category of official interactions between the President and Vice President alleged in this case would have no effect— chilling or otherwise—on the President's other interactions with the Vice President that implicate Executive Branch interests.  The President would still be free to direct the Vice President in the discharge of his Executive Branch functions, such as "presid[ing] over . . . cabinet meetings," engaging in "diplomacy and negotiation," or performing any other presidential duties that the President chooses to delegate.  *See Trump*, 144 S. Ct. at 2336 (internal quotation marks omitted). The President would likewise still be free to advise the Vice President on how to "advance the

---

[499] Section 15 of Title 3 was amended in the Electoral Count Reform Act of 2022, Pub. L. 117-328, 136 Stat. 4459, 5237-40 (2022), in response to the defendant's conduct here, to eliminate any doubt that the President of the Senate's role at the joint session is ministerial.  And because the rebuttal analysis is necessarily prospective in nature, the current version of Section 15 supplies the relevant measure, in this context, of "the Vice President's role in the counting of electoral votes," *Trump*, 144 S. Ct. at 2337.

President's agenda in Congress," by casting tiebreaking votes on legislation or nominations. *Id.* at 2337. None of these legitimate Executive Branch functions would be chilled or affected at all.

Lastly, the fact that the defendant regularly included other private actors, such as his private attorney and co-conspirator CC2 in some conversations to attempt to pressure Pence (Superseding Indictment, ECF No. 226 ¶¶ 75-76; *supra* pp. 66-67, 71-72) strengthens the conclusion that prosecuting the defendant for his actions using CC2 to help recruit Pence into the conspiracies does not infringe on any Executive Branch authority or function. As set forth in Section I, private co-conspirators worked to schedule the January 4 meeting at which CC2 attempted to pressure Pence. Although White House Counsel P59 was invited to the meeting, when he arrived to attend, the defendant explicitly excluded him from it—meaning that the only attorney attending the meeting for the defendant was CC2 his privately-retained counsel. In P59 telling, when P59 arrived at the Oval Office for the meeting, the defendant "said words . . . indicating he didn't want me at the meeting."[500] It is hard to imagine stronger evidence that conduct is private than when the President excludes his White House Counsel and only wishes to have his private counsel present.

Next, the phone call on January 5 that the defendant and CC2 made to Pence, P58 and P8 was the result of the private co-conspirators' failure to convince P58 and P8 to do as CC2 urged in the meeting on the morning of January 5 that P58 and P8 took at the defendant's request. The defendant's decision to include private actors in the conversations with Pence about his role at the certification makes even more clear that there is no danger to the Executive Branch's functions and authority, because the CC2 conversations had no bearing on any Executive Branch prerogative. Instead, all of this conduct objectively benefitted the defendant

---

[500] GA 120-121 (                         ).

in his private capacity as a candidate. The Court should therefore find the presumption of immunity to be rebutted. And because the presumption is rebutted, any participant in the meeting or phone call—including Pence, ███ and ███ can testify about it at trial.

### 2. The defendant's interactions with Pence as a running mate were unofficial

At trial, as indicated *supra* pp. 12-14, the Government intends to introduce evidence of private phone calls or in-person meetings (which occasionally included Campaign staff) that the defendant had with Pence in their unofficial capacities, as running mates in the post-election period. These conversations were not described in the original indictment nor analyzed by the Supreme Court in its opinion, nor are they described in the superseding indictment. In these conversations, the defendant and Pence discussed their electoral prospects, election-related litigation, and the possibility of the defendant running again in 2024 if his legal challenges failed. For example, Pence "tried to encourage" the defendant "as a friend," when news networks projected Biden as the winner of the election; on other occasions, softly suggested the defendant "recognize [the] process is over" even if he was unwilling to concede; and encouraged the defendant to consider running for election again in 2024. Although the defendant and Pence naturally may have touched upon arguably official responsibilities that were tangential to their election prospects—for instance, whether the federal government should begin its logistical transition to prepare for a different Administration[501]—the overall context and content of the conversations demonstrate that they were primarily frank exchanges between two candidates on a shared ticket, and the Government does not intend to elicit testimony about any peripheral discussion of arguably official responsibilities. *See Blassingame*, 87 F.4th at 17 ("[A] President

---

[501] *See, e.g.*, GA 1037 (███████████████████████); GA 425-426 (███████████ ████). *See* GA 1018 (Pence, *So Help Me God* p. 432).

acts in a private, unofficial capacity when engaged in re-election campaign activity."); *see also United States v. Helstoski*, 442 U.S. 477, 488 n. 7 (1979) (in the Speech or Debate context, when an act contains both protected legislative components and non-protected components, the correct course is to "excis[e] references to legislative acts, so that the remainder of the evidence would be admissible"). Together, these discussions show the defendant and Pence considering advice from their shared Campaign advisors, weighing electoral strategies, and grappling with their loss. Both men had something to gain by winning re-election, making more notable the persistence of Pence's suggestions on how to accept the results of the election without losing face.

Even if the Court determines that these conversations were official, however, the Government can rebut the presumption of immunity because the use of this evidence poses no risk to Executive Branch prerogatives. The content of the conversations at issue—the defendant and Pence's joint electoral fate and how to accept the election results—have no bearing on any function of the Executive Branch. *See Blassingame*, 87 F.4th at 4 ("The Office of the Presidency as an institution is agnostic about who will occupy it next.").

### 3.  P58 one-on-one interactions with CC2 were unofficial

Pence staffer P58 also participated in a January 5 meeting with CC2 and P8 (Superseding Indictment, ECF No. 226 ¶ 78a; *supra* pp. 69-70) and on January 6 engaged in a lengthy email exchange with CC2 (Superseding Indictment, ECF No. 226 ¶ 99; *supra* p. 85). These interactions were outside of the defendant's presence, and the latter was a series of emails. These conversations were not official, within the meaning of *Trump*, since the defendant was not involved and did not otherwise direct P58 actions, and because of the other information above describing CC2 inherently private role.

## B. The Defendant's Interactions, in his Capacity as a Candidate, with Officials in the Targeted States

### 1. The interactions at issue were unofficial

At trial, the Government will introduce evidence that the defendant, in his capacity as a candidate, contacted state elected officials to use false claims of election fraud to induce their assistance with the charged conspiracies at the point in the electoral process in which the states ascertain electors. These communications included calls to P16 the Governor of Arizona; a meeting with Michigan legislators at the White House; a call to P18 the Speaker of the Arizona State House; a call to P26 the Attorney General of Georgia; and a call to P33 the Georgia Secretary of State. The contacts, sometimes in person and sometimes by phone, were part of a single course of conduct aimed at lying to and influencing these state officials to alter the results of the election in the defendant's favor. In each conversation, the defendant raised false claims of election fraud when pressing the state officials, often asking them to take steps to prevent or overturn the ascertainment of Biden's legitimate electors. And in each case, the state officials informed the defendant that they had not seen the fraud he was claiming had occurred in their state. Notably, all of these elected officials were the defendant's fellow Republicans; he made no efforts to contact the equivalent individuals holding the same offices in Nevada, New Mexico, Pennsylvania, or Wisconsin, all of whom were Democrats. Most importantly, as with the defendant's plan regarding the fraudulent elector slates, as President, he had no official role in the process by which states appointed and ascertained their presidential electors. *See* 144 S. Ct. at 2353 (Barrett, J., concurring) ("The President has no authority over state legislatures or their leadership, so it is hard to see how prosecuting him for crimes committed when dealing with the Arizona House Speaker would unconstitutionally intrude on executive power."). The content,

form, and context of the defendant's interactions with these state officials firmly establish that his

conduct was unofficial.

a. **Calls to** P16 (*supra* pp. 17-18)

The defendant called P16 then the Governor of Arizona, on or about November 9.[502]

The defendant's call to P16 was unofficial and undertaken as a candidate.  Throughout the call,

the defendant was engaged in partisan electioneering.  His comments focused on the vote count in

Arizona in his particular race, and on the margins and allegations of fraud that could potentially

benefit him personally as a candidate.  P16 in turn, responded by giving the defendant his

assessment of the defendant's electoral prospects in Arizona—prospects that were dim.[503]  The

defendant did not ask about the vote counts for, or claim fraud existed in, any race other than his

own.  And he raised fraud claims in this context—about whether he could still win Arizona—not

in the larger context of election integrity.  The defendant claimed that he would deliver evidence

of election fraud to P16 then did not.[504]  The call was a surprise to P16 and unusually short

and to the point for the defendant, who usually liked to chat.[505]  In contrast, according to P16

this call contained little conversation or pleasantries and was solely focused on the vote count in

the Presidential race and the defendant's fraud claims.[506]

This call must also be considered in the context of the conspirators' additional pressure

campaign on P16  On other occasions, CC1 tried to reach P16 but P16 declined to

---

[502] GA 656-658 (███████████████); GA 727 (███████████████).
[503] *See* GA 656-658 (███████████). *See also* GA 667 (███████████)
███████████████.
[504] GA 657 (███████████).
[505] *Id.*
[506] *Id.*

accept the calls.[507]  And on November 30, the day ▮P16▮ signed the certificate of ascertainment

declaring Biden's electors the legitimate ones for Arizona, the defendant (joined by Pence) again

called ▮P16▮ again raised fraud claims, and again failed to substantiate them.[508]  When ▮P16▮

failed to do as the defendant demanded, after the call, the defendant attacked ▮P16▮ publicly

through Twitter.[509]

     Each of these communications with ▮P16▮ was unofficial.  The defendant engaged in them

all in his capacity as a candidate, in an attempt to elicit ▮P16▮ support in re-installing him as

president.

### b.  Meeting with Michigan legislators (Superseding Indictment, ECF No. 226 ¶ 36; *supra* pp. 31-34)

     The defendant's November 20 Oval Office meeting with Michigan state legislators was

private in nature.  During the meeting, the defendant raised claims of election fraud in the state

related specifically and only to his own election, and the legislators explained that the defendant

had lost not because of fraud but because he had underperformed with educated female voters.[510]

Although the meeting took place in the Oval Office—as did many unofficial Campaign meetings

in which the defendant participated in the post-election period[511]—a close examination of all of

the other circumstances surrounding the meeting makes clear that it was a Campaign meeting.

---

[507] GA 661 (███████████████).

[508] GA 658-659, 667-668 (███████████).

[509] GA 831-834 (Donald J. Trump Tweet 11/30/2020);  GA 835-836, GA 1892 (Donald J. Trump Tweet 11/30/2020).

[510] GA 563-564 (███████████).

[511] *See, e.g.*, GA 723, 725 (███████████████); GA 728-730 (███████ ███████); GA 732 (███████████████); GA 737-738 (███████ ███████████); GA 739-740 (███████████████);  GA 746 (███████████).

The defendant originally initiated the meeting through RNC Chairwoman **P39** a private and partisan actor, and then followed up himself with **P37** and **P38**—both fellow Republicans and strong political supporters of the defendant.[512]  *Cf. Trump*, 144 S. Ct. at 2340 (suggesting the President acts in an unofficial capacity when acting as "party leader"). Although the defendant did not specify the topic of the meeting in advance, both **P37** and **P38** assumed—correctly—that the defendant wanted to see them to discuss claims of election fraud related to his own race.[513]  Notably, the defendant did not include in the meeting invitation other Michigan officials who held positions more relevant to the election and certification—the Governor and Secretary of State—but who were not Republicans.[514]

At the time, public interest and alarm were piqued by news that the defendant was meeting with legislators from a state where there were pending election disputes and where the Governor had not yet signed a certificate of ascertainment, and the White House declined to state the topic of the meeting.[515]  During a press conference on the morning of November 20, White House Press Secretary **P60** was asked about the meeting and claimed, "This is not an advocacy meeting.  There will be no one from the Campaign there.  He routinely meets with lawmakers from all across the country."[516]

**P60** claim was false.  Over the course of the meeting, the defendant dialed in both **P39** despite her request not to participate—and **CC1** [517]  The defendant's Chief of

---

[512] GA 69-71 (⬛⬛⬛⬛⬛); GA 555-557 (⬛⬛⬛⬛⬛⬛).
[513] GA 556-559 (⬛⬛⬛⬛).
[514] GA 559-561 (⬛⬛⬛⬛); GA 71-74 (⬛⬛⬛⬛⬛).
[515] GA 1712 (Email from the White House Press Office 11/20/2020).
[516] *Id.* (Email from the White House Press Office 11/20/2020).
[517] GA 330-337 (⬛⬛⬛⬛⬛); GA 82 (⬛⬛⬛⬛⬛); GA 560-561 (⬛⬛⬛⬛).

Staff, **P21** was present for at least part of the meeting.[518] But besides **P21** who

separate from his Chief of Staff duties assisted the defendant with Campaign-related logistics,[519]

no other Executive Branch staff joined the meeting; in fact, according to **P9** he and

White House Counsel **P59** wanted no part of it.[520] As **P37** and **P38** had expected,

the defendant was focused on his own vote count in Michigan and on claims of fraud that related

only to him.[521] **CC1** a private Campaign attorney, then dominated the rest of the meeting with

a monologue of false fraud claims.[522]

 The only reason that there were topics of conversation other than the defendant's claims of

election fraud in his race was because the legislators, on their own initiative, brought them up,

including presenting the defendant with a letter on COVID that they had prepared specifically to

have something to talk about other than the defendant's unsupported election fraud claims[523]—an

official portion of the meeting about which the Government does not intend to elicit testimony at

trial.  The legislators then took photos with the defendant, and the meeting ended; afterward,

**P21** took the group on a tour of the White House.[524]

 As planned, after the meeting, **P37** and **P38** released their statement that publicly

disclaimed evidence of outcome-determinative fraud in the election in Michigan.[525]  The statement

also specified that **P37** and **P38** had raised with the defendant issues related to Michigan's

---

[518] GA 560 (■■■■■■■■■■■■); GA 361-362 (■■■■■■■■■■■■).
[519] GA 348-358 (■■■■■■■).
[520] GA 560 (■■■■■■■■■■); GA 348-354 (■■■■■■■■■■); GA 685 (■■■■■■■■■).
[521] GA 560-571 (■■■■■■■■■); GA 74-84 (■■■■■■■■■).
[522] GA 567-569 (■■■■■■■■).
[523] GA 75, 80-81 (■■■■■■■■); GA 559, 561-562 (■■■■■■■■■).
[524] GA 348-358 (■■■■■■■■); GA 562 (■■■■■■■).
[525] GA 75, 94-95 (■■■■■■■■); GA 1040 (Joint Statement 11/20/2020).

need for federal funds to fight COVID.[526]  When the defendant responded to the legislators' public statement in a Tweet, the private nature of that message, sent as a candidate seeking to overturn the results of his own election—"We will show massive and unprecedented fraud!"—further demonstrates the private nature of the meeting it concerned.[527]  In addition, it was one of six retweets and replies the defendant sent over an approximately thirteen-minute period, all of which were focused on allegations of election fraud in his own race.[528]  Notably, the defendant did not conduct similar meetings in this period with legislators in states where he had won or even where he had lost by large margins, nor did he seek a meeting with the Michigan officials—the Governor and Secretary of State—who could have provided him with information about the integrity of the election.[529]

    As further context establishing the private nature of this meeting, it was the opening volley of a larger pressure campaign on the same Michigan legislators by the defendant, his co-conspirators, and his Campaign.  For example, days after this meeting, ▮CC1▮ sent text messages intended to urge ▮P37▮ and ▮P38▮ to help overturn the results in Michigan.[530]  In the same time period, the Campaign publicized contact information for ▮P37▮ and ▮P38▮ (although the number published for ▮P38▮ was wrong) and encouraged the defendant's supporters to flood their phone lines with complaints.[531]

---

[526] *Id.* (Joint Statement 11/20/2020).

[527] GA 799-800 (Donald J. Trump Tweet 11/21/2020).

[528] GA 801-802 (Donald J. Trump Tweet 11/22/2020); GA 803-804 (Donald J. Trump Tweet 11/22/2020); GA 805-806 (Donald J. Trump Tweet 11/22/2020); GA 807-808 (Donald J. Trump Tweet 11/22/2020); GA 809-810 (Donald J. Trump Tweet 11/22/2020); GA 811-812 (Donald J. Trump Tweet 11/22/2020)).

[529] GA 559-561 (███████████████████); GA 71-74 (██████████████).

[530] GA 1175 (█████████████████████████████); GA 1177 (██████████████████████████).

[531] GA 913-914 (Team Trump Tweet 01/03/2021).

    **c.** **Call with** **P18** **(Superseding Indictment, ECF No. 226 ¶ 19;** *supra* **p. 19)**

The defendant's call to **P18** on November 22, 2020, also was unofficial.[532]  Along with his private attorney, the defendant made the call in his capacity as a candidate and pressured **P18** on electoral matters over which neither the defendant—nor even **P18** had an official role.

The context of the call makes its unofficial nature clear.  The defendant placed the call to **P18** along with **CC1** his lead Campaign attorney, and no White House officials participated in the call.[533]  In fact, **CC1** did most of the talking.[534]  The defendant and **CC1** were singularly focused on fraud claims that affected only the defendant, and did not raise any other races in Arizona.[535]  And the content of the call confirmed it was unofficial: the defendant and his private attorney asked **P18** the defendant's political ally, to take steps to replace Arizona's legitimate electors with illegitimate ones for the defendant—a step that necessarily only affected the defendant's race, out of all the races on the same ballot.[536]

The call must also be viewed in the larger context of the pressure campaign the defendant and his co-conspirators put on **P18** and other Arizona officials.  Immediately after speaking to **P18** the defendant and **CC1** spoke to Arizona State Senate President **P61** [537]  A week later, during the "hotel hearing," **CC1** and **P12** failed to bring the promised evidence and instead admitted "[w]e don't have the evidence, but we have lots of theories."[538]  *See supra* p. 19.

---

[532] GA 735 (⬛⬛⬛⬛); GA 21-22 (⬛⬛⬛⬛).

[533] GA 21-22 (⬛⬛⬛⬛).

[534] GA 22-31 (⬛⬛⬛⬛).

[535] *Id.*

[536] GA 22-25, 32-34 (⬛⬛⬛⬛).

[537] GA 735 (⬛⬛⬛⬛).

[538] GA 36 (⬛⬛⬛⬛).

When **P18** publicly announced that he would not take extralegal action on the defendant's behalf, **P19** and the defendant attacked **P18** on Twitter.[539]  Then, days before January 6, **CC2** made another attempt to convince **P18** to act in contravention of the law and his principles.[540]  And just as was done with the Michigan legislators, the defendant's Campaign and **P1** publicized contact information for **P18** and **P61** in an attempt to pressure them to undertake the same actions the defendant and co-conspirators had asked them privately to perform.[541]  **P18** like others who publicly opposed the defendant's efforts, was harassed and threatened.[542]

### d. Call to **P26** (*supra* pp. 23-24)

The defendant's call on December 8 to **P26** the Georgia Attorney General, also was private.  He undertook it to speak with **P26** about *Texas v. Pennsylvania*, a lawsuit filed by the Texas Attorney General against Pennsylvania, Georgia, Michigan, and Wisconsin seeking to prevent those states from certifying their election results in favor of Biden based on a claim that the manner in which those states had administered their elections had violated the Constitution.[543]

The defendant's interest in *Texas v. Pennsylvania* was personal and private; the lawsuit dealt only with the election for the offices of President and Vice President, not the myriad other races on the same ballots.  Indeed, the day after his call with **P26** the defendant—in his personal capacity and with the assistance of co-conspirator **CC2** as his private attorney—intervened in

---

[539] GA 854-855 (Donald J. Trump Tweet 12/06/2020); GA 852-853 (Donald J. Trump Tweet 12/06/2020).

[540] GA 37-44 (                                   ).

[541] GA 915 (Team Trump Facebook Post 01/02/2021); GA 916 (Team Trump Tweet 01/02/2021); GA 1982 at 22:00 (                                   ); *see also* GA 1713-1715 (                                   ).

[542] GA 45-47 (                          ).

[543] GA 61-64 (                          ); Mot. for Leave to File Bill of Complaint, *Texas v. Pennsylvania*, No. 22-O-155 (S. Ct. Dec. 7, 2020).

the suit[544] and in so doing "affirmatively communicated to the Supreme Court (and the public) that he was acting and speaking in that matter in his 'personal capacity' as a candidate for reelection." *Blassingame*, 87 F.4th at 16.

The defendant initiated the call with ▋P26▋ after a political intermediary laid the groundwork for it, and immediately raised the lawsuit, which was the principal topic of conversation on the call.[545]  Based on ▋P26▋'s estimate and the Presidential Daily Diary, the call lasted about ten minutes and the defendant placed it at night from his private residence in the White House.[546]  In fact, shortly before speaking with ▋P26▋, the defendant had spoken with ▋P62▋, the Texas Attorney General who had filed the lawsuit,[547] and immediately after speaking with ▋P26▋, the defendant called ▋P63▋, the Missouri Attorney General who authored an amicus brief supporting the lawsuit that sixteen other state attorneys general joined.[548]

The speed of the filing of the defendant's intervention brief the following day echoed what he told ▋P26▋: he was "running out of time,"[549] presumably because landmark dates in the electoral process, like December 14 and January 6, were fast approaching.  Lastly, the defendant and ▋P26▋ also spoke about the importance of their fellow Republican party members, Senators ▋P27▋ and ▋P28▋, winning their pending election—further making clear this call was unofficial.[550]

---

[544] Mot. to Intervene, *Texas v. Pennsylvania*, No. 22-O-155 (S. Ct. Dec. 9, 2020).

[545] GA 64 (▋▋▋▋▋▋).

[546] GA 67 (▋▋▋▋▋▋); GA 742 (▋▋▋▋▋▋▋▋).

[547] GA 742 (▋▋▋▋▋▋▋▋); Mot. for Leave to File Bill of Complaint, *Texas v. Pennsylvania*, No. 22-O-155 (S. Ct. Dec. 7, 2020).

[548] GA 742 (▋▋▋▋▋▋▋▋); Brief of Missouri et al. as *Amici Curiae* Supporting Plaintiff, *Texas v. Pennsylvania*, No. 22-O-155 (S. Ct. Dec. 9, 2020).

[549] GA 66 (▋▋▋▋▋▋).

[550] GA 67 (▋▋▋▋▋▋).

e. **Call to** ▮P33▮ **(Superseding Indictment, ECF No. 226 ¶ 33;** *supra* **pp. 28-31)**

The defendant's January 2 call to ▮P33▮ was unofficial and is not subject to immunity; its content, form, and context make clear that the defendant undertook it as a candidate and plaintiff in a private lawsuit in which ▮P33▮ was a defendant.

▮P21▮ has said that the purpose of the call was to discuss the lawsuit,[551] and he acted accordingly during it. At the outset of the call, ▮P21▮ made introductions of all the participants on the defendant's behalf— ▮P32▮ ▮P36▮ and ▮P31▮ [552]—all of whom were affiliated with the Campaign's litigation efforts, which the defendant brought in his capacity as a candidate for President of the United States.[553]

Throughout the call, the defendant and his advisors approached the conversation through his role as a candidate and with a focus on his private lawsuit. For instance, in an apparent reference to individuals retained for his private lawsuit, the defendant claimed, "We're going to have an accurate number over the next two days with certified accountants. But an accurate number will be given, but it's, it's in the fifties of thousands, and that's people that went to vote and they were told they can't vote because they've already been voted for."[554] Some of his false claims of fraud paralleled claims made in Campaign lawsuits, such as that of a substantial number of dead and non-resident voters—for example, in *Trump v. Raffensperger*, a state court case whose complaint was appended to the federal suit *Trump v. Kemp*, the defendant's complaint asserted that 4,926 out-of-state voters had cast ballots, while on the call the defendant cited the number

---

[551] GA 367-368 ( ▮ ).
[552] GA 1154 (Tr. of Call 01/02/2021).
[553] Complaint at 1, *Trump v. Kemp*, No. 1:20-cv-5310 (N.D. Ga. Dec. 31, 2020), ECF No. 1.
[554] GA 1154 (Tr. of Call 01/02/2021).

4,925.[555] And he deferred to his private attorneys at multiple points throughout the conversation. For instance, after ██P33██ told the defendant, "the challenge that you have is the data you have is wrong," the defendant turned to ██P31██ and asked, "Well, █P31█, how do you respond to that?"[556]  At one point, ██P21██ interjected and invoked the Campaign's litigation, asking whether "we can find some kind of agreement . . . to find a path forward that's less litigious."[557] And near the end of the call, ██P32██, the defendant's lead counsel in the lawsuit against ██P33██ requested "to sit down with your office, and we can do it through purposes of compromise just like this phone call" to review data.[558] ██P33██ counsel, ██P35██, responded that ██P32██s cited numbers were inaccurate, but agreed to meet with him.[559]

The defendant's call to ██P33██ was purely a private one, which he undertook as a candidate and the plaintiff in a lawsuit.  Indeed, a federal district court has concluded that the ██P33██ call was a Campaign call rather than official business; when ██P21██ sought removal to federal court of his criminal case in Fulton County, Georgia, a court in the Northern District of Georgia issued an order declining to assume jurisdiction because ██P21██ had failed to meet his burden of showing that his role in the call was official rather than unofficial.  *See Georgia v. Meadows*, 692 F. Supp. 3d 1310, 1332 (N.D. Ga. 2023), *aff'd* 88 F. 4th 1331, 1349 (11th Cir. 2023) (petition for cert. filed) ("██████s participation in the call reflected a clear attempt to further Trump's *private* litigation interests . . . .") (emphasis in original)); *see also Arizona v. Meadows*, No. CV-24-02063-PHX-JJT, 2024 WL 4198384, at *7 (D. Ariz. Sept. 16,

---

[555] Complaint at 19, *Trump v. Raffensperger*, No. 2020CV343255 (Ga. Super. Ct. Dec. 4, 2020) available at: *Trump v. Kemp*, No. 1:20-cv-5310 (N.D. Ga. Dec. 31, 2020), ECF No. 1-1 at 12-79.

[556] GA 1159 (Tr. of Call 01/02/2021).

[557] GA 1157 (Tr. of Call 01/02/2021).

[558] GA 1170 (Tr. of Call 01/02/2021).

[559] GA 1170-1171 (Tr. of Call 01/02/2021).

2024) (similarly denying ███████ notice of removal to federal court of a criminal case in Arizona related to the defendant's fraudulent elector plan on the basis that ███████ conduct in furtherance of the plan charged by the State "is unrelated to ███████ official duties").

**2. Even if the defendant's contacts with state officials were official, the Government can rebut the presumption of immunity**

Although the Supreme Court did not resolve the issue in *Trump*, it described the basis for concluding that using the defendant's conduct of lying to and pressuring state officials to change the legitimate vote in a criminal prosecution would not intrude on Executive Branch functions or authority:

> Indeed, the Constitution commits to the States the power to "appoint" Presidential electors "in such Manner as the Legislature thereof may direct." Art. II, § 1, cl. 2; see *Burroughs* v. *United States*, 290 U.S. 534, 544 (1934). "Article II, § 1's appointments power," we have said, "gives the States far-reaching authority over presidential electors, absent some other constitutional constraint." *Chiafalo* v. *Washington*, 591 U.S. 578, 588–589 (2020). By contrast, the Federal Government's role in appointing electors is limited. Congress may prescribe when the state-appointed electors shall meet, and it counts and certifies their votes. Art. II, § 1, cls. 3, 4. The President, meanwhile, plays no direct role in the process, nor does he have authority to control the state officials who do. And the Framers, wary of "cabal, intrigue and corruption," specifically excluded from service as electors "all those who from situation might be suspected of too great devotion to the president in office." The Federalist No. 68, at 459 (A. Hamilton); see Art. II, § 1, cl. 2.

144 S. Ct. at 2339. Under the Constitution, the Executive Branch has no constitutionally assigned role in the state-electoral process. To the contrary, the constitutional framework excludes the President from that process to protect against electoral abuses. *See supra* p. 93. Accordingly, applying federal criminal law to the defendant's use of fraud to interfere with electoral processes carried out by the states does not intrude on Executive Branch authority or functions. Rather, it ensures that the President's conduct remains consistent with the Constitution's allocation of that authority to the States, while in no way impairing his ability to "encourage [state officials] to act

in a manner that promotes the President's view of the public good." 144 S. Ct. at 2338. The President remains free, for instance, to urge state officials to institute measures to combat a pandemic or make arrangements to provide emergency relief. This case does not remotely implicate such official conduct. What neither the President nor any other candidate may do is further his private campaign for office by using fraudulent means to have state officials certify him as winner of a presidential election despite the will of the voters. Accordingly, applying criminal penalties to that conduct will not intrude on any Executive Branch authority or function.

### C. The defendant's efforts, as a candidate, to organize fraudulent electors

#### 1. The conduct at issue was unofficial

The defendant's conduct with respect to the elector scheme is inherently private, and not subject to immunity. *See* 144 S. Ct. at 2353 n.2 (Barrett, J., concurring in part) ("Sorting private from official conduct sometimes will be difficult—but not always. Take the President's alleged attempt to organize alternative slates of electors. In my view, that conduct is private and therefore not entitled to protection."). The President of the United States has no official responsibilities related to the organization or voting of electors in the various states—by virtue of the Constitution, that process takes place in the states according to the laws and procedures set forth by each state. *See* U.S Const., Art. II, § 1, cl. 2. At oral argument before the Supreme Court, the defendant initially conceded that the plan to submit fraudulent electors directed by the defendant and CC1 was not official. Tr. of Oral Argument at 29-30; *Trump*, 144 S. Ct. at 2338. The Government nonetheless sets forth here the context, form, and content of the defendant's private contacts with RNC Chairwoman P39 in furtherance of the fraudulent elector plan because the defendant conversely suggested in the same oral argument that he will argue that those efforts were official. *See* 144 S. Ct. at 2338.

The defendant had two relevant contacts with ▮P39▮ first, he and co-conspirator ▮CC2▮ called ▮P39▮ on December 6 to ask her to ensure that the effort was properly coordinated (Superseding Indictment, ECF No. 226 ¶ 53; *supra* p. 50), and second, on the evening of December 14, ▮P39▮ emailed the defendant through his executive assistant, ▮P42▮ to inform him that the fraudulent electors had cast votes as he had directed (Superseding Indictment, ECF No. 226 ¶ 66; *supra* p. 57).

The defendant and ▮CC2▮ call to ▮P39▮ on December 6 was private. The defendant placed the call along with ▮CC2▮ a private attorney and co-conspirator, to ▮P39▮ the Chairwoman of a political organization whose objective was to elect a broad set of Republicans at the federal and state level, including the defendant and other allied candidates.[560] ▮CC2▮ was acting in his capacity as a private attorney for the defendant; on the same day, ▮CC2▮ emailed with several other private attorneys and wrote, "This is huge – and hugely important. Let's make sure the various state electors are aware of the absolute necessity of meeting on the 14th, casting their votes, and otherwise complying with the transmittal requirements of federal law."[561] Finally, the content of the call was likewise unofficial. The defendant and ▮CC2▮ asked ▮P39▮ to work with the Campaign, to ensure that the fraudulent electors were properly organized, which she agreed to do—and did, as is clear from her further contacts with ▮CC1▮ and ▮CC6▮ regarding the plan.[562]

▮P39▮ email to the defendant on December 14 was likewise a private communication; ▮P39▮ simply forwarded the defendant an RNC communication summarizing the electoral vote

---

[560] GA 323-325 (▮▮▮▮▮▮▮▮▮▮▮▮).
[561] GA 1716-1717 (▮▮▮▮▮▮▮▮▮▮).
[562] GA 323-325 (▮▮▮▮▮▮▮▮▮▮); GA 1286-1287 (▮▮▮▮▮▮▮▮▮▮▮▮▮); GA 1326-1327 (▮▮▮▮▮▮▮▮▮▮); GA 1288-1290 (▮▮▮▮▮▮▮▮▮▮▮▮▮).

to inform him that the private task the defendant had given her was complete, and **P42**
confirmed that she had relayed the message by writing, "It's in front of him!"[563]  As discussed
*infra* pp. 145-147, when a White House staffer facilitates unofficial conduct by relaying private,
political communications, the private action is not converted to an official one simply because an
Executive Branch aide helps carry it out.

### 2. Even if the conduct were deemed official, the Government could rebut the presumption of immunity

In any event, even if the defendant's efforts to convene fraudulent electors could be
considered official, the presumption would be rebutted because "a President has no legal
authority—and thus no official capacity—to influence how the States appoint their electors," and
accordingly, there is "no plausible argument for barring prosecution of that alleged conduct."
*Trump*, 144 S. Ct. at 2353 n.2 (Barrett, J., concurring in part).  "[W]hile Congress has a limited
role [in the appointment of Presidential electors], the President has none."  *Id.*  Accordingly,
applying the criminal law to the defendant's "alleged attempt to organize alternative slates of
electors," while properly viewed as prosecution for private conduct, *see id.*, implicates no authority
or functions of the Executive Branch—and therefore including such conduct in the defendant's
prosecution poses no danger of intruding on Executive Branch authority or functions.  No federal
executive function is impaired by applying criminal law to the alleged conduct of privately
organizing fraudulent slates of electors.

---

[563] GA 328-329 (███████████); GA 1483-1484 (██████████████ ███████).

### D. The Defendant's Public Speeches, Tweets, and Other Public Statements as a Candidate

#### 1. The statements at issue were unofficial

Merely because the President is speaking to the public—even on "matters of public concern"—does not automatically render the communication official. *Blassingame*, 87 F.4th at 19-20. Instead, what matters is "whether the President is speaking (or engaging in conduct) in an official capacity as office-holder or instead in an unofficial capacity as officer-seeker," *id.* at 19, as determined by "content, form, and context," *Trump*, 144 S. Ct. at 2340. Starting before the election and lasting until January 6, the defendant at various times communicated publicly not as President but as a candidate for office. These communications included public Campaign speeches, Tweets, and other public statements and comments. The defendant's communications that the Government has alleged in the superseding indictment and described in Section I were all made in his capacity as a candidate and are not official.

#### a. Speeches

The defendant made a number of speeches as a candidate, rather than as an office-holder. *See* 144 S. Ct. at 2339-40 ("There may . . . be contexts in which the President, notwithstanding the prominence of his position, speaks in an unofficial capacity—perhaps as a candidate for office or party leader."). The superseding indictment cites, and the Government plans to use at trial, two: the defendant's Campaign speech at a political rally in Dalton, Georgia, on January 4, 2021, and his Campaign speech at a political rally on the Ellipse on January 6, 2021.

### i.   Dalton, Georgia, on January 4, 2021 (*supra* p. 68)

In his capacity as a candidate, the defendant traveled to Dalton, Georgia, on January 4 at the invitation of two Republican U.S. Senators who were competing in a run-off election the following day to retain their seats.  The RNC paid for the event.[564]

The White House's records, including the trip binder that White House staff prepared for the event and that includes a schedule and manifests, further confirm the private nature of the Dalton speech.[565]  The defendant was the only Executive Branch participant in the event—other attendees were federal and state elected officials, the Chairman of the Georgia Republican Party, and the founder of Bikers for Trump.[566]  The trip binder included a Hatch Act disclaimer stating that "employees of the Federal Government may not use their official title or position when participating in a political event."[567]  Its description of the "event" to which the defendant was traveling was "Remarks at Victory Rally."[568]  Similarly, the Presidential Daily Diary from that day describes that "[t]he President made remarks at the Georgia Senate Victory Rally."[569]  This nomenclature—the use of the phrase "Victory Rally"—is significant.  "Victory" necessitates one political candidate or party defeating another, and rallies are the kinds of events that candidates hold to excite their supporters and garner votes.

---

[564] GA 1718-1724 (⬛); GA 1725-1729 (⬛); GA 1730-1732 (⬛); GA 1733-1736 (⬛); GA 1743 (⬛); GA 1744 (⬛); GA 1741 (⬛); GA 1745-1746 (⬛); GA 1747 (⬛); GA 1739 (⬛).

[565] GA 1751-1755 (⬛).

[566] GA 1752 (⬛).

[567] *Id.*

[568] *Id.*

[569] GA 767 (⬛).

Moreover, the defendant's Campaign sent numerous fundraising emails before, during, and after the speech, confirming the event's private nature. In a January 4 email around 3:00 p.m., the Campaign sent a fundraising email with the subject line "EPIC Rally in 6 HOURS," that began, "President Trump is heading to GEORGIA for a RALLY with Senators ▇▇▇ P28 ▇▇▇ and ▇ P27 ▇ ▇▇▇▇. This rally is going to be EPIC and will show the Nation that REAL Americans, like YOU, are fired up and ready to FIGHT to keep our Republican Senate Majority. The Senate Runoff Election is TOMORROW, and it's going to take the support of Patriots from all around the Nation if we're going to WIN BIG and SAVE America from the Radical Left."[570] Later, at 9:21 p.m., the Campaign sent a fundraising email (in the name of the defendant's son) that began, "My father is on stage RIGHT NOW in Georgia rallying with Senators ▇▇▇ P28 ▇▇▇ and ▇▇ P27 ▇▇ to DEFEND our Senate Republican Majority. *Are YOU watching?*"[571] The email reminded voters that "The Senate Runoff Election is TOMORROW and YOU are the only one who can stop ["the Left"] from taking over."[572] Another email at 10:41 p.m. (sent in the name of the defendant) began, "I just stepped off stage after speaking at an EPIC Victory Rally in Georgia with Senators P28 ▇▇▇ and ▇ P27 ▇. The energy of the American People was UNMATCHED and I know we're going to WIN BIG tomorrow."[573]

---

[570] *See, e.g.*, GA 1759-1762 (Campaign Fundraising email 01/04/2021); GA 1763-1765 (Campaign Fundraising email 01/04/2021); GA 1766-1767 (▇▇▇▇▇▇▇▇▇▇▇▇ ▇▇▇▇); GA 1768-1771 (Campaign Fundraising email 01/04/2021).

[571] *See, e.g.*, GA 1772-1775 (Campaign Fundraising email 01/04/2021); GA 1776-1778 (Campaign Fundraising email 01/04/2021); GA 1779-1780 (▇▇▇▇▇▇▇▇▇▇▇▇ ▇▇▇▇); GA 1781-1784 (Campaign Fundraising email 01/04/2021).

[572] *Id.*

[573] *See, e.g.*, GA 1785-1788 (Campaign Fundraising email 01/04/2021); GA 1789-1791 (Campaign Fundraising email 01/04/2021); GA 1792-1793 (▇▇▇▇▇▇▇▇▇▇▇▇ ▇▇▇▇); GA 1794-1797 (Campaign Fundraising email 01/04/2021).

Finally, the content of the Dalton speech confirms its unofficial nature. The defendant began by telling the crowd, "Tomorrow, each of you is going to vote in one of the most important runoff elections in the history of our country. . . . You're going to get everyone you know. You're going to show up to the polls in record numbers. You got to swamp them, and together, we're going to defeat the Democrat extremists and deliver a thundering victory to [P27] . . . And someone that has really been a star in Washington, [P28] [574] He also used the speech to pressure Pence.[575] Much of the speech then veered into the defendant's principal claims of fraud and irregularities in the presidential election, but he occasionally returned to the theme of the following day's election, including discussion of the Democratic candidates.[576]

### ii. The Ellipse on January 6, 2021 (Superseding Indictment, ECF No. 226 ¶ 86; *supra* pp. 75-78)

The "content and context" of the Ellipse rally, including the people involved in "organizing the rally," *Trump*, 144 S. Ct. at 2340, demonstrate that it too consisted of non-official conduct. The Ellipse rally—named the Save America Rally or the March for Trump—was planned and executed by private political supporters, including Women For America First (WFAF), a 501(c)(4) organization that advocated for the defendant's reelection in advance of election day in 2020 and throughout the post-election time period.[577] *Cf. Trump*, 144 S. Ct. at 2340 ("Knowing . . . who was involved in . . . organizing the rally[] could be relevant to the classification" of the Ellipse speech as official or unofficial.). The Ellipse rally was originally planned to take place at Freedom Plaza, but after WFAF began to plan the rally independent of the defendant, [P64] a

---

[574] GA 1089 (Dalton Rally Speech Draft Tr. 01/04/2021).

[575] GA 1090 (Dalton Rally Speech Draft Tr. 01/04/2021).

[576] GA 1091 (Dalton Rally Speech Draft Tr. 01/04/2021).

[577] GA 299-300 (██████████████); GA 485-486 (██████████████████); GA 653 (████████████████); GA 1801-1802 (████████████████████ ██████████).

private fundraiser for the defendant, contacted WFAF to discuss moving the event to the Ellipse and featuring the defendant as a guest.[578]   The organizers and planners of the event were almost exclusively private individuals, with minimal involvement by White House advance staff.   The United States Secret Service, which is charged with the President's protection at all times, even during unofficial events, considered the rally to be "a campaign event."[579]   The rally was completely funded by a $2.1 million private donation by ███ P65 ███ a grocery chain heiress.[580]   This private funding, while not dispositive, is a strong indicator that the event was unofficial. ███ P66 ███ the rally organizer who had the most direct contact with the defendant, was an employee of the defendant's Campaign until December 31, 2020, and after that, a private citizen.[581] And in public statements since leaving office, the defendant has said repeatedly that he "had nothing to do with" the rally "other than they asked me to make a speech.   I showed up for a speech."[582]

For weeks leading up to the event, the defendant promoted it on Twitter using the word "rally"—a word that the defendant, on his Twitter account, reserved almost exclusively for political and Campaign events.   As with the trip binder for the Dalton remarks, the defendant's trip binder for the Ellipse speech also reinforces the private nature of the event.   Although it does not

---

[578] GA 301-302 (████████████); GA 1804 (████████████).

[579] GA 399-403 (████████).   ████████, then the Special Agent in Charge of the Washington Field Office of the Secret Service, elaborated that the defendant's protective detail "wasn't getting information [about the rally] from their counterparts at the White House staff because this was not a staff-driven event.   This was a campaign driven event." GA 399.

[580] GA 645-652 (████████████); GA 1142 (████████ ████████); GA 1805-1818 (████████████); GA 1895 (████████); GA 1819-1822 (████████).

[581] GA 483-484 (████████████).

[582] Riley Hoffman, *Read: Harris-Trump presidential debate transcript* (Sept. 10, 2024, 11:58 PM), available at https://abcnews.go.com/Politics/harris-trump-presidential-debate-transcript/story?id=113560542; *see also* GA 1692 (Transcript of CNN Town Hall 05/10/2023).

include the same Hatch Act disclaimer—perhaps because the event, in contrast to the Dalton rally, was not for the benefit of another political candidate—it describes the event as the defendant's "Remarks at the Save America Rally"—using a word, "rally," that reflected an unofficial, Campaign-related event.[583]

The defendant's White House employees understood the rally and the defendant's speech at it to be a private, unofficial exercise and acted accordingly.  Consistent with the Hatch Act's requirement that officials within the Executive Branch (other than the President or Vice President) must refrain from using their official authority for partisan political purposes, *see* 5 U.S.C. § 7323(a)(1), on the morning of the rally, an email from White House photographer P67 ███████ on which P45 was copied, provided "[a] reminder today is a political event."[584] Likewise, the defendant's White House speechwriting staff understood that the speech was a political, unofficial one and used their personal devices and personal email accounts to do most of the drafting and fact-checking for the defendant's Ellipse speech, though some last revisions to the speech on the morning of January 6 occurred over White House email.[585]  And officials in the White House Counsel's Office who customarily reviewed the defendant's official remarks pointedly did not review the Ellipse speech because it was an unofficial Campaign speech.[586] Similarly, the White House website in the moments after the defendant's speech at the rally made no mention of it—instead, the official webpage touted official accomplishments like COVID

---

[583] GA 1827-1832 (████████████████████████).

[584] GA 1833 (█████████████████); GA 539 (███████████████).

[585] *See* GA 636 (████████████████); GA 191-192 (███████████████████); GA 1834-1843 (██████████████████); GA 1681 (███████████████████).

[586] GA 105 (███████████████); GA 476-477 (████████████████).

vaccines and peace in the Middle East.[587]  By contrast, the speech was advertised heavily by the defendant's Campaign Twitter account, which also repeatedly posted clips of the event in progress and afterward.[588]

The day-of logistics of the Save America Rally further indicate its private nature.  No other Executive Branch officials spoke.  Instead, other speakers included WFAF officials, the defendant's political allies, two U.S. Representatives, and the defendant's co-conspirators and private attorneys, CC1 and CC2 [589]

Moreover, the defendant's appearance was consistent with a Campaign rally, not an official event.  The crowd at the rally consisted of the defendant's political supporters, who held signs and wore clothing bearing the defendant's Campaign slogans.[590]  And the manner in which the defendant took the stage at the rally was also consistent with his Campaign rallies: instead of entering as a military band played Hail to the Chief, as he might at an official presidential event, the defendant entered and exited the Ellipse speech to the songs he had used throughout his Campaign (Lee Greenwood's "God Bless the U.S.A." and the Village People's "Y.M.C.A."[591]).

---

[587] *See* The White House Home Page (screenshot), WHITEHOUSE.GOV (Jan. 6, 2021) https://web.archive.org/web/20210106154456/https://www.whitehouse.gov/.

[588] GA 954 (Team Trump Facebook Post 01/06/2021); GA 955 (Team Trump Facebook Post 01/06/2021); GA 956 (Team Trump Facebook Post 01/06/2021); GA 957 (Team Trump Tweet 01/06/2021); GA 958 (Team Trump Tweet 01/06/2021); GA 959 (Team Trump Tweet 01/06/2021); GA 960 (Team Trump Tweet 01/06/2021); GA 961 (Team Trump Tweet 01/06/2021); GA 962 (Team Trump Tweet 01/06/2021); GA 963 (Team Trump Tweet 01/06/2021).

[589] GA 1928 (Video of Ellipse Rally 01/06/2021).

[590] *See* GA 1913 (Video of Ellipse Rally 01/06/2021); GA 1908 (Video of Ellipse Rally 01/06/2021).

[591] *Compare* KJRH-TV Tulsa, *President Trump arrives at White House*, YouTube https://www.youtube.com/watch?v=j7u5obMdl8A *with* GA 1928 at 3:28:50 and 4:42:55 (Video of Ellipse Rally 01/06/2021).

Tellingly, the significant similarities with the defendant's Dalton Campaign speech[592] confirm that the Ellipse speech[593]—delivered just two days later—was private, partisan electioneering.  The defendant covered many of the same topics and told many of the same lies about fraud in only his election—in some cases, using the exact same words.  For instance:

- The defendant, as a candidate, falsely claimed he had won the election (Dalton at GA 1102: "I ran two elections.  I won both of them.  Second one, much more successful than the first."  Ellipse at GA 1115: "I've been in two elections; I won them both, and the second one I won much bigger than the first.").

- The defendant, as a candidate and the leader of a political party, implored political supporters to pressure Pence (Dalton at GA 1090: "I hope Mike Pence comes through for us, I have to tell you.  I hope that our great Vice President, our great Vice President comes through for us.  He's a great guy.  Of course, if he doesn't come through, I won't like him quite as much."  Ellipse at GA 1116: "I hope Mike is going to do the right thing.  I hope so.  I hope so.  Because if Mike Pence does the right thing, we win the election.").

- The defendant, as a candidate and the leader of a political party, attacked a fellow party member who had been insufficiently subservient (Dalton at GA 1104: Georgia Governor ▮P17▮ was an "incompetent governor."  Ellipse at GA 1125: ▮P17▮ was "one of the dumbest governors in the United States.").

- The defendant, who in his capacity as a candidate had suffered personal legal defeats in his private, election-related litigation at the Supreme Court, attacked it (Dalton at GA 1095: "I'm not happy with the Supreme Court.  They are not stepping up to the plate.  They're not stepping up."  Ellipse at GA 1125: "I'm not happy with the Supreme Court.  They love to rule against me.").

- The defendant, as a candidate, made myriad false claims regarding fraud in the presidential election, including:

  - Arizona

    - Non-citizens cast 36,000 votes (Dalton at GA 1106: "In Arizona, more than 36,000 votes were cast by non-citizens."  Ellipse at GA 1134: "Over 36,000 ballots were illegally cast by non-citizens."); and

---

[592] *See* GA 1088 (Dalton Rally Speech Draft Tr. 01/04/2021).

[593] *See* GA 1114 (Ellipse Rally Speech Draft Tr. 01/06/2021).

- There were more ballots than voters (Dalton at GA 1106: "There were 11,000 more ballots than there were voters." Ellipse at GA 1134: "11,600 more ballots and votes were counted, more than there were actual voters.").

  o Georgia

  - There were more than 10,000 dead voters (Dalton at GA 1103: "We were up. 10,315 ballots were cast by individuals whose name and date of birth matches a Georgia resident who died in 2020 prior to the election. Then your wacky secretary of state said two people, two people." Ellipse at GA 1133-1134: "Over 10,300 ballots in Georgia were cast by individuals whose names and dates of birth match Georgia residents who died in 2020 and prior to the election.");

  - More than 2,500 ineligible felons voted (Dalton at GA 1103: "2,506 ballots were cast by individuals whose name and date of birth matches an incarcerated felon in a Georgia prison. Maybe they aren't all there, but they did a lot of work. I paid a lot of money to a lot of people. I can tell you that." Ellipse at GA 1134: "More than 2,500 ballots were cast by individuals whose names and dates of birth match incarcerated felons in Georgia prison—people who are not allowed to vote.");

  - Thousands of unregistered people voted (Dalton at GA 1103: "4,502 illegal ballots were cast by individuals who do not appear on the state's voter rolls." Ellipse at GA 1134: "More than 4,500 illegal ballots were cast by individuals who do not appear on the state's own voter rolls.");

  - More than 18,000 voters used vacant addresses (Dalton at GA 1103: "18,325 illegal ballots were cast by individuals who registered to vote using an address listed as vacant according to the postal service." Ellipse at GA 1134: "Over 18,000 illegal ballots were cast by individuals who registered to vote using an address listed as 'vacant,' according to the Postal Service.");

  - At least 88,000 ballots were illegally backdated (Dalton at GA 1103: "At least 86,880 ballots were cast by people whose registrations were illegally backdated." Ellipse at GA 1134: "At least 88,000 ballots in Georgia were cast by people whose registrations were illegally backdated.");

  - Underage voters cast 66,000 ballots (Dalton at GA 1103: "66,000 votes in Georgia were cast by people under the legal voting age." Ellipse at GA 1134: "66,000 votes—each one of these is far more than we need. 66,000 votes in Georgia were cast by individuals under the legal voting age."); and

- 15,000 voters had moved out of the state before the election (Dalton at GA 1103: "At least 15,000 ballots were cast by individuals who moved out of the state prior to the November 3rd election, or maybe they moved back in." Ellipse at GA 1134: "And at least 15,000 ballots were cast by individuals who moved out of the state prior to November 3rd election. They say they moved right back. They moved right back. Oh, they moved out; they moved right back. Okay. They missed Georgia that much. I do. I love Georgia. But it's a corrupt system.").

o Michigan

- 17,000 ballots were cast by dead people (Dalton at GA 1106: "An estimated 17,000 ballots were cast by dead people." Ellipse at GA 1135: "More than 17,000 Michigan ballots were cast by individuals whose names and dates of birth match people who were deceased.").

o Nevada

- Signature verification machines were flawed (Dalton at GA 1106: "In Clark County, Nevada, over 130,000 ballots, this is far, just so you know, all these numbers, these are far more than we need, were processed on machines where the signature matching threshold was intentionally lowered to a level that you could sign your name, 'Santa Claus,' and it wouldn't pick it up." Ellipse at GA 1134: "In Clark County, Nevada, the accuracy settings on signature verification machines were purposely lowered before they were used to count over 130,000 ballots."); and

- There were tens of thousands of double votes (Dalton at GA 1106: "More than 42,000 people in Nevada double voted." Ellipse at GA 1134: "There were also more than 42,000 double votes in Nevada.").

o Pennsylvania

- The Commonwealth had more votes than voters (Dalton at GA 1105: "In Pennsylvania, there were 205,000 more ballots cast than there were voters." Ellipse at GA 1127: "So, in Pennsylvania, you had 205,000 more votes than you had voters.");

- 8,000 dead people voted (Dalton at GA 1106: "Pennsylvania also had an estimated 8,000 dead voters." Ellipse at GA 1127: "Over 8,000 ballots in Pennsylvania were cast by people whose names and dates of birth match individuals who died in 2020 and prior to the election.");

- 14,000 out-of-state voters voted (Dalton at GA 1106: "14,000 ballots illegally cast by out of state voters." Ellipse at GA 1127: "Over 14,000

ballots were cast by out-of-state voters.  So these are voters that don't live in this state.");

- 400,000 absentee ballots appeared after the election (Dalton at GA 1106: "There's an unexplained 400,000 vote discrepancy between the number of mail-in ballots in Pennsylvania sent out reported on November 2nd, 2020, and the number reported on November 4th.  They can't explain it.  400,000 previously unreported mail-in ballots, magically appeared.  They couldn't explain it.  And all of a sudden they just happened to find 400,000.  That's a lot of people."  Ellipse at GA 1128: "The day before the election, the state of Pennsylvania reported the number of absentee ballots that had been sent out, yet this number was suddenly and drastically increased by 400,000 people.  It was increased—nobody knows where it came from—by 400,000 ballots one day after the election."); and

- Tens of thousands of ballots were received back before they were mailed out (Dalton at GA 1106: "55,000 ballots received back before they were even sent."  Ellipse at GA 1128: "And more than 60,000 ballots in Pennsylvania were reported received back—they got back—before they were ever supposedly mailed out.  In other words, you got the ballot back before you mailed it, which is also logically and logistically impossible. Right?").

o   Wisconsin

- Hundreds of illegal drop boxes were used (Dalton at GA 1105: "In Wisconsin over 90,000 ballots were illegally harvested.  Can't do that.  Not allowed to.  Through so-called human drop boxes and over 500 illegal unmanned drop boxes were put out statewide."  Ellipse at GA 1131: "In Wisconsin, corrupt Democrat-run cities deployed more than 500 illegal, unmanned, unsecured drop boxes, which collected a minimum of 91,000 unlawful votes."); and

- 170,000 invalid absentee votes were counted (Dalton at GA 1105: "Over 170,000 absentee votes were counted that are blatantly illegal under Wisconsin law and should never have been included in the tally."  Ellipse at GA 1131: "Over 170,000 absentee votes were counted in Wisconsin without a valid absentee ballot application.  So they had a vote, but they had no application, and that's illegal in Wisconsin.").

The defendant's language throughout the speech was that of a candidate focused on his re-election.  He claimed that he would not concede, that he received more votes than he had four years earlier, that the election was over by 10:00 p.m. on election night, and that he wanted to go

back eight weeks to fix the election result.  Significantly, he made many of these statements at the beginning of the speech, framing the themes for the rest of the speech.[594]

In addition, although countless federal, state, and local races also were on the same ballots as the defendant on election day—including those of every sitting member of the House of Representatives, even those on whom the defendant was counting to object at the congressional proceeding—the defendant focused only on his own race, the election for President, and only on allegations favoring him as a candidate in targeted states he had lost.[595]  He claimed his "election victory" was "stolen," that he would not "concede," and that "with only three of the seven states in question, we win the presidency of the United States."[596]  He framed the claims of election fraud in terms of his own election and the margin of victory in his own race, and he spoke to his political supporters using the pronoun "we"—showing that he was speaking not to all citizens, but only to his own voters.[597]  Finally, the defendant repeatedly aimed accusations at Biden, his principal opponent in the election contest, as would a candidate.[598]

### b.  Tweets

One of the tools the defendant used for partisan political advantage—and in furtherance of the charged conspiracies—was his personal Twitter account.  He used his Twitter account to undermine public confidence in the electoral system, spread false claims of election fraud, attack those speaking the truth that the defendant had lost the election, exhort supporters to travel to Washington for the certification proceeding, and marshal his supporters' anger at, and pressure on,

---

[594] GA 1118-1119 (Ellipse Rally Speech Draft Tr. 01/06/2021).

[595] GA 1122, 1126-1136 (Ellipse Rally Speech Draft Tr. 01/06/2021).

[596] GA 1115, 1122 (Ellipse Rally Speech Draft Tr. 01/06/2021).

[597] GA 1115, 1132-1133, 1136 (Ellipse Rally Speech Draft Tr. 01/06/2021).

[598] GA 1119, 1133, 1135 (Ellipse Rally Speech Draft Tr. 01/06/2021).

Pence.  As described below, an objective analysis of "content, form, and context," *id.* at 2340, establishes that the select Tweets that the Government intends to offer at trial were unofficial.

As an initial matter, the defendant sent, or directed the sending of, all Tweets and re-Tweets from @realDonaldTrump, the personal Twitter account that the defendant started long before assuming the presidency.[599]  The defendant began tweeting from @realDonaldTrump in May 2009.  Throughout his campaign for the presidency in 2016, the defendant used this Twitter account for electioneering purposes; he even announced the selection of Pence as his Vice Presidential nominee over Twitter.[600]  Since the end of his term in office, the defendant again has used the account for private purposes.  During his presidential term, the defendant sometimes used the @realDonaldTrump account to tweet about official business, including regarding COVID relief and vaccines, legislation in Congress, and Executive Branch business.  But he also regularly used the account to post on unambiguously private matters—for example, when he posted a picture of himself golfing with Jack Nicklaus and Tiger Woods at the Trump National Golf Club in Jupiter, Florida, and re-tweeted a Trump Organization post about the Trump New York hotel being "named the #1 'Best Hotel in the World!'"[601]

The Supreme Court's decision in *Lindke v. Freed*, 144 S. Ct. 756, 769 (2024), confirms that a public official's personal social-media account can be used for both personal and public business, and—consistent with *Trump*—that a fact-specific inquiry is required to discern into which category a post falls.  In conducting the necessary Tweet-by-Tweet analysis, context and

---

[599] GA 525-527 (███████████████); GA 534 (███████████████).

[600]  GA  411  (████ ███ █████████████);  *see*  https://x.com/realDonaldTrump/status/ 753965070003109888?lang=en (Donald J. Trump Tweet 07/15/2016).

[601]  https://x.com/realDonaldTrump/status/1091760712756744192  (Donald  J.  Trump  Tweet 02/02/2019);  https://x.com/realdonaldtrump/status/1172353230505938946  (Donald  J.  Trump Tweet 09/12/2019).

content matter.   Simply because a Tweet relates to a matter of public concern does not automatically transform it into an official communication.   In *Blassingame*, 87 F.4th at 20, the D.C. Circuit rejected the defendant's contention that any and all of the President's communications are immune official acts whenever they involve a matter of public concern.   The D.C. Circuit recognized that the "integrity of the 2020 election" was a matter of public concern, but if the defendant spoke about that issue "in his personal capacity as a candidate for reelection rather than in his official capacity as President," it was unofficial speech not shielded by immunity.   *Id.*   Thus, when a court consults "content and context" to inform the official-act inquiry, *see Trump*, 144 S. Ct. at 2340, a claim that all Tweets concerning election integrity were official must fail.

An analysis of the @realDonaldTrump account during the time period of the charged conspiracies demonstrates that the defendant frequently used the account to advance his unofficial objectives as a candidate.   Of the more than 1,200 Tweets, the vast majority were related to the 2020 presidential election.   For example, he announced over Twitter that ▮CC1▮ and others were taking over his Campaign legal team, and he repeatedly used the platform to espouse false claims of election fraud and promote political rallies on his behalf.[602]   ▮P45▮ the defendant's Deputy Chief of Staff and the only person other than the defendant with control over the @realDonaldTrump Twitter account, acknowledged that he sometimes consulted with Campaign personnel about material he was going to post on the account, that he worked as a volunteer for the defendant's Campaign at the same time that he served as Deputy Chief of Staff, and that he did

---

[602] GA 784-785 (Donald J. Trump Tweet 11/14/2020); GA 786-787 (Donald J. Trump Tweet 11/14/2020); GA 944-945 (Donald J. Trump Tweet 01/06/2021); GA 881-882 (Donald J. Trump Tweet 12/22/2020); GA 884-885 (Donald J. Trump Tweet 12/23/2020); GA 905-906 (Donald J. Trump Tweet 01/01/2021); GA 938-939 (Donald J. Trump Tweet 01/05/2021).

not differentiate between his official and Campaign duties and when he would send Tweets on the account for Campaign purposes as a Campaign volunteer.[603]

A review of the defendant's official @POTUS45 account presents a relevant contrast. The defendant used this institutional account primarily to re-tweet other accounts like the @realDonaldTrump account, as well as @WhiteHouse. There were 74 Tweets from the @POTUS45 account during the charged conspiracies.[604] None of them include the defendant's election-related claims or his election challenges.[605] The last four Tweets in the account, which the Government cites here to show context, were re-Tweets of Tweets from @realDonaldTrump regarding January 6.[606] These include two Tweets that the defendant issued on the afternoon of January 6 purportedly asking individuals to support law enforcement and "stay" peaceful; notably, the @POTUS45 account archive does not include the defendant's Twitter pressure campaign against Pence, such as the 2:24 p.m. Tweet on January 6.[607]

Below, the Government analyzes the "content, form, and context," *id.* at 2340, of various categories of the defendant's Tweets. All of these categories consist of unofficial Tweets.

---

[603] GA 526-532 (███████████████).

[604] GA 1899 (Spreadsheet of @POTUS45 Tweets).

[605] *Id.* (Spreadsheet of @POTUS45 Tweets).

[606] *Id.* (Spreadsheet of @POTUS45 Tweets). The four re-Tweets are: on January 5, "Antifa is a Terrorist Organization, stay out of Washington. Law enforcement is watching you very closely! @DeptofDefense @TheJusticeDept @DHSgov @DHS_Wolf @SecBernhardt @SecretService @FBI"; on January 6, "Please support our Capitol Police and Law Enforcement. They are truly on the side of our Country. Stay Peaceful" and "I am asking for everyone at the U.S. Capitol to remain peaceful. No violence! Remember, WE are the Party of Law & Order – respect the Law and our great men and women in Blue. Thank you!"; and on January 7, a link to a speech the defendant gave on that date about the events of the previous day.

[607] *Compare id.* (Spreadsheet of @POTUS45 Tweets) *with* GA 946-947 (Donald J. Trump Tweet 01/06/2021).

###### i.  Tweets, as candidate, casting doubt on election integrity

As described in Section I, the defendant attempted to discourage mail-in voting and undermine confidence in the election results to prepare to declare victory even if he lost.  *See, e.g.*, *supra* p. 6.  Just as his public statements casting doubt on the election were unofficial, so too were the analogous Tweets that the defendant posted in his capacity as a candidate.  The context of these Tweets confirms this conclusion.  The defendant issued the Tweets in advance of election day, in the midst of his campaign for re-election; furthermore, he made them while his own Campaign advisors were warning him that Biden supporters were much more likely to use mail-in voting, the very method the defendant attempted to discourage.  In addition, the Tweets' content further reinforces their private nature; they show the defendant taking a partisan electioneering position on an issue rather than proposing any official measures to address a problem that the defendant claimed existed.

###### ii.  Tweets making false claims of election fraud

The superseding indictment alleges that the defendant repeated and widely disseminated false claims of election fraud.  *See, e.g.*, Superseding Indictment, ECF No. 226 ¶¶ 12, 14.  One of the ways that he did so was by Tweet, constantly, day in and day out.  Examples of the kinds of Tweets that the Government intends to use at trial are set forth throughout Section I, in which the defendant falsely claimed victory and outcome-determinative election fraud in targeted states.  *See, e.g.*, *supra* pp. 22-23, 32, 45, 55-56, 62-63.

These kinds of Tweets all shared common internal characteristics that establish their unofficial nature.  The defendant used the language of a candidate when he spoke in terms of his personal electoral victory ("I win!" or "We win!").[608]  He divided his audience between personal

---

[608] *See, e.g.*, GA 772-773 (Donald J. Trump Tweet 11/05/2020); GA 774-775 (Donald J. Trump

allies who supported his election challenges and enemies who did not, dismissing the latter as "RINOs" (shorthand for Republicans in Name Only) or "the Democrats."[609] And he focused only on fraud claims that would affect his own election and was fixated on his own margin of victory ("far more votes than are necessary to win").[610]

### iii. Tweets and re-Tweets attacking those speaking the truth about the election

On multiple occasions, the defendant issued a Tweet, or re-tweeted an agent's Tweet, in order to attack individuals who had spoken out publicly to defend the integrity of the 2020 presidential election and reassure the public that there had not been outcome-determinative fraud. These instances include: on November 11, the defendant attacked Philadelphia City Commissioner P47 after he dispelled fraud claims in a television interview that the defendant saw;[611] on November 29, the defendant issued a Tweet attacking P50 when he appeared on *60 Minutes*;[612] on December 6, the defendant re-tweeted a post by his agent, P19 attacking Arizona House Speaker P18 for a public announcement that the defendant had not presented Arizona legislators with any evidence of outcome-determinative fraud and that the Arizona legislature could not overturn election results based on unsupported theories of fraud;[613] again on December 6, the defendant re-tweeted a post by his agent, P48 labeling four Republican state legislators

---

Tweet 11/06/2020); GA 797-798 (Donald J. Trump Tweet 11/18/2020); GA 850-851 (Donald J. Trump Tweet 12/05/2020).

[609] *See, e.g.*, GA 777-778 (Donald J. Trump Tweet 11/11/2020); GA 860-861 (Donald J. Trump Tweet 12/07/2020); GA 782-783 (Donald J. Trump Tweet 11/13/2020); GA 795-796 (Donald J. Trump Tweet 11/17/2020); GA 881-882 (Donald J. Trump Tweet 12/22/2020).

[610] GA 909-910 (Donald J. Trump Tweet 01/01/2021); GA 911-912 (Donald J. Trump Tweet 01/01/2021).

[611] GA 1953 at 2:20–4:13 (Video of Interview with CNN 11/11/2020); GA 777-778 (Donald J. Trump Tweet 11/11/2020).

[612] GA 825-826 (Donald J. Trump Tweet 11/29/2020).

[613] GA 854-855 (Donald J. Trump Tweet 12/06/2020).

"cowards" after they issued a public announcement that they could not overturn the popular vote and appoint their own electors;[614] and on December 21, the defendant attacked Wisconsin Supreme Court Justice ▇▇P49▇▇ for ruling against him.[615]

    (a) ▇▇P47▇▇ **(Superseding Indictment, ECF No. 226 ¶ 41;** *supra* **p. 38)**

After ▇▇P47▇▇ then a Philadelphia City Commissioner, gave a television interview on November 11 and made clear that he had not seen evidence of fraud there, the defendant issued a Tweet attacking ▇▇P47▇▇ in partisan terms. The defendant called ▇▇P47▇▇ a "so called Republican (RINO)" and finished the Tweet with "We win!"[616] In so doing, the defendant was acting as a candidate frustrated that a member of his political party refused to perpetuate the lies the defendant was promoting to advance his personal political interests.

    (b) ▇▇P50▇▇ (*supra* pp. 45)

On November 29, when *60 Minutes* aired an interview with ▇▇P50▇▇ formerly the CISA director, defending the integrity of the election, the defendant tweeted an attack on the television program and ▇▇▇C3▇▇▇ and claimed that the 2020 election was "probably our least secure EVER!"[617] These complaints about ▇▇C3▇▇ and mail-in ballots echoed others which the defendant was making regularly as a candidate only in states in which he had lost the election.[618] He also issued the Tweet between two other Tweets in which he was speaking as a candidate. Thirty minutes before the ▇▇P50▇▇ Tweet, the defendant used his @realDonaldTrump account to discuss Campaign litigation—specifically, he wrote, "We have some big things

---

[614] GA 856, 858 (Donald J. Trump Tweet 12/06/2020).

[615] GA 875-880 (Donald J. Trump Tweets 12/21/2021).

[616] GA 777-778 (Donald J. Trump Tweet 11/11/2020).

[617] GA 825-826 (Donald J. Trump Tweet 11/29/2020).

[618] *See, e.g.*, GA 867-872 (Donald J. Trump Tweets 12/13/2020).

happening in our various litigations on the Election Hoax.  Everybody knows it was Rigged.  They

know Biden didn't get more votes from the Black community than Obama, & certainly didn't get

80,000,000 votes.  Look what happened in Detroit, Philadelphia, plus!"[619]  And within twenty

minutes of the **P50** Tweet, the defendant issued another Tweet about *60 Minutes*, this time asking

whether the "Fake News" program was paying attention to a Tweet that the defendant then linked

to by **P68** then a private citizen—who in turn was publicizing what he characterized

as a Campaign litigation victory on the defendant's behalf by co-conspirator **CC3** in litigation

in Georgia.[620]

     The defendant's Tweet regarding *60 Minutes* and **P50** was unofficial.  The Campaign

litigation-focused Tweets surrounding it demonstrate that the "us" whom the defendant claims *60*

*Minutes* never consulted was the defendant's Campaign, not his Administration.

     (c)  **P18** **and Pennsylvania legislators (Superseding**
          **Indictment, ECF No. 226 ¶¶ 21, 43; *supra* pp. 20, 40)**

     In the early morning hours on December 6, upon returning from a Campaign speech in

Valdosta, Georgia, the defendant re-tweeted a December 4 Tweet from **P19** who was working

with the Campaign and **CC6** to overturn the election results[621]—attacking Arizona House

Speaker **P18** after **P18** released a public statement that he had not seen evidence of election

fraud and could not take action to overturn the election results in Arizona.[622]  Just four minutes

---

[619] GA 823-824 (Donald J. Trump Tweet 11/29/2020).

[620] GA 827-828 (Donald J. Trump Tweet 11/29/2020).  A week later, the court dismissed the lawsuit, stating that the plaintiffs "essentially ask the Court for perhaps the most extraordinary relief ever sought in any Federal Court in connection with an election.  They want this Court to substitute its judgment for that of two-and-a-half million Georgia voters who voted for Joe Biden, and this I am unwilling to do."  *Pearson v. Kemp*, 1:20-cv-4809, ECF No. 79 at 43 (N.D. Ga.) (Tr. of 12/7/2020 Hrg.).

[621] *See generally, e.g.*, GA 1848-1850 ( ).

[622] GA 854-855 (Donald J. Trump Tweet 12/06/2020).

earlier, the defendant had written "Thank you ███P19███ !"[623] while re-tweeting another of ███P19███

Tweets that read, "President Trump is back on the campaign trail today!!!  America is the best

country on earth and @realDonaldTrump is the greatest President!"[624]

On the same day, December 6, the defendant also re-tweeted a Tweet by ███P48███ an agent

of the defendant who was working closely with ███CC1███ [625]  ███P48███  Tweet attacked four

Pennsylvania legislators who, like ███P18███ had issued a public statement that they could not

overturn the valid election results.  The defendant re-tweeted ███P48███ post without comment.[626]

Both of the defendant's re-tweets on December 6 were unofficial.  At the time, both ███P19███

and ███P48███ were, at a minimum, private agents of the defendant who were working to overturn the

election results in his favor.  ███P19███ and ███P48███  original Tweets were in service of that objective—

they were attempting to pressure state officials to take extralegal actions to replace their states'

duly-ascertained electors with the defendant's fraudulent ones.  The defendant's re-posting of these

private Tweets was similarly private.

> **(d)** ███████P49███████ **(Superseding Indictment, ECF No. 226 ¶ 46; *supra* p. 41)**

On December 21, when Wisconsin's Governor signed a certificate of final determination

confirming that Biden had won the state based on the resolution by the Wisconsin Supreme Court

of a lawsuit in Biden's favor, the defendant took to Twitter to attack Justice ███P49███ who had

written the majority opinion that ruled against him.[627]  The defendant claimed—falsely—that he

---

[623] GA 852-853 (Donald J. Trump Tweet 12/06/2020).

[624] *Id.* (Donald J. Trump Tweet 12/06/2020).

[625] GA 856, 858 (Donald J. Trump Tweet 12/06/2020).  *See, e.g.*, GA 1851-1852 (███████████ ██████).

[626] GA 856, 858 (Donald J. Trump Tweet 12/06/2020).

[627] GA 1233-1235 (Wisconsin Certificate of Ascertainment 11/30/2020 and Certificate of Final Determination 12/21/2020; *Trump v. Biden*, 394 Wis. 2d 629 (Wis. 2020); GA 875-880 (Donald

had endorsed ███P49███ in his election for the Wisconsin Supreme Court, and implied that the

endorsement had caused ███P49███ to win.[628]   The defendant then encouraged "Republicans in

Wisconsin" to go "to their State Legislators and overturn this ridiculous State Election.  We won

in a LANDSLIDE!"[629]  The entire context of the defendant's Tweet about ███P49███—including

his fictitious endorsement of ███P49███ his encouragement of Wisconsin Republicans to lobby

their legislators, and his claim at the end that "We won"—demonstrates that the Tweet as a whole

was partisan, personal, and unofficial.

**(e) Governor** ██P16██ **Governor** ███P17███ **and Secretary of**
**State** ██████P33██████ **(*supra* pp. 18, 26-31)**

     Throughout the post-election period, the defendant used his status and power as the head

of a political party to bring political pressure to bear on fellow Republicans, including Arizona

Governor ██P16██ Georgia Governor ██P17██ and Georgia Secretary of State ████P33████  In the

Tweets, the defendant assailed the three elected officials because they refused to take extralegal

actions to benefit him personally, suggested that they would suffer politically if they did not do as

he asked, and repeatedly suggested that they were "RINOs" and not real Republicans.   The

defendant launched these public attacks both as "a candidate for office" and as "a party leader,"

*Trump*, 144 S. Ct. at 2340, and they were thus unofficial.

---

J. Trump Tweets 12/21/2020).

[628] *Id.* (Donald J. Trump Tweets 12/21/2020); GA 187-188 (████████████████).
Although the defendant did not endorse Justice ████P49████ as he claimed, he did endorse a
congressional candidate with the surname ████P49████ from another midwestern state.  *See*
https://x.com/realDonaldTrump/status/1292879824210595842.

[629] GA 877, 880 (Donald J. Trump Tweet 12/21/2020).

iv. **Tweets exhorting individuals to travel to Washington, D.C., for the Save America Rally (Superseding Indictment, ECF No. 226 ¶¶ 68, 72, 79(b); *supra* pp. 60, 64, 71-73)**

Beginning on December 19, and continuing through early January, the defendant used the @realDonaldTrump account to promote the private, campaign-style Ellipse rally at which he spoke on the morning of January 6. Indeed, some of the defendant's Tweets from this account were re-tweeted and amplified by the defendant's Campaign Twitter account.[630] The defendant's multiple Tweets on this topic[631] included his initial message that there would be a "[b]ig protest in D.C. on January 6th. Be there, will be wild!"[632] In turn, that Tweet linked to a document drafted by ▇ P69 ▇ ▇ that had nothing to do with ▇ P69 ▇ official duties as a White House trade advisor, but rather constituted unofficial political activity by a Campaign volunteer who the Office of Special Counsel already had determined to have violated the Hatch Act on numerous occasions by attacking the defendant's opponent during the lead up to the 2020 presidential election.[633] For the reasons described *supra* pp. 118-126 that make clear that the Ellipse rally was a private event, and the defendant's remarks there unofficial, his Tweets as a candidate promoting the event were unofficial.

---

[630] *See, e.g.*, GA 896 (Team Trump Retweet of Donald J. Trump Tweet 12/26/2020); GA 901 (Team Trump Retweet of Donald J. Trump Tweet 12/30/2020); GA 902 (Team Trump Retweet of Donald J. Trump Tweet 12/30/2020); GA 534 (▇▇▇▇▇▇▇▇▇▇).

[631] GA 886-887 (Donald J. Trump Tweet 12/26/2020); GA 897-898 (Donald J. Trump Tweet 12/27/2020); GA 899-900 (Donald J. Trump Tweet 12/30/2020); GA 903-904 (Donald J. Trump Tweet 01/01/2021); GA 905-906 (Donald J. Trump Tweet 01/01/2021); GA 913-914, 1891 (Donald J. Trump Tweet 01/01/2021); GA 921-922 (Donald J. Trump Tweet 01/03/2021); GA 923-924 (Donald J. Trump Tweet 01/03/2021); GA 928-929 (Donald J. Trump Tweet 01/04/2021); GA 932-933 (Donald J. Trump Tweet 01/05/2021); GA 938-939 (Donald J. Trump Tweet 01/05/2021).

[632] GA 873-874 (Donald J. Trump Tweet 12/19/2020).

[633] *Id.* (Donald J. Trump Tweet 12/19/2020); GA 1853-1865 (Report of Prohibited Political Activity Under the Hatch Act 11/18/2020).

v.   **Tweets regarding Pence's role on January 6 (Superseding Indictment, ECF No. 226 ¶¶ 69, 79(a), 82; *supra* pp. 61, 71-73)**

As the defendant set his sights on using Pence's role as President of the Senate to overturn the election results at the January 6 certification proceeding, concurrent with his direct efforts to pressure Pence, the defendant began to issue Tweets falsely claiming that Pence could use his ministerial position to benefit the defendant as a candidate.  For instance, on December 23, the defendant re-tweeted a Tweet by a Campaign surrogate named ▮ P70 ▮ who had posted a facially fake White House memorandum titled "Operation 'PENCE' CARD," which falsely claimed that Pence could unilaterally disqualify legitimate electors.[634]  The defendant issued similar Tweets as the certification grew closer, including posting on January 5 that "[t]he Vice President has the power to reject fraudulently chosen electors."[635]  And twice on the morning of January 6, before his speech at the Ellipse rally, the defendant tweeted again about Pence.  First, at 1:00 a.m., the defendant wrote, "[i]f Vice President @Mike_Pence comes through for us, we will win the Presidency.  Many States want to decertify the mistake they made in certifying incorrect & even fraudulent numbers in a process NOT approved by their State Legislatures (which it must be).  Mike can send it back!"[636]  He again focused on Pence's role in the certification at 8:17 a.m. when he wrote, "States want to correct their votes, which they now know were based on irregularities and fraud, plus corrupt process never received legislative approval.  All Mike Pence has to do is send them back to the States, AND WE WIN.  Do it Mike, this is a time for extreme courage!"[637]

---

[634] GA 883 (Donald J. Trump Tweet 12/23/2020); GA 449 (▮▮▮▮▮▮▮▮▮▮); GA 1022-1023 (Pence, *So Help Me God* p. 439-40); *see also* GA 1524-1527 (▮▮▮▮▮▮▮▮).

[635] GA 934-395 (Donald J. Trump Tweet 01/05/2021).

[636] GA 940-941 (Donald J. Trump Tweet 01/06/2021).

[637] GA 942-943 (Donald J. Trump Tweet 01/06/2021).

The context and content of these Tweets establish that they were unofficial.  Through the Tweets, the defendant was using the political pressure of his supporters and social media followers to convince Pence to take an action to benefit the defendant as a candidate and help him overturn the results of the election.  As discussed *supra* pp. 91-96, the defendant played no official role in the congressional certification proceeding and was not using his Tweets about Pence's role to advance any Executive Branch or governmental interest.  Likewise, the defendant had no role in whether state legislatures might take action regarding their own electoral slates (though his claim that these legislatures were poised to do so was also false).  And the defendant's language throughout the Tweets is that of a candidate seeking to win an election, including stating to his political supporters that if Pence "comes through for us, we will win the Presidency" and "All Mike Pence has to do is send them back to the States, AND WE WIN."[638]

The private and Campaign nature of the Tweets is further confirmed when viewed in the context of the defendant's increasing desperation as even his unlawful path to remain in power narrowed.  When the defendant re-tweeted the "Operation Pence Card" Tweet on December 23, the defendant knew that he had lost the legitimate electoral college vote and had begun summoning supporters to Washington for the Ellipse rally on January 6.[639]  When he tweeted on January 5 that Pence had the power to reject fraudulent electors, Pence already had "told him many times" that Pence did not believe he had such power—including as recently as the day before.[640]  And in the early morning hours of January 6, when the defendant again tweeted publicly that Pence should exceed his authority as President of the Senate when counting electoral votes, the defendant's

---

[638] *Id.*; GA 940-941 (Donald J. Trump Tweet 01/06/2021).

[639] GA 873-874 (Donald J. Trump Tweet 12/19/2020).

[640] GA 457-460 ( ███████████████ ).

personal desperation was at its zenith: he was only hours from the certification proceeding that spelled the end.

### vi. The defendant's 2:24 p.m. Tweet on January 6 (Superseding Indictment, ECF No. 226 ¶ 94; *supra* pp. 80-81)

The defendant's 2:24 p.m. Tweet aimed at Vice President Pence was unofficial. The defendant personally posted the Tweet on the afternoon of January 6 at a point when he already understood that the Capitol had been breached, writing: "Mike Pence didn't have the courage to do what should have been done to protect our Country and our Constitution, giving States a chance to certify a corrected set of facts, not the fraudulent or inaccurate ones which they were asked to previously certify. USA demands the truth!"[641]

The defendant's actions and knowledge in the hours leading up to this Tweet provide helpful context. First, the evening before, on January 5, the defendant had dictated a Tweet to P45 as he listened to the angry crowd gathered outside the White House.[642] That Tweet shows that the defendant understood that his gathering supporters, who were angry and believed his false claims that the election had been stolen, were a powder keg. At 5:05 p.m., he tweeted: "Washington is being inundated with people who don't want to see an election victory stolen by emboldened Radical Left Democrats. Our Country has had enough, they won't take it anymore! We hear you (and love you) from the Oval Office. MAKE AMERICA GREAT AGAIN!"[643]

Thereafter, the defendant continued to fixate on preventing the certification proceeding. As described above, he tweeted about it at 1:00 a.m. on January 6 and again at 8:17 a.m.[644] After

---

[641] GA 946-947 (Donald J. Trump Tweet 01/06/2021).

[642] GA 535-538 (                              ).

[643] GA 936-937 (Donald J. Trump Tweet 01/05/2021).

[644] GA 940-941 (Donald J. Trump Tweet 01/06/2021); GA 942-943 (Donald J. Trump Tweet 01/06/2021).

the 8:17 a.m. Tweet, the defendant worked on his remarks for the Ellipse and planned to include language explicitly putting pressure on Pence regarding the certification until advisors prevailed on him not to.[645]  At 11:15 a.m., the defendant called Pence and tried one last-ditch effort to convince him to fraudulently reject or return Biden's legitimate electors.[646]  Pence was resolute and unmoved, and the defendant was furious.[647]  Immediately after the call, the defendant directed that the original language targeting Pence be reinserted in his prepared remarks for the Ellipse rally.[648]

The defendant then went to the Ellipse and delivered a falsehood-laden speech to his angry supporters.  He purposely singled out Pence by claiming that Pence had the power to overturn the election results and—though the defendant stood at the podium with full knowledge that Pence would not do so—gave the crowd false hope that Pence might exercise that power.[649]  The defendant told the crowd to act, stating, we "can't let it happen" and then directed his supporters, who were angry and motivated by his speech, to march to the Capitol.[650]

Instead of marching with his supporters as he said he would, the defendant returned to the White House.[651]  He went to the dining room next to the Oval Office and began to watch television coverage of the events at the Capitol.[652]  Although the Government does not intend to use at trial

---

[645] GA 1680 (⬛⬛⬛⬛⬛⬛⬛⬛⬛⬛⬛⬛⬛⬛⬛⬛⬛); GA 638-642 (⬛⬛⬛⬛⬛⬛⬛⬛⬛⬛⬛⬛⬛⬛⬛⬛).

[646] GA 471-472 (⬛⬛⬛⬛⬛⬛⬛⬛⬛⬛); GA 1668-166 (⬛⬛⬛⬛⬛⬛⬛⬛⬛⬛⬛⬛).

[647] GA  471-472  (⬛⬛⬛⬛⬛⬛⬛⬛);  GA  1668-1669  (⬛⬛⬛⬛⬛⬛⬛⬛); GA 225-230 (⬛⬛⬛⬛⬛⬛⬛⬛).

[648] GA 1681 (⬛⬛⬛⬛⬛⬛⬛⬛⬛⬛⬛); GA 405-406 (⬛⬛⬛⬛⬛⬛⬛⬛⬛⬛⬛); GA 1670-1679 (⬛⬛⬛⬛⬛⬛⬛⬛⬛⬛⬛⬛).

[649] See GA 1114-1141 (Ellipse Rally Speech Draft Tr. 01/06/2021).

[650] See GA 1140-1141 (Ellipse Rally Speech Draft Tr. 01/06/2021).

[651] GA  1866  (⬛⬛⬛⬛⬛⬛⬛⬛⬛⬛⬛⬛); GA  168  (⬛⬛⬛⬛⬛⬛⬛⬛⬛⬛⬛).

[652] GA 541-544 (⬛⬛⬛⬛⬛⬛⬛⬛); GA 232, GA 236 (⬛⬛⬛⬛⬛⬛⬛⬛⬛⬛).

evidence of the defendant's discussions with White House staff during this time period, it provides necessary context: when news broke that rioters had breached the Capitol, the defendant's advisors—including ██P59██ Deputy White House Counsel ██P71██ and ██P9██ urged the defendant to issue a calming message and make efforts to stop the riot.[653] The defendant refused, responding that the people at the Capitol were angry because the election had been stolen.[654] Eventually, all of the defendant's staffers left him alone in the dining room.[655] Fox News continued to report on the growing crisis at the Capitol.[656]

It was at that point—alone, watching news in real time, and with knowledge that rioters had breached the Capitol building—that the defendant issued the 2:24 p.m. Tweet attacking Pence for refusing the defendant's entreaties to join the conspiracy and help overturn the results of the election.[657] One minute later, the Secret Service was forced to evacuate Pence to a secure location in the Capitol.[658] This was roughly ninety minutes after Pence had announced publicly that he would not act unlawfully to overturn the election;[659] the certification proceeding was underway;[660] and the first breach of the Capitol building had occurred minutes before, at 2:12 p.m.[661] At that

---

[653] GA 479 (████████████████) (advisors told the defendant that "[t]here's a riot, and there are people inside the Capitol Building"); GA 122 (████████████████) (recalling telling the defendant "that someone's gotten into the Capitol"); GA 232-234 (████████████████ ████████); GA 168-169 (████████████████████).

[654] GA 547-548 (████████████████); GA 232-234 (████████████████); GA 123 (████████████).

[655] GA 546 (████████████).

[656] GA 1931 (Video of Fox News Coverage 01/06/2021).

[657] GA 546 (████████████); GA 946-947 (Donald J. Trump Tweet 01/06/2021).

[658] GA 473-474 (████████████████); GA 1944 (Video of Pence Evacuation 01/06/2021).

[659] GA 1684-1686 (Pence Dear Colleague Letter 01/06/2021); GA 1867-1868 (████████████████████).

[660] GA 1937 (Video of House Floor 01/06/2021); GA 1954 (Video of Senate Floor 01/06/2021).

[661] GA 1957 at 00:40–1:25 (Video of Senate Wing Door CCTV 01/06/2021); GA 1909 at 00:15–1:10 (Video of Capitol Riot 01/06/2021).

point, the defendant's only hope to disrupt the certification proceeding and retain power was through his angry supporters. The defendant further revealed the private nature of his desperate conduct as a candidate, rather than a President, in an exchange (that the Government does not plan to use at trial) he had with aide ███ shortly after the 2:24 p.m. Tweet. Upon receiving a phone call alerting him that Pence had been taken to a secure location, ███ rushed to the dining room to inform the defendant in hopes that the defendant would take action to ensure Pence's safety. Instead, after ███ delivered the news, the defendant looked at him and said only, "So what?"[662]

The private, unofficial nature of the 2:24 p.m. Tweet contrasts with two other Tweets the defendant sent during the following hour and a video message he sent two hours later, and which the Government does not intend to introduce at trial. Only after advisors had again urged the defendant to calm matters at the Capitol,[663] the defendant at 2:38 p.m. posted, "Please support our Capitol Police and Law Enforcement. They are truly on the side of our Country. Stay peaceful!"[664] As the violence at the Capitol nonetheless escalated, the defendant at 3:13 p.m. posted, "I am asking for everyone at the U.S. Capitol to remain peaceful. No violence! Remember, WE are the Party of Law & Order—respect the Law and our great men and women in Blue. Thank you!"[665] And after those Tweets failed to disperse the rioters, and after still more demands from his staff

---

[662] GA 310-317 (████████████████).

[663] GA 124-125 (████████████████████) ("both ███ P71 ███ and I went down and told him you got to tell people get out of the Capitol, the people who were breaching the Capitol"); GA 232 (██████████████) ("And I said, we need to tell everyone to get the fuck out of the Capitol, right now."); GA 237 (████████████████) ( ███ P71 ███ and ███ P59 ███ "argued . . . to the president, you have to tell people to get out, right now, as well. ███ P71 ███ for the first time I'd ever heard him raise his voice, yelled at the president. . . He said, you need to tell them now; you're destroying your legacy; you're destroying everything anyone's ever worked for; you've got to tell these people to get out of the Capitol, immediately."); GA 480 (██████████████████) ("I think we were probably, at that point, encouraging the President that he needed to come out and say something, he needed to condemn this and say something about it.").

[664] GA 948-949 (Donald J. Trump Tweet 01/06/2021).

[665] GA 950-951 (Donald J. Trump Tweet 01/06/2021).

that he do more to stop the riot, the defendant at 4:17 p.m. tweeted a video message in which he finally asked those at the Capitol—whom he described as "very special" people that he "love[d]"—to leave the Capitol, while also claiming that "[w]e had an election that was stolen from us."[666] He sent a Tweet at 6:01 p.m. that conveyed a similar sentiment: "These are the things and events that happen when a sacred landslide election victory is so unceremoniously & viciously stripped away from great patriots who have been badly & unfairly treated for so long.  Go home with love & in peace.  Remember this day forever!"[667]

The defendant at least has an argument—though he issued the 2:38 p.m. and 3:13 p.m. Tweets only after being harangued by his staff while he adamantly refused to do anything at all—that he was addressing a matter of public safety as President (the riot at the Capitol).  Likewise, in the 4:17 p.m. message, the defendant, while still focused on his election loss, asked rioters to evacuate the breached Capitol, and foreshadowed the sentiment in his 6:01 p.m. Tweet when he said to "[g]o home with love & in peace."[668]  By contrast, in the 2:24 p.m. Tweet, the defendant focused solely on the Vice President's role in the certification of the presidential election results—a matter of intense personal concern to the defendant as a candidate for office.  Even assuming that topic constituted a "matter[] of public concern," *Blassingame*, 87 F.4th at 14, the defendant's 2:24

---

[666] GA 1952 (Video of Rose Garden Speech 01/06/2021); GA 1868 (Rose Garden Speech Draft Tr. 01/06/2021).

[667] GA 952-953 (Donald J. Trump Tweet 01/06/2021).

[668] There are, however, strong arguments that all of these Tweets were unofficial.  For example, in some of them, the defendant misleadingly suggested that the already-violent crowd should "[s]tay" or "remain" "peaceful" while failing to urge or direct those unlawfully at the Capitol to leave, as his advisors had urged him to do.  He also used the messages to recognize the rioters at the Capitol as his own supporters, calling them "WE" and telling them that they were "very special" and that he loved them.  And even as early as the afternoon of January 6, when violence still raged at the Capitol, the defendant justified and revered the rioters' lawless actions on his behalf when he tweeted that "[t]hese are the things and events that happen" and to "[r]emember this day forever!"

p.m. Tweet reflected speech made "in an unofficial, private capacity as office-seeker, not an official capacity as office-holder." *Id.* at 5.

Given all of this context, the 2:24 p.m. Tweet was unofficial. When the defendant sent it, he knew that what he had asked Pence to do, and that he claimed would "protect our Country and our Constitution," was contrary to the ECA; that no state was poised to "certify a corrected set of facts;" that a large crowd of his political supporters had gathered in Washington at his urging; that these supporters were angry and believed his false claims that the election had been stolen; that he had called them to action through his Ellipse speech, in which he told them that Pence might still do as he wished and directed these supporters to march to the Capitol; and that his supporters had done so and had breached the Capitol building.

The defendant also knew what his advisors were forcefully urging him to do as President: issue a message to quell the emergency at the Capitol. Instead, the defendant refused repeatedly until his advisors gave up and left him alone in the dining room. It was then that the defendant issued the 2:24 p.m. Tweet, as a candidate communicating to his angry supporters that Pence had let him—and them—down. The content of the 2:24 p.m. Tweet was not a message sent to address a matter of public concern and ease unrest; it was the message of an angry candidate upon the realization that he would lose power. And unlike the defendant's later Tweets that day, the defendant was not asking the individuals at the Capitol to "remain peaceful," leave the building, or "go home."

### c. Other public statements

By virtue of his status as a candidate for re-election, the defendant occasionally made public statements—whether in response to questions or otherwise. Examples of such statements set forth in Section I are the defendant's statements in advance of the election to seed public doubt in the outcome (*supra* p. 6), the defendant's televised election night remarks to his supporters

(*supra* pp. 7-8), and the defendant's telephonic endorsement of CC1 false allegations at the Gettysburg "hotel hearing" (*supra* p. 39).

Each of the defendant's cited public statements was made in his capacity as a candidate. His pre-election statements, for instance, were made in contexts like the Republican National Convention or in the midst of statements about political polling.[669]  His election night remarks were made to a room of his supporters and were about his status as a candidate in the pending election.[670]  And his contribution to the Gettysburg "hotel hearing" was to call in by dialing one of his private attorneys, who broadcast his personal message by holding her phone to the microphone so that he could make statements supporting those of his private attorneys.[671]  In sum, the defendant made all of these comments as a candidate for office, and was speaking about his own election.  They were unofficial.

> **2. In the alternative, any official portions of the defendant's public speeches, Tweets, or statements should be excised**

Alternatively, if segregable portions of the speeches, Tweets, or statements are found to be presumptively immune official conduct, the first alternative would be to excise them from the speeches, allowing the Government to rely on the unofficial statements in those speeches.

The D.C. Circuit has long recognized that district courts have "discretionary power to delete objectionable portions" of evidence "where appropriate," *United States v. Lemonakis*, 485 F.2d 941, 949 (D.C. Cir. 1973), and the Supreme Court has approved of that practice in the context of statements that contain protected legislative acts along with unprotected acts under the Constitution's Speech or Debate Clause, *see United States v. Helstoski*, 442 U.S. 477, 488 n.7

---

[669] GA 1951 at 22:08–22:18 (Video of RNC Speech 08/24/2020); GA 1927 at 2:50–3:28 (Video of Donald J. Trump Statement 10/27/2020).

[670] GA 1974 (Video of White House Speech 11/04/2020).

[671] GA 1945 at 2:06:23–2:07:23 (Video of Pennsylvania Hotel Hearing 11/25/2020).

(1979) (approving practice of "excising references to legislative acts, so that the remainder of the evidence would be admissible"); *see also Gov't of Virgin Islands v. Lee,* 775 F.2d 514, 523 (3d Cir. 1985) ("even where a conversation includes a discussion of both legislative acts and non-legislative acts, the conversation can be examined and the immunized aspects of the conversation deleted").  This is a familiar practice across a range of legal contexts.  *See, e.g.*, *Samia v. United States*, 599 U.S. 635, 653 (2023) (upholding use of a redacted statement to avoid constitutional concerns); *Davis v. Washington*, 547 U.S. 813, 829 (2006) ("Through *in limine* procedure, [trial courts] should redact or exclude the portions of any statement that have become testimonial, as they do, for example, with unduly prejudicial portions of otherwise admissible evidence."); *In re Rail Freight Fuel Surcharge Antitrust Litig. - MDL No. 1869*, 34 F.4th 1, 13 (D.C. Cir. 2022) (relying on *Lemonakis*).  Redaction of any statements ultimately found to be immune, while admitting the significant remaining unofficial content, would resolve any constitutional questions under *Trump*.

To the extent that excision does not resolve any arguable immunity claim, then even if the defendant's conduct in these speeches, Tweets, and statements can be nudged across the line from Campaign conduct to official action, it is so heavily intertwined with Campaign-related conduct that prosecuting it does not pose a danger to any Executive Branch function or authority.  Because the defendant bears the burden in the first instance of proving that conduct was official so as to qualify for presumptive immunity, the Government in its reply brief will address any specific arguments the defense makes regarding the speeches, Tweets, and statements discussed here.

### E. The Defendant's Interactions, in his Capacity as a Candidate, with White House Staff

#### 1. The interactions at issue were unofficial

White House staffers witnessed or engaged in private, unofficial communications with the defendant. These staffers included ▮P9▮ the White House Senior Advisor who acted as a conduit between the defendant and the Campaign; ▮P45▮ and ▮P7▮ who both volunteered for the Campaign while working in the White House; ▮P15▮ a staffer who witnessed a pertinent private remark by the defendant; and ▮P42▮ the defendant's executive assistant.

Federal law confirms that the defendant's Campaign-related conversations with these White House staffers were unofficial. The Hatch Act permits certain White House staffers to engage in political activity while on duty, *see* 5 U.S.C. § 7324(a)(1), but prohibits them from using their "official authority or influence for the purpose of interfering with or affecting the result of an election," 5 U.S.C. § 7323(a)(1). These staffers can thus wear two hats. They can work in their private capacity to advance the interests of a political candidate, including while on official duty, or they can work in their official capacity to carry out Executive Branch responsibilities—but they may not wear both hats at the same time. Accordingly, when the defendant's White House staff participated in political activity on his behalf as a candidate, they were not exercising their official authority or carrying out official responsibilities. And when the President, acting as a candidate, engaged in Campaign-related activities with these officials or in their presence, he too was not engaging in official presidential conduct.[672]

Precedent from the D.C. Circuit further confirms that the defendant was not engaging in official presidential conduct when he spoke with White House staffers about Campaign matters.

---

[672] Indeed, at least two of the witnesses— ▮P9▮ and ▮P45▮ consulted with the White House Counsel's Office about their ability to engage with the Campaign, demonstrating that they understood their roles with respect to the Campaign were distinct from their White House roles.

In *In re Lindsey*, 158 F.3d 1263, 1278-79 (D.C. Cir. 1998), the D.C. Circuit recognized that senior White House personnel may serve as the President's agents in a personal capacity to act as a conduit for unofficial information from a private party.  The D.C. Circuit held that while the President's communications with his personal attorney are "fully protected by the absolute attorney-client privilege," *id.* at 1283, a White House lawyer "cannot rely on a government attorney-client privilege to shield evidence from the grand jury," *id.* at 1281.  But a White House lawyer may invoke the President's personal attorney-client privilege when he acts as "an intermediary" to convey unofficial information from the President to his personal attorney.  *Id.*  As the court explained, a President must often "rely on aides" to communicate with personal advisors, such as his personal attorneys, and the involvement of those aides does not alter the personal nature of the underlying communication.  *Id.* at 1281-82.  Similarly in this case, the transmission of a private Campaign communication by or to the defendant through a White House employee serving as an intermediary did not render that communication official and thereby shield it from use in a criminal trial against the defendant.

In sum, just as the President can at times act "in an unofficial capacity"—including as "a candidate for office or party leader," *Trump*, 144 S. Ct. at 2340—so too can the Executive Branch staff around him.  Simply because a staffer holds a title in the Executive Branch and interacts with the President does not mean that the interaction is necessarily official.  *See Blassingame*, 87 F.4th at 14 (noting "the settled understanding that immunity is based on 'the nature of the function performed, not the identity of the actor who performed it.'" (quoting *Clinton*, 520 U.S. at 695)).  When the individuals listed below interacted with the defendant in the circumstances described in Section I, those conversations were unofficial.

      a. ███ P9 ███

From August 2020 through the end of the defendant's administration, ███ P9 ███ was an Assistant to the President without a defined portfolio.[673]   More importantly for the Court's purposes, during the charged conspiracies, ███ P9 ███ served as a conduit of information from the Campaign to the defendant and discussed Campaign matters with the defendant.  These actions were, consistent with *In re Lindsey*, unofficial.

As part of its immunity analysis, the Court should consider multiple different interactions involving ███ P9 ███ none of which bear on his official White House responsibilities: (1) a November 13 phone call in which the defendant told ███ P9 ███ he was going to put ███ CC1 ███ in charge of the Campaign's legal efforts under an agreement where the defendant only would pay if ███ CC1 ███ were successful, and ███ P9 ███ guaranteed the defendant he never would have to pay (*supra* pp. 11-12); (2) a November conversation with the defendant regarding ███ CC3 ███ (*supra* p. 44); (3) an undated conversation in which he told the defendant that ███ CC1 ███ fraud allegations could never be proved in court and the defendant responded, "the details don't matter" (*supra* pp. 12-13); (4) a November or December 2020 conversation in which ███ P9 ███ explained to the defendant why one of his fraud claims was "bullshit" (*supra* p. 13); (5) a late December exchange with the defendant regarding the verification ███ CC2 ███ wanted him to sign in *Trump v. Kemp* (*supra* p. 27); (6) a January 4, 2021, conversation ███ P9 ███ had with ███ CC2 ███ (ECF No. 226 ¶ 77; *supra* p. 66), after which Herschman reported to the defendant that ███ CC2 ███ had admitted his plan was "not going to work" (*supra* p. 66); and (7) a variety of occasions on which ███ P9 ███ reported to the defendant that his Campaign and its hired experts had found various election fraud claims to be unsupported (*supra* p. 12).

---

[673] GA 671 (███████████████████).

Section I also includes actions by [P9] that do not reflect any presidential conduct because the defendant was not involved. These include December 3 text messages that [P9] exchanged with [P21] regarding [CC1] false fraud claims at a Georgia legislative hearing (ECF No. 226 ¶ 26(a); *supra* pp. 21-22), and December 13 text messages [P9] exchanged with Campaign personnel regarding the fraudulent elector scheme (ECF No. 226 ¶ 60; *supra* pp. 52-53).

The content of each of [P9] communications with the defendant enumerated above involve the defendant's Campaign, including the status and viability of the defendant's fraud claims, the quality of the advice the defendant was receiving from his Campaign advisors, his litigation and electoral prospects, and the legality and practicality of [CC2] proposal that Pence reject Biden's legitimate electors at the certification proceeding. None of the communications pertain to general election policy issues or considerations, Justice Department criminal investigations, Executive Branch functions, or any other presidential responsibilities.

As context for all these communications, the Court should consider [P9] relationship with the defendant, his role in the White House, and his interactions with the Campaign. [P9] relationship with the defendant and his family pre-existed his position in the White House, and [P9] represented the defendant in his impeachment trial. [P9] did not have a defined portfolio, and worked on matters related to the Justice Department, including the Portland riots and Section 230 of the Communications Decency Act, as well as Middle East issues and pardons.[674] The Government does not intend to elicit specific information about communications [P9] had with the defendant regarding his official duties.

---

[674] GA 671, 697 (████████████████████); GA 700 (████████████████████).

[P9] was not acting in an official capacity during the conversations enumerated above, but as a conduit for information from the Campaign. [P9] contact with the Campaign began in October 2020, when he asked Campaign staffers [P3] and [P72] for a tutorial on campaign basics and operations.[675] He continued to talk to [P3] and [P72] leading up to the election to understand different electoral college win/loss scenarios.[676] Shortly thereafter, in early November 2020 [P9] asked [P77], who handled ethics issues in the White House Counsel's Office, for permission to engage with the Campaign, and thereafter [P9] began frequent contact with Campaign staff.[677] Several days after the election, [P9] went to the Campaign headquarters in Virginia for the first time, while [P2] [CC1] [P56] [CC3] [P10] [P48] and [P12] were there too.[678] As discussed *supra* p. 9, on November 7—likely the same day he went to the Campaign headquarters— [P9] joined Campaign staffers, including [P2] [P3] and [P4] at the White House to discuss with the defendant the fact that networks that morning had projected Biden as the winner of the election.[679] The Campaign staff and [P9] told the defendant his chance of victory was slim.[680] [P9] also participated in various Oval Office meetings with the defendant, Pence, White House staff, Campaign officials, and [P39].[681]

The defendant heard and mentioned, to [P9] and others, various fraud allegations throughout the post-election period, sometimes from his outside attorneys like [CC1] or [CC3]

---

[675] GA 671-672 (████████████████).
[676] GA 672-673 (████████████████).
[677] GA 673, 686 (████████████████).
[678] GA 673 (██████████████).
[679] GA 194-195 (████████████).
[680] GA 196-197 (████████████).
[681] *See, e.g.*, GA 683-684 (████████████████).

Consistent with this, **P9** asked **P3** and **P72** if certain fraud allegations were accurate, so that he could challenge information provided to the defendant by people like **CC1** **CC3** and **P12** [682] **P9** also began interacting on a near-daily basis with **P22** a Campaign staffer who **P73** told **P9** he could trust.[683]  The Campaign, in turn, hired two outside firms—**C1** and **C2** to investigate fraud allegations.[684] **P9** told the defendant that people external to the Campaign were hired to look into fraud allegations.[685]

Overall, **P9** served as a conduit of day-to-day information between **P22** and the defendant during the post-election period.  **P22** testified that around the time that **CC1** was named to lead legal efforts, "I was introduced to **P9** . . . and I started predominately reporting to **P9** [686]  He elaborated that **P9** "started to call me more and more.  It would be, you know, once every couple of days that then it was kind of every day for a period of time that I was talking to **P9** [687]  With this information, on a daily basis, **P9** attempted to debunk the false fraud allegations in the White House. For example, after watching **P74** testify in a December 10, 2020, hearing in Georgia, **P9** reached out to **P22** [688]  Through this channel, **P9** learned about **C1** and **C2** uniform findings—that no substantial fraud allegations were supported— essentially in real time.[689]  **P9** also participated in calls with **C1** and had the number

---

[682] GA 673 (⬛); GA 710 (⬛).
[683] GA 704 (⬛); GA 715 (⬛).
[684] GA 715 (⬛).
[685] GA 716 (⬛).
[686] GA 58 (⬛).
[687] GA 59 (⬛).
[688] GA 719 (⬛).
[689] GA 715, 719 (⬛).

of one of its managing directors, ███P75███ in his cell phone; some of those calls occurred at the White House.[690] ███P9███ directly passed the information to the defendant.[691]

███P9███ had other contact regarding initiatives by the Campaign or its outside attorneys. For example, ███P9███ was on a call with the defendant and ███CC2███ on December 9 regarding the defendant's motion, in his capacity as a candidate, to intervene in *Texas v. Pennsylvania*.[692] Separately, ███P9███ spoke to the defendant about the lawsuit, and explained how the legal system worked and that the Campaign—not the Justice Department or FBI—was responsible for filing election challenge lawsuits.[693]

Throughout these conversations, even if ███P9███ could be understood to have been acting in an official capacity—which he was not—rather than a Campaign one, the defendant was himself acting in his private capacity as a candidate. The defendant was asking for ███P9███ view on various strategic decisions he was making regarding his Campaign and his private attorneys, and he was getting reports from ███P9███ on information related to actual and potential election challenges important to his candidacy and private Campaign. All of this context establishes both that ███P9███ wore two hats—one official, one private—and that the defendant interacted with ███P9███ in these conversations as a candidate rather than as President. The interactions between the defendant and ███P9███ that the Government intends to introduce at trial were thus all private.

---

[690] GA 719, 721 (███████████████).
[691] GA 717-718 (███████████████).
[692] GA 713 (███████████████).
[693] GA 687 (███████████████).

**b.** ██ P45 ██

██ P45 ██ served as Assistant to the President and White House Deputy Chief of Staff.[694] He also volunteered his time for Campaign work, including traveling to political rallies with the defendant and posting pictures and videos.[695] The Government will elicit from ██ P45 ██ at trial that he was the only person other than the defendant with the ability to post to the defendant's Twitter account, that he sent tweets only at the defendant's express direction, and that ██ P45 ██ did not send certain specific Tweets, including one at 2:24 p.m. on January 6, 2021.[696] He also will generally describe the defendant's Twitter knowledge and habits, including that the defendant was "very active on his Twitter account," "paid attention to how his tweets played with his followers," "was very engaged in watching the news," and "knew how to read the replies and see all the replies of what people were saying and doing which . . . led to where he would retweet things," and that any Tweet sent "between 5 or 6 a.m. until 9 or 10 a.m." and after "9 or 10 p.m." generally was the defendant personally sending out the Tweet, as opposed to having ██ P45 ██ do it. None of this proposed testimony on ██ P45 ██'s part constitutes evidence of an official act. General information about access to the defendant's Twitter account, as well as ██ P45 ██'s testimony that ██ P45 ██ did or did not issue a particular Tweet, is unrelated to any particular official act by the defendant.

**c.** ██ P7 ██

██ P7 ██ was an Assistant to the President and a volunteer for the Campaign.[697] She will testify about two specific sets of conversations: (1) a handful of conversations in which the defendant, in advance of the election, said that he would simply declare victory (*supra* p. 5); and

---

[694] GA 526 (████████████████).

[695] GA 528-529 (████████████████).

[696] GA 527 (████████████████); GA 545 (████████████████████).

[697] GA 241-244 (████████████████).

(2) an unprompted statement in which the defendant remarked, in a private moment, that **CC3** claims were "crazy" (*supra* p. 44).

Regarding the pre-election conversations, **P7** has testified that COVID's expected effect on the election, and in particular the anticipated phenomenon that the defendant would take an early lead in some states based on the election day vote that would dissipate as mail-in ballots were counted, was discussed among Campaign personnel and dual-hat White House staffers who simultaneously volunteered for the Campaign.[698]  In that context, the defendant told **P7** and others words to the effect of, "We'll just declare victory."[699] Regarding the defendant's statement about **CC3**, **P7** will testify about a November 20 phone call in which the defendant mocked and laughed at **CC3** and called her allegations—that he adopted and amplified—"crazy."[700]

In all of these interactions, the defendant was interacting as a candidate with **P7** not as President.  With respect to his pre-election comments about declaring victory, the context of the conversations indicates that the defendant was responding in real time to information that Campaign staff provided him on private matters.  Similarly, the November 20 conversation among the defendant, **P7** and **P45** regarding **CC3** was also a Campaign conversation.  **P7** and **P45** two staffers who volunteered for the Campaign while working in the White House, were informally discussing with the defendant developments in his Campaign—namely that one of his private attorneys had been a source of public embarrassment.  The defendant then dialed his private attorney, **CC3** and made the comment about her claims with her on the muted phone line.  The defendant was not seeking advice from White House staffers; he was making fun of his private attorney in the presence of Campaign volunteers.

---

[698] GA 246-249 (████████████████).
[699] GA 250-253 (████████████████).
[700] GA 258 (██████████████).

**c.**  ███ P15 ███

███ P15 ███ was an Assistant to the President and Director of Oval Office Operations.[701]  At trial, the Government will elicit from ███ P15 ███ that he witnessed an unprompted comment that the defendant made to his family members in which the defendant suggested that he would fight to remain in power regardless of whether he had won the election.  Specifically, following the 2020 election while aboard Marine One, the defendant told his wife, daughter ███ P14 ███ and son-in-law ███ P13 ███ "It doesn't matter if you won or lost the election.  You still have to fight like hell." *See supra* p. 14-15.[702]  ███ P15 ███ happened to overhear this comment, but was not participating in the conversation.[703]

This statement is plainly private.  It was exclusively about the election and the defendant's determination, as a candidate, to remain in power whether he won or lost.  The defendant made the comment to his family members, who campaigned on his behalf and served as private advisors (in addition to any official role they may have played).  The fact that it was overheard by ███ P15 ███ a White House staffer, does not convert it to an official communication.

**d.**  ███ P42 ███

To a limited extent, the allegations in the superseding indictment and the Government's evidence involve ███ P42 ███ the defendant's executive assistant in the White House.  Section I describes multiple instances in which ███ P42 ███ received emails intended for the defendant or sent emails on the defendant's behalf.  These instances include:  ███ P42 ███ sending to a group of private attorneys, including ███ CC3 ███ an email with the subject "From POTUS" directing the private attorneys to include material critical of ███████ C3 ███████ in private lawsuits (*see supra*

---

[701] GA 307 (████████████); GA 304-305 (███████████).
[702] GA 308 (██████████).
[703] GA 309 (████████████).

pp. 42); ██P42██ receiving from ██CC1██ an email for the defendant providing a copy of the message ██CC1██ had drafted to exert pressure on Michigan Senate Majority Leader ██P37██ (*see supra* p. 34); ██P42██ receiving from ██P39██ the RNC's "Elector Recap" email to put in front of the defendant (*see supra* p. 57); and ██P42██ receiving an email from ██CC2██ on December 23 asking to update the defendant on "overall strategic thinking" on the defendant's status as a candidate (*see supra* p. 61).

None of these actions by ██P42██ in which she was merely facilitating communications between the defendant and his private attorneys or private political allies, constitute the defendant's official conduct. ██P42██ regularly facilitated the defendant's purely private matters, including communications with his children about his Thanksgiving travel.[704]  The defendant's reliance on ██P42██ to pass messages to and from personal advisors, friends, and family does not render the underlying private communications official. *See Lindsey*, 158 F.3d at 1281-82.

### 2. Even if this evidence were deemed official, the Government could rebut any presumption of immunity

Even if an "official" gloss were applied to the defendant's conversations with White House staff pertaining solely to the President's chances as a candidate to successfully challenge the election results, the use of such evidence would not intrude on Executive Branch functions or authority.  "The Office of the Presidency as an institution is agnostic about who will occupy it next." *Blassingame*, 87 F.4th at 4.  Whatever blurring of the lines might exist between candidate conduct and official conduct in conversations that the President may conduct with his immediate

---

[704] GA 1904 at row 1151 (██████████████████) (11/17/2020, "Hi ████! Your dad is going to stay in DC for thanksgiving - just wanted to let you know!" from ██P42██ to ████), row 1765, 1153 (11/16/2020, "Has DJT solidified his Thanksgiving plans" from ██P73██ to ██P42██ she responded, "As of earlier today, FLOTUS wants to stay up here and POTUS is on board, as of now").

- 157 -

staff, introducing evidence of conversations with dual-hat White House staff members—those who function in both a Campaign-related capacity and an official advisory capacity—when they are speaking to the President in his capacity as a candidate or in their Campaign-related capacity does not impede decision-making on matters entrusted to the Executive Branch. The Supreme Court required that its rebuttal analysis focus on Executive Branch authority and functions—not merely on anything that the President might say or do while at the White House. Here, the Executive Branch has no authority or function in the certification of the next President. Accordingly, the use of evidence of White House staffers' Campaign-capacity discussions with the President about how to challenge state election results—challenges brought in his capacity as a candidate—does not risk impairing the constitutional role of the Executive Branch.

### F. Other Evidence of the Defendant's Knowledge and Intent

The Government intends to introduce at trial additional evidence to prove the defendant's knowledge and intent. These include (1) public statements by federal officials that the defendant did not direct be made (specifically, public statements by Attorney General ▉P52▉ and CISA Director ▉P50▉ about the lack of election fraud and foreign interference); (2) evidence that the defendant was reviewing Twitter and watching television throughout the afternoon of January 6; and (3) the defendant's post-Administration statements. None of this evidence will involve testimony from the defendant's Executive Branch staff about his official actions.

#### 1. The evidence at issue was unofficial

##### a. Statements by federal officials

###### i. ▉P52▉ (*supra* p. 46)

In a public statement issued on December 1, 2020, Attorney General ▉P52▉ said that the Department of Justice had not seen evidence of fraud sufficient to change the election results, and

that claims that voting machines had skewed election results were unsubstantiated.[705] `P52` decided to make his statement without informing the defendant in advance.[706]  He prepared the statement because he had been watching the defendant repeat claims of election fraud publicly despite direct knowledge, from `P52` and others, that they were false, and `P52` was growing more and more frustrated by the defendant's actions.[707]  On November 29, `P52` saw the defendant appear on the Maria Bartiromo Show and claim, among other false things, that the Justice Department was "missing in action" and had ignored evidence of fraud.[708]  `P52` decided it was time to speak publicly in contravention of the defendant's false claims, set up a lunch with a reporter for the Associated Press, and made his statement—all without informing or seeking permission from the defendant.  The same day, on behalf of the Campaign, `CC1` and `P12` issued a statement attacking `P52` for his comments.[709]  In the days that followed, `P1` acknowledged and criticized `P52` statement during his podcast, asking rhetorically "is [`P52` reading the same things we're reading?" and prompting guest `CC6` to comment that "the DOJ has not been following up on these leads as far as we know right now.  That statement seemed to be very premature. . . .  [T]here's no way one can look at this election in these states and say that it was done properly."[710]

`P52` statement is not an official act by the defendant.  *Trump* treats only the defendant's own acts as potentially immune, *see, e.g.*, 144 S. Ct. at 2338, consistent with the "justifying purposes of the immunity"—"to ensure that the President can undertake his constitutionally

---

[705] GA 1242-1243 (Email from Comms Alert 12/01/2020).

[706] GA 12-13 (⬛⬛⬛⬛⬛⬛⬛⬛).

[707] GA 8-10 (⬛⬛⬛⬛⬛⬛⬛⬛).

[708] GA 10 (⬛⬛⬛⬛⬛⬛⬛⬛).

[709] GA 1244 (Trump Campaign Press Release 12/01/2020).

[710] GA 1978 at 11:56–12:04, 32:06–33:16 (⬛⬛⬛⬛⬛⬛⬛⬛).

designated functions effectively, free from undue pressures or distortions," *id.* at 2332 (internal quotation marks omitted).  The immunity that the Supreme Court recognized thus does not imply that acts by other government officials can qualify as presidential acts.  More to the point, P52 statement does not reveal any official action by the defendant because P52 did not give his public statement at the defendant's direction or even with his knowledge.  To the contrary, if the defendant had been aware of what P52 intended to do he undoubtedly would have instructed P52 not to make the statement; when the defendant learned of P52 statement, he was so angry that P52 tendered his resignation and, momentarily, the defendant accepted—until P9 and P59 prevailed upon the defendant to calm down and convinced P52 to delay his departure.[711] The Government does not intend to introduce evidence that implies that P52 or his deputies refuted the defendant's fraud claims to him directly; instead, the Government intends to introduce P52 statement and CC1 Campaign response to it, as well as P1 recognition and repetition of P52 statement.

        ii.    P50 (*supra* pp. 42-43)

On November 17, CISA Director P50 tweeted a link to an open letter by 59 election security experts and touted it in an effort to promote public confidence in the election's infrastructure.[712]  This was similar to what P50 had done five days earlier on November 12, when he had publicized the joint statement CISA issued with the National Association of Secretaries of State, the National Association of State Election Directors, and other organizations declaring the 2020 election to be "the most secure in American history" and that there was "no evidence that any voting system deleted or lost votes, changed votes, or was in any way

---

[711] GA 107-113 (                    ); GA 115-119 (                    ).

[712] GA 790 (Tweet 11/17/2020).

compromised."[713]  On November 17, [P50] promoted the expert report on his own initiative and, as he later learned, contrary to the defendant's wishes; the defendant promptly fired [P50] the same day, by Tweet.[714]  The Government does not intend to introduce any evidence about the defendant's removal of [P50]  Rather, as with [P52] public statement, [P50] public Tweets were not official actions by the defendant and thus are not protected by presidential immunity.

### b. The defendant's use of Twitter and television on January 6 (Superseding Indictment, ECF No. 226 ¶ 92; *supra* p. 79)

Forensic evidence from the defendant's iPhone and observations by witnesses otherwise testifying about unofficial acts will establish that upon his return from the Ellipse, throughout the afternoon on January 6, the defendant sat in the dining room by the Oval Office, where he used his phone to review Twitter and watched the television, which was turned on and displaying news coverage of the riot at the Capitol.[715]

As explained in the Government's expert notice, ECF No. 183, an FBI Computer Analysis Response Team forensic examiner can testify as to the news and social media applications downloaded on the defendant's phone,[716] and can describe the activity occurring on the phone throughout the afternoon of January 6.[717]  The phone's activity logs show that the defendant was using his phone, and in particular, using the Twitter application, consistently throughout the day after he returned from the Ellipse speech.[718]

---

[713] GA 779 (Tweet 11/12/2020); GA 1236-1237 (Election Security Joint Statement 11/12/2020).
[714] GA 791-794 (Donald J. Trump Tweet 11/17/2020).
[715] GA 1869-1871 (██████████████████████████████).
[716] GA 1900 (███████████████████████████).
[717] GA 1872-1885 (████████████████████████████).
[718] GA 1902 (███████████████████████████████████
Phone.); ████████████████████████████).

In addition, ███ P9 ███ [719] ███ P15 ███ [720] and ███ P45 ███ each of whom are, as described *supra* pp. 147-154, 156, otherwise expected to testify about the defendant's unofficial acts—will offer the objective observation that during the afternoon of January 6, the television in the defendant's dining room, where he spent the day, was on and tuned into news programs that were covering in real time the ongoing events at the Capitol. In turn, the Government will introduce the authenticated coverage showing what Fox News was playing in real time while the defendant sat in the room with the television on. This evidence is particularly relevant to the defendant's knowledge at the time he issued the 2:24 p.m. Tweet, which, as described above, was unofficial.

None of this evidence involves testimony about an act by the defendant at all, and it shows what social media and news the defendant privately reviewed in service of issuing a private Tweet. The Government will not elicit testimony from the defendant's staffers about his official deliberations, reactions to social media or television, or official actions taken in response. The defendant's review of social media and television news—under these particular circumstances— was no different from that of any other citizen or candidate and therefore was unofficial.

### c.  The defendant's post-Administration statements (*supra* pp. 81, 83)

As the Government identified in its Rule 404(b) notice, ECF No. 174-1 at 8-9, the Government will introduce some of the defendant's numerous statements that post-date his time as President in which he has blamed Pence and approved of the actions of his supporters who breached the Capitol and obstructed the certification proceeding,[722] thus providing evidence of his intent on January 6.

---

[719] GA 232-236 (███████████████).
[720] GA 318 (██████████).
[721] GA 541-543 (████████████).
[722] *See, e.g.*, GA 1970 at 17:37 (Video of Trump Interview 07/10/2021); GA 1926 at 1:15:30

The defendant's endorsement of the violent actions of his supporters on January 6, and his sentiment that they were justified in threatening Pence—all made while the defendant was a private citizen after the end of his term in office—are probative of his intent during the charged conspiracies.  The Government intends to offer them as evidence of the defendant's intent on January 6, not as evidence of his official acts.

### 2. Even if this evidence were deemed official, the Government could rebut any presumption of immunity

The use of the evidence regarding former Attorney General ██ P52 and CISA Director ██ P50 would not intrude on Executive Branch authority or functions because the federal officials' statements reflected those officials' positions, knowledge, and expertise—not presidential acts or direction.  The President is the "the only person who alone composes a branch of government," *Trump*, 144 S. Ct. at 2329 (citation omitted), but Congress structures the Executive Branch and assigns manifold specific duties to subordinate officers who in turn execute the law.  The President is responsible to take care that the laws be faithfully executed, *see* U.S. Const. Art. 2, § 3, but that does not mean that every executive official is at all times performing presidential acts.  Allowing the Government to introduce evidence of these independent actions and public statements of subordinate officials in the Executive Branch, not taken at the direction of the President, does not intrude on the authority or functions of the Executive Branch.  Nothing in *Trump* dictates such an

---

(Video of Conroe Rally 01/29/2022); GA 1971 at 15:51, 16:42 (Video of Trump Interview 02/01/2022); GA 1962 at 48:29 (Video of Trump at Faith and Freedom Coalition 06/17/2022); GA 1966 at 09:30 (Video of Trump Interview 09/01/2022); GA 1973 at 43:07 (Video of Waco Rally 03/25/2023); GA 1694 (Transcript of CNN Town Hall 05/10/2023); GA 1964 (Video of Trump Campaign Statement 2024); GA 1967 at 45:18 (Video of Trump Interview 08/23/2023); GA 1965 at 56:10, 57:11 (Video of Trump Interview on Meet the Press 09/17/2023); GA 1935 at 35:50, 01:16:16 (Video of Greensboro Rally 03/02/2024); GA 967 (Donald J. Trump Truth Social Post 03/11/2024); Isaac Arnsdorf and Maeve Reston, *Trump claims violence he inspired on Jan. 6 was Pence's fault*, WASH. POST, (Mar. 13, 2023, 8:09 p.m.), https://www.washingtonpost.com/politics/2023/03/13/trump-pence-iowa/.

outcome that would effectively bar any Executive Branch employee from providing evidence against a President who committed crimes in his private capacity.  Put concretely, allowing these independent acts of Executive Branch officials to be used in the prosecution would not chill any Presidential conduct, and thus any presumption of immunity is overcome.

The same is true for testimony by White House staff about the President's review of Twitter or his watching public events on television.  Assuming for the moment that the President sometimes acts in an official capacity when watching television or reviewing Twitter, no statute or constitutional provision addresses the matter, and using evidence of his activity that virtually all citizens engage in—*i.e.*, checking their social-media feeds and watching television—does not intrude on any authority or functions of the Executive Branch.

## IV.   Conclusion

Based on a "factbound analysis," for the reasons explained above, the Court should determine that the conduct described in the factual proffer of Section I of this motion is not subject to presidential immunity.  As part of this determination, the Court should specify four determinations, and do so in a single order: (1) that the Government has rebutted the presumption of immunity attached to the defendant's official communications with the Vice President (*see supra* pp. 49, 63-67, 77-74; ECF No. 226 ¶¶ 11(c), 67, 70-78, 80, 82, and 84); and (2) that the remaining conduct described in Section I (that is, conduct other than the official communications with the Vice President) was not official, and, in the alternative, that the Government has rebutted any presumptive immunity for any of the remaining conduct that the Court finds to be official. The Government requests alternative rulings regarding rebuttal for all conduct the Court finds to be unofficial, to buttress the Court's record, ensure thorough and efficient appellate review, and minimize the risk of successive rounds of interlocutory appeal.

Furthermore, based on the determination that all the conduct described in Section I is not immune from prosecution, and because Section I encompasses all the allegations in the superseding indictment, the Court should further specify: (3) that the defendant is subject to trial on the superseding indictment; and (4) that the Government is not prohibited at trial from using evidence of the conduct described in Section I, subject at a later date to non-immunity based objections and this Court's admissibility rulings under the Federal Rules of Evidence.

Respectfully submitted,

JACK SMITH
Special Counsel

/s/ Molly Gaston
Molly Gaston
Thomas P. Windom
Senior Assistant Special Counsels
950 Pennsylvania Avenue NW
Room B-206
Washington, D.C. 20530