**UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA**

| | |
|---|---|
| **UNITED STATES OF AMERICA**, | |
| v. | Criminal Action No. 23-257 (TSC) |
| **DONALD J. TRUMP**, | |
| Defendant. | |

**MEMORANDUM OPINION AND ORDER**

Defendant has filed a Motion to Compel Discovery, ECF No. 167 ("Motion to Compel"),

and a Motion for an Order Regarding the Scope of the Prosecution Team, ECF No. 169 ("Motion

on Scope").  Collectively, the motions seek an order requiring the prosecution to search nine

government entities for fourteen categories of information, and to produce any discovered

information to the defense.  For the reasons set forth below and in a Classified Supplement that

will be distributed to the parties, the court will GRANT in part and DENY in part Defendant's

motions, and require Defendant to file any further motions to compel immunity-related discovery

by October 30, 2024.

## I.      BACKGROUND

### A.  Discovery obligations

As relevant here, the Government must comply with two related discovery obligations.[1]

First, it must search for and produce *Brady* materials.  "[T]he suppression by the prosecution of

evidence favorable to an accused upon request violates due process where the evidence is

material either to guilt or to punishment." *Brady v. Maryland*, 373 U.S. 83, 87 (1963).  This

---

[1] The court may refer to the Government as the Special Counsel's Office, the Office, or the
prosecution.

court shares the view of others in this district that, in order to minimize the risk of any such due process violation, the Government has an affirmative duty during all phases of a criminal case to "produce any potentially exculpatory or otherwise favorable evidence without regard to how the withholding of such evidence might be viewed—with the benefit of hindsight—as affecting the outcome of the trial." *United States v. Safavian*, 233 F.R.D. 12, 16 (D.D.C. 2005); *United States v. Singhal*, 876 F. Supp. 2d 82, 103–04 (D.D.C. 2012). That includes "all favorable evidence that is itself admissible or 'that is likely to lead to favorable evidence that would be admissible,' or that could be used to impeach a prosecution witness." *Safavian*, 233 F.R.D. at 16 (first citing *United States v. Sudikoff*, 36 F. Supp. 2d 1196, 1199–1200 (C.D. Cal. 1999); then citing *United States v. Trie*, 21 F. Supp. 2d 7, 23 (D.D.C. 1998)); *see also* Local Crim. R. 5.1 (affirming the broad scope of evidence for *Brady* purposes).

*Brady* also imposes "a duty to learn of any favorable evidence known to the others acting on the government's behalf in the case, including the police." *Kyles v. Whitley*, 514 U.S. 419, 437 (1995). That includes "a duty to search . . . files maintained by branches of government 'closely aligned with the prosecution,'" if "there [is] enough of a prospect of exculpatory materials to warrant a search." *United States v. Brooks*, 966 F.2d 1500, 1503 (D.C. Cir. 1992) (citation omitted); *see also Safavian*, 233 F.R.D. at 17. The scope of that duty depends on the "working relationship" between the prosecution and other agencies, along with "the nature of the files" at issue, the difficulty of searching for them, and the prospect of finding favorable evidence therein. *Brooks*, 966 F.2d at 1503; *see also United States v. Griffith*, 990 F.2d 1377 (tbl.), at *5 (D.C. Cir. 1993) (finding no *Brady* obligation where there was "no sound basis for believing that the records contained potentially exculpatory material" and "the documents were

not within the control of the [prosecutors] or another government office that would allow the prosecutors easy access").

"[T]he burden of showing a *Brady* violation . . . is on the defendant." *United States v. Andrews*, 532 F.3d 900, 907 n.3 (D.C. Cir. 2008). That showing must identify withheld evidence "material and favorable to his defense, in ways not merely cumulative." *United States v. Valenzuela-Bernal*, 458 U.S. 858, 873 (1982). Mere speculation—either that another agency is closely aligned with the prosecution or that a search of its files would yield favorable evidence— cannot support a claim that the prosecution has failed to fulfill its *Brady* obligations. *Brooks*, 966 F.2d at 1504. And "[a]s the burden of the proposed examination rises, clearly the likelihood of a pay-off must also rise before the government can be put to the effort." *Id.* (citation omitted). "In the typical case where a defendant makes only a general request for exculpatory material under *Brady* . . . , it is the State that decides which information must be disclosed." *Pennsylvania v. Ritchie,* 480 U.S. 39, 59 (1987). "Unless defense counsel becomes aware that other exculpatory evidence was withheld and brings it to the court's attention, the prosecutor's decision on disclosure is final." *Id.* (footnote omitted).[2]

Second, the Government must produce certain documents if requested by the defense. Federal Rule of Criminal Procedure 16(a)(1)(E) provides:

> Upon a defendant's request, the government must permit the defendant to inspect and to copy or photograph books, papers, documents, data, photographs, tangible objects, buildings or places, or copies or portions of any of these items, if the item is within the government's possession, custody, or control and . . . the item is material to preparing the defense . . . .

---

[2] In preparing a defense, Defendant is not confined to the materials disclosed by the prosecution. He may gather evidence through his own investigation, including by issuing subpoenas as appropriate. *See* Fed. R. Crim. P. 17(c); Def.'s Mot. for Pre-Trial Rule 17(c) Subpoenas, ECF No. 99.

As set forth below, the legal standard governing the prosecution's Rule 16 obligations mirrors, in large part, the standard under *Brady*.

Defendant's Rule 16 request obligates the Government to search its files for and produce evidence material to his defense.  Defendant bears the burden of demonstrating that materiality under Rule 16.  While it "is not a heavy burden," he must point to at least "a strong indication that [the requested information] will 'play an important role in uncovering admissible evidence, aiding witness preparation, corroborating testimony, or assisting impeachment or rebuttal.'" *United States v. Lloyd*, 992 F.2d 348, 351 (D.C. Cir. 1993) (quoting *United States v. George*, 786 F. Supp. 56, 58 (D.D.C. 1992)).  In other words, "the Government need disclose Rule 16 material 'only if it enables the defendant significantly to alter the quantum of proof in his favor.'"  *United States v. Graham*, 83 F.3d 1466, 1474 (D.C. Cir. 1996) (citation omitted); *see also Lloyd*, 992 F.2d at 351.  "When analyzing materiality, a court should focus first on the indictment which sets out the issues to which the defendant's theory of the case must respond."  *George*, 786 F. Supp. at 58.  To compel Rule 16 discovery, Defendant must show at least "a tenable relationship between the materials sought and the preparation of the defense" to those allegations.  *United States v. Poindexter*, 727 F. Supp. 1470, 1480 (D.D.C. 1989).

Rule 16 limits the Government's duty to search for or produce requested evidence to information within its possession, custody, or control.  In determining the scope of that control, "[c]ourts have in the main been more concerned with fairness to the defendant, on the one hand, and the government's ease of access to the documents sought, on the other, than with the issue whether the documents are actually within the physical possession of the prosecutor."  *United States v. Libby*, 429 F. Supp. 2d 1, 5–6 (D.D.C. 2006) (quoting *Poindexter*, 727 F. Supp. at 1477).  Accordingly, judges in this district have applied the same definition of control that

governs *Brady* obligations:  A prosecutor must search for and produce information "maintained by other components of the government which are 'closely aligned with the prosecution.'" *Id.* at 6 (quoting *Brooks*, 966 F.2d at 1503); *see also id.* (citing *Poindexter*, 727 F. Supp. at 1477; *Safavian*, 233 F.R.D. at 14).  The closeness of any such alignment "is fact-intensive and must be resolved on a case-by-case basis."  *Id*.

## B.  Defendant's motions

Defendant contends that the Government has failed to comply with its discovery obligations under *Brady* and Rule 16.  Specifically, the Motion to Compel cites Defendant's discovery requests to identify fourteen categories of information that he argues the Government has unlawfully failed to search for and produce.  Motion to Compel at 17–33; *see infra* Section II (addressing each category).  Defendant's accompanying Motion on Scope asserts that the prosecution must search for that requested information—along with all other *Brady*, *Giglio*, and Jencks Act materials—not only in the files held by "prosecutors of the Special Counsel's Office and law enforcement officers who are working on this case," but also in the files of nine additional government entities.  Motion on Scope at 7–8, 22–29; *see infra* Section III (addressing each entity).

Although his arguments span two motions, Defendant effectively pursues a single form of relief: an order from this court compelling the Government to search the additional government entities and produce all the information to which Defendant believes he is entitled.  Relying on the Department of Justice's internal policies, Defendant contends that the search should include a review of any relevant files at law enforcement agencies that may contain discoverable information—spanning the "investigative agency's entire investigative file, including documents such as FBI Electronic Communications (ECs), inserts, emails," and "[s]ubstantive case-related communications."  Motion on Scope at 5 (citation omitted).  He

likewise contends that the Government should "conduct Prudential Search Requests at agencies and components that may possess discoverable material." *Id.* at 5–6 (citation omitted).

Whether under Rule 16 or *Brady* and its related obligations, the Government's duty to search for and produce information is bounded by (1) the materiality of that information, including its favorability for the Defendant, and (2) the Government's control over that information. *See, e.g.*, *Libby*, 429 F. Supp. 2d at 5, 8–17; *Brooks*, 966 F.2d at 1503. In reviewing a *Brady* challenge in *United States v. Haldeman*, the D.C. Circuit explained that it was only necessary to define the scope of the prosecution team if the defendant had carried his burden of showing that the information he sought was material. 559 F.2d 31, 73 & n.71 (D.C. Cir. 1976). Accordingly, the court begins by assessing what information the Government is obligated to search for, and then determining where the Government must search for it.

As noted above, the materiality analysis at the heart of that assessment starts with the indictment. *See George*, 786 F. Supp. at 58. Defendant's Motion to Compel and Motion on Scope were filed before the Superseding Indictment, but his reply in support of those motions was filed after it. *See* Superseding Indictment, ECF No. 226; Def.'s Reply in Further Supp. of Disc. Mots. ("Def.'s Reply"), ECF No. 235. The court accordingly addresses Defendant's motions and arguments as applied to the Superseding Indictment's allegations.

## II.    MATERIALITY

Five of the fourteen categories of information Defendant seeks specifically request discrete, identified documents. The remaining nine categories are generic requests for "all information" or "evidence" relating to certain topics. As explained below, Defendant has only carried his burden with respect to a small portion of the information he seeks. For most of it, he has proffered only speculation that a search will yield material, noncumulative information. Moreover, while Defendant purports to seek much of this information to show his state of mind

at the time of his indicted conduct—*i.e.,* his "good faith and the absence of criminal intent" in "disagree[ing] with officials now favored by the prosecution and [relying] instead on [his] independent judgment . . . that the election was stolen," Motion to Compel at 1—he does not indicate that he was aware of the requested information such that it could have affected his state of mind, *see, e.g.*, *United States v. Secord*, 726 F. Supp. 845, 848 (D.D.C. 1989) ("To affect Defendant's state of mind, his specific intent, a piece of information must have been perceived by him *personally,* or been conveyed to him via his contacts in the Executive Branch."). Consequently, with a few exceptions, the court cannot compel the Government to search for or produce additional documents.

## A. **Identified Documents**

### 1. 2016 Election ICA records

First, Defendant seeks a "complete, classified version of the 2016 Election ICA [Intelligence Community Assessment] and all source materials." Motion to Compel at 21; *see* Off. of Dir. of Nat'l Intel., Assessing Russian Activities and Intentions in Recent US Elections: The Analytic Process and Cyber Incident Attribution (Jan. 6, 2017), ECF No. 167-1 (declassified version) ("2016 Election ICA"). He claims that "information relating to a 'significant escalation' of foreign influence in the 2016 election motivated [him] and his Administration to focus on foreign influence and cyber risks," rebutting the allegation "that [his] actions between November 2020 and January 2021 were motivated by a desire to maintain office and undertaken with specific intent and unlawful purpose." Motion to Compel at 21. And he contends that the 2016 Election ICA contradicts the allegation that he "eroded public faith in the administration of the election" by disclosing foreign efforts to accomplish that erosion. *Id.* at 22. The Government replies that the classified 2016 Election ICA is immaterial because it "relates to a different election" and the defense seeks "closely guarded secrets of national security about the illicit

activity of actors who are not implicated in the indictment," and that "[t]here is no meaningful connection between the charges in the indictment and 'specific information relating to measures' Defendant "oversaw to mitigate cybersecurity threats."  Gov't's Opp'n to Def.'s Disc. Mots. at 33–34, ECF No. 181 ("Opp'n") (quoting Motion to Compel at 21).

 Defendant has not carried his burden to establish an adequate basis for inferring that the requested documents will contain any material information.  He already has access to the unclassified, public version of the 2016 Election ICA, Opp'n at 33, and its "conclusions are identical to the highly classified assessment," 2016 Election ICA at i.  Cumulative information generally does not "enable[] the defendant significantly to alter the quantum of proof in his favor," *Graham*, 83 F.3d at 1474 (quoting *United States v. Calcedo-Llanos*, 960 F.2d 158, 164 n.4 (D.C. Cir. 1992)), and so often does not qualify as material, *see, e.g.*, *United States v. Cousin*, No. 20-cr-10071, 2022 WL 314853, at *21 (D. Mass. Feb. 2, 2022) ("[I]nformation in the other redacted portions of the SRT report is cumulative and not material under either *Brady* or Rule 16(a)(1)(E)(i).").  Defendant does not demonstrate that the additional, classified materials he seeks will be noncumulative or otherwise material.  A motion to compel must give some reason to believe that the requested search and production will yield material fruit; "mere speculation that a government file may contain" something helpful is "not enough."  *Brooks*, 966 F.2d at 1504 (quoting *United States v. Navarro*, 737 F.2d 625, 630–31 (7th Cir. 1984)).

Furthermore, Defendant fails to explain how classified records related to the 2016 Election ICA could bear on his motives for acts he allegedly committed years later.  Courts have routinely explained that information "to which defendants were not privy would be entirely irrelevant to their state of mind."  *United States v. Bingert Sturgeon*, No. 1:21-cr-91-1, 2023 WL 3203092, at *8 (D.D.C. May 2, 2023); *see also George*, 786 F. Supp. at 64 (finding information

"immaterial" for purposes of a defendant's intent "unless the defendant was aware of [it]");
*Secord*, 726 F. Supp. at 848 (similarly requiring a defendant to have personally perceived or been
provided information for it to be material to his state of mind).  Defendant does not claim to have
reviewed the records he seeks, their sources, or their conclusions before or during the time period
of his indicted conduct.  Nor does he proffer that the information therein was relayed to him by
someone else.  There is no basis, accordingly, for the inference that classified portions of the
2016 Election ICA contain "intelligence that underscores [his] good faith" in undertaking that
conduct, Motion to Compel at 22, and no reason to consider them material on that basis.[3]

   2.  2020 Election CISA Statement records

        Second, Defendant seeks "information that undercuts the categorical claims in the 2020
Election CISA Statement"—in particular, "drafts of the Statement that contained narrower
language and communications relating to revisions."  Motion to Compel at 25; *see* Dep't of
Homeland Sec.'s Cybersecurity and Infrastructure Sec. Agency, Joint Statement from Elections
Infrastructure Government Coordinating Council & the Election Infrastructure Sector
Coordinating Executive Committees (Nov. 12, 2020), ECF No. 167-2 ("2020 Election CISA
Statement").  The Superseding Indictment refers to that Statement in alleging that the 2020
Election was the "most secure in American history" and that there was "no evidence any voting
system deleted or lost votes, changed votes, or was in any waycompromised."  Superseding
Indictment ¶ 13.  Defendant contends that the records he seeks will bolster his "argu[ment] at
trial that the 2020 Election CISA Statement was part of a partisan effort to provide false
assurances to the public that outpaced the government's understanding of the situation."  Motion
to Compel at 25.

_____

[3] The court provides further analysis supporting this conclusion in the Classified Supplement.

As with his first request, however, Defendant presents nothing more than speculation that any earlier drafts and communications about revisions of the 2020 CISA Statement will undermine its final conclusions.  His only attempt at doing so is a reference to "the SolarWinds SUNBURST attack."  Motion to Compel at 25.  Relying on the allegations in another case's civil complaint, Defendant reports that in 2019 and 2020, "parties reportedly linked to Russia's Foreign Intelligence Service . . . inserted malicious code into" certain software products and "conducted reconnaissance, exfiltration, and data collection" that posed "an unacceptable risk to Federal Civilian Executive Branch agencies."  *Id.* at 9–10 (citations omitted).  Defendant claims the SolarWinds attack renders the 2020 Election CISA Statement's conclusions "implausible." *Id.* at 25.  But he identifies no link between the SolarWinds attack and the compromise of any election systems, or even the 2020 election in general.  Consequently, there is no indication that the Statement's revisions—or communications about them—would be favorable to Defendant or otherwise material to preparing his defense, and the Government has no obligation to search for or produce them.  *See Lloyd*, 992 F.2d at 351–52.

This request also lacks a link to Defendant's mental state.  Presumably, Defendant seeks to characterize the 2020 Election CISA Statement as partisan to rebut the Superseding Indictment's allegation that his claims of election fraud "were unsupported, objectively unreasonable, and . . . publicly disproven."  Superseding Indictment ¶ 12.  But at the time of his indicted conduct, Defendant would only have had reason to believe the Statement was partisan if he knew about information like that he requests here, such as earlier, narrower drafts or communications that "undercut[] the categorical claims" therein.  Motion to Compel at 25.  Had Defendant proffered, for instance, that he had seen or been told about narrower drafts of the Statement before his allegedly criminal activity, that could render those earlier versions material.

But he has not made that proffer or anything like it—much less supplied a "strong indication" that the requested records could have given him reason to doubt the Statement's conclusions. *Lloyd*, 992 F.2d at 351. Accordingly, he has not established the materiality of the 2020 Election CISA Statement's early drafts or revision communications.

   3.   2020 Election ICA records

Third, Defendant seeks four specific types of records related to the 2020 Election Intelligence Community Assessment (ICA). *See* Nat'l Intel. Council, Foreign Threats to the 2020 US Federal Elections (March 10, 2021), ECF No. 167-6 (declassified version) ("2020 Election ICA"). Specifically, he requests:

> (1) all drafts of the 2020 Election ICA; (2) communications regarding drafting and revisions; (3) all information and materials relating to Dr. Zulauf's conclusions, including evidence of efforts by "CIA Management" to "pressur[e]" analysts and "suppress" reporting . . . ; and (4) the additional materials discussed in the Classified Supplement.

Motion to Compel at 26.

Defendant hangs the materiality of those records on the original Indictment's reference to "Intelligence community[] findings" from the 2020 Election ICA. *Id.* at 25 (quoting Indictment ¶ 11(c), ECF No. 1). He contends that all "[i]nformation that is inconsistent with the judgments in the ICA" favors the defense and makes the requested records material. *Id.*; *see also infra* Sections II.B.5–6. (discussing broader requests for all information regarding foreign influence and interference in the 2020 election, which overlap somewhat with this category). Specifically, Defendant argues that the records are material because they can be used "to impeach the 2020 Election CISA Statement" and "the ICA's judgments," "to argue that [he] and others had greater concerns about the . . . integrity of the election than the witnesses that the prosecution prefers," and "to impeach anticipated testimony from the former CISA Director" using "[i]nformation relating to the SUNBURST attack." Motion to Compel at 25–26.

Even as applied to the original Indictment, these arguments are flawed.  To begin, the logical chain between these requested records and Defendant's "concerns about the . . . integrity of the election," Motion to Compel at 25, again lacks the "crucial link," *George*, 786 F. Supp. at 64, to Defendant's awareness of the records.  He does not indicate that he knew about these records or their contents, and so they could not have informed any concerns he had at the time.  By the same token, these records can only "impeach the 2020 Election CISA Statement" and "the ICA's judgments," Motion to Compel at 25–26, to the extent that they contradict Defendant's alleged state of mind —*i.e.*, that "Defendant knew that [his claims of election fraud] were false," Indictment ¶ 11; *see also* Superseding Indictment ¶ 12—and the records could not have affected his state of mind if he did not know about them.  Finally, Defendant provides no reason to believe the requested records in this category contain "[i]nformation relating to the SUNBURST attack" that could be used "to impeach anticipated testimony from the former CISA Director."  Motion to Compel at 25; *see supra* Section II.A.2.  As noted, a defendant's motion to compel cannot succeed if based solely on the desire for information and speculation that the records sought may contain it.

The Superseding Indictment offers even less support for Defendant's arguments about materiality.  Unlike the original Indictment, it does not rely on allegations about intelligence community findings to establish his state of mind, so the 2020 Election ICA records are correspondingly less relevant to that element.  *Compare* Indictment ¶ 11(c), *with* Superseding Indictment ¶ 12–15.  Defendant offers an alternative ground for their materiality, contending that the records could support his "Presidential immunity defense" because they relate to "his role as Commander in Chief" in "overseeing . . . intelligence gathering."  Def.'s Reply at 7 (quoting *Trump v. United States*, 144 S. Ct. 2312, 2327 (2024)).  But Defendant is not charged with

unlawfully gathering intelligence, and he does not explain how that role is implicated by any of the criminal conduct alleged in the Superseding Indictment and could thus be a defense for it. The court therefore cannot compel the records on that theory, either.

In addition, Defendant does not indicate that the requested records contain material information beyond what he has already received. The Government reports that in addition to the public, declassified 2020 Election ICA, Defendant has already received two classified versions—the final draft, and an earlier draft. Opp'n at 29. Defendant gives no basis for the inference that other drafts or communications about revisions would contain favorable or otherwise material information. He cites the 2020 Election ICA's "Minority View," which suggests that "China took at least some steps to undermine President Trump's reelection chances . . . meeting the definition of election influence," but *not* that "China tried to interfere with election processes." 2020 Election ICA at 8 (PDF p. 14); *see infra* Sections II.B.4–5. Accordingly, that Minority View does not indicate that the 2020 Election ICA's earlier drafts or revision communications contained information supporting Defendant's election fraud claims. The same is true of the records related to the public report from the Intelligence Community Analytic Ombudsman, Dr. Zulauf. Defendant focuses on the report's comments on efforts to "suppress" alternative analysis about China's attempts to conduct election influence. Motion to Compel at 26 (citing ECF No. 167-5 at 7). But he draws no connection between those efforts (or that alternative analysis) and this case—much less explains why he needs classified "information and materials" relating to them. *Id.* The report itself notes that the efforts took place before the charged conduct in this case, and that the alternative analysis itself was ultimately published.

2020 Election ICA at 7 (PDF p. 13).  Without more, the court cannot conclude that the 2020

Election ICA records are material to the preparation of a defense.[4]

    4.  <u>2020 Election DOJ-DHS Report</u>

       Fourth, Defendant requests "the complete, classified version of the 2020 Election DOJ-

DHS Report and all source materials."  Motion to Compel at 26; *see* Dep't of Just. and Dep't of

Homeland Sec., Foreign Interference Targeting Election Infrastructure or Political Organization,

Campaign, or Candidate Infrastructure Related to the 2020 US Federal Elections (Mar. 2021),

ECF No. 167-8 (declassified version) ("2020 Election DOJ-DHS Report").  The Report found

> no evidence that any foreign government-affiliated actor prevented voting, changed
> votes, or disrupted the ability to tally votes or to transmit election results in a timely
> manner; altered any technical aspect of the voting process; or otherwise
> compromised the integrity of voter registration information of any ballots cast
> during 2020 federal elections.

*Id.* at 2.

       Despite this finding, Defendant argues that the Report's classified "details" will support

his "defense that he had good-faith concerns about the integrity of the election."  Motion to

Compel at 26–27.  But while Defendant cites snippets from the Report indicating that its authors

considered several potential threats to the election's integrity, he omits that the Report refuted all

of them.  For example, he highlights "several incidents when Russian, Chinese, and Iranian

government-affiliated actors materially impacted the security of networks associated with or

pertaining to US political organizations, candidates, and campaigns during 2020 federal

elections," and "[b]road Russian and Iranian campaigns targeting multiple critical infrastructure

sectors did compromise the security of several networks that managed some election

functions"—but ignores that those efforts "did not materially affect the integrity of voter data,

---

[4] The court provides further analysis supporting this conclusion in the Classified Supplement.

the ability to vote, the tabulation of votes, or the timely transmission of election results." 2020
Election DOJ-DHS Report at 2. Likewise, Defendant relies on the Report's acknowledgment of
"multiple public claims that one or more foreign governments" manipulated "election
infrastructure" or "vote counts"—despite its authors' statement that they had "investigated the
public claims and determined that they [were] not credible." *Id.* Defendant does not offer
anything beyond speculation that the Report's classified details will, contrary to its publicly
stated conclusions, reveal any threats that actually impacted the election's integrity.

   The larger problem with this request, though, is that once again Defendant has not
proffered any indication that the Report's classified details could have affected his state of mind
during the alleged offenses. He argues that he "was not obligated to credit [the Report's]
assessments and determinations at the time." Motion to Compel at 27. That may be true, but the
information Defendant now seeks could not have prompted him to discredit those assessments
unless he knew about it during the relevant time period, and he does not make that claim.
Instead, he argues that he "must be permitted to draw attention to good-faith, non-criminal
disagreements regarding the purported conclusions that the Special Counsel's Office seeks to
present as infallible." *Id.* But whatever "disagreements" other people may have about those
conclusions, they are immaterial to this case unless they concern a specific element of the
offenses charged, such as Defendant's intent.

   Indeed, even the original Indictment did not refer to "the Intelligence Community's
findings regarding foreign interference" as infallible *per se*, but rather as evidence that
"Defendant knew that [his claims of election fraud] were false" because he "was notified
repeatedly that his claims were untrue—often by the people on whom he relied for candid advice
on important matters, and who were best positioned to know the facts." Indictment ¶ 11. And as

already noted, the Superseding Indictment does not refer to those findings at all, instead alleging Defendant's knowledge based on information he received from "his own running mate and his campaign staff," along with "[s]tate officials" and other organizations. Superseding Indictment ¶ 13. Defendant has given no reason to believe that the Report's classified details would assist him in preparing a defense against that allegation—*e.g.*, that his subordinates provided him contrary information and counsel based on the classified details he seeks. Without a connection to that defense or some other one, the Report and its classified sources are not material.

     5.   <u>DNI interview preparation materials</u>

Fifth, Defendant seeks records related to the testimony of a former Director of National Intelligence ("DNI"). Motion to Compel at 29. The original Indictment alleged that the DNI "disabused the Defendant of the notion that the Intelligence Community's findings regarding foreign interference would change the outcome of the election." Indictment ¶ 11(c). Defendant notes that "[d]uring an interview by the Special Counsel's Office and related grand jury testimony, the DNI indicated that he had prepared by reviewing materials maintained by his former employer, the Office of the Director of National Intelligence" ("ODNI"). Motion to Compel at 29. Defendant argues that therefore the Government "must collect and produce all such materials," along with "all classified communications relating to the subject matter of [the DNI's] testimony." *Id.* While the Superseding Indictment does not contain the same allegation about the DNI's communication with Defendant, the Government has not disputed that the DNI is "a potential witness" in this case, although it maintains that Defendant has not shown that any information in those records would be material. Opp'n at 32.

The Government may have a duty to search for and produce these records—if they are within its control. Documents that informed a prospective witness's testimony may be relevant for impeachment purposes, *see Lloyd*, 992 F.2d at 351, as well as subject to disclosure under the

Jencks Act, which requires the Government, "on motion of the defendant . . . to produce any statement . . . of [a] witness in the possession of the United States which relates to the subject matter" of their testimony,. 18 U.S.C. § 3500(b).  If the materials the DNI reviewed before his interview included some of his own prior statements and relate to his testimony—which seems likely, given that he was preparing to speak about his own past conduct and recollection—the Jencks Act may obligate the Government to produce any of those statements in its possession. That obligation does not formally trigger until after the witness "has testified on direct examination in the trial of the case," *id.* § 3500(a), but in the interests of justice, courts have sometimes ordered the Government to produce Jencks Act materials in advance of trial, *see, e.g.*, *United States v. Daum*, 847 F. Supp. 2d 18, 21 (D.D.C. 2012).  Consequently, the court is persuaded that "the nature of the files" triggers "the duty to search" for them.  *Brooks*, 966 F.2d at 1503.

The question of where the Government must search for these materials is discussed *infra* Section III.  As Defendant's motion itself suggests, many of the materials appear to be maintained by ODNI, Motion to Compel at 29, which the court does not consider to be part of the prosecution team, *see infra* Section III.G, and so a search of the prosecution's records may be unlikely to bear fruit.  The court will also afford the Government an opportunity to argue, should it choose to do so, why it is not required to produce Jencks Act material until trial.  *See infra* Section V.

**B.  Generic requests**

1.  January 6 responsibility statements

Defendant seeks "all documents, including private communications, in which prosecutors, law enforcement, and other officials made statements that are inconsistent with the

prosecution's position regarding responsibility for January 6." Motion to Compel at 18.[5]  The Government position to which Defendant refers is "that the defendant is responsible for the events at the Capitol on January 6," a "day [that] was the culmination of the defendant's criminal conspiracies to overturn the legitimate results of the presidential election." Government's Opp'n to Def.'s Mot. to Strike Inflammatory Allegations from the Indictment at 1, ECF No. 140.  In Defendant's view, that position is contradicted by statements by prosecutors from the United States Attorney's Office for the District of Columbia ("USAO-DC"), which makes those statements "exculpatory under *Brady* because they undercut one of the prosecution's arguments." Motion to Compel at 18.

In theory, inconsistent statements by government officials might be admissible as an opposing party's statement under Federal Rule of Evidence 801(d)(2).  To support the inference that such inconsistent statements exist and must therefore be searched for and produced, Defendant points to several examples from the prosecutions of January 6 rioters: a prosecutor's argument that a defendant could not assert an entrapment-by-estoppel or public authority defense because he could not "identify any remarks made by former President Trump that authorized that illegal conduct," Mot. in *Limine* at 3, *United States v. Carpenter*, No. 21-cr-305 (D.D.C. Dec. 21, 2022), ECF No. 56; a prosecutor's closing statement that "it is essentially irrelevant in this case what you think about President Trump's conduct on that day," Tr. T. at 595–596, *United States v. Thompson*, No. 21-cr-161 (Aug. 8, 2022), ECF No. 109; and a prosecutor's statement that

---

[5] In his reply, Defendant reframes this request as all "statements by officials that are inconsistent with the Office's theory of this case." Def.'s Reply at 24.  That is a much broader category and, like asking "for 'all Brady material' or 'anything exculpatory[,] . . . really gives the prosecutor no better notice than if no request is made." *United States v. Agurs*, 427 U.S. 97, 106 (1976).  The court accordingly focuses its analysis on the request as stated in the Motion to Compel.

"[t]he President didn't take action" in the days leading up to January 6, Tr. T. at 9922, *United States v. Rhodes*, No. 22-cr-15 (D.D.C. Nov. 18, 2022), ECF No. 766.

It does not appear, however, that these kinds of statements could assist Defendant "significantly to alter the quantum of proof in his favor." *Graham*, 83 F.3d at 1474. Opposing-party statements from government agents are relevant only to the extent that they make the existence of a material fact "more probable or less probable than it would be without the evidence." Fed R. Evid. 401. As Defendant's own citations demonstrate, such statements are typically material only where the government agent making the statement has some personal knowledge of the relevant facts. *See* Motion to Compel at 18 (citing *United States v. Morgan*, 581 F.2d 933, 937–38 (D.C. Cir. 1978) (district court erred in excluding a sworn affidavit from a detective stating that an informant was reliable); *United States v. Warren*, 42 F.3d 647, 655 (D.C. Cir. 1994) (district court erred in excluding a sworn affidavit from a police officer stating that someone besides the defendant leased an apartment where drugs were found)). The USAO-DC prosecutors whose statements Defendant seeks were not fact witnesses in the January 6 rioter cases, nor does he suggest that their statements reflect personal knowledge that could be "admissible against the government as substantive evidence" in this case. *Morgan*, 581 F.2d at 937 n.10. Defendant has thus failed to show that the statements could be exculpatory.

In any event, the court is not persuaded that the USAO-DC prosecutors' statements actually contradict the Government's position in this case. It is entirely conceivable, for instance, that Defendant could share responsibility for the events of January 6 without such express authorization of rioters' criminal actions that they could claim entrapment-by-estoppel or public authority defenses. *See* Mot. in *Limine* at 3, *United States v. Carpenter*, No. 21-cr-305 (D.D.C. Dec. 21, 2022), ECF No. 56. Likewise, Defendant could still share that responsibility

even though he did not take certain actions that some rioters had hoped for—*i.e.*, invoking the

Insurrection Act to "stop the election, to call up the military and groups like the Oath Keepers to

seize voting machines, to throw out the result, and to hold a new election."  Tr. T. at 9922,

*United States v. Rhodes*, No. 22-cr-15 (D.D.C. Nov. 18, 2022), ECF No. 766.  Nor is there a

contradiction in a prosecutor stating that Defendant's conduct was "essentially irrelevant" to a

January 6 rioter's case.  Tr. T. at 595–596, *United States v. Thompson*, No. 21-cr-161 (Aug. 8,

2022), ECF No. 109.  As the Government has explained, its

> position in other January 6 cases that the defendant's actions did not absolve any
> individual rioter of responsibility for that rioter's actions—even if the rioter took
> them at the defendant's direction—is in no way inconsistent with the indictment's
> allegations here.

ECF No. 169-6, Ex. F at 4.  For these reasons, Defendant has failed to demonstrate the

materiality of such statements.

    2.  <u>January 6 security</u>

Next, Defendant seeks "all information relating to security at the Capitol on January 6,

including documents and communications regarding requests for security and the timing of the

National Guard's deployment that day."  Motion to Compel at 19.  He originally argued that

information is material "because it suggests that (1) federal and local officials believed adequate

measures were in place to facilitate a lawful and peaceful protest at the Capitol, including during

the speech at the Ellipse, and (2) the delayed arrival of the National Guard contributed to the

violence that [he] sought to prevent."  *Id.* at 19–20.  And he noted that there are public records of

"a number of meetings from Saturday, January 2, 2021, through Monday, January 4, 2021"

within the Departments of Defense, Justice, Homeland Security, and Interior "regarding security

at the Capitol."  *Id.* at 20 (quotation omitted).  With one narrow exception, the court is not

persuaded that Defendant has adequately demonstrated the materiality of this information on those grounds.

To begin, Defendant has not given sufficient indication that "all information relating to security at the Capitol on January 6" will be material to the preparation of his defense. *Id.* at 19. As discussed above, he primarily seeks discovery to support the defense that he "genuinely believed that the election was stolen . . . and related arguments regarding good faith and the absence of criminal intent." *Id.* at 1. With respect to the events of January 6, that defense might include "security measures that informed President Trump's remarks and assessment of the situation." *Id.* at 2. But Defendant's request is not limited to those measures. Instead, he claims to be "entitled to not only information relating to events and communications in which he participated, but also interactions in which he was not directly involved." *Id.* at 20. He does not explain that entitlement other than by citing *Safavian*, 233 F.R.D. at 18, which found a discrete set of e-mails that the defendant had not seen to be material because they could support a defense unrelated to the defendant's state of mind. *See* Motion to Compel at 20; *but see George*, 768 F. Supp. at 64 (finding information "immaterial" if unknown to defendant); *Secord*, 726 F. Supp. at 848 (same).[6] Here, however, Defendant has not identified an alternative defense for which the wide range of information he seeks could be material.

---

[6] Defendant also reads *Poindexter* as compelling the production of documents containing the conclusions of other government officials "irrespective of the defendant's awareness" of them. Def.'s Reply at 6. The court does not share that reading. That decision does not mention any such documents unknown to the defendant, and indeed compelled disclosure for certain documents precisely because they "could support his belief in the legality of [his] activities, and hence negate his specific intent to violate the law." 727 F. Supp. at 1476. As in this case, what mattered was the defendant's state of mind at the time of his alleged crimes. *See id.* at 1475.

Moreover, Defendant makes no effort to distinguish between the information he already has and that which he still needs.  Cumulative information is generally not material, *see supra* Section II.A.1., and the Government indicates that Defendant has already received considerable discovery related to security at the Capitol on January 6.  *See* Opp'n at 38.  Courts disfavor "overbroad" requests.  *George*, 786 F. Supp. at 65.  Without a more specific showing of what information Defendant still needs and why he needs it, the court cannot order a search for "all information relating to security at the Capitol on January 6."  Motion to Compel at 19.

As noted, there is one exception.  Defendant cites a public report that includes General Mark Milley's recollection of a meeting he had a few days before January 6 with Defendant and the Acting Secretary of Defense, Christopher C. Miller.  Motion to Compel at 20.  According to the report, the meeting's "primary topic . . . was unrelated to the scheduled rally," but

> at the end of the meeting, the President told Mr. Miller that there would be a large number of protestors on January 6, 2021, and Mr. Miller should ensure sufficient National Guard or Soldiers would be there to make sure it was a safe event. . . .  Mr. Miller responded, "We've got a plan and we've got it covered."

Inspector General, U.S. Dep't of Defense, Review of the DOD's Role, Responsibilities, and Actions to Prepare for and Respond to the Protests and Its Aftermath at the U.S. Capitol Campus on January 6, 2021, at 31 (Nov. 16, 2021).[7]

This meeting could have affected Defendant's state of mind during the relevant time period, and its contents could thus be material to the defense.  Defendant does not specify whether he needs additional information specifically regarding the exchange he had with Acting Secretary Miller during that meeting, Motion to Compel at 20, but the Government does not mention anything related to it in describing the records Defendant has already received, Opp'n at

---

[7] *Available at* https://media.defense.gov/2021/Nov/19/2002896088/-1/-1/1/DODIG-2022-039%20V2%20508.pdf [https://perma.cc/LD6A-S6QH].

38.  The court will therefore give Defendant the benefit of the doubt and assume that any additional information would not be cumulative.  Accordingly, the court will order the Government to search for and produce any additional records within its possession, *see infra* Section III., concerning information about security measures that was conveyed to Defendant during his meeting with General Milley and Acting Secretary Miller.

Beyond the points above, Defendant adds that "[s]ecurity-related disclosures are discoverable irrespective of [his] knowledge because these materials provide relevant context for determining the scope of official acts and dangers of intrusion on the Executive Branch for purposes of Presidential immunity."  Def.'s Reply at 27.  But he does not elaborate on that conclusion by explaining how all materials related to security would provide relevant context for determining the scope of official acts, which allegations they would contextualize, or how they implicate the potential dangers of intrusion that this prosecution could pose for the Executive Branch.  Defendant bears the burden of justifying a court order compelling discovery, *Andrews*, 532 F.3d at 907 n.3, and broad gestures at "context" are not sufficient..  Without a clearly identified and sufficient nexus to the Superseding Indictment's allegations or particular immunity arguments, there is no basis for ordering specific disclosures at this juncture.

3. January 6 federal agents

Defendant also seeks "all information regarding undercover agents and individuals acting at the direction of official authorities at the Capitol on January 6."  Motion to Compel at 20.  He argues that "information regarding individuals who were present in an official capacity is favorable to [him] because it suggests that there were adequate controls in place and that the violence at issue resulted from a failure of those controls and/or failed sting operations rather than any directions from [him]."  *Id.* at 21.  The court cannot agree that this information is material.

As with his broader request regarding all security measures at the Capitol on January 6, Defendant omits any connection between the information he seeks and his state of mind. Whether "there were adequate controls in place and that the violence at issue resulted from a failure of those controls," *id.*, could only have supplied the "good faith" that Defendant intends to assert, *id.* at 1, if he knew about those controls at the time, and he does not proffer that he did. The only case Defendant cites in support of his request, *United States v. Zink*, rejected a January 6 rioter's request for "the identification of any and all undercover Government agents who may have been present at the Capitol on January 6" for the very same reason: There was no sign that any of "th[o]se purported actors could have affected or did affect [the rioter's] conduct or state of mind." No. 21-cr-191, 2023 WL 5206143, at *3 (D.D.C. Aug. 14, 2023). And like in *Zink*, Defendant does not provide anything more than speculation that there even were any such undercover actors at the Capitol on January 6. *Id.* Consequently, there is no reason to compel the Government to search for and produce that information in this case.

4. Foreign influence

Perhaps the largest category of discovery that Defendant seeks to compel is "all information relating to foreign influence efforts targeting the 2020 election, including foreign influence relating to events on January 6, whether or not he was briefed contemporaneously regarding these issues." Motion to Compel at 23. He asserts that this information is material under two theories: (1) it rebuts the allegation that Defendant "create[d] an intense national atmosphere of mistrust and anger, and erode[d] public faith in the administration of the [2020] election," *id.* (modifying Indictment ¶ 2); and (2) it "supports the defense argument that President Trump and others acted in good faith even if certain reports were ultimately determined to be inaccurate," *id.* To bolster his claim that such information has not yet been

produced, he cites the 2020 Election ICA and the report issued by the House Select Committee
to Investigate the January 6th Attack on the United States Capitol.  Motion to Compel at 23–24.

      Defendant's theories of materiality do not withstand scrutiny.  The first relies on a
misunderstanding of the charges against him.  The Superseding Indictment does not allege
Defendant's criminal activity to be that he "create[d] an intense national atmosphere of mistrust
and anger, and erode[d] public faith in the administration of the [2020] election," *Id.*at 23
(modifying Indictment ¶ 2).  Indeed, it stresses that Defendant had a right to "to speak publicly
about the election and even to claim, falsely, that there had been outcome-determinative fraud
during the election and that he had won."  Superseding Indictment ¶ 3.  And it identifies where
Defendant's conduct crossed the line:  In addition to whatever effect those claims had on the
national atmosphere, "Defendant *also* pursued unlawful means of discounting legitimate votes
and subverting the election results." *Id.* ¶ 4 (emphasis added).  Those unlawful means are the
crimes with which Defendant is charged, including several criminal conspiracies. *Id.*

      The difference matters.  Whether Defendant sought to undermine public confidence in
the election to legitimize or otherwise further his criminal conspiracies does not depend on
whether other nations also tried to achieve similar results for their own purposes. *Contra* Motion
to Compel at 23 (citing 2020 Election ICA's conclusions that foreign actors attempted to
undermine public confidence).  Accordingly, additional information about foreign actors' efforts
to mislead or inflame the public would not rebut Defendant's allegedly criminal conduct. *See*
Opp'n at 26–27 (explaining that the requested material would not help a third-party guilt defense
because "the lies told by others in no way exonerate the defendant for the specific lies he told to
his followers or the criminal steps he took to illegally retain power").

Defendant's second theory suffers from the now-familiar lack of connection to his state of mind during the time of his alleged criminal activity.  The basic problem is that Defendant could not have "acted in good faith" in response to "certain reports" if he was not "briefed contemporaneously regarding these issues."  Motion to Compel at 23.  Put simply, his motives could not be based on information he did not know.  Yet his request expressly seeks information of which he was not aware, and it fails to proffer what information he did know and could therefore seek to support with additional documentation through discovery.  Defendant has not adequately demonstrated materiality on this ground.

This request also runs aground on a more categorical problem: foreign *influence* in an election is not the same as foreign *interference*.  As those terms are used by the Government and the sources it cites, "election interference" refers to efforts "targeted at the technical aspects of the election, including voter registration, casting and counting ballots, or reporting results," whereas "election influence" refers to broader efforts aimed at affecting elections, including "candidates, political parties, voters or their preferences, or political processes" generally.  2020 Election ICA at PDF p. 4 (2020 Election ICA); *see also* Motion to Compel at 23–24, 27–29 (separating requests for information regarding foreign influence efforts and information regarding "Infrastructure Compromises, Voting Fraud, and Irregularities"); Opp'n at 19–20 (explaining the distinction).  Election influence typically involves "efforts to spread disinformation, often to falsely denigrate or support a candidate, sow confusion, exacerbate political tensions, undermine confidence in the electoral process, or otherwise influence the hearts and minds of American citizens."  Opp'n at 20 (citation omitted).

The Superseding Indictment alleges that Defendant's knowing deceit concerned election interference, not election influence.  It states that he knowingly "spread lies that there had been

outcome-determinative fraud in the election and that he had actually won."  Superseding

Indictment ¶ 2.  Those alleged lies "included dozens of specific claims that there had been

substantial fraud in certain states, such as that large numbers of dead, non-resident, non-citizen,

or otherwise ineligible voters had cast ballots, or that voting machines had changed votes for the

Defendant to votes for Biden."  *Id.* ¶ 12.  But that kind of outcome-determinative fraud is

fundamentally different from foreign disinformation or persuasion campaigns.  *See* Opp'n at 26

("No one disputes that certain foreign countries, to varying extents, attempted to influence

Americans and spread disinformation.").  So, insofar as Defendant seeks to show that he made

his claims of fraud in good faith, he could not do so by showing that he based those claims on

information that there was foreign *influence* in the 2020 election.[8]

That leaves just one way in which records about foreign influence might be even

arguably material:  If, in making his claims of fraud, Defendant contends that he relied on advice

or conclusions that turned out to be sourced from foreign disinformation, knowing more about

those foreign sources could help him to prepare his defense that he "acted in good faith even if

certain reports were ultimately determined to be inaccurate."  Motion to Compel at 23.  As the

court has repeatedly noted, however, Defendant has not proffered that he based his alleged

claims of fraud on any particular report or adviser whose sources he now seeks to uncover.

Vague allusions to "certain reports," *id.*, are not enough, particularly where a request is so broad

and implicates sensitive intelligence about foreign activities.  "Defendant asks the court to be

---

[8] Defendant "disputes" the "artificial distinction between 'influence' and 'interference.'"  Def.'s
Reply at 25.  But rejecting those conceptual categories does not narrow the gap between the
allegations of his specific outcome-determinative-fraud claims on the one hand, and his
demand for information about foreign disinformation or persuasion efforts on the other.  In any
event, as discussed in the next section, the court construes Defendant's motion as seeking both
information regarding foreign influence as well as foreign interference.

permitted to search for a needle in a haystack of the country's most classified secrets, without the slightest indication of what the needle might be." *George*, 786 F. Supp. at 65.  He has not met his burden to demonstrate the materiality of "all information relating to foreign influence efforts."  Motion to Compel at 23.

    5.  <u>Foreign interference</u>

        Defendant's requests do include a category similar to election interference: "all information supporting his position that his concerns regarding fraud during the 2020 election— rather than 'knowingly false' or criminal, *e.g.*, Indictment ¶ 10(a)—were plausible and maintained in good faith."  Motion to Compel at 27.  "For example," he argues, the Government "must produce details regarding the evolving assessments of the impact of the SolarWinds 'SUNBURST' attack," "risk to elections information housed on [U.S. state, local, territorial, and tribal] networks," cyberattacks "targeting U.S. state websites . . . to include election websites," and "information relating to abuses of equipment from Dominion Voting Systems." *Id.* at 27–29 (citations omitted).  He contends that he is entitled to that information "because it supports the argument that there were reasonable concerns about the integrity of the 2020 election and the possibility of technical penetrations of election infrastructure." *Id.* at 28.

        Evidence of election interference—foreign or domestic—that informed Defendant's "concerns regarding fraud during the 2020 election" might well be material to his state of mind during his allegedly criminal activity. *Id.* at 27.  But here too, Defendant fails to tie his request for information to his knowledge at that time.  In determining his motives, it does not matter whether there were "concerns about the integrity of the 2020 election and the possibility of technical penetrations of election infrastructure" in anyone's mind but Defendant's. *Id.* at 28.  Without any proffer of what *his* concerns or their sources might have been, Defendant's request is too vague to satisfy the materiality standard.  As the Government notes, Defendant's demand

for "all information supporting his position" is effectively a demand for all *Brady* materials "and thus 'gives the prosecutor no better notice than if no request [were] made.'"  Opp'n at 31 (quoting *Agurs*, 427 U.S. at 106).  If, for example, Defendant had proffered that during the relevant time period, he was aware of evidence of interference in the 2020 election, and then provided some reason to believe that the Government possessed additional information regarding that evidence but had not disclosed it, that could warrant an order compelling the Government to search for and produce that information.  But a blanket demand for "all information," without any connection to Defendant's state of mind, is not enough.

Defendant's examples do not demonstrate the request's materiality.  Again, he does not suggest that he knew about any of the risks of interference that he identifies, so there is no reason to believe they animated his concerns at the time.  And even if he had proffered that knowledge, his requests for information related to those examples are inadequate in other ways.  With respect to the SolarWinds cyberattack, *see* Section II.A.2., or any other breach of government networks around the relevant time period, Defendant offers no explanation for how they resulted in or signaled interference in the 2020 election results.  To the contrary, the reports Defendant attaches to his Motion to Compel all conclude that no network breach interfered in the election results.  *See* 2020 Election ICA at i (PDF p. 5); 2020 Election DOJ-DHS Report at 2; *see also* Opp'n at 22.  What is more, the election fraud claims Defendant is alleged to have made appear totally unrelated to foreign cyberattacks.  *See* Superseding Indictment ¶ 12 (alleging claims of fraud "such as that large numbers of dead, non-resident, non-citizen, or otherwise ineligible voters had cast ballots, or that voting machines had changed votes").  At best, then, Defendant might attempt to use information about these network breaches to argue that because of generic foreign cyberattacks unrelated to election results, he had reason to worry that foreign adversaries would

interfere in the 2020 election, which in turn somehow gave him a good-faith basis to claim that *domestic* actors had perpetrated outcome-determinative election fraud in *non-cyberattack* forms. That logic is too strained to meet Defendant's burden. "The Court declines to follow so remote and tenuous a path." *Poindexter*, 727 F. Supp. at 1480.

Similarly, the final example Defendant identifies, "information relating to abuses of equipment from Dominion Voting Systems," Motion to Compel at 29, does not satisfy the materiality requirement. That example involved a discovery request seeking "all documents relating to investigations relating to fraud, interference . . . , or irregularities during the 2020 election, including but not limited to documents relating to" Dominion Voting Systems. ECF No. 166-3 at 2 (Request 8(c)). But Defendant has not proffered any contemporaneous knowledge of those documents or investigations, so it is unclear how they could have affected his state of mind. Moreover, the Government responded that it had already produced the discoverable information in its possession on that topic, ECF No. 169-5, Ex. E at 1—a representation that the court credits absent evidence to the contrary, *see Poindexter*, 727 F. Supp. at 1485; *see also Ritchie*, 480 U.S. at 59. Defendant has given no indication that a compelled search would yield any additional, material information.

In sum, Defendant may be entitled to information about election interference if it is related to what he knew at the time of his indicted conduct; that information could assist a defense that "his concerns regarding fraud during the 2020 election . . . were plausible and maintained in good faith." Motion to Compel at 27. But he has not proffered any specific knowledge that would create at least a "tenable relationship" with any particular information on that topic, *Poindexter*, 727 F. Supp. at 1480, and his sweeping request for "all information supporting his position," Motion to Compel at 27, is too broad to compel a search and production

beyond what the Government has already done to comply with its *Brady* and Rule 16 obligations.  Defendant has therefore not met his burden of demonstrating materiality by providing "a strong indication that [this request] will play an important role in uncovering admissible evidence, aiding witness preparation, corroborating testimony, or assisting impeachment or rebuttal."  *Lloyd*, 992 F.2d at 351 (quotation omitted).[9]

6. Pence investigation

Next, Defendant seeks "evidence relating to unauthorized retention of classified documents by Vice President Mike Pence."  Motion to Compel at 29.  He cites news reports that in January 2023, the Department of Justice obtained about a dozen classified documents from former Vice President Pence's home during a consensual search, but that the investigation into that retention was closed and no charges were filed.  *Id.* at 30.  Defendant argues that "[t]he potential criminal charges faced by Vice President Pence gave him an incentive to curry favor with authorities by providing information that is consistent with the [Government's] preferred, and false, narrative regarding this case."  *Id.*  Accordingly, he contends that the Government "must collect and disclose information maintained by the [DOJ] National Security Division and the FBI related to the Pence investigation, the 'negotiations' relating to the FBI's search, and the decision not to bring charges."  *Id.* at 31.

Defendant is correct that information suggesting a potential witness's motives for implicating him may be material.  The Supreme Court has held that "[w]hen the 'reliability of a given witness may well be determinative of guilt or innocence,' nondisclosure of evidence affecting credibility" is "incompatible with 'rudimentary demands of justice.'"  *Giglio v. United States*, 405 U.S. 150, 153–54 (1972) (citations omitted).  And the Government does not dispute

---

[9] The court provides further analysis supporting this conclusion in the Classified Supplement.

that one "condition[] that could affect the witness's bias" is "uncharged criminal conduct (that may provide an incentive to curry favor with a prosecutor)."  Motion to Compel at 30 (quotation omitted); *see United States v. Larrahondo*, 885 F. Supp. 2d 209, 218 (D.D.C. 2012) ("If the government has information that indicates, as [Defendant] suggests, that [a witness] had a motive to implicate [Defendant] in a crime, that sort of information would seem to qualify as *Brady* material if the government will introduce inculpatory statements from [the witness] at trial."). Because former Vice President Pence may be a witness in this case, *see* Superseding Indictment ¶¶ 11(c), 67–87, evidence regarding his uncharged criminal conduct may be material for impeachment purposes.

With materiality comes an obligation to search and produce, but that obligation is limited to information within the prosecutors' control.  The Government maintains that the prosecution team in this case "had no involvement with or influence over the Pence investigation, and the prosecution team has no discoverable information beyond what has been publicly reported." Opp'n at 41.  Nonetheless, the court will order the Government to search for and produce any additional information responsive to this request—but only insofar as it is within the Government's control as defined *infra* Section III, and the Government has not already searched for it.

7. <u>Biden communications</u>

Defendant seeks all "[c]ommunications regarding these investigations by members, relatives, or associates of the Biden Administration," arguing that such communications "are discoverable because they support [his] defense regarding the politically motivated nature of the prosecution."  Motion to Compel at 31.  As the court has previously noted, "the showing necessary to obtain discovery in support of [a selective-prosecution] claim" is "rigorous," requiring the defendant to provide "evidence tending to show the existence of the essential

elements of the defense, discriminatory effect and discriminatory intent." *United States v. Armstrong*, 517 U.S. 456, 468 (1996) (quotation omitted); *see United States v. Trump*, 2024 WL 3638344, at *8 (D.D.C. Aug. 3, 2024) (ECF No. 198).   Defendant's argument in support of this sweepingly broad and undefined request—the single conclusory sentence quoted at the beginning of this paragraph—utterly fails to meet that standard.  *See* Motion to Compel at 31–32. The court cannot compel additional discovery based on Defendant's "mere speculation" that any such communications exist and are material.  *Brooks*, 966 F.2d at 1504.

    8.  <u>FISA violations</u>

        Defendant seeks "evidence demonstrating that the FBI violated procedures relating to the Foreign Intelligence Surveillance Act ('FISA') in connection with investigations relating to this case."  Motion to Compel at 32.  He bases this request on a Foreign Intelligence Surveillance Court opinion describing "significant violations of the [FISA § 702] querying standard, including several relating to the January 6, 2021 breach of the U.S. Capitol, and indicating that some of the queries sought to identify "possible foreign influence," "foreign ties" and activities "at the direction of a foreign power."  *Id.* (citations omitted).  He argues that the information he seeks is material because (1) "it can be used to impeach the integrity of the investigation," and (2) "evidence that agents or analysts queried FISA databases because they suspected that the events of January 6 were influenced by foreign actors is favorable to [him] because it suggests that, prior to this case, the government did not believe he was 'responsible' for incidents on that day." *Id.*

        Neither of these arguments is persuasive.  First, there is no indication that those FISA queries have anything to do with this case.  Evidence that may "throw the reliability of the investigation into doubt and to sully the credibility of [the investigators]" can be material.  *Kyles*, 514 U.S. at 447.  But the queries at issue here appear to focus on individuals who rioted at the

Capitol on January 6, 2021, *see* ECF No. 167-9 at 28, not Defendant or the allegations against him, and there is no evidence that any investigators who executed those queries are involved in Defendant's prosecution, *see* Opp'n at 44–45.  Defendant has not demonstrated how the requested information could impeach the investigation or the investigators in this case.

Second, the fact that government agents wondered whether foreign actors were involved in the January 6 riot is entirely compatible with the belief that Defendant shared in the responsibility for the events of that day.  *Cf. supra* Section II.B.1 (statements holding rioters accountable for their own actions on January 6 are not inconsistent with responsibility that Defendant shared responsibility for events); Section II.B.4. (evidence about foreign influence generally cannot support a defense that Defendant had a good-faith basis for believing there was outcome-determinative election fraud).  And in any event, Defendant has not shown that the beliefs of unrelated government investigators—who had no firsthand knowledge of the criminal conduct alleged in this case—would tend to make any element of the offenses charged here "more probable or less probable than it would be without the evidence," Fed R. Evid. 401, or "enable[ him] significantly to alter the quantum of proof in his favor," *Graham*, 83 F.3d at 1474.  Consequently, the information sought in this request is not material.

9. Prosecution bias and misconduct

Finally, Defendant seeks "evidence relating to bias and other investigative misconduct." Motion to Compel at 32.  In his view, that evidence includes information relating to deliberations within the Department of Justice about the investigation and prosecution of this case.  *Id.* at 32–33.  The court has already considered the examples that Defendant claims demonstrate bias or investigative misconduct in this case and concluded that none of them do so.  *See Trump*, 2024 WL 3638344, at *4–7; Mot. to Dismiss for Selective and Vindictive Prosecution, ECF No. 116;

*id.*, Ex. A, ECF No. 116-1.  Accordingly, Defendant has not carried his burden to justify the additional discovery he seeks on this topic.  *Id.* at *8; *see Armstrong*, 517 U.S. at 468.

*     *     *

Having reviewed Defendants' fourteen categories of requests, the court concludes that only three types of information are material or otherwise discoverable: (1) "materials the DNI reviewed before his interview" with the Government, *supra* Section II.A.5.; (2) records "concerning information about security measures that was conveyed to Defendant during his meeting with General Milley and Acting Secretary Miller," *supra* Section II.B.2; and (3) "evidence relating to unauthorized retention of classified documents by Vice President Mike Pence," *supra* Section II.B.6.  The Government's search for that information must include the files and personnel defined as comprising the prosecution team in the following section, as relevant, and it must produce the information it finds, if any, to Defendant.  Alternatively, with respect to only the first type of information above, the Government may submit a supplemental brief explaining why any Jencks Act material relating to the former DNI should not be disclosed unless and until he actually testifies.  *See supra* Section II.A.5.

### III.   PROSECUTION CONTROL

Defendant contends that in addition to "the Special Counsel's Office and law enforcement officers who are working on this case," the prosecution team also includes nine additional government entities.  Motion on Scope at 7 (quoting Government's definition of prosecution team).  The court cannot accept that sweeping contention; most of those entities have not been meaningfully "acting on the [Office's] behalf in the case."  *Kyles*, 514 U.S. at 437.  That said, the court does find "a duty to search . . . files maintained by" certain entities "closely aligned with the prosecution," both because of their "working relationship" and because of "the nature of the files" that the required search would cover.  *Brooks*, 966 F.2d at 1503.  Notably,

however, the court does not "view the entirety of" those entities "as a monolith," and so will deem only certain personnel therein as closely aligned with the prosecution, and only some of their files as within the prosecution's constructive control. *United States v. Michel*, No. 19-cr-148-1, 2023 WL 7140001, at *2 (D.D.C. Mar. 22, 2023) (quotation omitted). Thus, insofar as the Government has not conducted a search of the prosecution team as defined below, the court will order it to conduct that search and produce any records required by *Brady*, *Giglio*, the Jencks Act, or Rule 16, including those deemed to be material *supra* Section II.

## A.  Special Counsel's Office

First, Defendant asserts that the prosecution team includes the entire Special Counsel's Office, including the individuals who have worked on the criminal case against Defendant in the Southern District of Florida. Motion on Scope at 8. He notes that the Office "did not silo its investigative activities or its personnel during the investigations" of both cases, that the Office "used the same grand jury in this District for matters relating to both," and that at least some of the individuals now working on each case participated in the investigation of the other. *Id.* The Government does not contest those points; instead, it argues that "delineation of the investigative teams within the Office is immaterial given the factual record and the defendant's failure to identify any specific material from the Florida investigation to which he is entitled in discovery in this case and does not already have." Opp'n at 9.

Both parties make valid points. Defendant is correct that the prosecution team includes not only the Special Counsel's Office staff currently working on this case, but also those that previously assisted in its investigation. "[I]nformation possessed by other . . . investigating officers[] is typically imputed to the prosecutors of the case for *Brady* purposes." *Safavian*, 233 F.R.D. at 17 (quotation omitted). But the Government is correct that Defendant "has not identified a single document from the Florida case that he believes also should be discoverable

here and that he does not already have." Opp'n at 9. Indeed, the Government suggests that it has

produced at least some overlapping discovery from the Florida case to Defendant here. *Id.*

Nonetheless, because it is not clear whether the Government has searched the files of its staff

who participated in the investigation of this case but are not "working on" it now, pursuant to its

general *Brady* and other obligations, *id.*, the court will require the Government to conduct that

search and make any required productions, or to report that it has already done so.

**B.  U.S. Attorney's Office for the District of Columbia**

Second, Defendant argues that the prosecution team includes all "personnel at [USAO-

DC] who participated in any investigation relating to the 2020 election or January 6, 2021, as

well as files accessible by former USAO-DC personnel now or previously assisting the Special

Counsel." Motion on Scope at 9. He proffers that "[p]rior to and in anticipation of the

appointment of the Special Counsel, the USAO-DC played a leading role in the investigations

that led to this case," and that some USAO-DC staff eventually joined the Special Counsel's

Office. *Id.* at 9–10. He also claims that "Special Counsel's Office has enjoyed constructive

access to USAO-DC documents" in a "database of materials comprising discovery in the

criminal cases related to the breach of the United States Capitol on January 6, 2021." *Id.* at 11.

Here too, the Government largely does not dispute those statements, other than to clarify

that "[t]he Special Counsel's Office is, by regulation, separate from" USAO-DC. Opp'n at 10.

It does note that "[t]he investigation assumed by the Special Counsel had been conducted

primarily within USAO-DC, and all case files from that investigation were transferred to the

Special Counsel upon his appointment," and that, "[t]hereafter, when the Government has

received discoverable information from USAO-DC, it has made it available to the defendant."

*Id.* And it reports that it "has produced in this case discovery related to the Capitol siege, which

includes material generated in USAO-DC's Capitol breach cases," and "has offered to provide

the defendant access to the highly organized, searchable database for discovery populated by USAO-DC in those cases." *Id.*

Based on these factual proffers, the Government's discovery obligations extend to a limited subset of USAO-DC files. "[T]he bureaucratic boundary" between the entities is not dispositive. *Brooks*, 966 F.2d at 1503. From the active role USAO-DC played in investigating this case, the fact that the Special Counsel's Office "has received discoverable information from USAO-DC" on an apparently ongoing basis, and the Office's open access to the USAO-DC Capitol breach cases database, Opp'n at 10, it is fairly evident that there is a cooperative "working relationship" between the two entities, suggesting that USAO-DC is "closely aligned with the prosecution" in this case, *Brooks*, 966 F.2d at 1503. That imposes on the Special Counsel's Office "a duty to search" the files of USAO-DC personnel who have worked on investigations and prosecutions regarding January 6 or the 2020 election, but only where there is "enough of a prospect of exculpatory materials to warrant a search." *Id.* The court concludes that two kinds of files meet that standard: (1) communications with and information transmitted to the Special Counsel's Office by USAO-DC, and (2) any other USAO-DC investigative or case files specifically regarding Defendant's indicted conduct in this case. To the extent that the Government has already searched these files for discoverable materials and made the corresponding productions, it need not do so again. And it need not search, for instance, the entire Capitol breach database, or all the January 6 case files; Defendant has not adequately demonstrated that any particular information from those cases will be material here. *Contra* Motion on Scope at 24 (basing the materiality of those additional files on the arguments rejected *supra* Section II.B.1.).

### C.  **Department of Justice**

Third, Defendant claims that the prosecution team "also includes the components within DOJ that participated in the investigation and deliberations relating to charging decisions: the Office of the Attorney General, the Office of the Deputy Attorney General, the National Security Division, the Public Integrity Section, and the Office of the Inspector General."  Motion on Scope at 11.  Only one part of that claim succeeds.

The Offices of the Attorney General and Deputy Attorney General plainly do not qualify as part of the prosecution team.  Even if "[c]urrent and former 'senior leaders of the Justice Department' are likely witnesses in the case," *id.*, that fact has no bearing on whether their offices have been "acting on [the Special Counsel's Office's] behalf," *Kyles*, 514 U.S. at 437.  Likewise, the facts that those current officials were "briefed on the investigation relating to January 6," or "participated in the deliberations over whether to bring seditious conspiracy charges" in a January 6 rioter's case, Motion on Scope at 13–14, does not make their offices part of the prosecution team in this case.

Similarly, Defendant has not shown that DOJ's Public Integrity Section or National Security Division are "closely aligned with the prosecution" for discovery purposes.  *Brooks*, 966 F.2d at 1503.  With respect to the Public Integrity Section, Defendant asserts only that its members "played key roles in suppressing investigations relating to widespread fraud in the 2020 election."  Motion on Scope at 11.  And as for the National Security Division, Defendant observes only that some of its personnel have prosecuted January 6 rioters and participated in the decision to charge some of those rioters with seditious conspiracy.  *Id.* at 12, 14.  That conduct does not show that either DOJ component has acted on behalf of the Special Counsel's Office in

this investigation.  *See Kyles*, 514 U.S. at 437.  Consequently, there is no basis for considering them part of the prosecution team.[10]

By contrast, it is undisputed that at least some personnel from DOJ's Office of the Inspector General should be considered part of the prosecution team.  The Government acknowledges that agents from the Office of the Inspector General "participated in this investigation," but states that it "has produced related discovery."  Opp'n at 12 n.3.  That statement implies, but does not make clear, that the Government has searched all the case files related to this investigation at the Office of the Inspector General, including the files of the personnel who have worked on it previously.  For the sake of clarity, then, the court will order the Government to search those files pursuant to its discovery obligations, or to report that it has already done so.

**D.  FBI Washington Field Office**

Fourth, Defendant asserts that the prosecution team includes the FBI's Washington Field Office "because its personnel are potential witnesses, and they have assisted the relevant investigations since their inception."  Motion on Scope at 14.  For example, Defendant reports that the Washington Field Office shared "evidence about Oath Keeper and Proud Boy extremists involved in the riot" with USAO-DC prosecutors, and that in April 2022 it "opened a formal investigation targeting President Trump."  *Id.* at 15.  Only the latter assertion is relevant.  The court has already explained that the fact that witnesses may be employed by the government does not mean their entire offices are closely aligned with the prosecution, *see supra* Section III.C.,

---

[10] The same is true of any National Security Division personnel who worked on any investigation into former Vice President Pence's retention of classified documents.  *See supra* Section II.B.6.

and the FBI's sharing evidence about January 6 rioters with USAO-DC prosecutors does not facially bear on the investigation in this case.

The fact that the FBI Washington Field Office participated in the investigation of this case renders at least some of its personnel within the prosecution team, and some of its files within the prosecution's control for purposes of *Brady* and Rule 16.  The Government recognizes that "the law enforcement officers working on" this case "includes agents from the FBI's Washington Field Office," but contends that it is in full compliance with its discovery obligations for those agents' files.  Opp'n at 11–12.  However, the Government does not specify whether it has also fulfilled its obligations to search the files of Washington Field Office personnel who worked on this case but are no longer "working on" it, or any other investigative case files maintained by the Field Office that are related to Defendant's charged conduct.  The court will accordingly order the Government to search those files and produce any required materials, to the extent that it has not already done so. [11]

## E.  Department of Homeland Security

Fifth, Defendant argues that "the U.S. Department of Homeland Security ('DHS') is part of the prosecution team, including the United States Secret Service ('USSS') and the Cybersecurity and Infrastructure Security Agency ('CISA')."  Motion on Scope at 15.  The court disagrees.

Defendant categorizes DHS and CISA as part of the prosecution because they "participated in security efforts relating to the 2020 election" and January 6, and issued public

---

[11] The court's order does not require searching the files of FBI Washington Field Office staff members because they worked on any investigation into former Vice President Pence's retention of classified documents.  *See supra* Section II.B.6.  Nor does it include the files of personnel who assisted with classification review.  *See infra* Section III.F.

reports regarding the 2020 election that the original Indictment (as well as the Superseding Indictment) credits.  Motion on Scope at 16–17.  But neither those security efforts nor those public reports were undertaken or prepared on behalf of this investigation or prosecution, and they do not obligate the Special Counsel's Office to search DHS or CISA files.

Defendant's arguments for including the Secret Service present a somewhat closer question, but ultimately fare no better.  He identifies one undisputed connection between that agency and this prosecution: that the Special Counsel's Office "obtained . . . several official phones from USSS employees."  Opp'n at 14.  But the Government reports that "much—if not all—discoverable material" that it obtained from USSS was "through compulsory process."  *Id.*[12]  That fact alone undermines any inference that USSS and the prosecution are "closely aligned," *Brooks*, 966 F.2d at 1503, or that the prosecution had "easy access" to USSS files, *Griffith*, 990 F.2d 1377, at *5.  As another district court explained, "[t]he need for formal process in the acquisition of documents is the antithesis of 'access'" for purposes of determining whether materials are within the prosecution's control.  *United States v. Sayler*, 271 F.R.D. 148, 156 (E.D. Cal. 2010).

USSS's apparently limited and compulsory production of evidence here contrasts with the cases Defendant cites.  In *United States v. Bingert Sturgeon*, the court considered USSS closely aligned with the prosecution because of its "extensive cooperation with the [prosecutors] in gathering evidence for this case."  2023 WL 3203092, at *4.  And in *United States v. Sheppard*, the court reached the same conclusion where USSS had not only given the prosecution a number of documents, but had also "contributed to the investigation in other

---

[12] The Government also notes that the phones in question "did not contain any recoverable information and that, though informed that the Government intended to return the phones to USSS by a certain date, [Defendant] failed to interpose an objection."  Opp'n at 14.

ways"—and even then, the court acknowledged that "in some [other] prosecutions the USSS would be outside the scope" of the prosecution team.  No. 21-cr-203 , 2022 WL 17978837, at *11 (D.D.C. Dec. 28, 2022).

Defendant has not demonstrated a sufficiently cooperative and "close working relationship" between the Secret Service and the Special Counsel's Office in this case to designate the former as part of the prosecution team for discovery purposes.  *Brooks*, 966 F.2d at 1503.  Unlike, for example, the FBI's Washington Field Office, *see supra* Section III.D, the USSS does not appear to have lent its agents or other investigative resources to this case, or to have assisted the prosecution in any way besides producing—involuntarily—some specific evidence to the Special Counsel's Office.  The court therefore cannot conclude that USSS has been meaningfully "acting on the government's behalf in the case."  *Kyles*, 514 U.S. at 437.

## F.  Department of Defense

Sixth, Defendant claims that the prosecution team comprises certain "[c]omponents of the U.S. Department of Defense ('DOD')."  Motion on Scope at 17.  But he never identifies those components, and only proffers two connections between DOD and this case: (1) "DOD's role on January 6," and (2) its provision of "some materials to the Special Counsel's Office," including a classification review of those materials.  *Id.* at 18.  As with DHS and its components, DOD's security efforts related to January 6 were not conducted in connection with the investigation in this case, so do not bring DOD within the ambit of the prosecution team.  *Supra* Section III.E. The Government does not report any further contact with DOD during its investigation other than interviewing "a small number of former DOD officials" who may be fact witnesses.  Opp'n at 15–16.  That does not indicate a close alignment between DOD and the Special Counsel's Office.

The court likewise cannot conclude that DOD's classification review and provision of certain documents to the Special Counsel's Office renders it part of the prosecution team. In analyzing whether an entity is "closely aligned" with the prosecution, there is appreciable distance between an agency that merely complies with a prosecutor's request for a limited, specific set of documents, and an agency that, for instance, substantially deploys its own personnel and resources to conduct a broad or open-ended search for evidence that might be helpful to the prosecution. The latter could readily be said to have "act[ed] on the government's behalf in the case," *Kyles*, 514 U.S. at 437, or "actually contributed to the investigation by locating . . . evidence," *Libby*, 429 F. Supp. 2d at 10 (quoting *United States v. Santiago*, 46 F.3d 885, 893 (9th Cir. 1995)). But it is inapposite to characterize an agency that only provides a particular requested document as displaying a "close working relationship," *Brooks*, 966 F. 2d at 1503, or "extensive cooperation" with the prosecution, *Bingert Sturgeon*, 2023 WL 3203092, at *4.

In *Libby*, for example, the court concluded that the Office of the Vice President ("OVP") and CIA were closely aligned with the prosecution only after finding that they had done more than simply producing requested records. 429 F. Supp. 2d at 10–11. The OVP, on Presidential orders of "full cooperation with [the] investigation," had taken affirmative steps to preserve "all documents which might relate to the Special Counsel's investigation," then searched for and produced a wide variety and "substantial number" of internal documents in response to open-ended requests for any "documents relating to" certain people and events. *Id.* at 10. And the CIA had initiated the investigation by deciding to "refer the alleged unauthorized disclosure of classified information to the Department of Justice for criminal investigation," and then provided the Special Counsel with "the initial documents prepared by the CIA when determining whether"

to make that referral—which presumably reflected the CIA's own investigative efforts into the alleged criminal activity. *Id.* at 10–11. It was not only the "rather free flow of documents" from OVP and CIA, but also the "nature of [their] relationship" with the prosecution, that rendered them closely aligned. *Id.* at 11.

Here, DOD's putative sharing of certain documents is too limited to consider the agency effectively part of the prosecution team. The extent of that sharing appears to be two documents, the larger of which appears to be mostly unclassified. Motion on Scope at 18. Moreover, there is nothing about DOD conducting classification review of those documents—a standard internal process for any agency producing documents—that suggests it had a particularly close working relationship with the prosecutors here, much less that it meaningfully acted on their behalf. Unsurprisingly, Defendant cites no case that has relied on such review to establish an agency's close alignment, and proffers no further evidence that DOD enjoys a "close working relationship" with the prosecution. *Brooks*, 966 F. 2d at 1503. Nor is there any indication that a prosecutor in this case had opportunity to "avoid his discovery obligations by selectively leaving the materials with the agency once he has reviewed them." *Poindexter*, 727 F. Supp. at 1478. Without more, the court cannot deem DOD and the Special Counsel's Office closely aligned.[13]

## G.  Office of the Director of National Intelligence

Seventh, Defendant contends that the "Office of the Director of National Intelligence ("ODNI") is part of the prosecution team because of its assistance to the investigation and direct role in the Special Counsel's allegations." Motion on Scope at 19. Both arguments fail. As already explained, the Indictment's reliance on a public report issued by an agency component does not render that agency part of the prosecution. *Supra* Section III.E. The only other reported

---

[13] The court provides further analysis supporting this conclusion in the Classified Supplement.

connection between the Government and ODNI is that the Special Counsel's Office "interviewed two ODNI witnesses, neither of whom was employed by the agency at the time," "issued compulsory process to both witnesses prior to voluntary interviews," and produced the corresponding materials to Defendant.  Opp'n at 16.  Those interviews do not evidence any cooperation from ODNI, much less extensive coordination or investigative support.  ODNI is not part of the prosecution team.[14]

## H.  Central Intelligence Agency

Eighth, Defendant argues that "the CIA's assistance to the Special Counsel's Office—in this case and in the Florida Case—merits [its] inclusion on the prosecution team."  Motion on Scope at 19.  The court cannot agree.  In the first place, any purported coordination between the CIA and the prosecution against Defendant in the Southern District of Florida would not necessarily mean that agency was closely aligned with the prosecution in this case.  And for the reasons set forth in the Classified Supplement, Defendant has not shown any CIA assistance in this case that renders it closely aligned with the prosecution team.

## I.  January 6 Select Committee

Finally, Defendant claims that the prosecution was "closely aligned with the January 6 Committee," so "[r]ecords maintained by the Committee are within the constructive possession of the prosecution team."  Motion on Scope at 20 (referring to the House Select Committee to Investigate the January 6th Attack on the United States Capitol).  But "it is settled that the government generally need not produce documents that are in the possession, custody, or control of a separate branch of government such as Congress."  *Libby*, 429 F. Supp. 2d at 7; *see also Safavian*, 233 F.R.D. at 14; *United States v. Trie*, 21 F. Supp. 2d 7, 25 n.17 (D.D.C. 1998).  This

---

[14] The court provides further analysis supporting this conclusion in the Classified Supplement.

makes sense; although Congress may undertake some investigative activities, it does so to legislate, not prosecute. *See United States v. Nichols*, No. 21-cr-00117, 2023 WL 6809937, at *12 (D.D.C. Oct. 16, 2023). Accordingly, courts in this district have repeatedly rejected parallel assertions from other defendants that their prosecutors included the January 6 Committee. *See, e.g.*, *id.*; *United States v. Zink*, 2023 WL 5672555, at *2 (D.D.C. 2023); *United States v. Bannon*, No. 21-cr-670, ECF No. 147 at 5 (D.D.C. Sept. 2, 2022); *United States v. Nordean*, 2022 WL 2292062, at *2 n.4 (D.D.C. 2022).

Defendant provides no reason to break with that established precedent. In asserting the prosecution's "coordination" with and "extensive access" to the Committee's files, Defendant cites the conclusion of a single newspaper article and the fact that the Committee produced records to the Special Counsel's Office. Motion on Scope at 20, 28. As Defendant acknowledges, however, that newspaper article was contradicted by other reporting. *Id.* at 20–21. And at any rate, the Government states that it has already produced all the records it received from the Committee. Opp'n at 18.[15] Defendant has therefore not supplied an adequate basis to consider the January 6 Select Committee part of the prosecution team, or to infer that the Special Counsel's Office has "knowledge of and access to" Select Committee records that it has not already produced to Defendant. *Libby*, 429 F. Supp. 2d at 11.

---

[15] Defendant argues that he is entitled to additional, classified records based on a statement General Milley made to the Committee, offering to disclose additional, classified records. Motion on Scope at 28–29. But Defendant proffers no evidence that the Committee ever received those records, much less that the Special Counsel's Office had access to them, or that those records would be material to this case. To the extent that any Committee records support the proposition that "foreign actors . . . attempt[ed] to influence the American political climate during and after the 2020 Presidential election" as Defendant contends, *id.* at 29, the court has already explained that evidence of foreign influence is not material to preparing any defense that Defendant has identified, *see supra* Section II.B.4.

## IV.   FURTHER IMMUNITY DISCOVERY

The court ordered Defendant to identify in his reply brief "any specific evidence related to Presidential immunity that Defendant believes the Government has improperly withheld." Order at 2, ECF No. 233 ("Scheduling Order").  Defendant partially complied with that order, arguing that some of the material he already sought was also material to the immunity issue, *see* Def.'s Reply at 7, 23, 25, 27, and the court has addressed those arguments above.  But he did not transmit any additional immunity-related discovery requests to the Government before filing the reply, much less engage in meaningful conferral about them.  Instead, his reply stated simply that he "reserve[d] the right to seek further relief regarding such requests" in the future—*i.e.*, after the court-ordered deadline.  *Id.* at 6 n.3.  That is not how deadlines work.

Nonetheless, the court will permit Defendant another opportunity to move to compel immunity-related discovery.  It appears that he has now made immunity-related discovery requests to the Government, and that the Government has responded to them.  *See* Government's Sur-Reply to Def.'s Disc. Mots., Attachment A, ECF No. 249-1.  To the extent that Defendant believes the Government has improperly withheld immunity-related discovery, he must request a court order compelling that discovery by October 30, 2024.

## V.   CONCLUSION AND ORDER

For the reasons set forth above and in the Classified Supplement, Defendant's Motion to Compel Discovery, ECF No. 167, and Motion for an Order Regarding the Scope of the Prosecution Team, ECF No. 169, are hereby GRANTED in part and DENIED in part.

It is hereby ORDERED that the Government shall conduct a reasonable search for and, if located, produce:

(1) "materials the DNI reviewed before his interview" with the Government, *supra* Section II.A.5.;

(2) records "concerning information about security measures that was conveyed to Defendant during his meeting with General Milley and Acting Secretary Miller," *supra* Section II.B.2.; and

(3) "evidence relating to unauthorized retention of classified documents by Vice President Mike Pence," *supra* Section II.B.6.

The Government's obligation to search for those materials extends to all relevant personnel and files deemed herein to be within the control of the prosecution team. That includes not only "the Special Counsel's Office and law enforcement officers who are working on this case" right now, Motion on Scope at 7, but also:

(a) Special Counsel's Office personnel that "participated in the investigation of this case but are not 'working on' it now" and their files, *supra* Section III.A.;

(b) "the files of USAO-DC personnel who have worked on investigations and prosecutions regarding January 6 or the 2020 election, but only" where those files include "communications with and information transmitted to the Special Counsel's Office" or "other investigative or case files specifically regarding Defendant's indicted conduct" in this case, *supra* Section III.B.;

(c) "the case files related to this investigation at the [DOJ] Office of the Inspector General, including the files of the personnel who have worked on it previously," *supra* Section III.C.; and

(d) "the files of Washington Field Office personnel who have previously worked on this case but are no longer 'working on' it, or any other investigative case files maintained by the Field Office that are related to Defendant's charged conduct," *supra* Section III.D.

The Government shall produce any responsive materials it finds during this search to Defendant by October 26, 2024, and shall file a notice of compliance with the court upon doing so.

It is further ORDERED, that to the extent that the court has defined the prosecution team to include added entities, personnel, or files beyond the Government's operating definition, the Government shall conduct a reasonable search of those additions for any materials that it is required to disclose to Defendant under *Brady*, *Giglio*, the Jencks Act, or Rule 16.  The Government shall produce any materials it finds during that search to Defendant by October 26, 2024, and shall file a notice of compliance with the court upon doing so.  With respect to any Jencks Acts materials, the Government may alternatively file a motion by that date proposing an alternative date by which it must produce those materials to Defendant.  In addition, if the Government wishes to withhold any additional, classified materials, it may submit a Classified Information Procedures Act Section 4 motion by October 26, 2024.

In all other respects, Defendant's Motion to Compel Discovery, ECF No. 167, and Motion for an Order Regarding the Scope of the Prosecution Team, ECF No. 169, are hereby DENIED.

Finally, it is hereby ORDERED that to the extent Defendant believes the Government has improperly withheld immunity-related discovery, he shall move to compel that discovery by October 30, 2024.

Date: October 16, 2024

*Tanya S. Chutkan*
TANYA S. CHUTKAN
United States District Judge